**2017-2078, -2134**

# United States Court of Appeals for the Federal Circuit

ACORDA THERAPEUTICS, INC.,
*Plaintiff – Appellant,*
ALKERMES PHARMA IRELAND LIMITED,
*Plaintiff – Appellee,*

*v.*

ROXANE LABORATORIES, INC., MYLAN PHARMACEUTICALS INC., TEVA PHARMACEUTICALS USA, INC.,
*Defendants – Cross-Appellants.*

*Appeals from the United States District Court for the District of Delaware in Nos. 1:14-cv-00882-LPS, 1:14-cv-00922-LPS, 1:14-cv-00935-LPS, 1:14-cv-00941-LPS, Chief Judge Leonard P. Stark*

## BRIEF OF APPELLANT ACORDA THERAPEUTICS, INC.

Garrard R. Beeney
Stephen J. Elliott
Wen-Ying Angela Chang
Alexandra H. Moss
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
beeneyg@sullcrom.com
elliotts@sullcrom.com
changw@sullcrom.com
mossa@sullcrom.com

Jane G. Wasman
Anthony Michael
ACORDA THERAPEUTICS, INC.
420 Saw Mill River Road
Ardsley, NY 10502
(914) 347-4300
jwasman@acorda.com
amichael@acorda.com

Bruce M. Wexler
Gerald J. Flattmann, Jr.
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
brucewexler@paulhastings.com
geraldflattmann@paulhastings.com

Stephen B. Kinnaird
Igor V. Timofeyev
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C. 20005
(202) 551-1700
stephenkinnaird@paulhastings.com
igortimofeyev@paulhastings.com

*Counsel for Appellant Acorda Therapeutics, Inc.*

Corrected: August 9, 2017

## REPRESENTATIVE CLAIMS AT ISSUE

## U.S. PATENT No. 8,354,437 (Claim 22)

1. A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

18. The method of claim 1 wherein said sustained release composition is a tablet.

22. The method of claim 18 wherein said tablet exhibits a release profile to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

## U.S. PATENT No. 8,007,826 (Claim 7)

6. A dosing regimen method for providing a 4-aminopyridine at a therapeutically effective concentration in order to improve walking in a human with multiple sclerosis in need thereof, said method comprising: initiating administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a day without a prior period of 4-aminopyridine titration, and then, maintaining administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily; without a subsequent period of 4-aminopyridine titration, whereby an in vivo 4-aminopyridine $C_{maxSS}$:$C_{minSS}$ of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are maintained in the human.

7. The method of claim 6, whereby an increase in walking speed is obtained in said human.

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Plaintiff-Appellant Acorda Therapeutics, Inc. certifies the following:

1. The full name of the party represented by me is:

   Acorda Therapeutics, Inc.

2. The name of the real party in interest represented by me is:

   Acorda Therapeutics, Inc.

3. Parent corporations and publicly held companies that own 10 percent or more of the stock in the party represented by me are:

   BlackRock, Inc.

4. The names of all law firms and the partners or associates that appeared for the party represented by me in the trial court or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

   Arnold & Porter Kaye Scholer LLP:
   Aaron Stiefel, Daniel DiNapoli, Jeffrey Martin,
   Soumitra Deka, and Sylvia Becker

   Morris, Nichols, Arsht & Tunnell LLP:
   Jack B. Blumenfeld, Maryellen Noreika, and
   Jeremy A. Tigan

Dated: August 7, 2017

/s/Bruce M. Wexler
Bruce M. Wexler
*Counsel for Appellant*
*Acorda Therapeutics, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iii

STATEMENT OF RELATED CASES .......... 1

INTRODUCTION .......... 2

STATEMENT OF JURISDICTION .......... 4

STATEMENT OF THE ISSUES .......... 4

STATEMENT OF THE CASE .......... 5

I. Acorda Invented a New Therapy for Treating Multiple Sclerosis Where Others Repeatedly Failed. .......... 5

A. Multiple Sclerosis Has Long Been Recognized as a Complex Disease with Unpredictable Variability in Treatment Effect. .......... 5

B. Early Attempts with 4-AP for the Treatment of MS Used Escalating Doses and Did Not Succeed, Confirming the Complexity and Unpredictability of the Art. .......... 6

C. Elan Developed a 4-AP Sustained-Release Dosage Form for Treating Neurological Conditions, but Then Abandoned Efforts To Use It To Treat MS After Clinical Trials Failed. .......... 9

D. Acorda Itself First Tried but Failed To Find a Safe and Effective MS Treatment Using 4-AP. .......... 12

E. Acorda Persisted and Achieved the Breakthrough Discovery that Led to the Acorda Patents and Ampyra®, the First Drug Approved To Treat Walking Impairment in MS Patients. .......... 18

II. The District Court Found the Acorda Patents Obvious. .......... 23

SUMMARY OF THE ARGUMENT .......... 27

STANDARD OF REVIEW .......... 31

ARGUMENT .......... 31

I. The District Court's Obviousness Ruling Was Fatally Distorted by Its Failure To Analyze the Claimed Invention as a Whole. ....................31

A. The District Court Failed To Find a POSA's Motivation To Combine Prior Art To Arrive at the Entire Claimed Invention. ....................35

1. The District Court Clearly Erred in Combining References That It Deemed To Support a Claim Limitation, but Which Taught Away from the Invention as a Whole. ....................35

2. The District Court Improperly Applied the "Obvious to Try" Standard to the 10 mg BID Dose Limitation, Rather than to Acorda's Claimed Invention as a Whole. ....................38

3. The District Court Clearly Erred in Finding a Motivation to Combine Goodman with Prior Art That Did Not Teach Stable Dosing Without Dose Escalation. ....................44

B. The District Court Failed to Consider Whether a POSA Had a Reasonable Expectation of Success for the Claimed Invention as a Whole. ....................47

II. The District Court's Obviousness Analysis Is Legally Defective Because It Is Based on an Erroneous Inherency Finding. ....................51

III. The District Court Improperly Extended *Merck*'s Blocking-Patent Holding To Negate Its Own Findings of Objective Indicia of Non-Obviousness. ....................55

CONCLUSION ....................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
817 F.3d 755 (Fed. Cir. 2016) ....................1

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000) ....................60

*Alco Std. Corp. v. TVA*,
808 F.2d 1490 (Fed. Cir. 1986) ....................62

*Allergan, Inc. v. Sandoz Inc.*,
726 F.3d 1286 (Fed. Cir. 2013) ....................52

*Application of Shetty*,
566 F.2d 81 (C.C.P.A. 1977) ....................52

*Boehringer Ingelheim Vetmedica, Inc. v. Schering–Plough Corp.*,
320 F.3d 1339 (Fed. Cir. 2003) ....................60

*Boston Sci. Scimed, Inc. v. Cordis Corp.*,
554 F.3d 982 (Fed. Cir. 2009) ....................34

*Cumberland Pharm. Inc. v. Mylan Institutional LLC*,
846 F.3d 1213 (Fed. Cir. 2017) ....................47

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ....................*passim*

*Eisai Co. v. Dr. Reddy's Labs., Ltd.*,
533 F.3d 1353 (Fed. Cir. 2008) ....................49

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
471 F.3d 1369 (Fed. Cir. 2006) ....................61

*In re Enhanced Security Research, LLC*,
739 F.3d 1347 (Fed. Cir. 2014) ....................37

*Ferring B.V. v. Watson Labs., Inc.*,
764 F.3d 1401 (Fed. Cir. 2014) ....................................................................59

*In re Fine*,
837 F.2d 1071 (Fed. Cir. 1988) ....................................................................41

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)..........................................................................................55

*In Touch Techs., Inc. v. VGO Comms., Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ....................................................................56

*Institut Pasteur v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) ....................................................................37

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................................................................47

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) ....................................................................56

*Knoll Pharm. Co. v. Teva Pharm. USA, Inc.*,
367 F.3d 1381 (Fed. Cir. 2004) ....................................................................62

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)...................................................................42, 43, 44, 49

*Leo Pharm. Prod., Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013) ....................................................................55

*Los Angeles Biomedical Research Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly & Co.*,
849 F.3d 1049 (Fed. Cir. 2017) ...............................................................46, 47

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed Cir. 2005) ...............................................................*passim*

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2015) ....................................................................38

*Microsoft Corp. v. i4i Ltd.*,
564 U.S. 91 (2011)........................................................................................63

*Millennium Pharm., Inc. v. Sandoz Inc.*,
--- F.3d ----2017 WL 3013204 (Fed. Cir. 2017)....................................47, 52, 54

*Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) ....................................................................49, 54

*PAR Pharm., Inc. v. TWI Pharm., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ..............................................................31, 50, 52

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009) ..........................................................................51

*Ruiz v. A.B. Chance Co.*,
357 F.3d 1270 (Fed. Cir. 2004) ..............................................................32, 34, 49

*Sanofi-Synthelabo v. Apotex*,
550 F.3d 1075 (Fed. Cir. 2008) .......................................................................32

*Santarus, Inc. v. Par Pharm., Inc.*,
694 F.3d 1344 (Fed. Cir. 2012) .......................................................................53

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
407 F.3d 1371 (Fed. Cir. 2005) .......................................................................57

*In re Young*,
927 F.2d 588 (Fed. Cir. 1991) ...............................................................43, 44, 50

**Statutes**

28 U.S.C.
§ 1295(a)(1) ..........................................................................................4
§ 1338(a) ...............................................................................................4

35 U.S.C.
§ 103.......................................................................................*passim*

## STATEMENT OF RELATED CASES

A prior appeal in this case was before this Court under Docket Nos. 2015-1456 and 2015-1460. This Court's opinion resolving the appeal is available at *Acorda Therapeutics Inc. v. Mylan Pharmaceuticals Inc.*, 817 F.3d 755 (Fed. Cir. 2016). Judge Taranto authored the opinion, joined by Judge Newman. Judge O'Malley authored an opinion concurring in the judgment.

The patents at issue here are also asserted in litigation pending in the United States District Court for the District of New Jersey. *Acorda Therapeutics, Inc. v. Micro Labs. Ltd.*, No. 17-CIV-03724 (filed on May 24, 2017). Counsel is not aware of any other cases pending in this or any other court that will directly affect, or be directly affected by, this Court's decision in this appeal.

## INTRODUCTION

Before Appellant Acorda Therapeutics, Inc.'s ("Acorda's") invention at issue in this appeal, there was no safe and effective treatment to improve walking in patients afflicted by multiple sclerosis ("MS"), long recognized to be one of the disease's most devastating symptoms. Acorda was also the first to achieve a safe and effective therapy using the century-old compound 4-aminopyridine ("4-AP"), a drug known for its high toxicity.

Acorda's invention represented a radical break from the prior art. Because the same mechanism of action of 4-AP was responsible for therapeutic and toxic effects, including seizures, and because achieving meaningful symptomatic treatment for MS was exceedingly difficult, every prior art study involving more than one week of drug administration taught escalating doses over a specified time to reach the highest dose of 4-AP tolerable by the patient (also known as "titration"). Acorda discovered a completely new treatment protocol to improve walking in MS patients, and claimed in its patents that invention with specificity—reciting a single low, fixed dose of sustained-release 4-AP, administered orally twice a day ("10 mg BID"), with no escalation of dosage, and maintaining specific blood level concentrations—that repudiated the consistent teaching of the prior art of escalation to higher doses.

Acorda persevered despite contrary teachings of unpromising prior art and multiple failures of others; took "harrowing financial risks"; sustained a number of near "fatal blows"; and, in a "bet-the-company" strategy, finally achieved the first successful treatment. Appx88. The patented invention, marketed under the brand Ampyra®, has achieved sales since 2010 of $1.7 billion, and helped numerous MS patients to walk better.

The district court nonetheless found the invention was obvious. The court's conclusion of obviousness results from three significant, reversible errors. First, instead of analyzing whether a person of ordinary skill in the art ("POSA") would have been motivated to combine the prior art to achieve Acorda's entire claimed invention, and with a reasonable expectation of success in improving walking in MS patients, the district court parsed the claim limitations and improperly conducted a mini-obviousness analysis on each, which caused findings to be clearly erroneous when considered in the context of the invention as a whole. Second, the district court erroneously found the pharmacokinetic claim limitations, required in the combination as a whole, to be obvious through inherency even though such parameters may vary for different formulations, and there was no evidence that a POSA would be motivated without hindsight to combine the references the court relied on. Third, the district court improperly invoked a

blocking patent rule to negate compelling objective indicia of non-obviousness. For the reasons set forth below, the judgment of obviousness should be reversed.

## STATEMENT OF JURISDICTION

The United States District Court for the District of Delaware entered final judgment on April 24, 2017. The district court had jurisdiction under 28 U.S.C. § 1338(a). Acorda timely appealed on May 23, 2017, and Defendants-Appellees-Cross-Appellants Roxane Laboratories, Inc., Mylan Pharmaceuticals Inc., and Teva Pharmaceuticals USA, Inc. ("Defendants") cross-appealed on June 5, 2017. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court improperly failed to determine the obviousness of the invention "as a whole," as required by 35 U.S.C. § 103, when it only conducted a separate analysis of each common claim limitation.

2. Whether the district court erred in finding obviousness by inherency with respect to the pharmacokinetic limitations of the claimed combination, when those limitations of the claimed combination were not taught in the prior art.

3. Whether the district court erred in expanding the holding of *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed Cir. 2005), to negate findings of the existence of multiple objective indicia of non-obviousness that constituted strong evidence of non-obviousness.

# STATEMENT OF THE CASE

## I. Acorda Invented a New Therapy for Treating Multiple Sclerosis Where Others Repeatedly Failed.

### A. Multiple Sclerosis Has Long Been Recognized as a Complex Disease with Unpredictable Variability in Treatment Effect.

MS is a complex degenerative neurological disease of the central nervous and immune systems. Appx4-5. Individuals with MS experience degradation of the myelin component of their nerve axons that slows or blocks nerve impulses. Appx4. The disease affects their balance and sensory systems, and impedes muscle coordination and motoring functions. Appx5. MS patients suffer a wide variety of debilitating symptoms, including visual impairment, fatigue, bladder dysfunction, tingling or pain, sexual dysfunction, balance problems, cognitive changes, and slowness and difficulty in walking. Appx5. Their MS may progress and relapse without warning, and symptoms may change day-to-day or even hour-to-hour. Appx5; Appx748-750 (433:7-435:17); Appx436 (121:18-25).

Because of the extreme variability of differing symptoms, both among patients and within the same patient, attempting to develop and test treatments for MS is—as the district court found—"particularly unpredictable." Appx42. A perceived improvement could be from a change in disease course, a tested treatment, or merely daily symptom fluctuations. Appx6; Appx751-753 (436:13-438:1). MS studies, therefore, were understood by those in the art commonly to

show exaggerated effects due just to the fact of treatment (*i.e.*, placebo effects) and false positive results. Appx66; Appx716-719 (401:23-404:7); Appx806-807 (491:25-492:9). Consequently, to reach reliable conclusions about the efficacy and safety of potential treatments for MS, the art demanded large, rigorously controlled studies and robust, objective statistical analysis of clinical trial data. Appx66; Appx783 (468:1-24); Appx810-811 (495:20-496:17); Appx803-805 (488:19-490:2); Appx716-717 (401:23-402:10).

### B. Early Attempts with 4-AP for the Treatment of MS Used Escalating Doses and Did Not Succeed, Confirming the Complexity and Unpredictability of the Art.

The contents of the 4-AP prior art were largely undisputed. 4-AP is an old compound discovered in 1902 and used for many years as a bird toxin. Appx11; Appx676 (361:23-24). It was known to be highly toxic, causing seizures and other serious adverse effects—a risk that is substantially more dangerous for MS patients because of brain scarring. Appx5; Appx7; Appx11; Appx14. Because 4-AP's toxicity was believed to relate to its mechanism of action (potassium channel blocking), if any therapeutic effect were possible, it would only be within a narrow therapeutic window "perilously close" to the toxicity threshold. Appx773-774 (458:23-459:8). Given these challenges, 4-AP had never been approved for use in any drug product since its discovery over a century ago. Appx7.

Neurological impairments (like the inability to walk) exist on a continuum, and researchers thus sought to maximize efficacy for a successful treatment. Appx835 (520:13-18); Appx609-610 (294:17-295:6). Before Acorda's invention, researchers investigating potential therapeutic use of 4-AP uniformly sought to achieve efficacy while avoiding prohibitive adverse effects by administering to the patient escalating doses of 4-AP over a specified time period. This escalating dose process, known also as titration, starts with a low dosage that avoids effect (adverse or otherwise), and then escalates in regular increments for as long as the patient tolerates the drug without a seizure or other debilitating effects. Appx600 (285:4-14); Appx610 (295:15-18).

Research examining whether 4-AP could be used to treat MS began in the late 1980s, with small studies (fewer than 20 patients each) by Stefoski and Davis. Appx11-12. Although they observed that 4-AP could affect certain functions, such as eye movement, these studies were not designed to determine clinical efficacy and suffered from known methodological deficiencies (such as lack of prospectively defined endpoints, small sample size, and absence of randomization or being double-blinded) that made interpretation difficult and uncertain. Appx12-13; Appx6180; Appx758-762 (443:4-447:19); Appx763-766 (448:14-451:23).

In the early 1990s, Van Diemen and Polman published additional small studies in Europe testing different symptoms and producing varying results,

similarly indicating that 4-AP's potential was, at best, unclear. Appx26-27. Both articles taught escalation of dosing (titration) to a maximum tolerated dose (up to 0.5 mg/kg body weight), which ranged as high as 50 mg/day and 40 mg/day in the respective studies. Appx7037-7042; Appx6655.

The Van Diemen and Polman studies, however, as well as others by Bever and Murray, also reported that patients administered 4-AP experienced adverse effects such as seizures, even at low doses. Appx27; Appx7040-7041; Appx6656-6657; Appx771-772 (456:21-457:8). Murray specifically concluded that toxicity limited 4-AP's use. Appx14; Appx6647, Appx6651; Appx756 (441:18-22).

These early studies also taught that higher dosages of 4-AP increased the likelihood of achieving a therapeutic effect: "'higher dosages and serum levels are likely to produce greater improvement.'" Appx27 (quoting Appx7045). Each study thus emphasized the need to give MS patients an escalating dose of 4-AP toward the highest tolerable dose in order to obtain meaningful therapeutic effect (*i.e.*, upward titration). Appx7038-7039; Appx767-770 (452:22-455:3); Appx6655; Appx777-778 (462:13-463:3). Because of 4-AP's serious side effects and the belief that low dosages lacked therapeutic effect, before Acorda's claimed invention, ***every*** clinical study examining the administration of 4-AP for more than one week consistently taught titration to significantly higher doses than in the Acorda invention.

The prior art studies also demonstrated how MS studies were known to be fraught with limitations in methodology that required caution in reviewing the results (*e.g.,* small size, no placebo control, not statistically-adjusted to account for the range of measurements used). *See, e.g.*, Appx13; Appx6172; Appx758-762 (443:4-447:19); Appx763-766 (448:14-451:23).

### C. Elan Developed a 4-AP Sustained-Release Dosage Form for Treating Neurological Conditions, but Then Abandoned Efforts To Use It To Treat MS After Clinical Trials Failed.

In the early 1990s, Elan Corporation PLC ("Elan") developed a sustained-release drug formulation for 4-AP that delivered the drug continuously for an extended time period. This maintained elevated blood levels of 4-AP for longer than had been possible with immediate-release formulations used in prior studies. Appx9.

In 1991, Elan filed a patent application, issuing after divisional filings as U.S. Patent No. 5,540,938 ("the '938 Patent"), directed to sustained-release compositions of a family of compounds, including 4-AP, and claiming methods of administering these compositions to treat neurological diseases, including MS. Appx9-10 (quoting Appx164 (claims 1, 2, 3, 8)). The '938 Patent did not: (i) specify a particular dosage; (ii) describe 4-AP's use to improve walking or walking speed; or (iii) describe effective and safe blood concentrations. Appx777-778 (462:1-463:10). The '938 Patent also taught the POSA to titrate upwards to

the maximum tolerated dose. Appx777-778 (462:19-463:7). These and other factors distinguish Elan's early work from Acorda's later innovation.

Elan subsequently engaged in significant efforts to develop a treatment protocol to address specific MS symptoms, but did not succeed. In 1997, Schwid reported on Elan's failed clinical trial, a six-week, 161-patient randomized, placebo-controlled study of the administration of sustained-release 4-AP to MS patients—the largest clinical trial of 4-AP in the prior art. Appx18; Appx27-28; Appx6681; Appx782 (467:14-17). The effects of 4-AP were measured using the Expanded Disability Status Scale ("EDSS"), "a composite measure of function in MS patients" widely used by MS specialists, the largest component of which is walking. Appx18; Appx771 (456:6-20).

The trial—designed to demonstrate any statistically significant difference between those treated with 4-AP and those given a placebo, Appx782-783 (467:14-468:24)—failed to show that 4-AP had any therapeutic effect whatsoever: "Twenty-two percent of patients in the 4-AP SR group improved on the EDSS, but ***the same percentage improved in the placebo group***." Appx6681 (emphasis added); Appx28; Appx784 (469:2-4). Acorda's expert, Dr. Andrew Goodman (who was active in 4-AP/MS research at the time and a co-author) testified that the failure of this large-scale study created "a huge amount of skepticism and doubt"

about both 4-AP's efficacy to treat MS and the reliability of inferences from the prior, small, less controlled studies. Appx829 (514:1-124); Appx784 (469:5-17).

The same Schwid article also reported on a second Elan study of 4-AP designed to test the use of different outcome measures. Appx28; Appx784-785 (469:24-470:3). This follow-on study was extremely small in size and duration, involving only ten patients and lasting only seven days. Schwid reported that nine of the ten patients in this "test of tests" study (Appx788 (473:3-9)) showed some improvement in timed gait (the time required to walk a measured distance). Because the study failed to correct for the multiple endpoints tested, however, that result was not a statistically significant improvement over the administered placebo. Appx29; Appx6684; Appx787-788 (472:15-473:2); *see also* Appx34 (the art recognized that the use of multiple outcome measures raised "the 'distinct possibility of false positive findings'") (quoting Appx7208).

Schwid reported that, in the ten-patient Elan study, "[t]reatment appeared particularly efficacious in subjects who achieved serum 4-AP levels above 60 ng/ml," and "[*n*]*one* of the patients with a serum level less than 60 ng/ml felt better (according to their global impressions) on 4-AP SR than placebo." Appx29 (quoting Appx6683-6684) (emphasis added). To obtain the reported 60 ng/ml blood serum levels, a POSA at the time would have understood that a patient

would need to receive at least 25 mg BID of 4-AP, as the district court found. Appx70; Appx445-448 (130:21-133:9); Appx789 (474:1-7); Appx823 (508:10-16).

Following these failures, Elan abandoned independent clinical development of sustained-release 4-AP for MS. Appx596 (281:11-24).

In 2003, an independent review article by Solari confirmed the art's consistent failures to show that 4-P could successfully treat MS. Appx33-34, Appx66. Solari summarized the published art as of that date—approximately a year before the filing date of the Acorda Patents—and concluded that (i) the "available information allows no unbiased statement about safety or efficacy of aminopyridines for treating MS symptoms"; (ii) "no confident estimate of effectiveness of aminopyridines in the management of MS symptoms is possible"; and (iii) there is "not enough evidence about the safety of these drugs or whether [symptomatic] benefits are certain." Appx34; Appx7204; Appx7218; Appx803-804 (488:16-489:3).

### D. Acorda Itself First Tried but Failed To Find a Safe and Effective MS Treatment Using 4-AP.

Dr. Ron Cohen (one of two inventors of the Acorda Patents) founded Acorda in 1993 to develop therapies for chronic spinal cord injury ("SCI") and neurological disease. Appx587-588 (272:1-273:3). Dr. Andrew Blight, the other inventor and Acorda's head of R&D, had previously worked with 4-AP as a potential treatment for SCI. Appx593-594 (278:4-279:9).

Acorda's initial work started with SCI, as described in a 2003 article by Hayes, and examined the pharmacokinetics—or blood levels—of a sustained-release formulation of 4-AP administered to SCI patients. Appx33; Appx6434; Appx778 (463:11-23). Acorda went on to conduct three phases of clinical SCI trials (including two large phase-3 trials). Each trial used dosages substantially higher than 10 mg BID. The larger, more robust phase-3 studies failed, notwithstanding the preliminary results of the earlier studies. In 2004, Acorda discontinued its efforts to develop 4-AP as a treatment for SCI. Appx596 (281:4-10).

In 1998, Acorda began to explore 4-AP's potential to treat MS. Appx596 (281:4-12). Having learned that Elan no longer intended to pursue a possible MS treatment and was seeking to out-license the use of 4-AP sustained-release compositions, Acorda approached Elan and obtained an exclusive license to the '938 Patent. Appx596 (281:11-19).

As a small start-up seeking to attract investment, Acorda felt it "had to take much bigger risks than other companies," and therefore accepted the "daunting challenges" of developing sustained-release 4-AP to treat MS notwithstanding Elan's failure and the prior art's lack of promise. Appx596-597 (281:25-282:9). Acorda's first 4-AP MS trial, testing whether sustained-release 4-AP could improve eye muscle movement in MS patients, failed in 1999; the placebo group

showed better improvement than the treated group. Appx7171-7173; Appx601-602 (286:1-287:12).

After this setback, Acorda explored alternatives, and in 2000 began a second small, "hypothesis generating," clinical study, designated "MS-F201." Appx623-624 (308:21-309:6). The study, primarily directed to evaluating the safety and tolerability of a range of doses, also investigated a "number of outcome measures," hoping for "a hint of where [Acorda] might go next." Appx813-814 (498:21-499:1); Appx602 (287:17-21). The MS-F201 study involved only 25 patients receiving 4-AP and 11 receiving placebo. Appx18; Appx603 (288:7-14).

Just as the prior art studies had done (*see* Appx75; *supra* at 6-11), the Acorda MS-F201 study administered to each patient in the 4-AP group "escalating doses" of sustained-release 4-AP after an initial placebo run-in. Appx6371; Appx790 (475:6-11). In particular, the 4-AP subjects received a placebo for one week, then a starting dose of 10 mg twice daily in the second week (for acclimation and not therapeutic effect, Appx830 (515:8-25); Appx873-874 (558:23-559:4)), and then, for each subsequent week, the same subjects received a dose increased by 10 mg/day, until the final dose of 80 mg/day was received in week 8. Appx18; Appx791 (476:10-19). Eleven patients received only placebo during the entire eight-week period. Appx603 (288:9-21). The MS-F201 study

failed as to all but one of its multiple secondary endpoints of outcome measures. Appx604-605 (289:23-290:2).

Data from Acorda's MS-F201 study were discussed in two abstracts and a "poster" presentation in 2002 and 2003 by Goodman, the lead clinical investigator. Appx6371-6372 ("Goodman I"); Appx6370 ("Goodman II"); Appx6501-6504 ("Goodman Poster") (collectively, "Goodman").

In evaluating the 4-AP escalating dosing regimen, Goodman provided an aggregate assessment that pooled the data from the entire 4-AP dosing range and compared all subjects who received any amount of 4-AP with those just receiving the placebo. Goodman reported that the pooled population receiving the escalating dosages of 20 mg/day to 80 mg/day (no patient received *only* 10 mg BID) showed some improvement over the patient group receiving placebo in 25-foot walking speed and lower extremity muscle strength. Appx791-794 (476:20-479:4). The study acknowledged that "[n]o other measures showed significant treatment effects." Appx6502.

Importantly, Goodman did not show that any individual dosage had a statistically significant effect versus placebo. Appx31; Appx6502. Nor would Goodman suggest to a POSA that a single starting dose, continued over an extended period of time without escalation, would have any therapeutic effect compared to placebo. Appx797-798 (482:17-483:22); Appx6502, Appx6504;

Appx30. As with other prior art studies showing the necessity of an escalating dosing regimen for 4-AP, Goodman indicated to a POSA, within the limits of that study, that the escalating dosing regimen as a whole potentially allowed for some improvement. Appx799-800 (484:19-485:11); *see also* Appx811 (496:15-16) ("much of the prior art suggested targeting higher doses, higher dose levels or titrating to higher dose level").

The Goodman Poster included a "Dose Response" curve, cited by the district court, that showed the escalating dosing regimen for the patients who received 4-AP from week to week plotted against the average walking time. This curve did not report the average walking times for the placebo group, and the poster did not draw comparisons between different dosages. Appx799 (484:11-18); Appx451 (136:1-23). A POSA, aware of significant placebo effects in the field of MS treatments, would have understood that this curve of the Goodman Poster, lacking placebo group data for comparison, was not providing for "meaningful inferences about efficacy or safety" of the individual data points. Appx804-805 (489:18-490:2).

Because the fastest walking times on the curve occurred after patients received the 20 mg BID dosage, Goodman reported an "increasing benefit" to patients at higher doses, suggesting (consistent with the earlier art) the importance of escalating the patient's dose over time to obtain a potential therapeutic effect,

using such titration to address the concomitant risk of adverse side effects. Appx6501-6504; Appx792-793 (477:16-478:22); Appx799-800 (484:8-485:2); Appx451-452 (136:24-137:7).

Overall, the small MS-F201 study was not adequate to demonstrate efficacy. Its initial secondary endpoint of walking time even failed to reproduce the weak connection between 4-AP and symptom improvement reported by Schwid from the smaller of the two Elan studies, Appx604-605 (289:23-290:17), and, in three of the MS-F201 study's seven weeks, the placebo group demonstrated similar or better improvement than the 4-AP group. Appx19; Appx7281. Safety concerns remained; five of the 36 subjects withdrew due to adverse side effects, including two who experienced seizures. Appx7281.

* * *

At this juncture, a POSA's assumed knowledge from the art as a whole would have included the following: (i) MS was a complex and challenging condition to treat requiring robust data to make reliable conclusions of efficacy and to overcome the strong placebo effect (*supra* at 5-6); (ii) 4-AP studies showed inconsistent clinical trial results (*supra* at 7-9); (iii) the largest, most rigorously controlled, and most conclusive trial on the subject, conducted by Elan, had failed (*supra* at 10-11); (iv) even if 4-AP could potentially provide some therapeutic benefit, escalating dosages titrated toward higher, riskier levels was needed (*supra*

at 7-11); and (v) per Schwid, a minimum of 60 ng/mL blood levels, requiring at least a 25 mg BID dosage, would be particularly efficacious (*supra* at 11-12).

### E. Acorda Persisted and Achieved the Breakthrough Discovery that Led to the Acorda Patents and Ampyra®, the First Drug Approved To Treat Walking Impairment in MS Patients.

Dr. Cohen did not give up. After Acorda's disappointing MS-F201 study, he resolved to try again to discover if there could be a safe therapeutic use of 4-AP, to "see if we could get that to work prospectively." Appx607-608 (292:23-293:8).

In 2003, Acorda designed, funded, and carried out a large 206-patient clinical study, designated MS-F202. The MS-F202 study, and Dr. Cohen's discovery from that study discussed below, is not prior art to the Acorda patents. Acorda examined the effects of 10, 15, and 20 mg BID doses of sustained-release 4-AP on walking speed. Appx19; Appx607-609 (292:11-294:16). The study used a two-week up-titration period to the dose, which was then continued for 12 weeks. Appx19; Appx610 (295:7-18).

The MS-F202 study, as designed, initially failed to show improved walking speed. No 4-AP treatment group demonstrated a statistically significant difference compared to placebo over the 12-week testing period. Appx19; Appx610-611 (295:25-296:8); Appx235 (24:21-25).

But Dr. Cohen, whom the district court found to be "credible" (Appx88), persevered with insight from his "clinical acumen" and knowledge of MS.

Appx612 (297:2-15). Thinking of the complexity and uncertain manifestations of MS, Dr. Cohen hypothesized that the disease itself might be masking positive effects of 4-AP. Appx612-613 (297:16-298:7). Together with Dr. Blight, Dr. Cohen created criteria to go back into the MS-F202 data and identify and analyze those patients in the study who, after treatment, showed a "meaningful difference" from their before-treatment baseline—*i.e.*, the "responders." *See, e.g.*, Appx275-276 (20:62-21:19); Appx611-613 (296:9-298:20). As part of this novel approach, Acorda analyzed the consistency of patients' improvement over the treatment period compared to baseline and post-treatment follow-up visits, rather than the magnitude of improvement, to try to exclude false positives. Appx831 (516:7-24).

Looking at their MS-F202 data in this new way, the Acorda inventors found startling results: The "responders" came overwhelmingly from the group of patients who received 4-AP; and, by examining these "responders" in the MS-F202 study, the Acorda inventors detected for the first time in any study a meaningful, statistically significant improvement in walking speed for 4-AP treatment compared with placebo. Appx19; Appx613 (298:8-20). Even more startlingly, given the prior art, the new responder analysis revealed that the therapeutic effect of 4-AP did not increase with the increase in tested doses. Contrary to prior teaching, those "responders" in the MS-F202 study who received 10 mg BID

experienced as much improvement as those who received 15 mg BID or 20 mg BID. Appx19; Appx835-836 (520:18-521:3); Appx613-614 (298:21-299:9).

Drs. Cohen and Blight, analyzing their new responder data-set from their MS-F202 study, and interpreting it with the benefit of their experience with MS and 4-AP, discovered for the first time that the walking speed of MS patients could be improved safely (with a minimum risk of adverse effects) using a 10 mg BID dose of a sustained-release formulation of 4-AP for an extended period and without dose escalation. As Dr. Goodman explained at trial, "what was surprising is that [therapeutic benefit] could be done with a single dose without having to do what was described in … the prior art of titrating or individualizing or maximizing doses in order to gain efficacy with the peril of coming close to the toxic range. Here we have a sweet spot at 10 milligrams with no or minimal … serious adverse events but still having equivalent efficacy compared to these other doses." Appx835-836 (520:18-521:3); Appx830 (515:8-11).

Dr. Cohen similarly testified that the inventors "were extremely surprised" because "[e]verything that we had come to expect throughout the program told us that we should be seeing more and more efficacy the higher the dose went as long as the patients were tolerating it and that turned out not to be the case." Appx614 (299:5-9). Nothing before had suggested the efficacy of such a treatment regimen.

Acorda subsequently conducted two further large clinical studies of sustained-release 4-AP. For the first time, these studies, which did not include any titration, used only the 10 mg BID dose (versus placebo) and both were successful. Appx19-20; Appx614-615 (299:18-300:5).

Acorda filed a provisional application on April 19, 2004, which defines priority for the four Acorda Patents at issue in this appeal. Appx20 n.8. In the district court, Acorda asserted sixteen claims of the Acorda Patents. Two of those claims are representative for purposes of this appeal.

Claim 22 of the ’437 Patent (which depends from claims 1 and 18) is directed to a specific method of increasing walking speed in a human MS patient by administering a 10 mg BID dosage of sustained-release 4-AP for at least two weeks, with no escalating dosing regimen, and achieving certain blood-serum concentrations:

> 1. A ***method of increasing walking speed in a human multiple sclerosis patient in need thereof*** comprising orally administering to said patient a sustained release composition of ***10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period***.
>
> 18. The method of claim 1 wherein said sustained release composition is a tablet.

> 22. The method of claim 18 wherein said tablet exhibits a release profile ***to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml***.

Appx237 (emphasis added).

Claim 7 of the '826 patent (which depends from claim 6), similarly claims improved walking in a human MS patient while expressly requiring that there be no prior or subsequent period of titration:

> 6. A dosing regimen method for providing a ***4-aminopyridine at a therapeutically effective concentration in order to improve walking in a human with multiple sclerosis in need thereof***, said method comprising: initiating administration of 4-aminopyridine by orally administering to said human a sustained release composition of ***10 milligrams of 4-aminopyridine twice daily for a day without a prior period of 4-aminopyridine titration, and then, maintaining administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily; without a subsequent period of 4-aminopyridine titration***, whereby an in vivo 4-aminopyridine $C_{maxSS}$:$C_{minSS}$ of 1.0 to 3.5 and a ***$C_{avSS}$ of 15 ng/ml to 35 ng/ml*** are maintained in the human.
>
> 7. The method of claim 6, ***whereby an increase in walking speed is obtained in said human***.

Appx195 (emphasis added).

Thus, the representative claims of the Acorda Patents recite an improvement in walking in a human MS patient resulting from the following limitations in combination: oral administration to that patient of 10 mg sustained-release tablets of 4-AP twice daily (10 mg BID) as the only dose, without any escalation over the treatment period, and achieving specific 4-AP blood concentration levels (15 ng/ml

to 35 ng/ml). No prior art, in combination or alone, had previously achieved that therapeutic outcome. Appx34-35; Appx82.

Having discovered a safe and effective use of 4-AP to treat walking impairment in MS patients, Acorda submitted a New Drug Application to the FDA. The FDA granted Acorda priority review, and in 2010, approved Ampyra®, Acorda's sustained-released 4-AP formulation for 10 mg BID administration without titration—the first and only FDA-approved drug to treat walking in MS patients and the first approved drug using 4-AP as the active ingredient. Appx7-8; Appx36. Ampyra® has succeeded commercially, with sales of $1.7 billion through 2015 and high rates of patient satisfaction. Appx34-35; Appx82.

## II. The District Court Found the Acorda Patents Obvious.

Defendants filed Abbreviated New Drug Applications for FDA approval for generic versions of Ampyra® that included "Paragraph IV" certifications challenging the '938 Elan Patent and the Acorda Patents. Appx37. Acorda and Alkermes Pharma Ireland Limited (the'938 Patent owner) subsequently filed suit.

Defendants stipulated to infringement of their generic alternatives. Appx37-38. After a short trial of ten hours per side, and after finding all fact and expert witnesses credible, the district court ruled that the '938 Patent was not obvious, but the Acorda Patents were. Appx38-41. The obviousness finding was based entirely

on references that were of record in the U.S. Patent and Trademark Office during prosecution of the Acorda Patents. Appx43.[1]

In finding obviousness, the district court broke the Acorda claims down into "four disputed limitations: the use of 4-AP to improve walking; the use of a 10 mg BID dosage; the use of stable dosing; and the inherent pharmacokinetic limitations." Appx63. As the district court proceeded sequentially through them, it asked whether each limitation was obvious or obvious to try, and whether a POSA would have a reasonable expectation of success for each of them (*i.e.*, using 4-AP for walking; using 10 mg BID; stable dosing; achieving pharmacokinetic limitations). Having answered each in the affirmative, the court did not analyze the claimed invention as an integrated whole, nor whether there was a reasonable expectation in the art that the limitations of the Acorda invention as combined would have resulted in an efficacious treatment to improve walking in MS patients.

The court made several findings regarding the prior art:

First, despite expressly acknowledging "the complexity and uncertainty of the prior art," and the unpredictability of 4-AP clinical studies in particular, Appx65, the court concluded that a POSA "would have formed a reasonable

[1] The Goodman Poster was of record for three of the Acorda patents-in-suit, but not the '826 Patent. Appx6501; Appx211; Appx253.

expectation of success based on Schwid and Goodman" in "using 4-AP to improve walking speed," Appx67.

Next, the court turned to the limitation of a 10 mg BID dose of sustained-release 4-AP. The court acknowledged that the prior art "may have generally suggested that 4-AP would be more effective in higher doses" but that "higher doses of 4-AP were more likely to cause adverse events." Appx71. Nevertheless, the court, premised on hindsight, held that the limitation of 10 mg, twice-daily dosing was obvious to try. Appx73.

The court then moved to a limitation referred to as "stable dosing/no titration." The court found that 4-AP safety concerns had in fact taught "consistent use of titration" in the prior art, and that the prior art "did not specifically support stable dosing [*i.e.*, a long-term dosing regimen without titration]." Appx75. But the court nevertheless ruled, with the benefit of hindsight, that regardless of serious safety concerns, and the consistent use of titration in the prior art due to those concerns, a POSA "would have been motivated to pursue stable dosing and would have had a reasonable expectation of success in doing so." Appx76. The court then summarily connected its finding that stable dosing was obvious to the claimed dose of 10 mg BID. Appx76.

Finally, the district court looked at the "pharmacokinetic limitations," *i.e.*, the 15 ng/ml to 35 ng/ml blood levels that must be maintained in the MS patient

during the claimed period. The court adopted the Defendants' argument that these pharmacokinetic parameters were "inherent" in the claimed dosing regimen and obvious because of the obviousness of the other claim limitations, even while acknowledging that the record was "not as clear as the Court would have hoped." Appx77-78.

After finding the individual limitations of Acorda's claims obvious—and without considering Acorda's entire combined invention, as required by the applicable statute and this Court's precedent—the district court turned to the objective indicia of non-obviousness. The court expressly found that "Ampyra® is a commercial success, and that there is a nexus between that success and the features claimed in the Acorda Patents." Appx79. The court found that walking impairments were "long recognized as a devastating symptom of MS" and that Ampyra® for the first time satisfied this "long-felt, unmet need for a method of treating walking in MS patients." Appx87. And the court observed that Elan and Sanofi had tried and failed to develop a therapy to improve walking. Appx86.

But the court discounted this evidence, which objectively confirmed the complexity and unpredictability of the art, as well as the non-obviousness of Acorda's invention, after concluding that the '938 Patent "blocked" the field. Appx79-87. The court thus negated what it found to be "convincing evidence" of a

long-felt, unmet need for Acorda's invention, significant commercial success, and evidence of failures of others. Appx86-87.

## SUMMARY OF THE ARGUMENT

The Patent Act states that a patent is invalid if, from the perspective of a POSA at the time of the invention, "the claimed invention as a whole would have been obvious" over prior art. 35 U.S.C. § 103. The district court thus was required to find, by clear and convincing evidence, that before the invention of the Acorda Patents a POSA would have been motivated to combine the prior art references into the entirety of Acorda's invention—oral administration of a 10 mg BID dose of sustained-release 4-AP for at least two weeks with no dose escalation, and achieving certain blood serum levels—with a reasonable expectation that the combination would succeed in improving walking speed in MS patients.

The district court did not correctly apply the required legal test. And, in view of the teachings of the prior art as found by the court, it would not and could not have reached a conclusion of obviousness had it correctly done so. The district court erred when it conducted a separate obviousness inquiry for each claim limitation, determining whether the prior art would have motivated a POSA to use that individual limitation to treat walking in MS patients, but never independently determining whether a POSA would been motivated to combine and modify the prior art references so as to achieve the Acorda invention as a whole. That

methodological error in turn led the court to reversible error in finding obviousness.

*First*, analyzing different combinations of prior art references for each different limitation, the district court committed clear error in finding a motivation to combine references even though the references taught away from Acorda's invention as a whole.

*Second*, applying hindsight, the district court clearly erred in holding that a 10 mg BID dose *identified in Goodman as a starting dose in an escalating, higher dose study* was itself obvious to try as the singular dose in an MS treatment regimen. Goodman teaches a statistically significant dose response across the entire escalating-dose regimen; it did not and could not motivate a POSA to achieve an invention that abandons upward titration for treating MS with 4-AP. Moreover, the obvious-to-try standard is not applied at the limitation level (*e.g.*, 10 mg BID dose); the district court never made the required finding that Acorda's entire invention would be obvious to try.

*Third*, the district court committed clear error when it found that a POSA would be motivated to combine and modify references so as to practice stable dosing, when that limitation is considered in the context required by the Acorda patent claims. All three references (Goodman, Van Diemen, and Polman) on which the court relied teach titration by *increasing* the dose during therapy, as the

court acknowledged elsewhere in its opinion. By analyzing obviousness in piecemeal fashion, the court ignored Acorda's break from the consistent teachings of the art that dosages far above 10 mg BID were necessary for efficacy and that titration to the maximum tolerable dose was critical because of 4-AP's narrow therapeutic window. The court thus also discounted the unpredictability of the art, including the failure of the only large-scale trial of sustained-release 4-AP. This is an independent ground to reverse the judgment below.

As it did with motivation to combine, the district court erred in determining only whether a POSA would have reasonably expected success in using each claim limitation to treat walking problems of MS patients; the court should have applied that standard to Acorda's claimed invention as a whole. The court also erred in discounting the unpredictability and scientific limitations of the art and the failure of the only robust, large-scale trial of 4-AP. On the facts found by the district court, no POSA would regard Acorda's claimed invention as a "predictable solution" to walking impairment in MS patients.

The district court also clearly erred in finding that a POSA would know that the pharmacokinetic limitations, appearing in the claimed combination, are simply inherent in a dose taught by the prior art. Obviousness by inherency is a demanding standard, and is only found when the invention is the inevitable result of the combination of prior art elements. Blood-serum concentrations, however,

are formulation-dependent, and the prior art cited by the district court did not teach that the same formulations were being used. And even if they had, as assumed by the district court, a POSA would not be motivated to combine the pharmacokinetic teachings of the prior art to result in the claimed combination. The pharmacokinetic teachings relied on by the district court were from a study of spinal-cord injury patients (Hayes), not MS patients; a POSA had no basis of knowing if the same formulation was used in the MS reference on which the court relied (Goodman); and the other main MS reference relied upon by the court (Schwid) taught that much higher blood-serum concentrations than those specified in Acorda's claims should be used in order to improve walking in MS patients.

The district court also committed legal error in analyzing the objective indicia of non-obviousness. The court found as a factual matter that Ampyra® enjoyed commercial success with a nexus to the features of the patented invention, that a long-felt but unmet need existed for the invention, and that others tried but failed to meet it. But the court then negated evidence of non-obviousness because it believed that the '938 Patent *per se* blocked all efforts to develop a method of improving walking in MS patients using 4-AP. The '938 Patent, however, did not block all uses of 4-AP to achieve the effect of the Acorda invention, and there was no finding that any such blocking in fact occurred. No one other than Acorda successfully persevered, and indeed Acorda was able to obtain a license under that

patent. The district court's expanded application of a blocking patent argument to discount every powerful objective indicium of non-obviousness was erroneous and has not been (and should not be) approved by this Court. As a matter of law, this Court should reverse the district court and hold that Defendants failed to prove by clear and convincing evidence that the invention as claimed in the Acorda patents would have been obvious.

## STANDARD OF REVIEW

"Obviousness is a question of law based on underlying factual determinations, including: (1) the scope and content of prior art; (2) differences between prior art and claims; (3) the level of ordinary skill in the art; and (4) objective indicia of non-obviousness." *Par Pharm., Inc. v. TWi Pharm., Inc.*, 773 F.3d 1186, 1193 (Fed. Cir. 2014) (citation omitted). This Court reviews the district court's determination of obviousness *de novo* and the underlying factual findings for clear error. *Id*. at 1194.

## ARGUMENT

### I. The District Court's Obviousness Ruling Was Fatally Distorted by Its Failure To Analyze the Claimed Invention as a Whole.

A patent is obvious only "if the differences between the claimed invention and the prior art are such that the claimed invention *as a whole* would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103

(emphasis added). "[A] party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012) (internal quotation marks and citations omitted).

In keeping with the plain language of Section 103, this Court has instructed that the "[t]he determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1086 (Fed. Cir. 2008).

> The "as a whole" instruction in title 35 prevents evaluation of the invention part by part. Without this important requirement, an obviousness assessment might break an invention into its component parts (A + B + C), then find a prior art reference containing A, another containing B, and another containing C, and on that basis alone declare the invention obvious. This form of hindsight reasoning, using the invention as a roadmap to find its prior art components, would discount the value of combining various existing features or principles in a new way to achieve a new result—often the very definition of invention.

*Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1275 (Fed. Cir. 2004).

The district court was led to just this fundamental methodological error. Acorda's claimed invention included a specific and precise combination of limitations: achieving the therapeutic effect of improving walking speed in an MS

patient by administering 10 mg BID of 4-AP consistently with no dose escalation, and achieving specific blood serum levels of about 15-35 ng/ml. The district court never analyzed this entire claimed invention in light of the prior art to determine whether a POSA would be motivated to combine the claimed limitations with a reasonable expectation of achieving the invention.

Instead, the court parsed Acorda's invention into four separate limitations, each with a separate section heading, and conducted a mini-obviousness analysis on each. Appx63; Appx69; Appx73; Appx76. It then reviewed the prior art cited by Defendants but as support for each limitation individually, ignoring whether a POSA would have a motivation to combine the art into the invention as a whole. It determined whether a POSA would have had a reasonable expectation of success in using *each limitation* in some manner to improve walking in MS. Specifically, the court found that (1) "a POSA would reasonably expect that 4-AP could be used to improve walking in at least some MS patients," and therefore "the use of 4-AP to treat walking in MS patients would have been obvious to a POSA," Appx69; (2) "a POSA would consider 10 mg/twice daily to be among the finite group of doses of sustained-release 4-AP that could reasonably be expected to improve walking in MS patients," Appx73; (3) "a POSA would have been motivated to pursue stable dosing and would have had a reasonable expectation of success in doing so," Appx76; and (4) "Defendants have met their burden of proof" with

respect to the blood-serum limitations because the claimed parameters are "inherent in the claimed doses," Appx77-78. Having checked off those individualized findings that a POSA would have reasonably expected to use each *claim limitation* to treat walking in MS patients, the district court concluded that "a POSA at the priority date would have been motivated and would have had a reasonable expectation of success to practice and combine each of the limitations of the asserted claims of the Acorda Patents." Appx88.

The district court's conclusion—that if there is a reasonable likelihood that each individual limitation A, B, C, and D could be used in some way to seek to improve walking speed in MS patients, then Acorda's invention A+B+C+D is obvious—is the logical hindsight error this Court condemned in *Ruiz*. Acorda invented an unprecedented dosing regimen for a 102-year-old compound that would become the basis for the first and only FDA-approved treatment for the debilitating effects of MS on walking, and the first ever FDA-approved use of that compound. Appx827-828 (512:20-513:1); *supra* at 18-23. The district court improperly "discounted the value" of that invention. *Ruiz*, 357 F.3d at 1275. The district court's methodological legal error, which this Court reviews *de novo*, *Boston Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 990 (Fed. Cir. 2009), impermissibly used the invention as a roadmap and placed a thumb on the scale in favor of obviousness, and alone compels reversal.

### A. The District Court Failed To Find a POSA's Motivation To Combine Prior Art To Arrive at the Entire Claimed Invention.

Under the first part of the obviousness test, a defendant must prove by clear and convincing evidence that "a skilled artisan would have had reason to combine the teaching of the prior art references *to achieve the claimed invention*." *Cyclobenzaprine*, 676 F.3d at 1069 (emphasis added). By conducting separate obviousness inquiries on each claim limitation, and ignoring features of the prior art that taught away from the claimed invention, the district court committed substantial reversible errors on this prong of the test. That failing is fatal to the judgment below, and it should be reversed.

#### 1. The District Court Clearly Erred in Combining References That It Deemed To Support a Claim Limitation, but Which Taught Away from the Invention as a Whole.

Identifying 4-AP as the first limitation of the invention, the district court began by broadly asking whether a POSA could reasonably expect success in using that active ingredient to treat walking in MS patients. Appx63-65. Despite acknowledging the high unpredictability of the art, the "significant uncertainty" in 4-AP research after the failed Elan trial, and the "key shortcomings" of the principal references upon which Defendants relied (Schwid and Goodman), Appx65-67, the district court asserted that Schwid and Goodman delivered the "combined message" to a POSA that there is "a reasonable expectation of success in treating walking with 4-AP" because "obtaining the same result in a second

study decreases the likelihood that a second was a fluke," and nothing in the prior art tempered those expectations. Appx67.

Whether a POSA would have been motivated to combine Schwid and Goodman to use 4-AP in *some form* is irrelevant to the analysis; the only question is whether a POSA would have been motivated to combine the prior art into Acorda's entire claimed invention. Had the district court focused its analysis on that question, it could not have found a motivation to combine because the court's own findings established how Schwid affirmatively teaches away from Acorda's invention. First, the ten-patient study in Schwid involved a high dose (17.5 mg BID) that was 75% higher than the low 10 mg BID amount of the invention. *Supra* at 11-12, 21-23. Second, as the district court acknowledged, Schwid teaches that 4-AP's "'therapeutic window'" was "'relatively narrow" (*i.e.,* it would have efficacy only at dosages near the toxic range), and "conclude[s] that '[t]reatment appeared particularly efficacious in subjects who achieved serum … levels above 60 ng/ml,'" Appx29; Appx70 (quoting Appx6684). In contrast, Schwid reports that "'[n]one of the patients with a serum level less than 60ng/ml felt better … on 4AP SR than placebo.'" Appx29 (quoting Appx6683). Those target blood serum levels of 60 ng/ml falling within the "relatively narrow" "therapeutic window" far exceed the 15-35 ng/ml serum levels required by the claims. Third, as Defendants' expert admitted and the district court found, Appx445-448 (130:21-133:9);

Appx70, a POSA would have understood the desired blood serum levels taught in Schwid to suggest a floor of 25 mg BID for some efficacy, which is inconsistent with (and indeed more than double) the 10 mg BID limitation of the claims used without dose escalation. Appx789 (474:2-7); Appx823 (508:10-16).

Schwid's affirmative teaching away from the 10 mg BID dosage and the 15-35 ng/ml pharmacokinetic parameters required by Acorda's invention "counts significantly against finding a motivation to take the claimed steps with a reasonable expectation of success." *Institut Pasteur v. Focarino*, 738 F.3d 1337, 1345 (Fed. Cir. 2013). The district court erred when it extracted selectively one disclosure of Schwid—its finding with regard to 4-AP and walking improvement generally—while ignoring the disclosures that teach away from the invention as a whole. "[Section] 103 does not permit a court to stitch together an obviousness finding from discrete portions of prior art references without considering the references as a whole." *In re Enhanced Sec. Research, LLC*, 739 F.3d 1347, 1355 (Fed. Cir. 2014). Absent this methodological mistake, it would have been clear that Defendants' obviousness defense turns solely on claims about the Goodman Poster tainted by hindsight.[2]

---

[2] The district court's subsidiary finding that earlier prior art "would not have tempered a POSA's expectations" of using 4-AP successfully to improve walking in MS patients, Appx67-68, is both legally irrelevant and inaccurate. None of the early prior 4-AP art would have supported a reasonable expectation of success of using *any* single dose of 4-AP as a treatment for MS that is both *safe and*

### 2. The District Court Improperly Applied the "Obvious to Try" Standard to the 10 mg BID Dose Limitation, Rather than to Acorda's Claimed Invention as a Whole.

The district court's piecemeal approach also rendered erroneous its analysis of whether a POSA would have been motivated to combine with other prior art the purported teachings of the Goodman Poster regarding the claimed 10 mg BID dose limitation. The district court found that the Goodman Poster taught that 10 mg BID was one of a finite number of plausible doses that were obvious to try, and therefore "the use of a 10 mg sustained-release dose of 4-AP twice per day to treat walking in MS patients would have been obvious to a POSA at the priority date of the Acorda Patents." Appx73.

As an initial matter, the district court's conception that the Goodman Poster teaches anything about a 10 mg BID dose of 4-AP as the sole individual dose of an MS treatment protocol—as opposed to merely the starting point of an escalating dosing scheme—is impermissible hindsight. A court may not use the teachings of the patent as "the thread that stitches together prior art patches into something that is the claimed invention." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017) (citation omitted).

---

*efficacious* for treating walking impairment in MS patients; those exploratory studies suggested some clinical or sub-clinical effects of 4-AP but also reported severe adverse toxic effects that cast doubt on its viability as a drug. *Supra* at 6-8; Appx810-811; Appx814-815 (495:24-496:17) (discussing prior art).

The Goodman Poster was, like earlier prior art, investigating an *escalating* dosing regimen and did not teach the use of a single dose over the treatment period as a means to successfully improve MS symptoms. *See* Appx6502 (noting that study was to investigate "the safety and tolerability of escalating doses"). Acorda reported in the Goodman Poster a single statistically significant finding related to walking in MS patients: namely, an improvement in the walking speed for the treatment group *aggregated across the entire 20-80 mg/day titration dosing protocol*. Appx30-31; Appx6372; Appx6501-6504; Appx792-793 (477:21-478:22); Appx797-798 (482:17-483:3). Indeed, Goodman reported statistical significance using the repeated measures analysis of variance over weeks 1-7, which conveyed that statistical significance applies only to the titrated dosing scheme in aggregate and not a single dose. Appx30 n.11; Appx797-799 (482:17-484:1); Appx452-453 (137:25-138:7). The Goodman Poster displayed a line chart evincing the entire 20-80 mg/day dosing protocol and made no comparisons in that chart of an individual dose effect to that of placebo (Appx6503):




The district court, at Defendants' urging, improperly treated Goodman (an Acorda study reporting walking improvement from the escalation of doses) as a reference teaching the efficacy of the specific dose at issue. The court posited that a POSA in 2004 would have honed in upon 1/11th of the line chart (the segment between "run in" and "20mg" on the X axis) as illustrating the value associated with the 20 mg/day dose (10 mg BID), and made conclusions without a placebo comparator for context. But as Dr. Goodman testified, no POSA in 2004 would have attached significance to the response of the treatment group to such a dosage

amount in that study without information on how the placebo group was responding, which would be necessary if one were trying to make any determination of efficacy for that dose. Appx819 (504:6-14); Appx813-814 (498:21-499:3); Appx848-849 (533:17-534:6).

The district court discounted this testimony because it found "a POSA would assume that" the Goodman Poster "did not omit context that a POSA would have found material to interpreting the study results." Appx73. But a presentation would not be expected to include context for a finding it did not report. And, without hindsight, a POSA would find material just what the court elsewhere found Goodman indeed did focus on: the pooled aggregated effect of an escalating dosing regimen (a regimen appearing consistently and repeatedly in the 4-AP prior art). Appx30; Appx74. "One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to depreciate the claimed invention." *In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988).

Even apart from the absence of placebo comparators, and express teachings regarding the use of escalating dosages over time, no POSA would have been motivated to combine Goodman with the other prior art to achieve Acorda's invention, for multiple reasons reported by Goodman itself:

- "a POSA would not infer anything about the statistical significance of any individual dose based on the Goodman references' claims about a dose response," Appx73 n.34;
- Goodman reported an "increasing benefit" in a range up to 50 mg/day, reaffirming the need to escalate and target the higher doses, Appx6502; Appx792-793 (477:16-478:22); Appx451-452 (136:24-137:7); Appx848-849 (533:17-534:16);
- the study was "preliminary" and had (as the district court found) "key shortcomings" of "relatively small size and multi-endpoint, exploratory design," Appx67; and
- if the study included adjustment for those multiple endpoints, there would not even have been statistical significance for the aggregate 20-80 mg/day regimen, Appx29-30 nn.10, 11; Appx877-879 (562:2-564:13).

In the absence of hindsight, and if properly considered in the context of the Acorda invention as a whole, the Goodman Poster does not support the weighty showing required for obviousness. Appx816-817 (501:21-502:6).

The district court improperly relied on *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), to cure the inadequacies of Goodman. Even though "the prior art may have generally suggested that 4-AP would be more effective in higher doses," the court declared that the 10 mg BID dose as such was "obvious to

try" under *KSR* because it was one of a "finite" number of "plausible" doses, given that "the prior art reduced the range of doses falling within 4-AP's perceived therapeutic window to a fairly narrow band" below 25 mg BID. Appx71.

This error arises from the district court's methodological legal error of a piecemeal approach to obviousness. The *KSR* obvious-to-try standard does not apply to an individual limitation of an invention (such as a 10 mg BID dosage), but to the combination constituting the invention as whole. *KSR* holds that, when the prior art teaches elements of the invention, but does not teach or suggest a motivation to combine them, "a design need or market pressure to solve a problem" might provide the motivation to combine if the combination constituting the invention is one of a "finite number of identified, predictable solutions." 550 F.3d at 421. The Supreme Court specifically instructed that the challenger must show that "the *combination* was obvious to try" to satisfy Section 103. *Id.* (emphasis added).

Here the district court did not make the necessary finding that a POSA would be motivated to conceive Acorda's entire treatment protocol using that specific dose as a "predictable solution" to the problem of walking in MS patients that would be obvious to try; nor could it given its findings with respect to Schwid and the other prior art that would teach away from using a low 4-AP dosage without dose escalation (*supra* at 7-9, 36-37). *See In re Young*, 927 F.2d 588, 591

(Fed. Cir. 1991) (POSA would consider entirety of prior art, not just certain references). Instead, the district court only found that a POSA would regard the 10 mg BID limitation as a plausible dose to try, not that the claimed invention as a whole was a predictable solution based on the art. The district court's hindsight-based determination of obviousness based on the limitation of a 10 mg BID dose being "obvious to try" is not supported by *KSR*.

#### 3. The District Court Clearly Erred in Finding a Motivation to Combine Goodman with Prior Art That Did Not Teach Stable Dosing Without Dose Escalation.

Having improperly declared that the limitation of a 10 mg BID dose would have been obvious to a POSA, the district court then turned to the prior art cited by Defendants to support what the court described as the "stable dosing/no titration" limitation of the invention. Appx73 & n.36. The court found that "the prior art's consistent use of titration did not specifically support stable dosing," Appx75, but opined that three references (Van Diemen, Polman, and Goodman itself) would have "motivated" a POSA "to seek a stable dose of 4-AP." Appx74-76.

The district court's reliance on the Goodman Poster's purported teachings of both a 10 mg BID dose and stable dosing without titration illustrates the error of its approach. The central teaching of Goodman is a titration scheme: of escalating the doses administered to individual patients and looking at the pooled, aggregated data set for some signal of effect. There was no dispute that Goodman involved an

eight-week scheme of *weekly escalation* (*i.e.*, forced titration) of doses from 20 to 80 mg/day, Appx6371-6372; Appx791-792 (476:23-477:3), because the "primary aim of this trial was to determine the safety and tolerability of escalating doses." Appx6502. The finding of the Goodman Poster was that there was a statistically significant improvement in walking over the entire titration protocol (*i.e.*, that titration had some effect). *Id*. Moreover, Goodman reported an "increasing benefit … in the 20-50 mg/day," implying the need to titrate upward or target the higher doses. A6502; *see also* Appx792-793 (477:16-478:22); Appx451-452 (136:24-137:7). Because Goodman reports the success of a titration protocol, and increased benefits in a higher range, it cannot, without impermissible hindsight, motivate a POSA to adopt the Acorda invention that *excludes titration* and administers a single low 10 mg BID dose throughout an extended period to achieve the claimed therapeutic effect of improving walking in an MS patient.

The other two references that the district court cited as teaching "stable dosing" involve stable dosing but only *after titration* to the highest tolerable doses, doses far beyond those claimed by Acorda, which is flatly contrary to Acorda's invention as a whole. *See* Appx868-869 (553:7-554:6) (discussing use of titration to achieve stable dosing). The district court's endeavor to extract and apply teachings of stable dosing from these references is once again hindsight in operation. Van Diemen, as the district court found, "used an individualized

titration scheme based on tolerability up to a maximum amount calculated based on patient weight," Appx27, with actual doses ranging up to 30.5 mg/day in the intravenous phase and 50 mg/day in the oral-administration phase. Appx7040-7042. Furthermore, it taught away from the low 10 mg BID dose of Acorda's invention, stressing that "higher dosages and serum levels are likely to produce greater improvement." Appx7045; Appx27; Appx767-769 (452:22-454:3). Polman likewise "employed an upward titration dosing scheme based on tolerability up to a maximum (determined based on weight) over the course of four to eight weeks," Appx27, with actual daily doses ranging as high as 40 mg/day. Appx6656; Appx769-770 (454:23-455:3).

Van Diemen's and Polman's disclosures of stable *high* dosing *after titration* thus do not remotely suggest Acorda's claimed invention, which requires low twice-daily 10 mg stable doses as "the only doses" of 4-AP administered during the minimum time period, Appx237 (claim 1, 22), without a "prior" or "subsequent" period of 4-AP "titration," Appx195 (claims 6, 7). *See* Appx867 (552:17-25). If the district court had properly applied the obviousness test to Acorda's claimed invention as a whole, rather than the abstracted limitations thereof ("stable dosing"), it could not have found that a POSA in 2004 would have any motivation to combine those references with other prior art to achieve Acorda's invention. *See L.A. Biomedical Research Inst. at Harbor-UCLA Med.*

*Ctr. v. Eli Lilly & Co.*, 849 F.3d 1049, 1064 (Fed. Cir. 2017) (rejecting district court finding of obviousness based on prior art teaching erectile dysfunction treatments when the "claim language require[d] more than simply treating erectile dysfunction."); *Millennium Pharm., Inc. v. Sandoz Inc.*, --- F.3d ----, 2017 WL 3013204, at *4-5 (Fed. Cir. July 17, 2017) (rejecting district court finding of obviousness when "[n]one of these references, alone or in combination, suggests or teaches," the solution constituting the invention).

### B. The District Court Failed to Consider Whether a POSA Had a Reasonable Expectation of Success for the Claimed Invention as a Whole.

Section 103 requires not only a determination that a POSA would have been motivated to combine references, but that she "'would have had a reasonable expectation of success in doing so.'" *Cumberland Pharm. Inc. v. Mylan Institutional LLC*, 846 F.3d 1213, 1221-22 (Fed. Cir. 2017) (citation omitted). The "reasonable expectation of success requirement refers to the likelihood of success *in combining references* to meet the limitations of the claimed invention." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016) (emphasis added).

The district court never analyzed whether a POSA would reasonably have expected that the combination constituting Acorda's claimed invention would succeed. Instead, the court marched through interim findings of whether a POSA

would reasonably expect each limitation to be part of a successful invention. Those findings are not only unnecessary, but each was compromised by the district court's errors in assessing the motivation to combine.

First, the district court found that "a POSA would reasonably expect that 4-AP could be used to improve walking in at least some MS patients," Appx69, but that finding turned on the improper combination of Goodman and Schwid when they teach away from Acorda's invention as claimed. *Supra* at 35-37.

Second, the court found that "a POSA would consider 10 mg/twice daily to be among the finite group of doses of sustained-release 4-AP that could reasonably be expected to improve walking in MS patients," Appx73, but that finding derives from the district court's hindsight-driven misreading of Goodman, its misapprehension of the obvious-to-try standard, and its failure to view the invention as a whole as excluding an escalating dosing regimen. *Supra* at 38-44.

Third, the district court found that a POSA would have "a reasonable expectation of success" in pursuing stable dosing, Appx76, but only by misconceiving the Goodman Poster as teaching the utility of 10 mg BID as a singular rather than starting dose in an escalating dosing regimen, and combining that purportedly obvious teaching with other references that teach a treatment using titration and higher doses than Acorda's invention. *Supra* at 44-47.

Finally, the court found a reasonable expectation of success with regard to the pharmacokinetic parameters because it found them inherent in the claimed dosing, Appx77-78, an error discussed in section II.

Even aside from those errors, the district court could not (as it did, Appx88) pronounce that a POSA would have reasonably expected the invention to succeed simply because it believes each limitation A, B, C, and D could be used successfully. *Ruiz*, 357 F.3d at 1275. It had to analyze Acorda's invention as a whole and determine that the integrated combination was not more than "the predictable use of prior art elements according to their established functions." *KSR*, 550 U.S. at 417. "[P]redictability is a vital consideration in the obviousness analysis," *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1298 (Fed. Cir. 2012), and "[t]o the extent an art is unpredictable, as the chemical arts often are, *KSR*'s focus on these 'identified, predictable solutions' may present a difficult hurdle because potential solutions are less likely to be genuinely predictable," *Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008). Indeed, because Acorda's invention relates to an area where drug research had been extensive but successful treatments had proven elusive, it is even more unlikely to have been a predictable solution to the problem of walking in MS patients. *Compare Otsuka*, 678 F.3d at 1298 (non-obviousness shown by "evidence demonstrating the high degree of unpredictability in antipsychotic drug

discovery as of the priority date"), *with* Appx42 ("[a] POSA at the priority date of the Acorda Patents would have understood that MS studies are particularly unpredictable in view of the great variability in MS patients' responses to treatment and the high risk of placebo effect."); *see also Par Pharm., Inc.*, 773 F.3d at 1198 (a reasonable expectation of success exists once the technology at issue has "become fairly reliable and showed consistent results").

The district court, because it examined one set of references to determine a reasonable expectation of success in using limitation A, and different references for limitations B, C, and D, never evaluated whether a POSA considering the prior art comprehensively would reasonably predict success for the Acorda invention, as it was obliged to do. *Young*, 927 F.2d at 591.

Indeed, it was only after Drs. Cohen and Blight created, applied, and interpreted a post-hoc responder analysis of their MS-F202 study data (none of which was in the prior art) that Acorda conceived its invention. Appx611-614 (296:1-299:17). In that analysis of MS-F202, Acorda chose to define a responder by a highly selective criterion of consistency (not magnitude) of improvement in walking speed in at least three treatment-period visits, versus a baseline of both pre- and post-treatment visits to eliminate false positives. Appx831-832 (516:7-25). Only this innovative analysis of data not even existing in the prior art (not the Goodman Poster) generated the insights necessary to the invention. The responder

analysis yielded the "hugely surprising" results that 10 mg BID was just as efficacious as the higher doses without the adverse side effects, Appx830 (515:8-25); Appx835-836 (520:9-521:3), and that a single stable low dose could be administered without having to resort to the prior art's methods of "titrating or individualizing or maximizing doses in order to gain efficacy without the peril of coming close to the toxic range," Appx832-836 (520:18-24); Appx830 (515:6-25).

The district court's piecemeal approach caused it improperly to discount Acorda's innovation. "[P]atents are not barred just because it was obvious 'to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.'" *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 997 (Fed. Cir. 2009) (citation omitted).

## II. The District Court's Obviousness Analysis Is Legally Defective Because It Is Based on an Erroneous Inherency Finding.

A POSA would also not have had a reasonable expectation of success in achieving Acorda's invention because the prior art did not teach or suggest that the claimed blood serum levels would successfully improve walking in MS patients.

The district court noted that the pharmacokinetic parameters in the claim also fell within the blood serum range disclosed in Hayes for a 10 mg BID dose administered to SCI patients in that study. Appx76. The district court found that

the record was "not as clear as the Court would have hoped," but nevertheless concluded (without discussion of the evidence) that a POSA would have known that the pharmacokinetic parameters disclosed in Hayes would have resulted in an improvement in walking because these parameters were "inherent in the claimed dosing" in the Acorda patents. Appx77-78.

This ruling is error. "A party must ... meet a high standard in order to rely on inherency to establish the existence of a claim limitation in the prior art in an obviousness analysis. The mere fact that a certain thing may result from a given set of circumstances is not sufficient to render the result inherent." *Millennium*, 2017 WL 3013204, at *6 (internal quotation marks and citations omitted). "[T]he inherency of an advantage and its obviousness are entirely different questions. … Obviousness cannot be predicated on what is unknown.'" *Application of Shetty*, 566 F.2d 81, 86 (C.C.P.A. 1977) (internal quotation marks omitted). Thus, "the concept of inherency must be limited when applied to obviousness, and is present only when the limitation at issue is the 'natural result' of the combination of prior art elements." *Par Pharm.*, 773 F.3d at 1195 (citation omitted).

The district court did not apply this legal standard, and could not have made the requisite finding if it had. As this Court has recognized, different formulations of a drug, even when administered at the same dosage level, can produce different pharmacokinetic values in a patient. *See Allergan, Inc. v. Sandoz Inc.*, 726 F.3d

1286, 1294 n.1 (Fed. Cir. 2013); *see also, e.g.*, Appx178 (Fig.2); Appx183 (4:5-11); Appx191 (19:19-24) (Fig. 2; 4:5-11; 19:19-24) (pharmacokinetic parameters achieved by 12.5 mg capsule formulation differ significantly from those achieved by same dose of tablet formulation). The district court found that (i) Hayes used the Ampyra® formulation (though that was not disclosed in Hayes), (ii) "the pharmacokinetic parameters reported in Hayes from SCI patients are inherent properties *of that formulation*," and (iii) the blood profiles of SCI and MS patients receiving the same formulation dose would be analogous. Appx76-77 (emphasis added). The court thus did not find that the specific pharmacokinetic parameters are necessarily inherent in every stable 10 mg BID dosing regimen.[3]

Moreover, the district court could not show obviousness simply by finding that the inventors derived the claimed pharmacokinetic parameters from Hayes. *See* Appx78. Because "[p]atentability shall not be negated by the manner in which the invention was made," 35 U.S.C. § 103, "[t]he inventor's own path itself never leads to a conclusion of obviousness; that is hindsight. What matters is the path that the person of ordinary skill in the art would have followed, as evidenced by

[3] This case is different from *Santarus, Inc. v. Par Pharmaceutical, Inc.*, 694 F.3d 1344 (Fed. Cir. 2012), which held that a patent on an obvious formulation could not be saved by claiming its pharmacokinetic values, *id.* at 1354. Acorda did not claim a formulation, but rather a specific dosing regimen for treating a particular MS symptom.

the pertinent prior art." *Millennium*, 2017 WL 3013204, at *6 (rejecting inherency) (quoting *Otsuka*, 678 F.3d at 1296).

Here the prior art would not have motivated a POSA to combine the prior art teachings regarding 4-AP's efficacy in treating MS with Hayes. Hayes, as a study of SCI patients, reports nothing with regard to 4-AP's efficacy in treating MS. Appx779 (464:12-13); Appx825 (510:5-13). A POSA would have no basis to connect Hayes with MS prior art because none of the references discloses the formulations used. Hayes only discloses that it used a matrix tablet, with no other details on the formulation used. Appx6435. The MS-F201 Study Report itself was not in the prior art, Appx622-623 (307:19-308:9), and the Goodman poster and abstracts (the only prior art relating to that study) did not describe the formulation used in MS-F201.

The district court did not explain the basis for its conclusion "that a POSA would have been aware that a sustained-release dosage form achieving the pharmacokinetic parameters disclosed in Hayes III would have been associated with an improvement in walking in MS patients." Appx78. The court appears to have assumed that Elan was the source of sustained-release formulations and only made one, and therefore a POSA would believe that Acorda used the same formulation (later approved as Ampyra®) in its Hayes and Goodman studies, and thus would have identified in Hayes the claimed pharmacokinetic parameters

associated in the 10 mg BID dose. That assumption improperly uses hindsight, and lacks support in the record, but regardless cannot support an obviousness finding. A POSA in that scenario would also assume that Schwid used the Elan formulation and Schwid teaches using serum levels above 60 ng/ml. In light of Schwid, a POSA would not combine art to associate a range of 15-35 ng/ml (as in Acorda's claims) with efficacy for improving walking in MS patients, and would not combine the MS dose-response teachings of Goodman with the SCI pharmacokinetic teachings of Hayes, Appx788-789 (473:15-474:7). *See Cyclobenzaprine*, 676 F.3d at 1069-73 (holding invention nonobvious because of lack of a prior art relationship between pharmacokinetic and therapeutic effects).

## III. The District Court Improperly Extended *Merck*'s Blocking-Patent Holding To Negate Its Own Findings of Objective Indicia of Non-Obviousness.

"Objective indicia of non-obviousness play a critical role in the obviousness analysis." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013); *see also Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) (recognizing commercial success, long-felt but unmet need, and failure of others as indicia of non-obviousness). "Objective indicia 'can be the most probative evidence of non-obviousness in the record, and enables the court to avert the trap of hindsight.'" *Leo Pharm.*, 726 F.3d at 1358 (citation omitted). Accordingly, this Court has "warned about the dangers of ignoring objective indicia of

non-obviousness," *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1370-71 (Fed. Cir. 2012), and reversed judgments that fail to take these indicia into account properly, *InTouch Techs., Inc. v. VGO Comms., Inc.*, 751 F.3d 1327, 1347-49 (Fed. Cir. 2014).

Despite these rulings, the district court rejected *its own findings* of "significant" and "convincing" evidence of multiple indicia of non-obviousness of Acorda's invention based on an erroneous extension of a blocking-patent rule. Appx86-88. According to the district court, Elan's '938 Patent was a blocking patent that diminished the relevance of *every* objective indicia of non-obviousness. Appx79; Appx84-87. The court's approach would substantially—and unwarrantedly—eviscerate incentives for research and development in the pharmaceutical field by substantially weakening patent rights.

In discounting the objective evidence of non-obviousness, the district court relied on *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005). In *Merck*, this Court held that commercial success may be more difficult to establish as objective indicia where "others were legally barred from commercially testing," and "could only exhort" a patent owner to carry out the development work that produced the successful product. *Id.* at 1376-77. The Court subsequently explained that the *Merck* holding is designed to determine whether "the commercial success of [the drug] may heavily derive from subject

matter that does not on the whole contribute to the patentable distinctiveness of these claims. In such a case, the trial court should carefully consider whether the nexus requirement of our law is satisfied." *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1383 (Fed. Cir. 2005) (citation omitted). While *Merck* may counsel a court to scrutinize a nexus between an invention and commercial success if another patent "legally bars" others from pursuing the claimed invention, it does not negate *per se* the objective considerations of non-obviousness.

The district court expanded *Merck* far beyond its rationale to nullify not only the court's own findings of Ampyra®'s commercial success and nexus, but also its determination that the Acorda invention addressed a long-felt but unmet need, and that others had tried but failed to develop the claimed invention. This erroneous extension of *Merck* to discount powerful findings of objective evidence of non-obviousness is a legal error, and an independent ground for reversal.

***Commercial Success.*** The district court found that "Ampyra® is a commercial success and … there is a nexus between that success and the features claimed in the Acorda Patents," Appx79; Appx82-83, but discounted this finding "because the existence of a 'blocking' patent provides an independent, alternative reason why a POSA would not have attempted to develop the [claimed] invention." Appx79. While *Merck* requires evaluation of whether commercial success may derive from something other than the "patentable distinctness" of the claims, such

as a blocking patent, *Merck* does not suggest completely discounting a finding of nexus between success and the patentable claims just because of another patent.

This case is readily distinguishable from *Merck*. In *Merck*, there was already a medication on the market for treating the disease; the patent simply claimed weekly instead of daily dosing; and press articles disclosed weekly dosing. *Merck*, 395 F.3d at 1373, 1375-76. This Court found the invention obvious over the prior references essentially disclosing the method of the patent, with the prior blocking patent but one factor in determining obviousness. *Id.* Here, unlike in *Merck*, there was *no* medication in the marketplace for improving walking speed in MS patients, no prior FDA approval of 4-AP for any purpose, and no prior reference disclosing Acorda's method.

The district court premised its decision to discount the commercial success of Ampyra® only on its surmise that the '938 patent would prevent others from pursuing development work. Appx84. But there is no evidence that the '938 Patent barred all use of 4-AP; indeed, the district court cited prior art using 4-AP that was not Elan's work. Appx26-27; Appx33.

Others could have sought a license from Elan as Acorda did, yet none did. And when Acorda was trying (and failing) to pursue development of 4-AP, no one sought a sub-license from Acorda. The district court also failed to consider that research could have been, and indeed was (albeit unsuccessfully) conducted in

Europe. *Supra* at 7-8. Indeed, Van Diemen and Polman, cited by the court, researched 4-AP in the Netherlands. Appx26-27; Appx7037; Appx6654.

There is simply no warrant for the district court to convert *Merck* into a categorical bar to *any* consideration of commercial success as an indicator of non-obviousness, particularly after finding expressly a nexus between the claimed features of the invention and the commercial success.

***Long-Felt but Unmet Need.*** The district court also found that "[t]he record reflects that Ampyra® satisfied a long-felt, unmet need for a method of treating walking in MS patients," acknowledging "that walking impairments have long been recognized as a devastating symptom of MS." Appx87. The court also recognized that "[t]he FDA's decision to grant priority review status to Acorda's NDA for Ampyra® suggests that the industry considered that need to be at least partially unmet" under *Ferring B.V. v. Watson Labs., Inc.-Florida*, 764 F.3d 1401, 1407 (Fed. Cir. 2014). Appx87. Nevertheless, the district court adjudged this objective evidence "of limited probative value" because "a POSA would not have been able to practice the invention of the Acorda Patents without infringing the Elan Patent." *Id*.

This Court has not extended *Merck* to long-felt need and should not, especially on the facts of this case. Even if the '938 Patent created exclusivity in the United States for the subject matter claimed (which, as discussed above, did not

entirely block all research into 4-AP and MS), that still does not eliminate the fact (as found by the district court) that the need was longstanding and unsatisfied, until Acorda's invention. *Supra* at 6-12, 59. A long-felt but unsatisfied need objectively confirms the complexity of the art, and is an important check against viewing that art with the oversimplification of hindsight. The district court committed legal error by ignoring this powerful evidence solely because the '938 Patent claimed treatment of neurological diseases by administration of sustained-release 4-AP.

***Failure of Others.*** This Court has consistently emphasized that failed attempts by others are highly relevant and potentially "*determinative* on the issue of obviousness." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1285 (Fed. Cir. 2000) (collecting cases) (emphasis added); *Cyclobenzaprine*, 676 F.3d at 1082 (describing this evidence as "particularly probative of obviousness"). Indeed, "there can be little better evidence negating an expectation of success than actual reports of failure." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1354 (Fed. Cir. 2003) (citations omitted).

The district court found that others in the field tried to develop an effective treatment to improve walking in MS patients, but failed. The court once again relied on the '938 Patent to discount this evidence. Appx86. Nothing in *Merck* or any other decision of this Court suggests that the existence of a blocking patent

undermines the relevance of objective evidence showing failed efforts by others to achieve the invention.

Thus, the district court recognized that "another pharmaceutical company, Sanofi-Aventis, tried and failed to develop a therapy to improve walking in MS patients, using as an active ingredient a potassium channel blocker other than 4-AP," known as nerispirdine. Appx86 (citing Appx726-728; Appx828-830). The record demonstrates that Sanofi tried an alternative to 4-AP because of safety concerns, not because of the '938 Patent. In particular, by using a different compound, Sanofi hoped to lessen "the side effect profile and some of the concerning safety issues of [4-AP]." Appx727 (412:8-16). Nothing in the record undermines the evidence that Sanofi (and others) tried, and failed, to develop a treatment to improve walking in MS patients for reasons unrelated to the '938 Patent.

The district court erred in discounting Sanofi's failures because they differed from Acorda's inventive solution. The relevant inquiry is whether Sanofi and Acorda "share[d] a central common goal: to create a therapeutically effective product"; that [Acorda] "took a materially different approach and succeeded" demonstrates non-obviousness. *Cyclobenzaprine*, 676 F.3d at 1081-82; *see also Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1375, 1378-80 (Fed. Cir. 2006) (finding a failure of others based on compounds different from the

claimed compound); *Alco Std. Corp. v. TVA*, 808 F.2d 1490, 1500-01 (Fed. Cir. 1986) (finding a failure of others where a competitor "had pursued other solutions to the problem," using different technology); *Knoll Pharm. Co. v. Teva Pharm. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004). "Evidence that others were going in different ways is strong evidence that the [inventor's] way would not have been obvious." *Cyclobenzaprine*, 676 F.3d at 1082 (internal quotation marks and citation omitted).

The district court similarly erred when it attempted to explain away the failed efforts to clinically develop the invention by Elan itself—the holder of the purported "blocking" patent and the sponsor of the largest, most rigorously controlled clinical trial of 4-AP in the prior art. *Supra* at 10-11. The court found that "Elan failed in its attempts to develop MS therapies for indications other than walking," but opined that "Elan's failed efforts preceded the Schwid and MS-F201 studies that demonstrated 4-AP's effects in walking." Appx86. As already shown, *supra* at 35-51, these studies did not render Acorda's pioneering invention obvious. Elan decided not to pursue further development of treatments using 4-AP because, like Sanofi, it did not expect such efforts to succeed. Appx596 (281:13-19); *supra* at 12. As such, Elan's clinical trial failure, which included a failure in the EDSS endpoint involving walking (*supra* at 10-11), constitutes "classic evidence of non-obviousness" that the district court wrongly ignored.

* * *

This Court "retain[s] plenary review to determine whether, as a legal matter, the evidence satisfies the clear-and-convincing standard of proof." *Cyclobenzaprine*, 676 F.3d at 1069. Given the statutory presumption of validity, defendants "'bear[] a heavy burden of persuasion'" to meet the clear-and-convincing standard, and "'every reasonable doubt should be resolved against'" the defendant. *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 101, 105 (2011).

Here, relying on prior art of record in the prosecution of the Acorda patents, the district court made findings which show that the prior art was "particularly unpredictable," Appx42; failure dominated the field, *supra* at 6-17; the prior art taught away from the claimed 10 mg BID dosage for an extended period without titration, *supra* at 38-44; there is no evidence of motivation to combine references into the entire MS treatment protocol comprising Acorda's invention with a reasonable expectation of success, *supra* at 47-51; the case was close and the court had misgivings about the record, Appx65-67, Appx71, Appx73-74, Appx77, Appx88; and the objective indicia of non-obviousness are compelling, *supra* at 56-62. This Court should hold that that the Defendants failed, as a matter of law, to carry their burden of proving obviousness of Acorda's important innovation.

## CONCLUSION

This Court should reverse the district court judgment invalidating the Acorda Patents and remand with instruction to enter judgment for Acorda.

August 7, 2017

Respectfully submitted,

/s/Bruce M. Wexler

Bruce M. Wexler
*Attorney of Record*
Gerald J. Flattmann, Jr.
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
brucewexler@paulhastings.com
geraldflattmann@paulhastings.com

Stephen B. Kinnaird
Igor V. Timofeyev
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C. 20005
(202) 551-1700
stephenkinnaird@paulhastings.com
igortimofeyev@paulhastings.com

Garrard R. Beeney
Stephen J. Elliott
Wen-Ying Angela Chang
Alexandra H. Moss
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
beeneyg@sullcrom.com
elliotts@sullcrom.com
changw@sullcrom.com
mossa@sullcrom.com

Jane G. Wasman
Anthony Michael
ACORDA THERAPEUTICS, INC.
420 Saw Mill River Road
Ardsley, NY 10502
(914) 347-4300
jwasman@acorda.com
amichael@acorda.com

*Counsel for Appellant Acorda Therapeutics, Inc.*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS


| | **Page No.** |
|---|---|
| Memorandum Opinion (Mar. 31, 2017) | Appx1-89 |
| Final Judgment (Apr. 25, 2017) | Appx90-92 |
| U.S. Patent 8,007,826 | Appx167-200 |
| U.S. Patent 8,354,437 | Appx201-242 |
| U.S. Patent 8,440,703 | Appx243-284 |
| U.S. Patent 8,663,685 | Appx285-315 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ACORDA THERAPEUTICS, INC., *et al.* | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 14-882-LPS |
| | : | (CONSOLIDATED) |
| ROXANE LABORATORIES, INC., *et al.* | : | |
| | : | |
| Defendants. | : | |

---

Jack B. Blumenfeld, Maryellen Noreika, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE
Aaron Stiefel, Daniel P. Di Napoli, Jeffrey Martin, David Harris, Philip Smithback, Stephanie M. Piper, ARNOLD & PORTER KAYE SCHOLER LLP, New York, NY
Sylvia M. Becker, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, DC
Soumitra Deka, ARNOLD & PORTER KAYE SCHOLER LLP, Palo Alto, CA
Jane Wasman, Anthony Michael, ACORDA THERAPEUTICS, INC., Ardsley, NY

Attorneys for Plaintiffs.

John C. Phillips, Jr., Megan C. Haney, PHILLIPS, GOLDMAN, MCLAUGHLIN, & HALL, P.A., Wilmington, DE
Charles B. Klein, WINSTON & STRAWN LLP, Washington, DC
George C. Lombardi, Samuel S. Park, Bryce A. Cooper, Reid Smith, WINSTON & STRAWN LLP, Chicago, IL

Attorneys for Defendants Apotex Corp., Apotex, Inc., Teva Pharmaceuticals USA Inc., and Roxane Laboratories, Inc.

Richard K. Herrmann, Mary B. Matterer, MORRIS JAMES LLP, Wilmington, DE
Robert L. Florence, Karen L. Carroll, Michael L. Binns, PARKER POE ADAMS & BERNSTEIN LLP, Atlanta, GA
Melanie Black Dubis, Catherine R.L. Lawson, Christopher M. Thomas, PARKER POE ADAMS & BERNSTEIN LLP, Raleigh, NC

Attorneys for Defendant Mylan Pharmaceuticals Inc.

**MEMORANDUM OPINION**

March 31, 2017
Wilmington, Delaware

**STARK, U.S. District Judge:**

Acorda Therapeutics, Inc. and Alkermes Pharma Ireland Limited ("Plaintiffs") allege that Apotex Corp., Apotex Inc., Mylan Pharmaceuticals Inc., Roxane Laboratories, Inc., and Teva Pharmaceuticals, USA, Inc. ("Defendants") infringe several United States Patents. Patent No. 5,540,938 (the "'938 patent" or the "Elan Patent") relates to the use of a sustained-release formulation of 4-AP, administered once or twice daily, to treat neurological diseases including multiple sclerosis ("MS"). Patent Nos. 8,007,826 (the "'826 patent"), 8,663,685 (the "'685 patent"), 8,354,437 (the "'437 patent"), and 8,440,703 (the "'703 patent") (collectively, the "Acorda Patents") relate to the use of 10 mg sustained-release formulations of 4-AP to treat walking impairments in individuals with MS.

The Court adopted stipulated constructions for certain claim terms in the patents-in-suit. (D.I. 187, 193) With respect to disputed claim terms, the Court held a claim construction hearing on March 7, 2016 and issued an opinion and order on March 16, 2016. (D.I. 195, 196) In September 2016, the Court held a four-day bench trial. (*See* D.I. 266-69) ("Tr.") The parties have submitted a Statement of Uncontested Facts ("SUF") (D.I. 252-1 Ex. 1) and their competing versions of proposed findings of fact (D.I. 262, 263). They have also submitted extensive post-trial briefing, which concluded with supplemental letter briefs filed on March 6, 2017. (D.I. 265, 272, 273, 274, 278, 279)[1]

Pursuant to Federal Rule of Civil Procedure 52(a), and after having considered the entire

[1]The parties have also advised the Court of the recent conclusion of an inter partes review ("IPR"), in which the Patent Trial and Appeal Board ("PTAB") found that the Acorda Patents had not been shown to be unpatentable. (*See* D.I. 280) As Defendants point out, two of the three references the PTAB was considering are not part of the trial record here. (*See* D.I. 281)

record in this case and the applicable law, the Court concludes that: (1) Defendants have stipulated that their proposed products infringe the asserted claims of the patents-in-suit; (2) Defendants have failed to prove by clear and convincing evidence that the asserted claims of the Elan Patent are invalid for obviousness; and (3) Defendants have proven by clear and convincing evidence that the asserted claims of the Acorda Patents are invalid for obviousness. The Court's findings of fact and conclusions of law are set forth in detail below.

## FINDINGS OF FACT

This section contains the Court's findings of fact ("FF") on disputes raised by the parties during trial, as well as facts to which the parties have stipulated. Certain findings of fact are also provided in connection with the Court's conclusions of law.

### A. The Parties

#### i. Plaintiffs

1. Plaintiff Acorda Therapeutics, Inc. ("Acorda") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 420 Saw Mill River Road, Ardsley, New York 10502. (SUF ¶ 1)

2. Plaintiff Alkermes Pharma Ireland Limited ("Alkermes") is an Irish corporation having a principal place of business at Connaught House, 1 Burlington Road, Dublin 4, Ireland. (SUF ¶ 2)

3. Plaintiffs have standing with respect to each of Plaintiffs' claims asserted against Defendants. (D.I. 254 ¶ 9)

#### ii. Defendants

4. Defendant Apotex Corp. (together with Apotex, Inc., "Apotex") is a corporation

organized and existing under the laws of the State of Delaware, having a principal place of business at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326. (SUF ¶ 3)

5. Defendant Apotex Inc. is a corporation organized and existing under the laws of Canada, having its principal place of business at 150 Signet Drive, Toronto, Ontario M9L 1T9, Canada. (SUF ¶ 4)[2]

6. Defendant Mylan Pharmaceuticals Inc. ("Mylan") is a corporation organized and existing under the laws of the State of West Virginia, having a principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505. (SUF ¶ 5)

7. Defendant Roxane Laboratories, Inc. ("Roxane") is a corporation organized and existing under the laws of the State of Nevada, having a principal place of business at 1809 Wilson Road, Columbus, Ohio 43228. (SUF ¶ 6)

8. Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. (SUF ¶ 7)

**B. Multiple Sclerosis**

9. Multiple Sclerosis ("MS") is a chronic disease of the neuroimmunological system. (Peroutka Tr. at 52-53)[3] MS causes a loss of myelin, the fatty material that insulates many of the nerves in the central nervous system. (Peroutka Tr. at 53-54; *see also* Lublin Tr. at 392) This

---

[2]On March 28, 2017, the Court so ordered a stipulation of dismissal that was filed the day before by Plaintiffs, Apotex Corp., and Apotex Inc. (*See* D.I. 283) As Apotex participated in the trial and the post-trial briefing, the Court has included findings of fact that may be pertinent to the now-resolved disputes between Plaintiffs and Apotex.

[3]Citations to trial testimony are in the form: "([Witness name] Tr. at pp.-pp)".

loss of myelin is called demyelination. (Peroutka Tr. at 52-53; Lublin Tr. at 392)

10. Demyelination slows or blocks the movement of nerve impulses along the nerve, resulting in diminished coordination of nervous system signals. (Lublin Tr. at 392; Goodman Tr. at 432-33) This disruption results in a wide variety of symptoms affecting a range of body parts and systems. (Lublin Tr. at 392) The symptoms of MS may include walking impairment, visual difficulty, fatigue, bladder dysfunction, tingling or pain, sexual dysfunctions, balance problems, and cognitive changes. (*Id.*; Peroutka Tr. at 55; Goodman Tr. at 433)

11. Weakness in the legs and/or alterations in walking are among the most common symptoms of MS. (Peroutka Tr. at 55; Goodman Tr. at 432) Roughly 50-75% of MS patients experience difficulty walking. (Peroutka Tr. at 55)

12. MS may also cause brain scarring, which can lead to permanent symptoms and make MS patients susceptible to seizures or convulsions. (Goodman Tr. at 430-31, 442)

13. There is substantial variability in how MS manifests itself both among different patients and within a single patient over time. (Goodman Tr. at 431-32, 434-36; Peroutka Tr. at 121) Any particular patient's symptoms may vary on a day-to-day, or even hour-to-hour, basis. (Goodman Tr. at 435-36; Peroutka Tr. at 121-22)

**C. Treating MS**

14. There is presently no known cure for MS. (Peroutka Tr. at 53-54)

15. Current treatments for MS fall into two categories: (1) the use of disease-modifying agents, which alter the course of the disease and lessen the chance that a patient's condition deteriorates; and (2) therapies that attempt to alleviate the individual symptoms of MS, to improve a patient's quality of life. (Lublin Tr. at 393-94)

16. Designing and interpreting the results of clinical trials for MS therapies is complex because the wide variety of MS symptoms makes it difficult to select clinical endpoints (*i.e.*, measures of efficacy) and leads to mixed results. (Goodman Tr. at 436-37) In particular, it can be difficult to determine whether changes in symptoms result from the treatment being tested, from independent changes in the course of the disease, or from day-to-day variability in symptoms. (*Id.* at 436-38)

17. Placebo effect is also a problem in analyzing results of MS trials. (Lublin Tr. at 401-05) Placebo effect is an improvement in symptoms among test subjects who do not receive a drug. (*See id.* at 412; Goodman Tr. at 468-69)

18. There are a number of methods for assessing the disease state of a patient with MS. Some measures consist of numerical scales designed to interpret patients' subjective assessment of particular symptoms – such as fatigue or walking – or their condition in general. (Goodman Tr. at 455, 481, 518-19) Other measures, such as timed walking tests, provide objective, quantitative indications of results. (Lublin Tr. at 394)

19. In addition to tests that measure clinically manifested symptoms, other tests directly assess nerve impulse transmission. For example, researchers and clinicians can measure subclinical visually evoked potentials ("VEP") to detect the speed of nerve impulse transmissions. (JTX-0065;[4] Lublin Tr. at 394-96) Research established in the 1970s that VEP could serve as a valuable test in the early diagnosis of MS. (JTX-0065; Lublin Tr. at 395-97) By the 1980s and 1990s, VEP was also being used in conjunction with clinical metrics as a measure

---

[4]Citations to exhibits admitted at trial are in the form: "([JTX or PTX or DTX]-####)," referring to Joint Trial Exhibits, Plaintiffs' Trial Exhibits, or Defendants' Trial Exhibits, respectively.

of therapeutic efficacy in clinical trials. (JTX-0025) VEP is an especially useful tool because it is not susceptible to placebo effect. (Lublin Tr. at 401-05)

**D. Ampyra®**

20. Acorda holds an FDA-approved New Drug Application ("NDA"), No. 022250, for the use of 10 mg dalfampridine extended release tablets to improve walking in patients with MS. (D.I. 1 ¶ 30; SUF ¶ 8) Acorda markets the approved drug product under the registered name Ampyra®. (D.I. 1 ¶ 30; SUF ¶ 8)

21. Dalfampridine, also known as fampridine, 4-Aminopyridine, or "4-AP," is the active ingredient in Ampyra®. Ampyra® was the first FDA-approved use of 4-AP. (SUF ¶ 9, 68)

22. The FDA approved Ampyra® on January 22, 2010. (SUF ¶ 67) Acorda has been marketing and selling Ampyra® in the United States since March 2010. (*Id.* ¶ 69)

**i. Active Ingredient (4-Aminopyridine)**

23. The 4-AP molecule improves nerve conduction by blocking potassium channels and is sometimes referred to as a "potassium channel blocker." (Peroutka Tr. at 122)

24. Adverse effects such as seizures have been related to 4-AP's potassium channel blocking mechanism of action. (Goodman Tr. at 438-39, 482; Peroutka Tr. at 122) The concern about seizures is heightened in MS patients because brain scarring associated with the disease can increase seizure risk. (Goodman Tr. at 441-42)

**ii. Ampyra® Label**

25. The "INDICATIONS AND USAGE" portion of Ampyra®'s label states that "AMPYRA (dalfampridine) is indicated as a treatment to improve walking in patients with

multiple sclerosis (MS). This was demonstrated by an increase in walking speed . . . ." (JTX-0076 at AMPDEL0170808; SUF ¶ 73) Improvement of walking in MS patients is Ampyra®'s only approved use. (SUF ¶ 9)

26. The "DOSAGE AND ADMINISTRATION" portion of Ampyra®'s label states:

> The maximum recommended dose of AMPYRA is one 10 mg tablet twice daily, taken with or without food, and should not be exceeded. Doses should be taken 12 hours apart. Tablets should only be taken whole; do not divide, crush, chew, or dissolve. Patients should not take double or extra doses if a dose is missed . . . . No additional benefit was demonstrated at doses greater than 10 mg twice daily and adverse reactions and discontinuations because of adverse reactions were more frequent at higher doses.

(JTX-0076 at AMPDEL0170808; SUF ¶ 74)

27. The "DESCRIPTION" portion of Ampyra®'s label states that "AMPYRA (dalfampridine) is a potassium channel blocker, available in a 10 mg tablet strength. Each tablet contains 10 mg dalfampridine, formulated as an extended release tablet for twice-daily oral administration." (JTX-0076 at AMPDEL0170811; SUF ¶ 75)

**E. The Elan Patent**

28. The FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" ("Orange Book") lists the Elan Patent with respect to Ampyra®. (SUF ¶ 12)

**i. Development**

29. In the 1980s, Dusan Stefoski and Floyd A. Davis of the Rush Medical School began to develop immediate release formulations of 4-AP to treat MS. (JTX-0112; JTX-0043)

30. By 1990, Elan Corporation PLC ("Elan") entered into an agreement with Rush to allow Elan to use Rush's research on 4-AP to develop pharmaceutical formulations of the drug.

(Fogarty Tr. at 158-59) At the time, Elan was at the forefront of the development of sustained-release formulations. (*Id.* at 159-60; Myers Tr. at 151; Fassihi Tr. at 325)

31. Sustained-release formulations release a drug continuously over a long period of time, such that, compared to an immediate release formulation, the body absorbs drug more slowly, the drug's concentration in the body peaks later, and the drug dissipates from the body more slowly. (Kibbe Tr. at 186) As a result, a sustained-release formulation of a drug is effective for longer than an immediate release formulation of the same drug. (*Id.*)

32. The inventors of the Elan Patent required about three or four weeks to design three or four sustained-release 4-AP formulations "on paper," and about a day thereafter to actually prepare a sustained-release formulation of 4-AP. (Myers Tr. at 154-55) In preparing formulations, one of the inventors, Dr. Michael Myers, used sustained-release platforms with which he already had experience, then substituted 4-AP for the active ingredients he had previously used, and "adjusted the platforms with routine testing" until he obtained the desired dissolution pattern. (*Id.* at 211)

**ii. Patent and Claims**

33. The United States Patent and Trademark Office ("USPTO") issued the Elan Patent, entitled "Formulations and Their Use in the Treatment of Neurological Diseases," on July 30, 1996. (JTX-0001; SUF ¶ 10) The inventors listed on the face of the Elan Patent are Joseph G. Masterson and Michael Myers. (JTX-0001; SUF ¶ 13)

34. The Elan Patent is a divisional of U.S. Application No. 73,651 ("Application No. 73,651"), filed June 7, 1993, which issued as U.S. Patent No. 5,370,879 on December 6, 1994. (JTX-0001) Application No. 73,651 was a continuation of U.S. Application No. 786,400, filed

November 1, 1991, which was subsequently abandoned by the applicant. (*Id.*; SUF ¶ 11)[5] The Elan Patent also claims priority to an Irish patent application filed November 2, 1990. (SUF ¶ 11) The Elan Patent expires on July 30, 2018. (*Id.*)

35. Elan is named on the face of the Elan Patent as the assignee on the patent. (JTX-0001) Acorda has an exclusive license to the Elan Patent. (SUF ¶ 15) Alkermes, which acquired Elan, is the successor-in-interest to the Elan Patent. (Goodman Tr. at 535)

36. Plaintiffs assert that Defendants infringe claims 3 and 8 of the Elan Patent. (SUF ¶ 16)

37. Claims 3 and 8 both depend from claim 1. Claim 1 recites:

> A method for the treatment of a neurological disease where the disease is characterised by a slowing of nerve impulse transmission, which comprises administering to a patient in need thereof a medicament containing a mono- or di-aminopyridine active agent, said medicament being effective to permit sustained release of said mono- or di-aminopyridine active agent at a rate allowing controlled absorption thereof which achieves therapeutically effective blood levels over a 12-24 hour period when administered on a once- or twice-daily basis.

(JTX-0001 at 22:16-25)

38. Claim 3 also depends from claim 2. Claim 2 recites: "[a] method according to claim 1, wherein the neurological disease is characterised by demyelination of the central nervous system." (JTX-0001 at 22:26-28) Claim 3 recites: "[a] method according to claim 1 or 2, wherein the neurological disease is multiple sclerosis." (*Id.* at 22:29-30)

39. Claim 8 recites: "[a] method according to claim 1, wherein the active agent is 4-

---

[5] It is undisputed that the priority date for the Elan Patent is November 1, 1991. (*See* D.I. 272 at 2 n.4)

aminopyridine." (JTX-0001 at 22:50-51)

**iii. 4-AP: Scope and Content of the Prior Art**

40. A German paper first identified 4-AP in 1902. (Peroutka Tr. at 73) The drug was subsequently used as a bird toxin and as an agent to induce seizures in animals. (Fassihi Tr. at 361)

41. 4-AP was first used in humans in studies conducted in the 1970s, when a Swedish group tested the drug in connection with neurological diseases that resulted in muscle weakness associated with an impasse in nerve transmission. (Peroutka Tr. at 73)

42. A 1980 British study examined the effect of 4-AP on rats with demyelinated nerves and suggested that the drug could be used to improve their condition. (Peroutka Tr. at 73-74)

43. In 1981, Drs. Nicholas M.F. Murray and John Newsom-Davis disclosed the use of 4-AP in pharmaceutical preparations, to evaluate the safety and efficacy of the drug. (Peroutka Tr. at 74; JTX-0089)

**a. Stefoski**

44. In 1987, Stefoski and Davis, researchers at Rush Medical School, conducted a study and published a paper entitled "4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis," *Annal. Neurol.*, 21:71-77 (1987) ("Stefoski"). (JTX-0112) Stefoski is a printed publication in the United States and available to persons of ordinary skill in the art in 1987. (SUF ¶ 62)

45. Stefoski studied the effect of 4-AP on VEP, ocular motor function, and motor function (defined by the researchers as power, coordination, and gait). (JTX-0112 at 71) The

researchers monitored 12 MS patients and five men without MS before, during, and after IV injection of seven to 35 mg of 4-AP. (*Id.*) Stefoski found that ten of the 12 MS patients showed mild to marked improvement, with vision improving in seven patients, ocular motor function improving in five patients, and motor function improving in five patients. (*Id.*) Some of the improvements developed within minutes and at doses as low as two mg. (*Id.*) Stefoski concluded that 4-AP might be useful in treating MS patients, adding that studies were "currently in progress to determine the clinical usefulness of 4-AP as a symptomatic treatment." (*Id.* at 75)

46. A later article by Christopher T. Bever *et al.*, "The Effects of 4-Aminopyridine in Multiple Sclerosis Patients," *Neurology*, 44:1054-59 (1994), stated that the conclusions to be drawn from the results reported in Stefoski were "limited by questions about blinding, failure to randomize treatment, and failure to either use prospectively-defined neurologic deficits or adjust significance levels to compensate for multiple comparisons." (JTX-0028 at 1058) A later article by Bever also noted several limitations with Stefoski, including that it was small in size, did not use a randomized treatment design, was not double-blind, involved only short-term use of 4-AP, and relied on outcome measures that were not widely accepted. (JTX-0027 at S119)

**b. Davis**

47. In February 1990, Stefoski and Davis published a paper entitled "Orally Administered 4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis," *Annal. Neurol.*, 27:186-92 (1990) ("Davis"). (JTX-0043) Davis is a printed publication published in the United States and available to persons of ordinary skill in the art in 1990. (SUF ¶ 47)

48. Davis examined the effect of 4-AP at doses of 10-25 mg versus a placebo. (JTX-0043 at 186) Fifteen patients received immediate-release capsules of 4-AP and five received

placebo. (*Id.*) Davis found that all patients experienced mild to marked improvements, with motor function (defined by the researchers as power, coordination, and gait) improving in nine of 13 subjects. (*Id.*) Davis further found that improvements were observed with use of doses as low as 10 mg. (*Id.*) No serious adverse events, such as seizures, occurred in patients taking 10-25 mg doses of the drug. (*Id.* at 191) Although the study became unblinded, several patients demonstrated reversible improvements in VEP that could not be explained by placebo effect. (*Id.*) Davis concluded that orally-administered 4-AP produces clinically important improvements in multiple chronic deficits resulting from MS. (*Id.*)

49. A later article by Christopher T. Bever *et al.*, "The Effects of 4-Aminopyridine in Multiple Sclerosis Patients," *Neurology*, 44:1054-59 (1994), described the conclusions that could be drawn from the results reported in Davis were "limited by questions about blinding, failure to randomize treatment, and failure to either use prospectively-defined neurologic deficits or adjust significance levels to compensate for multiple comparisons." (JTX-0028 at 1059) A still later article by Bever also noted that Davis had several limitations, including that it was small in size, did not use a randomized treatment design, was not double-blind, involved only short-term use of 4-AP, and relied on outcome measures that were not widely accepted. (JTX-0027 at S119)

**c. Murray**

50. In 1981, Nicholas M.F. Murray *et al.* published a paper entitled "Treatment with Oral 4-Aminopyridine in Disorders of Neuromuscular Transmission," *Neurology*, 31:265-81 (1981) ("Murray"). Murray is a printed publication published in the United States and available to persons of ordinary skill in the art in 1991. (JTX-0089)

51. Murray reports on a study evaluating 4-AP as an immediate release oral

preparation in nine patients: four with Eaton-Lambert syndrome, four with congenital myasthenia, and one with myasthenia gravis.[6] (JTX-0089 at 265) The patients in Murray received a starting dose of 10 mg/twice daily, which was gradually increased, depending on response, to up to 200 mg daily. (*Id.* at 266)

52. Of the nine patients in the study, one had an "acute confusional episode" and three others experienced seizures. (JTX-0089 at 270) Murray concluded that "[t]he central effects of 4-AP, especially seizures, limit its use." (*Id.*)

**iv. Sustained-Release Technology: Scope and Content of the Prior Art**

53. Every active pharmaceutical ingredient (*e.g.*, 4-AP) is unique, with its own physical-chemical properties and pharmacokinetics. (*See* Fassihi Tr. at 340) There was (and is) no sustained-release formulation that works for all drugs. (*Id.*)

54. In 1990-91, the FDA had not developed guidelines to aid pharmaceutical companies in developing sustained-release formulations. (JTX-0108)

55. Once a product has been widely-consumed in immediate release form, information about the safety, efficacy, and pharmacokinetics of the drug becomes available. (Fassihi Tr. at 336-38) In 1990-91, all of the drugs that were commercially available in sustained-release dosage forms had previously been approved by the FDA in immediate release forms. (*Id.* at 335-36, 366)

---

[6]Dr. Goodman testified that the diseases studied in Murray differ from MS because they are diseases relating to different parts of the nervous system: whereas MS is a disease of the central nervous system, the diseases studied in Murray are diseases of the peripheral nervous system and neuromuscular junction. (Goodman Tr. at 440, 442-43)

**a. Remington's (1985 and 1990)**

56. "Sustained-Release Drug Delivery Systems," *Remington's Pharmaceutical Sciences*, Alfonso R. Gennaro ed., 18th ed., pp. 1676-93 (1990) ("Remington's") is a printed publication published in the United States and available to persons of ordinary skill in the art in 1990. (JTX-0081; SUF ¶ 59) Remington's is an authoritative treatise on the subject of pharmaceutical formulations. (*See* Peroutka Tr. at 81 (describing Remington's as "the Bible of pharmaceuticals sciences"))

57. The 1985 edition of Remington's highlights that, prior to 1990, there were numerous sustained-release drugs on the market. (JTX-0082 at 1644) ("1985 Remington's") The 1990 edition of Remington's lists five types of sustained-release formulation "platforms" (*e.g.*, encapsulated dissolution) and 39 FDA-approved, commercially-available sustained-release products. (JTX-0081 at 1683-86) The 1990 edition of Remington's also explains how to make a sustained-release drug using each of the disclosed platforms, listing excipients appropriate for each. (*Id.*)

58. The 1985 edition of Remington's includes a table setting forth various known advantages of sustained-release formulations. (JTX-0082 at 1646) One recognized advantage of sustained release is improved patient compliance, as the less frequently a patient has to take a dose the more likely a patient will be to take the required doses. (*Id.*)

59. The 1985 edition of Remington's also lists several characteristics of a drug that are compatible with a sustained-release formulation. First, a drug with a relatively short-half-life is a good candidate for sustained release because sustained release eliminates the need for

frequent dosing.[7] (JTX-0082 at 1647-50) Second, a drug with efficient absorption is a good candidate for sustained release. (*Id.*) Third, a drug requiring a relatively small dose is a good candidate for sustained-release dosing because the resulting sustained-release product will not be too large to swallow. (*Id.*) Finally, because sustained-release dosage forms are often used to treat chronic conditions that require consistent concentration of drug in the blood stream for a long period, drugs used to treat chronic conditions are good candidates for sustained-release formulations. (*Id.*)

**b. Robinson & Lee**

60. Robinson & Lee, whose full title is *Methods to Achieve Sustained Drug Delivery* and is authored by Joseph R. Robinson and Vincent Hon-Leung Lee, is a printed publication in the United States and available to persons of ordinary skill in the art in 1978. (JTX-0079) Robinson & Lee is an authoritative treatise on the subject of pharmaceutical formulations. (*See* Kibbe Tr. at 236-37 (describing Robinson as "a real authority on sustained release"))

61. The 1990 edition of the Robinson & Lee treatise stated that the design of a sustained-release product was "normally a very difficult task." (PTX-0095 at 201) It further explained that the "[s]uccessful fabrication of sustained-release products . . . involves consideration of the physical-chemical properties of the drug, pharmacokinetic behavior of the drug, route of administration, disease state to be treated and, most importantly, placement of the drug in a dosage form that will provide the desired temporal and spatial delivery pattern for the

---

[7]Dr. Peroutka testified that a person of ordinary skill in the art ("POSA") would understand that a drug in an immediate release formulation must be administered approximately once every half-life in order to maintain a consistent level of drug in a patient's blood. Thus, if a drug has a half-life of 3-4 hours, a patient must take the drug once every 3-4 hours to maintain a consistent concentration of it in the body. (Peroutka Tr. at 61)

drug." (*Id.* at 199; *see also* Fassihi Tr. at 326-27, 329-30)

**c. Uges**

62. In 1982, Donald R.A. Uges *et. al.* published a paper entitled "4-Aminopyridine Kinetics," *Clin. Pharmacol. Ther.* 31(5):587-593 (1982) ("Uges"). Uges is a printed publication published in the United States and available to persons of ordinary skill in the art in 1990. (JTX-0137)

63. Uges examined the pharmacokinetics of 4-AP in nine healthy subjects. (JTX-0137) The subjects received three different administrations of 20 mg of 4-AP: intravenous administration ("IV"), administration via an uncoated (immediate release) tablet, and administration via an enteric (delayed release) dose. (*Id.*) Uges reported that the half-life of 4-AP is about four hours. (*Id.*) Uges also reported that the bioavailability (percent absorption) of enteric-coated tablets was 95% ± 29%, suggesting that the drug was highly bioavailable even when release was delayed. (*Id.*) Finally, Uges taught that almost 100% of the drug was excreted unchanged in the urine, regardless of how the drug was administered. (*Id.*)

**F. The Acorda Patents**

**i. Development**

64. Dr. Ron Cohen founded Acorda in 1993. (Cohen Tr. at 277) Dr. Cohen learned of 4-AP through Dr. Andrew Blight, one of Acorda's first employees, who had previously done some exploratory work with 4-AP and spinal cord injury. (*Id.* at 278-79) Acorda initially focused on developing immediate-release formulations of 4-AP. (*Id.* at 280)

65. In 1997, Elan licensed the Elan Patent to Acorda, allowing Acorda to use Elan's sustained-release 4-AP formulations for clinical trials in spinal cord injury patients. (Cohen Tr.

at 280-81; JTX-0020) In 1998, Elan and Acorda expanded the license to give Acorda exclusive rights over the use of the 4-AP formulations, including for use in the treatment of MS. (Cohen Tr. at 303-04; JTX-0021) Acorda did not do any independent development or formulation work on any sustained-release formulation of 4-AP but, instead, used Elan's formulation in its trials. (Cohen Tr. at 304; Blight Tr. at 163)

66. Prior to licensing its sustained-release formulations to Acorda, Elan conducted a double-blind, randomized, placebo-controlled, 161-patient study of the safety and efficacy of twice-daily sustained-release formulations of 4-AP in MS patients. (PTX-0360) (the "Elan Study") Patients in the 4-AP group initially received 12.5 mg doses/twice daily, a dose that was increased by 5 mg every two weeks until the patients either experienced intolerable side effects or reached the maximum dose of 22.5 mg/twice daily. (*Id.* at 8-9) The primary endpoint of the study was the Expanded Disability Status Scale (EDSS), a composite measure of functioning that was widely accepted in the MS community. (*Id.* at 1; JTX-0104 at 817; Goodman Tr. at 284, 467) The only outcome measure with a statistically significant difference compared to placebo was the secondary outcome measure of lower extremity muscle strength; all other secondary outcome measures, including ambulation, showed no statistically-significant difference from placebo. (PTX-0360 at 101-02)

67. In 2000 and 2001, Acorda conducted a 36-patient study on the use of sustained-release formulations of 4-AP to treat MS (the "MS-F201 Study"). (*See* PTX-0466A; Cohen Tr. at 287-88) The 25 patients in the 4-AP group received initial doses of 10 mg/twice daily for the first week of the study, with dosages increasing by 5 mg per week to a maximum of 40 mg/twice daily. (Cohen Tr. at 288) The outcome measures of the study included fatigue, a lower

extremity manual muscle test, the multiple sclerosis functional composite (including a timed 25-foot walk), and subjective measures. (*Id.* at 289) The study failed as to all of the prospectively-defined outcome measures other than the lower-extremity manual muscle test. (*Id.* at 289-90) The results of the timed 25-foot walking test were not statistically significant, as members of the placebo group showed greater improvement than the 4-AP group in multiple weeks. (PTX-0466A; Cohen Tr. at 290-92) In three of the seven weeks, the placebo group demonstrated greater improvement than the members of the 4-AP group had exhibited during the 10 mg/twice-daily week. (PTX-0466A at 63) However, a post-hoc analysis of the data analyzing walking speed (rather than time) indicated a statistically-significant difference between the 4-AP and placebo groups when the 4-AP results were aggregated across all of the various doses combined together. (Cohen Tr. at 292; Goodman Tr. at 478-79)

68. In 2003, Acorda conducted a 206-patient, "Phase II" study regarding the use of sustained-release 4-AP to improve walking speed in patients with MS. (PTX-0168A ("the MS-F202 Study")) The study explored sustained-release doses of 10 mg, 15 mg, and 20 mg 4-AP administered twice daily. (Cohen Tr. at 293) The study included a two-week up-titration period to limit side effects, followed by a twelve-week period of stable dosing. (*Id.* at 295) None of the 4-AP groups demonstrated a statistically significant difference in walking speed compared to placebo. (*Id.* at 296-98) However, a post-hoc, unblinded "responder" analysis indicated that the responders were, overwhelmingly, members of the 4-AP group ($p < 0.0001$). (*Id.*) The responder analysis also indicated that there was no meaningful difference in efficacy among the 10 mg, 15 mg, and 20 mg 4-AP groups. (*Id.* at 298-99)

69. Following the Phase II study, Acorda conducted two Phase III studies of 4-AP,

using 10 mg/twice-daily dosing and the walking improvement responder analysis as a prospectively-defined primary outcome measure. (Cohen Tr. at 299-300) Both studies were successful (p <0.0001). (*Id.*)

**ii. Patents and Claims**

70. The inventors listed on the face of the Acorda Patents are Andrew R. Blight and Ron Cohen. (*See* JTX-0002; JTX-0003; JTX-0004; JTX-0005; SUF ¶¶ 21, 27, 33, 39)

71. Acorda is listed as the assignee of each of the Acorda Patents. (*See* JTX-0002; JTX-0003; JTX-0004; JTX-0005; SUF ¶¶ 22, 28, 34, 40)[8]

**a. The '826 Patent**

72. The USPTO issued the '826 patent, entitled "Sustained Release Aminopyridine Composition," on August 30, 2011. (SUF ¶ 18)

73. The '826 patent issued from U.S. Patent Application No. 11/010,828, which was filed on December 13, 2004, and claims priority to U.S. Provisional Application No. 60/560,894, filed on April 9, 2004. (*See* JTX-0002; SUF ¶ 19) The patent expires on May 26, 2027. (SUF ¶ 19)

74. Plaintiffs assert that Defendants infringe claims 1, 7, 38, and 39. (SUF ¶ 23)

75. Claim 1 recites:

> A method for maintaining a therapeutically effective concentration of 4-aminopyridine in order to improve walking in a human with multiple sclerosis in need thereof, said method comprising:
>
> orally administering to the human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a day; and

---

[8]It is undisputed that the priority date for each of the Acorda Patents is April 9, 2004. (*See* D.I. 272 at 2 n.4)

> thereafter, maintaining administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, whereby an in vivo 4-aminopyridine $C_{maxSS}$:$C_{minSS}$ of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are obtained in the human.

(JTX-0002 at 27:17-30)

76. Claim 7 depends from claim 6. Claim 6 recites:

> A dosing regimen method for providing a 4-aminopyridine at a therapeutically effective concentration in order to improve walking in a human with multiple sclerosis in need thereof, said method comprising:
>
> initiating administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a day without a prior period of 4-aminopyridine titration, and then, maintaining administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily;
>
> without a subsequent period of 4-aminopyridine titration, whereby an in vivo 4-aminopyridine $C_{maxSS}$:$C_{minSS}$ of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are maintained in the human.

(JTX-0002 at 27:41-57) Claim 7 recites: "[t]he method of claim 6, whereby an increase in walking speed is obtained in said human." (*Id.* at 27:58-59)

77. Claims 38 and 39 depend from claim 37. Claim 37 recites:

> A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of greater than two weeks, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 5.2 hours after administration of the sustained release composition to the patient.

(JTX-0002 at 30:14-21)

78. Claim 38 recites: "[t]he method of claim 37 wherein the sustained release composition elicits a $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 when administered b.i.d. [*i.e.*, twice daily] or administered at 12-hour intervals to a human." (JTX-0002 at 30:22-25)

79. Claim 39 recites: "[t]he method of claim 37 wherein said time period is twelve weeks." (JTX-0002 at 30:26-27)

80. The parties have stipulated that if the two-week limitations (of, for example, claim 37) is obvious, then the 12-week limitations (of, for example, claim 39) are also obvious. (D.I. 254 ¶ 5) This stipulation applies to all of the Acorda Patents. (*Id.* ¶¶ 6-8)

**b. The '685 Patent**

81. The USPTO issued the '685 patent, entitled "Sustained Release Aminopyridine Composition," on March 4, 2014. (SUF ¶ 36)

82. The '685 patent issued from U.S. Patent Application No. 13/187,158. (*See* JTX-0005; SUF ¶ 37) The application was a continuation of U.S. Patent Application No. 11/010,828, which was filed on December 13, 2004, and claims priority to U.S. provisional application No. 60/560,894, filed on April 9, 2004. (SUF ¶ 37) The patent expires on January 18, 2025. (*Id.*)

83. Plaintiffs assert that Defendants infringe claims 3 and 5 of the '685 patent. (SUF ¶ 41)

84. Claim 3 depends from claim 2, which depends from claim 1. Claim 1 recites:

> A method of improving walking in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein the sustained release composition further comprises one or more pharmaceutically-acceptable excipients.

(JTX-0005 at 27:22-28) Claim 2 recites: "[t]he method of claim 1 wherein said sustained release

composition provides a mean $T_{max}$ in a range of about 2 to about 6 hours after administration of the sustained release composition to the patient." (*Id.* at 28:1-4) Claim 3 recites: "[t]he method of claim 2 wherein the sustained release composition is capable of providing, upon administration to the patient, a release profile of 4-aminopyridine extending over at least 6 hours." (*Id.* at 28:5-8)

85. Claim 5 depends from claim 1 and recites: "[t]he method of claim 1 wherein the sustained release composition provides an average plasma concentration at steady state in humans in the range of about 15 ng/ml to about 35 ng/ml." (JTX-0005 at 28:14-17)

**c. The '437 Patent**

86. The USPTO issued the '437 patent, entitled "Method of Using Sustained Release Aminopyridine Compositions," on January 15, 2013. (SUF ¶ 24)

87. The '437 patent issued from U.S. Patent Application No. 11/102,559, which was filed on April 8, 2005, and claims priority to U.S. Provisional Application No. 60/560,894, filed on April 9, 2004. (*See* JTX-0003; SUF ¶ 25) The patent expires on December 22, 2016. (SUF ¶ 25)

88. Plaintiffs assert that Defendants infringe claims 1, 2, 5, 22, 32, 36, and 37 of the '437 patent. (SUF ¶ 29)

89. Claim 1 recites:

> A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

(JTX-0003 at 27:55-61)

90. Claim 2 recites:

> A method of improving walking in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

(JTX-0003 at 27:62-67)

91. Claim 5 depends from claim 1 and recites: "[t]he method of claim 1 wherein said time period comprises twelve weeks." (JTX-0003 at 28:16-17)

92. Claim 22 depends from claim 18, which depends from claim 1. Claim 18 recites: "[t]he method of claim 1 wherein said sustained release composition is a tablet." (JTX-0003 at 28:48-49) Claim 22 recites: "[t]he method of claim 18 wherein said tablet exhibits a release profile to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml." (*Id.* at 28:55-57)

93. Claim 32 recites:

> A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release tablet of 10 milligrams of 4-aminopyridine at about every 12 hours for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine at about every 12 hours are the only doses of 4-aminopyridine administered to said patient during said time period.

(JTX-0003 at 29:10-17)

94. Claim 36 depends from claim 32 and recites: "[t]he method of claim 32 wherein said time period comprises twelve weeks." (JTX-0003 at 30:11-12)

95. Claim 37 depends from claim 33. Claim 33 recites:

> A method of improving walking in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release tablet of 10 milligrams of 4-aminopyridine at about every 12 hours for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine at about every 12 hours are the only doses of 4-aminopyridine administered to said patient during said time period.

(JTX-0003 at 29:17-24) Claim 37 recites: "[t]he method of claim 33 wherein said time period comprises twelve weeks." (*Id.* at 30:13-14)

**d. The '703 Patent**

96. The USPTO issued the '703 patent, entitled "Method of Using Sustained Release Aminopyridine Compositions," on May 14, 2013. (SUF ¶ 30)

97. The '703 patent issued from U.S. Patent Application No. 13/299,969. (*See* JTX-0004; SUF ¶ 31) The application was a continuation of U.S. Patent Application No.11/102,559, which was filed on April 8, 2005, and claims priority to U.S. Provisional Application No. 60/560,894, filed on April 9, 2004. (SUF ¶ 31) The patent expires on April 8, 2025. (*Id.*)

98. Plaintiffs assert that Defendants infringe claims 36, 38, and 45 of the '703 patent. (SUF ¶ 35)

99. All of the asserted claims depend from claim 2. Claim 2 recites:

> A method of improving lower extremity function in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks.

(JTX-0004 at 29:63-67)

100. Claim 36 recites: "[t]he method of claim 2, wherein the lower extremity function is walking, and wherein said sustained release composition provides a release profile to obtain a

$C_{avSS}$ of about 15 ng/ml to about 35 ng/ml." (JTX-0004 at 31:28-31)

101. Claim 38 recites: "[t]he method of claim 2, wherein the lower extremity function is walking, and wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 6 hours after administration of the sustained release composition to the patient." (JTX-0004 at 31:36-40)

102. Claim 45 recites: "[t]he method of claim 2, wherein the lower extremity function is walking, and wherein said time period is more than two weeks." (JTX-0004 at 32:20-22)

**iii. Scope and Teachings of the Prior Art**[9]

103. It was well-known and accepted prior to the priority dates of the patents-in-suit that impaired walking is a common symptom of MS. (Peroutka Tr. at 56)

104. It was known and accepted prior to the priority dates of the patents-in-suit that MS is a chronic disease that requires ongoing treatment. (Peroutka Tr. at 52)

**a. Van Diemen**

105. Harriët A.M. Van Diemen *et al.*, "4-Aminopyridine in Patients with Multiple Sclerosis: Dosage and Serum Level Related to Efficacy and Safety," *Clin. Neuropharmacol.*, 16(3):195-204 (1993) ("Van Diemen"), is a printed publication published in the United States and available to persons of ordinary skill in the art in 1993. (PTX-0330)

106. Van Diemen evaluated the "relationship between dosage, serum level, efficacy, and safety" of 4-AP in 70 patients with MS. (PTX-0330 at 196) The study examined both intravenous and oral administration of 4-AP for up to 12 weeks. (*Id.*) For oral doses, the

---

[9] All references that constitute prior art to the Elan Patent are also prior art to the Acorda Patents. The Elan Patent itself, which was published in 1996, is also prior art to the Acorda Patents. (*See* JTX-0001)

researchers used an individualized titration scheme based on tolerability up to a maximum amount calculated based on patient weight. (*Id.* at 196-97) The study assessed efficacy by "registering horizontal smooth pursuit eye movements." (*Id.* at 197) Van Diemen concluded that "higher dosages and serum levels are likely to produce greater improvement in those MS patients who are capable of favorably responding to 4-AP." (*Id.* at 203)

**b. Polman**

107. Chris H. Polman *et al.*, "4-Aminopyridine in the Treatment of Patients with Multiple Sclerosis," *Arch. Neurol.*, 51:292-296 (March 1994) ("Polman"), is a printed publication published in the United States and available to persons of ordinary skill in the art in 2003. (JTX-0095)

108. Polman disclosed an open-label, unblinded study of the treatment of 23 MS patients with 4-AP and placebo. (JTX-0095 at 295) The study employed an upward titration dosing scheme based on tolerability up to a maximum (determined based on weight) over the course of four to eight weeks. (*Id.* at 293) Polman measured efficacy based on subjective information collected from patients during clinic visits. (*Id.*)

109. Polman reported that "[i]mprovements in fatigue and ambulation were mentioned quite often by the patients as being responsible" for positive effects. (JTX-0095 at 295) Two patients in the Polman study had to discontinue their use of 4-AP due to seizures. (*Id.* at 292)

**c. Schwid**

110. Steven R. Schwid *et al.*, "Quantitative Assessment of Sustained Release 4-Aminopyridine for Symptomatic Treatment of Multiple Sclerosis," *Neurology*, 48:817-21 (April 1997) ("Schwid"), is a printed publication published in the United States and available to persons

of ordinary skill in the art in 1997. (JTX-0104)

111. Schwid summarizes the Elan Study. (*See supra* ¶ 66) Schwid reports that the Elan Study consisted of administering a sustained-release formulation of 4-AP to 161 MS patients for six weeks. (JTX-0104 at 817) Schwid further explains that the Elan study used a sustained-release formulation of 4-AP because high serum concentrations of 4-AP were associated with seizures and toxicity. (*Id.*) Schwid also states that the Elan Study did not "establish clinical efficacy" because there was no improvement in EDSS relative to placebo – 22% of patients in both groups showed improvement. (*Id.*)

112. Schwid also reports the results of an original study involving the use of sustained-release 4-AP in MS patients. (JTX-0104 at 817) The Schwid study was a randomized, placebo-controlled, crossover design in ten MS patients. (*Id.* at 817-18) All ten patients were randomly assigned to receive either a placebo or 17.5 mg sustained-release 4-AP twice daily for seven days. (*Id.*) After an intervening washout period of seven days, the patients that had received placebo treatment were given 4-AP, and vice versa, for an additional seven days. (*Id.*)

113. The Schwid study did not disclose any prospectively-defined efficacy outcome measure. (JTX-0104 at 817) Instead, the Schwid study was designed to assess a variety of quantitative measurements, including maximum voluntary isometric contraction, manual muscle testing, grip strength, time to ambulate eight meters, time to climb four stairs, EDSS score, and global impression score. (*Id.*)

114. Schwid reported that nine out of ten MS patients experienced improvements in timed gait relative to the placebo group. (JTX-0104 at 820) This was the only outcome measure for which the Schwid study demonstrated a statistically significant improvement relative to

placebo (p = 0.02). (*Id.*) However, the statistically significant result was not adjusted for the fact that multiple outcome measures were included in the study.[10] (*See id.*)

115. Schwid reported that the mean serum level of 4-AP during treatment was "65±25 ng/ml (range, 34-99)" and that the treatment "appeared particularly efficacious in subjects who achieved serum 4AP levels above 60 ng/ml." (JTX-0104 at 819-20) Schwid also stated that "[n]one of the patients with a serum level less than 60 ng/ml felt better (according to their global impressions) on 4AP SR than placebo." (*Id.* at 819) Conversely, all patients with serum levels above 60 ng/ml demonstrated improvement in timed gait, grip strength, and subjective impression. (*Id.* at 820)

116. The Schwid authors (among them, Dr. Andrew Goodman, Plaintiffs' expert witness at trial) suggested further studies of 4-AP, stating, "[i]n addition to establishing efficacy in larger trials, future studies of 4AP SR will need to examine long-term efficacy and tolerability as well as further refine dosing regimens to optimize delivery despite a relatively narrow therapeutic window." (JTX-0104 at 820)

**d. Goodman I**

117. Dr. Andrew Goodman *et al.*, "Placebo-Controlled Double-Blinded Dose Ranging Study of Fampridine-SR in Multiple Sclerosis," *Multiple Sclerosis*, 8:S116-S117 (P308) (July 2002) ("Goodman I"), is a printed publication (abstract) published in the United States and available to persons of ordinary skill in the art in 2002. (*See* JTX-0062) The lead author of

---

[10]Dr. Goodman testified that studies that evaluate multiple efficacy endpoints can result in false-positive findings. (*See* Goodman Tr. at 471-72, 562-64; *see also* PTX-0416 at 5 (Solari)) Dr. Goodman opined that, adjusted for the number of measures assessed in Schwid, the timed gait p-value would be 0.14, indicating a 14% likelihood that the measured result was due to chance. (Goodman Tr. at 562-63)

Goodman I, Dr. Andrew Goodman, appeared at trial as one of Plaintiffs' expert witnesses. (Goodman Tr. at 474)

118. Goodman I disclosed the results of Acorda's MS-F201 study – a randomized-double-blind, placebo-controlled, dose-ranging study of 4-AP in MS patients. (JTX-0062 at S116) Goodman I explained that the MS-F201 study's "primary aim" was to "determine the safety and tolerability of escalating doses of a sustained-release ('SR') formulation given orally to patients with MS." (*Id.*) Goodman I also stated that the MS-F201 study aimed "to explore efficacy over a broad dose range using measures of fatigue and motor function." (*Id.*)

119. Goodman I reported that the MS-F201 study involved 36 patients who were randomized to treatment (25 patients) and placebo (11 patients) groups. (JTX-0062 at S116-17) The treatment group received placebo for the first week, 20 mg of 4-AP per day during the second week, and then an additional 10 mg per day each subsequent week to a maximum of 80 mg/day during the eighth week of the study. (*Id.* at S117) Five subjects withdrew due to adverse side effects: two due to seizures, one due to tremors, one due to dizziness and nausea, and one due to leg pain. (*Id.*)

120. Goodman I stated that analysis of the MS-F201 study data "showed statistically significant improvement from baseline compared to placebo in functional measures of mobility (timed 25 walking speed; p=0.04) and lower extremity strength (manual muscle testing; p=0.01).[11] (JTX-0062 at S117) None of the other measures showed "significant treatment effects." (*Id.*)

---

[11]Dr. Goodman testified that the p-values reported in Goodman I reflected the aggregated value for the treatment group ***as a whole***, including all dosages, and did not reflect the results associated with any single dosage. (Goodman Tr. at 482-84)

121. Goodman I also observed that "[d]ose response curves showed increasing benefit in both measures in the 20 to 50 mg/day range." (JTX-0062 at S117)

**e. Goodman Poster**

122. The Goodman Poster is a poster presented at the September 2002 annual meeting of the America's Committee for Treatment and Research in Multiple Sclerosis, held in Baltimore, Maryland. (*See* JTX-0080; JTX-0080A) The Goodman Poster was a public presentation in the United States and available to a person of ordinary skill in the art in September 2002. (*See* Goodman Tr. at 523-24)

123. Like Goodman I, the Goodman Poster reports results from the MS-F201 study. (Goodman Tr. at 479-80)

124. The Goodman Poster reports that the MS-F201 study was designed to "[d]etermine [the] safety of multiple doses of [sustained-release 4-AP] (one week each of 20 mg/day, 30 mg/day, 40 mg/day, 50 mg/day, 60 mg/day, 70 mg/day and 80 mg/day)" and to "[o]btain evidence of efficacy and dose-response using several outcome measures." (JTX-0080A) The poster identifies multiple efficacy endpoints, including the timed 25-foot walk, manual muscle testing, and patient self-reports using subjective fatigue scales. (*Id.*)

125. The Goodman Poster disclosed that the MS-F201 study data reflected statistically significant improvements in the timed 25-foot walk and manual muscle test relative to placebo. (JTX-0080A (stating that MS-F201 study showed "[s]ignificant benefit on timed walking")) The poster also reported a greater improvement in fatigue in the placebo-treated group as compared to the 4-AP treated group. (*Id.*)

126. The Goodman Poster includes a graph (reproduced below) entitled "Dose

Response 25 Ft. Walk" which shows the measured improvement in walking among members of the treatment group at each dose. (JTX-0080A) The graph does not include data for the placebo group. (*Id.*)




127. The Goodman Poster disclosed adverse events in the treatment group "consistent with the findings of previous studies." (JTX-0080A) It also noted that further study was required to determine whether there was a seizure risk in the disclosed dose range. (*Id.*)

**f. Goodman II**

128. Dr. Andrew Goodman *et al.*, "Placebo-Controlled Double-Blinded Dose Ranging Study of Fampridine-SR in Multiple Sclerosis," *Neurology*, vol. 60 (Supp. 1):A167 (March 2003) ("Goodman II"), is a printed publication published in the United States and available to persons of ordinary skill in the art in March 2003. (*See* JTX-0061) The lead author is again Dr. Andrew Goodman. (Goodman Tr. at 479)

129. Goodman II disclosed the results of the MS-F201 study. (Goodman Tr. at 479)

**g. Hayes**

130. Keith C. Hayes *et al.*, "Pharmacokinetic Studies of Single and Multiple Oral Doses of Fampridine-SR (Sustained-Release 4-Aminopyridine) in Patients with Chronic Spinal Cord Injury," *Clin. Neuropharmacol.*, 26(4):185-92 (2003) ("Hayes III"), is a printed publication published in the United States and available to persons of ordinary skill in the art in 2003. (JTX-0069)

131. Hayes reported the pharmacokinetic ("PK") data from early Acorda clinical trials using 4-AP with patients having spinal cord injuries. (Peroutka Tr. at 87-88; JTX-0069 at 191; JTX-0002 at 25:1-28) The first study evaluated single doses of sustained-release 4-AP (10 mg, 15 mg, 20 mg, and 25 mg) administered once a week for 4 weeks in 14 patients with spinal cord injuries. (JTX-0069 at 186) The second study examined the effect of multiple oral doses of sustained-release 4-AP (10 mg, 15 mg, 20 mg, and 25 mg, each given twice daily for six days and once on the seventh day) in six patients with spinal cord injury. (*Id.*)

132. Hayes reported that the plasma half-life of 4-AP was 5.6 to 7.6 hours; that the peak plasma concentration of 4-AP shortly after doses was 2.6 to 3.7 hours; and that 4-AP concentrations reached steady state after four days of twice-daily administration. (JTX-0069 at 185)[12]

**h. Solari**

133. Alessandra Solari *et al.*, "Aminopyridines for Symptomatic Treatment in Multiple

[12]The $T_{max}$, $C_{avg}$ at steady state, and ratio of $C_{max}$ to $C_{min}$ at steady state are all within the claimed pharmacokinetic ranges of the Acorda Patents. (*Compare* JTX-0069 *with* JTX-0002) The '826 patent refers to the data in Hayes, and one of this patent's tables is identical to a table disclosed in Hayes. (Kibbe Tr. 223:25-224:15)

Sclerosis," Cochrane Review, *The Cochrane Library*, Issue 2 (2003) ("Solari"), is a printed publication published in the United States and available to persons of ordinary skill in the art in 2003. (*See* PTX-0416)

134. Solari is a systematic review of the literature related to 4-AP, including a meta-analysis of the few randomized clinical trials of 4-AP that had been conducted in MS patients. (PTX-0416 at 1) Solari excluded from its analysis several prior art studies, including Hayes and the MS-F201 study disclosed in the Goodman references. (*Id.*)

135. Among the studies considered, Solari found that 54% of patients taking 4-AP experienced improved motor functions, compared with only 7% of patients taking placebo. (PTX-0416 at 1) However, Solari noted that "publication bias remain[ed] a pervasive problem," as well as the "distinct possibility of false positive findings" in trials where " the primary endpoint was not specified." (*Id.* at 1, 5) Solari concluded that, while "[p]otassium blocking drugs [including 4-AP] may be able to improve nerve function in nerves without enough myelin," there was at that time "not enough evidence about the safety of these drugs or whether [symptomatic] benefits are certain." (*Id.* at 15)

## G. Secondary Considerations

### i. Commercial Success

136. Annual net sales of Ampyra® in the United States were $133.1 million in 2010, the year of its launch, and increased to $436.9 million in 2015. (PTX-0795 at 1) Total sales were $1.7 billion by the end of 2015. (*See id.*) Net income from those sales was $998.7 million. (*See id.*)

137. The volume of Ampyra® tablets sold increased from 8 million in 2010 to

16.6 million in 2015, despite an increase in price per tablet from $17 to $26. (Bell Tr. at 578, 592) From 2011 (the first full year of sales) through 2015, domestic unit sales (tablets) of Ampyra® grew at an average rate of 8% per year, and net sales (dollars) increased at an average rate of 20% per year. (PTX-0794; PTX-0795; PTX-0796) Over this same period, Acorda's annual marketing expenditures decreased. (Bell Tr. at 590)

138. Acorda receives additional revenue from milestone and royalty payments associated with licenses it granted to Biogen to sell dalfampridine outside the U.S. (PTX-0733 at 25-27) Payments from Biogen have totaled approximately $135 million to date. (*Id.*)

139. Surveys have found that 87% of Ampyra® prescribers and 83-87% of Ampyra® patients were moderately to highly satisfied with the drug. (PTX-0556 at 7; PTX-0547 at 4; PTX-0549 at 4) Sales to patients continuing with Ampyra® therapy accounted for 76-78% of Ampyra®'s revenue in 2012-13. (PTX-0579 at 2; PTX-0604 at 3) Patients' ability to renew prescriptions was in some cases contingent upon whether the patients could demonstrate to their insurance companies that they had experienced improvements in walking. (PTX-0543 at 2; PTX-0603 at 1; PTX-0664 at 5)

140. Ampyra® is promoted to physicians and patients only as a treatment to improve walking in patients with MS. (PTX-0111 at 20; PTX-0115; PTX-0116; PTX-0119; PTX-0121; PTX-0556 at 8, 10; PTX-0586 at 25) Acorda's key Ampyra® messages to physicians and patients are based on clinically meaningful improvement in walking speed. (*Id.*)

141. The commercial opportunity for Ampyra® is constrained by its limited indication (improving walking in patients with MS) and the relatively small proportion of MS patients (25-30%) who are eligible to take the drug. (McDuff Tr. at 630; JTX-0076; DTX-0419; DTX-0057)

Ampyra® sales revenue is equal to approximately 2-3% of the total sales of the top ten MS drugs. (McDuff Tr. at 633-34)

142. Plaintiffs' expert, Dr. Bell, opined that the preclinical costs associated with developing Ampyra® were lower than for the typical drug, because 4-AP was a pre-existing drug. (Bell Tr. at 595-96)

143. The expected success rate for Ampyra® was higher than average, for reasons including that it is an orphan drug. (Bell Tr. at 596)

**ii. Long-Felt Need**

144. Difficulty walking is one of the most common difficulties faced by MS patients. (Goodman Tr. at 432, 511) The symptoms of MS that affect mobility have a significant impact on independence, quality of life, safety, and financial and emotional health. (*Id.* at 432, 512) MS patients often cite walking impairments as among the most devastating symptoms of their disease. (*Id.* at 432)

145. The FDA granted priority review to Acorda's Ampyra® New Drug Application. (Cohen Tr. at 300) The FDA's decision to grant priority review indicated that the FDA considered Ampyra® a potentially important therapy for an important condition. (Goodman Tr. at 512)

146. Ampyra® is the first and only FDA-approved drug indicated for improving walking in patients with MS. (Goodman Tr. at 512-13) However, only 15-20% of the patients who suffer from walking difficulties are prescribed Ampyra®. (*Id.* at 539-40)

**iii. Failure of Others**

147. Elan attempted to demonstrate the effectiveness of 4-AP in treating MS but failed

to show therapeutic efficacy (using the EDSS test). (Goodman Tr. at 513)

148. Sanofi-Aventis attempted to create a therapy, Nerispirdine, to improve walking in MS patients. (*See* PTX-0569 (Nerispirdine Report); Lublin Tr. at 411-12) The active ingredient in Nerispirdine was (like 4-AP) a potassium channel blocker. (Lublin Tr. at 412) Like Acorda's Ampyra® trial, the Sanofi-Aventis Nerispirdine trial used a timed 25-foot walk as a measure of efficacy and used a responder analysis to analyze whether the data reflected efficacy. (PTX-0569; Lublin Tr. at 412) Sanofi-Aventis found "no evidence" of efficacy. (Lublin Tr. at 412)

**H. Defendants' ANDAs**

149. Each Defendant filed an ANDA, pursuant to the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et. seq.* ("FDCA"), seeking approval to engage in the commercial manufacture, sale, or use of dalfampridine (10 mg) oral extended release tablets before the patents-in-suit expire. (SUF ¶¶ 78, 98, 111, 131)

150. In connection with the filing of its respective ANDA, each Defendant submitted a Paragraph IV certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV), alleging that each of the patents-in-suit is invalid, unenforceable, or will not be infringed by the commercial manufacture, use, or sale of that defendant's generic dalfampridine tablet. (SUF at ¶¶ 79, 99, 112, 132)

**I. Infringement**

151. Each Defendant has stipulated that the filing of its ANDA with the FDA, seeking approval to market its generic dalfampridine tablets prior to the expiration of the patents-in-suit, infringed the asserted claims of the patents-in-suit under 35 U.S.C. § 271(e)(2)(A), to the extent those claims are found to be valid and enforceable. (D.I. 254 ¶ 1)

152. Each Defendant has stipulated that the asserted claims of the patents-in-suit would

be infringed by use of the proposed generic products that are the subject of its ANDA, to the extent those claims are valid and enforceable. (D.I. 254 ¶ 2)

**J. Fact Witnesses**

153. Dr. Ron Cohen was called by Plaintiffs to testify live at trial as a fact witness. Dr. Cohen is a medical doctor and a named inventor on the Acorda Patents. (Cohen Tr. at 274) He is the President and CEO of Acorda, which he founded in 1993. (*Id.* at 274, 277)

154. Michael Myers testified by deposition. Mr. Myers is a named inventor of the Elan Patent and was designated as Alkermes' Rule 30(b)(6) witness on numerous topics. (Tr. at 148)

155. Mairead Fogarty testified by deposition. Ms. Fogarty was designated as Alkermes' Rule 30(b)(6) witness on numerous topics. (Tr. at 158)

156. Andrew Blight testified by deposition. Mr. Blight is a named inventor of the Acorda Patents and was designated as Acorda's Rule 30(b)(6) witness on numerous topics. (Tr. at 161)

157. The Court found all of the fact witnesses who testified to be credible.

**K. Expert Witnesses**

**i. Plaintiffs' Experts**

158. Dr. Reza Fassihi testified on behalf of Plaintiffs as an expert witness in pharmaceutics and, in particular, sustained-release formulations. (Fassihi Tr. at 320-21) Dr. Fassihi is a professor of pharmacy at Temple University School of Pharmacy. (*Id.* at 315) He holds a Ph.D. in pharmaceutics from Brighton University (U.K.). (*Id.* at 316; JTX-0040 at 3) A majority of Dr. Fassihi's publications relate to the development of sustained-release pharmaceutical formulations. (Fassihi Tr. at 320; *see also* JTX-0040 at 6-22)

159. Dr. Andrew Goodman testified on behalf of Plaintiffs as an expert in neurology and, in particular, MS, the treatment of MS, and clinical trials in MS. (Goodman Tr. at 428) Dr. Goodman is a Professor of Neurology at the University of Rochester, where he directs the Immunology and Multiple Sclerosis Division within the Department of Immunology. (*Id.* at 424) He has for decades specialized in treating MS patients and conducting MS clinical trials, treating thousands of MS patients, publishing widely regarding MS, and training other doctors regarding the care of MS patients. (*Id.* at 423-27) Dr. Goodman has also advised and consulted with Elan for many years, beginning in 1994. (*Id.* at 536) He has served as a paid consultant for Acorda since the late 1990s, and in the course of his consulting relationship he worked with the inventors of the Acorda Patents on the development of Ampyra®. (*Id.*) He continues to receive compensation from Acorda when he attends meetings of its MS advisory committee. (*Id.* at 537)

160. Dr. Fred Lublin testified on behalf of Plaintiffs as an expert in neurology, with specific expertise in research on MS and care of patients with MS. (Lublin Tr. at 392) Dr. Lublin is a board-certified neurologist and Professor of Neurology at the Icahn School of Medicine at Mount Sinai in New York. (*Id.* at 386) He has for decades specialized in treating MS patients and conducting MS clinical trials, treating thousands of MS patients, publishing widely regarding MS, and training other doctors regarding the care of MS patients. (*Id.* at 388-90)

161. Dr. Gregory Bell testified on behalf of Plaintiffs as an expert in the economics of the pharmaceutical industry. (Bell Tr. at 576) Dr. Bell is a Group Vice President at Charles River Associates, a global economics and management consulting firm, where he is the global head of the life sciences practice and works on, among other things, new drug strategy, product

launches, pricing, and market strategy. (*Id.* at 573-74) He earned a Ph.D. in business economics and an M.B.A. (*Id.* at 573)

**ii. Defendants' Experts**

162. Dr. Stephen Peroutka testified on behalf of Defendants as an expert in neurology, pharmacology, and drug development. (Peroutka Tr. at 49) Dr. Peroutka is currently Vice President of Neuroscience and Global Therapeutic Head of inVentiv Health, a company that focuses on neurosciences. (*Id.* at 47) Previously, Dr. Peroutka worked as an Assistant Professor of Neurology at Stanford University and in the neuroscience sector of the pharmaceutical industry. (*Id.* at 45-47) He also treated roughly 100 MS patients during the 1980s. (*Id.* at 45) Dr. Peroutka holds an M.D. and a Ph.D. in pharmacology and experimental therapeutics. (*Id.*)

163. Dr. Arthur Kibbe testified on behalf of Defendants as an expert in pharmacokinetics and the development and evaluation of pharmaceutical dosage form formulations, including immediate and sustained-release formulations. (Kibbe Tr. at 179-80) Dr. Kibbe is an Emeritus Professor of Pharmacy at Wilkes University. (*Id.* at 177) Since 1989, Dr. Kibbe has also served on the Steering Committee, as Editor-in-Chief, and as an author of 20-25 monographs included in the *Handbook of Pharmaceutical Excipients*, an internationally-recognized reference text disclosing information on excipients, including those used to achieve sustained release. (*Id.* at 176-78) He has almost 50 years of experience in the development and formulation of pharmaceutical dosage forms, including the development of dosage forms to be used for the first time in patients, as well as the development and review of pharmacokinetic studies (although he has not researched or published on sustained-release pharmaceutical

formulations). (*Id.* at 175, 229-31) Among his other degrees, Dr. Kibbe holds a Master's Degree in pharmaceutics, focusing on formulation development and pharmacokinetics. (*Id.* at 174)

164. Dr. DeForest McDuff testified on behalf of Defendants as an expert on economics and commercial success as it relates to patentability. (McDuff Tr. at 627) Dr. McDuff is a Vice President at Intensity Corporation, a consulting firm with expertise in economics, finance, law, computer sciences, and data science. (*Id.* at 626) He has substantial experience in the pharmaceutical industry, including working on approximately 20 cases considering commercial success. (*Id.* at 627) He holds a Ph.D. in economics. (*Id.* at 626)

165. The Court found each of the expert witnesses who testified for each side to be credible.

## L. Person Having Ordinary Skill in the Art

166. The parties have offered different definitions of a person of ordinary skill in the art ("POSA"). Plaintiffs define POSA as having "the knowledge of someone with an M.D. with experience treating MS patients and a Ph.D. in pharmaceutics, or pharmacology, and at least five years of experience in clinical research and drug development, including researching, designing, and testing drug formulations, particularly for the treatment of multiple sclerosis." (D.I. 262 ¶ 68) Defendants' definition differs from Plaintiffs' only in that Defendants do not believe that a POSA must have experience treating MS patients. (*See* D.I. 252-1 Ex. 3 ¶¶ 22-24) All of the testifying experts agreed, however, that their opinions regarding obviousness would be the same regardless of which definition the Court adopts. (Peroutka Tr. at 72; Kibbe Tr. at 184; Fassihi

Tr. at 323; Lublin Tr. at 406; Goodman Tr. at 430) Therefore, the Court need not make an express finding as to which party's definition of a POSA it will use.[13]

167. A POSA at the priority date would have understood that all scientific studies are subject to limitations, including investigator bias, number of subjects, and limitations on the inferences that may be drawn from various statistical analyses. (Peroutka Tr. at 143) It is common for authors of journal articles to comment on limitations of studies reviewed in their papers. (*Id.*) Persons of ordinary skill in the art consider these limitations in the context of the reported study results and the teachings of the prior art. (*Id.*)

168. A POSA at the priority date of the Acorda Patents would have understood that MS studies are particularly unpredictable in view of the great variability in MS patients' responses to treatment and the high risk of placebo effect. (*See* Lublin Tr. at 401-04; Goodman Tr. at 436-38)

## LEGAL STANDARDS

### I. Presumption of Validity

An issued patent is presumed to be valid. *See* 35 U.S.C. § 282. Therefore, to invalidate a patent, a party must carry its burden of proof by "clear and convincing evidence." *See Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009). Clear and convincing evidence is evidence that "proves in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] highly probable." *Intel Corp. v. ITC*, 946 F.2d 821, 830 (Fed. Cir. 1991) (internal quotation marks omitted; first alteration in original).

---

[13] *See generally Supernus Pharms. Inc. v. Actavis Inc.*, 2016 WL 527838, at *5 (D.N.J. Feb. 5, 2016) (making no express finding of POSA when there was no material difference between plaintiff's and defendant's definitions and court's analysis was same under either definition).

A defendant's burden to prove obviousness is "especially difficult when the prior art [on which the party relies] was before the PTO examiner during prosecution of the application." *Hewlett-Packard Co. v. Bausch & Lamb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990).

## II. Obviousness

A patent may not issue "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103(a). Obviousness is a question of law based on underlying factual findings concerning: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

To prove that a patent is obvious, a party must demonstrate "that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1069 (Fed. Cir. 2012) (internal quotation marks and citation omitted); *see also Amgen, Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009) ("An obviousness determination requires that a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art."). While an analysis of any teaching, suggestion, or motivation to combine known elements is useful to an obviousness

analysis, the overall obviousness inquiry must be expansive and flexible. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 415, 419 (2007).

The use of hindsight is not permitted when determining whether a claim would have been obvious to one having ordinary skill in the art. *See id.* at 421 (cautioning against "distortion caused by hindsight bias" and obviousness "arguments reliant upon *ex post* reasoning"). To protect against the improper use of hindsight when assessing obviousness, the Court is required to consider objective (or "secondary") considerations of non-obviousness, such as commercial success, failure of others, unexpected results, and long-felt but unmet need. *See, e.g., Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013). Secondary considerations "may often be the most probative and cogent evidence in the record" relating to obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

## DISCUSSION

### I. The Elan Patent

The asserted claims of the Elan Patent – claims 3 and 8 – require that the claimed sustained-release formulation of 4-AP is directed to a "method of treatment of a neurological disease" by administering a sustained-release mono- or di-aminopyridine "which achieves therapeutically effective blood levels over a 12-24 hour period when administered on a once- or twice-daily basis."[14] (JTX-0001 at 22:16-25) The Court previously construed the term "therapeutically effective blood levels" as meaning "blood levels sufficient to produce a therapeutic effect." (D.I. 195 at 6)

[14]Claim 3 specifies that the neurological disease is MS. (JTX-0001 at 22:29-30) Claim 8 specifies that the aminopyridine is 4-AP. (*Id.* at 22:50-51)

Defendants argue that claims 3 and 8 of the Elan Patent are obvious because the prior art taught the use of sustained-release drug formulations as well as the use of 4-AP to treat MS, and a POSA would have been motivated to combine these prior art teachings and to have a reasonable expectation of success in doing so. (*See* D.I. 265 at 17) Plaintiffs do not dispute that, as of the priority date of the Elan Patent,[15] 4-AP was a known drug (*see* D.I. 272 at 14) and sustained release was a known formulation type (*see id.* at 20). Plaintiffs do dispute, however, whether a POSA would have had a reasonable expectation of success in developing a sustained-release formulation of 4-AP.[16] In particular, Plaintiffs contend that a POSA would not have had a reasonable expectation of success in using ***any*** 4-AP formulation to treat MS – and emphasize that such a person would not have reasonably expected success with a ***sustained-release*** formulation. (*See id.* at 25)

Defendants have the burden to prove invalidity by clear and convincing evidence. *See Otsuka*, 678 F.3d at 1289-90; *Procter & Gamble Co.*, 566 F.3d at 994. As explained below, the Court concludes that Defendants have failed to meet their burden to establish that the Elan Patent is invalid for obviousness. Although Defendants have shown that a POSA would have had a

---

[15]Plaintiffs "rely[]" on a November 1991 priority date. (D.I. 265 at 11 n.1) "Defendants' arguments do not turn on whether the date for determining prior art is November 1990 or November 1991." (*Id.*)

[16]Plaintiffs frame their discussion regarding the teachings of the prior art as posing a question of whether a POSA would have been "motivated to develop" a sustained-release formulation of 4-AP, given how little was known about the drug's safety and efficacy. (D.I. 272 at 14-20) (internal punctuation omitted) In substance, however, Plaintiffs' arguments relate more so to whether the prior art would have given a POSA a reasonable expectation of success in developing ***any*** formulation of 4-AP to treat MS. (*See id.* at 25) Specifically, Plaintiffs argue that "proof of safety and efficacy beyond what could be gleaned from [the prior art] would be needed to motivate a POSA to undertake the development of a sustained-release formulation of 4-AP." (*Id.* at 19)

reasonable expectation of success in using 4-AP to treat MS, Defendants have not shown that a POSA would have had a reasonable expectation of success in developing an effective ***sustained-release*** formulation of the drug.

### A. Use of 4-AP to Treat MS

The parties dispute whether a POSA would have had a reasonable expectation of success in using ***any*** formulation of 4-AP to treat MS. Defendants argue that the prior art establishes that 4-AP could be used to treat MS. In support of their contention, Defendants cite principally to two categories of prior art: (1) Stefoski and Davis (collectively, the "Rush Studies"), which describe the use of 4-AP to improve symptoms in MS patients, and (2) early human studies and animal models that explore 4-AP's safety and benefits in improving neurotransmission. (*See* D.I. 265 at 12-15) Plaintiffs contend that this prior art amounts to "at best, fragmentary hints" that 4-AP could be a clinically useful treatment for MS – particularly given the questions about the safety of 4-AP. (D.I. 272 at 16)

The Court is persuaded that the Rush Studies establish that a POSA would have had a reasonable expectation of success of administering 4-AP to achieve a therapeutic effect in MS patients. In the first study, reported in Stefoski, 12 patients with MS and five men without MS received intravenous doses of between seven and 35 mg of 4-AP. (Findings of Fact ("FF") ¶ 45) As Plaintiffs acknowledge, most of the MS patients demonstrated some improvement in symptoms, including vision, ocular motor function, and motor function (defined as power, coordination, and gait). (*Id.*) Stefoski concluded that "4-AP lessens multiple neurological deficits in multiple sclerosis" and "suggests a clinical usefulness for [4-AP]." (JTX-0112 at 71, 76) Similarly, the second study, reported in Davis, found that orally administered 4-AP produces

clinically important improvements in multiple, chronic deficits resulting from MS. (JTX-0043 at 186) Davis was a placebo-controlled study of the effect of 10-25 mg immediate-release doses of 4-AP in 20 MS patients (15 patients received 4-AP and five patients received placebo). (FF ¶ 48) Davis reported mild to marked improvement in all patients, including improvements in motor coordination in nine out of 13 subjects tested. (*Id.*)

In addition to suggesting that 4-AP could improve symptoms of MS, the Rush Studies' findings about 4-AP's safety suggested that there would be a viable therapeutic window for the drug (*i.e.*, a range of doses at which the drug was both non-toxic and had therapeutic effects). Davis, for example, reported no serious adverse events in patients taking 10-25 mg oral doses. Davis concluded that, even in light of prior research indicating that 4-AP could cause seizures, the results of the reported study suggested that 10-25 mg per day could be a "safe and effective therapeutic window for orally administered 4-AP for visual and motor deficits in . . . MS patients."[17] (JTX-0043 at 191)

Plaintiffs argue that the Rush Studies provide a limited basis for drawing conclusions about the possible therapeutic effects of 4-AP. As the 1994 Bever article points out, and as Dr. Fassihi testified at trial, the Rush Studies were conducted in small numbers of patients, "did not use randomized treatment design, were not double-blinded, and relied on outcome measures that

---

[17]Defendants argue that Murray, along with two studies conducted in the 1970s, also established the safety of long-term use of 4-AP in humans. (*See* D.I. 265 at 12-13) Although these studies tend to suggest that 4-AP is not toxic in all patients, a POSA would have found the data in these studies to have limited probative value in assessing the safety of 4-AP in MS patients, particularly concerning the seizure risk associated with the use of 4-AP in MS patients. This is because each of the three earlier studies were conducted in patients who suffered from medical conditions that, unlike MS, do not affect the central nervous system. (*See* D.I. 272 at 14) Dr. Goodman testified that a POSA would have understood that MS patients had a greater risk of suffering seizures than did the patients in the Murray study. (*See* Goodman Tr. at 441-42)

were not widely accepted." (Fassihi Tr. at 355) Indeed, Stefoski and Davis themselves draw qualified conclusions from the Rush Studies.[18] Stefoski describes the need to conduct further studies to assess the "possibility" that 4-AP would have "clinical usefulness." (JTX-0112 at 76) Similarly, Davis notes that the "possible use of oral 4-AP as a clinical treatment in MS requires further study to assess long-term efficacy, safety, and patient selection criteria." (JTX-0043 at 190)

The Court agrees with Plaintiffs that a POSA would have found in the results of the Rush Studies only limited information regarding the safety and efficacy of 4-AP for treating MS. A POSA would have understood that additional clinical research would be needed to establish, among other things, 4-AP's therapeutic effects and the dosages necessary to achieve them. (*See* JTX-0043 at 190) Further, a POSA would have understood that additional testing would be required to establish that the drug could meet the FDA's standards of safety and efficacy. (*See id.*)

Still, as even Plaintiffs acknowledge, the prior art need not contain "[c]onclusive proof of efficacy" in order to support a finding that a POSA would have been motivated to develop, and would have had a reasonable expectation of success in developing, a medical treatment. *See Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014). Rather, a POSA need only have a "reasonable expectation of success in developing [the claimed invention]." *Allergan, Inc. v. Sandoz, Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013).

---

[18]As Defendants note, however, the studies' titles both state that 4-AP "improves clinical signs in multiple sclerosis." (*See* D.I. 273 at 7) (internal quotation marks omitted)

Here, the patentee broadly claimed the use of 4-AP to achieve blood levels having ***any*** "therapeutic effect." (D.I. 195 at 6) The prior art would have given a POSA a reasonable expectation of success in using 4-AP to achieve a therapeutic effect in MS patients. Although the Rush Studies each involved a limited number of patients and did not include statistical analysis (*see* D.I. 272 at 15), a vast majority of patients involved in these studies reported some improvement in symptoms. Further, the trials reported that many patients experienced improvements in VEP, a test that is indisputably immune to placebo effect. (*See* D.I. 265 at 15; D.I. 272 at 17; JTX-0043 at 190; FF ¶ 48) This result would have allayed a POSA's concerns that the Rush Studies' results were attributable to the placebo effects often observed in MS trials. (*See* D.I. 265 at 15) Similarly, the results were consistent with a small animal study that showed that 4-AP could "reverse and improve" the disruption in nerve flow caused by demyelination. (D.I. 263 ¶ 55) Consistent with these results, the authors of the Rush Studies concluded that 4-AP produced improvements in the condition of MS patients (despite noting that the studies did not conclusively establish 4-AP's "clinical" usefulness). Similarly, Stefoski concluded that "the magnitude of the improvements . . . observed without serious side effects suggests a clinical usefulness for [4-AP], administered orally in selected patients" (JTX-0112 at 76), and Davis concluded that "orally administered 4-AP produces clinically important improvements in multiple, chronic deficits in MS" (JTX-0043 at 186).

Taken as a whole,[19] the evidence would have strongly suggested to a POSA at the pertinent time that 4-AP could be used to improve symptoms of MS. Thus, the Court concludes that a POSA would have had a reasonable expectation that 4-AP would be "therapeutically effective" in treating MS.[20] (JTX-0001 at 22:23)

**B. Developing a Sustained-Release Dosage Form**

Having found that a POSA would have had a reasonable expectation of success in using 4-AP to treat MS, the Court must next determine whether a POSA would also have had a reasonable expectation of success in developing a ***sustained-release*** formulation of 4-AP to treat MS. It is undisputed that the asserted claims of the Elan Patent are directed to sustained-release formulations of 4-AP. (Kibbe Tr. at 219; Fassihi Tr. at 374) Thus, the parties' dispute centers

---

[19]The parties' post-trial briefs addressed two other sources of evidence regarding whether the prior art taught the use of 4-AP to treat MS. Defendants argue that the Elan Patent itself characterizes the prior art as establishing that 4-AP could be used to treat MS patients. (*See* D.I. 265 at 15) Citing a Davis and Stefoski study, the Elan Patent explains that 4-AP had previously been found to "alleviat[e] symptoms in MS patients." (JTX-0001 at 1:53-54) Plaintiffs contend that these statements do not refer to the published prior art discussed above, pointing out that the conditions of the study described are inconsistent with those outlined by the Rush Studies. (*See* D.I. 272 at 17-18) In Plaintiffs' view, the cited statements reflect only "the inventors' personal knowledge about the continuing work by Davis and Stefoski" and cannot support a finding as to a POSA's expectations based on publicly-available prior art. (*Id.*) The parties also dispute whether a later published study – Stefoski and Davis, "4-Aminopyridine In Multiple Sclerosis: Prolonged Administration," *Neurology*, 41:1344-48 (Sept. 1991) ("Stefoski II") – should be treated as prior art. Defendants contend that this study precedes the priority date of the Elan Patent (*see* D.I. 265 at 16 n.2); Plaintiffs counter that Defendants waived any right to discuss the study because they identified the paper as prior art only with respect to the Acorda Patents. (*See* D.I. 272 at 18-19) Because the Court has found that the Rush Studies, even by themselves, establish that a POSA would have had a reasonable expectation of success in using 4-AP to treat MS, the Court does not need to make any findings as to the disputes described in this footnote. Resolution of these disputes would not alter the Court's pertinent conclusions.

[20]As the Court noted in its claim construction opinion, decreasing or preventing symptoms is one type of therapeutic effectiveness. (*See* D.I. 195 at 6-7)

on whether development of a sustained-release dosage form would have been obvious to a POSA.

Defendants argue that a POSA would have had a reasonable expectation of success in developing such a formulation because a POSA would have recognized the advantages of such a dosage form for 4-AP and would have found the development process to be routine. (*See* D.I. 265 at 30-31) Plaintiffs respond that there was insufficient information in the prior art to provide a POSA with a reasonable expectation of success in developing such a formulation. (*See* D.I. 272 at 20-25)

The parties do not genuinely dispute that a POSA would have understood the hypothetical advantages of a sustained-release formulation of 4-AP as compared to an immediate release formulation. (*See* Fassihi Tr. at 325; Kibbe Tr. at 207-08) Dr. Peroutka testified that a POSA would have concluded that 4-AP's short half-life (reported in Stefoski and Uges) and narrow therapeutic window (reported in Davis) would make a sustained-release formulation of the drug particularly advantageous, because a sustained-release formulation could overcome the need for dosing at inconvenient three- or four-hour intervals. (Peroutka Tr. at 77-78, 81) Indeed, Dr. Blight, one of the two named inventors on the Acorda Patents, testified that it was "not unusual" or "particularly mysterious" to pursue development of a sustained-release formulation for a drug with a short half-life. (Blight Tr. at 164)

Based on this testimony, it is evident that the prior art would have provided a clear motivation for a POSA to prepare a sustained-release formulation of 4-AP. The Elan Patent itself, in discussing the prior art, expressly states that "it can be appreciated . . . that there is a need for an improved dosage form" of 4-AP, as a POSA would have known based on the prior

art that "it is desirable that the drug be formulated so that it is suitable for once- or twice-daily administration to aid patient compliance." (JTX-0001 at 2:8-12) Thus, the key factual dispute for the Court to resolve is whether a POSA would have had a "reasonable expectation of success" in developing a sustained-release formulation that could realize those hypothetical and strongly-desired, benefits.

Defendants argue that the prior art supports such a finding. (*See* D.I. 265 at 30-33) Defendants' expert, Dr. Kibbe, testified that development of a sustained-release formulation would have been "straightforward" for a POSA in light of the information included in Remington's, an indisputably authoritative treatise on pharmaceutical formulations. (Kibbe Tr. at 208-11) Remington's discloses five sustained-release platforms, explains how to prepare them, and lists appropriate excipients for each. (*See id.* at 208-09) Dr. Kibbe testified that a POSA would have known how to choose a platform from among those listed; from there, could perform compatibility tests to identify, within approximately four months, appropriate excipients; could then make several prototypes over the course of a day or two; and thereafter could perform dissolution testing to confirm that, when administered, the drug would have the desired release profile. (*See id.* at 210-11)

Plaintiffs argue that Remington's demonstrates only that certain platforms had been used to produce sustained-release formulations of other drugs but would not have provided a POSA with sufficient information as to whether it was possible to develop a sustained-release formulation of 4-AP that could achieve therapeutic blood levels. (*See* Fassihi Tr. at 328-29, 343-45, 348-52) Plaintiffs' expert, Dr. Fassihi, highlighted several attributes of 4-AP that would have made the development of a sustained-release formulation of it particularly challenging. He

explained that a POSA would have understood, based on the incidence of seizures in past trials of immediate-release 4-AP, that there was only a limited range of concentrations over which 4-AP was both effective and non-toxic. (*See id.* at 328, 350) This combination of potency and potential toxicity would have complicated the design of a sustained-release formulation because of concerns related to dose-dumping and the need to achieve a uniform distribution of 4-AP throughout the formulation. (*See id.* at 325-26, 328, 341-43) Further, 4-AP is highly soluble, making it difficult to slow its release. (*See id.* at 342-43; *see also* Myers Tr. at 153-54; JTX-0081 at 1679)

In addition to the uncertainty regarding whether it would be possible to overcome the challenges posed by 4-AP's high solubility and narrow therapeutic window, Dr. Fassihi testified that a POSA would have had insufficient information about 4-AP's pharmacokinetics. Unlike all other sustained-release drugs that were on the market at the pertinent time, 4-AP had never been approved by the FDA in an immediate-release form. (*See* Fassihi Tr. at 335-36, 366) Consequently, there was a dearth of information about 4-AP's pharmacokinetics relative to what would normally have been available to a POSA attempting to develop a sustained-release formulation. (*See id.* at 336-38) In particular, a POSA would have known little about how 4-AP is distributed, metabolized, and eliminated by the body when released at various points throughout the gastrointestinal tract. (*See id.* at 337-38; *see also id.* at 326-27 (explaining that sustained-release formulations differ from immediate release formulations because they travel through gastrointestinal tract, which subjects sustained-release formulations to wider varieties of environments)) The data presented in Uges, the only prior art publication containing any

pharmacokinetic information regarding 4-AP, reflected the results of only a small number of patients and demonstrated a high degree of variability. (*See id.* at 348-52)

In Defendants' view, a POSA could have overcome the challenges Dr. Fassihi highlighted by engaging in "routine experimentation[]." (D.I. 273 at 18) Dr. Kibbe testified that resolving concerns unique to sustained-release formulations, such as avoiding "dose dumping," was a common consideration for formulators and part of the routine optimization process to formulate a sustained-release drug. (Kibbe Tr. at 194-98) Similarly, Dr. Kibbe pointed out that at least one polymer suitable for developing sustained-release formulations of soluble products already existed in the prior art. (*See id.* at 209-10) Additionally, Dr. Kibbe disagreed with Dr. Fassihi's views about the impact of a lack of pharmacokinetic information, noting that all of the available information about 4-AP's pharmacokinetics tended to suggest that the drug would be a good candidate for sustained release. Dr. Kibbe noted that Uges reported that 4-AP had a short (four-hour) half-life, high bioavailability, low risk of biotransformation, and a low risk of first pass effect – all characteristics that made 4-AP a favorable candidate for the development of a sustained-release formulation. (*See id.* at 201-02)[21] In Dr. Kibbe's view, this information would have given a POSA a reasonable expectation of success in developing a sustained-release 4-AP formulation to treat MS. Based on this testimony, Defendants argue that, despite some uncertainty about exactly which formulations would work, a POSA would have had a reasonable expectation of success in developing a sustained-release formulation of 4-AP.

[21]Dr. Peroutka further noted that, although the Uges study size was small, a POSA would be encouraged by the consistency between the reported half-life and bioavailability data and between the consistency of the half-life reported in Uges and the half-life reported in Stefoski. (*See* Peroutka Tr. at 77-78)

The need to engage in routine testing or optimization efforts – even if expensive and technically challenging – does not render an invention non-obvious, if a POSA would reasonably expect the testing or optimization efforts to succeed. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367-68 (Fed. Cir. 2007). Thus, a POSA may have a reasonable expectation of success despite "a showing of some degree of unpredictability in the art." *Id.* at 1364; *see also Allergan*, 726 F.3d at 1292.

The Federal Circuit's decision in *Cyclobenzaprine* is instructive. There, the Federal Circuit considered a claim directed to a "method of relieving muscle spasms" which "provides [a] therapeutically effective plasma concentration over a period of 24 hours . . . ."[22] 676 F.3d at 1066 (brackets in original). Similar to here, the term "therapeutically effective plasma concentration" was construed to mean "the amount of a drug required to produce the therapeutic result." *Id.* at 1067 (internal quotation marks omitted). The Federal Circuit held that a POSA would not have had a reasonable expectation of successfully developing a formulation to satisfy the "therapeutically effective" limitation unless a POSA would have both (i) known what blood levels would produce a therapeutic result ***and*** (ii) would have had a reasonable expectation of success in developing a sustained-release formulation that could achieve those blood levels. *See id.* at 1070 ("Because . . . skilled artisans did not know the [relationship between the pharmacokinetics and therapeutic effect] . . . for the immediate-release formulation, there was no way to match the dosage for the extended-release formulation to achieve a known therapeutic effect.") (emphasis omitted) Absent specific knowledge of the relationship between the

---

[22]Additional asserted claims specified particular pharmacokinetic values, including the concentration of drug. *See Cyclobenzaprine*, 676 F.3d at 1066.

pharmacokinetics and therapeutic effectiveness, the Federal Circuit noted, the claims could not be obvious without a "finding that the prior art would have taught or suggested a [specific] therapeutically effective formulation to one of ordinary skill in the art." *Id.*

Of relevance to this case, the Federal Circuit's analysis in *Cyclobenzaprine* illustrates that knowledge of a ***correlation*** between a particular set of pharmacokinetic values and the therapeutic effectiveness of an immediate release formulation is ***not necessarily sufficient*** to raise a reasonable expectation that a sustained-release formulation achieving the same pharmacokinetic values would be therapeutically effective. *See id.* at 1071. The drug at issue in *Cyclobenzaprine* had already been released in an immediate-release form, and its pharmacokinetic parameters were available in the prior art. *See id.* Nevertheless, the Federal Circuit rejected the argument that a POSA would have considered it obvious to "target extended-release [pharmacokinetic] values 'mirroring' – in other words, bioequivalent to – those of the immediate release . . . formulation." *Id.* at 1069. The Federal Circuit explained that, without a known relationship between pharmacokinetics and effectiveness, "immediate-release [pharmacokinetic] values are of little use in calculating extended-release values, [absent] proof that a skilled artisan would expect the extended-release values to produce a therapeutic effect solely because they are drawn from immediate-release values." *Id.* at 1071. Rather, a POSA would need evidence that "in the specific context" of the drug at issue, a skilled artisan would expect the particular "[pharmacokinetic] values drawn from the prior art to yield a therapeutically effective formulation." *Id.* at 1072. Thus, without information about which particular parameters (*i.e.* $T_{max}$, $C_{max}$, etc.) were crucial to therapeutic effectiveness, "[t]he fact that a skilled artisan could have predicted [that a sustained-release formulation could achieve] a particular

blood plasma concentration . . . does not mean that such knowledge would have provided a skilled artisan a reasonable expectation of success." *Id.* at 1071.

As with the active ingredient at issue in *Cyclobenzaprine*, there was no well-characterized relationship between 4-AP's pharmacokinetics and its therapeutic effects at the time of the priority date of the Elan Patent. (*See* Kibbe Tr. at 241) Uges, the only pharmacokinetic study of 4-AP available at that date, did not link pharmacokinetic data to therapeutic effects. The record does not support a finding that Uges, combined with other prior art references, would have allowed a POSA to infer the relationship between the pharmacokinetics and therapeutic effects. As a result, a POSA would not have known what *in vitro* dissolution profile a sustained-release formulation would have needed to achieve in order to maintain safe and effective therapeutic blood levels of 4-AP over time. Thus, a POSA would not have had the information necessary to assess whether a sustained-release formulation could be developed to achieve those blood levels. *See Cyclobenzaprine*, 676 F.3d at 1071.

Absent prior art showing the 4-AP blood levels that would be therapeutically effective, a POSA might nevertheless have formed a reasonable expectation of success in developing a sustained-release formulation had the prior art "taught or suggested" that a particular formulation could be effective. *Id.* at 1070. Here, however, the record lacks such evidence as well. Although Dr. Kibbe testified that a POSA would be able to identify prior art sustained-release platforms and excipients that would be particularly likely to complement 4-AP, given the drug's characteristics (*see, e.g.*, Kibbe Tr. at 208-10) (explaining that POSA would understand that encapsulated dissolution, and particular known polymers, would be appropriate for 4-AP), he did not testify as to why a "skilled artisan would have had a reasonable expectation [that these

platforms and excipients] would succeed in being ***therapeutically effective***." *Cyclobenzaprine*, 676 F.3d at 1070 (emphasis added). Thus, while the record indicates that it may have been obvious to experiment with certain approaches to developing a sustained-release formulation, nothing in the record demonstrates that a POSA would have had a "reasonable expectation" that at least one of those approaches would have resulted in a therapeutically effective sustained-release formulation of 4-AP. *Id.*

Defendants urge the Court overlook these evidentiary shortcomings, arguing that there is no "credible evidence" to support a finding that a POSA would ***not*** have had "a reasonable expectation of successfully formulating 4-AP into ***any*** of multiple available sustained-release dosage forms." (D.I. 273 at 18) (emphasis in original) But the burden in this case does not reside with Plaintiffs. Rather, it is Defendants' burden to present clear and convincing evidence that a POSA would have had a reasonable expectation that one of the multiple available sustained-release dosage forms could be combined with 4-AP to create a therapeutically effective formulation when administered as claimed. Defendants have shown that the prior art included many sustained-release platforms, that many drugs had been formulated using these sustained-release platforms, and that no affirmative evidence existed that would have ***dissuaded*** a POSA from ***pursuing*** a sustained-release dosage form of 4-AP. Defendants have ***not*** shown, however, that a POSA would have inferred from this evidence that success would reasonably be expected from an attempt to develop a therapeutically-effective, sustained-release formulation for ***any*** drug, and most particularly for 4-AP.

The Court is mindful that the evidence regarding the inventors' actual experience in developing the invention of the Elan Patent is not inconsistent with Dr. Kibbe's testimony. Dr.

Myers, one of the inventors, stated that it took him only three or four weeks to put three or four formulations of 4-AP on paper and then about a day actually to prepare a sustained-release formulation of 4-AP. (*See* Myers Tr. at 154-55) Dr. Myers further explained that this process essentially involved substituting 4-AP for the active ingredients he had previously used in sustained-release platforms, and "adjust[ing] the platform[s] with routine testing" until he obtained the desired dissolution pattern. (Kibbe Tr. at 211) Among the disclosed sustained-release formulations in the Elan Patent is one platform that had been disclosed in the 1990 edition of Remington's. (*See* JTX-0001 at 4:41-46; Kibbe Tr. at 219-20)

While this evidence does nothing to discredit Dr. Kibbe's testimony that developing a sustained-release formulation of 4-AP was straightforward, it also does not help Defendants to meet their burden of showing that a POSA would reasonably have ***expected it to be so***. "[I]n addressing the question of obviousness a judge must not pick and choose isolated elements from the prior art and combine them so as to yield the invention in question if such a combination would not have been obvious at the time of the invention." *Abbott Labs. v. Sandoz*, 544 F.3d 1341, 1348 (Fed Cir. 2008) (internal quotation marks omitted). Without the benefit of hindsight, the record here does not support a finding that the approach taken by the Elan Patent represented an "identified, predictable solution[]" that produced an "anticipated success." *KSR*, 550 U.S. at 421. As such, the Court finds that Defendants have not met their burden to establish, by clear and convincing evidence, that the Elan Patent is invalid as obvious.

### C. Secondary Indicia of Non-Obviousness

As detailed below in the discussion of the Acorda Patents, the Court finds that Ampyra® is a commercially successful product. This success has a nexus with the Elan Patent because, as

is undisputed, Ampyra®'s sustained-release formulation allowed for infrequent dosing that improves patient compliance. (JTX-0001 at 2:22-32) As such, Court finds that the invention of the Elan Patent likely contributes to this commercial success. This finding is further evidence supporting the Court's conclusion that Defendants have failed to prove that the invention of the Elan Patent is non-obvious.

**D. Section 112 Defenses**

Defendants contend in the alternative that, if the Elan Patent is not found to be obvious, then it should be found to be invalid for lack of adequate written description and/or lack of enablement. *See* 35 U.S.C. § 112.[23] Defendants' Section 112 defenses could likely be found to have been waived, given the lack of evidence presented at trial. (*See* D.I. 272 at 57 n.38 (Plaintiffs arguing for waiver); D.I. 274 at 1 n.1 (same); *but see* D.I. 273 at 22 n.3 (Defendants responding that they noted defenses in pretrial order, as well as in opening statement and closing arguments at trial)) Indeed, these defenses barely even got mention at trial.[24] Notably, none of the experts testified at trial about the Section 112 defenses and, accordingly, none opined that the Elan Patent is invalid due to lack of enablement or written description. (*See* Tr. at 272)

---

[23]*See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1370 (Fed. Cir. 2013) (explaining that test for enablement requires specification to teach one of skill in art "how to make and use the full scope of the claimed invention without undue experimentation") (internal quotation marks omitted); *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997) (explaining that test for written description requires specification to describe invention in sufficient detail that one of skill in art can conclude "the inventor invented the claimed invention") (internal quotation marks omitted).

[24]According to the index to the trial transcript, the terms "written description," "enablement," and "112" were mentioned only five times over the four days of trial. (*See* Tr. at 800)

Even assuming these defenses were not waived, they are unavailing on the merits. To the extent Defendants have articulated their Section 112 invalidity theory, it is a theory based on contingencies which, given the Court's findings, have not been satisfied.

In the less than two pages (out of 66) Defendants devote in their opening brief to these defenses, they explain that the defenses are predicated on the Court accepting certain arguments or evidence relied on by Plaintiffs. (*See* D.I. 265 at 65-66; *see also* D.I. 273 at 2, 19-22) Defendants argue: "In rebutting Defendants' evidence of obviousness for the Elan [P]atent, Plaintiffs have repeatedly made arguments, or elicited testimony, that – ***if accepted by the Court*** – would render the Elan [P]atent invalid for lacking enablement or written description." (D.I. 265 at 65) (emphasis added) But (as best as the Court can tell) the Court has not "accepted" these arguments or evidence relied on by Plaintiffs. Contrary to Plaintiffs' position, the Court has found that a POSA would have been, at the priority date, motivated to use 4-AP to improve walking in MS patients, and would have had a reasonable expectation of success in doing so, for all the reasons Defendants contend.

So, for example, Defendants argue that "either Davis and Stefoski teach using 4-AP to treat clinical symptoms of MS (including gait) or the Elan [P]atent is invalid for lacking enablement and written description." (*Id.* at 66) The Court has found that Davis and Stefoski ***do*** teach using 4-AP to treat clinical symptoms of MS (including gait). Hence, on Defendants' own reasoning, it follows that the Elan Patent does not lack enablement or written description.

Defendants expand their arguments in their reply brief, stating:

> [Plaintiffs] further refer to the prior art as providing "meager data" with only "fragmentary hints" that 4-AP might have some clinical usefulness in MS patients. ***If true***, these are significant admissions

> under 35 U.S.C. § 112, given that the Elan [P]atent claims methods of "treatment" for MS, and the patent disclosure does not identify any 4-AP testing conducted independently by the inventors.

(D.I. 273 at 19) (emphasis added; internal citation omitted) But, again, the Court has not been persuaded that the statements Defendants here call out are "true." The Court has found for Plaintiffs on the parties' dispute as to the invalidity of the Elan Patent based on other grounds. It follows, again, that Defendants have failed to prove their Section 112 defenses.

In sum, assuming the defenses have not been waived, Defendants have failed to meet their burden to prove, by clear and convincing evidence, that the Elan Patent is invalid due to lack of enablement or written description.

## II. The Acorda Patents

The asserted claims of the Acorda Patents are directed to a method of improving walking in a human with multiple sclerosis by administering a 10 milligram dose of 4-AP twice per day, for either two weeks or twelve weeks.[25] Certain claims also require that this dosage regimen produce particular pharmacokinetic results.[26] (*See, e.g.*, JTX-0002 at 27:55-57; JTX-0003 at 28:55-57; JTX-0004 at 31:28-31) Certain claims further mandate that there be no titration before or after administration of the 10 mg/twice-daily dose. (JTX-0002 at 27:48-49) Defendants argue that all of these claims are obvious because the prior art would have given a POSA a reasonable expectation of success in combining these limitations. (*See* D.I. 265 at 38-43) Plaintiffs disagree

[25]As noted earlier, the parties have stipulated that if the claims requiring stable dosing for two weeks are obvious, then the twelve-week limitations are obvious as well. (D.I. 254 ¶¶ 5-8)

[26]The claims including pharmacokinetic or release profile limitations are: claims 1, 7, 38, and 39 of the '826 patent; claims 3 and 5 of the '685 patent; claim 22 of the '437 patent; and claims 36 and 38 of the '703 patent.

and further argue that secondary indicia of non-obviousness preclude a finding that the invention of the Acorda Patents was obvious. (*See* D.I. 272 at 31)

As explained below, the Court concludes that Defendants have shown that the prior art taught the four disputed limitations: the use of 4-AP to improve walking; the use of a 10 mg/twice-daily dosage; the use of stable dosing; and the inherent pharmacokinetic limitations. The Court finds that a POSA would have been motivated to combine these limitations with a reasonable expectation of success. The Court also agrees with Defendants that the secondary indicia do not support a finding of non-obviousness with respect to any claim. As such, the asserted claims of the Acorda Patents are invalid.[27]

**A. Use of 4-AP to Improve Walking**

All of the asserted claims of the Acorda Patents are directed to methods of administering sustained-release 4-AP to "improving walking." (JTX-0003 at 27:62-67) It is undisputed that the claims do not require that the patents be effective to treat MS in all patients. (*See* D.I. 265 at 50; D.I. 272 at 38) Thus, the parties' dispute with respect to this limitation centers on whether the claimed studies would provide a POSA with a reasonable expectation that 4-AP could be

---

[27]Defendants contend that the Acorda Patents "are ***presumed obvious*** as a matter of law, because they simply claim an optimized dose selected from a discrete, narrow range of doses disclosed in the prior art," including the Elan Patent. (D.I. 265 at 5) (emphasis in original) (citing *Tyco Healthcare Grp., LP v. Mut. Pharm. Co.*, 642 F.3d 1370, 1372-73 (Fed. Cir. 2011); *Galderma Labs., L.P. v. Tolmar*, 737 F.3d 731, 738 (Fed. Cir. 2013)) Plaintiffs disagree, arguing that "unlike in *Galderma* and *Tyco*, there was no prior art teaching that ***any*** dose of 4-AP – any single dose or any range of doses – was safe and effective to improve walking or increase walking speed in MS patients. The Acorda inventors were not seeking to improve upon what was already a known process, and their invention was not the mere optimization of a known dose range." (D.I. 272 at 54) (emphasis in original) Given the Court's conclusion that Defendants have proven, by clear and convincing evidence, that the asserted claims of the Acorda Patents are obvious, it is unnecessary for the Court to also determine whether these claims should be presumed obvious.

successfully used as claimed to treat (*i.e.*, achieve therapeutically-effective blood levels in) even a single patient. (*See* D.I. 272 at 38)

Defendants argue that the prior art made it obvious to a POSA that 4-AP could be used to treat impaired walking in some MS patients. For this contention, Defendants rely on three prior art references: Schwid, Goodman I, and the Goodman Poster. (*See* D.I. 265 at 38-41)

Schwid begins by disclosing the failure of the Elan Study, a rigorous clinical trial into the effect of sustained-release 4-AP on EDSS in MS patients.[28] (*See* JTX-0104 at 817) Schwid theorized that EDSS – which is a composite of several measures of effectiveness, including improvements in walking – "may have been an inadequate outcome variable" for measuring the effectiveness of 4-AP. (*Id.*) Schwid thus tested seven outcome measures that the authors thought might be "more sensitive." (*Id.*) Doing so, Schwid found a statistically significant improvement in only one measure: timed gait, which was found to be improved in nine out of 10 patients, in comparison to the placebo group. (*See id.*)

The Goodman references disclose the results of the MS-F201 study, which, like the Schwid study, examined multiple outcome measures. The Goodman references disclose that the MS-F201 study was randomized, double-blinded, and placebo-controlled. Goodman I explains that one of the goals of the MS-F201 study was "to explore efficacy over a broad dose range using measures of fatigue and motor function," and it concludes that the study data "showed statistically significant improvement from baseline compared to placebo in functional measures

[28]The trial was multi-center, double-blind, and placebo-controlled, and it used parallel-groups involving 161 patients who took 4-AP for six weeks. (*See* JTX-0104 at 817) Plaintiffs' expert, Dr. Goodman, testified that Schwid disclosed "all of the key characteristics one looks for" to obtain "a rigorous assessment of efficacy." (Goodman Tr. at 468)

of mobility (timed 25 walking speed; p=0.04) and lower extremity strength (manual muscle testing; p=0.01)." (JTX-0062 at S116-17) Likewise, the Goodman poster reports a "[s]ignificant benefit on timed walking" and a "[s]ignificant benefit on lower extremity strength." (JTX-0080A)

Defendants argue that these prior art references – viewed in light of earlier studies, such as Stefoski (which showed that 4-AP improved MS symptoms), Davis (which showed that 4-AP improved motor function), and Polman (which showed that 4-AP could improve ambulation) – represent the culmination of a "consistent march by those skilled in the art towards using 4-AP to improve walking in MS patients." (D.I. 273 at 31)

Defendants' characterization of the prior art is not entirely persuasive. It understates the complexity and uncertainty of the prior art, given what a POSA would know about both the broader content of the prior art related to 4-AP and the challenges of interpreting MS studies more generally. In particular, Defendants ignore the fact that the Schwid and MS-F201 studies arose in the midst of significant uncertainty in the field of 4-AP research. Each study came in the wake of the larger and more "rigorously designed" Elan study, which failed to show that 4-AP had an effect on EDSS (which includes a walking component). (Goodman Tr. at 469) Although researchers believed that alternative outcome variables could be more appropriate, it was not yet clear that ***any*** variable would meet the requirements for clinical approval. The 2003 Solari review, which analyzed the results of the Schwid and Van Diemen studies, concluded that the information then available allowed "no unbiased statement about safety or efficacy of aminopyridines for treating MS symptoms." (PTX-0416 at 1)

As Plaintiffs point out, both the Schwid and MS-F201 studies were exploratory studies, designed to identify possible alternatives to EDSS as measures of efficacy, rather than studies aimed at establishing effectiveness of the tested drug. Neither study includes a single, pre-defined measure of efficacy; instead, each consider multiple possible measures. (*See* D.I. 272 at 33) A POSA would understand that the risk of a false positive result is higher for such studies than it is for studies with a single, pre-defined endpoint. (*See* Goodman Tr. at 472; PTX-0416 at 5 (recognizing "[a] distinct possibility of false positive findings" in studies involving multiple measures of effectiveness))[29] As Plaintiffs' expert Dr. Goodman explained, a POSA would have recognized that the statistical significance of the Schwid and MS-F201 results did not account for the increased probability of obtaining a false positive in the study as a whole.[30] (Goodman Tr. at 472)

Further, a POSA at the pertinent date would have known that "complexity, variability, and [the] high placebo effect that characterize MS . . . complicate the design and interpretation of MS trials." (D.I. 272 at 38) Also, as Solari noted, "publication bias remain[ed] a pervasive problem" in MS studies, meaning a POSA would have been concerned that the prior art may have misleadingly excluded studies showing no effect.[31] (PTX-0416 at 1)

---

[29]As evidence of this concept, Plaintiffs point out that "leads that had appeared promising on the basis of [earlier] reports of small, multiple-endpoint studies were not" reproduced in later studies. (D.I. 272 at 35) (comparing Polman's report of improvement in fatigue with Goodman's finding of no such improvement)

[30]Plaintiffs argue that, were a POSA to adjust the results of the Schwid and MS-F201 studies, the study results would not be statistically significant. (*See* D.I. 272 at 61 (arguing that adjusted p-value for Schwid would be 0.14); *id.* at 66 (arguing that adjusted p-value for MS-F201 would be 0.16))

[31]Plaintiffs note that Acorda itself opted in some cases not to publish data related to failed trials. (*See* D.I. 272 at 50-51)

Taking all of this into account, the Court concludes that a POSA would have examined and interpreted the prior art holistically and cautiously. Despite all of Plaintiffs' valid concerns, the Court finds that Defendants have proven, by clear and convincing evidence, that a POSA would have formed a reasonable expectation of success based on Schwid and Goodman, in light of the totality of the prior art. That neither Schwid nor the Goodman references report on the results of a randomized, placebo-controlled study that was "properly designed to assess efficacy" would be taken into account by a POSA, but would not have led a POSA to conclude that there was not a reasonable expectation of success in using 4-AP to improve walking speed. (D.I. 272 at 38)

Several aspects of the record support the Court's conclusion on this issue. First, both the Schwid and MS-F201 studies have two of the three characteristics Plaintiffs deem essential to a persuasive efficacy study: each is randomized and placebo-controlled. (*See id.*) The studies' key shortcomings are their relatively small size and multi-endpoint, exploratory design. (*See id.*) While these features increase the probability of obtaining a false positive result (*see* Goodman Tr. at 472; PTX-0416 at 5), the combined message a POSA would have discerned from Schwid together with the Goodman references was a reasonable expectation of success in treating walking with 4-AP. Just as conducting a study with multiple endpoints increases the overall likelihood of uncovering at least one false-positive, obtaining the same result in a second study decreases the likelihood that the first result was a fluke. (*See* D.I. 273 at 31-33)

Considering the prior art as a whole would not have tempered a POSA's expectations. The results Schwid and Goodman present are consistent with the results of earlier studies such as Polman, in which patients subjectively reported improvements in ambulation (*see* JTX-0095 at

295), and Davis, in which patients demonstrated improvements in motor function (*see* JTX-0043 at 186). These results are also consistent with Solari, which reported that a meta-analysis of past studies of aminopyridines (including 4-AP) suggested that such drugs improved ambulation in MS patients ($p < 0.001$). (*See* PTX-0416 at 1) Considering these results in light of the VEP results reported in the Rush Studies, which demonstrated that 4-AP had real physiological effects in MS patients at doses falling within a viable therapeutic window,[32] the prior art would not have undermined the conclusion that a POSA would have drawn from the combination of Stefoski and Goodman: that 4-AP could reasonably be expected to be successful in improving walking in patients with multiple sclerosis.[33]

Plaintiffs argue that this view of the prior art fails to take account of contemporaneous uncertainty about the usefulness of 4-AP that only Acorda's later studies have made it possible to disregard. (*See* D.I. 272 at 52) (arguing that Defendants' view of prior art "us[es] the path actually followed by the inventors as a map" to "argue that it would have been obvious to follow

[32]As discussed above with respect to the Elan Patent, the pre-Elan Patent prior art would have given a POSA a reasonable expectation of success in finding a viable therapeutic window for 4-AP, despite incidents of seizures and other side effects in some patients. None of the subsequent studies presents results that would have negated this conclusion. Indeed, Goodman stated that 4-AP's safety profile was "consistent with previous experience." (JTX-0080A)

[33]Plaintiffs suggest that a POSA would consider the results of the Schwid and MS-F201 studies to be inconsistent with the results of the Elan Study, as reported in Schwid. (*See* D.I. 272 at 46-47) The Court disagrees. The Elan Study failed to show a statistically significant improvement in MS symptoms as measured by EDSS, a composite measure of functioning. (*See id.* at 37) Walking is just one component of the EDSS scale. Thus, a finding of no statistically significant improvement in EDSS as a whole is not inconsistent with improvements in walking. In fact, the Schwid study showed a statistically significant improvement in walking, but not in EDSS. (*See* JTX-0104 at 817, 820) Therefore, the Court finds that a POSA would not assign great weight to the results of the Elan Study in assessing whether it was reasonable to expect that 4-AP could be used to treat walking, specifically.

that path with a reasonable expectation of success") In the Court's view, Plaintiffs' position unreasonably suggests that proof of obviousness in this case must include at least one prior art study demonstrating, to a statistically significant certainty, that the use of 4-AP is effective to treat walking in MS patients. The law does not set the bar that high. In the context of obviousness, an "expectation of success need only be reasonable, not absolute." *Pfizer*, 480 F.3d at 1364 (stating patentee cannot avoid finding of obviousness "simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success"); *Hoffmann-LaRoche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014) ("Conclusive proof of efficacy is not necessary to show obviousness."); *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Obviousness does not require absolute predictability.").

For these reasons, Defendants have shown by clear and convincing evidence that a POSA would reasonably expect that 4-AP could be used to improve walking in at least some MS patients. Given this evidence, the Court finds that the use of 4-AP to treat walking in MS patients would have been obvious to a POSA.

**B. Use of 10-mg, Twice-Daily Dosing**

The asserted claims of the Acorda Patents are directed to the use of 10 mg, twice-daily doses of sustained-release 4-AP to improve walking in a patient with MS. The parties dispute whether the claims' 10 mg/twice-daily dosing pattern would have been obvious to a POSA.

Defendants argue that the claimed dosing pattern is unpatentably obvious under an "obvious-to-try" standard. An invention may be obvious to try "[w]hen there is a design need or market pressure to solve a problem" and the invention is one of "a finite number of identified, predictable solutions" to that problem. *KSR*, 550 U.S. at 421. In Defendants' view, the 10

mg/twice-daily dose of the claims was one of a finite number of doses that a POSA would have reasonably expected to be effective based on the prior art. Defendants point out that both Schwid and Goodman disclosed studies that showed statistically significant benefits in walking among MS patients who took 10-20 mg of 4-AP in sustained-release form twice daily. (*See* JTX-0104 at 817) The Goodman Poster, which described the MS-F201 study as being designed to "[d]etermine [the] safety of" sustained release, concluded that the study showed "[e]vidence of dose-response in [the] 20-40 mg/day range" and "[l]ittle added benefit, and increased [adverse events] at doses above 50 mg/day." (JTX-0080A) In Defendants' view, a POSA who had reviewed these references would have reasonably expected that the 10-20 mg/twice-daily dosages of 4-AP disclosed in the prior art would be effective to treat walking in patients with MS. (*See* D.I. 265 at 44)

Plaintiffs' response includes the observation that some of the prior art suggested that 4-AP was more effective in higher doses – including doses higher than 20 mg, twice per day. Van Diemen, a prior art study designed to assess the relationship among dosage, serum level, safety, and efficacy, concluded that "higher doses and serum levels are likely to produce greater improvement in those MS patients who are capable of favorably responding to 4-AP." (PTX-0330 at 203) Likewise, Schwid concluded that "[t]reatment appeared particularly efficacious in subjects who achieved serum . . . levels above 60 ng/ml." (JTX-0104 at 820) Lastly, as Defendants' expert Dr. Peroutka admits, the pharmacokinetic information available to a POSA indicated that a dose higher than 25 mg/twice daily would be required to sustain that serum level. (*See* Peroutka Tr. at 130-31; *see also* Goodman Tr. at 508)

Although the prior art might have given a POSA reasons to consider a broader range of doses than 10-20 mg/twice daily, the prior art as a whole nevertheless suggests a "finite" set of plausible solutions. A set of solutions is "finite" within the meaning of *KSR* when the prior art provides direction about "which parameters were critical" or "which of many possible choices is likely to be successful," and thereby reduces the options to a set that is "small and easily traversed." *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1347 (Fed. Cir. 2009) (internal quotation marks omitted). While the prior art may have generally suggested that 4-AP would be more effective in higher doses, the art also reduced the set of plausible doses because it suggested that higher doses of 4-AP were more likely to cause adverse events. The Goodman Poster, for example, explains that, "consistent with prior experience," adverse events were more likely at doses beyond 25 mg/twice daily. (JTX-0080A) Thus, while it is unclear what the highest dosage is that a POSA would have reasonably explored based on the prior art, the prior art reduced the range of doses falling within 4-AP's perceived therapeutic window to a fairly narrow band. (*See* Peroutka Tr. 104) (explaining that POSA would be motivated to find lowest effective dose of 4-AP based on prior art showing that serious adverse events are more likely to occur at higher dosages) As such, the prior art showed that the "field of endeavor" was limited to a "finite" number of solutions. *KSR*, 550 U.S. at 420.

Plaintiffs further argue that, even if the prior art suggested a "finite" set of doses, the claimed dosing scheme would not have been among them. They note that the Goodman references, which disclose the only study that specifically explored dosages as low as 10 mg/twice daily, supply no dosage-specific information regarding the performance of 4-AP versus placebo. Instead, the references report that the MS-F201 study demonstrated statistically-

significant improvements in the timed walk and manual muscle test for the treatment group as a whole (*i.e.*, based on combining the data for each patient at each dosage level). (Goodman Tr. at 482-84; Peroutka Tr. at 137-38) Thus, the study did not disclose a statistically-significant treatment effect at a dose of 10 mg/twice daily, or at any other single, specific dose. (Peroutka Tr. at 137-38) In Plaintiffs' view, the limited information regarding this dose would preclude a POSA from having a reasonable expectation that the dose would be successful. (*See* D.I. 272 at 66-70)

Plaintiffs' contention, however, proves too much. On their reasoning, a POSA could not have had a reasonable expectation of success in treating walking with ***any*** of the 4-AP doses disclosed in the Goodman references – despite the fact that the results of treatment with those dosages, taken as a whole, showed a statistically-significant effect on walking in MS patients – simply because the significance of each individual result was unknown. This reasoning is unpersuasive. Furthermore, the Goodman references are not silent as to the results of individual doses. Instead, Goodman states that the results showed "evidence of a dose response in the 20 to 40 milligram per day range," indicating that patients taking these dosages of 4-AP demonstrated a greater response to treatment than did patients receiving placebo. (Tr. at 801; *see also* Goodman Tr. at 477-78 ("[A] dose response curve is looking at a series of increasing or decreasing doses, and assessing the effects seen at the different dose levels . . . to see whether or not there is a pattern of correlation between . . . increasing a dose and increasing a response.")) A POSA would have inferred from this finding that patients' walking responded to 4-AP dosed

at a 10 mg level.[34] Consequently, a POSA would consider 10 mg/twice daily to be among the finite group of doses of sustained-release 4-AP that could reasonably be expected to improve walking in MS patients.[35] As the lowest of the range of encouraging doses, 10mg/twice daily would have been an attractive starting point for a POSA.

Given this evidence, the Court finds that the use of a 10 mg sustained-release dose of 4-AP twice per day to treat walking in MS patients would have been obvious to a POSA at the priority date of the Acorda Patents.

### C. Use of Stable Dosing/No Titration

Each of the asserted claims of the Acorda Patents is directed to administration of a "stable" dosing regimen of 10 mg sustained-release 4-AP.[36]

---

[34]Plaintiffs argue that a POSA would not draw this inference because the Goodman references do not state that the dose response was statistically significant or highlight how the doses in this range compared to placebo. (*See* D.I. 272 at 66-71) While the Court agrees with Plaintiffs that a POSA would not infer anything about the statistical significance of any individual dose based on the Goodman references' claims about a dose response, the Court also finds that a POSA would have understood the Goodman authors to have considered the results of the placebo group before representing that there was "evidence of a dose response" in the listed range. (Tr. at 733) Put differently, a POSA would assume that a printed publication presented at an academic conference did not omit context that a POSA would have found material to interpreting the study results. (*See generally* Goodman Tr. at 525)

[35]Dr. Goodman indicated at trial that this is the message that the Goodman Poster was intended to convey. (*See* Goodman Tr. at 529-30) Dr. Goodman also conceded that a POSA would have been motivated based on the results of the MS-F201 study to design a study "along the lines of what became the [subsequent Acorda MS-F]202 study," which explored sustained-release doses of 10 mg, 15 mg, and 20 mg/twice daily to treat walking in patients with MS. (*Id.* at 559; *see also* PTX-0168A)

[36]Some of the claims require that the claimed 10 mg/twice-daily dose be administered for a specified period (*i.e.*, two weeks or twelve weeks) and that the claimed dose be the only dose of 4-AP administered during that period. Other asserted claims specify that there be no titration before or after administration of the 10 mg/twice-daily dose – precluding any adjustment of the dosage at any time. These differences are not material to the Court's analysis. Nor do the parties argue that they are. (*See generally* D.I. 272 at 30)

The parties disagree about whether a POSA would have had a reasonable expectation of success in improving walking in a patient with MS by administering a stable dose of 10 mg/twice-daily 4-AP over several weeks. Defendants argue that a POSA would have expected success with stable dosing because the prior art suggests that it can be safe and effective. References including Van Diemen and Polman included reports of safe and effective long-term use of stable dosing of immediate-release 4-AP. (*See* PTX-0330 at 196; JTX-0095 at 294) Further, the MS-F201 study reported in Goodman indicates that 4-AP can be used safely over the long-term; although participants received escalating rather than stable doses, the study did not report unexpected adverse effects with use over several weeks. (*See* JTX-0080A) (stating that observed safety profile was "consistent with the findings of previous studies") Dr. Peroutka testified that a POSA would have had a reasonable expectation of success with stable dosing because nothing in the prior art suggested that 4-AP could not be used chronically. (*See* Peroutka Tr. at 104)

Plaintiffs argue that a POSA would not have had a reasonable expectation that stable dosing would be safe and effective because "[n]o prior art reference cited by [D]efendants shows the administration of any stable dose of 4-AP . . . for more than a single week." (D.I. 272 at 78) Plaintiffs add that prior art studies, including Murray and Polman, demonstrated that 4-AP could cause adverse effects, including seizures. (*See id.* at 79)

As discussed above, however, any concerns a POSA would have had in light of these studies would not have been sufficient to preclude a reasonable expectation that 4-AP could be used to treat MS. Plaintiffs offer no evidence indicating why stable, long-term dosing would change or magnify these concerns. Thus, the Court is not persuaded that safety concerns would

have undermined a POSA's otherwise reasonable expectation of success in implementing stable dosing of 10 mg of sustained-release 4-AP twice daily. *See generally Allergan*, 726 F.3d at 1293 (stating that finding of nonobviousness cannot be predicated solely on "no reasonable expectation of success in view of the general unpredictability of the formulation arts").

Plaintiffs also argue that stable dosing without titration would not have been obvious to a POSA because the prior art taught that titration or dose escalation could be used to "gain maximum efficacy while seeking to avoid adverse events." (D.I. 272 at 82) Plaintiffs argue that this art would "not have provided a POSA with a reasonable expectation of success" in any dosing regimen other than titration. (*Id.* at 42) But while it may be true that the prior art's consistent use of titration did not specifically support stable dosing, it also did not undermine the other evidence in the prior art that supports a finding that a POSA would have had a reasonable expectation of success with stable dosing.

Plaintiffs' post-trial brief suggests that their argument regarding the titration schemes of the prior art may be better understood in connection with the "motivation to combine" prong of the obviousness inquiry. (*See, e.g.*, *id.* at 40) ("The prior art taught upward titration as a means of addressing 4-AP's narrow therapeutic index.") Plaintiffs point to Dr. Goodman's testimony that there were "all kinds of" alternative dosing schemes that might be attractive to a POSA. (Goodman Tr. at 551-52) They further argue that titration could be preferable to stable dosing, as it could allow a POSA to optimize the dosage on a patient-by-patient basis. (*See* D.I. 272 at 82)

Even crediting these arguments, however, the Court finds that a POSA would have been motivated to seek a stable dose of 4-AP. Dr. Peroutka stated this very opinion, explaining that

stable dosing was particularly desirable for treating MS, a chronic disease requiring long-term treatment. (*See* Peroutka Tr. at 99) Similarly, Dr. Goodman conceded that, in at least some circumstances, "it would be desirable that one would have some . . . dose that . . . the patient would be prescribed to take on a regular basis."[37] (Goodman Tr. at 553)

Because the evidence in the record reflects that a POSA would have been motivated to pursue stable dosing and would have had a reasonable expectation of success in doing so, the Court finds that stable dosing of a 10 mg sustained-release dose of 4-AP twice per day to treat walking in MS patients would have been obvious to a POSA.

### D. Pharmacokinetic Limitations

Several of the asserted claims of the Acorda Patents specify particular pharmacokinetic parameters or a particular release profile to be achieved by administering the specified dosing regimen to improve walking or increase walking speed.

The pharmacokinetic ranges listed in the asserted claims of the Acorda Patents fall within the ranges previously disclosed in Hayes. (*See* Peroutka Tr. at 96-97; JTX-0069 at 185-86) Hayes is a prior art study that disclosed the pharmacokinetics of a 10 mg sustained-release formulation when administered twice a day for six consecutive days, and once daily on the seventh day. (*See* JTX-0069 at 186) It is undisputed that the Hayes researchers used the Ampyra® formulation in their study. (*See* D.I. 272 at 71) There is also no disagreement that the

---

[37]Dr. Goodman also testified that a POSA "could look at the entirety of the art and still believe that there was a desire to increase, escalate, titrate doses towards higher levels." (Goodman Tr. at 552) Even accepting this opinion as true, however, does not overcome the Court's finding that there was a motivation to identify a stable dose as well. The goal of a stable dose (for at least some MS patients) and the goal of a dose that could be titrated upwards (perhaps for other patients) are not incompatible.

pharmacokinetic parameters reported in Hayes are inherent properties of that formulation. (*See* D.I. 265 at 42-43)

To Defendants, it follows that inclusion of the pharmacokinetic parameters in the claims cannot render the claims non-obvious. (*See id.* at 48) This position assumes that a POSA would have been aware that a sustained-release dosage form achieving the pharmacokinetic parameters disclosed in Hayes would have resulted in an improvement in walking, as required by the asserted claims. (*See* D.I. 279 at 4; *Cyclobenzaprine*, 676 F.3d at 1071) While the record on this issue is not as clear as the Court would have hoped, the Court ultimately finds that Defendants have met their burden of proof with respect to the PK limitations of the Acorda Patents.

Plaintiffs insist that Defendants failed to prove that the PK parameters of the asserted claims of the Acorda Patents "are inherent properties of the administration of every sustained-release formulation of 4-AP administered at 10 mg BID."[38] (D.I. 272 at 83; *see also id.* at 84 (arguing that "most significantly" "there is nothing in the prior art identifying the pharmacokinetic values recited in the claims as being effective to improve walking or increase

---

[38]In their supplemental letter brief, Plaintiffs argue that the Court previously "reject[ed] an argument that 'conflate[d] the difference between PK data and dose-efficacy results'" in *Avanir Pharmaceuticals, Inc. v. Actavis South Atlantic LLC*, 36 F. Supp. 3d 475 (D. Del. 2014). (D.I. 279 at 4) (quoting *Avanir*, 36 F. Supp. 3d at 501) In Plaintiffs' view, *Avanir* supports Plaintiffs' contention that it was not obvious that the PK values disclosed in Hayes would lead to improved walking in patients with MS. (*See id.*) The Court disagrees. The instant case is distinguishable from *Avanir* because, here, several experts testified as to the relationship between the PK values disclosed in the prior art and improved walking in patients with MS. (*See, e.g.*, Goodman Tr. at 510 (stating that PK profiles reported in Hayes "may certainly show the pharmacokinetic profile that[] [is] analogous to what would be found in MS patients"); Kibbe Tr. at 224 (stating that POSA would expect no difference in PK results from dosing patients with MS or patients with spinal cord injuries)) By contrast, in *Avanir*, "[b]oth sides' experts agreed [that] the disclosed . . . dose ranges . . . in the [prior art] were not directed to the treatment of PBA." *Avanir*, 36 F. Supp. 3d at 501.

walking speed in MS patients")) The Court disagrees. Instead, the Court agrees with Defendants that the pharmacokinetic responses that are incorporated as limitations into certain asserted claims of the Acorda Patents are "inherent in the claimed dosing and [are] taken directly from the prior art." (D.I. 265 at 5 (citing JTX-0002 at 23:1-23; JTX-0069 at AMP-DEF-000498, Table 2)[39]; *see also* Goodman Tr. at 510 (stating that PK profiles reported in Hayes "may certainly show the pharmacokinetic profile that[] [is] analogous to what would be found in MS patients"); *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012) ("[A]n obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting serum concentrations."))

Further, the parties recently submitted supplemental letter briefs to respond to questions from the Court. (*See* D.I. 278, 279) Having considered the letter briefs, and having considered the evidence of record, the Court agrees with Defendants that they have proven that, at the priority date of the Acorda Patents, a POSA would have been aware that a sustained-release dosage form achieving the pharmacokinetic parameters disclosed in Hayes III would have been associated with an improvement in walking in MS patients. (*See* D.I. 278 at 4) (citing evidence)

**E. Secondary Indicia of Non-Obviousness**

Plaintiffs argue that four secondary considerations support the non-obviousness of the Acorda Patents: commercial success, unexpected results, failure of others, and long-felt but unmet need. Defendants respond that none of these factors is probative of non-obviousness. As

---

[39]At trial, in response to the Court's questioning, Plaintiffs' counsel conceded that the claimed PK data were obvious. (*See* Tr. at 793-94) ("It was known in the art that a sustained-release formulation of 10 megs BID could achieve that PK, [but] not that that PK would yield any efficacy for walking.")

discussed below, the Court finds that secondary considerations do not support a finding of non-obviousness in this case.

**1. Commercial Success**

Commercial success can be an indication of nonobviousness "because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art." *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005). Evidence of commercial success is only relevant, however, when it "results from the claimed combination of elements that constitutes the invention," rather than being attributable to what was "already known in the prior art" or to the benefits of "unclaimed features." *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1326 (Fed. Cir. 2012). Thus, a party proffering evidence of commercial success must demonstrate that there is a "causal relation or 'nexus' between an invention and commercial success of a product embodying that invention." *Merck*, 395 F.3d at 1376.

The parties here dispute both whether Ampyra® is a commercial success and whether any commercial success it has achieved has a nexus with the invention claimed in the Acorda Patents. For the reasons discussed below, the Court finds that Ampyra® is a commercial success and that there is a nexus between that success and the features claimed in the Acorda Patents. However, the Court also finds that this success does not support a finding that the Acorda Patents are non-obvious because the existence of a "blocking" patent provides an independent, alternative reason why a POSA would not have attempted to develop the invention claimed in the Acorda Patents.

**a. Ampyra® is a commercial success**

Ampyra® has demonstrated considerable success. Between its launch in 2010 and the end of 2015, domestic sales of Ampyra® reached $1.7 billion and profits reached nearly $1 billion. (D.I. 262 ¶ 157) Over that time-frame, sales of Ampyra® tablets more than doubled, even as the price per tablet increased from $17 to $26. (*Id.*) Acorda was also able to license Ampyra® to another drug company, Biogen, to sell the drug outside the United States – a partnership that has led to an additional $135 million in royalties to date. (*Id.*)

Defendants argue that these sales data do not support a finding of commercial success because the projected sales of Ampyra® are insufficient to cover the costs of its development. Defendants' expert, Dr. McDuff, made several estimates of the cost of developing Ampyra®, accounting for factors such as (1) direct expenditures on research and development; (2) success rates; (3) development time; and (4) costs of capital. (*See* D.I. 265 at 63) After tailoring his estimates to reflect several factors specific to Ampyra®, he found that the present value of Ampyra®'s profits, even projected until the Acorda Patents' 2027 expiration date, does not exceed the estimated costs of Ampyra®'s development. (*See id.*)

In Defendants' view, the entire cost of developing Ampyra® is relevant to the analysis because no "rational decision[]maker" would proceed to develop a drug unless he or she expected its eventual revenues to cover its development costs. (*Id.*) Thus, the decision to proceed with incurring the costs of development gives some indication as to what, at a minimum, a rational decisionmaker expected the commercial opportunity for the drug to be. (McDuff Tr. at 629) If a drug does not realize ***at least*** that commercial opportunity, Defendants argue, then the drug is commercially ***unsuccessful*** from the perspective of one who has invested in the process

of bringing it to market. (*See id.*) In Defendants' view, if a drug is unsuccessful according to this analysis, then it is unclear whether the invention had not been previously brought to market because (i) it was non-obvious or, instead, because (ii) it was obvious but a rational decisionmaker would have known that its commercial potential was too limited to justify the costs of its development.

Examination of Ampyra®'s development history demonstrates that a comparison of actual sales to total development costs constitutes an inappropriate portrayal of how a rational decisionmaker would have analyzed Ampyra®'s commercial potential. As Defendants themselves note, the Acorda inventors licensed the Elan Patent in 1997, with the intention of developing a drug for treatment of spinal cord injuries and MS. (*See* D.I. 265 at 61-62) It was only after expending considerable time and money on licensing a formulation and conducting clinical trials that the Acorda patentees recognized the likelihood that the drug would be suited to treat only walking in MS patients. (*See* McDuff Tr. at 630) Further, it was not until after the priority date of the Acorda Patents that published clinical trials revealed that Ampyra® was effective in just a subset of patients who suffered from walking disabilities. (*See id.*) At each stage of this process, a rational decisionmaker could have had a different estimation as to the likely future sales of Ampyra®, as well as the costs of future development. But at any given time, the pertinent comparison could have supported a rational decision to proceed with development.[40]

---

[40]Defendants argue that a POSA considering whether to proceed with developing Ampyra® in 2004 would compare likely revenues to the entire cost of bringing Ampyra® to market. (*See* D.I. 265 at 63) At trial, Dr. McDuff further stated that a POSA would consider sunk costs in deciding whether to proceed with drug development, because such costs would capture a drug's "full development cost." (McDuff Tr. at 688) However, Plaintiffs did not incur all of those sunk

In arguing that Ampyra®'s purported economic unprofitability may have been the reason no one attempted to develop it sooner, Defendants urge the Court to find that a rational decisionmaker performing this analysis in 2004 would have been able to project Ampyra®'s sales and to determine that the drug would be unprofitable. (*See* D.I. 265 at 63) But the record does not support such a finding. Crucially, the record does not make clear how a rational decisionmaker in 2004 would have projected the eventual size of the market for Ampyra® to be, particularly given that later clinical trials demonstrated that the drug had a more limited patient population than previously expected. Nor is it clear what remaining development costs a rational decisionmaker would expect to incur, because Dr. McDuff did not adjust estimates of direct expenditure, development time, or anticipated success rate to reflect the work that had been done. Hence, even assuming that economic profitability calculations could in some cases undermine the persuasive force of apparently strong sales, the Court finds that Defendants have not made a sufficient showing to support such a finding in this case.

Given the strength of Ampyra®'s sales, and the absence of any evidence that its sales are disappointing given its limited indication and patient population,[41] the Court finds that Ampyra® is a commercial success.

---

costs; they obtained a license to the Elan Patent. It is not necessarily the case that the cost of the license met or exceeded the amount of Elan's sunk costs in developing the Elan Patent.

[41]Defendants argue that Ampyra®'s sales figures are weak in comparison to the sales of top MS treatments. (*See* D.I. 265 at 63) This comparison is not particularly probative of commercial success in this case because, unlike Ampyra®, none of the drugs to which Defendants are comparing it is approved exclusively for the narrow indication of improving walking. (*See* Goodman Tr. at 512)

**b. Nexus with the invention of the Acorda Patents**

The Court further finds that there is a nexus between Ampyra's® commercial success and the inventions claimed in the Acorda Patents. There is considerable evidence that the drug's success is at least partially attributable to its unique indication: treating walking in MS patients. In addition to being indicated exclusively for walking, Ampyra®'s marketing messaging to physicians and patients specifically highlights the drug's ability to improve walking-related symptoms of MS.[42] (*See* D.I. 272 at 10) A large proportion of Ampyra®'s prescriptions are renewals, indicating that the drug is successful in treating MS. (*See id.* at 87) Indeed, some insurance companies require patients to demonstrate improved walking in order to be able to renew their prescription. (*See id.*) These data, like consumer and physician surveys showing that over 80% of doctors and patients are satisfied with Ampyra®, suggest that the drug's ability to treat walking drives its commercial success. (*See id.*)

As Defendants point out, the record does not support a finding that Ampyra®'s success is ***exclusively*** attributable to the Acorda Patents. For example, Ampyra®'s commercial success is also attributable in part to the drug's sustained-release formulation (claimed in the Elan Patent) and the 4-AP active ingredient (disclosed in the prior art). Plaintiffs did not attempt to apportion Ampyra®'s success among its various features. Nevertheless, the proffered evidence regarding the importance of the drug's efficacy (in treating walking in MS patients) to its sales is sufficient for establishing a nexus between the Acorda Patents and Ampyra®'s success. *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1068, 1073 (Fed. Cir. 2016) (indicating that nexus is

---

[42]Notably, the record suggests that Ampyra® sales are not due to aggressive marketing: both Ampyra® revenues and tablet sales have increased even as marketing expenditures for the drug have declined. (Bell Tr. at 590-91)

established when patentee shows consumers are more likely to buy product if it includes patented features).

**c. Commercial success and a blocking patent**

Although the Court finds that Ampyra® is a commercial success and that its commercial success has a nexus with the patents-in-suit, this evidence is of little probative value to the obviousness inquiry with respect to the Acorda Patents because the earlier Elan Patent "blocked" competitors from practicing the Acorda Patents. *See Merck*, 395 F.3d at 1377. Because the Acorda Patents practice the Elan Patent,[43] no one other than the Elan patentees and their licensees could have practiced the invention of the Acorda Patents without facing liability for patent infringement. The risk of such liability would have provided an independent incentive for a patentee not to develop the invention of the Acorda Patents, even if those inventions were obvious. *See Warner Chilcott Co, LLC v. Teva Pharm. USA, Inc.*, 37 F. Supp. 3d 731, 739 (D. Del. 2014), *aff'd*, 594 F. App'x 630 (Fed. Cir. Nov. 18, 2014).

For this reason, the Court finds that Plaintiffs' evidence that Ampyra®'s commercial success had a nexus to the Acorda Patents does not support a finding that the claims of the Acorda Patents are non-obvious.

**2. Unexpected Results**

Evidence that a "claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected" may suggest that the invention is non-obvious. *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995). Plaintiffs argue that the efficacy of a 10 mg/twice-daily dose of 4-AP would have been surprising

---

[43]It is undisputed that the Acorda Patents practice the Elan Patent. (*See* D.I. 265 at 37)

to a POSA, as would have been the fact that a 10 mg dose was as effective in treating walking as higher doses. In Plaintiffs' view, these results are unexpected because "[n]one of the [prior] art, viewed alone or in combination, supported an expectation that the 10 mg[/twice-daily] dosing regimen of the Acorda [P]atent claims would improve walking or increase walking speed." (D.I. 274 at 6) Specifically, Plaintiffs argue that the limited and varied data in the prior art would have prevented a POSA from developing such an expectation. (*See id.* at 6-9)

A showing that a drug was slightly more or less effective than the prior art would suggest does not constitute an "unexpected result" for purposes of assessing obviousness. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013); *In re Merck*, 800 F.2d at 1098-99. As discussed above with respect to the obviousness of the 10 mg dose, the prior art, while perhaps insufficient to ***prove*** the effectiveness of that dosage, did not render its effectiveness ***unexpected***. Further, although the prior art in this case suggested that larger doses of 4-AP might be more effective than smaller doses, there was not sufficient evidence of dose-response to render a 10 mg/twice-daily dose non-obvious under an obvious-to-try-standard.

For these reasons, the Court finds that Plaintiffs have not presented evidence of unexpected results that militates in favor of finding that the claims of the Acorda Patents are non-obvious.

**3. Failure of Others**

The "failure of others to find a solution to the problem which the patent[s] . . . purport[] to solve" may be probative of non-obviousness because it suggests "the presence of a significant defect [in the prior art], while serving as a simulated laboratory test of the obviousness of the solution to a skilled artisan." *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578-79 (Fed.

Cir. 1991) (internal quotation marks omitted; brackets in original). Plaintiffs argue that the non-obviousness of the Acorda Patents is evident from the failure of others to develop a "safe and effective therapy to improve walking in MS patients." (D.I. 274 at 24)

The record includes only minimal evidence that anyone other than the Acorda patentees attempted to develop a "safe and effective therapy to improve walking in MS patients." (*Id.*) Drs. Lublin and Goodman testified that another pharmaceutical company, Sanofi-Aventis, tried and failed to develop a therapy to improve walking in MS patients, using as an active ingredient a potassium channel blocker other than 4-AP. (*See* Lublin Tr. at 411-13; Goodman Tr. at 513-15) But this failed effort is not particularly probative of a "gap" in the prior art that would render non-obvious the invention of the Acorda Patents. Sanofi-Aventis likely did not use 4-AP because it was blocked from doing so by the Elan Patent. (*See* D.I. 272 at 92) Hence, Sanofi-Aventis' failure does not provide much evidence that the formulation of the Acorda Patents was non-obvious.

The record also reflects that Elan failed in its attempts to develop MS therapies for indications other than walking. (PTX-0360 at 101-02) Since Elan's failed efforts preceded the Schwid and MS-F201 studies that demonstrated 4-AP's effects in walking – indeed, as Dr. Goodman testified, the study documenting Elan's failure prompted those later studies (*see* Goodman Tr. at 469) – Elan's failure is not particularly probative of what would have been obvious to a POSA on the priority date of the Acorda Patents. Moreover, the Acorda Patents themselves have also not been successful as a therapy for indications other than walking – and Ampyra® is not FDA-approved for treatment of any other symptom of MS. (*See* McDuff Tr. at 630)

For these reasons, the Court finds that Plaintiffs have not presented evidence of "failure of others" that militates in favor of finding that the claims of the Acorda Patents are non-obvious.

**4. Long-Felt but Unmet Need**

"Evidence of a long-felt but unresolved need can weigh in favor of . . . non-obviousness of an invention because it is reasonable to infer [that] the need would not have persisted had the solution been obvious." *Apple*, 839 F.3d at 1056. The record reflects that Ampyra® satisfied a long-felt, unmet need for a method of treating walking in MS patients. It is undisputed that walking impairments have long been recognized as a devastating symptom of MS. The FDA's decision to grant priority review status to Acorda's NDA for Ampyra® suggests that the industry considered that need to be at least partially unmet. *See Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1401, 1407 (Fed. Cir. 2014) (holding that FDA's decision to "fast-track" approval supported finding of long-felt and unmet need).

Nevertheless, this evidence of long-felt and unmet need is of limited probative value with respect to the obviousness of the invention claimed by the Acorda Patents. As of the Acorda Patents' priority date, a POSA would not have been able to practice the invention of the Acorda Patents without infringing the Elan Patent. Thus, it is possible that the need for a therapy to improve walking in MS patients remained unmet ***despite*** the ***obviousness*** of the solution claimed in the Acorda Patents. For these reasons, the Court finds that, although Plaintiffs have presented convincing evidence that there existed a long-felt, unmet need for a method of improving walking in MS patients, this evidence does not militate in favor of finding that the claims of the Acorda Patents are non-obvious.

### F. Conclusion as to Acorda Patents

While Defendants face a high burden in proving that the Acorda Patents are invalid as obvious, the Court finds, after weighing all of the credible evidence, that they have met this burden. As explained above, Defendants have adduced clear and convincing evidence that a POSA at the priority date would have been motivated and would have had a reasonable expectation of success to practice and combine each of the limitations of the asserted claims of the Acorda Patents. The evidence of secondary considerations is not sufficient to overcome these findings.

This is not to say that there is no significant evidence of nonobviousness. The Court has explained above that there is merit in many of Plaintiffs' contentions. Of particular note, the Court found credible the testimony of co-inventor (Acorda CEO) Dr. Cohen. At trial, Dr. Cohen vividly recounted the sometimes harrowing financial risks he and his nascent company took, and the several occasions on which it looked as if his "bet-the-company" approach had suffered a fatal blow. (*See, e.g.*, Cohen Tr. at 282) It may well be that Dr. Cohen's subjective experience of the "invention story" was that the purported invention of the Acorda Patents was anything but obvious. The Court has considered this evidence – but the law directs a different analysis. For the reasons explained above, the evidence as a whole establishes, clearly and convincingly, and objectively, that the asserted claims of the Acorda Patents would have been obvious to a person of ordinary skill in the art at the priority date, notwithstanding the actual inventors' subjective experience.

Also, the Court agrees with Plaintiffs that, at the priority date of the Acorda Patents, the risk of seizures "loomed over the work of exploring the use of 4-AP in MS." (D.I. 272 at 5) A

POSA would have known in 2004 that 4-AP was known to have the capacity to induce seizures, and would further have known that seizures could be particularly dangerous for individuals suffering from MS. (*See id.*) However, as Defendants correctly argue, a POSA can have a motivation and reasonable expectation of success notwithstanding recognition of a substantial risk. As Defendants further point out, even today seizure risk remains a significant concern associated with the use of 4-AP (especially at doses greater than those of Ampyra®), but that known and significant risk has not deterred POSAs or pharmaceutical companies – including Plaintiffs and Defendants – from developing drugs with 4-AP as their active ingredient. (*See* Tr. at 746)

In the end, there is evidence on both sides of the parties' dispute, and this was an eminently "triable case." But the Court's assessment of the evidence as a whole is that Defendants have proven clearly and convincingly that the Acorda Patents are invalid due to obviousness.

**CONCLUSION**

Defendants have failed to prove by clear and convincing evidence that claims 3 and 8 of the Elan Patent are invalid due to obviousness. Defendants have proven by clear and convincing evidence that claims 1, 7, 38, and 39 of the '826 patent; claims 3 and 5 of the '685 patent; claims 1, 2, 5, 22, 32, 36, and 37 of the '437 patent; and claims 36, 38, and 45 of the '703 patent are invalid due to obviousness.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACORDA THERAPEUTICS, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-882 (LPS) |
| | ) | (CONSOLIDATED) |
| ROXANE LABORATORIES INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

LPP

**~~[PROPOSED]~~ FINAL JUDGMENT**

This action, having been tried before the Court on September 19, 20, 21 and 23, 2016, Honorable Leonard P. Stark, Chief District Judge presiding, the evidence and testimony of witnesses of each side having been heard and a decision having been rendered:

IT IS HEREBY ORDERED AND ADJUDGED this 24th day of April, 2017, for the reasons set forth in the Memorandum Opinion dated March 31, 2017 (D.I. 284) that:

1. Judgment is entered in favor of plaintiffs Acorda Therapeutics, Inc. ("Acorda") and Alkermes Pharma Ireland Limited (collectively, "Plaintiffs") and against defendants Mylan Pharmaceuticals Inc. ("Mylan"), Roxane Laboratories, Inc. ("Roxane"), and Teva Pharmaceuticals USA Inc. ("Teva") (collectively, "Defendants") that claims 3 and 8 of U.S. Patent No. 5,540,938 (the "'938 Patent") would be infringed by the use of the products that are the subjects of ANDA Nos. 206858, 206646 and 206854, filed with the Food and Drug Administration ("FDA") by defendants Mylan, Roxane and Teva, respectively, and that claims 3 and 8 of the '938 patent are valid and enforceable.

2. Judgment is entered in favor of Defendants and against Plaintiffs that the following patent claims asserted by Plaintiffs are invalid for obviousness: claims 1, 7, 38 and 39 of U.S. Patent No. 8,007,826 (the "'826 Patent"); claims 3 and 5 of U.S. Patent No. 8,663,685

(the "'685 Patent"); claims 1, 2, 5, 22, 32, 36 and 37 of U.S. Patent No. 8,354,437 (the "'437 Patent"); and claims 36, 38 and 45 of U.S. Patent No. 8,440,703 (the "'703 Patent").

3. On September 1, 2016, Plaintiffs and Defendants stipulated that claims 1, 7, 38 and 39 of the '826 Patent, claims 3 and 5 of the '685 Patent, claims 1, 2, 5, 22, 32, 36 and 37 of the '437 Patent, and claims 36, 38 and 45 of the '703 Patent would be infringed by the use in the United States of the products that are the subjects of ANDA Nos. 206858, 206646 and 206854, filed with the FDA by defendants Mylan, Roxane and Teva, respectively, if those claims were not invalid for obviousness. (D.I. 254.)

4. Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the FDA of the product that is the subject of Mylan's ANDA No. 206858 shall not be a date earlier than the date of the expiration of the '938 Patent, inclusive of the patent term extension granted under 35 U.S.C. § 156 (July 30, 2018) ("the '938 Patent Term").

5. Pursuant to 35 U.S.C. § 271(e)(4)(B), and subject to 35 U.S.C. § 271(i), Mylan and its officers, agents, servants, employees, and those persons in active concert or participation with any of them, are enjoined from selling or offering for sale in the United States Mylan's proposed generic dalfampridine product that is the subject of Mylan's ANDA No. 206858 prior to the expiration of the '938 Patent Term.

6. Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the FDA of the product that is the subject of Roxane's ANDA No. 206646 shall not be a date earlier than the date of the expiration of the '938 Patent, inclusive of the patent term extension granted under 35 U.S.C. § 156 (July 30, 2018).

7. Pursuant to 35 U.S.C. § 271(e)(4)(B), and subject to 35 U.S.C. § 271(i), Roxane and its officers, agents, servants, employees, and those persons in active concert or participation with any of them, are enjoined from selling or offering for sale in the United States Roxane's proposed generic dalfampridine product that is the subject of Roxane's ANDA No. 206646 prior to the expiration of the '938 Patent Term.

8. Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the FDA of the product that is the subject of Teva's ANDA No. 206854 shall not be a date earlier than the date of the expiration of the '938 Patent, inclusive of the patent term extension granted under 35 U.S.C. § 156 (July 30, 2018).

9. Pursuant to 35 U.S.C. § 271(e)(4)(B), and subject to 35 U.S.C. § 271(i), Teva and its officers, agents, servants, employees, and those persons in active concert or participation with any of them, are enjoined from selling or offering for sale in the United States Teva's proposed generic dalfampridine product that is the subject of Teva's ANDA No. 206854 prior to the expiration of the '938 Patent Term.

April 24, 2017
DATED

CHIEF UNITED STATES DISTRICT JUDGE

10983433

U 7504989

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

November 14, 2014

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,007,826*
ISSUE DATE: *August 30, 2011*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

T. WALLACE
Certifying Officer

CA No. 14-882-LPS
**JTX-0002**

AMPFH0018039

US008007826B2

(12) **United States Patent**
**Blight et al.**

(10) **Patent No.: US 8,007,826 B2**
(45) **Date of Patent: Aug. 30, 2011**

(54) **SUSTAINED RELEASE AMINOPYRIDINE COMPOSITION**

(75) Inventors: **Andrew R. Blight**, Mahopac, NY (US); **Ron Cohen**, Irvington, NY (US)

(73) Assignee: **Acorda Therapeutics, Inc.**, Hawthorne, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 894 days.

(21) Appl. No.: **11/010,828**

(22) Filed: **Dec. 13, 2004**

(65) **Prior Publication Data**

US 2005/0276851 A1 Dec. 15, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/528,760, filed on Dec. 11, 2003, provisional application No. 60/528,592, filed on Dec. 11, 2003, provisional application No. 60/528,593, filed on Dec. 11, 2003, provisional application No. 60/560,894, filed on Apr. 9, 2004.

(51) **Int. Cl.**
***A61K 31/44*** (2006.01)
***A61K 9/22*** (2006.01)

(52) **U.S. Cl.** ........................................ **424/468**; 514/352

(58) **Field of Classification Search** .................. 424/468
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,386,095 A 5/1983 Gibson et al.
4,508,715 A 4/1985 Booth et al.
4,721,619 A 1/1988 Panoz et al.
4,894,240 A 1/1990 Geoghegan et al.
4,946,853 A 8/1990 Bannon et al.
5,370,879 A 12/1994 Masterson et al.
5,540,938 A 7/1996 Masterson et al.
5,545,648 A 8/1996 Hansebout et al.
5,580,580 A 12/1996 Masterson et al.
5,597,827 A 1/1997 Miller et al.
5,597,828 A 1/1997 Miller et al.
5,869,480 A 2/1999 Shutske et al.
5,952,357 A 9/1999 Blass et al.
6,284,473 B1 9/2001 Whitaker
6,288,026 B1 9/2001 Exner et al.
2005/0025744 A1 2/2005 Lane
2005/0228030 A1* 10/2005 Blight et al. .................. 514/352
2005/0276851 A1 12/2005 Cunningham et al.

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2085785 AA 6/1994

(Continued)

OTHER PUBLICATIONS

Roche, E.B. (ed.), *Bioreversible Carriers in Drug Design*, American Pharmaceutical Association and Pergamon Press, 1987 (TOC).

(Continued)

*Primary Examiner* — Sharmila G. Landau
*Assistant Examiner* — Rachael Welter
(74) *Attorney, Agent, or Firm* — Jones Day

(57) **ABSTRACT**

A pharmaceutical composition which comprises a therapeutically effective amount of a aminopyridine dispersed in a release matrix, including, for example, a composition that can be formulated into a stable, sustained-release oral dosage formulation, such as a tablet which provides, upon administration to a patient, a therapeutically effective plasma level of the aminopyridine for a period of at least 12 hours, preferably 24 hours or more and the use of the composition to treat various neurological diseases.

**41 Claims, 5 Drawing Sheets**




Copy provided by USPTO from the PIRS Image Database on 11/12/2014

AMPFH0018040

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2006/0276537 | A1 | 12/2006 | Goren et al. |
| 2007/0037848 | A1 | 2/2007 | Masters et al. |
| 2009/0150180 | A1 | 6/2009 | Cohen et al. |
| 2010/0272795 | A1 | 10/2010 | Cunningham |
| 2010/0272796 | A1 | 10/2010 | Cunningham |
| 2010/0272807 | A1 | 10/2010 | Cunningham |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 113562 | B1 | 7/1984 |
| EP | 117027 | A1 | 8/1984 |
| EP | 325843 | A2 | 8/1989 |
| EP | 484186 | | 5/1992 |
| IE | 82916 | B1 | 6/2003 |
| WO | WO 2004/082684 | A1 | 9/2004 |
| WO | WO2005/099701 | | 10/2005 |
| WO | WO2007/035958 | | 3/2007 |
| WO | WO2010/030755 | | 3/2010 |
| WO | WO2010/093838 | | 8/2010 |
| WO | WO2010/093839 | | 8/2010 |
| WO | WO2010/090730 | | 9/2010 |

OTHER PUBLICATIONS


Barge, S.M. et al., *Pharmaceuticals Salts*, J. Pharm. Sci., 66:1-19, 1977.

Hayes et al., Pharmacokinetic Studies of Single and Multiple Oral Doses of Fampridine-SR (Sustained-Release 4-Aminopyridine) in Patients with Chronic Spinal Cord Injury , 2003, Clinical Neuropharmacology 26(4):185-192.

Cohen et al., Responder analysis of walking speed applied to a trial of Fampridine in subjects with MS, 2005, Neurology 64(Suppl. 1):A388, P06.169.

Gonzalez et al., Influence of enteric citric acid on the release profile of 4-aminopyridine from HPMC matrix tablets; Int. J. of Pharmaceutics 251, Issue 1-2; Jan. 30, 2003; pp. 183-193.

Martinez-Gonzalez et al., Effect of varying the restriction degree of 4-aminopyridine release from HPMC matrices on the mechanism controlling the process, 2003, Int. J. Pharmaceutics 257:253-264.

Juarez et al., Influence of admixed carboxynethylcellulose and release of 4-aminopyridine from hydroxypropyl methylcellulose matrix tablets, Int. J. Pharmaceutics 216:115-125.

Hayes et al., Pharmacokinetics of an immediate release oral formulation of Fampridine (4 aminopyridine) in normal subjects and patients with spinal cord injury, Apr. 2003, J. Clin. Pharm. 43(4):379-385.

Segal et al., Absorption Characteristics of Sustained-Release 4-Aminopyridine (Fampridine SR) in Patients with Chronic Spinal Cord Injury, 2000, Journal of Clinical Pharmacology 40(4):402-409.

Barker et al., Alzheimer's Disease, Jan. 26, 1991, Pharmaceutical Journal, pp. 116-118.

Davidson et al., 4-Aminopyridine in the treatment of Alzheimer's Disease, 1988, J. of Biological Psychiatry 23:485-490.

Bever Jr., et al., Preliminary Trial of 3, 4-Diaminopyridine in Patients with Multiple Sclerosis, Apr. 1990, Annals of Neurology 27(4):421-427.

Wesseling et al., Effects of 4-aminopyridine in elderly patients with Alzheimer's Disease, Apr. 1984, New England Journal of Medicine 310(15):988-989.

Burchiel et al., Effects of potassium channel-blocking agents on spontaneous discharges from neuromas in rats, 1985, J. of Neurosurgery 63:246-249.

Blight et al., Effect of 4-aminopyridine on action potential conduction in myelinated axons of chronically injured spinal cord; Department of Neurosurgery and Physiology; NYU Medical Center, Spinal Cord and Brainstem 62:21.15.

Gruner et al., Recovery of motor function in chronic experimental spinal cord injury enhanced by 4-aminopyridine; Department of Neurosurgery and Physiology; NYU Medical Center.

Mitsov, Analgesic activity of pimadine (4-Aminopyridine), Jul.-Aug. 1988, Russian Journal of Pharmacology and Toxology 51(4):122-125.

Biessels et al., Comparison of the pharmacological actions of some new 4-aminopyridine derivatives, 1984, European Journal of Pharmacology 106:319-325.

Nockles et al., Pharmacologic Strategies in the Treatment of Experimental Spinal Cord Injury, 1992, J. Neurotrauma 9, Supplement 1:S211-S217.

Myers, Therapy of multiple sclerosis, 1990, Neurology and Neurosurgery 3:208-212.

Pratt et al., Plasma and Cerebrospinal Fluid Concentrations of 4-Aminopyridine Following Intravenous Injection and Metered Intrathecal Delivery in Canines, 1995, Journal of Neurotrauma 12(1):23-39.

Hansebout et al., 4-Aminopyridine in Chronic Spinal Cord Injury: A Controlled, Double Blind, Crossover Study in Eight Patients, 1993, The Journal of Neurotrauma 10(1):1-18.

Arhem et al., A Model for the fast 4-aminopyridine effects on amphibian myelinated nerve fibers. A study based on voltage-clamp experiments, 1989, Acta Physiol. Scand. 137:53-61.

Beric et al., Central dysesthesia syndrome in spinal cord injury patients., 1988, Pain 34:109-116.

Beric, Altered Sensation and Pain in Spinal Cord Injury, in: Recent Achievements in Restorative Neurology, 3 Altered Sensation and Pain. Dimitrijevic et al. eds., Karger:Basel, pp. 27-36, 1990.

Blight, Cellular Morphology of Chronic Spinal Cord Injury in the Cat: Analysis of Myelinated Axons by Line-Sampling, 1983a, Neuroscience 10(2):521-543.

Blight et al., Morphometric Analysis of Experimental Spinal Cord Injury in the Cat: The Relation of Injury Intensity to Survival of Myelinated Axons, 1986, Neuroscience. 19(1):321-341.

Bever, The Current Status of Studies of Aminopyridines in Patients with Multiple Sclerosis, 1994, Ann. Neurol., 36:S118-S121.

Bever et al., The Effects of 4-Aminopyridine in Multiple Sclerosis Patients: Results of a Randomized, Placebo-Controlled, Double-Blind, Concentration-Controlled, Crossover Trial, 1994, Neurology, 44(6):1054-1059.

U.S. Appl. No. 12/557,015, filed Sep. 10, 2009, Blight et al.

Van Diemen et al., The Effect of 4-Aminopyridine on Clinical Signs in Multiple Sclerosis: A Randomized, Placebo-Controlled, Double-Blind, Cross-Over Study, 1992, Ann. Neurol., 32(2):123-130.

Van Diemen et al., 4-Aminopyridine in Patients with Multiple Sclerosis: Dosage and Serum Level Related to Efficacy and Safety, 1993, Clin. Neuropharm., 16(3):195-204.

Meglio et al., Spinal Cord Stimulation and Peripheral Blood Flow: Part I, In: Indications for Spinal Cord Stimulation, 1981, Y. Hosebuchi and T. Corbin (eds), Excerpta Medica: Amsterdam, pp. 60-66.

Hayes, The Use of 4-Aminopyridine (Fampridine) in Demyelinating Disorders, 2004 Winter, CNS Drug Reviews, 10(4):295-316.

Martinez-Gonzalez et al., Influence of Enteric-Coated Lactose on the Release Profile of 4-Aminopyridine from HPMC Matrix Tablets, 2004, Pharm. Dev. Technol., 9(2):145-153.

Hayes et al., Pharmacokinetics and Safety of Multiple Oral Doses of Sustained-Release 4-Aminopyridine (Fampridine-SR) in Subjects with Chronic, Incomplete Spinal Cord Injury, Jan. 2004, Arch. Phys. Med. Rehabil., 85(1):29-34.

Potter et al., Randomized Double-Blind Crossover Trial of Fampridine-SR (Sustained Release 4-Aminopyridine) in Patients With Incomplete Spinal Cord Injury, Oct, 1998, J. Neurotrauma, 15(10):837-849.

U.S. Appl. No. 12/824,133, filed Jun. 25, 2010, Blight et al.

U.S. Appl. No. 12/824,135, filed Jun. 25, 2010, Blight et al.

U.S. Appl. No. 12/824,136, filed Jun. 25, 2010, Blight et al.

U.S. Appl. No. 12/824,137, filed Jun. 15, 2010, Blight et al.

U.S. Appl. No. 12/824,140, filed Jun. 15, 2010, Blight et al.

U.S. Appl. No. 12/824,141, filed Jun. 25, 2010, Blight et al.

2nd Meeting of the Pharmacy Compounding Advisory Committee, May 6, 1999, Transcript (http://www.fda.gov/ohrms/dockets/ac/99/transcpt/3513t1.rtf (last accessed Nov. 18, 2010).

Advisory Action Before the Filing of an Appeal Brief mailed Mar. 13, 2009 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.

Agoston et al., 1978, "Effects if 4-Aminopyridine in Eaton Lambert Syndrome," Br. J. Anesth., vol. 50:383-385.


Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Agoston et al.,1980, "Antagonism of Ketamine-Diazepam anaesthesia by 4-Aminopyridine in Human Volunteers," Br. J. Anaesth., vol. 52:367-369.
Aisen et al., 1995, "3,4-Diaminopyridine as a treatment for amyotrophic lateral sclerosis," J. of Neurological Sciences, vol. 129:21-24.
Aisen et al., 1996, "A double-blind placebo-controlled study of 3,4-diaminopyridine in amytrophic lateral sclerosis patients on a rehabilitation unit," J. of Neurological Sciences, vol. 138:93-96.
Albrecht et al., 2001, "Day-to-day variability of maximum walking distance in MS patients can mislead to relevant changes in the Expanded Disability Status Scale (EDSS): average walking speed is a more constant parameter," Multiple Sclerosis, vol. 7:105-109.
Ampyra® (dalfampridine), Acorda Therapeutics, Inc., Prescribing Information, Jan. 2010. http://ampyra.com/local/files/PI.pdf (last accessed Nov. 3, 2010).
Avonex® (interferon beta-1a), Biogen Idec Inc., Prescribing Information, Oct. 2008. http://www.avonex.com/pdfs/pi_luer_lock.pdf (last accessed Nov. 3, 2010).
Ball et al., 1979, "Human botulism caused by Clostridium Botulinum Type E: the Birmingham Outbreak," Quarterly Journal of Med. New Series XLVIII, vol. 191:473-491.
Bertelsmann et al., 1992, "Comparison between 4-aminopyridine and 3,4diaminopyridine in the treatment of multiple sclerosis," Annals of Neurology, vol. 32(2):256 (Abstract P100).
Betaseron® (Interferon Beta-1b) for SC injection, Bayer HealthCare Pharmaceuticals Inc., Prescribing Information, May 2010. http://berlex.bayerhealthcare.com/html/products/pi/Betaseron_PI.pdf (last accessed Nov. 3, 2010) (pp. 1-10).
Bever et al., 1995, "Experience with slow release 4-aminopyridine in multiple sclerosis patients: Long term tolerability and safety," Journal of Neuroimmunology, 1 Suppl. 58.
Bever et al., 1995, "The brief repeatable battery of neuropsychological tests for multiple sclerosis: a preliminary serial study," Multiple Sclerosis, vol. 1:165-169.
Bever et al., 1995, "The Pharmacokinetics and Tolerability of a Slow-Release Formulation of 4-Aminopyridine in Multiple Sclerosis Patients," Neurol. vol. 45(Suppl 4):A351.
Bever et al., 1996, "Treatment with oral 3,4 diaminopyridine improves leg strength in multiple sclerosis patients: Results of a randomized, double-blind, placebo-controlled, crossover trial," Neurol., vol. 47:1457-1462.
Bever et al., 2009, "Sustained-release fampridine for multiple sclerosis," Expert Opin. Investig. Drugs, vol. 18(7):1013-1024.
Blight et al., 2001, "Acute spinal cord injury: Pharmacotherapy and drug development perspectives," Curr. Opin. Investig. Drugs, vol. 2(6):801-08.
Blight et al., 2002, "Miracles and molecules—progress in spinal cord repair," Nature Neuroscience, vol. 5:1051-1054.
Blight, 1987, "Effect of 4-aminopyridine on action potential conduction in myelinated axons of chronically injured spinal cord," Society of Neurosciences Abstracts, vol. 13(1):62 (Abstract 21.15.
Blight, 1989, "Effect of 4-aminopyridine on axonal conduction-block in chronic spinal cord injury," Brain Res. Bull., vol. 22(1):47-52.
Blight, 1998, "Containing plasticity: neurite inhibitory factors of myelin," Nat. Neurosci., vol. 1(2):87-88.
Blight, 2004,"Just one word: plasticity," Nat. Neurosci., vol. 7(3):206-08.
Booij et al., 1978, "Neostigmine and 4-Aminopyridine Antagonism of Lincomycin-Pancuronium Neuromuscular Blockade in Man," Anesth. Analg., vol. 57:316-321.
Bowman et al., 1981, "Actions of 4-aminopyridine on the cardiovascular systems of anaesthetized cats and dogs," Br. J. Anaesth., vol. 53:555-565.
Bowman et al., 1981, "Pharmacological actions of aminopyridines and related compounds," Rev. Pure Appl. Phamacol. Sci., vol. 2(4):317-31.
Bronnum-Hansen et al., 2005, "Suicide among Danes with multiple sclerosis," J. of Neurol. Neurosurg. Psych., vol. 76:1457-1459.
Bruckner et al., 2000, "Effects of standard anticonvulsant drugs on different patterns of epileptiform discharges induced by 4-aminopyridine in combined entorhinal cortex-hippocampal slices," Brain Res., vol. 859(1):15-20.
Bugaresti et al., 2001, "Pharmacokinetics and safety of single oral doses of fampridine-sr (sustained-release 4-aminopyridine) tablets in patients with chronic spinal cord injury," Presented to the American Academy of Physical Medicine and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Calabresi et al., 1993, "Progressive spinal multiple sclerosis," Seminars in Neurology, vol. 13(4):322-332.
Capacio et al., 1997, "Pharmacokinetics and pharmacodynamics of 4-aminopyridine in awake guinea pigs," Drug Chem. Toxicol., vol. 20(3):151-172.
Cardenas E et al., 2007, "Phase 2 trial of sustained-release fampridine in chronic spinal cord injury," Spinal Cord, vol. 4592:158-168.
Carlsson et al., 1983, "Can 4-aminopyridine be used to reverse anaesthesia and muscle relaxation?" Acta Anaesth. Scand., vol. 27:87-90.
CD-ROM in duplicate containg video-file "Today Show.mov," created Jul. 18, 2010, showing segment of the "Today Show" aired May 27, 2010 accompained by still image single frame photograph.
Chalk et al., 1990, "Response of the Lambert-Eaton myasthenic syndrome to treatment of associated small-cell lung carcinoma," Neurology, vol. 40(10):1552-1556.
Clinicaltrial.gov, Efficacy, safety, and tolerability of Nerispirdine in patients with multiple sclerosis, ClinicalTrials.gov. http://clinicaltrials.gov/show/NCT00811902 (last accessed Nov. 2, 2010).
Coetzee et al., 1999, "Molecular diversity of K+ channels," Ann. NY Acad. Sci., vol. 868:233-285.
Cohen et al., 1999, "Utilization of the multiple sclerosis functional composite as an outcome measure in the phase 3 trial of interferon beta-1a (Avonex®) in secondary progressive multiple sclerosis (Impact)," Neurology, vol. 62 (6 Suppl. 2):A548-S549 (Abstract S74.002).
Cohen et al., 2000, "Intrarater and interrater reliability of the MS functional composite outcome measure," Neurology, vol. 54:802-806.
Cohen et al., 2000, "One-year change in the multiple sclerosis functional composite and expanded disability status scale in the phase 3 trial of interferon beta-1a in secondary progressive multiple sclerosis (Impact)," Neurology, vol. 54 (7 Supp. 3):A215 (Abstract 530.02).
Cohen et al., 2001, "Use of the multiple sclerosis functional composite as an outcome measure in a phase 3 clinical trial," Arch. Neurol. vol. 58:961-967.
Cohen et al., 2001, "Results of Impact, a phase 3 trial of interferon beta-1a in secondary progressive multiple sclerosis," Neurology, vol. 56 (8 Supp. 3):A148-149 (Abstract S20.003).
Cohen et al., 2001, "Results of Impact, a phase 3 trial of interferon beta-1a in secondary progressive multiple sclerosis," Neurology, vol. 56 (8 Supp. 3):A148-149 (Abstract S20.003).
Cohen et al., 2002, Benefit of interferon beta-1a on MSFC progression in secondary progressing MS (Abstract), Neurology, vol. 59(5):679-687.
Cohen et al., 2005, "Responder analysis of walking speed applied to a trial of fampridine in subjects with MS," 57th Annual Meeting of the American Academy of Neurology, Miami, FL, Apr. 9-16, 2005 (Poster).
Confavreux and Compston, 2005, "Disease-modifying treatments in multiple sclerosis," Chap. 18 in McAlpine's Multiple Sclerosis, 4th ed., Compston et al., (eds.), Churchill Livingstone Elsevier, pp. 765-770.
Confavreux and Compston, 2005, "The person with multiple sclerosis: a prospectus," Chap. 19, in McAlpine's Multiple Sclerosis 4th ed., Compston et al. (eds.), Churchill Livingstone Elsevier, pp. 805-810.
Confavreuz and Compston, Dec. 2005, "The natural history of multiple sclerosis," Chap. 4 in McAlpine's Multiple Sclerosis, 4th Ed., Compston et al. (eds.) Churchill Livingstone Elsevier, pp. 193-196.
Consortium of Multiple Sclerosis Centers (CMSC), Annual Meeting, Jun. 7, 2002 (Poster).
Cooke et al., 1994, "Lambert-Eaton myasthenic syndrome: evaluation of movement performance following drug therapy," Electromyogr. Clin. Neurophysiol. vol. 34(2):87-93.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Copaxone® (glatiramer acetate), TEVA Neuroscience, Inc., Prescribing Information, Feb. 2009. http://www.copaxone.com/pdf/PrescribingInformation.pdf (last accessed Nov. 3, 2010).
Cowen and Company, "Acorda Therapeutics," Aug. 3, 2010 (pp. 1-5).
Crenshaw et al. 2006, "Gait variability in people with multiple sclerosis," Multiple Sclerosis, vol. 12:613-691.
Darlington, 2000, "Fampridine Acorda Therapeutics," Curr. Opin. Investig. Drugs, vol. 1(3):375-379.
Davis et al., 1995, "Mechanism of Action of 4-Aminopyridine in the Symptomatic Treatment of Multiple Sclerosis," Ann. Neurol., vol. 37(5):684.
de Waal et al., 1994, "The treatment of multiple sclerosis (MS): 4-aminopyridine (4-AP)," J. of Neurology, vol. 241:S102 (Abstract 11).
DeForge et al., 2004, "The effect of 4-aminopyridine on gait in ambulatory spinal cord injuries: a double-blind, placebo-controlled, crossover trial," Spinal Cord, vol. 42:674-685.
Department of Health & Human Services, Mar. 29, 2010, Warning Letter, http://www.fda.gov/dowloads/ICECI/EnforcementActions/WarningLetters/2001/UCM069491.pdf (last accessed Nov. 16, 2010).
Ditunno et al., 2002, "Double-blinded, placebo-controlled, dose-escalating study evaluating the safety and efficacy of oral doses of fampridine-sr (sustained-release-aminopyridine) in patients with chronic spinal cord injury," First Meeting of the American Spinal Injury and the Intl Medical Society of Paraplegia, Vancouver, Canada, May 3-6, 2002 (Poster).
Ditunno et al., 2002, "Double-blind, placebo-controlled, dose-escalating study evaluating the safety and efficacy of oral doses of fampridine-sr (sustained-release 4-aminopyridine) in patients with chronic spinal cord injury," American Spinal Association Twenty-Eight Annual Meeting, p. S35 (Abstract # 78).
Donovan et al., 2000, "Intravenous infusion of 4-AP in chronic spinal cord injured subjects," Spinal Cord, vol. 38:7-15.
Dubuc et al., 1986, "The effects of 4-aminopyridine on the spinal cord: rhythmic discharges recorded from the peripheral nerves," Brain Res., vol. 369:243-259.
Edgley et al., 1991, "A survey of multiple sclerosis. Part 2: Determinants of employment status," Can. J. Rehab., vol. 4(3):127-132.
Eriksson et al., 2002, "Epileptic seizures, cranial neuralgias and paroxysmal symptoms in remitting and progressive multiple sclerosis," Mult. Scler. vol. 8(6):495-499.
Evenhius et al., 1981, "Pharmacokinetics of 4-aminopyridine in human volunteers. A preliminary study using a new GLC method for its estimation," Br. J. Anaesth., vol. 53:567-570.
Extavia® (interferon beta-1b), Novartis Pharmaceuticals Inc., Prescribing Information, Aug. 2009. http://www.pharma.us.novartis.com/product/pi/pdf/extavia.pdf (last accessed Nov. 3, 2010).
Faculty, Doctors, Staff, Department of Neurology, Columbia University, New York, http://web.neuro.columbia.edu/members/profiles.php?id=91 (last accessed Nov. 17, 2010).
FDA Approval Letter NDA 022250, Jan. 22, 2010.
FDA Guidance for Industry: Bioanalytical Method Validation (May 2001) (pp. 1-22).
FDA Guidance for Industry: Bioavailability and Bioequivalence Studies for Orally Administered Drug Products—General Considerations (Mar. 2003) (pp. 1-23).
FDA Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro / In Vivo Correlations (Sep. 1997) (pp. 1-24).
FDA Guidance for Industry: Food-Effect Bioavailability and Fed Bioequivalence Studies (Dec. 2002) (pp. 1-9).
Feinstein, 2004, "The neuropsychiatry of multiple sclerosis," Can. J. Psychiatry, vol. 49:157-163.
Fingerman, et al., 2000, "The overactive bladder in multiple sclerosis," J. Am. Osteopath. Assoc., vol. 100(Suppl):S9-S12.
Fischer et al., 1999, "The Multiple Sclerosis Functional Composite measure (MSFC): an integrated approach to MS clinical outcome assessment," Mult. Scler., vol. 5:244-250.
Fleming et al., 1994, "Patterns of comorbidity in elderly patients with multiple sclerosis," J. Clin. Epidemiol., vol. 47:1127-1132.
Folkert, 2005, "Neuropathologic Substrate of Cerebral Palsy," J. Child Neurol. vol. 20:940-949.
Friend et al., 1999, "Language Functions in Patients with Multiple Sclerosis," Clin Neuropsychologist, vol. 13(1):78-94.
Gean, 1990, "The epileptiform activity induced by 4-aminopyridine in rat amygdale slices: antagonism by non-N-methyl-D-aspartate receptor antagonists," Brain Res., vol. 530:251-256.
Gilenya® (fingolimod), Novartis Pharmaceuticals Corporation, Prescribing Information, Sep. 2010. http://www.pharma.us.novartis.com/product/pi/pdf/gilenya.pdf (last accessed Nov. 9, 2010).
Glasauer et al., 2005, "4-Aminopyridine restores visual ocular motor function in upbeat nystagmus," J. Neurol. Neurosurg. Psychiatry, vol. 76:451-453.
Glasauer et al., 2005, "Effect of 4-aminopyridine on upbeat and downbeat nystagmus elucidates the mechanism of downbeat nystagmus," Ann. NY Acad. Sci., vol. 1039:528-531.
Gold et al., 1996, "Characterization of six voltage-gated K+ currents in adult rat sensory neurons," J. Neurophysiol., vol. 75:2629-2646.
Goodman et al., 2002, "Placebo-controlled double-blinded dose ranging study of Fampridine-SR in multiple sclerosis," P308, ACTRIMS-ECTRIMS, Abstracts of the 7th Annual Meeting of the Americas Committee for Treatment and Research in Multiple Sclerosis and 18th Congress of the European Committee for Treatment and Research in Multiple Sclerosis, Sep. 18-21, 2002, Baltimore, Maryland, USA, Mult. Scler. vol. 8 Suppl Posters S116-S117, (P308).
Goodman et al., 2003, "Placebo-controlled double-blinded dose ranging study of fampridine-SR in multiple sclerosis," Neurology, vol. 60 (5 Suppl. 1), Abstract S21.001, p. A167 (S31.001).
Goodman et al., 2004, "Phase 2 trial of fampridine-sr (sustained-release 4-aminopyridine) in multiple sclerosis," 20th European Committee for Treatment and Research in Multiple Sclerosis, Vienna, Austria, Oct. 2-9, 2004 (Poster).
Goodman et al., 2005, "Clinical meaningfulness of consistent improvement on the timed 25 foot walk (TW25) during treatment with fampridine," 130th Annual Meeting of the American Neurological Association, San Diego, CA, Sep. 25-28, 2005 (Poster).
Goodman et al., 2005, "Stability and interrelatedness of the 12-item multiple sclerosis walking scale and the timed 25 foot walk during a 3 month clinical trial," Presented at the ECTRIMS/ACTRIMS Congress, Thessaloniki, Greece, Sep. 2005 (Poster).
Graziani et al., 2002, "Two multicenter trials demonstrate potential efficacy of fampridine-sr (sustained-release 4-aminopyridine) for spasticity management in subjects with chronic spinal cord injury," 63rd Annual Academy of Physical Medicine and Rehabilitation Assembly, Orlando, FL Nov. 21-23, 2002 (Poster).
Grijalva et al., 2003, "The efficacy and safety of 4-aminopyridine in patients with long-term spinal cord injury: a randomized, double-blind, placebo-controlled trial," Pharmacotherapy, vol. 23:823-834.
Gutman et al., 2005, "International Union of Pharmacology. LIII. Nomenclature and molecular relationships of voltage-gated potassium channels," Pharmacol. Rev., vol. 57(4):473-508.
Guy W. Ecdeu Assessment Manual for Psychopharmacology—Revised (DHEW Publ No ADM 76-338). US Dept of Health Education & Welfare, Public Heath Service, Div of Exramural Research Programs, 1976: 218-222.
Haghighi et al., 1995, "Effect of 4-aminopyridine in acute spinal cord injury," Surg. Neurol., vol. 43(5):443-447.
Haghighi et al., 1998, "Effect of 4-aminopyridine and single-dose methylprednisolone on functional recovery after a chronic spinal cord injury," Spinal Cord, vol. 36:6-12.
Halter et al., 2000, "Intrathecal administration of 4-aminopyridine in chronic spinal injured patients," Spinal Cord, vol. 38(12):728-732.
Halter et al., 2000, "Intrathecal administration of 4-aminopyridine in chronic spinal injured patients," Spinal Cord, 38(12):728-732.
Hapoalim Securities, "Acorda Therapeutics, (ACOR," Aug. 4, 2010 (pp. 1-7).
Hapoalim Securities, "Acorda Therapeutics (ACOR )," Nov. 1, 2010 (pp. 1-10).
Hassan et al.,1980, "Double-blind comparison of single doses of DS103-282, baclofen and placebo for suppression of spasticity," J. of Neurology Neurosurgery and Psychiatry, vol. 43:1132-1136.
Hauser et al., 1993, "Incidence of epilepsy and unprovoked seizures in Rochester, Minnesota: 1935-1984," Epilepsia, 34(3):453-468.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Hayes et al., 1993, "Preclinical Trial of 4-Aminopyridine in Patients with Chronic Spinal Cord Injury," Paraplegia, vol. 31:216-224.
Hayes et al., 1994, "4-Aminopyridine sensitive neurologic deficits in patients with spinal cord injury," J. Neurotrauma, 11(4):433-446.
Hayes et al., 2001, "Open-label, multiple-dose study to determine the pharmacokinetics and safety of fampridine-sr (sustained-release 4-aminopyridine) in patients with chronic spinal cord injury," Presented to the American Neurological Association, Chicago, Il, Sep. 30-Oct. 3, 2001 (Poster).
Hayes et al., 2001, "Open-label, multiple-dose study to determine the pharmacokinetics and safety of fampridine-SR in patients with chronic spinal cord injury," Annals of Neurology, vol. 50(31):S62 (201).
Hayes et al., 2001, "Pharmacokinetics and safety of multiple oral doses of fampridine-sr (sustained-release 4-aminopyridine) tablets in patients with chronic spinal cord injury," Presented to the Academy of Physical Medicine and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Hobart et al., 2003, "Measuring the impact of MS on walking ability: the 12-Item MS Walking Scale (MSWS-12)," J. Neurology, vol. 60:31-36.
Hoogervorst et al., 2004, "The patient's perception of a (reliable) change in the Multiple Sclerosis Functional Composite," Multi. Scler., vol. 10:55-60.
International Preliminary Report on Patentability with Written Opinion from International Application No. PCT/US04/08101, issued Sep. 23, 2005.
International Preliminary Report on Patentability with Written Opinion from International Application No. PCT/US05/012427, issued Oct. 11, 2006.
International Search Report from International Application No. PCT/US04/08101, mailed Aug. 26, 2004.
International Search Report from International Application No. PCT/US05/12427, mailed Dec. 28, 2005.
International Search Report from International Application No. PCT/US09/56476, mailed Nov. 10, 2009.
International Search Report from International Application No. PCT/US10/23969, mailed Apr. 1, 2010.
International Search Report from International Application No. PCT/US10/23970, mailed Apr. 5, 2010.
Iriarte et al., 2000, "Modalities of fatigue in multiple sclerosis: correlation with clinical and biological factors," Mult. Scler., vol. 6:124-130.
Isoda et al., 2003, "The effects of 4-aminopyridine on cardiac repolarization, PR interval, and heart rate in patients with spinal cord injury," Pharmacotherapy, vol. 23:133-136.
J.P. Morgan, "Acorda Therapeutics," Aug. 3, 2010 (p. 1-8).
Jackson et al., 2002, "Twice-daily fampridine-sr (sustained-release 4-aminopyridine): safety and early efficacy experience in 151 patients with chronic motor-incomplete spinal cord injury," 127th Annual Meeting American Neurological Association, NY, NY Oct. 13-16, 2002 (Poster).
Jones et al., 1983, "Effects of 4-Aminopyridine in Patients with Multiple Sclerosis," J. Neurol Sci., vol. 60:353-362.
Judge et al., 1999, "Inactivation gating and 4-AP sensitivity in human brain Kv1.4 potassium channel," Brain Research, vol. 831:43-54.
Judge et al., 2002, Determinants of 4-Aminopyridine Sensitivity in a Human Brain Kv1.4K+ Channel: Phenylalanine Substitutions in Leucine Heptad Repeat Region Stabilize Channel Closed State, Mol. Pharmacol., vol. 61:913-920.
Kachuck, 2009, "Sustained release oral fampridine in the treatment of multiple sclerosis," Expert Opinion, vol. 10(12):12:2025-2035.
Kalla et al., 2004, "4-aminopyridine improves downbeat nystagmus, smooth pursuit, and VOR gain," Neurology, 62(7):1228-1229.
Katz et al., 2001, "Pharmacokinetics and safety of single oral doses of fampridine (immediate-release 4-aminopyridine) capsules in health volunteers," Presented to the American Academy of Physical and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Katz et al., 2002, "Pharmacokinetics and excretion of a single oral dose of 14c-labeled fampridine (4-aminopyridine) in healthy volunteers," 1st Joint Mtg of the American Spinal Injury Association and the Intl. Medical Society of Paraplegia, Vancouver, Canada, May 3-6, 2002 (Poster).
Kaufman et al., 2000, "The significant change for the timed 25-foot walk in the Multiple Sclerosis Functional Composite," Mult. Scler., 5:286-290.
Kobelt et al. 2006, Costs and quality of life in multiple sclerosis: a cross-sectional study in the United States, Neurology, vol. 66:1696-1702.
Kos et al., 2004, "Letter to the Editor," Multiple Sclerosis, Jun. 1, 2004, 10/3 (337-338.
Kovacs et al., 2003, "Seizure, neurotransmitter release, and gene expression are closely related in the striatum of 4-aminopyridine-treated rats," Epilepsy Res., vol. 55(1-2):117-129.
Kurtzke et al., 1983, "Rating neurologic impairment in multiple sclerosis: an expanded disability status scale (EDSS)," Neurology, 33:1444-1452.
Lammertse et al., 2002, "Clinical evaluation of oral fampridine-sr (sustained-release 4-aminopyridine) in subjects with chronic motor-incomplete spinal cord injury," 54th Annual Meeting of the American Academy of Neurology, Denver, CO, Apr. 13-20, 2002 (Poster).
Lammertse et al., 2002, "Evaluation fampridine-sr in patients with chronic spinal cord injury," 48th Conference of the Paraplegia Society, Las Vegas, NV, Sep. 3-5, 2002 (Poster).
Landete et al., 1998, "Low doses of 4-aminopyridine in the treatment of multiple sclerosis," Multiple Sclerosis, 4:386 (Abstract P3047).
Lazard Capital Markets, "Acorda Therapeutics (ACOR)," Aug. 24, 2010 (pp. 1-15).
Lazard Capital Markets, "Acorda Therapeutics," Aug. 3, 2010 (pp. 1-3).
Leary et al., 2003, "Interferon beta-1a in primary progressing MS—An exploratory, randomized, controlled trial," Neurology, vol. 60:44-51.
Lemeignan et al., 1981, "The ability of 4-aminopyridine and 3,4-diaminopyridine to cross the blood-brain barrier can account for their difference in toxicity," Adv. Biosci., 35:222.
Liang et al., 2005, "Effects of pelvic nerve neurectomy and estrogen on the M2 muscarinic receptor of the urinary bladder," Chang Gung Med. J., vol. 28:786-793.
Loss of mobility found to impact quality of life and emotional and financial health of most people living with multiple sclerosis, National Multiple Sclerosis Society, Mar. 2008, http://www.nationalmssociety.org/news/news-detail/index.aspx??nid=199 (last accessed Nov. 3, 2010).
Lublin et al., 1996, "Defining the clinical course of multiple sclerosis: Result of an international survey," Neurology, vol. 46:907-911.
Lundh et al., 1977, "4-Aminopyridine—A new drug tested in the treatment of Eaton-Lambert syndrome," J. Neuro. Neurosurg. Psych., vol. 40:1109-1112.
Lundh et al., 1979, "Effects of 4-Aminopyridine in Myasthenia Gravis," J. Neuro. Neurosurg. Psychiatry, 42:171-175.
Lundh et al., 1979, "Effects of 4-aminopyridine on statistical parameters of transmitter release at the neuromuscular junction," Acta Pharmacol. Toxicol., 44(5):343-346.
Lundh et al., 1982, "Lack of effect of 4-aminopyridine on choreic movements," J. Neurol. Neurosurg. Psychiatry, vol. 45(3):274-275.
Lundh et al., 1983, "Novel drug of choice in Eaton-Lambert syndrome," J. Neurol. Neurosurg. Psychiatry, vol. 46(7):684-685.
Lundh, 1978, "Effects of 4-aminopyridine on neuromuscular transmission," Brain Research, vol. 158(2):307-318.
Magdalan et al., 2003, "[Successful treatment by 4-aminopyridine of three cases of severe verapamil poisoning]," [Article in Polish] Przegl. Lek., vol. 60(4):271-273 (English translation attached).
Martin et al., 2006, "Gait and balance impairment in early multiple sclerosis in the absence of clinical disability," Multiple Sclerosis vol. 12:620-628.
Martinez-Aguirre E. 1982, "Antagonism of ketamine by 4-aminopyridine and physostigmine," Br. J. Anesth., 54(1):110.
Martinez-Aguirre et al., 1986, "Comparison of midazolam (RO 21-3981) and diazepam as complement of ketamine-air anesthesia in children," Acta Anesth. Belg., vol. 37(1):15-22.
Martinez-Aguirre, 1980, "Antagonism of 4-aminopyridine to ketamine-diazepam anesthesia in children," Acta Anaesthesiol. Belg., 31(4):289-291.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Matthews, 1998, "Symptoms and signs of multiple sclerosis," Chap. 5, in McAlpine's Multiple Sclerosis, 3rd ed., Compston et al., (eds), Churchill Livingstone, at pp. 145-190; McDonald & Compston.
Matthews, B., 1998, "Differential diagnosis of multiple sclerosis and related disorders," Chap. 7 in McApline's Multiple Sclerosis, Compston et al. (eds.), Churchill Livingstone at pp. 228-243.
McDonald & Compston, 2005, "The symptoms and signs of multiple sclerosis," Chapter 6, in McAlpine's Multiple Sclerosis, 4th ed., Compston et al., (eds.), Churchill Livingstone Elsevier, at pp. 287-346.
McGuigan et al., 2004, "Confirming the validity and responsiveness of the Multiple Sclerosis Walking Scale-12 (MSWS-12)," Neurology, 62:2103-2105.
Metz et al., 1998, "Urinary tract infections may trigger relapse in multiple sclerosis," Axone, vol. 19:67-70.
Mihai et al., 1997, "Selection criteria for interferon beta 1-b in multiple sclerosis patients," Neurology, vol. 48 (3 Suppl. 2):A348 (S48. 005).
Miller et al., 1979, "4-Aminopyridine Potentiates Neostigmine and Pyridostigmine in Man," Anesthesiology, vol. 50:416-420.
Molgo et al., 1977, "Effects of 4-aminopyridine at the frog neuromuscular junction," J. Pharmacol Exp. Ther., vol. 203(3):653-663.
Molgo et al., 1980, "Potency of 3,4-diaminopyridine and 4-aminopyridine on mammalian neuromuscular transmission and the effect of pH changes," Eur. J. Pharmacol., 61(1):25-34.
Moritoki et al., 1978, "Actions of aminopyridines on guinea-pig ileum," Arch. Int. Pharmacodyn. Ther., vol. 232:28-41.
Morning Show Ratings—TvNewser, Ratings of Week of Nov. 1, 2010, http://www.mediabistro.com/tvnewser/category/moming-show-ratings (last accessed Nov. 17, 2010).
MS Hope for a Cure, http://www.mshopeforacure.org/board.php#elissa (last accessed Nov. 17, 2010).
Murray et al., 1981, "Treatment with Oral 4-Aminopyridine in Disorders of Neuromuscular Transmission," Neurology, 31:265-271.
Murray, 2000, "The History of Multiple Sclerosis," Multiple Sclerosis, Diagnosis, Medical Management, and Rehabilitation: Demos Medical Publishing, Inc., pp. 1-32.
National Multiple Sclerosis Society homepage on the Internet, http://www.nationalmssociety.org/index.aspx (last accessed Nov. 2, 2010).
National Multiple Sclerosis Society, "FSS and EDSS," http://www.nationalmssociety.org/for-professionals/reearchers/clinical-study-measures/fss-and-edss/index.aspx (last accessed Nov. 17, 2010).
Ng et al., 1987, "Studies on the calcium dependence of human NK cell killing," Biochem. Pharmacol., 36:3943-3949.
Nicoletti et al., 2003, "Epilepsy and multiple sclerosis in Sicily: a population-based study," Epilepsia, 44(11):1445-1448.
Noseworthy, 2003, "Multiple Sclerosi and Related Conditions," Chap.97, in Neurological Therapeutics: Principle and Practices, vol. 1, Noseworthy, JH (ed.) pp. 1107-1131.
Novantrone® (interferon beta-1b), EMD Serono Inc., Prescribing Information, Sep. 2009. http://www.novantrone.com/assets/pdf/novantrone_prescribing_info.pdf (last accessed Nov. 3, 2010) (pp. 1-34).
Office Action mailed Apr. 14, 2010 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Jan. 23, 2008 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Jun. 23, 2009 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Oct. 29, 2008 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Sep. 17, 2010 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Ogawa et al., 1986, "Combined mutagenicity of cobalt(II) salt and heteroaromatic compounds in *Salmonella typhimurium*," Mutation Research, 172:97-104.
Oh et al., 2003, "Inhibitory effects of potassium channel blockers on carbachol-induced contraction in rat detrusor muscle," J. Korean Med. Sci., 18:701-706.
Olaffson et al., 1999, "Risk of epilepsy in patients with multiple sclerosis: a population-based study in Iceland," Epilepsia, vol. 40(6):745-747.
Olafsson et al., 1996, "Incidence of epilepsy in rural Iceland: a population-based study," Epilepsia, 37(19):951-955.
Oosterhuis HJ. 1996, "Severe 4-aminopyridine intoxication in a body-builder. Letter to the Editor," Ned. Tijdschr. Geneeeskd., 140(8):452 [Translation provided].
Oremus et al., 2000, "Review of outcome measurement instruments in Alzheimer's Disease drug trials: psychometric properties of global scales," J. Geriatr. Psychiatry Neurol. , vol. 13: 197-205.
Pant et al., 1982, "Calcium dependent 4 aminopyridine stimulation of protein phosphorylation in squid loligo-pealei optic lobe synaptosomes," Cellular and Molecular Neurobiology, vol. 3(3):223-238.
Paskov et al., 1973, "New Anti-Curare and Analeptic Drug, Pimadin, and its Use in Anesthesia," Eksp. Khir. Anestheziol., 18(4):48-52 (English translation provided).
Pearson, et al., 2004, "Quantification of walking mobility in neurological disorders," Q. J. Med. New Series, vol. 97:463-475.
Pena et al., 2000, "Seizures and neurodegeneration induced by 4-aminopyridine in rat hippocampus in vivo: role of glutamate- and GABA-mediated neurotransmission and of ion channels," Neuroscience, vol. 101(3):547-561.
Pickett et al., 1996, "Atypical presentation of 4-aminopyridine overdose," Ann. Emerg. Med., 27:382-385.
Pickett et al., 1996, "Fampridine Overdose," Reactions, vol. 30(594):8.
Piper Jaffray, "Acorda Therapeutics," Nov. 2, 2010 (pp. 1-8).
Pogue et al., 1998, "Overcoming the limitations of current meta-analysis of randomized controlled trials," Lancet, vol. 351: 47-52.
Polman et al., 1990, "4-Aminopyridine in Multiple Sclerosis," Ann. Neurol., vol. 28(4):589.
Polman et al., 1994, "4-Aminopyridine is Superior to 3,4-Diaminopyridine in the Treatment of Patients With Multiple Sclerosis," Arch. Neurol., vol. 51:1136-1139.
Polman et al., 1994, "4-Aminopyridine in the Treatment of Patients With Multiple Sclerosis," Arch. Neurol., vol. 51:292-296.
Poser et al., 2003, "Epilepsy and multiple sclerosis," Epilepsy & Behavior, vol. 4:6-12.
Potter et al., 1993, "Effects of intravenous 4-aminopyridine on central conduction in persons with incomplete spinal cord injury," Clinical and Investigative Medicine, vol. 16(4Suppl.):B111 (Abstract 693).
Potter et al., 1998, "Randomized double-blind crossover trial of Fampridine-SR (sustained release 4-aminopyridine) in patients with incomplete spinal cord injury," Neurotrauma, vol. 15(10):837-849.
Potter et al., 1998, "Sustained Improvements in Neurological Function in Spinal Cord Injured Patients Treated with Oral 4-Aminopyridine: Three Cases," Spinal Cord, 36:147-155.
Press Release, Sanofi-Aventis (Apr. 29, 2010), http://en.sanofi-aventis.com/press/press_releases/2010/ppc_28189.asp (last visited Nov. 2, 2010).
Prous et al., 1995, "Fampridine: agent for multiple sclerosis," Drugs of the Future, vol. 20:142-143.
Qiao et al., 1997, "Effects of 4-aminopyridine on motor-evoked potentials in patients with spinal cord injury," J. Neurotrauma, vol. 14(3):135-149.
Rebif® (interferon beta-1a), EMD Serono Inc. and Pfizer Inc., Prescribing Information, Sep. 2009. http://www.emdserono.com/cmg.emdserono_us/en/images/rebif_tcm115_19765.pdf (last accessed Nov. 3, 2010).
Riggs JE, 1982, "Pharmacologic enhancement of neuromuscular transmission in myasthenia gravis," Clin. Neuropharmacol., vol. 5(3):277-292.
Romani et al., 2004, "Fatigue in multiple sclerosis: multidimensional assessment and response to symptomatic treatment," Mult. Scler., 10:462-468.
Ropper and Brown (eds), 2005, Adams and Victor's Principles of Neurology. Eighth Edition. Blacklick, OH: McGraw-Hill Professional, Chapter 16, "Epilepsy and Other Seizure Disorders," pp. 271-301.
Rossini et al., 1996, 4-Aminopyridine treatment in chronic progressive multiple sclerosis: a 6 month double-blind placebo-controlled, crossover study by AMIT (American Italian Study). Europ. J. of Neurol., vol. 3 (Suppl 5):91, Abstract P208.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Rossini et al., 2001, "Fatigue in progressive multiple sclerosis: results of a randomized, double-blind, placebo-controlled, crossover trial of oral 4-aminopyridine," Multiple Sclerosis, vol. 7:354-358.
Ruddick et al., 1999, "Selecting relapsing remitting multiple sclerosis patients for treatment: The case of early treatment," J. of Neuroimmunology, vol. 98(1):22-28.
Rupp et al., 1983, "Pharmacokinetics and pharmacodynamics of 4-aminopyridine in anesthetized dogs," J. Pharmacol. Exp. Ther., vol. 225(2):351-354.
Rutecki et al., 1987, "4-Aminopyridine produces epileptiform activity in hippocampus and enhances synaptic excitation and inhibition," J. Neurophysiol., vol. 57(6):1911-1924.
Sadovnick et al., 1991, "Cause of death in patients attending multiple sclerosis clinics," Neurology, vol. 41:1193-1196.
Sander, 2003, "The epidemiology of epilepsy revisited," Curr. Opin. Neurol., vol. 16(2):165-170.
Sanders et al., 1980, "Eaton-Lambert syndrome: a clinical and electrophysiological study of a patient treated with 4-aminopyridine," J. Neurol. Neurosurg. Psychiatry, vol. 43(11):978-985.
Sandyk, 1996, "Weak electromagnetic fields potentiate the effects of 4-aminopyridine in multiple sclerosis," Intern. J. Neuroscience, vol. 85:125-129.
Scheinberg et al., 1980, "Multiple Sclerosis: Earning a living," NY State J. Med., 1395-1400.
Schneider et al., 1997, "Validity and reliability of the Alzheimer's Disease Cooperative Study—Clinical Global Impression of Change," Alzh. Disease Assoc. Dis., vol. 11(Suppl2):S22-S32.
Schwid et al., 1997, "Autoimmune hyperthyroidism in patients with multiple sclerosis treated with interferon beta 1-b," Archives of Neurology, vol. 54(9):1169-1170.
Schwid et al., 1998, "Quantitative measures of motor fatigue in multiple sclerosis: Features of motor dysfunction distinct from weakness," Neurology, vol. 50 (4 Suppl. 4):A210-A211 (P04.036).
Schwid et al., 2000, "Are quantitative functional measures more sensitive to worsening MS than traditional measures?" Neurology, vol. 55(12):1901-1903.
Schwid et al., 2000, "Subjective fatigue is associated with impaired central motor conduction in MS patients , but motor fatigue is not," Neurology, vol. 54 (7 Supp. 3):A56 (P01.085).
Schwid et al., 2001, "The cost of delaying treatment in multiple sclerosis, what is lost is not regained," Neurology, vol. 56(12):1620.
Schwid et al., 2002, "Quantitative functional measures in MS: What is a reliable change?" Neurology, vol. 58:1294-1296.
Schwid et al., 2004, "Cognitive status after 10 years of prospective evaluation in patients with relapsing multiple sclerosis," Multiple Sclerosis, vol. 10(2):S123 (P141).
Segal et al., 1997, "4-Aminopyridine improves pulmonary function in quadriplegic humans with longstanding spinal cord injury," Pharmacotherapy, vol. 17(3):415-423.
Segal et al., 1998, "4-Aminopyridine alters gait characteristics and enhances locomotion in spinal cord injured humans," J. Spinal Cord Med., vol. 21(3):200-204.
Segal et al., 1999, "Safety and efficacy of 4-aminopyridine in humans with spinal cord injury: a long term, controlled trial," Phamacother., vol. 19(6):713-723.
Segal et al., 2002, "4-aminopyridine influences heart rate variability in long-standing spinal cord injury," Am. J. Ther., vol. 9(1):29-33.
Sharrack et al., 1999, "The Guy's Neurological Disability Scale (GNDS): a new disability measure for multiple sclerosis," Mult. Scler., vol. 5:223-233.
Sherratt et al., 1980, "Effects of 4-aminopyridine on normal and demyelinated mammalian nerve fibres," Nature, vol. 283(5747):570-572.
Shi et al, 1996, "Compression injury of mammalian spinal-cord in-vitro and the dynamics of action-potential conduction failure," J. of Neurophysiology, vol. 76(3):1572-1580.
Shi et al., 1995, "4-Aminopyridine affects conduction in injured spinal cord axons in vitro at clinically relevant concentrations," Society of Neuroscience Abstracts, vol. 21(1-3):1003, (395.3).
Shi et al., 1997, "Conduction block in acute and chronic spinal cord injury: different dose-response characteristics for reversal by 4-aminopyridine," Exp. Neurol., vol. 148:495-501.
Shi et al., 1997, "Differential Effects of Low and High Concentrations of 4-Aminopyridine on Axonal Conduction in Normal and Injured Spinal Cord," Neuroscience, vol. 77(2):553-562.
Shinohara et al., 1982, "Lon-pair high performance liquid chromatographic assay of 4-aminopyridine in serum," J Chrom (Biomed Appl), vol. 230:363-372.
Sia et al., 1979, "Effects of the Analeptic Drug, 4-Aminopyridine, upon Post-operative Respiratory Depression in Patients," Acta Anesth. Belg., vol. 30(Suppl):195-199.
Sia et al., 1981, "4-Aminopyridine reversal of fentanyl-induced respiratory depression in normocapnic and hypercapnic patients," Br. J. Anaesth., vol. 53(4):373-379.
Sia et al., 1981, "Use of 4-aminopyridine to reverse morphine-induced respiratory depression in man," Br. J. Anaesth., vol. 53(8):865-868.
Sia et al., 1982, "An electroencephalographic study of 4-aminopyridine," Anest. Analg., vol. 61(4):354-357.
Siegert et al., 2005, "Depression in multiple sclerosis: a review," J. Neurol. Neurosurg. Psychiatry, vol. 76:469-475.
Smeets et al., 1995, "Severe 4-aminopyridine intoxication in a body-builder," Ned. Tijdschr. Geneesdk., vol. 139(51):2667-2668.
Smith et al., 2000, "Effects of 4-aminopyridine on demyelinated axons, synapses and muscle tension," Brain, vol. 123:171-184.
Smits et al., 1994, "The effect of 4-aminopyridine on cognitive function in patients with multiple sclerosis: A pilot study," Neurology, vol. 44:1701-1705.
Smits et al., 1994, "The effects of 4-aminopyridine on cognitive function in patients with multiple sclerosis: A pilot study," J. of Neurology, vol. 241:S102 (Abstract. 10).
Snyderman N, MD, Nightly News-About Us-msnbc.com, http://www.msnbc.com/id/14894442 (last accessed Nov. 17, 2010).
Sohn et al., 1981, "Pharmacokinetics and side-effects of 4-aminopyridine. 1981," E. Rugheimer, M. Zindler (eds) Proceedings of the Seventh World Congress of Anaesthesiologists, Hamburg, Sep. 14-21, 1980. Amsterdam: Excerpta Medica, 1981; 22, 228.
Solari et al., 2003, "Aminopyridines for symptomatic treatment in multiple sclerosis (Cochrane Review)", in: The Cochrane Library, Issue 2, 2003. Oxford: Update Software. (Date of most recent amendment: Jul. 15, 2002; Date of most recent substantive amendment: copyright Update Software Ltd.).
Solari et al., 2004, "Aminopyridines for symptomatic treatment in multiple sclerosis." Cochrane Database of Systematic Reviews 2002, Issue 4. (Date edited: Oct. 11, 2004; Date of most recent substantive amendment: Jul. 15, 2002).
Spatt et al., 2001, "Epileptic and non-epileptic seizures in multiple sclerosis," J. Neurol., vol. 248:2-9.
Spyker et al., 1980, "Poisoning with 4-Aminopyridine: Report of Three Cases," Clinical Toxicology, vol. 16(4):487-497.
Stefoski et al., 1987, "4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis," Ann. Neurol, vol. 21:71-77.
Stefoski et al., 1991, "4-Aminopyridine in multiple sclerosis: Prolonged administration," Neurology, vol. 41:1344-1348.
Stenager et al., 1992, "Suicide and multiple sclerosis: an epidemiological investigation," J. of Neurol. Neurosurg. Psychiatry, vol. 55:542-545.
Stork et al., 1994, "Characterization of 4-aminopyridine in overdose," Clin. Toxicol., vol. 32(5):583-587.
Stoyanov et al., 1976, "Clinical Electromyomechanographic and Electromyographic Studies in Decurarization with Pymadine," Anaesth. Resus Intern. Ther., vol. 4(2):139-142.
Striano et al., 2003, "Epileptic seizures in multiple sclerosis: clinical and EEG correlations," Neurol. Sci., vol. 24:322-328.
Strupp et al., 2004, "Treatment of episodic ataxia type 2 with the potassium channel blocker 4-aminopyridine," Neurology, vol. 62(9):1623-1625.
Stuhmer et al., 1989, "Molecular basis of functional diversity of voltage-gated potassium channels in mammalian brain," EMBO J., vol. 8(11):3235-3244.
Sugimura et al., 1982, "Metabolic aspects of the comutagenic action of norharman," Adv. Exper. Med. Biology, vol. 136:1011-1025.
Swingler et al., 1992, "The morbidity of multiple sclerosis," Q. J. Med., New Series, vol. 83(300):325-337.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Ter Wee et al., 1985, "4-Aminopyridine and haemodialysis in the treatment of verapamil intoxication," Human Toxicol., vol. 4(3):327-329.
Tim et al., 1998, "Lambert-Eaton myasthenic syndrome (LEMS): clinical and electrodiagnostic features and response to therapy in 59 patients," Ann. NY Acad. Sci., vol. 841:823-826.
Tim et al., 2000, "Lambert-Eaton myasthenic syndrome: electrodiagnostic findings and response to treatment," Neurology, vol. 54:2176-2178.
Truyen et al., 1996, "Magnetic resonance imaging of epilepsy in multiple sclerosis: a case control study. Implications for treatment trials with 4-aminopyridine," Mult. Scler., vol. 1(4):213-217.
Tysabri® (natalizumab), Biogen Idec Inc. and Elan Pharmaceuticals Inc., Prescribing Information, Jul. 2010. http://www.tysabri.com/en_US/tysb/site/pdfs/TYSABRI-pi.pdf (last accessed Nov. 3, 2010) (pp. 1-25).
Uges et al., 1981, "Liquid-chromatographic determination of 4-aminopyridine in serum, saliva, and urine," Clinical Chemistry, vol. 27(3):437-440.
Uges et al., 1982, "4+—aminopyridine Tablets; a Method for the Preparation in-vitro and in-vivo Studies," Pham. Acta. Helv. 57, Nr. 4, 122-128.
Uges et al., 1984, "Treatment of 4-aminopyridine-poisoning after oral overdoses; a proposal," Pharm. Acta Helv., vol. 59:172-176.
US Food and Drug Administration, for Consumers, Fast Track, Accelerated Approval and Priority Review, http://fda.gov/forconsumers/byaudience/forpatientadvocates/speedingaccesstoimportantnewtherapies/ucm128291.htm (last accessed Nov. 12, 2010).
van der Bruggen et al., 2001, "Randomized trial of 4-aminopyridine in patients with chronic incomplete spinal cord injury," J. Neurol., vol. 248(8):665-671.
van der Horst et al., 1992, "Determination of 4-aminopyridine in serum by solid-phase extraction and high-performance liquid chromatography," J. of Chromatography, vol. 574:166-169.
van Diemen et al., 1992, "Increased visual impairment after exercise (Uhthoff's phenomenon) in multiple sclerosis: therapeutic possibilities," Eur. Neurol., vol. 32(4):231-234.
van Diemen et al., 1992, "The Effect of 4-Aminopyridine on Clinical Signs in Multiple Sclerosis: A Randomized, Placebo-Controlled, Double-Blind, Cross-over Study," Ann. Neurol., vol. 32(2):123-130.
van Diemen et al., 1993, "4-Aminopyridine induces functional improvement in multiple sclerosis patients: a neurophysiological study," J. of Neurological Sciences, vol. 116:220-226.
Van Heeringen, 2003, "Understanding the suicidal brain," Br. J. Psychiatry, vol. 184:282-284.
Velez et al., 2003, "Opisthotonic posturing with neuromuscular irritability attributable to 4-aminopyridine ingestion by a healthy pediatric patient," Pediatrics, vol. 111:e82-e84.
Voskuyl et al., 1985, "Spontaneous epileptiform discharges in hippocampal slices induced by 4-aminopyridine," Brain Research, vol. 342(1):54-66.
Wakabayashi et al., 1982, "Comutagneic effect of norharman with aminopyridine derivatives," Mutation Research, vol. 105:205-210.
Walker, 2002, "A. Common Statistical Methods for Clinical Research with SAS® Examples," Second Edition, 2002, Cary, NC: SAS Institute Inc., p. 32.
Waxman et al., 1993, "Molecular dissection of the myelinated axon," Ann. Neurol., vol. 33(2):121-136.
Wirtavuori et al., 1984, "Antagonism of d-tubocurarine-induced neuromuscular blockade with a mixture of 4-aminopyridine and neostigmine in man," Can. Anaesth. Soc. J., vol. 31(6):624-630.
Wolfe et al., 2001, "Effects of 4-aminopyridine on motor evoked potentials in patients with spinal cord injury: a double-blinded, placebo-controlled crossover trial," J. Neurotrauma., vol. 18(8):757-771.
Wolinsky et al., 2007, "Glatiramer acetate in primary progressive multiple sclerosis: results of a multinational, multicenter, double-blind, placebo-controlled trial," Ann Neurol., vol. 61:14-24.
Zorzon et al:, 2001, "Depression and anxiety in multiple sclerosis. A clinical and MRI study in 95 subjects," J. Neurol., vol. 248:416-421.
Blight, 1991, "Morphometric analysis of blood-vessels in chronic experimental spinal-cord injury: hypervascularity and recovery of function," J of Neurol Sci., vol. 106(2):158-174.
Goodman et al., 2004, "Phase two trial of fampridine-sr in multiple sclerosis," Multiple Sclerosis, vol. 11(1):111.
Goodman et al., 2004, "Phase 2 trial of fampridine-SR in multiple Sclerosis," vol. 10(2):S273 (P694).
Goodman et al., 2005, "Clinical meaningfulness of consistent improvement on the timed 25-foot walk (TW25) during treatment with fampridine," Annals of Neurology, vol. 58(Suppl. 9):S26 (P96).
Goodman et al., 2005, "Stability and interrelatednes of the 12-item multiple sclerosis waking scale and the timed 25 foot walk during a 3 month clinical trial," Multiple Sclerosis, vol. 11:S102-S103 (P398).
Lammertse et al., 2002, "Clinical evaluation of oral fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic motor-incomplete spinal cord injury," Neurology, vol. 58 (7 Suppl. 3): A33 (P01.035).
Schwid et al., 1997, "The measurement of ambulatory impairment in multiple sclerosis," Neurology, vol. 49:1419-1424.
Fujihara et al., The effects of 4-aminopyridine on motor evoked potentials in multiple sclerosis, 1998, Journal of Neurological Sciences 159:102-106.
Blight et al., Axonal Physiology of Chronic Spinal Cord Injury in the Cat: Intracellular Recording in Vitro, 1983(b), Neuroscience; 10(4):1471-1486.
Blight et al., Effect of 4-aminopyridine on axonal conduction-block in chronic spinal cord injury, 1989, Brain Res. Bull. 22:47-52.
Blight et al., Augmentation by 4-aminopyridine of vestibulospinal free fall responses in chronic spinal-injured cats, 1987, J. Neurol. Sci. 82:145-159.
Blight et al., The effects of 4-aminopyridine on neurological deficits in chronic cases of traumatic spinal cord injury in dogs: a phase I clinical trial, 1991, J. Neurotrauma 8:103-119.
Hayes et al., Effects of intravenous 4-aminopyridine on neurological function in chronic spinal cord injured patients: preliminary observations; Proc. IBRO World Conference Neurosci., p. 345, 1991.
Blight, Morphometric analysis of a model of spinal cord injury in guinea pigs, with behavioral evidence of delayed secondary pathology, 1991, J. Neurol. Sci. 103:156-171.
Bostock et al., The Effects of 4-Aminopyridine and Tetraethylammonium Ions on Normal and Demyelinated Mammalian Nerve Fibers, 1981, J. Physiol. 313:301-315.
Bowe et al., Physiological Effects of 4-Aminopyridine on Demyelinated Mammalian Motor and Sensory Fibers, 1987, Ann. Neurol. 22:264-268.
Bresnahan et al., A Behavioral and Anatomical Analysis of Spinal Cord Injury Produced by a Feedback-Controlled Impaction Device, 1987, Exp. Neurol. 95:548-570.
Chandy et al., Voltage-Gated Potassium Channels are Required for Human T Lymphocyte Activation, 1984, J. Exp. Med 160:369-385.
Choquet et al., Modulation of Voltage-Dependent Potassium Channels in B-Lymphocytes, 1988, Biochem. Parmacol. 37(20):3797-3802.
Davis et al., Orally Administered 4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis, 1990, Ann. Neurol. 27(2):186-192.
Dimitrijevic et al., Spinal Cord Stimulation for the Control of Spasticity in Patients with Chronic Spinal Cord Injury: I, 1986a, I. Clinical observations, Cent. Nerv. Syst. Trauma in J. Am. Paralysis Assoc.3(2):129-144.
Dimitrijevic et al., Spinal Cord Stimulation for the Control of Spasticity in Patients with Chronic Spinal Cord Injury: II Neurophysiologic observations, 1986b, Cent. Nerv. Syst. Trauma in J. Am. Paralysis Assoc. 3(2):145-152.
Eidelberg et al., Relationship between Residual Hindlimb-Assisted Locomotion and Surviving Axons after Incomplete Spinal Cord Injuries, 1977, Exp. Neurol. 56:312-322.
Eidelberg et al., Anatomical Correlates of Return of Locomotor Function After Partial Spinal Cord Lesions in Cats, 1981a, Exp. Brain Res. 42:81-88.
Eidelberg et al., Locomotor Control in Macaque Monkeys, 1981b, Brain 104:647-663.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Eliasson et al., Effects of 4-aminopyridine on protein phosphorylation in heat-blocked peripheral nerve, 1991, J. Neutrol. Sci. 105:175-182.
Evenhuis et al., Pharmacokinetics of 4-Aminopyridine in Human Volunteers, 1981, Br. J. Anaesth. 53:567-570.
Glover, The aminopyridines, 1982, Gen. Pharmacol. 13:259-285.
Illis et al., Spinal cord stimulation in the United Kingdom (Review), 1983, J. Neurol. Neurosurg. Psychiat. 46:299-304.
Jack et al., Modifications to Synaptic Transmission at Group la Synapses on Cat Spinal Motoneurones by 4-Aminopyridine, 1981, J. Physiol. 321:111-126.
Jacobs et al., Foot salvage and improvement of microvascular blood flow as a result of epidural spinal cord electrical stimulation, 1990, J. Vasc. Surg. 12(3):354-360.
Jankowska et al., Effects of 4-aminopyridine on transmission in excitatory and inhibitory synapses in the spinal cord, 1977, Brain Res. 136:387-392.
Jankowska et al., Effects of 4-Aminopyridine on Synaptic Transmission in the Cat Spinal Cord, 1982, Brain Res. 240:117-129.
Jellinger, Neuropathology of cord injuries, in: Handbook of Clinical Neurology, vol. 25, Part I, Injuries of the Spine and Spinal Cord. Vinken et al. eds., North-Holland: Amsterdam, 1976, pp. 43-121.
Josephson et al., Early Outward Current in Rat Single Ventricular Cells, 1984, Circ. Res. 54:157-162.
Kakulas, Pathology of Spinal Injuries, 1984, Cent. Nerv. Syst. Trauma 1(2):117-129.
Kakulas et al., The Neuropathology of Pain and Abnormal Sensations in Human Spinal Cord Injury Derived from the Clinicopathological Data Base at the Royal Perth Hospital in: Recent Achievements in Restorative Neurology, 3: Altered Sensation and Pain, Dimitrijevic et al eds., Karger:Basel, pp. 37-41, 1990.
Kakulas et al., A Correlative Clinico-Pathologic Study of Spinal Cord Injury, 1969, Proc. Aust. Assoc. Neurologists 6:123-132.
Kirchhoff et al., Excitation of Cutaneous Sensory Nerve Endings in the Rat by 4-Aminopyridine and Tetraethylammonium, 1992, J. Neurophysiol. 67(1):125-131.
Kocsis et al, Effects of Extracellular Potassium Concentration on the Excitability of the Parallel Fibers of the Rat Cerebellum, 1983, J. Physiol. (Lond) 334:225-244.
Kocsis et al., Different effects of 4-aminopyridine on sensory and motor fibers: pathogenesis of paresthesias, 1986, Neurology 36:117-120.
Kostka et al., Column liquid chromatographic determination of 4-aminopyridine in plasma and urine after derivatization with benzoyl chloride, 1992, Clin. Biochem. 25:144.
Lemeignan, Analysis of the Action of 4-Aminopyridine on the Cat Lumbar Spinal Cord. 1. Modification of the Afferent Volley, the Monosynaptic Discharge Amplitude and the Polysynaptic Evoked Responses, 1972, Neuropharm. 11:551-558.
Linderoth et al., Peripheral Vasodilatation after Spinal Cord Stimulation: Animal Studies of Putative Effector Mechanisms, 1991, Neurosurgery 28(2):187-195.
Llinas et al., 3- and 4-Aminopyridine in Synaptic Transmission at the Squid Giant Synapse, in: Aminopyridines and Similarly Acting Drugs: Effects on Nerves, Muscles and Synapses, Lechat et al eds., Pergamon Press: Oxford, pp. 69-79, 1982.
Marchand et al., The effects of dorsal column stimulation on measures of clinical and experimental pain in man, 1991, Pain 45:249-257.
Molgo, Effects of Aminopyridines on Neuromuscular Transmission, in: Aminopyridines and Similarly Acting Drugs: Effects on Nerves, Muscles and Synapses, Lechat et al. eds., Pergamon Press: Oxford, pp. 95-116, 1982.
Noble et al., Correlative Analyses of Lesion Development and Functional Status after Graded Spinal Cord Contusive Injuries in the Rat, 1989, Exp. Neurol. 103:34-40.
Noordenbos et al., Diverse Sensory Functions with an Almost Totally Divided Spinal Cord. A Case of Spinal Cord Transaction with Preservation of Part of One Anterolateral Quadrant, 1976, Pain 2:185-195.
Ochoa, Pain in local nerve lesions, in: Abnormal Nerves and Muscles as Impulse Generators, Culp et al. eds., Oxford University Press: New York, pp. 568-587, 1982.
Saade et al., Effects of 4-aminopyridine, GABA and bicuculline on cutaneous receptive fields of cat dorsal horn neurons, 1985, Brain Res. 344:356-359.
Saadé et al., Cutaneous receptive field alterations induced by 4-aminopyridine, 1982, Brain Res. 232:177-180.
Segal et al., Decreased Systemic Clearance of Llorzepam in Humans with Spinal Cord Injury, 1991, J. Clin. Pharmacol. 31:651-656.
Semba et al., 4-Aminopyridine induces expansion of cutaneous receptive fields of dorsal horn cells, 1985, Brain Res. 343:398-402.
Shealy et al., Electrical Inhibition of Pain by Stimulation of the Dorsal Columns: Preliminary Clinical Report, 1967, Anesth. Analg. 46(4):489-491.
Smith et al., Spontaneous and Evoked Electrical Discharges from a Central Demyelinating Lesion, 1982, J. Neurol. Sci. 55:39-47.
Stefoski et al., 4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis, 1987, Ann. Neurol. 21(1):71-77.
Stefoski et al., 4-Aminopyridine in multiple sclerosis: Prolonged administration, 1991, Neurology 41:1344-1348.
Tapia et al., Mechanism of the Calcium-Dependent Stimulation of Transmitter Release by 4-Aminopyridine in Synaptosomes, 1985, Brain Res. 361:373-382.
Targ et al., 4-Aminopyridine leads to restoration of conduction in demyelinated rate sciatic nerve, 1985, Brain Res. 328:358-361.
Targ et al., Action Potential Characteristics of Demyelinated Rat Sciatic Nerve following Application of 4-Aminopyridine, 1986, Brain Res. 363:1-9.
Tasker, Pain Resulting From Central Nervous System Pathology (Central Pain), in: The Management of Pain, vol. 1, Bonica ed., Lea and Febiger: Philadelphia, pp. 264-283, 1990.
Thesleff, Aminopyridines and Synaptic Transmission, 1980, Neuroscience 5:1413-1419.
Uges et al., 4-Aminopyridine; Analysis of the Substance and a Method for the Preparation of a Solution for Injection in Man, 1981, Pharm. Acta Helv. 56(6):158-162.
Uges et al., 4-Aminopyridine kinetics, 1982, Clin. Pharmacol. Ther. 31(5):587-593.
Wagoner et al., Aminopyridines block an inactivating potassium current having slow recovery kinetics, 1990, Biophys. J. 58:1481-1489.
Waxman et al., Impulse Conduction in Inhomogeneous Axons: Effects of Variation in Voltage-Sensitive Ionic Conductances on Invasion of Demyelinated Axon Segments and Preterminal Fibers, 1984, Brain Res. 294:111-122.
Waxman et al., Ligature-Induced Injury in Peripheral Nerve: Electrophysiological Observations on Changes in Action Potential Characteristics Following Blockade of Potassium Conductance, 1985, Muscl. Nerve 8:85-92.
Xu et al., Chronic pain-related syndrome in rats after ischemic spinal cord lesion: a possible animal model for pain in patients with spinal cord injury, 1992, Pain 48:279-290.
Yeh et al., Interactions of Aminopyridines with Potassium Channels of Squid Axon M embranes, 1976a, Biophys. J. 16:77-81.
Yeh et al., Dynamics of Aminopyridine Block of Potassium Channels in Squid Axon Membrane, 1976a, J. Gen. Physiol. 68:519-535.
Schwid et al., Quantitative assessment of sustained-release 4-aminopyridine for symptomatic treatment of multiple sclerosis, 1997, Am. Acad. Neur. 48:817-821.
Juarez et al., 2001, "Influence of admixed carboxymethylcellulose on release of 4-aminopyridine from hydroxypropyl methylcellulose matrix tablets," Int. J. Pharm. 216:115-125.
Blight, 1987, "Effect of 4-Aminopyridine on Action Potential Conduction in Myelinated Axons of Chronically Injured Spinal Cord," Society for Neuroscience Abstracts 13(I):62 (abstr. 21.15).
Gruner et al., 1987, "Recovery of Motor Function in Chronic Experimental Spinal Cord Injury Enhanced by 4-Aminopyridine," Society for Neuroscience Abstracts 13(1):62 (abstr. 21.16).

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




FIG. 1

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




FIG.2

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig.3

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 4

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




FIG. 5

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

# SUSTAINED RELEASE AMINOPYRIDINE COMPOSITION

## CROSS REFERENCES

This application relates to U.S. Provisional Application Ser. No. 60/528,760, filed Dec. 11, 2003, U.S. Provisional Application No. 60/560,894 filed Apr. 9, 2004, U.S. Provisional Application No. 60/528,592 filed Dec. 11, 2003, 60/528,593 filed Dec. 11, 2003, and PCT/US2004/008101 filed on Mar. 17, 2004, all of which are incorporated herein by reference in their entirety.

## BACKGROUND

This invention relates to a sustained release oral dosage form of an aminopyridine pharmaceutical composition that can be used to treat individuals affected with neurological disorders wherein said pharmaceutical composition maximizes the therapeutic effect, while minimizing adverse side effects.

The sustained release oral dosage form of the present invention may be utilized to treat neurological disorders such as spinal cord injuries, multiple sclerosis, Alzheimer's disease, and ALS. Spinal cord injuries are one of the leading causes of disability in young adults resulting in from partial to complete paralysis of the lower extremities to partial to complete paralysis from the level of spinal injury downward. In the most extreme cases, paralysis is complete from the C-1 cervical vertebra downward. Oftentimes, however, the injury to the spinal cord does not consist of an actual severing of the cord but rather consists of an injury that interferes with signal transmission. Treatment alternatives for promoting transmission along injured nerves of the spinal cord have thus far met with limited success.

Multiple sclerosis (MS) is a degenerative and inflammatory neurological disease which affects the central nervous system, more specifically the myelin sheath. The condition of MS involves demyelination of nerve fibers resulting in short-circuiting of nerve impulses and thus a slowing or blocking of transmission along the nerve fibers, with associated disabling symptoms. Treatment alternatives for promoting transmission along affected nerves have thus far been limited.

Alzheimer's disease is a major cause of dementia in the elderly. It may be described as a progressive pathological deterioration in personality, memory and intellect consistent with a generalized atrophy of corresponding brain centers. The emotional state, behavior, cognitive function and thought processes of sufferers are all adversely affected. A minor degrading in memory which gradually becomes more apparent is the first indication of the onset of the disease. Part of the disease process involves the transmission of nerve signals and, as with MS, treatment alternatives have thus far been limited.

Amyotrophic lateral sclerosis (ALS), commonly referred to as Lou Gehrig's Disease, is a fatal neuromuscular disease characterized by progressive muscle weakness resulting in paralysis. ALS patients often suffer from symptoms including tripping, stumbling, and falling, loss of muscle control and strength in hands and arms, difficulty speaking, swallowing and/or breathing, chronic fatigue, and muscle twitching and/or cramping. ALS is characterized by both upper and lower motor neuron damage. Symptoms of upper motor neuron damage include stiffness, spasticity, muscle twitching (fasciculations), and muscle shaking (clonus). Symptoms of lower motor neuron damage include muscle weakness and muscle atrophy.



Potassium channel blockers are a class of compounds that have been found to improve the conduction of nerve impulses. As a result, they have become the focus of attention in the symptomatic treatment of spinal cord injury, MS and Alzheimer's disease. One sub-class of potassium channel blockers, aminopyridines have shown promise in the treatment of neurological diseases. 4-aminopyridine (4-AP), a mono-aminopyridine known as fampridine, has been found to slow the potassium flow in nerve impulse transmission and, thereby, shows effectiveness in restoring conduction in blocked and demyelinated nerves.

Potassium channel blockers have also been found to improve mental function in patients with Alzheimer's disease. This effect is believed to be related to the potassium channel blocking action which in turn enhances calcium influx into the neuron thus prolonging nerve action potential and increasing transmitter release. Mono- and di-aminopyridines constitute a particular sub-class of potassium channel blockers that have showed promise in the treatment of Alzheimer's disease.

## SUMMARY OF THE INVENTION

The present invention relates to a pharmaceutical composition which contains one or more potassium channel blockers and which can be used in the effective treatment of various diseases, for example, spinal cord injury, multiple sclerosis, Alzheimer's disease, and ALS. Embodiments of the present invention are directed to compositions that include a matrix and a potassium channel blocker. The potassium channel blockers may include aminopyridines, for example, 4-aminopyridine, 3,4-diaminopyridine and the like. The composition provides for sustained-release of the aminopyridine from the matrix to maintain the efficacious and safe plasma level of an aminopyridine. The aminopyridine dispersed in the matrix is capable of providing, upon administration to a patient, a desired release profile. The composition may be used to establish in patients in need of such treatment, a therapeutically effective blood plasma level of the aminopyridine for a period of at least about 6 hours and preferably up to at least 24 hours in the patient in a twice-daily administration while avoiding peaks and troughs in the relapse of the aminopyridine. The composition may include a mono- or di-aminopyridine, preferably 4-AP or 3,4-DAP or a combination thereof, homogeneously dispersed in a rate-controlling polymer matrix, preferably including a hydrophilic polymer like hydroxypropylmethylcellulose (HPMC). The composition of the present invention may also include one or more additional active ingredients and/or one or more pharmaceutically acceptable excipients. These compositions can be used to treat various neurological diseases, for example, spinal cord injury, multiple sclerosis, Alzheimer's disease, and ALS.

Another embodiment of the present invention is a stable pharmaceutical composition which comprises a therapeutically effective amount of an aminopyridine dispersed in a matrix that provides a release profile of the aminopyridine to a patient that has a desired $C_{max}$ to $C_{\tau}$ ratio. The composition may be used to establish and/or maintain in a patient, a therapeutically effective level of the aminopyridine. Preferably the aminopyridine in the composition is released over time so that a therapeutically effective level of the aminopyridine in the patient can be achieved with twice daily dosing of the composition. In a more preferred embodiment, undesirable spikes or peaks in the release of the aminopyridine are avoided.

Another embodiment of the present invention is a stable, sustained-release oral dosage formulation of a composition which includes an a therapeutically effective amount of a

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

4-aminopyridine dispersed in a matrix that provides a release profile of 4-aminopyridine in the blood plasma of the patient extending over a period of at least 6 hours, preferably at least 8 hours, and more preferably, at least about 12 hours. In another embodiment, a stable, sustained-release oral dosage formulation of a composition includes an a therapeutically effective amount of a 4-aminopyridine dispersed in a matrix that provides a therapeutically effective blood plasma level of 4-aminopyridine in the patient extending over about 24 hours.

Preferably, the oral dosage formulation of the composition is a monolithic tablet formed by compression of the pharmaceutical composition of the present invention. In preferred embodiments, the oral dosage formulation includes a compressed tablet of a therapeutically effective amount of 4-aminopyridine dispersed in matrix which includes a hydrophilic polymer such as HPMC. The oral dosage form of the present invention may also include one or more pharmaceutically acceptable excipients.

The dispersion of 4-aminopyridine throughout the matrix imparts chemical and physical stability to the composition while providing a sustained-release profile. This enhanced dosage stability is most notably observed in compositions and dosage forms of the present invention having low concentrations of 4-aminopyridine, and stability is achieved while maintaining the desired controlled-release profile. Specifically, the compressed tablet formulation of the present invention exhibits superior resistance to moisture absorption by ambient humidity and maintains a uniform distribution of the 4-aminopyridine throughout the tablet while providing a release profile of 4-aminopyridine that permits establishment of a therapeutically effective concentration of the potassium channel blocker with once daily or twice daily dosing of the formulation. Preferably the therapeutically effective concentration released by the formulation extends over at least 6 hours, preferably at least 8 hours, and more preferably to at least 12 hours. In addition, the homogeneity of the dosage form renders it amenable to formation by simple and inexpensive manufacturing processes as compared with the multilayered structure of prior sustained-release dosage formulations.

The compositions of the present invention may be used in the treatment of a condition in a patient which includes establishing a therapeutically effective concentration of a potassium channel blocker in the patient in need thereof. The compositions may be used for building up a level and or maintaining a therapeutically effective concentration of an aminopyridine in the patient by twice daily dosing. The dosages of the present compositions can made with a lower concentration of the aminopyridine to facilitate restful periods for the patient during the day. Where desirable, the compositions of the present invention may be formulated to avoid large peaks in initial release of the aminopyridine. The compositions of the present invention when administered to a patient in need thereof provide for the treatment of neurological diseases that are characterized by a degradation of nerve impulse transmission. Preferably, the compositions are a stable, sustained-release tablet of a therapeutically effective amount of a mono- or di-aminopyridine, dispersed in HPMC such that therapeutically effective blood plasma level of the mono- or di-aminopyridine is maintained in the patient for a period of at least 6 hours, preferably at least 8 hours, and more preferably at least about 10-12 hours in a once or twice daily administration.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graph of mean plasma profiles associated with the administration to a patient in both fasted and fed states of a tablet form of 4-AP (fampridine) in accordance with the present invention compared with the mean plasma profile associated with the administration of an immediate release formulation of 4-AP in a gelatin capsule.

FIG. 2 is a graph of mean plasma profiles associated with the administration (fasted state) of a homogeneous dispersion of 4-AP (fampridine) in a matrix in a tablet form of in accordance with the present invention compared with the mean plasma profile associated with the administration of a layered controlled-release capsule and an immediate release capsule formulations of 4-AP.

FIG. 3 is a graph of the mean change in walking sped observed with the administration of a sustained release 4-AP (fampridine) according to the present invention.

FIG. 4 is a graph of the mean change in LEMMT with the administration of a sustained release 4-AP (fampridine) according to the present invention.

FIG. 5 is a graph of the mean change in Ashworth score with the administration of a sustained release 4-AP (fampridine) according to the present invention.

DETAILED DESCRIPTION OF THE INVENTION

Before the present compositions and methods are described, it is to be understood that this invention is not limited to the particular molecules, compositions, methodologies or protocols described, as these may vary. It is also to be understood that the terminology used in the description is for the purpose of describing the particular versions or embodiments only, and is not intended to limit the scope of the present invention which will be limited only by the appended claims.

The terms used herein have meanings recognized and known to those of skill in the art, however, for convenience and completeness, particular terms and their meanings are set forth below.

It must also be noted that as used herein and in the appended claims, the singular forms "a", "an", and "the" include plural reference unless the context clearly dictates otherwise. Thus, for example, reference to a "spheroid" is a reference to one or more spheroid and equivalents thereof known to those skilled in the art, and so forth. Unless defined otherwise, all technical and scientific terms used herein have the same meanings as commonly understood by one of ordinary skill in the art. Although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of embodiments of the present invention, the preferred methods, devices, and materials are now described. All publications mentioned herein are incorporated by reference. Nothing herein is to be construed as an admission that the invention is not entitled to antedate such disclosure by virtue of prior invention.

"Buccal" refers to the cheek area in the mouth.

"Local administration" means direct administration by a non-systemic route at or in the vicinity of the site of affliction, disorder, or perceived pain.

The terms "patient" and "subject" mean all animals including humans. Examples of patients or subjects include humans, cows, dogs, cats, goats, sheep, and pigs.

The term "pharmaceutically acceptable salts, esters, amides, and prodrugs" as used herein refers to those carboxylate salts, amino acid addition salts, esters, amides, and prodrugs of the compounds of the present invention which are, within the scope of sound medical judgment, suitable for use in contact with the tissues of patients without undue toxicity, irritation, allergic response, and the like, commensurate with

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

a reasonable benefit/risk ratio, and effective for their intended use, as well as the zwitterionic forms, where possible, of the compounds of the invention.

The term "prodrug" refers to compounds that are rapidly transformed in vivo to yield the parent compounds of the above formula, for example, by hydrolysis in blood. A thorough discussion is provided in T. Higuchi and V. Stella, "Prodrugs as Novel Delivery Systems," Vol. 14 of the A.C.S. Symposium Series, and in Bioreversible Carriers in Drug Design, ed. Edward B. Roche, American Pharmaceutical Association and Pergamon Press, 1987, both of which are incorporated herein by reference.

The term "salts" refers to the relatively non-toxic, inorganic and organic acid addition salts of compounds of the present invention. These salts can be prepared in situ during the final isolation and purification of the compounds or by separately reacting the purified compound in its free base form with a suitable organic or inorganic acid and isolating the salt thus formed. Representative salts include the hydrobromide, hydrochloride, sulfate, bisulfate, nitrate, acetate, oxalate, valerate, oleate, palmitate, stearate, laurate, borate, benzoate, lactate, phosphate, tosylate, citrate, maleate, fumarate, succinate, tartrate, naphthylate mesylate, glucoheptonate, lactobionate and laurylsulphonate salts, and the like. These may include cations based on the alkali and alkaline earth metals, such as sodium, lithium, potassium, calcium, magnesium, and the like, as well as non-toxic ammonium, tetramethylammonium, tetramethylammonium, methylamine, dimethylamine, trimethylamine, triethylamine, ethylamine, and the like. (See, for example, S. M. Barge et al., "Pharmaceutical Salts," J. Pharm. Sci., 1977, 66:1-19 which is incorporated herein by reference).

"Slow or sustained release formulation" refers to a formulation designed to release a therapeutically effective amount of drug or other active agent such as a polypeptide or a synthetic compound over an extended period of time, with the result being a reduction in the number of treatments necessary to achieve the desired therapeutic effect. In the matter of the present invention, a slow release formulation would decrease the number of treatments necessary to achieve the desired effect in terms of reduction in pain or spasticity, or an improvement in motor or sensory function in patients in need of such therapy, for example, in spinal cord injured patients or in patients suffering from multiple sclerosis, ALS or Alzheimer's disease. The slow or sustained release formulations of the present invention achieve a desired pharmacokinetic profile in a subject.

"Sublingual delivery" refers to the system delivery of drugs or other agents through the mucosal membranes lining the floor of the mouth.

A "therapeutically effective amount" is an amount sufficient to decrease or prevent the symptoms associated with a medical condition or infirmity or to normalize body functions in disease or disorders that result in impairment of specific bodily functions. As related to the present application, a therapeutically effective amount is an amount sufficient to reduce the pain or spasticity associated with the neurological disorder being treated, or an amount sufficient to result in improvement of sexual, bladder or bowel function in subjects having a neurological disorder which impairs nerve conduction, which hinders normal sexual, bladder or bowl functions.

"Treatment" refers to the administration of medicine or the performance of medical procedures with respect to a patient, for either prophylaxis (prevention) or to cure the infirmity or malady in the instance where the patient is afflicted.

In addition, the compounds of the present invention can exist in unsolvated as well as solvated forms with pharmaceutically acceptable solvents such as water, ethanol, and the like. In general, the solvated forms are considered equivalent to the unsolvated forms for the purposes of the present invention.

One aspect of the invention is a sustained-release pharmaceutical composition comprising an aminopyridine dispersed in a sustained release matrix such as a rate-controlling polymer. The composition of the present invention is capable of providing, upon administration to a patient, a release profile of the aminopyridine extending over at least 6 hours, preferably least about 12 hours, and more preferably at least 24 hours or more. Preferably the aminopyridine concentration in the composition is a therapeutically effective amount, and preferably the aminopyridine is dispersed uniformly throughout the release matrix. A therapeutically effective amount is an amount of a potassium channel blocker, preferably an aminopyridine compound, that when administered to a patient or subject, ameliorates a symptom of a neurological disease.

When the compositions of the present invention are administered to a patient, the concentration of the aminopyridine in the patient's plasma over time (release profile) may extend over a period of at least 6 hours, preferably over at least 8 hours, and more preferably over at about 12 hours. The compositions may provide in single dose a mean maximum plasma concentration of aminopyridine in the patient of from about 15 to about 180 ng/ml; a mean $T_{max}$ from about 1 to about 6 hours, more preferably about 2 to about 5.2 hours after administration of the composition to the patient.

In one embodiment, aminopyridine is administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose at selected intervals of time until a therapeutic dose is achieved. In one embodiment the medicament is administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose of aminopyridine at selected intervals of time until a therapeutic dose is achieved. For example, at the commencement of treatment aminopyridine is preferably administered at a dose less than 15 mg/day until a tolerable state is reached. Suitably when said tolerable state is reached, the dose administered may be increased by amounts of at least 5-15 mg/day until said therapeutic dose is reached. The method can include scheduling administration of doses of the pharmaceutical so that the concentration of the aminopyridine in the patient is at about the minimum therapeutically effective level to ameliorate the neurological condition, yet relatively lower compared to the maximum concentration in order to enhance restful periods for the patient during the day. Preferably the method provides for the treatment of neurological diseases characterized by a degradation of nerve impulse transmission comprising the step of administering to a patient a composition of the present invention.

The formulations and compositions of the present invention exhibit a specific, desired release profile which maximizes the therapeutic effect while minimizing adverse side effects. The desired release profile may be described in terms of the maximum plasma concentration of the drug or active agent ($C_{max}$) and the plasma concentration of the drug or active agent at a specific dosing interval ($C_\tau$). A ratio of $C_{max}$ to $C_\tau$ ($C_{max}$:$C_\tau$) may be calculated from the observed $C_{max}$ and $C_\tau$. A dosing interval (τ) is the time since the last administration of the drug or active agent. In the present application, the dosing interval (τ) is twelve (12) hours, therefore $C_\tau$ is the concentration of the drug or active agent at twelve (12) hours from the last administration.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Additionally, the formulations and compositions of the present invention exhibit a desired release profile that may be described in terms of the maximum plasma concentration of the drug or active agent at steady state ($C_{maxSS}$) and the minimum plasma-concentration of the drug or active agent at steady state ($C_{minSS}$). Steady state is observed when the rate of administration (absorption) is equal to the rate of elimination of the drug or active agent. A ratio of $C_{maxSS}$ to $C_{minSS}$ ($C_{maxSS}$:$C_{minSS}$) may be calculated from the observed $C_{maxSS}$ and $C_{minSS}$. In addition, the formulations and compositions of the present invention exhibit a desired release profile that may be described in terms of the average maximum plasma concentration of the drug or active agent at steady state ($C_{avSS}$).

Another embodiment is a sustained release tablet of a sustained release matrix and an aminopyridine, said tablet exhibits a release profile to obtain a $C_{max}$:$C_\tau$ ratio in vivo of 1.0 to 3.5, and more preferably a $C_{max}$:$C_\tau$ ratio of about 1.5 to about 3.0. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio is about 2.0 to about 3.0. The aminopyridine may comprise 4-aminopyridine. The sustained release matrix may include for example, hydroxypropylmethylcellulose, or other rate controlling matrices that are suitable for controlling the release rate of an aminopyridine for use in the pharmaceutical compositions of the present invention.

In a further embodiment, a sustained release tablet of a sustained release matrix and an aminopyridine, wherein the tablet exhibits an in vivo $C_{max}$:$C_\tau$ ratio of about 2.0 to about 3.0.

A method of treating a disease associated with a neurological disorder is also provided. The method may include administering an 4-aminopyridine on a dosing regimen to obtain an in vivo $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5. In more preferred embodiments, the $C_{max}$:$C_\tau$ ratio is about 1.5 to 3.0, and about 2.0 to about 3.0. Such neurological disorders include a spinal cord injury, Alzheimer's disease, multiple sclerosis, ALS or the like. The dosing regimen of the method of treating a neurological disorder may comprise administering a tablet of said aminopyridine twice daily dosing. In a further embodiment, the twice-daily dosing regiment of the aminopyridine may comprise every twelve hours.

Another embodiment is a method of treating a neurological disorder comprising administering an aminopyridine to achieve an in vivo $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5, and more preferably the $C_{max}$:$C_\tau$ ratio is about 1.5 to about 3.25. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio of the method of treating a neurological disorder is about 2.0 to about 3.0.

Another aspect is a therapeutic composition of a release matrix and an active aminopyridine, wherein the aminopyridine is released from the release matrix at a rate to maintain a $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5, and more preferably about 1.5 to about 3.0. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio of the therapeutic composition is about 2.0 to about 3.0.

Another embodiment is a sustained release tablet of a sustained release matrix and an aminopyridine, said tablet exhibits a release profile to obtain a $C_{max}$:$C_\tau$ ratio in vivo of 1.0 to 3.5 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml, and more preferably a $C_{max}$:$C_\tau$ ratio of about 1.5 to about 3.0. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio is about 2.0 to about 3.0.

In another embodiment, a sustained release tablet comprising a sustained release matrix and an aminopyridine, said tablet exhibiting an in vivo $C_{max}$:$C_\tau$ ratio of about 2.0 to about 3.0 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml is provided.

A further embodiment is a method of treating a disease associated with a neurological disorder, said method comprising administering an aminopyridine on a dosing regimen to obtain an in vivo $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

A further aspect is a method of treating a disease associated with a neurological disorder comprising administering an aminopyridine to achieve an in vivo $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

In a further aspect, a therapeutic composition comprised of a release matrix and an active aminopyridine, said aminopyridine being released from said release matrix at a rate to maintain an in vivo $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml is provided.

In another embodiment, a method of treating a disease associated with a neurological disorder, said method comprising administering an aminopyridine on a dosing regimen to obtain an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml is provided.

A further aspect is a sustained release composition comprising a sustained release matrix and an aminopyridine, wherein said composition provides a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml. In a further aspect, a sustained release tablet comprising a sustained release matrix and an aminopyridine, said tablet exhibiting a $C_{maxSS}$ of about 20 ng/ml to about 35 ng/ml is provided.

In another embodiment, a sustained release tablet comprising a sustained release matrix and an aminopyridine, said tablet exhibiting a $C_{maxSS}$ of about 30 ng/ml to about 55 ng/ml. In a further embodiment, a sustained release tablet comprising a sustained release matrix and an aminopyridine, said tablet exhibiting a $C_{maxSS}$ of about 24 ng/ml to about 40 ng/ml is provided. In a further embodiment, a sustained release tablet comprising sustained release matrix and an aminopyridine, said tablet exhibiting a $C_{maxSS}$ of about 35 ng/ml to about 55 ng/ml is provided.

A further aspect is a method of treating a disease associated with a neurological disorder comprising administering an aminopyridine on a dosing regimen in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5, preferably an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of about 1.5 to about 3.0, and more preferably about 2.0 to about 3.0. The dosing regimen may consist of administering the aminopyridine twice daily, more preferably every twelve hours.

The amount of a pharmaceutically acceptable quality aminopyridine, salt, solvated, or prodrug thereof included in the pharmaceutical composition of the present invention will vary, depending upon a variety of factors, including, for example, the specific potassium channel blocker used, the desired dosage level, the type and amount of rate-controlling polymer matrix used, and the presence, types and amounts of additional materials included in the composition. Preferably, the aminopyridine comprises from about 0.1 to about 13% w/w, more preferably from about 0.5 to about 6.25% w/w. In an even more preferable embodiment of the present invention the aminopyridine is present from about 0.5 to 4.75% w/w of the pharmaceutical composition. It has been found that for many indications a weight (wt/wt %) above about 5% can result in undesirable side effects. Accordingly, a weight percentage less than about 4.75% is desired. The amount of aminopyridine, or a derivative thereof, in the formulation varies depending on the desired dose for efficient drug delivery, the molecular weight, and the activity of the compound. The actual amount of the used drug can depend on the patient's age, weight, sex, medical condition, disease or any other medical criteria. The actual drug amount is determined according to intended medical use by techniques known in the art. The pharmaceutical dosage formulated according to the

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

invention may be administered once or more times per day, preferably two or fewer times per day as determined by the attending physician.

Typically, the 4-aminopyridine is formulated in tablets or other pharmaceutical composition in amounts of about 0.5 mg to about 80 mg, preferably from about 5 to about 50 mg of 4-aminopyridine. Preferably, the amount of an aminopyridine in the composition is formulated to maintain therapeutic levels of the aminopyridine in patient's blood up to about 80 ng/ml.

The matrix in which the aminopyridine is homogeneously dispersed provides a sustained release of the aminopyridine into the plasma of the patient. Polymeric matrices suitable for controlling the release rate of aminopyridines for use in the pharmaceutical compositions of the present invention include hydrophilic polymers, hydrophobic polymers or mixtures of hydrophilic and/or hydrophobic polymers that are capable of forming sustained-release dosage formulation in combination with an aminopyridine. Such matrices are also capable of preventing degradation and loss of the aminopyridine from the composition. Examples of suitable matrices either alone or in combination include but are not limited to hydroxyalkylcelluloses, such as hydroxypropylcellulose and HPMC, hydroxyethyl cellulose, alkylcelluloses such as ethylcellulose and methylcellulose, carboxymethylcellulose; sodium carboxymethylcellulose, hydrophilic cellulose derivatives, polyethylene oxide, polyethylene glycol, polyvinylpyrrolidone; cellulose acetate, cellulose acetate butyrate, cellulose acetate phthalate, cellulose acetate trimellitate, polyvinylacetate phthalate, hydroxypropylmethyl-cellulose phthalate, hydroxypropylmethyl-cellulose acetate succinate; poly(alkyl methacrylate); and poly(vinyl acetate). Examples of other suitable polymers include, either alone or in combination, carboxyvinylpolymers, poly(vinyl alcohols), glucans, scleroglucans, mannans, xanthans, and, in general, cellulose, crosslinked polyvinylpyrrolidone, carboxymethyl starch, potassium methacrylate-divinylbenzene copolymer, hydroxypropylcyclodextrin, alpha, beta, gamma cyclodextrin or derivatives and other dextran derivatives, natural gums, seaweed extract, plant exudate, agar, agarose, algin, sodium alginate, potassium alginate, carrageenan, kappa-carrageenan, lambda-carrageenan, fucoidan, furcellaran, laminarin, hypnea, eucheuma, gum arabic, gum ghatti, gum karaya, gum tragacanth, guar gum, locust bean gum, okra gum, quince psyllium, flax seed, arabinogalactin, pectin, scleroglucan, dextran, amylose, amylopectin, dextrin, acacia, karaya, guar, a swellable mixture of agar and carboxymethyl cellulose, a swellable composition comprising methyl cellulose mixed with a sparingly cross-linked agar, a blend of sodium alginate and locust bean gumpolymers or copolymers derived from acrylic or methacrylic acid esters, copolymers of acrylic and methacrylic acid esters, zein, waxes, shellac and hydrogenated vegetable oils.

In certain embodiments, the matrix is a rate-controlling polymer such as but not limited to HPMC. HPMC is a hydroxyalkylcellulose characterized by a polymeric backbone of cellulose, a natural carbohydrate that contains a basic repeating structure of anhydroglucose units, and varying ratios of hydroxypropyl and methyl substitution at the three available substitution positions. The amount of substituent groups on the anhydroglucose units can be designated by weight percent or by the average number of substituent groups attached to the ring. For example, if all three available positions on each unit are substituted, the degree of substitution may be designated as 3 whereas if an average of two positions on each ring are reacted, the degree of substitution is correspondingly designated as 2.

According to one method of manufacture, cellulose fibers are heated with a caustic solution and then treated with methyl chloride and propylene oxide to produce HPMC. The fibrous reaction product is purified and ground to a fine, uniform powder. Especially suitable HPMCs manufactured according to this process are sold under the Methocel K designation, such as Methocel K100LV, Methocel K15M, Methocel K4M and Methocel K100M, all available from the Dow Chemical Co. Methocel K products are generally characterized by a methoxyl degree of substitution of about 1.4, a methoxyl percentage of about 22%, a hydroxypropyl molar substitution of about 0.2, a hydroxypropyl percentage of about 8%, and a particle size of 90%<100 mesh. In a preferred embodiment, the rate-controlling polymer is HPMC sold under the name Methocel K100LV.

Interaction between the matrix, excipients or other additives and the potassium channel blocker through van der Waal forces, hydrogen bonding, coordination, solvation, or complex formation may also be desirable to control the release of the potassium channel blocker from the composition and to prevent evaporation and or degradation of the potassium channel blocker within the composition.

In preferred embodiments, the rate-controlling polymer is HPMC. In such embodiments, the HPMC preferably has a viscosity (2 wt % solution at 20° C.) of about 100 to 100,000 cps, more preferably 100 to 30,000 cps. Especially suitable HPMCs are Methocel K types, such as Methocel K100LV, Methocel K15M, Methocel K4M and Methocel K100M, available from the Dow Chemical Co. The hydroxypropylmethylcelluloses used according to the invention preferably have a molecular weight of about 80,000 to about 1,150,000, more preferably about 80,000 to about 600,000. Especially suitable is a hydroxypropylmethylcellulose sold under the name Klucel LF available from Aqualon and Nippon Soda Co., which has a molecular weight of 100,000. The poly (ethylene oxide) used according to the invention preferably has a molecular weight of about 100,000 to about 7,000,000, more preferably about 900,000 to about 7,000,000. An especially suitable poly(ethylene oxide) is sold under the name Polyox WSR Coagulant available from the Dow Chemical Co., which has a molecular weight of 5,000,000. The ethylcelluloses used according to the invention preferably have a viscosity of about 3 to about 110 cps, more preferably about 7 to about 100 cps. In particularly preferred embodiments, the rate-controlling polymer is the HPMC sold under the name Methocel K100LV.

In another embodiment, the rate-controlling polymer is HPC. HPCs used according to the invention preferably have a viscosity (2 wt % solution at 20° C.) of about 10 to 100,000 cps, more preferably 100 to 30,000 cps, and a molecular weight of about 80,000 to about 1,150,000, more preferably about 80,000 to about 600,000. An especially suitable HPC is sold under the name Klucel LF available from Aqualon and Nippon Soda Co. which has a molecular weight of about 95,000.

In another embodiment, the rate-controlling polymer release matrix is poly(ethylene oxide) preferably having a molecular weight of about 100,000 to about 7,000,000, more preferably about 900,000 to about 7,000,000. An especially suitable poly(ethylene oxide) is sold under the name Polyox WSR Coagulant available from the Dow Chemical Co. which has a molecular weight of about 5,000,000. Suitable ethylcelluloses that may be used as the rate-controlling polymer in accordance with the invention preferably have a viscosity of about 3 to about 110 cps, more preferably about 7 to about 100 cps.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

The polymeric matrix of the drug delivery of the invention may additionally also contain a hydrophobic polymer. Suitable hydrophobic polymers are hydrophobic cellulose derivatives, such as ethyl cellulose, fats, such as glycerol palmitostearate, waxes, such as beeswax, glycowax, castrowax, carnaubawax, glycerol monostearate or stearylalcohol, hydrophobic polyacrylamide derivatives and hydrophobic methacrylic acid derivatives.

A hydrophobic polymer may be included as part of a release matrix, in order to modify the release kinetics. Preferably such a hydrophobic polymer is used only in a mixture of hydrophilic and hydrophobic polymers. In such a mixture, the hydrophobic polymer controls the water penetration rate into the delivery system. For example, incorporation of a hydrophobic polymer into the polymer matrix and the ratio of hydrophilic to hydrophobic polymer thus changes the erosion characteristics of the tablet. The hydrophobic polymer shows down the water penetration into the tablet and thus slows the tablet erosion.

The amount of the release matrix included in the pharmaceutical composition of the present invention will vary depending upon a variety of factors, including, for example, the specific matrix used, its molecular weight, is hydrophilicity, the type and amount of potassium channel blocker used, and the presence, types and amounts of additional materials included in the composition. Preferably, the rate-controlling polymer comprises from about 20 to about 96% w/w, more preferably from about 20 to about 70% w/w, of the pharmaceutical composition. It is desirable that the matrix permit release of the potassium channel blocker in the lower gastrointestinal tract.

In general, when the viscosity grade of the matrix polymer is higher, the release rate of the drug is slower. The size, shape and surface area of the tablet may also be modified to increase or decrease the release rate of the aminopyridine from the tablet.

In preferred embodiments, the aminopyridine is milled prior to dispersal in the rate-controlling polymer in order to ensure proper particle size distribution. Milling of the aminopyridine may be accomplished by any suitable means such as, for example, an air jet mill, a micronizer, a hammer mill, a ball mill, a cone mill, or other suitable type of mill. The milling is preferably accomplished so that the particle size distributions permit satisfactory dosage content uniformity and dissolution profiles. The particle size distribution may be ±25% of the mean particle size use in the formulation. In a preferred embodiment, the aminopyridine is milled so that 90% of the particles are smaller than about 1.5 mm, more preferably smaller than about 1 mm, and even more preferably smaller than about 300 μm; 50% of the particles are smaller than about 1 mm, more preferably smaller than about 600 μm, and even more preferably smaller than about 150 μm; and 10% of the particles are smaller than about 500 μm, more preferably smaller than about 400 μm, and even more preferably smaller than about 50 μm.

Suitable screen sizes are from about #10 to about #400 mesh, preferably #24 to #60 mesh. In certain embodiments, milling of the aminopyridine may involve multiple passes of the material through mesh screens at the same or different mill blade orientations. In one embodiment, the milling process involves two passes of 4-AP through a #24 mesh screen in a FitzMill® comminutor using two different mill blade orientations.

The aminopyridine, in either milled or un-milled form, is dispersed in the release matrix to form the pharmaceutical composition such that the aminopyridine is distributed substantially uniformly throughout the entirety of the matrix. The dispersal of aminopyridine throughout the matrix may be accomplished by any method capable of achieving substantial homogeneity. Preferred dispersal methods include the use of blenders, for example, planetary and cross-flow blenders. While blending time will vary depending on a variety of factors, including, for example, the specifics of the aminopyridine and rate-controlling polymer used, substantially uniform distribution is preferably realized within from about 10 to about 55 minutes of blending.

The release matrix aminopyridine formulation is preferably fabricated into tablets, capsules or granules for oral use. The rate of aminopyridine release from the tablets may be controlled by the erosion mechanism of the release matrix from which aminopyridine is released. In general, for producing a tablet on an industrial scale, the drug and polymer are granulated alone or in combination. Preferably the release of the aminopyridine from the matrix of the pharmaceutical composition is relatively linear over time. Preferably the matrix provides a release profile that gives a therapeutically effective concentration of the aminopyridine in the plasma of the patient permitting a once per day or twice per day dosing. Preferably the sustained release aminopyridine formulation for oral administration to patients includes from about 0.0001 mole to about 0.0013 mole aminopyridine that provides a mean maximum plasma concentration of aminopyridine from about 15 to about 180 ng/ml, a mean $T_{max}$ of about 2 to about 5 hours after administration, and a mean minimum plasma concentration of from about 10 to 60 ng/ml at about 8-24 hours after administration.

The formulations of the invention are prepared by procedures known in the art, such as, for example, by the dry or wet method. The method selected for manufacturing affects the release characteristics of the finished tablet. In one method, for example, the tablet is prepared by wet granulation in the presence of either water or an aqueous solution of the hydrophilic polymer or using other binder as a granulating fluid. In alternative, organic solvent, such as isopropyl alcohol, ethanol and the like, may be employed with or without water. The drug and polymer may be granulated alone or in combination. Another method for preparation of the tablet which may be used requires using a drug-polymer dispersion in organic solvents in the presence or absence of water. Where the aminopyridine or its derivative has very low solubility in water it may be advantageous to reduce the particle size, for example, by milling it into fine powder and in this way to control the release kinetics of the drug and enhance its solubility.

The hardness of the tablets of the present invention may vary, depending on a variety of factors, including, for example, the relative amounts and specific types of ingredients used, the tableting equipment employed, and the selected processing parameters. The pressure used to prepare the tablets can influence the release profile of the aminopyridine into the patient. The pressure used to prepare the tablets of the present invention may vary depending upon their surface area and the amount and particle size of aminopyridine, additive, excipients, or binders included in the tablet. The degree of hydration and solvation of the components in the composition will also be important in determining the hard ness of the tablets. Preferably the formed tablets have a hardness in the range of from 80-400 N, and more preferably from 150 to 300 N.

Pellets or a combination of pellets in accordance with the invention may also be filled into hard or soft gelatin capsules. The pellets included in the capsule may have different amounts of aminopyridine in the pellets and or different matrices. Various amounts of the pellets may be used to tailor

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

the total amount aminopyridine delivered as well as to alter the release and concentration profile of the aminopyridine in the patient.

The effects of various matrices, concentrations of aminopyridine, as well as various excipients and additives to the composition on the concentration of the channel blocker on the dissolution rate may be monitored for example using a type II dissolution apparatus according to U.S. Pharmacopoeia XXII, or USP Apparatus II (Paddle Method). Clinical evaluations may be used to study the effects on plasma levels of various release matrices, concentrations of aminopyridine, as well as various excipients and additives. Plasma aminopyridine concentrations may be used to calculate pharmacokinetic data (release profiles) including apparent absorption and elimination rates, area-under-the curve (AUC), maximum plasma concentration ($C_{max}$), time to maximum plasma concentration ($T_{max}$), absorption half-life ($T_{1/2}$(abs)), and elimination half-life ($T_{1/2}$(elim)). Pharmacodynamic effects may be assessed based upon response tests, such as muscle strength improvement or reduction in spasticity for patients with multiple sclerosis or spinal cord injury or other tests as would be known to those skilled in the art. Plasma aminopyridine concentration in blood plasma or cerebral spinal fluid may be monitored using liquid chromatography/MS/MS assay methods.

The drug delivery of the invention can utilize any suitable dosage unit form. Specific examples of the delivery system of the invention are tablets, tablets which disintegrate into granules, capsules, sustained release microcapsules, spheroids, or any other means which allow for oral administration. These forms may optionally be coated with pharmaceutically acceptable coating which allows the tablet or capsule to disintegrates in various portions of the digestive system. For example a tablet may have an enteric coating which prevents it from dissolving until it reaches the more basic environment of the small intestine.

The dispersion of the aminopyridine throughout the release matrix imparts enhanced stability characteristics in the dosage formulation. This enhanced stability is achieved without loss of the desired sustained-release profile. Preferably the release profile, which may be measured by dissolution rate is linear or approximately linear, preferably the release profile is measured by the concentration of the aminopyridine in the plasma in the patient and is such to permit twice daily (BID) dosing.

The pharmaceutical composition of the present invention can include also auxiliary agents or excipients, for example, glidants, dissolution agents, surfactants, diluents, binders including low temperature melting binders, disintegrants and/or lubricants. Dissolution agents increase the dissolution rate of the aminopyridine from the dosage formulation and can function by increasing the solubility of the aminopyridine. Suitable dissolution agents include, for example, organic acids such as citric acid, fumaric acid, tartaric acid, succinic acid, ascorbic acid, acetic acid, malic acid, glutaric acid and adipic acid, and may be used alone or in combination. These agents may also be combined with salts of the acids, e.g. sodium citrate with citric acid, in order to produce a buffer system.

Other agents that may alter the pH of the microenvironment on dissolution and establishment of a therapeutically effective plasma concentration profile of the aminopyridine include salts of inorganic acids and magnesium hydroxide. Other agents that may be used are surfactants and other solubilizing materials. Surfactants that are suitable for use in the pharmaceutical composition of the present invention include, for example, sodium lauryl sulphate, polyethylene separates, polyethylene sorbitan fatty acid esters, polyoxyethylene castor oil derivatives, polyoxyethylene alkyl ethers, benzyl benzoate, cetrimide, cetyl alcohol, docusate sodium, glyceryl monooleate, glyceryl monostearate, glyceryl palmitostearate, lecithin, medium chain triglycerides, monoethanolamine, oleic acid, poloxamers, polyvinyl alcohol and sorbitan fatty acid esters.

Diluents that are suitable for use in the pharmaceutical composition of the present invention include, for example, pharmaceutically acceptable inert fillers such as microcrystalline cellulose, lactose, sucrose, fructose, glucose dextrose, or other sugars, dibasic calcium phosphate, calcium sulfate, cellulose, ethylcellulose, cellulose derivatives, kaolin, mannitol, lactitol, maltitol, xylitol, sorbitol, or other sugar alcohols, dry starch, saccharides, dextrin, maltodextrin or other polysaccharides, inositol or mixtures thereof. The diluent is preferably a water-soluble diluent. Examples of preferred diluents include, for example: microcrystalline cellulose such as Avicel PH112, Avicel PH101 and Avicel PH102 available from FMC Corporation; lactose such as lactose monohydrate, lactose anhydrous, and Pharmatose DCL 21; dibasic calcium phosphate such as Emcompress available from Penwest Pharmaceuticals; mannitol; starch; sorbitol; sucrose; and glucose. Diluents are carefully selected to match the specific composition with attention paid to the compression properties. The diluent is preferably used in an amount of about 10 to about 80% by weight, preferably about 20 to about 50% by weight, of the sustained-release composition.

Glidants are used to improve the flow and compressibility of ingredients during processing. Suitable glidants include, for example, colloidal silicon dioxide, a sub-micron fumed silica that can be prepared by, for example, vapor-phase hydrolysis of a silicon compound such as silicon tetrachloride. Colloidal silicon dioxide is a sub-micron amorphous powder which is commercially available from a number of sources, including Cabot Corporation (under the tradename Cab-O-Sil); Degussa, Inc. (under the tradename Aerosil); and E.I. DuPont & Co. Colloidal silicon dioxide is also known as colloidal silica, fumed silica, light anhydrous silicic acid, silicic anhydride, and silicon dioxide fumed, among others. In one embodiment, the glidant comprises Aerosil 200.

Another agent that may be used is a surfactant, dissolution agent and other solubilizing material. Surfactants that are suitable for use in the pharmaceutical composition of the present invention include, for example, sodium lauryl sulphate, polyethylene stearates, polyethylene sorbitan fatty acid esters, polyoxyethylene castor oil derivatives, polyoxyethylene alkyl ethers, benzyl benzoate, cetrimide, cetyl alcohol, docusate sodium, glyceryl monooleate, glyceryl monostearate, glyceryl palmitostearate, lecithin, medium chain triglycerides, monoethanolamine, oleic acid, poloxamers, polyvinyl alcohol and sorbitan fatty acid esters. Dissolution agents increase the dissolution rate of the aminopyridine and function by increasing the solubility of the aminopyridine. Suitable dissolution agents include, for example, organic acids such as citric acid, fumaric acid, tartaric acid, succinic acid, ascorbic acid, acetic acid, malic acid, glutaric acid and adipic acid, which may be used alone or in combination. These agents may also be combined with salts of the acids, e.g. sodium citrate with citric acid, in order to produce a buffer system. Other agents that may be used to alter the pH of the microenvironment on dissolution include salts of inorganic acids and magnesium hydroxide.

The pellets or granulates may be compressed into tablets using a binder and/or hardening agent commonly employed in tablets such as microcrystalline cellulose sold under the Trade Mark "AVICEL" or a co-crystallized powder of highly

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

modified dextrins (3% by weight) and sucrose sold under the Trade Mark "DI-PAC" in such a way that the specific dissolution rate of the pellets is maintained. Binders that are suitable for use in the pharmaceutical composition of the present invention include, for example, starches, ethyl cellulose, polyvinylpyrrolidone, acacia, guar gum, hydroxyethylcellulose, agar, calcium carrageenan, sodium alginate, gelatin, saccharides (including glucose, sucrose, dextrose and lactose), molasses, extract of Irish moss, panwar gum, ghatti gum, mucilage of isapol husk, carboxymethylcellulose, methylcellulose, veegum, larch arbolactan, polyethylene glycols, waxes and mixtures thereof. Suitable low temperature melting binders include, for example, polyethylene glycols such as PEG 6000, cetostearyl alcohol, cetyl alcohol, polyoxyethylene alkyl ethers, polyoxyethylene castor oil derivatives, polyoxyethylene sorbitan fatty acid esters, polyoxyethylene stearates, poloxamers, and waxes.

Disintegrants that are suitable for use in the pharmaceutical composition of the present invention include, for example, starches, sodium starch glycollate, crospovidone, croscarmellose, microcrystalline cellulose, low substituted hydroxypropyl cellulose, pectins, potassium methacrylate-divinylbenzene copolymer, poly(vinyl alcohol), thylamide, sodium bicarbonate, sodium carbonate, starch derivatives, dextrin, beta cyclodextrin, dextrin derivatives, magnesium oxide, clays, bentonite and mixtures thereof.

The active ingredient of the present invention may be mixed with excipients which are pharmaceutically acceptable and compatible with the active ingredient and in amounts suitable for use in the therapeutic methods described herein. Various excipients may be homogeneously mixed with the aminopyridines of the present invention as would be known to those skilled in the art. For example, aminopyridines may be mixed or combined with excipients such as but not limited to microcrystalline cellulose, colloidal silicon dioxide, lactose, starch, sorbitol, cyclodextrin and combinations of these.

Lubricants that are suitable for use in the pharmaceutical composition of the present invention include agents that act on the flowability of the powder to be compressed include but are not limited to silicon dioxide such as Aerosil 200, talc; stearic acid, magnesium stearate, calcium stearate, hydrogenated vegetable oils, sodium benzoate, sodium chloride, leucine carbowax, magnesium lauryl sulfate, and glyceryl monostearate.

To further improve the stability of the aminopyridine in the sustained release composition, an antioxidant compound can be included. Suitable antioxidants include, for example: sodium metabisulfite; tocopherols such as α, β, δ-tocopherol esters and α.-tocopherol acetate; ascorbic acid or a pharmaceutically acceptable salt thereof; ascorbyl palmitate; alkyl gallates such as propyl gallate, Tenox PG, Tenox s-1; sulfites or a pharmaceutically acceptable salt thereof; BHA; BHT; and monothioglycerol.

In another embodiment, the pharmaceutical composition of the present invention comprises a rate-controlling polymeric matrix comprising of a hydrogel matrix. For instance, an aminopyridine may be compressed into a dosage formulation containing a rate-controlling polymer, such as HPMC, or mixture of polymers which, when wet, will swell to form a hydrogel. The rate of release of the aminopyridine from this dosage formulation is sustained both by diffusion from the swollen tablet mass and by erosion of the tablet surface over time. The rate of release of the aminopyridine may be sustained both by the amount of polymer per tablet and by the inherent viscosities of the polymers used.

According to another aspect of the invention, there is provided a stable, sustained-release oral dosage formulation which includes an effective amount a aminopyridine dispersed in a release matrix, and which, upon administration to a patient or as part of a therapy regiment, provides a release profile (of therapeutically effective blood plasma level of the aminopyridine) extending for a period of at least 6 hours, preferably at least 12 hours, and more preferably at least 24 hours. In another embodiment, the stable, controlled-release oral dosage form provides, upon administration to a patient, a therapeutically effective blood plasma level of the aminopyridine for a period of at least 6 hours, preferably at least 12 hours, and more preferably at least 24 hours.

The dosage formulation may assume any form capable of delivering orally to a patient a therapeutically effective amount of a aminopyridine dispersed in a rate-controlling polymer. Preferably, the dosage formulation comprises a monolithic tablet.

Tablet weight will also vary in accordance with, among other things, the aminopyridine dosage, the type and amount of rate-controlling polymer used, and the presence, types and amounts of additional materials. Assuming 4-aminopyridine dosages of from about 2 mg to about 120 mg; tablet weights can range from about 50 mg to about 1200 mg per tablet, and preferably from 250 to 500 mg, and more preferably about 400 mg.

The dosage formulation of the present invention may comprise also one or more pharmaceutically acceptable excipients as mentioned above. In preferred embodiments, the dosage formulation will comprise diluents and a lubricant in addition to the aminopyridine unit dose and the rate-controlling polymer. A particularly preferred diluents is microcrystalline cellulose sold under the name Avicel PH101, and a particularly preferred lubricant is magnesium stearate. When these materials are used, the magnesium stearate component preferably comprises from about 0.2 to about 0.75% w/w of the dosage formulation, and the microcrystalline cellulose along with the rate controlling polymer and aminopyridine comprises the balance of the formulation. For example, a tablet formulation including a aminopyridine x % w/w, a rate-controlling polymer y % w/w, and microcrystalline cellulose z %, the magnesium stearate amount would be $(100-(x+y+z))$ where $0.2\% \leqq (100-(x+y+z)) \leqq 0.75\%$ w/w. As would be known to those skilled in the art, the amount of an additives such as magnesium stearate may vary depending upon the shear rate used to perform the mixing and the amount of such an additive may be changed without limitation to obtain a satisfactory dissolution rate or plasma level of the aminopyridine.

As used herein, the term "sustained-release" includes the release of a aminopyridine from the dosage formulation at a sustained rate such that a therapeutically beneficial blood level below toxic levels of the aminopyridine is maintained over a period of at least about 12 hours, preferably about 24 hours or more. Preferably, the amount of the aminopyridine in the oral dosage formulations according to embodiments of the present invention establish a therapeutically useful plasma concentration through BID administration of the pharmaceutical composition.

If desired, the dosage formulations of this invention may be coated with a sustained-release polymer layer so as to provide additional sustained-release properties. Suitable polymers that can be used to form this sustained release layer include, for example, the release matrices listed above. As desired, the dosage formulation of the invention can be provided also with a light-protective and/or cosmetic film coating, for example, film-formers, pigments, anti-adhesive agents and politicizes. Such a film-former may consist of fast-dissolving constituents, such as low-viscosity hydroxypropylmethylcellulose,

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

for example, Methocel E5 or D14, or Pharmacoat 606 (Shin-Etsu). The film coating may also contain excipients or enteric coatings customary in film-coating procedures, such as, for example, light-protective pigments, for example, iron oxide, or titanium dioxide, anti-adhesive agents, for example, talc, and also suitable plasticizers such as, for example, PEG 400, PEG 6000, diethyl phthalate or triethyl citrate.

The compositions of the present invention may be used for the treatment of neurological diseases characterized by a degradation of nerve impulse transmission by administering to a patient the oral dosage formulation of the present invention. Preferably, the administration is twice daily dosage of a therapeutically effective amount of an aminopyridine, even more preferably, 4-AP dispersed in HPMC. The administration can also include scheduling administration of doses of the pharmaceutical so that the concentration of the aminopyridine in the patient is at about the minimum therapeutically effective level to ameliorate the neurological condition, yet relatively lower compared to the maximum concentration in order to enhance restful periods for the patient during the day. The compositions may be administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose of said active agent in the tablets at selected intervals of time until a therapeutic dose is achieved in the subject. For example, at the commencement of treatment the active agent is preferably administered at a dose less than 15 mg/day until a tolerable state is reached. The dose administered may then be increased by amounts of at least 5-15 mg/day until a therapeutic dose is reached. For other diseases the amount of the aminopyridine required to reach a therapeutically effective amount for treatment is described in U.S. Pat. No. 5,952,357 the contents of which are incorporated herein by reference in their entirety.

Compositions of the present invention where the potassium channel blocker is a mono- or di-aminopyridine active agent are particularly suitable for use in the treatment of a neurological disease which is characterized by demyelination of the central nervous system, more especially multiple sclerosis. The mono- or di-aminopyridine active agent in accordance with the invention is also suitable for the treatment of Alzheimer's disease. Additional features and embodiments of the present invention are illustrated by the following non-limiting examples.

Example 1

This example illustrates preparation of compositions of the present invention and their release of an aminopyridine. Tablets in accordance with the present invention having dosages of 5 mg, 7.5 mg and 12.5 mg respectively were manufactured at 5 Kg scale. Materials were used in the amounts shown in Table 1.

TABLE 1

| | % w/w | % w/w | % w/w |
|---|---|---|---|
| Milled 4-AP (#50 mesh) | 1.25 | 1.875 | 3.125 |
| Methocel K100LV | 60 | 60 | 60 |
| Avicel PH101 | 38.15 | 37.525 | 36.275 |
| Magnesium stearate | 0.2 | 0.2 | 0.2 |
| Aerosil 200 | 0.4 | 0.4 | 0.4 |
| Equipment Tablet Press | Horn Noak equipped with 13 × 8 mm oval tooling press speed 42,000 tablets/hr | | |
| Tablet Weight Range (mg) | 386-404 (96.5-101.0%) | 388-410 (97.0-102.5%) | 388-406 (97.0-101.5%) |

TABLE 1-continued

| | | | |
|---|---|---|---|
| Tablet Hardness Range (N) | 200-262 | 179-292 | 150-268 |
| Tablet Potency - mg/tab. (% LC) | 97.1 | 99.1 | 100.2 |
| Mean CU (mg/tab.)/% CV | 5.0 mg/1.0% | 7.4 mg/0.7% | 12.4 mg/1.1% |
| CU Discrete Samples (mg/tab.)/% CV | 5.0 mg/1.2% | 7.5 mg/1.8% | 12.3/1.1% |

| Dissolution (%/hr) | Mean | (SD) | Mean | (SD) | Mean | (SD) |
|---|---|---|---|---|---|---|
| 1 | 28.9 | 1.1 | 29.2 | 1.8 | 25.9 | 1.1 |
| 2 | 42.7 | 1.8 | 42.1 | 1.6 | 40.2 | 2.5 |
| 3 | 52.8 | 1.4 | 53.0 | 1.0 | 49.8 | 2.1 |
| 4 | 61.4 | 2.2 | 61.8 | 1.5 | 60.1 | 2.4 |
| 6 | 75.7 | 3.1 | 75.2 | 1.6 | 74.8 | 2.7 |
| 10 | 95.5 | 3.3 | 98.7 | 1.4 | 93.2 | 0.9 |

Prior to blending, 4-AP was milled through #50 mesh screen using a Fitzmill® comminutor. The materials were added into a Gral 25 bowl in the following order: half Methocel K100LV, Avicel PH101, Aerosil 200, milled 4-AP and the remaining Methocel K100LV. The mix was blended for 15 minutes at 175 rpm, then the magnesium stearate was added and was further blended for 5 minutes at 100 rpm. Samples were taken from top and bottom positions for blend potency analysis. Weight and hardness checks were performed every 15 minutes by the check-master E3049. Discrete tablet samples were taken during the compression process to evaluate intra batch content uniformity.

Example 2

This example illustrates that the pharmacokinetic profile of fampridine in compositions of the present invention is altered by administration in a sustained release tablet matrix compared to immediate release and controlled release formulations.

There is a delay in absorption manifested by a lower peak concentration, without any effect on the extent of absorption. When given as a single 12.5 mg dose, the peak concentration is approximately two-thirds lower as compared to peak values following administration of the IR formulation; the time to reach peak plasma levels was delayed by about 2 hours. FIG. 1 is a graph of mean plasma profiles associated with the administration to a patient in both fasted and fed states of a tablet form of 4-AP (fampridine) in accordance with the present invention compared with the mean plasma profile associated with the administration of an immediate release (IR) formulation. As with the IR formulation, food delayed the absorption of Fampridine-SR. The absorption of fampridine was approximately 50% slower following ingestion of a fatty meal, although due to the flatness of the absorption curve, this may be exaggerated value. Extent of absorption did not differ, as values for Cmax and AUC were comparable as summarized in Table 2.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

TABLE 2

Pharmacokinetic Parameter Values (Mean ± SD) in Studies Using Fampridine SR, CR, and IR Formulations: Single Dose Studies in Healthy Adult Male Volunteers

| Study Number | Dose (mg) | Fed/Fasted | $C_{MAX}$ (ng/mL) | $t_{MAX}$ (hours) | AUC (0-∞) (ng hr/mL) |
|---|---|---|---|---|---|
| 0494006 N = 12 | 12.5 SR (PD12265) | Fed | 28.7 ± 4.3 | 5.3 ± 0.8 | 257.0 ± 62.7 |
| | | Fasted | 25.6 ± 3.8 | 2.8 ± 1.3 | 269.9 ± 44.4 |
| | 12.5 IR (PD12266) | Fasted | 79.3 ± 16.3 | 0.9 ± 0.4 | 294.2 ± 55.6 |
| 1194002 N = 12 | 12.5 SR (PD12907) | Fasted | 28.5 ± 4.3 | 2.9 ± 2.4 | 285.9 ± 37.8 |
| | 12.5 CR (4n806) | Fasted | 37.7 ± 9.9 | 3.6 ± 0.9 | 300.0 ± 53.6 |
| | 12.5 IR (PS644) | Fasted | 83.5 ± 23.5 | 0.79 ± 0.3 | 274.0 ± 59.2 |

FIG. 2 is a graph of mean plasma profiles associated with the administration of a tablet form of 4-AP (fampridine) in accordance with the present invention compared with the mean plasma profile associated with the administration of a sustained-release capsule of the present invention and an immediate release capsule.

### Example 3

This example details the plasma concentration of different dosage tablets of a aminopyridine in compositions of the present invention administered to patients with spinal cord injury. Pharmacokinetic results are presented for the subset of 11 patients who completed all dose levels. Maximal plasma concentrations and AUC values increased with increasing dose, with a mean $C_{max}$ of 152.0 ng/mL at the highest dose of 120 mg/day. The time of the peak and the plasma elimination half-lives were independent of dose. Mean $T_{max}$ ranged from 2.2 hours to 3.0 hours. The $T_{1/2}$ of fampridine ranged from 5.7 to 6.9 hours. There were no apparent differences between males and females. Data from this study are summarized in Table 3.

TABLE 3

Pharmacokinetic Parameter Values (Mean ± SD) Following Multiple Oral Doses of Fampridine-SR to 11 Patients with SCI.

| Fampridine-SR Dosage (mg b.i.d.) | $C_{MAX}$ (ng/mL) | $T_{MAX}$ (hours) | $AUC_{(0-12)}$ (ng hr/mL) | $T_{1/2}$ (hours) |
|---|---|---|---|---|
| 25 | 63.4 ± 11.9 | 2.2 ± 0.9 | 475.8 ± 65.5 | 6.4 ± 1.4 |
| 30 | 83.2 ± 20.5 | 2.4 ± 1.4 | 600.0 ± 128.0 | 6.7 ± 3.8 |
| 35 | 90.2 ± 14.4 | 2.4 ± 1.2 | 660.3 ± 137.7 | 6.9 ± 3.4 |
| 40 | 103.2 ± 19.4 | 2.6 ± 1.3 | 771.5 ± 135.3 | 6.6 ± 2.1 |
| 50 | 145.7 ± 27.9 | 3.0 ± 1.9 | 1047.6 ± 258.8 | 5.8 ± 1.9 |
| 60 | 152.0 ± 25.2 | 3.0 ± 2.0 | 1075.0 ± 163.0 | 5.7 ± 2.3 |

### Example 4

This example details the pharmacokinetic properties of Fampridine-SR in tablets of the present invention administered to patients with multiple sclerosis. Plasma samples were analyzed for fampridine using a validated LC/MS/MS assay with a sensitivity of 2 ng/mL. Noncompartmental pharmacokinetic parameter values were calculated using standard methodology.

This was an open-label, multi-center, dose proportionality study of orally administered fampridine in patients with multiple sclerosis. Single doses of fampridine were to be given in escalating doses (5 mg, 10 mg, 15 mg, and 20 mg) with at least a four-day interval between administration of each dose of drug. Safety evaluations were to be performed during the 24 hour period following administration of fampridine and blood samples were to be taken at the following times to determine pharmacokinetic parameters: hour 0 (pre-dose), hours 1-8, and hours 10, 14, 18, and 24.

Twenty-three subjects received all 4 treatments, and one subject received only 3 treatments; data from all treatments were analyzed. Dose-dependent parameters (e.g., peak plasma concentration and areas-under-the curve) were normalized to a 10 mg dose for among-dose comparisons. Overall observed time of the peak plasma concentration (mean and its 95% confidence interval) was 3.75 (3.52, 3.98) h, observed peak plasma fampridine concentration (normalized to a 10 mg dose) was 24.12 (23.8, 26.6) ng/ml, area-under-the-concentration-time curve (normalized to a 10 mg dose) was estimated to be 254 (238, 270) ng·h/ml, extrapolated area-under-the-concentration-time curve (normalized to a 10 mg dose) was 284 (266, 302) ng·h/ml, terminal rate constant equaled 0.14 (0.13, 0.15) $h^{-1}$, terminal half-life was 5.47 (5.05, 5.89) h and clearance divided by bioavailability (CL/F) was equal to 637 (600, 674) ml/min.

Dizziness was the most common treatment-related adverse event. Other treatment related adverse events included amblyopia, asthenia, headache, and ataxia. There were clinically significant changes in clinical laboratory values, ECG parameters, vital signs, physical examination findings, or neurological examination findings noted over the course of this study.

When the plasma concentrations of fampridine were normalized to the 10.0 mg dose levels, there were no significant differences between any pharmacokinetic parameter (AUC, $C_{max}$, $t_{1/2}$) in the 5-20 mg dose range. Fampridine was well tolerated at the doses used in this study. Dose-normalized (to a 10 mg dose) pharmacokinetic parameter values are summarized in Table 4.

TABLE 4

Dose-Normalized (at 10 mg) Pharmacokinetic Parameter Values (Mean ± SEM) Following Single Oral Administration of Fampridine-SR to Patients with MS.

| Dose (mg) | $C_{MAX}$ norm (ng/mL) | $t_{MAX}$ (hours) | AUC-norm (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
|---|---|---|---|---|---|
| 5 (n = 24) | 26.2 ± 0.6 | 3.9 ± 0.2 | 244.2 ± 9.4 | 5.8 ± 0.5 | 619.8 ± 36.2 |
| 10 (n = 24) | 25.2 ± 0.7 | 3.9 ± 0.3 | 252.2 ± 7.8 | 5.6 ± 0.4 | 641.4 ± 39.1 |
| 15 (n = 24) | 24.6 ± 0.7 | 3.6 ± 0.3 | 263.0 ± 7.4 | 5.5 ± 0.4 | 632.4 ± 39.0 |

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

TABLE 4-continued

Dose-Normalized (at 10 mg) Pharmacokinetic Parameter Values (Mean ± SEM) Following Single Oral Administration of Fampridine-SR to Patients with MS.

| Dose (mg) | $C_{MAX}$ norm (ng/mL) | $t_{MAX}$ (hours) | AUC-norm (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
|---|---|---|---|---|---|
| 20 (n = 23) | 24.6 ± 0.8 | 3.6 ± 0.3 | 255.6 ± 6.9 | 5.1 ± 0.3 | 653.9 ± 37.1 |

## Example 5

This example describes the results of an open-label study to assess the steady state pharmacokinetics of orally administered fampridine (4-aminopyridine) compositions of the present invention in subjects with Multiple Sclerosis. This study was an open-label multiple dose study of Fampridine-SR intended to assess steady state pharmacokinetics in 20 patients with MS who previously completed the study summarized in Table 4. Fampridine-SR (40 mg/day) was administered as two 20 mg doses, given as one morning and one evening dose for 13 consecutive days, with a single administration of 20 mg on Day 14. Blood samples for pharmacokinetic analysis were collected on Days 1, 7/8, and 14/15 at the following intervals: immediately prior to drug administration (baseline), hourly for the first 8 hours, and 10, 12, and 24 hours post-dose. Additional blood samples were collected 14, 18, and 20 hours post-dose on Day 14, and 30 and 36 hours post-dose on Day 15.

Pharmacokinetic parameter estimates following the first dose in these patients in this study on Day 1 were comparable to those determined when they participated in the study summarized in Table 4. No significant difference in $T_{max}$ was detected among the four means (Single dose=3.76 h; Day 1=3.78 h; Day 8=3.33 h; Day 15=3.25 h). $C_{max}$ and $C_{max}/C_{\tau}$ on Days 8 ($C_{max}$=66.7 ng/ml) and 15 ($C_{max}$=62.6 ng/ml) were significantly greater than those of the single dose treatment and of Day 1 ($C_{max}$=48.6 ng/ml), reflecting accumulation of the drug with multiple dosing.

There was no significant difference among the four occasions with regard to either T or C and no difference in $C_{max}$, $C_{max}/C_{\tau}$, CL/F or $AUC_{0-\tau}$ between Days 8 and 15. Further AUC on Days 8 and 15 did not differ significantly from total AUC with single dose treatment. Likewise, the estimates of CL/F on Days 8 and 15 and of λ and $T_{1/2}$ on Day 15 did not differ significantly from those with single dose.

Steady-state was attained by Day 7/8 as evidence by the lack of differences in $C_{max}$ or AUC between Days 7/8 and 14/15; there was no apparent unexpected accumulation. Likewise, the estimates of Cl/F on Days 7/8 and 14/15 of and of $T_{1/2}$ on Day 14/15 did not differ significantly from those given a single dose. On the final day of dosing, mean $C_{max}$ was 62.6 ng/mL, occurring 3.3 hours post-dose. The $T_{1/2}$ was 5.8 hours. These values are similar to those observed in patients with chronic SCI receiving similar doses of this formulation. These results are summarized in Table 5.

TABLE 5

Pharmacokinetic Parameter Values (Mean and 95% CI) Following Multiple Oral Doses of Fampridine-SR (40 mg/day) to 20 Patients with MS.

| | Parameter | | | | |
|---|---|---|---|---|---|
| Day | $C_{MAX}$ (ng/mL) | $t_{MAX}$ (hours) | $AUC_{(0-12)}$ (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
| Day 1 | 48.6 (42.0, 55.3) | 3.8 (3.2, 4.3) | NE | NE | NE |



TABLE 5-continued

Pharmacokinetic Parameter Values (Mean and 95% CI) Following Multiple Oral Doses of Fampridine-SR (40 mg/day) to 20 Patients with MS.

| | Parameter | | | | |
|---|---|---|---|---|---|
| Day | $C_{MAX}$ (ng/mL) | $t_{MAX}$ (hours) | $AUC_{(0-12)}$ (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
| Day 7/8 | 66.7 (57.5, 76.0) | 3.3 (2.8, 3.9) | 531 (452, 610) | NE | 700 (557, 884) |
| Day 14/15 | 62.6 (55.7, 69.4) | 3.3 (2.6, 3.9) | 499 (446, 552) | 5.8 (5.0, 6.6) | 703 (621, 786) |

Dizziness was the most common treatment-related adverse event. Other treatment-related adverse events that occurred included nausea, ataxia, insomnia, and tremor. There were no clinically significant changes in mean clinical laboratory values, vital signs, or physical examination findings from baseline to last visit. There were no apparent clinically significant changes in corrected QT intervals or QRS amplitudes after administration of fampridine.

Fampridine was well tolerated in subjects with multiple sclerosis who receive twice daily doses (20 mg/dose) of fampridine for two weeks. A significant increase was observed in $C_{max}$, and $C_{max}/C_{\tau}$ on Days 8 and 15 relative to those on Day 1 and with single dose treatment, reflecting accumulation of fampridine with multiple dosing. A lack of significant differences in $C_{max}$, $C_{max}/C_{\tau}$, CL/F or $AUC_{0-\tau}$ between Days 8 and 15 suggest that near steady-state is reached by Day 8. There was no evidence of significant pharmacokinetics during a two-week period of multiple dosing with fampridine.

## Example 6

This was an open-label, single dose, single-center study of the pharmacokinetics and tolerability of escalating doses of orally administered Fampridine-SR in fourteen (14) patients with chronic incomplete SCI.

After fasting overnight, a single oral dose of Fampridine-SR (10, 15, 20, or 25 mg) was to be administered. Each patient was to receive each dose in an ascending fashion. Each dose was to be followed by a 7-day washout period. A single dose of Fampridine-SR was to be administered orally on Day 1-10 mg, Day 8-15 mg, Day 15-20 mg and Day 22-25 mg with 240 mL of tepid water at approximately the same time on each treatment day. Patients were to continue their fast for 4 hours after dosing and then a standard meal was to be served. Blood samples for pharmacokinetic analysis were to be obtained at Hour 0 (immediately preceding study drug administration) and 1, 2, 3, 4, 5, 6, 8, 10, 12, 16, 20, and 24 hours after each dose. A baseline urine sample was to be collected prior to dosing and urine was to be collected for 24 hours after administration of the study drug at the following intervals: 0.1 to 4 hours; 4.1 to 8 hours; 8.1 to 12 hours; and 12.1 to 24 hours.

There was no detectable fampridine in any of the pre-dose plasma samples. By visual inspection of plasma concentration-time curves, concentrations were seen to rise for up to the first 4 hours post-dose and then to decline in a monophasic fashion. In some patients, there was evidence of a second peak. Peak concentrations increased proportionally with dose, with mean $C_{MAX}$ of 27.7 ng/mL following a single dose of 10 mg and mean $C_{MAX}$ of 67.4 ng/mL following a single dose of 25 mg. Peak concentrations occurred 3 to 4 hours post-dose, regardless of dose level. AUC also increased proportionally with increasing dose. The length of sampling was adequate since $AUC_{0-24}$ is at least 92% of $AUC_{0-8}$. The mean $T_{1/2}$ was independent of dose, approximately 6 hours. Pharmacokinetic parameter values by dose are summarized in the Table 6 below.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

TABLE 6

Mean (±SD) pharmacokinetic parameters of fampridine-SR following single dose administration

| Parameter | Fampridine-SR dose 10 mg n = 14 | 15 mg n = 14 | 20 mg n = 14 | 25 mg n = 13* |
|---|---|---|---|---|
| $C_{max}$ (ng/mL) | 27.7 ± 9.1 | 43.5 ± 11.2 | 54.9 ± 11.0 | 67.4 ± 13.3 |
| $t_{max}$ (h) | 3.2 ± 1.0 | 3.5 ± 1.2 | 3.5 ± 1.0 | 3.7 ± 1.2 |
| $AUC_{0\text{-}24\,h}$ (ng · h/mL) | 285.4 ± 96.8 | 423.0 ± 98.6 | 561.1 ± 117.6 | 715.6 ± 150.0 |
| $AUC_{0\text{-}\infty}$ (ng · h/mL) | 311.8 ± 93.2 | 460.2 ± 100.2 | 604.3 ± 124.6 | 769.2 ± 154.4 |
| $K_{el}$ ($h^{-1}$) | 0.13 ± 0.03 | 0.12 ± 0.03 | 0.12 ± 0.02 | 0.13 ± 0.03 |
| $t_{1/2}$ (h) | 5.9 ± 1.5 | 5.9 ± 1.5 | 5.9 ± 1.4 | 5.8 ± 1.6 |
| Cl/F (L/h) | 34.8 ± 10.2 | 34.3 ± 8.9 | 34.7 ± 8.5 | 34.0 ± 8.3 |
| $V_d$/F (L) | 299.8 ± 127.4 | 289.0 ± 93.7 | 289.9 ± 84.1 | 286.2 ± 123.2 |

*One patient was excluded from analysis, as not all blood samples were collected.
$C_{max}$, maximum observed plasma concentration;
$t_{max}$, time to reach $C_{max}$;
AUC, area under the plasma concentration-time curve;
$K_{el}$, elimination rate constant;
$t_{1/2}$, plasma half-life;
Cl/F, apparent total clearance;
$V_d$/F, apparent volume of distribution.

Fampridine pharmacokinetic parameters following the oral administration of single doses of fampridine-SR (10-25 mg) are summarized in Table 6. Fampridine-SR was slowly absorbed (mean $t_{max}$ occurring 3.2 to 3.7 hours postdose) and slowly eliminated in a monophasic manner (mean $t_{1/2}$~5.9 hours). Mean $t_{1/2}$, $K_{el}$, $V_d$/F, and Cl/F were independent of dose over the dose range (10-25 mg), while mean $C_{max}$, $AUC_{0\text{-}24h}$, and $AUC_{0\text{-}\infty}$ were linearly related to dose. $AUC_{0\text{-}24h}$ was at least 92% of $AUC_{0\text{-}\infty}$. Mean $C_{max}$ for the lowest fampridine-SR dose (10 mg) was 27.7 ng/mL, while mean $C_{max}$ for the highest dose (25 mg) was 67.4 ng/mL.

The plasma concentration profile following administration of Fampridine-SR was consistent with a sustained release of drug. Peak concentrations of fampridine occurred on average 3 to 4 hours post-dose, and concentrations declined with a plasma half-life of approximately 6 hours. The results of this study indicate that Fampridine-SR pharmacokinetics are linear over the single dose range studied, 10 to 25 mg. Area under the curve (AUC) and peak plasma concentration ($C_{MAX}$) increased proportionally with dose.

Fampridine-SR was well-tolerated over the range of single oral doses administered in this study. Dizziness was the most frequently reported adverse event. The next most common events were hypotension, nausea, and paresthesia. There was no clear relationship between dose level and frequency of adverse events, except with the possibility of nausea, which only occurred at the 25 mg dose. There were no clinically significant changes in vital signs during treatment.

The pharmacokinetic analysis of Fampridine-SR administered once weekly showed dose proportionality across single oral doses of 10, 15, 20, and 25 mg. Mean peak fampridine concentration increased linearly with dose from 27.7 ng/mL following a dose of 10 mg to 69.9 ng/mL following a dose of 25 mg. Absorption was prolonged with peak concentrations occurring on average 3 to 4 hours postdose; this was independent of dose. The mean $T_{1/2}$ appeared independent of dose, approximately 6 hours. Single oral doses of 10, 15, 20, and 25 mg of Fampridine-SR were well-tolerated, as assessed by adverse event reporting, clinical laboratories, vital sign measurements, physical examinations, and ECG interpretation.

Example 7

This example describes the results of an open-label, multiple dose, single center study to assess the effects of escalating doses of orally administered sustained release fampridine (4-aminopyridine) in sixteen (16) patients with chronic incomplete spinal cord injury (SCI). Sustained release tablets of fampridine were administered 10 mg twice daily for 1 week, 15 mg twice daily for 1 week, 20 mg twice daily for 1 week and 25 mg twice daily for 1 week in sixteen patients with SCI.

Following administration of Fampridine-SR, fampridine was slowly adsorbed, with peak concentration observed approximately three hours post-dose, regardless of dose (p=0.227). Plasma levels declined gradually with a half life of 6 to 7 hours, independent of dose. Based on the mean trough concentrations, steady state was achieved by Day 5. Steady state maximal, minimal, and average plasma concentrations and AUC increased with increasing dose. Total clearance ranged between 9 and 10 mL/min/kg across dose groups. Volume of distribution at steady state ranged from 2.01 L/kg in the 15 mg BID dose group to 2.11 L/kg in the 20 mg BID dose group. A summary of the mean pharmacokinetic results is provided in Table 7.

Fampridine pharmacokinetic parameters following the oral administration of multiple doses of fampridine-SR (10-25 mg BID) are summarized in Table 7. Mean $t_{max}$ and $t_{1/2}$ were similar to values found in the single-dose study (compare to Table 6). Steady state was achieved by Day 5 (4 days of fampridine-SR dosing) following twice-daily administration of fampridine-SR. Mean $t_{max}$, $t_{1/2}$, $K_{el}$, $V_{ss}$/F, Cl/F, and mean residence time at steady state ($MRT_{ss}$) were independent of dosage following the administration of fampridine-SR (10-25 mg BID). Mean plasma concentrations ($C_{maxss}$, $C_{avss}$, and $C_{minss}$) and $AUC_{0\text{-}12h}$ at steady state were linearly related to dose over the dosage range (fampridine-SR 10-25 mg BID). Mean $C_{maxss}$ at steady state for the lowest fampridine-SR dosage (10 mg BID) was 32.2 ng/mL and was 87.2 ng/mL for the highest fampridine-SR dosage (25 mg BID). Corresponding $C_{minss}$ values for the lowest and highest dosages were 14.0 and 41.3 ng/mL.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

TABLE 7

Mean (±SD) pharmacokinetic parameters of fampridine-SR following multiple dose administration

| Parameter | Fampridine-SR dose 10 mg BID n = 15 | 15 mg BID n = 15 | 20 mg BID n = 14 | 25 mg BID n = 14 |
|---|---|---|---|---|
| $C_{maxss}$ (ng/mL) | 32.2 ± 8.9 | 46.7 ± 10.5 | 60.1 ± 15.0 | 87.2 ± 29.0 |
| $C_{minss}$ (ng/mL) | 14.0 ± 4.4 | 23.5 ± 9.1 | 27.3 ± 10.0 | 41.3 ± 15.2 |
| $C_{avss}$ (ng/mL) | 20.8 ± 5.7 | 31.0 ± 7.2 | 39.4 ± 9.3 | 53.3 ± 14.5 |
| $t_{max}$ (h) | 2.7 ± 1.0 | 3.2 ± 0.9 | 3.1 ± 1.2 | 2.6 ± 0.9 |
| $AUC_{0-12\,h}$ (ng · h/mL) | 249.3 ± 68.3 | 371.8 ± 86.8 | 472.3 ± 111.8 | 639.4 ± 173.9 |
| $K_{el}$ ($h^{-1}$) | 0.14 ± 0.05 | 0.12 ± 0.03 | 0.13 ± 0.04 | 0.12 ± 0.05 |
| $t_{1/2}$ (h) | 5.6 ± 1.8 | 6.0 ± 1.5 | 5.8 ± 2.1 | 7.6 ± 5.5 |
| Cl/F (L/h/kg) | 9.52 ± 2.85 | 9.35 ± 2.44 | 9.79 ± 2.03 | 9.15 ± 2.35 |
| $V_{ss}$/F (L/kg) | 2.22 ± 0.79 | 2.01 ± 0.59 | 2.11 ± 0.51 | 2.09 ± 0.65 |
| $MRT_{ss}$ (h) | 5.18 ± 0.21 | 5.18 ± 0.30 | 5.15 ± 0.35 | 5.08 ± 0.31 |
| Accumulation factor | 1.30 ± 0.18 | 1.34 ± 0.16 | 1.32 ± 0.22 | 1.53 ± 0.62 |

$C_{maxss}$, maximum observed plasma concentration at steady state;
$C_{minss}$, minimum observed plasma concentration at steady state;
$C_{avss}$, average plasma concentration at steady state;
$t_{max}$, time to reach $C_{max}$;
AUC, area under the plasma concentration-time curve;
$K_{el}$, elimination rate constant;
$t_{1/2}$, plasma half-life;
Cl/F, apparent total clearance;
$V_{ss}$/F, apparent volume of distribution at steady state;
$MRT_{ss}$, mean residence time at steady state;
BID, twice daily.

Adverse events included pain, hypertonia, dizziness, accidental injury, dyspepsia, asthenia, urinary tract infection and euphoria. There was no clear relationship between frequency of adverse events and dose level, however euphoria and dizziness were observed more frequently in the 25 mg BID dose level.

Multiple oral doses of 10, 15, 20 and 25 mg BID of Fampridine-SR were generally well-tolerated, as assessed by adverse event reporting, clinical laboratories, vital signs, and physical examinations. The pharmacokinetic analysis of Fampridine-SR showed dose proportionality across multiple oral doses of 10, 15, 20, 25 mg BID each administered for 1 week. The results demonstrate that fampridine pharmacokinetics are linear over the dose range studied. Trough values indicated that steady state had been achieved by Day 5. Fampridine pharmacokinetics are dose-proportional: both AUC and $C_{max}$ at doses of 10, 15, 20, and 25 mg BID, each administered over the course of one week, were dose-proportional under both and ANOVA model and a regression power model. Neither rate of absorption (as reflected by the time of the peak concentration) nor the rate of elimination ($K_{el}$) were dependent on dose.

## Example 8

This was a double-blind, placebo-controlled, 20 week, parallel-group study to evaluate safety, tolerability and activity of oral fampridine-SR in subjects with Multiple Sclerosis. The study was designed as follows: a two-week placebo run-in (single blind); a two-week upward titration (10 mg bid, 15 mg bid or placebo); a twelve-week stable treatment period (placebo, 10 mg bid, 15 mg bid or 20 mg bid); a one-week downward titration (10 mg bid, 15 mg bid or placebo) and a two-week post treatment follow-up. A total of 206 patients were enrolled in the study.

The mean change in walking speed, the walking speed measured per visit, the mean change in LEMMT, the LEMMT per visit, the adverse events and serious adverse events associated with the study were documented.

Results. The trial showed a strong positive trend across all three dose groups compared to placebo in its primary endpoint, improvement in walking speed, as measured by a timed 25-foot walk as shown in FIG. 3. The trial also showed a statistically significant improvement across dose groups in its secondary endpoint, the Lower Extremity Manual Muscle Test (LEMMT), as shown in FIG. 4. These results confirmed observations in earlier double-blind trials that involved fewer subjects and shorter treatment periods. Because most people with MS experience both impairment in walking ability and weakened muscles, the Timed 25 Foot Walk is widely-used to assess MS patients' functional status. The LEMMT is a standardized, 5-point manual assessment of strength, applied to leg muscle groups. The study showed a statistically significant difference across all doses at up-titration and follow-up for the 25 foot walk. The study also showed a statistically significant improvement in LEMMT across all doses during stable treatment. The study confirms the safety profile of 4-aminopyridine and preferable dosing of 10 to 15 milligrams twice daily.

Fampridine-SR showed a strong positive trend in the improvement of walking speed and significantly improved leg muscle strength in people with multiple sclerosis (MS). The drug also showed a reduction of muscle spasticity in people with chronic spinal cord injury (SCI).

## Example 9

This was a group study to evaluate safety, tolerability and activity of oral fampridine-SR in subjects with spinal cord injury (SCI). The study was designed as follows: a two-week placebo run-in (single blind); a two-week upward titration (10 mg bid, 15 mg bid or placebo); a twelve-week stable treatment period (placebo, or 25 mg bid); a two-week downward titration (10 mg bid, 15 mg bid) and a two-week post treatment follow-up. A total of 204 patients were enrolled in the study, of which 166 completed.

The mean change in Ashworth score, the Ashworth score measured per visit, the mean change in LEMMT, the

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

LEMMT per visit, the adverse events and serious adverse events associated with each study were documented. The Ashworth is a validated, 5-point clinician assessment of an individual's spasticity (the involuntary tension, stiffness or contraction of muscles.)

Results. The study showed a statistically significant improvement of Ashworth score using FDA-preferred analysis, as shown in FIG. 5. The study also confirmed the safety profile of 4-aminopyridine.

Although the present invention has been described in considerable detail with reference to certain preferred embodiments thereof, other versions are possible. Therefore the spirit and scope of the appended claims should not be limited to the description and the preferred versions contain within this specification.

What is claimed:

**1**. A method for maintaining a therapeutically effective concentration of 4-aminopyridine in order to improve walking in a human with multiple sclerosis in need thereof, said method comprising:

orally administering to the human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a day; and thereafter,

maintaining administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, whereby an in vivo 4-aminopyridine $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are obtained in the human.

**2**. The method of claim **1**, whereby an increase in walking speed is obtained in said human.

**3**. The method of claim **1**, whereby an improvement in lower extremity muscle strength is obtained in said human.

**4**. The method of claim **1**, wherein the sustained release composition further comprises an additional active ingredient.

**5**. The method of claim **1**, wherein the sustained release composition further comprises a pharmaceutically acceptable excipient.

**6**. A dosing regimen method for providing a 4-aminopyridine at a therapeutically effective concentration in order to improve walking in a human with multiple sclerosis in need thereof, said method comprising:

initiating administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a day without a prior period of 4-aminopyridine titration, and then,

maintaining administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily; without a subsequent period of 4-aminopyridine titration,

whereby an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are maintained in the human.

**7**. The method of claim **6**, whereby an increase in walking speed is obtained in said human.

**8**. The method of claim **6**, whereby an improvement in lower extremity muscle strength is obtained in said human.

**9**. The method of claim **6**, wherein the sustained release composition further comprises an additional active ingredient.

**10**. The method of claim **6**, wherein the sustained release composition further comprises a pharmaceutically acceptable excipient.

**11**. A method for maintaining a therapeutically effective concentration of 4-aminopyridine in a human with multiple sclerosis in need of an improvement in walking, in order to improve walking in the human, said method comprising:

orally administering twice daily to the human a sustained release composition comprising a pharmaceutically acceptable excipient and 4-aminopyridine, the 4-aminopyridine consisting of 10 milligrams of 4-aminopyridine, for one day; and thereafter,

maintaining twice daily administration for a time period of greater than two weeks of a sustained release composition comprising a pharmaceutically acceptable excipient and 4-aminopyridine, the 4-aminopyridine consisting of 10 milligrams of 4-aminopyridine; whereby an in vivo 4-aminopyridine $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are obtained in the human.

**12**. The method of claim **11**, wherein an improvement in lower extremity muscle strength is obtained in said human.

**13**. The method of claim **1**, further comprising a step of determining the $C_{maxSS}$:$C_{minSS}$ ratio or the $C_{avSS}$.

**14**. The method of claim **11**, wherein the twice daily administration comprises b.i.d. administration or administration at 12-hour intervals.

**15**. The method of claim **11**, whereby an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 1.5 to 3.0 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are obtained in the human.

**16**. The method of claim **11**, whereby an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 2.0 to 3.0 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are obtained in the human.

**17**. A method to improve walking by a human with multiple sclerosis in need thereof, said method comprising:

orally administering twice daily for one day to the human a sustained release composition of 10 milligrams of 4-aminopyridine and an agent selected from the group consisting of one or more additional active ingredients, one or more pharmaceutically acceptable excipients and a combination thereof; and thereafter,

maintaining twice daily administration of 4-aminopyridine by orally administering twice daily to said human a sustained release composition of 10 milligrams of 4-aminopyridine and an agent selected from the group consisting of one or more additional active ingredients, one or more pharmaceutically acceptable excipients and a combination thereof for a time period of greater than two weeks; whereby an in vivo 4-aminopyridine $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are obtained and there is an improvement in walking by the human.

**18**. The method of claim **1**, whereby an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 1.5 to 3.0 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are obtained in the human.

**19**. The method of claim **1**, whereby an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 2.0 to 3.0 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are obtained in the human.

**20**. The method of claim **1** wherein the maintaining step comprises maintaining for a period of more than two weeks.

**21**. The method of claim **1** wherein the maintaining step comprises maintaining for a period of more than twelve weeks.

**22**. The method of claim **1** wherein said sustained release composition is a tablet.

**23**. The method of claim **6** wherein the maintaining step comprises maintaining for a period of at least a week.

**24**. The method of claim **6** wherein the maintaining step comprises maintaining for a period of at least two weeks.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

25. The method of claim 6 wherein the maintaining step comprises maintaining for a period of more than two weeks.

26. The method of claim 6 wherein the maintaining step comprises maintaining for a period of more than twelve weeks.

27. The method of claim 6, whereby an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 1.5 to 3.0 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are obtained in the human.

28. The method of claim 6, whereby an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 2.0 to 3.0 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are obtained in the human.

29. The method of claim 6 wherein said sustained release composition is a tablet.

30. The method of claim 17 wherein said sustained release composition is a tablet.

31. A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of greater than two weeks, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 1 to about 6 hours after administration of the sustained release composition to the patient.

32. The method of claim 31 wherein the sustained release composition elicits a $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 when administered b.i.d. or administered at 12-hour intervals to a human.

33. The method of claim 31 wherein said time period is twelve weeks.

34. The method of claim 31 wherein said sustained release composition is a tablet.

35. The method of claim 31 wherein the step of administering comprises b.i.d. administering or administering at 12-hour intervals.

36. A method to improve walking in a patient with multiple sclerosis in need thereof by use of a sustained release composition of 4-aminopyridine, where sustained indicates that the composition achieves an in vivo 4-aminopyridine $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml in a human, said method comprising:

orally administering twice daily for one day to the patient an amount of the sustained release composition having only 10 milligrams of 4-aminopyridine; and thereafter,

maintaining twice daily administration of 4-aminopyridine by orally administering to said patient an amount of the sustained release composition having only 10 milligrams of 4-aminopyridine for a time period of at least two weeks.

37. A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of greater than two weeks, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 5.2 hours after administration of the sustained release composition to the patient.

38. The method of claim 37 wherein the sustained release composition elicits a $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 when administered b.i.d. or administered at 12-hour intervals to a human.

39. The method of claim 37 wherein said time period is twelve weeks.

40. The method of claim 37 wherein said sustained release composition is a tablet.

41. The method of claim 37 wherein the step of administering comprises b.i.d. administering or administering at 12-hour intervals.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 8,007,826 B2
APPLICATION NO. : 11/010828
DATED : August 30, 2011
INVENTOR(S) : Andrew R. Blight and Ron Cohen



It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specifications:

In column 2, line 67, replace "an a" with --a--;

In column 3, line 6, replace "an a" with --a--;

In column 3, line 14, replace "in matrix" with --in a matrix--;

In column 4, line 7, replace "form of in" with --form in--;

In column 4, line 11, replace "formulations" with --formulation--;

In column 4, line 12, replace "sped" with --speed--;

In column 5, line 23, replace "naphthylate mesylate" with --naphthalate, mesylate--;

In column 5, line 28, replace "tetramethylammonium, tetramethylammonium" with --tetramethylammonium--;

In column 5, line 61, replace "bowl" with --bowel--;

In column 7, line 5, replace "plasma-concentration" with --plasma concentration--;

In column 7, line 39, replace "regiment" with --regimen--;

In column 8, line 33, replace "comprising sustained release matrix" with --comprising a sustained release matrix--;

In column 8, line 45, replace "solvated" with --solvate--;

Signed and Sealed this
Twenty-seventh Day of August, 2013

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

**CERTIFICATE OF CORRECTION (continued)**
**U.S. Pat. No. 8,007,826 B2**



In column 11, line 17, replace "shows" with --slows--;

In column 11, line 23, replace "is" with --its--;

In column 12, line 37, replace "other" with --another--;

In column 12, lines 37-38, replace "In alternative, organic solvent" with --In the alternative, an organic solvent--;

In column 12, line 59, replace "hard ness" with --hardness--;

In column 13, line 1, replace "amount aminopyridine" with --amount of aminopyridine--;

In column 13, line 31, replace "with pharmaceutically" with --with a pharmaceutically--;

In column 13, lines 32-33, replace "disintegrates" with --disintegrate--;

In column 13, line 41, replace "rate is" with --rate, is--;

In column 13, line 67, replace "polyethylene separates" with --polyethylene stearates--;

In column 14, line 11, replace "glucose dextrose" with --glucose, dextrose--;

In column 16, line 3, replace "regiment" with --regimen--;

In column 16, line 30, replace "diluents" with --diluent--;

In column 16, line 38, replace "a aminopyridine" with --an aminopyridine--;

In column 16, line 43, replace "additives" with --additive--;

In column 16, line 65, replace "politicizes" with --plasticizers--;

In column 18, table 1, last column replace "12.3/1.1%" with --12.3 mg/1.1%--;

In column 18, line 65, replace "be exaggerated" with --be an exaggerated--;

In column 19, line 29, replace "a aminopyridine" with --an aminopyridine--;

In column 20, line 38, replace "CL/F" with --CI/F--;

In column 21, line 42, replace "CL/F" with --CI/F--;

In column 21, line 45, replace "CL/F" with --CI/F--;

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

**CERTIFICATE OF CORRECTION (continued)**
**U.S. Pat. No. 8,007,826 B2**



In column 21, line 46, replace "evidence" with --evidenced--;

In column 22, line 28, replace "CL/F" with --CI/F--;

In column 24, line 38, replace "adsorbed" with --absorbed--;

In column 25, line 47, replace "and ANOVA" with --an ANOVA--;

In column 27, line 3, replace "clinician" with --clinical--; and

In column 27, line 14, replace "contain" with --contained--.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

PTO-1683
(Rev. 7-96)

U 7504969

THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

November 14, 2014

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,354,437*
ISSUE DATE: *January 15, 2013*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

T. WALLACE
Certifying Officer

CA No. 14-882-LPS

JTX-0003

AMPFH0018073

US008354437B2

(12) **United States Patent**
**Blight et al.**

(10) **Patent No.: US 8,354,437 B2**
(45) **Date of Patent: *Jan. 15, 2013**

(54) **METHOD OF USING SUSTAINED RELEASE AMINOPYRIDINE COMPOSITIONS**

(75) Inventors: **Andrew R. Blight**, Mahopac, NY (US); **Ron Cohen**, Irvington, NY (US)

(73) Assignee: **Acorda Therapeutics, Inc.**, Ardsley, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 623 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/102,559**

(22) Filed: **Apr. 8, 2005**

(65) **Prior Publication Data**

US 2005/0228030 A1 Oct. 13, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/560,894, filed on Apr. 9, 2004.

(51) **Int. Cl.**
*A61K 31/44* (2006.01)
*A61K 9/22* (2006.01)

(52) **U.S. Cl.** ......... **514/352**; 514/903; 514/965; 424/468

(58) **Field of Classification Search** .................. 514/352, 514/903, 965; 424/468
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,386,095 | A | 5/1983 | Gibson et al. |
| 4,508,715 | A | 4/1985 | Booth et al. |
| 4,721,619 | A | 1/1988 | Panoz et al. |
| 4,851,230 | A | 7/1989 | Tencza et al. |
| 4,894,240 | A | 1/1990 | Geoghegan et al. |
| 4,946,853 | A | 8/1990 | Bannon et al. |
| 5,370,879 | A | 12/1994 | Masterson et al. |
| 5,540,938 | A | 7/1996 | Masterson et al. |
| 5,545,648 | A | 8/1996 | Hansebout et al. |
| 5,580,580 | A | 12/1996 | Masterson et al. |
| 5,597,827 | A | 1/1997 | Miller et al. |
| 5,597,828 | A | 1/1997 | Miller et al. |
| 5,869,480 | A | 2/1999 | Shutske et al. |
| 5,952,357 | A | 9/1999 | Blass et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2085785 AA 6/1994

(Continued)

OTHER PUBLICATIONS

Hayes et al., Pharmacokinetics and Safety of Multiple Oral Doses of Sustained-Release 4-Aminopyridine (Fampridine-SR) in Subjects with Chronic, Incomplete Spinal Cord Injury, Jan. 2004, Arch. Phys. Med. Rehabil., 85(1):29-34.

(Continued)

*Primary Examiner* — Savitha Rao
(74) *Attorney, Agent, or Firm* — Jones Day

(57) **ABSTRACT**

A pharmaceutical composition which comprises a therapeutically effective amount of a aminopyridine dispersed in a release matrix, including, for example, a composition that can be formulated into a stable, sustained-release oral dosage formulation, such as a tablet which provides, upon administration to a patient, a therapeutically effective plasma level of the aminopyridine for a period of at about 12 hours and the use of the composition to treat various neurological diseases, including multiple sclerosis. A method of selecting individuals based on responsiveness to a treatment, including, for example, identifying individuals who responded to treatment with a sustained release fampridine composition.

**40 Claims, 12 Drawing Sheets**




Copy provided by USPTO from the PIRS Image Database on 11/12/2014

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,284,473 | B1 | 9/2001 | Whitaker | |
| 6,288,026 | B1 | 9/2001 | Exner et al. | |
| 2005/0025744 | A1 | 2/2005 | Lane | |
| 2005/0276851 | A1 * | 12/2005 | Cunningham et al. | 424/468 |
| 2006/0276537 | A1 | 12/2006 | Goren et al. | |
| 2007/0037848 | A1 | 2/2007 | Masters et al. | |
| 2009/0150180 | A1 | 6/2009 | Cohen et al. | |
| 2010/0061935 | A1 | 3/2010 | Blight et al. | |
| 2010/0272795 | A1 | 10/2010 | Cunningham | |
| 2010/0272796 | A1 | 10/2010 | Cunningham | |
| 2010/0272807 | A1 | 10/2010 | Cunningham | |
| 2010/0324098 | A1 | 12/2010 | Blight et al. | |
| 2010/0324099 | A1 | 12/2010 | Blight et al. | |
| 2010/0324100 | A1 | 12/2010 | Blight et al. | |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 113562 | B1 | 7/1984 |
| EP | 117027 | A1 | 8/1984 |
| EP | 325843 | A2 | 8/1989 |
| EP | 484186 | B2 | 5/1992 |
| IE | 82916 | B1 | 6/2003 |
| WO | WO 2004/082684 | A1 | 9/2004 |
| WO | WO2005/099701 | | 10/2005 |
| WO | WO2007/035958 | | 3/2007 |
| WO | WO2010/030755 | | 3/2010 |
| WO | WO2010/093838 | | 8/2010 |
| WO | WO2010/093839 | | 8/2010 |
| WO | WO2010/090730 | | 9/2010 |

## OTHER PUBLICATIONS

Meglio et al., Spinal Cord Stimulation and Peripheral Blood How: Part 1, In: Indications for Spinal Cord Stimulation, 1981, Y. Hosebuchi and T. Corbin (eds), Excerpta Medica: Amsterdam, pp. 60-66.

Van Diemen et al., 4-Aminopyridine in Patients with Multiple Sclerosis: Dosage and Serum Level Related to Efficacy and Safety, 1993, Clin. Neuropharm., 16(3):195-204.

Bever, The Current Status of Studies of Aminopyridines in Patients with Multiple Sclerosis, 1994, Ann. Neurol. 36:S118-S121.

Bever et al., The Effects of 4-Aminopyridine in Multiple Sclerosis Patients: Results of a Randomized, Placebo-Controlled, Double-Blind, Concentration-Controlled, Crossover Trial, 1994, Neurology, 44(6):1054-1059.

Van Diemen et al., The Effect of 4-Aminopyridine on Clinical Signs in Multiple Sclerosis: A Randomized, Placebo-Controlled, Double-Blind, Cross-Over Study, 1992, Ann. Neurol. 32(2):123-130.

Fujihara et al., The effects of 4-aminopyridine on motor evoked potentials in multiple sclerosis, 1998, Journal of Neurological Sciences 159:102-106.

Blight et al., Axonal Physiology of Chronic Spinal Cord Injury in the Cat: Intracellular Recording in Vitro, 1983(b), Neuroscience; 10(4):1471-1486.

Blight et al., Effect of 4-aminopyridine on axonal conduction-block in chronic spinal cord injury, 1989, Brain Res. Bull. 22:47-52.

Blight et al., Augmentation by 4-aminopyridine of vestibulospinal free fall responses in chronic spinal-injured cats, 1987, J. Neurol. Sci. 82:145-159.

Blight et al., The effects of 4-aminopyridine on neurological deficits in chronic cases of traumatic spinal cord injury in dogs: a phase I clinical trial, 1991, J. Neurotrauma 8:103-119.

Hayes et al., Effects of intravenous 4-aminopyridine on neurological function in chronic spinal cord injured patients: preliminary observations; Proc. IBRO World Conference Neurosci., p. 345, 1991.

Hayes et al., Pharmacokinetic Studies of Single and Multiple Oral Doses of Fampridine-SR (Sustained-Release 4-Aminopyridine) in Patients with Chronic Spinal Cord Injury , 2003, Clinical Neuropharmacology 26(4):185-192.

Gonzalez et al., Influence of enteric citric acid on the release profile of 4-aminopyridine from HPMC matrix tablets; Int. J. of Pharmaceutics 251, Issue 1-2; Jan. 30, 2003; pp. 183-193.

Gonzalez et al., Effect of varying the restriction degree of 4-aminopyridine release from HPMC matrices on the mechanism controlling the process, 2003, Int. J. Pharmaceutics 257:253-264.

Hayes et al., Pharmacokinetics of an immediate release oral formulation of Fampridine (4 aminopyridine) in normal subjects and patients with spinal cord injury, Apr. 2003, J. Clin. Pharm. 43(4):379-385.

Segal et al., Absorption \Characteristics of Sustained-Release 4-Aminopyridine (Fampridine SR) in Patients with Chronic Spinal Cord Injury, 2000, Journal of Clinical Pharmacology 40(4):402-409.

Barker et al., Alzheimer's Disease, Jan. 26, 1991, Pharmaceutical Journal, pp. 116-118.

Davidson et al., 4-Aminopyridine in the treatment of Alzheimer's Disease, 1988, J. of Biological Psychiatry 23:485-490.

Bever Jr., et al., Preliminary Trial of 3, 4-Diaminopyridine in Patients with Multiple Sclerosis, Apr. 1990, Annals of Neurology 27(4):421-427.

Wesseling et al., Effects of 4-aminopyridine in elderly patients with Alzheimer's Disease, Apr. 1984, New England Journal of Medicine 310(15):988-989.

Burchiel et al., Effects of potassium channel-blocking agents on spontaneous discharges from neuromas in rats, 1985, J. of Neurosurgery 63:246-249.

Mitsov, Analgesic activity of pimadine (4-Aminopyridine), Jul.-Aug. 1988, Russian Journal of Pharmacology and Toxology 51(4):32-34.

Biessels et al., Comparison of the pharmacological actions of some new 4-aminopyridine derivatives, 1984, European Journal of Pharmacology 106:319-325.

Nockles et al., Pharmacologic Strategies in the Treatment of Experimental Spinal Cord Injury, 1992, J. Neurotrauma 9, Supplement 1:S211-S217.

Myers, Therapy of multiple sclerosis, 1990, Neurology and Neurosurgery 3:208-212.

Pratt et al., Plasma and Cerebrospinal Fluid Concentrations of 4-Aminopyridine Following Intravenous Injection and Metered Intrathecal Delivery in Canines, 1995, Journal of Neurotrauma 12(1):23-39.

Hansebout et al., 4-Aminopyridine in Chronic Spinal Cord Injury: A Controlled, Double Blind, Crossover Study in Eight Patients, 1993, The Journal of Neurotrauma 10(1):1-18.

Arhem et al., A Model for the fast 4-aminopyridine effects on amphibian myelinated nerve fibers. A study based on voltage-clamp experiments, 1989, Acta Physiol. Scand. 137:53-61.

Beric et al., Central dysesthesia syndrome in spinal cord injury patients., 1988, Pain 34:109-116.

Beric, Altered Sensation and Pain in Spinal Cord Injury, in: Recent Achievements in Restorative Neurology, 3 Altered Sensation and Pain. Dimitrijevic et al. eds., Karger:Basel, pp. 27-36, 1990.

Blight, Cellular Morphology of Chronic Spinal Cord Injury in the Cat: Analysis of Myelinated Axons by Line-Sampling, 1983a, Neuroscience 10(2):521-543.

Blight et al., Morphometric Analysis of Experimental Spinal Cord Injury in the Cat: The Relation of Injury Intensity to Survival of Myelinated Axons, 1986, Neuroscience. 19(1):321-341.

Blight, Morphometric analysis of a model of spinal cord injury in guinea pigs, with behavioral evidence of delayed secondary pathology, 1991, J. Neurol. Sci. 103:156-171.

Bostock et al., The Effects of 4-Aminopyridine and Tetraethylammonium Ions on Normal and Demyelinated Mammalian Nerve Fibers, 1981, J. Physiol. 313:301-315.

Bowe et al., Physiological Effects of 4-Aminopyridine on Demyelinated Mammalian Motor and Sensory Fibers, 1987, Ann. Neurol. 22:264-268.

Bresnahan et al., A Behavioral and Anatomical Analysis of Spinal Cord Injury Produced by a Feedback-Controlled Impaction Device, 1987, Exp. Neurol. 95:548-570.

Chandy et al., Voltage-Gated Potassium Channels are Required for Human T Lymphocyte Activation, 1984, J. Exp. Med 160:369-385.

Choquet et al., Modulation of Voltage-Dependent Potassium Channels in B-Lymphocytes, 1988, Biochem. Parmacol. 37(20):3797-3802.

Davis et al., Orally Administered 4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis, 1990, Ann. Neurol. 27(2):186-192.


Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Dimitrijevic et al., Spinal Cord Stimulation for the Control of Spasticity in Patients with Chronic Spinal Cord Injury: I, 1986a, I. Clinical observations, Cent. Nerv. Syst. Trauma in J. Am. Paralysis Assoc.3(2):129-144.
Dimitrijevic et al., Spinal Cord Stimulation for the Control of Spasticity in Patients with Chronic Spinal Cord Injury: II Neurophysiologic observations, 1986b, Cent. Nerv. Syst. Trauma in J. Am. Paralysis Assoc. 3(2):145-152.
Eidelberg et al., Relationship between Residual Hindlimb-Assisted Locomotion and Surviving Axons after Incomplete Spinal Cord Injuries, 1977, Exp. Neurol. 56:312-322.
Eidelberg et al., Anatomical Correlates of Return of Locomotor Function After Partial Spinal Cord Lesions in Cats, 1981a, Exp. Brain Res. 42:81-88.
Eidelberg et al., Locomotor Control in Macaque Monkeys, 1981b, Brain 104:647-663.
Eliasson et al., Effects of 4-aminopyridine on protein phosphorylation in heat-blocked peripheral nerve, 1991, J. Neutrol. Sci. 105:175-182.
Evenhuis et al., Pharmacokinetics of 4-Aminopyridine in Human Volunteers, 1981, Br. J. Anaesth. 53:567-570.
Glover, The aminopyridines, 1982, Gen. Pharmacol. 13:259-285.
Illis et al., Spinal cord stimulation in the United Kingdom (Review), 1983, J. Neurol. Neurosurg. Psychiat. 46:299-304.
Jack et al., Modifications to Synaptic Transmission at Group Ia Synapses on Cat Spinal Motoneurones by 4-Aminopyridine, 1981, J. Physiol. 321:111-126.
Jacobs et al., Foot salvage and improvement of microvascular blood flow as a result of epidural spinal cord electrical stimulation, 1990, J. Vasc. Surg. 12(3):354-360.
Jankowska et al., Effects of 4-aminopyridine on transmission in excitatory and inhibitory synapses in the spinal cord, 1977, Brain Res. 136:387-392.
Jankowska et al., Effects of 4-Aminopyridine on Synaptic Transmission in the Cat Spinal Cord, 1982, Brain Res. 240:117-129.
Jellinger, Neuropathology of cord injuries, in: Handbook of Clinical Neurology, vol. 25, Part I, Injuries of the Spine and Spinal Cord. Vinken et al. eds., North-Holland: Amsterdam, 1976, pp. 43-121.
Josephson et al., Early Outward Current in Rat Single Ventricular Cells, 1984, Circ. Res. 54:157-162.
Kakulas, Pathology of Spinal Injuries, 1984, Cent. Nerv. Syst. Trauma 1(2):117-129.
Kakulas et al., The Neuropathology of Pain and Abnormal Sensations in Human Spinal Cord Injury Derived from the Clinicopathological Data Base at the Royal Perth Hospital in: Recent Achievements in Restorative Neurology, 3: Altered Sensation and Pain,Dimitrijevic et al eds., Karger:Basel, pp. 37-41, 1990.
Kakulas et al., A Correlative Clinico-Pathologic Study of Spinal Cord Injury, 1969, Proc. Aust. Assoc. Neurologists 6:123-132.
Kirchhoff et al., Excitation of Cutaneous Sensory Nerve Endings in the Rat by 4-Aminopyridine and Tetraethylammonium, 1992, J. Neurophysiol. 67(1):125-131.
Kocsis et al., Effects of Extracellular Potassium Concentration on the Excitability of the Parallel Fibers of the Rat Cerebellum, 1983, J. Physiol. (Lond) 334:225-244.
Kocsis et al., Different effects of 4-aminopyridine on sensory and motor fibers: pathogenesis of paresthesias, 1986, Neurology 36:117-120.
Kostka et al., Column liquid chromatographic determination of 4-aminopyridine in plasma and urine after derivatization with benzoyl chloride, 1992, Clin. Biochem. 25:144.
Lemeignan, Analysis of the Action of 4-Aminopyridine on the Cat Lumbar Spinal Cord. 1. Modification of the Afferent Volley, the Monosynaptic Discharge Amplitude and the Polysynaptic Evoked Responses, 1972, Neuropharm. 11:551-558.
Linderoth et al., Peripheral Vasodilatation after Spinal Cord Stimulation: Animal Studies of Putative Effector Mechanisms, 1991, Neurosurgery 28(2):187-195.
Llinas et al., 3- and 4-Aminopyridine in Synaptic Transmission at the Squid Giant Synapse, in: Aminopyridines and Similarly Acting Drugs: Effects on Nerves, Muscles and Synapses, Lechat et al eds., Pergamon Press: Oxford, pp. 69-79, 1982.
Marchand et al., The effects of dorsal column stimulation on measures of clinical and experimental pain in man, 1991, Pain 45:249-257.
Meglio et al., Spinal cord stimulation and peripheral blood flow: Part 1, in: Indications for Spinal Cord Stimulation. Y. Hosebuchi and T. Corbin (eds). Excerpta medica: Amsterdam, pp. 60-66, 1981.
Molgo, Effects of Aminopyridines on Neuromuscular Transmission, in: Aminopyridines and Similarly Acting Drugs: Effects on Nerves, Muscles and Synapses, Lechat et al. eds., Pergamon Press: Oxford, pp. 95-116, 1982.
Noble et al., Correlative Analyses of Lesion Development and Functional Status after Graded Spinal Cord Contusive Injuries in the Rat, 1989, Exp. Neurol. 103:34-40.
Noordenbos et al., Diverse Sensory Functions with an Almost Totally Divided Spinal Cord. A Case of Spinal Cord Transaction with Preservation of Part of One Anterolateral Quadrant, 1976, Pain 2:185-195.
Ochoa, Pain in local nerve lesions, in: Abnormal Nerves and Muscles as Impulse Generators, Culp et al. eds., Oxford University Press: New York, pp. 568-587, 1982.
Saade et al., Effects of 4-aminopyridine, GABA and bicuculline on cutaneous receptive fields of cat dorsal horn neurons, 1985, Brain Res. 344:356-359.
Saade et al., Cutaneous receptive field alterations induced by 4-aminopyridine, 1982, Brain Res. 232:177-180.
Segal et al., Decreased Systemic Clearance of Llorzepam in Humans with Spinal Cord Injury, 1991, J. Clin. Pharmacol. 31:651-656.
Semba et al., 4-Aminopyridine induces expansion of cutaneous receptive fields of dorsal horn cells, 1985, Brain Res. 343:398-402.
Shealy et al., Electrical Inhibition of Pain by Stimulation of the Dorsal Columns: Preliminary Clinical Report, 1967, Anesth. Analg. 46(4):489-491.
Smith et al., Spontaneous and Evoked Electrical Discharges from a Central Demyelinating Lesion, 1982, J. Neurol. Sci. 55:39-47.
Stefoski et al., 4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis, 1987, Ann. Neurol. 21(1):71-77.
Stefoski et al., 4-Aminopyridine in multiple sclerosis: Prolonged administration, 1991, Neurology 41:1344-1348.
Tapia et al., Mechanism of the Calcium-Dependent Stimulation of Transmitter Release by 4-Aminopyridine in Synaptosomes, 1985, Brain Res. 361:373-382.
Targ et al., 4-Aminopypridine leads to restoration of conduction in demyelinated rate sciatic nerve, 1985, Brain Res. 328:358-361.
Targ et al., Action Potential Characteristics of Demyelinated Rat Sciatic Nerve following Application of 4-Aminopyridine, 1986, Brain Res. 363:1-9.
Tasker, Pain Resulting From Central Nervous System Pathology (Central Pain), in: The Management of Pain, vol. 1, Bonica ed., Lea and Febiger: Philadelphia, pp. 264-283, 1990.
Thesleff, Aminopyridines and Synaptic Transmission, 1980, Neuroscience 5:1413-1419.
Uges et al., 4-Aminopyridine; Analysis of the Substance and a Method for the Preparation of a Solution for Injection in Man, 1981, Pharm. Acta Helv. 56(6):158-162.
Uges et al., 4-Aminopyridine kinetics, 1982, Clin. Pharmacol. Ther. 31(5):587-593.
Wagoner et al., Aminopyridines block an inactivating potassium current having slow recovery kinetics, 1990, Biophys. J. 58:1481-1489.
Waxman et al., Impulse Conduction in Inhomogeneous Axons: Effects of Variation in Voltage-Sensitive Ionic Conductances on Invasion of Demyelinated Axon Segments and Preterminal Fibers, 1984, Brain Res. 294:111-122.
Waxman et al., Ligature-Induced Injury in Peripheral Nerve: Electrophysiological Observations on Changes in Action Potential Characteristics Following Blockade of Potassium Conductance, 1985, Muscl. Nerve 8:85-92.
Xu et al., Chronic pain-related syndrome in rats after ischemic spinal cord lesion: a possible animal model for pain in patients with spinal cord injury, 1992, Pain 48:279-290.
Yeh et al., Interactions of Aminopyridines with Potassium Channels of Squid Axon M embranes, 1976a, Biophys. J. 16:77-81.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Yeh et al., Dynamics of Aminopyridine Block of Potassium Channels in Squid Axon Membrane, 1976a, J. Gen. Physiol. 68:519-535.
Schwid et al., Quantitative assessment of sustained-release 4-aminopyridine for symptomatic treatment of multiple sclerosis, 1997, Am. Acad. Neur. 48:817-821.
Higuchi et al., Pro-drugs as Novel Delivery Systems, 1987, vol. 14 of the A.C.S. Symposium Series.
Roche (ed.), Bioreversible Carriers in Drug Design-Theory and Application, American Pharmaceutical Assoc. and Pergamon Press, New York, 1987 (TOC).
Berge et al., Pharmaceutical Salts, 1977, J. Pharm. Sci 66(1):1-19.
U.S. Appl. No. 12/824,133, filed Jun. 25, 2010, Blight et al.
U.S. Appl. No. 12/824,135, filed Jun. 25, 2010, Blight et al.
U.S. Appl. No. 12/824,136, filed Jun. 25, 2010, Blight et al.
2nd Meeting of the Pharmacy Compounding Advisory Committee, May 6, 1999, Transcript (http://www.fda.gov/ohrms/docket/ac/99/transcpt/3513t1.rtf (last accessed Nov. 18, 2010).
Agoston et al., 1978, "Effects if 4-Aminopyridine in Eaton Lambert Syndrome," Br. J. Anesth., vol. 50:383-385.
Agoston et al.,1980, "Antagonism of Ketamine-Diazepam anaesthesia by 4-Aminopyridine in Human Volunteers," Br. J. Anaesth., vol. 52:367-369.
Aisen et al., 1995, "3,4-Diaminopyridine as a treatment for amyotrophic lateral sclerosis," J. of Neurological Sciences, vol. 129:21-24.
Aisen et al., 1996, "A double-blind placebo-controlled study of 3,4-diaminopyridine in amytrophic lateral sclerosis patients on a rehabilitation unit," J. of Neurological Sciences, vol. 138:93-96.
Albrecht et al., 2001, "Day-to-day variability of maximum walking distance in MS patients can mislead to relevant changes in the Expanded Disability Status Scale (EDSS): average walking speed is a more constant parameter," Multiple Sclerosis, vol. 7:105-109.
AMPYRA® (dalfampridine), Acorda Therapeutics, Inc., Prescribing Information, Jan. 2010. http://ampyra.com/local/files/PI.pdf (last accessed Nov. 3, 2010).
Ashworth et al., 1964, "Preliminary trial of carisoprodol in multiple sclerosis," Practitioner, vol. 192:540-542.
AVONEX® (interferon beta-1a), Biogen Idec Inc., Prescribing Information, Oct. 2008. http://www.avonex.com/pdfs/pi_luer_lock.pdf (last accessed Nov. 3. 2010).
Ball et al., 1979, "Human botulism caused by *Clostridium botulinum* Type E: the Birmingham Outbreak," Quarterly Journal of Med. New Series XLVIII, vol. 191:473-491.
Bertelsmann et al., 1992, "Comparison between 4-aminopyridine and 3,4diaminopyridine in the treatment of multiple sclerosis," Annals of Neurology, vol. 32(2):256 (Abstract P100).
Betaseron® (Interferon Beta-1b) for SC injection, Bayer HealthCare Pharmaceuticals Inc., Prescribing Information, May 2010. http://berlex.bayerhealthcare.com/html/products/pi/Betaseron_PI.pdf (last accessed Nov. 3, 2010) (pp. 1-10).
Bever et al., 1995, "Experience with slow release 4-aminopyridine in multiple sclerosis patients: Long term tolerability and safety," Journal of Neuroimmunology, 1 Suppl. 58.
Bever et al., 1995, "The brief repeatable battery of neuropsychological tests for multiple sclerosis: a preliminary serial study," Multiple Sclerosis, vol. 1:165-169.
Bever et al., 1995, "The Pharmacokinetics and Tolerability of a Slow-Release Formulation of 4-Aminopyridine in Multiple Sclerosis Patients," Neurol. vol. 45(Suppl 4):A351 (Abstract 684P).
Bever et al., 1996, "Treatment with oral 3,4 diaminopyridine improves leg strength in multiple sclerosis patients: Results of a randomized, double-blind, placebo-controlled, crossover trial," Neurol., vol. 47:1457-1462.
Bever et al., 2009, "Sustained-release fampridine for multiple sclerosis," Expert Opin. Investig. Drugs, vol. 18(7):1013-1024.
Blight et al., 2001, "Acute spinal cord injury: Pharmacotherapy and drug development perspectives," Curr. Opin. Investig. Drugs, vol. 2(6):801-08.
Blight., 2002, "Miracles and molecules—progress in spinal cord repair," Nature Neuroscience, vol. 5:1051-1054.
Blight, 1989, "Effect of 4-aminopyridine on axonal conduction-block in chronic spinal cord injury," Brain Res. Bull., vol. 22(1):47-52.
Blight, 1991, "Morphometric analysis of blood-vessels in chronic experimental spinal-cord injury: hypervascularity and recovery of function," J of Neurol Sci., vol. 106(2):158-174.
Blight, 1998, "Containing plasticity: neurite inhibitory factors of myelin," Nat. Neurosci., vol. 1(2):87-88.
Blight, 2004,"Just one word: plasticity," Nat. Neurosci., vol. 7(3):206-08.
Booij et al., 1978, "Neostigmine and 4-Aminopyridine Antagonism of Lincomycin-Pancuronium Neuromuscular Blockade in Man," Anesth. Analg., vol. 57:316-321.
Bowman et al., 1981, "Actions of 4-aminopyridine on the cardiovascular systems of anaesthetized cats and dogs," Br. J. Anaesth., vol. 53:555-565.
Bowman et al., 1981, "Pharmacological actions of aminopyridines and related compounds," Rev. Pure Appl. Phamacol. Sci., vol. 2(4):317-371.
Bronnum-Hansen et al., 2005, "Suicide among Danes with multiple sclerosis," J. of Neurol. Neurosurg. Psych., vol. 76:1457-1459.
Bruckner et al., 2000, "Effects of standard anticonvulsant drugs on different patterns of epileptiform discharges induced by 4-aminopyridine in combined entorhinal cortex-hippocampal slices," Brain Res., vol. 859(1):15-20.
Bugaresti et al., 2001, "Pharmacokinetics and safety of single oral doses of fampridine-SR (sustained-release 4-aminopyridine) tablets in patients with chronic spinal cord injury," Presented to the American Academy of Physical Medicine and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Calabresi et al., 1993, "Progressive spinal multiple sclerosis," Seminars in Neurology, vol. 13(4):322-332.
Capacio et al., 1997, "Pharmacokinetics and pharmacodynamics of 4-aminopyridine in awake guinea pigs," Drug Chem. Toxicol., vol. 20(3):151-172.
Cardenas E et al., 2007, "Phase 2 trial of sustained-release fampridine in chronic spinal cord injury," Spinal Cord, vol. 4592:158-168.
Carlsson et al., 1983, "Can 4-aminopyridine be used to reverse anaesthesia and muscle relaxation?" Acta Anaesth. Scand., vol. 27:87-90.
Chalk et al., 1990, "Response of the Lambert-Eaton myasthenic syndrome to treatment of associated small-cell lung carcinoma," Neurology, vol. 40(10):1552-1556.
Clinicaltrial.gov, Efficacy, safety, and tolerability of Nerispirdine in patients with multiple sclerosis, ClinicalTrials.gov. http://clinicaltrials.gov/show/NCT00811902 (last accessed Nov. 2, 2010).
Coetzee et al., 1999, "Molecular diversity of K+ channels," Ann. NY Acad. Sci., vol. 868:233-285.
Cohen et al., 1999, "Utilization of the multiple sclerosis functional composite as an outcome measure in the phase 3 trial of interferon beta-1a (Avonex®) in secondary progressive multiple sclerosis (IMPACT)," Neurology, vol. 62 (6 Supp. 2):A548-S549 (Abstract S74.002).
Cohen et al., 2000, "Intrarater and interrater reliability of the MS functional composite outcome measure," Neurology, vol. 54:802-806.
Cohen et al., 2000, "One-year change in the multiple sclerosis functional composite and expanded disability status scale in the phase 3 trial of interferon beta-1a in secondary progressive multiple sclerosis (IMPACT)," Neurology, vol. 54 (7 Supp. 3):A215 (Abstract S30.02).
Cohen et al., 2001, "Use of the multiple sclerosis functional composite as an outcome measure in a phase 3 clinical trial," Arch. Neurol. vol. 58:961-967.
Cohen et al., 2001, "Results of IMPACT, a phase 3 trial of interferon beta-1a in secondary progressive multiple sclerosis," Neurology, vol. 56 (8 Supp. 3):A148-149 (Abstract S20.003).
Cohen et al., 2002, "Benefit of interferon beta-1a on MSFC progression in secondary progressing MS," Neurology, vol. 59(5):679-687.
Cohen et al., 2005, "Responder analysis of walking speed applied to a trial of fampridine in subjects with MS," 57th Annual Meeting of the American Academy of Neurology, Miami, FL, Apr. 9-16, 2005 (Poster).
Confavreux and Compston, 2005, "Disease-modifying treatments in multiple sclerosis," Chap. 18 in McAlpine's Multiple Sclerosis, 4th ed., Compston et al., (eds.), Churchill Livingstone Elsevier, pp. 765-770.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Confavreux and Compston, 2005, "The person with multiple sclerosis: a prospectus," Chap. 19, in McAlpine's Multiple Sclerosis 4th ed., Compston et al. (eds.), Churchill Livingstone Elsevier, pp. 805-810.
Confavreux and Compston, Dec. 2005, "The natural history of multiple sclerosis," Chap. 4 in McAlpine's Multiple Sclerosis, 4th Ed., Compston et al. (eds.) Churchill Livingstone Elsevier, pp. 193-196.
Consortium of Multiple Sclerosis Centers (CMSC), Annual Meeting, Jun. 7, 2002 (Poster).
Cooke et al., 1994, "Lambert-Eaton myasthenic syndrome: evaluation of movement performance following drug therapy," Electromyogr. Clin. Neurophysiol. vol. 34(2):87-93.
COPAXONE® (glatiramer acetate), TEVA Neuroscience, Inc., Prescribing Information, Feb. 2009. http://www.copaxone.com/pdf/PrescribingInformation.pdf (last accessed Nov. 3, 2010).
Cowen and Company—Acorda Therapeutics, Nov. 19, 2010 (p. 1-18).
Cowen and Company, "Acorda Therapeutics," Aug. 3, 2010 (pp. 1-5).
Crenshaw et al. 2006, "Gait variability in people with multiple sclerosis," Multiple Sclerosis, vol. 12:613-691.
Darlington, 2000, "Fampridine Acorda Therapeutics," Curr. Opin. Investig. Drugs, vol. 1(3):375-379.
Davis et al., 1995, "Mechanism of Action of 4-Aminopyridine in the Symptomatic Treatment of Multiple Sclerosis," Ann. Neurol., vol. 37(5):684.
de Waal et al., 1994, "The treatment of multiple sclerosis (MS): 4-aminopyridine (4-AP)," J. of Neurology, vol. 241:S102 (Abstract 11).
DeForge et al., 2004, "The effect of 4-aminopyridine on gait in ambulatory spinal cord injuries: a double-blind, placebo-controlled, crossover trial," Spinal Cord, vol. 42:674-685.
Department of Health & Human Services, Mar. 29, 2010, Warning Letter, http://www.fda.gov/dowloads/ICECI/EnforcementActions/WarningLetters/2001/UCM069491.pdf (last accessed Nov. 16, 2010).
Ditunno et al., 2002, "Double-blinded placebo-controlled, dose-escalating study evaluating the safety and efficacy of oral doses of fampridine-SR (sustained-release-aminopyridine) in patients with chronic spinal cord injury," First Meeting of the American Spinal Injury and the Intl Medical Society of Paraplegia, Vancouver, Canada, May 3-6, 2002 (Poster).
Ditunno et al., 2002, "Double-blind, placebo-controlled, dose-escalating study evaluating the safety and efficacy of oral doses of fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic spinal cord injury," American Spinal Association Twenty-Eight Annual Meeting, p. S35-S36 (Abstract # 78).
Donovan et al., 2000, "Intravenous infusion of 4-AP in chronic spinal cord injured subjects," Spinal Cord, vol. 38:7-15.
Dubuc et al., 1986, "The effects of 4-aminopyridine on the spinal cord: rhythmic discharges recorded from the peripheral nerves," Brain Res., vol. 369:243-259.
Edgley et al., 1991, "A survey of multiple sclerosis. Part 2: Determinants of employment status," Can. J. Rehab., vol. 4(3):127-132.
Eriksson et al., 2002, "Epileptic seizures, cranial neuralgias and paroxysmal symptoms in remitting and progressive multiple sclerosis," Mult. Scler. vol. 8(6):495-499.
Evenhius et al., 1981, "Pharmacokinetics of 4-aminopyridine in human volunteers. A preliminary study using a new GLC method for its estimation," Br. J. Anaesth., vol. 53:567-570.
EXTAVIA® (interferon beta-1b), Novartis Pharmaceuticals Inc., Prescribing Information, Aug. 2009. http://www.pharma.us.novartis.com/product/pi/pdf/extavia.pdf (last accessed Nov. 3, 2010).
Faculty, Doctors, Staff, Department of Neurology, Columbia University, New York, http://web.neuro.columbia.edu/members/profiles.php?id=91 (last accessed Nov. 17, 2010).
FDA Approval Letter NDA 022250, Jan. 22, 2010.
FDA Guidance for Industry: Bioanalytical Method Validation (May 2001) (pp. 1-22).
FDA Guidance for Industry: Bioavailability and Bioequivalence Studies for Orally Administered Drug Products—General Considerations (Mar. 2003) (pp. 1-23).
FDA Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of in Vitro / in Vivo Correlations (Sep. 1997) (pp. 1-24).
FDA Guidance for Industry: Food-Effect Bioavailability and Fed Bioequivalence Studies (Dec. 2002) (pp. 1-9).
Feinstein, 2004, "The neuropsychiatry of multiple sclerosis," Can. J. Psychiatry, vol. 49:157-163.
Fingerman, et al., 2000, "The overactive bladder in multiple sclerosis," J. Am. Osteopath. Assoc., vol. 100(Suppl):S9-S12.
Fischer et al., 1999, "The Multiple Sclerosis Functional Composite measure (MSFC): an integrated approach to MS clinical outcome assessment," Mult. Scler., vol. 5:244-250.
Fischer et al., 2001, Multiple Sclerosis Functional Compositie (MSFC), Administration and Scoring Manual, rev. Oct. 2001, National Multiple Sclerosis Society, New York, pp. 1-41.
Fleming et al., 1994, "Patterns of comorbidity in elderly patients with multiple sclerosis," J. Clin. Epidemiol., vol. 47:1127-1132.
Folkert, 2005, "Neuropathologic Substrate of Cerebral Palsy," J. Child Neurol. vol. 20:940-949.
Friend et al., 1999, "Language Functions in Patients with Multiple Sclerosis," Clin Neuropsychologist, vol. 13(1):78-94.
Gean, 1990, "The epileptiform activity induced by 4-aminopyridine in rat amygdale slices: antagonism by non-N-methyl-D-aspartate receptor antagonists," Brain Res., vol. 530:251-256.
GILENYA® (fingolimod), Novartis Pharmaceuticals Corporation, Prescribing Information, Sep. 2010. http://www.pharma.us.novartis.com/product/pi/pdf/gilenya.pdf (last accessed Nov. 9, 2010).
Glasauer et al., 2005, "4-Aminopyridine restores visual ocular motor function in upbeat nystagmus," J. Neurol. Neurosurg. Psychiatry, vol. 76:451-453.
Glasauer et al., 2005, "Effect of 4-aminopyridine on upbeat and downbeat nystagmus elucidates the mechanism of downbeat nystagmus," Ann. NY Acad. Sci., vol. 1039:528-531.
Gold et al., 1996, "Characterization of six voltage-gated K+ currents in adult rat sensory neurons," J. Neurophysiol., vol. 75:2629-2646.
Goodman et al., 2002, "Placebo-controlled double-blinded dose ranging study of Fampridine-SR in multiple sclerosis," P308, ACTRIMS-ECTRIMS, Abstracts of the 7th Annual Meeting of the Americas Committee for Treatment and Research in Multiple Sclerosis and 18th Congress of the European Committee for Treatment and Research in Multiple Sclerosis, Sep. 18-21, 2002, Baltimore, Maryland, USA, Mult. Scler. vol. 8 Suppl Posters S116-S117, (P308).
Goodman et al., 2003, "Placebo-controlled double-blinded dose ranging study of fampridine-SR in multiple sclerosis," Neurology, vol. 60 (5 Suppl. 1), Abstract 521.001, p. A167.
Goodman et al., 2004, "Phase 2 trial of fampridine-SR (sustained-release 4-aminopyridine) in multiple sclerosis," 20th European Committee for Treatment and Research in Multiple Sclerosis, Vienna, Austria, Oct. 6-9, 2004 (Poster).
Goodman et al., 2004, "Phase 2 trial of fampridine-SR in multiple Sclerosis," Multiple Sclerosis, vol. 10(2):S273 (Abst. P694).
Goodman et al., 2004, "Phase two trial of fampridine-SR in multiple sclerosis," Multiple Sclerosis, vol. 11(1):111.
Goodman et al., 2005, "Clinical meaningfulness of consistent improvement on the timed 25 foot walk (TW25) during treatment with fampridine," 130th Annual Meeting of the American Neurological Association, San Diego, CA, Sep. 25-28, 2005 (Poster).
Goodman et al., 2005, "Stability and interrelatedness of the 12-item multiple sclerosis walking scale and the timed 25 foot walk during a 3 month clinical trial," Presented at the ECTRIMS/ACTRIMS Congress, Thessaloniki, Greece, Sep. 2005 (Poster).
Goodman et al., 2005, "Clinical meaningfulness of consistent improvement on the timed 25-foot walk (TW25) during treatment with fampridine," Annals of Neurology, vol. 58(Suppl. 9):S26 (94).
Goodman et al., 2005, "Stability and interrelatednes of the 12-item multiple sclerosis waking scale and the timed 25 foot walk during a 3 month clinical trial," Multiple Sclerosis, vol. 11:S102-S103 (P398).
Goodman et al., 2008, "Dose comparison trial of sustained-release fampridine in multiple sclerosis," Neurology 71:1130-1134.
Goodman et al., 2009, "Sustained-release oral fampridine in multiple sclerosi: a randomsed, double-blind, controlled trial," Lancet, vol. 373:732-738.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Goodman et al., 2010, "A phase 3 trial of extended release oral dalfampridine in multiple sclerosis," Ann Neurol., vol. 68(4):494-502.
Graziani et al., 2002, "Two multicenter trials demonstrate potential efficacy of fampridine-SR (sustained-release 4-aminopyridine) for spasticity management in subjects with chronic spinal cord injury," 63rd Annual Academy of Physical Medicine and Rehabilitation Assembly, Orlando, FL Nov. 21-23, 2002 (Poster).
Grijalva et al., 2003, "The efficacy and safety of 4-aminopyridine in patients with long-term spinal cord injury: a randomized, double-blind, placebo-controlled trial," Pharmacotherapy, vol. 23:823-834.
Gutman et al., 2005, "International Union of Pharmacology. LIII. Nomenclature and molecular relationships of voltage-gated potassium channels," Pharmacol. Rev., vol. 57(4):473-508.
Guy W. Ecdeu Assessment Manual for Psychopharmacology—Revised (DHEW Publ No. ADM 76-338). US Dept of Health Education & Welfare, Public Heath Service, Div of Exramural Research Programs, 1976: 218-222.
Haghighi et al., 1995, "Effect of 4-aminopyridine in acute spinal cord injury," Surg. Neurol., vol. 43(5):443-447.
Haghighi et al., 1998, "Effect of 4-aminopyridine and single-dose methylprednisolone on functional recovery after a chronic spinal cord injury," Spinal Cord, vol. 36:6-12.
Halter et al., 2000, "Intrathecal administration of 4-aminopyridine in chronic spinal injured patients," Spinal Cord, 38(12):728-732.
Hapoalim Securities, "Acorda Therapeutics (ACOR )," Nov. 1, 2010 (pp. 1-10).
Hapoalim Securities, "Acorda Therapeutics, (ACOR," Aug. 4, 2010 (pp. 1-7).
Hassan et al.,1980, "Double-blind comparison of single doses of DS103-282, baclofen and placebo for suppression of spasticity," J. of Neurology Neurosurgery and Psychiatry, vol. 43:1132-1136.
Hauser et al., 1993, "Incidence of epilepsy and unprovoked seizures in Rochester, Minnesota: 1935-1984," Epilepsia, 34(3):453-468.
Hayes et al., 1993, "Preclinical Trial of 4-Aminopyridine in Patients with Chronic Spinal Cord Injury," Paraplegia, vol. 31:216-224.
Hayes et al., 1994, "4-Aminopyridine sensitive neurologic deficits in patients with spinal cord injury," J. Neurotrauma, 11(4):433-446.
Hayes et al., 2001, "Open-label, multiple-dose study to determine the pharmacokinetics and safety of fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic spinal cord injury," Presented to the American Neurological Association, Chicago, Il, Sep. 30-Oct. 3, 2001 (Poster).
Hayes et al., 2001, "Open-label, multiple-dose study to determine the pharmacokinetics and safety of fampridine-SR in patients with chronic spinal cord injury," Annals of Neurology, vol. 50(31):S62 (201).
Hayes et al., 2001, "Pharmacokinetics and safety of multiple oral doses of fampridine-SR (sustained-release 4-aminopyridine) tablets in patients with chronic spinal cord injury," Presented to the Academy of Physical Medicine and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Hayes, 2004, "The Use of 4-Aminopyridine (Fampridine) in Demyelinating Disorders," CNS Drug Reviews, vol. 10(4):295-316.
Hobart et al., 2003, "Measuring the impact of MS on walking ability: the 12-Item MS Walking Scale (MSWS-12)," J. Neurology, vol. 60:31-36.
Hoogervorst et al., 2004, "The patient's perception of a (reliable) change in the Multiple Sclerosis Functional Composite," Multi. Scler., vol. 10:55-60.
International Preliminary Report on Patentability with Written Opinion from International Application No. PCT/US04/08101, issued Sep. 23, 2005.
International Preliminary Report on Patentability with Written Opinion from International Application No. PCT/US05/012427, issued Oct. 11, 2006.
International Search Report from International Application No. PCT/US04/08101, mailed Aug. 26, 2004.
International Search Report from International Application No. PCT/US05/12427, mailed Dec. 28, 2005.
International Search Report from International Application No. PCT/US09/56476, mailed Nov. 10, 2009.
International Search Report from International Application No. PCT/US10/23969, mailed Apr. 1, 2010.
International Search Report from International Application No. PCT/US10/23970, mailed Apr. 5, 2010.
Iriarte et al., 2000, "Modalities of fatigue in multiple sclerosis: correlation with clinical and biological factors," Mult. Scler., vol. 6:124-130.
Isoda et al., 2003, "The effects of 4-aminopyridine on cardiac repolarization, PR interval, and heart rate in patients with spinal cord injury," Pharmacotherapy, vol. 23:133-136.
J.P. Morgan, "Acorda Therapeutics," Aug. 3, 2010 (p. 1-7).
Jackson et al., 2002, "Twice-daily fampridine-SR (sustained-release 4-aminopyridine): safety and early efficacy experience in 151 patients with chronic motor-incomplete spinal cord injury," 127th Annual Meeting American Neurological Association, NY, NY Oct. 13-16, 2002 (Poster).
Jones et al., 1983, "Effects of 4-Aminopyridine in Patients with Multiple Sclerosis," J. Neurol Sci., vol. 60:353-362.
Judge et al., 1999, "Inactivation gating and 4-AP sensitivity in human brain Kv1.4 potassium channel," Brain Research, vol. 831:43-54.
Judge et al., 2002, Determinants of 4-Aminopyridine Sensitivity in a Human Brain Kv1.4K+ Channel: Phenylalanine Substitutions in Leucine Heptad Repeat Region Stabilize Channel Closed State, Mol. Pharmacol., vol. 61:913-920.
Kachuck, 2009, "Sustained release oral fampridine in the treatment of multiple sclerosis," Expert Opinion, vol. 10(12):12:2025-2035.
Kalla et al., 2004, "4-aminopyridine improves downbeat nystagmus, smooth pursuit, and VOR gain," Neurology, 62(7):1228-1229.
Katz et al., 2001, "Pharmacokinetics and safety of single oral doses of fampridine (immediate-release 4-aminopyridine) capsules in health volunteers," Presented to the American Academy of Physical and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Katz et al., 2002, "Pharmacokinetics and excretion of a single oral dose of 14c-labeled fampridine (4-aminopyridine) in healthy volunteers," 1st Joint Mtg of the American Spinal Injury Association and the Intl. Medical Society of Paraplegia, Vancouver, Canada, May 3-6, 2002 (Poster).
Kaufman et al., 2000, "The significant change for the timed 25-foot walk in the Multiple Sclerosis Functional Composite," Mult. Scler., 5:286-290.
Kobelt et al. 2006, Costs and quality of life in multiple sclerosis: a cross-sectional study in the United States, Neurology, vol. 66:1696-1702.
Kos et al., 2004, "Letter to the Editor," Multiple Sclerosis, Jun. 1, 2004, 10/3 (337-338.
Kovacs et al., 2003, "Seizure, neurotransmitter release, and gene expression are closely related in the striatum of 4-aminopyridine-treated rats," Epilepsy Res., vol. 55(1-2):117-129.
Kurtzke et al., 1983, "Rating neurologic impairment in multiple sclerosis: an expanded disability status scale (EDSS)," Neurology, 33:1444-1452.
Lammertse et al., 2002, "Clinical evaluation of oral fampridine-SR (sustained-release 4-aminopyridine) in subjects with chronic motor-incomplete spinal cord injury," 54th Annual Meeting of the American Academy of Neurology, Denver, CO, Apr. 13-20, 2002 (Poster).
Lammertse et al., 2002, " Evaluation fampridine-SR in patients with chronic spinal cord injury," 48th Conference of the Paraplegia Society, Las Vegas, NV, Sep. 3-5, 2002 (Poster).
Lammertse et al., 2002, "Clinical evaluation of oral fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic motor-incomplete spinal cord injury," Neurology, vol. 58 (7 Suppl. 3): A33 (P01.035).
Landete et al., 1998, "Low doses of 4-aminopyridine in the treatment of multiple sclerosis," Multiple Sclerosis, 4:386 (Abstract P3047).
Lazard Capital Markets, "Acorda Therapeutics (ACOR)," Aug. 24, 2010 (pp. 1-15).
Lazard Capital Markets, "Acorda Therapeutics," Aug. 3, 2010 (pp. 1-3).
Leary et al., 2003, "Interferon beta-1a in primary progressing MS—An exploratory, randomized, controlled trial," Neurology, vol. 60:44-51.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Lemeignan et al., 1981, "The ability of 4-aminopyridine and 3,4-diaminopyridine to cross the blood-brain barrier can account for their difference in toxicity," Adv. Biosci., 35:222.
Liang et al., 2005, "Effects of pelvic nerve neurectomy and estrogen on the M2 muscarinic receptor of the urinary bladder," Chang Gung Med. J., vol. 28:786-793.
Loss of mobility found to impact quality of life and emotional and financial health of most people living with multiple sclerosis, National Multiple Sclerosis Society, Mar. 2008, http://www.nationalmssociety.org/news/news-detail/index.aspx??nid=199 (last accessed Nov. 3, 2010).
Lublin et al., 1996, "Defining the clinical course of multiple sclerosis: Result of an international survey," Neurology, vol. 46:907-911.
Lundh et al., 1977, "4-Aminopyridine—A new drug tested in the treatment of Eaton-Lambert syndrome," J. Neuro. Neurosurg. Psych., vol. 40:1109-1112.
Lundh et al., 1979, "Effects of 4-Aminopyridine in *Myasthenia gravis*," J. Neuro. Neurosurg. Psychiatry, 42:171-175.
Lundh et al., 1979, "Effects of 4-aminopyridine on statistical parameters of transmitter release at the neuromuscular junction," Acta Pharmacol. Toxicol., 44(5):343-346.
Lundh et al., 1982, "Lack of effect of 4-aminopyridine on choreic movements," J. Neurol. Neurosurg. Psychiatry, vol. 45(3):274-275.
Lundh et al., 1983, "Novel drug of choice in Eaton-Lambert syndrome," J. Neurol. Neurosurg. Psychiatry, vol. 46(7):684-685.
Lundh, 1978, "Effects of 4-aminopyridine on neuromuscular transmission," Brain Research, vol. 158(2):307-318.
Magdalan et al., 2003, "[Successful treatment by 4-aminopyridine of three cases of severe verapamil poisoning]," [Article in Polish] Przegl. Lek., vol. 60(4):271-273 (English translation attached).
Martin et al., 2006, "Gait and balance impairment in early multiple sclerosis in the absence of clinical disability," Multiple Sclerosis vol. 12:620-628.
Martinez-Aguirre E. 1982, "Antagonism of ketamine by 4-aminopyridine and physostigmine," Br. J. Anesth., 54(1):110.
Martinez-Aguirre et al., 1986, "Comparison of midazolam (RO 21-3981) and diazepam as complement of ketamine-air anesthesia in children," Acta Anesth. Belg., vol. 37(1):15-22.
Martinez-Aguirre, 1980, "Antagonism of 4-aminopyridine to ketamine-diazepam anesthesia in children," Acta Anaesthesiol. Belg., 31(4):289-291.
Martinez-Gonzalez et al., 2004, "Influence of enteric-coated lactose on the release profile of 4-aminopyridine from HPMC matrix tablets," Pharmaceutical Development and Technology, vol. 9(2):145-153.
Matthews, 1998, "Symptoms and signs of multiple sclerosis," Chap. 5, in McAlpine's Multiple Sclerosis, 3d ed., Compston et al., (eds), Churchill Livingstone, at pp. 145-190; McDonald & Compston.
Matthews, B., 1998, "Differential diagnosis of multiple sclerosis and related disorders," Chap. 4 in McApline's Multiple Sclerosis, Compston et al. (eds.), Churchill Livingstone at pp. 228-243.
McDonald & Compston, 2005, "The symptoms and signs of multiple sclerosis," Chapter 6, in McAlpine's Multiple Sclerosis, 4th ed., Compston et al., (eds.), Churchill Livingstone Elsevier, at pp. 287-346.
McGuigan et al., 2004, "Confirming the validity and responsiveness of the Multiple Sclerosis Walking Scale-12 (MSWS-12)," Neurology, 62:2103-2105.
Medical Research Council (MRC), 1976, "Memorandum No. 45—Aids to the examination of the peripheral nervous system, London: Her Majesty's Stationery Office," Printed in London for Her Majesty's Stationary Office, The White Rose Press, Mexborough and London, pp. 1-62.
Metz et al., 1998, "Urinary tract infections may trigger relapse in multiple sclerosis," Axone, vol. 19:67-70.
Mihai et al., 1997, "Selection criteria for interferon beta 1-b in multiple sclerosis patients," Neurology, vol. 48 (3 Suppl. 2):A348 (S48.005).
Miller et al., 1979, "4-Aminopyridine Potentiates Neostigmine and Pyridostigmine in Man," Anesthesiology, vol. 50:416-420.
Molgo et al., 1977, "Effects of 4-aminopyridine at the frog neuromuscular junction," J. Pharmacol Exp. Ther., vol. 203(3):653-663.
Molgo et al., 1980, "Potency of 3,4-diaminopyridine and 4-aminopyridine on mammalian neuromuscular transmission and the effect of pH changes," Eur. J. Pharmacol., 61(1):25-34.
Moritoki et al., 1978, "Actions of aminopyridines on guinea-pig ileum," Arch. Int. Pharmacodyn. Ther., vol. 232:28-41.
Morning Show Ratings—TvNewser, Ratings of Week of Nov. 1, 2010, http://www.mediabistro.com/tvnewser/category/morning-show-ratings (last accessed Nov. 17, 2010).
MS Hope for a Cure, http://www.mshopeforacure.org/board.php#elissa (last accessed Nov. 17, 2010).
Murray et al., 1981, "Treatment with Oral 4-Aminopyridine in Disorders of Neuromuscular Transmission," Neurology, 31:265-271.
Murray, 2000, "The History of Multiple Sclerosis," Multiple Sclerosis, Diagnosis, Medical Management, and Rehabilitation: Demos Medical Publishing, Inc., pp. 1-32.
National Multiple Sclerosis Society homepage on the Internet, http://www.nationalmssociety.org/index.aspx (last accessed Nov. 2, 2010).
National Multiple Sclerosis Society, "FSS and EDSS," http://www.nationalmssociety.org/for-professionals/reearchers/clinical-study-measures/fss-and-edss/index.aspx (last accessed Nov. 17, 2010).
Ng et al., 1987, "Studies on the calcium dependence of human NK cell killing," Biochem. Pharmacol., 36:3943-3949.
Nicoletti et al., 2003, "Epilepsy and multiple sclerosis in Sicily: a population-based study," Epilepsia, 44(11):1445-1448.
Noseworthy, 2003, "Multiple Sclerosis and Related Conditions," Chap.97, in Neurological Therapeutics: Principle and Practices, vol. 1, Noseworthy, JH (ed.) pp. 1107-1131.
NOVANTRONE® (interferon beta-1b), EMD Serono Inc., Prescribing Information, Sep. 2009. http://www.novantrone.com/assets/pdf/novantrone_prescribing_info.pdf (last accessed Nov. 3, 2010) (pp. 1-34).
Office Action mailed Jun. 10, 2009 for U.S. Appl. No. 11/010,828, filed Dec. 13, 2004.
Office Action mailed Jun. 6, 2008 for U.S. Appl. No. 11/010,828, filed Dec. 13, 2004.
Office Action mailed May 25, 2010 for U.S. Appl. No. 11/010,828, filed Dec. 13, 2004.
Ogawa et al., 1986, "Combined mutagenicity of cobalt(II) salt and heteroaromatic compounds in *Salmonella typhimurium*," Mutation Research, 172:97-104.
Oh et al., 2003, "Inhibitory effects of potassium channel blockers on carbachol-induced contraction in rat detrusor muscle," J. Korean Med. Sci., 18:701-706.
Olaffson et al., 1999, "Risk of epilepsy in patients with multiple sclerosis: a population-based study in Iceland," Epilepsia, vol. 40(6):745-747.
Olafsson et al., 1996, "Incidence of epilepsy in rural Iceland: a population-based study," Epilepsia, 37(19):951-955.
Oosterhuis HJ. 1996, "Severe 4-aminopyridine intoxication in a body-builder. Letter to the Editor," Ned. Tijdschr. Geneeeskd., 140(8):452 [Translation provided].
Oremus et al., 2000, "Review of outcome measurement instruments in Alzheimer's Disease drug trials: psychometric properties of global scales," J. Geriatr. Psychiatry Neurol. , vol. 13: 197-205.
Pant et al., 1982, "Calcium dependent 4 aminopyridine stimulation of protein phosphorylation in squid loligo-pealei optic lobe synaptosomes," Cellular and Molecular Neurobiology, vol. 3(3):223-238.
Paskov et al., 1973, "New Anti-Curare and Analeptic Drug, Pimadin, and its Use in Anesthesia," Eksp. Khir. Anestheziol., 18(4):48-52 (English translation provided).
Pearson, et al., 2004, "Quantification of walking mobility in neurological disorders," Q. J. Med. New Series, vol. 97:463-475.
Pena et al., 2000, "Seizures and neurodegeneration induced by 4-aminopyridine in rat hippocampus in vivo: role of glutamate- and GABA-mediated neurotransmission and of ion channels," Neuroscience, vol. 101(3):547-561.
Pickett et al., 1996, "Atypical presentation of 4-aminopyridine overdose," Ann. Emerg. Med., 27:382-385.
Pickett et al., 1996, "Fampridine Overdose," Reactions, vol. 30(594):8.
Piper Jaffray, "Acorda Therapeutics," Nov. 2, 2010 (pp. 1-8).

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Pogue et al., 1998, "Overcoming the limitations of current meta-analysis of randomized controlled trials," Lancet, vol. 351: 47-52.
Polman et al., 1990, "4-Aminopyridine in Multiple Sclerosis," Ann. Neurol., vol. 28(4):589.
Polman et al., 1994, "4-Aminopyridine is Superior to 3,4-Diaminopyridine in the Treatment of Patients With Multiple Sclerosis,"Arch. Neurol., vol. 51:1136-1139.
Polman et al., 1994, "4-Aminopyridine in the Treatment of Patients With Multiple Sclerosis," Arch. Neurol., vol. 51:292-296.
Poser et al., 2003, "Epilepsy and multiple sclerosis," Epilepsy & Behavior, vol. 4:6-12.
Potter et al., 1993, "Effects of intravenous 4-aminopyridine on central conduction in persons with incomplete spinal cord injury," Clinical and Investigative Medicine, vol. 16(4Suppl.):B111 (Abstract 693).
Potter et al., 1998, "Randomized double-blind crossover trial of Fampridine-SR (sustained release 4-aminopyridine) in patients with incomplete spinal cord injury," Neurotrauma, vol. 15(10):837-849.
Potter et al., 1998, "Sustained Improvements in Neurological Function in Spinal Cord Injured Patients Treated with Oral 4-Aminopyridine: Three Cases," Spinal Cord, 36:147-155.
Press Release, Sanofi-Aventis (Apr. 29, 2010), http://en.sanofi-aventis.com/press/press_releases/2010/ppc_28189.asp (last visited Nov. 2, 2010).
Prous et al., 1995, "Fampridine: agent for multiple sclerosis," Drugs of the Future, vol. 20:142-143.
Qiao et al., 1997, "Effects of 4-aminopyridine on motor-evoked potentials in patients with spinal cord injury," J. Neurotrauma, vol. 14(3):135-149.
REBIF® (interferon beta-la), EMD Serono Inc. and Pfizer Inc., Prescribing Information, Sep. 2009. http://www.emdserono.com/cmg.emdserono_us/en/images/rebif_tcm115_19765.pdf (last accessed Nov. 3, 2010).
Riggs JE, 1982, "Pharmacologic enhancement of neuromuscular transmission in *Myasthenia gravis*," Clin. Neuropharmacol., vol. 5(3):277-292.
Romani et al., 2004, "Fatigue in multiple sclerosis: multidimensional assessment and response to symptomatic treatment," Mult. Scler., 10:462-468.
Ropper and Brown (eds), 2005, "Epilepsy and Other Seizure Disorders," Adams and Victor's Principles of Neurology. Eighth Edition. Blacklick, OH: McGraw-Hill Professional, Chapter 16, pp. 271-301.
Rossini et al., 1996, 4-Aminopyridine treatment in chronic progressive multiple sclerosis: a 6 month double-blind placebo-controlled, crossover study by AMIT (American Italian Study). Europ. J. of Neurol., vol. 3 (Suppl 5):91, Abstract P208.
Rossini et al., 2001, "Fatigue in progressive multiple sclerosis: results of a randomized, double-blind, placebo-controlled, crossover trial of oral 4-aminopyridine," Multiple Sclerosis, vol. 7:354-358.
Ruddick et al., 1999, "Selecting relapsing remitting multiple sclerosis patients for treatment: The case of early treatment," J. of Neuroimmunology, vol. 98(1):22-28.
Rupp et al., 1983, "Pharmacokinetics and pharmacodynamics of 4-aminopyridine in anesthetized dogs," J. Pharmacol. Exp. Ther., vol. 225(2):351-354.
Rutecki et al., 1987, "4-Aminopyridine produces epileptiform activity in hippocampus and enhances synaptic excitation and inhibition," J. Neurophysiol., vol. 57(6):1911-1924.
Sadovnick et al., 1991, "Cause of death in patients attending multiple sclerosis clinics," Neurology, vol. 41:1193-1196.
Sander, 2003, "The epidemiology of epilepsy revisited," Curr. Opin. Neurol., vol. 16(2):165-170.
Sanders et al., 1980, "Eaton-Lambert syndrome: a clinical and electrophysiological study of a patient treated with 4-aminopyridine," J. Neurol. Neurosurg. Psychiatry, vol. 43(11):978-985.
Sandyk, 1996, "Weak electromagnetic fields potentiate the effects of 4-aminopyridine in multiple sclerosis," Intern. J. Neuroscience, vol. 85:125-129.
Scheinberg et al., 1980, "Multiple Sclerosis: Earning a living," NY State J. Med., 1395-1400.
Schneider et al., 1997, "Validity and reliability of the Alzheimer's Disease Cooperative Study—Clinical Global Impression of Change," Alzh. Disease Assoc. Dis., vol. 11(Suppl2):S22-S32.
Schwid et al., 1997, "Autoimmune hyperthyroidism in patients with multiple sclerosis treated with interferon beta 1-b," Archives of Neurology, vol. 57:1169-1170.
Schwid et al., 1997, "The measurement of ambulatory impairment in multiple sclerosis," Neurology, vol. 49:1419-1424.
Schwid et al., 1998, "Quantitative measures of motor fatigue in multiple sclerosis: Features of motor dysfunction distinct from weakness," Neurology, vol. 50 (4 Suppl. 4):A210-A211 (P04.036).
Schwid et al., 2000, "Are quantitative functional measures more sensitive to worsening MS than traditional measures?" Neurology, vol. 55(12):1901-1903.
Schwid et al., 2000, "Subjective fatigue is associated with impaired central motor conduction in MS patients , but motor fatigue is not," Neurology, vol. 54 (7 Supp. 3):A56 (P01.085).
Schwid et al., 2001, "The cost of delaying treatment in multiple sclerosis, what is lost is not regained," Neurology, vol. 56(12):1620.
Schwid et al., 2002, "Quantitative functional measures in MS: What is a reliable change?" Neurology, vol. 58:1294-1296.
Schwid et al., 2004, "Cognitive status after 10 years of prospective evaluation in patients with relapsing multiple sclerosis," Multiple Sclerosis, vol. 10(2):S123 (P141).
Segal et al., 1997, "4-Aminopyridine improves pulmonary function in quadriplegic humans with longstanding spinal cord injury," Pharmacotherapy, vol. 17(3):415-423.
Segal et al., 1998, "4-Aminopyridine alters gait characteristics and enhances locomotion in spinal cord injured humans," J. Spinal Cord Med., vol. 21(3):200-204.
Segal et al., 1999, "Safety and efficacy of 4-aminopyridine in humans with spinal cord injury: a long term, controlled trial," Phamacother., vol. 19(6):713-723.
Segal et al., 2002, "4-aminopyridine influences heart rate variability in long-standing spinal cord injury," Am. J. Ther., vol. 9(1):29-33.
Sharrack et al., 1999, "The Guy's Neurological Disability Scale (GNDS): a new disability measure for multiple sclerosis," Mult. Scler., vol. 5:223-233.
Sherratt et al., 1980, "Effects of 4-aminopyridine on normal and demyelinated mammalian nerve fibres," Nature, vol. 283(5747):570-572.
Shi et al, 1996, "Compression injury of mammalian spinal-cord in-vitro and the dynamics of action-potential conduction failure," J. of Neurophysiology, vol. 76(3):1572-1580.
Shi et al., 1995, "4-Aminopyridine affects conduction in injured spinal cord axons in vitro at clinically relevant concentrations," Society of Neuroscience Abstracts, vol. 21(1-3):1003, (395.3).
Shi et al., 1997, "Conduction block in acute and chronic spinal cord injury: different dose-response characteristics for reversal by 4-aminopyridine," Exp. Neurol., vol. 148:495-501.
Shi et al., 1997, "Differential Effects of Low and High Concentrations of 4-Aminopyridine on Axonal Conduction in Normal and Injured Spinal Cord," Neuroscience, vol. 77(2):553-562.
Shinohara et al., 1982, "Ion-pair high performance liquid chromatographic assay of 4-aminopyridine in serum," J Chrom (Biomed Appl), vol. 230:363-372.
Sia et al., 1979, "Effects of the Analeptic Drug, 4-Aminopyridine, upon Post-operative Respiratory Depression in Patients," Acta Anesth. Belg., vol. 30(Suppl):195-199.
Sia et al., 1981, "4-Aminopyridine reversal of fentanyl-induced respiratory depression in normocapnic and hypercapnic patients," Br. J. Anaesth., vol. 53(4):373-379.
Sia et al., 1981, "Use of 4-aminopyridine to reverse morphine-induced respiratory depression in man," Br. J. Anaesth., vol. 53(8):865-868.
Sia et al., 1982, "An electroencephalographic study of 4-aminopyridine," Anest. Analg., vol. 61(4):354-357.
Siegert et al., 2005, "Depression in multiple sclerosis: a review," J. Neurol. Neurosurg. Psychiatry, vol. 76:469-475.
Smeets et al., 1995, "Severe 4-aminopyridine intoxication in a bodybuilder," Ned. Tijdschr. Geneesdk., vol. 139(51):2667-2668.
Smith et al., 2000, "Effects of 4-aminopyridine on demyelinated axons, synapses and muscle tension," Brain, vol. 123:171-184.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Smits et al., 1994, "The effect of 4-aminopyridine on cognitive function in patients with multiple sclerosis: A pilot study," Neurology, Vol. 44:1701-1705.

Smits et al., 1994, "The effects of 4-aminopyridine on cognitive function in patients with multiple sclerosis: A pilot study," J. of Neurology, vol. 241:S102 (Abstract. 10).

Snyderman N, MD, Nightly News—About Us—msnbc.com, http://www.msnbc.com/id/14894442 (last accessed Nov. 17, 2010).

Sohn et al., 1981, "Pharmacokinetics and side-effects of 4-aminopyridine. 1981," E. Rugheimer, M. Zindler (eds) Proceedings of the Seventh World Congress of Anaesthesiologists, Hamburg, Sep. 14-21, 1980. Amsterdam: Excerpta Medica, 1981; 224-228.

Solari et al., 2003, "Aminopyridines for symptomatic treatment in multiple sclerosis (Cochrane Review)", in: The Cochrane Library, Issue 2, 2003. Oxford: Update Software. (Date of most recent amendment: Jul. 15, 2002; Date of most recent substantive amendment: Jul. 15, 2002; copyright Update Software Ltd.).

Solari et al., 2004, "Aminopyridines for symptomatic treatment in multiple sclerosis." Cochrane Database of Systematic Reviews 2002, Issue 4. (Date edited: Oct. 11, 2004; Date of most recent substantive amendment: Jul. 15, 2002).

Spatt et al., 2001, "Epileptic and non-epileptic seizures in multiple sclerosis," J. Neurol., vol. 248:2-9.

Spyker et al., 1980, "Poisoning with 4-Aminopyridine: Report of Three Cases," Clinical Toxicology, vol. 16(4):487-497.

Stenager et al., 1992, "Suicide and multiple sclerosis: an epidemiological investigation," J. of Neurol. Neurosurg. Psychiatry, vol. 55:542-545.

Stork et al., 1994, "Characterization of 4-aminopyridine in overdose," Clin. Toxicol., vol. 32(5):583-587.

Stoyanov et al., 1976, "Clinical Electromyomechanographic and Electromyographic Studies in Decurarization with Pymadine," Anaesth. Resus Intern. Ther., vol. 4(2):139-142.

Striano et al., 2003, "Epileptic seizures in multiple sclerosis: clinical and EEG correlations," Neurol. Sci., vol. 24:322-328.

Strupp et al., 2004, "Treatment of episodic ataxia type 2 with the potassium channel blocker 4-aminopyridine," Neurology, vol. 62(9):1623-1625.

Stuhmer et al., 1989, "Molecular basis of functional diversity of voltage-gated potassium channels in mammalian brain," EMBO J., vol. 8(11):3235-3244.

Sugimura et al., 1982, "Metabolic aspects of the comutagenic action of norharman," Adv. Exper. Med. Biology, vol. 136:1011-1025.

Swingler et al., 1992, "The morbidity of multiple sclerosis," Q. J. Med., New Series, vol. 83(300):325-337.

Ter Wee et al., 1985, "4-Aminopyridine and haemodialysis in the treatment of verapamil intoxication," Human Toxicol., vol. 4(3):327-329.

Tim et al., 1998, "Lambert-Eaton myasthenic syndrome (LEMS): clinical and electrodiagnostic features and response to therapy in 59 patients," Ann. NY Acad. Sci., vol. 841:823-826.

Tim et al., 2000, "Lambert-Eaton myasthenic syndrome: electrodiagnostic findings and response to treatment," Neurology, vol. 54:2176-2178.

Truyen et al., 1996, "Magnetic resonance imaging of epilepsy in multiple sclerosis: a case control study. Implications for treatment trials with 4-aminopyridine," Mult. Scler., vol. 1(4):213-217.

TYSABRI® (natalizumab), Biogen Ides Inc. and Elan Pharmaceuticals Inc., Prescribing Information, Jul. 2010. http://www.tysabri.com/en_US/tysb/site/pdfs/TYSABRI-pi.pdf (last accessed Nov. 3, 2010) (pp. 1-25).

Uges et al., 1981, "Liquid-chromatographic determination of 4-aminopyridine in serum, saliva, and urine," Clinical Chemistry, vol. 27(3):437-440.

Uges et al., 1982, "4-aminopyridine Tablets; a Method for the Preparation in-vitro and in-vivo Studies," Pham. Acta. Helv. 57, Nr. 4, 122-128.

Uges et al., 1984, "Treatment of 4-aminopyridine-poisoning after oral overdoses; a proposal," Pharm. Acta Helv., vol. 59:172-176.

US Food and Drug Administration, for Consumers, Fast Track, Accelerated Approval and Priority Review, http://fda.gov/forconsumers/byaudience/forpatientadvocates/speedingaccesstoimportantnewtherapies/ucm128291.htm (last accessed Nov. 12, 2010).

van der Bruggen et al., 2001, "Randomized trial of 4-aminopyridine in patients with chronic incomplete spinal cord injury," J. Neurol., vol. 248(8):665-671.

van der Horst et al., 1992, "Determination of 4-aminopyridine in serum by solid-phase extraction and high-performance liquid chromatography," J. of Chromatography, vol. 574:166-169.

van Diemen et al., 1992, "Increased visual impairment after exercise (Uhthoff's phenomenon) in multiple sclerosis: therapeutic possibilities," Eur. Neurol., vol. 32(4):231-234.

van Diemen et al., 1992, "The Effect of 4-Aminopyridine on Clinical Signs in Multiple Sclerosis: A Randomized, Placebo-Controlled, Double-Blind, Cross-over Study," Ann. Neurol., vol. 32(2):123-130.

van Diemen et al., 1993, "4-Aminopyridine induces functional improvement in multiple sclerosis patients: a neurophysiological study," J. of Neurological Sciences, vol. 116:220-226.

Van Heeringen, 2003, "Understanding the suicidal brain," Br. J. Psychiatry, vol. 184:282-284.

Velez et al., 2003, "Opisthotonic posturing with neuromuscular irritability attributable to 4-aminopyridine ingestion by a healthy pediatric patient," Pediatrics, vol. 111:e82-e84.

Voskuyl et al., 1985, "Spontaneous epileptiform discharges in hippocampal slices induced by 4-aminopyridine," Brain Research, vol. 342(1):54-66.

Wakabayashi et al., 1982, "Comutagneic effect of norharman with aminopyridine derivatives," Mutation Research, vol. 105:205-210.

Walker, 2002, "A. Common Statistical Methods for Clinical Research with SAS® Examples," Second Edition, 2002, Cary, NC: SAS Institute Inc., p. 32.

Waxman et al., 1993, "Molecular dissection of the myelinated axon," Ann. Neurol., vol. 33(2):121-136.

Wirtavuori et al., 1984, "Antagonism of d-tubocurarine-induced neuromuscular blockade with a mixture of 4-aminopyridine and neostigmine in man," Can. Anaesth. Soc. J., vol. 31(6):624-630.

Wolfe et al., 2001, "Effects of 4-aminopyridine on motor evoked potentials in patients with spinal cord injury: a double-blinded, placebo-controlled crossover trial," J. Neurotrauma., vol. 18(8):757-771.

Wolinsky et al., 2007, "Glatiramer acetate in primary progressive multiple sclerosis: results of a multinational, multicenter, double-blind, placebo-controlled trial," Ann Neurol., vol. 61:14-24.

Zorzon et al., 2001, "Depression and anxiety in multiple sclerosis. A clinical and MRI study in 95 subjects," J. Neurol., vol. 248:416-421.

Wolinsky et al., 2004, "The PROMiSe trial: baseline data review and progress report," Multiple Sclerosis, vol. 10:S65-S72.

CD-ROM in duplicate containing video-file "Today Show.mov," created Jul. 18, 2010, showing segment of the "Today Show" aired May 27, 2010 accompanied by still image single frame photograph.

Cohen et al., 2005, "Responder Analysis of Walking Speed Applied to a Trial of Fampridine in Subjects With MS." 57th Annual Meeting of the American Academy of Neurology, Miami, Florida, Apr. 9-16, 2005.

Juarez et al., 2001, "Influence of admixed carboxymethylcellulose on release of 4-aminopyridine from hydroxypropyl methylcellulose matrix tablets," Int. J. Pharm. 216:115-125.

Blight, 1987, "Effect of 4-Aminopyridine on Action Potential Conduction in Myelinated Axons of Chronically Injured Spinal Cord," Society for Neuroscience Abstracts 13(1):62 (abstr. 21.15).

Gruner et al., 1987, "Recovery of Motor Function in Chronic Experimental Spinal Cord Injury Enhanced by 4-Aminopyridine," Society for Neuroscience Abstracts 13(1):62 (abstr. 21.16).

Opposition to EP 1732548 B1 by Synthon B.V., filed Mar. 7, 2012.

Opposition to EP 1732548 B1 by neuraxpharm Arzneimittel GmbH, filed Mar. 8, 2012 (with English Translation).

Fampridine Monograph, 1998, "Fampridine Neurelan(R) Agent for Multiple Sclerosis," Drugs Fut. 23(2): pp. 218-219.

Office Action, dated Sep. 13, 2011, issued in connection with U.S. Appl. No. 12/626,001.

Office Action, dated Sep. 16, 2011, issued in connection with U.S. Appl. No. 12/626,036.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Office Action, dated Sep. 16, 2011, issued in connection with U.S. Appl. No. 12/626,085.
Office Action. dated Sep. 8, 2011, issued in connection with U.S. Appl. No. 12/824,137.
Office Action. dated Aug. 12, 2011, issued in connection with U.S. Appl. No. 12/824,140.
Office Action, dated Aug. 16, 2011, issued in connection with U.S. Appl. No. 12/824,141.
Office Action, dated Aug. 30, 2011, issued in connection with U.S. Appl. No. 12/824,133.
Office Action. dated Aug. 16, 2011, issued in connection with U.S. Appl. No. 12/824,135.
Office Action. dated Aug. 22, 2011, issued in connection with U.S. Appl. No. 12/824,136.
Office Action, dated Apr. 25, 2012, issued in connection with U.S. Appl. No. 12/626,085.
Heng et al., 2001, "Investigation of the influence of mean HPMC particle size and number of polymer particles on the release of aspirin from swellable hydrophilic matrix tablets," Journal of Controlled Release, 76:39-49.
Poster entitled "Placebo-controlled double-blinded dose ranging study of fampridine-SR in multiple sclerosis" presented at the 7th Annual Meeting of the Americas Committee for Treatment and Research in Multiple Sclerosis and 18th Congress of the European Committee for Treatment and Research in Multiple Sclerosis (ACTRIMS/ECTRIMS) by Goodman et al. on Sep. 18-21, 2002, Baltimore, Maryland, USA.
Slide presentation entitled "Placebo-controlled double-blinded dose ranging study of fampridine-SR in multiple sclerosis" presented at the 7th Annual Meeting of the Americas Committee for Treatment and Research in Multiple Sclerosis and 18th Congress of the European Committee for Treatment and Research in Multiple Sclerosis (ACTRIMS/ECTRIMS) by Goodman et al. on Sep. 18-21, 2002, Baltimore, Maryland, USA.
Cohen et al., 2004, "The two towers: Quest for drugs from discovery to approval," Top Spinal Cord Inj Rehabil, 10(1):63-71.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 1

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 2

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Note: The treatment sample sizes are based on the number of ITT subjects with available data.

Note: The p-values (versus placebo) presented above the treatment mean bars are Dunnett-adjusted

Fig. 3

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Note: The treatment sample sizes are based on the number of ITT subjects with available data.

Fig. 4

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 5

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Note: The treatment sample sizes are based on the number of ITT subjects with available data.
Note: The p-values (versus placebo) presented above the treatment mean bars are Dunnett-adjusted

Fig. 6

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 7

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Note: Treatment p-value from the Cochran-Mantel Haenszel test controlling for center.

Fig. 8

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

*Change from baseline in the MSWS-12 over the double-blind**




*SGI over the double-blind*




*Change from baseline in the CGI over the double-blind*




- •Double blind measurements at first and last stable dose visits only.
- •Note: For the changes from baseline, a negative score is indicative of clinical benefit.
- •Note: Some non-responders had no post-baseline data for a particular variable; so the sample sizes for the non-responders (with respect to that variable) may be less than the actual number of non-responders.
- •Note: the p-values comparing responders to non-responders are from ANOVA models with effects for responder status and center.

Fig. 9

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




**: Significantly better than placebo and fampridine non-responders ($p < 0.001$ for each).

*: Significantly better than fampridine non-responders.

Fig. 10

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




@@: Significantly better than placebo ($p < 0.001$).
@: Significantly better than placebo ($p < 0.05$).

Fig. 11

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 12

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

# METHOD OF USING SUSTAINED RELEASE AMINOPYRIDINE COMPOSITIONS

## CROSS REFERENCES

This application claims priority to U.S. Provisional Application No. 60/560,894 filed Apr. 9, 2004.

## JOINT RESEARCH AGREEMENT

The claimed invention was made as a result of activities undertaken within the scope of a joint research agreement between Acorda Therapeutics, Inc. and Elan Corporation, PLC.

## BACKGROUND

This invention relates a sustained release oral dosage form of an aminopyridine pharmaceutical composition that can be used to treat individuals affected with neurological disorders wherein said pharmaceutical composition maximizes the therapeutic effect, while minimizing adverse side effects.

The sustained release oral dosage form of the present invention may be utilized to treat neurological disorders such as multiple sclerosis, spinal cord injuries, Alzheimer's disease and ALS.

Multiple sclerosis (MS) is a degenerative and inflammatory neurological disease that affects the central nervous system, more specifically the myelin sheath. The condition of MS involves demyelination of nerve fibers resulting in "short-circuiting" of nerve impulses and thus a slowing or blocking of transmission along the nerve fibers, with associated disabling symptoms. Treatment alternatives for promoting transmission along affected nerves have thus far been limited.

Potassium channel blockers are a class of compounds that has been found to improve the conduction of nerve impulses. As a result, they have become the focus of attention in the symptomatic treatment of spinal cord injury, MS and Alzheimer's disease. One sub-class of potassium channel blockers, aminopyridines have shown promise in the treatment of neurological diseases. 4-aminopyridine (4-AP), a mono-aminopyridine known as fampridine, has been found to reduce the potassium flow in nerve impulse transmission and, thereby, shows effectiveness in restoring conduction in blocked and demyelinated nerves.

Early studies of monoaminopyridines were conducted using an intravenous composition, comprising 4-AP. This was followed by the development of an immediate-release (IR) composition for oral administration of 4-AP, commonly known as fampridine. The IR composition consisted of 4-AP powder in a gelatin-based capsule and produced rapid peak plasma concentrations shortly after dosing with a time to maximum concentration of about 1 hour and a plasma half life of about 3.5 hours. The rapid release and short half life of fampridine makes it difficult to maintain effective plasma levels without producing high peaks following each dose that may cause undesirable side effects such as seizures and trembling.

Electrophysiological recordings from isolated spinal cord have shown chronic failure of action potential conduction in surviving myelinated axons, following a blunt contusion injury (Blight, A. R., "Axonal physiology of chronic spinal cord injury in the cat: intracellular recording in vitro", Neuroscience. 10:1471-1486 (1983b)). Some of this conduction block can be overcome, at the level of single nerve fibers, using the drug 4-aminopyridine (4-AP) (Blight, A. R., "Effect of 4-aminopyridine on axonal conduction-block in chronic spinal cord injury", Brain Res. Bull. 22:47-52 (1989)). Intravenous injection of this compound in animals with experimental or naturally occurring spinal cord injuries produces significant improvements in electrophysiological (Blight, A. R. and Gruner, J. A., "Augmentation by 4-aminopyridine of



vestibulospinal free fall responses in chronic spinal-injured cats," J. Neurol. Sci. 82:145-159, (1987)) and behavior function (Blight, A. R., "The effects of 4-aminopyridine on neurological deficits in chronic cases of traumatic spinal cord injury in dogs: a phase I clinical trial," J. Neurotrauma, 8:103-119 (1991)).

An initial study in spinal cord injury patients was organized by Dr. Keith Hayes and indicated a potential for a therapeutic benefit, mostly at the electrophysiological level, combined with a lack of serious side effects (Hayes et al, "Effects of intravenous 4-aminopyridine on neurological function in chronic spinal cord injured patients: preliminary observations," Proc. IBRO World Conf. Neurosci., p. 345 1991).

A recent study of fampridine in patients with chronic incomplete SCI was reported in Clinical Neuropharmacology 2003: Keith C. Hayes; Patrick J. Potter; Robert R. Hansebout; Joanne M. Bugaresti; Jane T. C. Hsieh; Sera Nicosia; Mitchell A. Katz; Andrew R. Blight; Ron Cohen 26(4):185-192.

## SUMMARY OF THE INVENTION

One embodiment of the present invention relates to a pharmaceutical composition which contains one or more potassium channel blockers and which can be used in the effective treatment of various diseases, for example, spinal cord injury, multiple sclerosis, Alzheimer's disease, and ALS. Embodiments of the present invention are directed to compositions that include a matrix and a potassium channel blocker. The potassium channel blockers may include aminopyridines, for example, 4-aminopyridine, 3,4-diaminopyridine and the like, most preferably 4-aminopyridine. The composition provides for sustained-release of the aminopyridine from the matrix to maintain the efficacious and safe plasma level of an aminopyridine. The aminopyridine dispersed in the matrix is capable of providing, upon administration to a patient, a desired release profile. The composition may be used to establish in patients in need of such treatment, a therapeutically effective blood plasma level of the aminopyridine for a period of at least about 6 hours and preferably up to at least about 12 hours in the patient in a twice-daily administration while avoiding excessive peaks and troughs in the level of the aminopyridine. The composition may include a mono- or di-aminopyridine, preferably 4-AP or 3,4-DAP or a combination thereof, homogeneously dispersed in a rate-controlling polymer matrix, preferably including a hydrophilic polymer like hydroxypropylmethylcellulose (HPMC). The composition of the present invention may also include one or more additional active ingredients and/or one or more pharmaceutically acceptable excipients. These compositions can be used to treat various neurological diseases, for example, spinal cord injury, multiple sclerosis, Alzheimer's disease, and ALS.

Another embodiment of the present invention is a stable pharmaceutical composition that comprises a therapeutically effective amount of an aminopyridine dispersed in a matrix that provides a release profile of the aminopyridine to a patient that has a desired $C_{max}$ to $C_\tau$ ratio. The composition may be used to establish and/or maintain in a patient, a therapeutically effective level of the aminopyridine. Preferably the aminopyridine in the composition is released over time so that a therapeutically effective level of the aminopyridine in the patient can be achieved with twice daily dosing of the composition. In a more preferred embodiment, undesirable spikes or peaks in the release of the aminopyridine are avoided.

Another embodiment of the present invention is a stable, sustained-release oral dosage formulation of a composition which includes a therapeutically effective amount of a 4-aminopyridine dispersed in a matrix that provides a release profile of 4-aminopyridine in the blood plasma of the patient extending over a period of at least 6 hours, preferably at least 8 hours, and more preferably, at least about 12 hours. In another embodiment, a stable, sustained-release oral dosage formulation of a composition includes a therapeutically

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

effective amount of a 4-aminopyridine dispersed in a matrix that provides a therapeutically effective blood plasma level of 4-aminopyridine in the patient extending over about 24 hours.

Preferably, the oral dosage formulation of the composition is a monolithic tablet formed by compression of the pharmaceutical composition of the present invention. In preferred embodiments, the oral dosage formulation includes a compressed tablet of a therapeutically effective amount of 4-aminopyridine dispersed in matrix that includes a hydrophilic polymer such as HPMC. The oral dosage form of the present invention may also include one or more pharmaceutically acceptable excipients.

The dispersion of 4-aminopyridine throughout the matrix imparts chemical and physical stability to the composition while providing a sustained-release profile. This enhanced dosage stability is most notably observed in compositions and dosage forms of the present invention having low concentrations of 4-aminopyridine, and stability is achieved while maintaining the desired controlled-release profile. Specifically, the compressed tablet formulation of the present invention exhibits superior resistance to moisture absorption by ambient humidity and maintains a uniform distribution of the 4-aminopyridine throughout the tablet while providing a release profile of 4-aminopyridine that permits establishment of a therapeutically effective concentration of the potassium channel blocker with once daily or twice daily dosing of the formulation. Preferably the therapeutically effective concentration released by the formulation extends over at least about 6 hours, preferably at least about 8 hours, and more preferably at least about 12 hours. In addition, the homogeneity of the dosage form renders it amenable to formation by simple and inexpensive manufacturing processes as compared with the multi-layered structure of prior sustained-release dosage formulations.

The compositions of the present invention may be used in the treatment of a condition in a patient that includes establishing a therapeutically effective concentration of a potassium channel blocker in the patient in need thereof. The compositions may be used for building up a level and or maintaining a therapeutically effective concentration of an aminopyridine in the patient by twice daily dosing. The dosages of the present compositions can be made with a lower concentration of the aminopyridine to facilitate restful periods for the patient during the day or night, depending on desired results or dosage schedule. Where desirable, the compositions of the present invention may be formulated to avoid large peaks in initial release of the aminopyridine. The compositions of the present invention when administered to a patient in need thereof provide for the treatment of neurological diseases that are characterized by a degradation of nerve impulse transmission. Preferably, the compositions are a stable, sustained-release tablet of a therapeutically effective amount of a mono- or di-aminopyridine, dispersed in HPMC such that therapeutically effective blood plasma level of the mono- or di-aminopyridine is maintained in the patient for a period of at least 6 hours, preferably at least 8 hours, and more preferably at least about 10-12 hours in a once or twice daily administration.

One embodiment of the present invention relates to a method of increasing walking speed comprising administering to a patient with multiple sclerosis an effective amount of a sustained release aminopyridine composition twice daily, wherein said effective amount is less than about 15 milligrams of aminopyridine. In a preferred embodiment, the effective amount is about 10 to about 15 milligrams of aminopyridine.

In a further embodiment of the present invention a method of improving lower extremity muscle tone comprising administering to a patient with multiple sclerosis an effective amount of a sustained-release aminopyridine composition twice daily is provided. In a preferred embodiment, said effective amount is less than about 15 milligrams of aminopyridine.

Another embodiment of the present invention relates to a method of improving lower extremity muscle strength comprising administering to a patient with multiple sclerosis an effective amount of a sustained-release aminopyridine composition twice daily, wherein said effective amount is less than about 15 milligrams of aminopyridine.

One embodiment of the present invention relates to a method of selecting individuals based on responsiveness to a treatment. The method comprises identifying a plurality of individuals; administering a test to each individual prior to a treatment period; administering a treatment to one or more of the individuals during the treatment period; administering the test a plurality of times to each individual during the treatment period; and selecting one or more individuals, wherein the selected individuals exhibit an improved performance during a majority of the tests administered during the treatment period as compared to the test administered prior to the treatment period. In certain embodiments, the method may further comprise administering the test to each individual after the treatment period, wherein the selected individuals further exhibit an improved performance during a majority of the tests administered during the treatment period as compared to the test administered after the treatment period.

A further embodiment relates to a method of selecting individuals based on responsiveness to a treatment, the method comprising identifying a plurality of individuals; administering a test to each individual prior to a treatment period; administering a treatment to one or more of the individuals during the treatment period; administering the test a plurality of times to each individual during the treatment period; administering the test to each individual after the treatment period; and selecting one or more individuals, wherein the selected individuals exhibit an improved performance during a majority of the tests administered during the treatment period as compared to the better performance of the test administered prior to the treatment period and the test administered after the treatment period.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a histogram to show the number of treatment visits at which subjects showed faster walking speed on the timed 25 foot walk than at all of the five non-treatment visits.

FIG. **2** is a graph of the average walking speeds (ft/sec) by study day (observed cases, ITT population).

FIG. **3** is a histogram of the percent change in average walking speed during the 12-week stable dose period (observed cases, ITT population).

FIG. **4** is a histogram of the percentage of protocol specified responders (subjects with average changes in walking speed during the 12-week stable dose period of at least 20%) by treatment group [(observed cases, ITT population]).

FIG. **5** is a graph of LEMMT by study day (observed cases, ITT population).

FIG. **6** is a histogram of change in LEMMT during the 12-week stable dose period (observed cases, ITT population).

FIG. **7** is a histogram of the percentage of post hoc responders by treatment group (ITT population) according to a responder analysis of the present invention.

FIG. **8** is a histogram of the percentage of responders for placebo subjects vs. fampridine subjects pooled (ITT population) according to a responder analysis of the present invention.

FIG. **9** are histograms of the validation of the post hoc responder variable using subjective scales (observed cases, ITT population).

FIG. **10** is a graph of percent change in walking speed at each double-blind visit by responder analysis grouping (observed cases, ITT population).

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

FIG. 11 is a graph of the change in LEMMT at each double-blind visit by responder analysis grouping (observed cases, ITT population).

FIG. 12 is a graph of change in overall Ashworth Score at each double-blind visit by responder analysis grouping (observed cases, ITT population).

## DETAILED DESCRIPTION OF THE INVENTION

Before the present compositions and methods are described, it is to be understood that this invention is not limited to the particular molecules, compositions, methodologies or protocols described, as these may vary. It is also to be understood that the terminology used in the description is for the purpose of describing the particular versions or embodiments only, and is not intended to limit the scope of the present invention which will be limited only by the appended claims.

The terms used herein have meanings recognized and known to those of skill in the art, however, for convenience and completeness, particular terms and their meanings are set forth below.

It must also be noted that as used herein and in the appended claims, the singular forms "a","an", and "the" include plural reference unless the context clearly dictates otherwise. Thus, for example, reference to a "spheroid" is a reference to one or more spheroid and equivalents thereof known to those skilled in the art, and so forth. Unless defined otherwise, all technical and scientific terms used herein have the same meanings as commonly understood by one of ordinary skill in the art. Although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of embodiments of the present invention, the preferred methods, devices, and materials are now described. All publications mentioned herein are incorporated by reference. Nothing herein is to be construed as an admission that the invention is not entitled to antedate such disclosure by virtue of prior invention.

"Local administration" means direct administration by a non-systemic route at or in the vicinity of the site of affliction, disorder, or perceived pain.

The terms "patient" and "subject" mean all animals including humans. Examples of patients or subjects include humans, cows, dogs, cats, goats, sheep, and pigs.

The term "pharmaceutically acceptable salts, esters, amides, and prodrugs" as used herein refers to those carboxylate salts, amino acid addition salts, esters, amides, and prodrugs of the compounds of the present invention which are, within the scope of sound medical judgment, suitable for use in contact with the tissues of patients without undue toxicity, irritation, allergic response, and the like, commensurate with a reasonable benefit/risk ratio, and effective for their intended use, as well as the zwitterionic forms, where possible, of the compounds of the invention.

The term "prodrug" refers to compounds that are rapidly transformed in vivo to yield the parent compounds of the above formula, for example, by hydrolysis in blood. A thorough discussion is provided in T. Higuchi and V. Stella, "Prodrugs as Novel Delivery Systems," Vol. 14 of the A.C.S. Symposium Series, and in Bioreversible Carriers in Drug Design, ed. Edward B. Roche, American Pharmaceutical Association and Pergamon Press, 1987, both of which are incorporated herein by reference.

The term "salts" refers to the relatively non-toxic, inorganic and organic acid addition salts of compounds of the present invention. These salts can be prepared in situ during the final isolation and purification of the compounds or by separately reacting the purified compound in its free base form with a suitable organic or inorganic acid and isolating the salt thus formed. Representative salts include the hydrobromide, hydrochloride, sulfate, bisulfate, nitrate, acetate, oxalate, valerate, oleate, palmitate, stearate, laurate, borate, benzoate, lactate, phosphate, tosylate, citrate, maleate, fumarate, succinate, tartrate, naphthylate mesylate, glucoheptonate, lactobionate and laurylsulphonate salts, and the like. These may include cations based on the alkali and alkaline earth metals, such as sodium, lithium, potassium, calcium, magnesium, and the like, as well as non-toxic ammonium, tetramethylammonium, tetramethylammonium, methlyamine, dimethlyamine, trimethlyamine, triethlyamine, ethylamine, and the like. (See, for example, S. M. Barge et al., "Pharmaceutical Salts," J. Pharm. Sci., 1977, 66:1-19 which is incorporated herein by reference.).

A "therapeutically effective amount" is an amount sufficient to decrease or prevent the symptoms associated with a medical condition or infirmity, to normalize body functions in disease or disorders that result in impairment of specific bodily functions, or to provide improvement in one or more of the clinically measured parameters of the disease. Preferably, improvement in symptoms associated with the disease including walking speed, lower extremity muscle tone, lower extremity muscle strength, or spasticity. As related to the present application, a therapeutically effective amount is an amount sufficient to reduce the pain or spasticity associated with the neurological disorder being treated, or an amount sufficient to result in improvement of sexual, bladder or bowel function in subjects having a neurological disorder which impairs nerve conduction, which hinders normal sexual, bladder or bowel functions.

"Treatment" refers to the administration of medicine or the performance of medical procedures with respect to a patient, for either prophylaxis (prevention), to cure the infirmity or malady in the instance where the patient is afflicted refers, or amelioration the clinical condition of the patient, including a decreased duration of illness or severity of illness, or subjective improvement in the quality of life of the patient or a prolonged survival of the patient.

In addition, the compounds of the present invention can exist in unsolvated as well as solvated forms with pharmaceutically acceptable solvents such as water, ethanol, and the like. In general, the solvated forms are considered equivalent to the unsolvated forms for the purposes of the present invention.

One aspect of the invention is a sustained-release pharmaceutical composition comprising an aminopyridine dispersed in a sustained release matrix such as a rate-controlling polymer. The composition of the present invention is capable of providing, upon administration to a patient, a release profile of the aminopyridine extending over at least 6 hours, preferably least about 12 hours, and more preferably at least 24 hours or more. Preferably the aminopyridine concentration in the composition is a therapeutically effective amount, and preferably the aminopyridine is dispersed uniformly throughout the release matrix. A therapeutically effective amount is an amount of a potassium channel blocker, preferably an aminopyridine compound, that when administered to a patient or subject, ameliorates a symptom of a neurological disease.

When the compositions of the present invention are administered to a patient, the concentration of the aminopyridine in the patient's plasma over time (release profile) may extend over a period of at least 6 hours, preferably over at least 8 hours, and more preferably over at about 12 hours. The compositions may provide in single dose a mean maximum plasma concentration of aminopyridine in the patient of from about 15 to about 180 ng/ml; a mean $T_{max}$ from about 1 to about 6 hours, more preferably about 2 to about 5.2 hours after administration of the composition to the patient.

In one embodiment, aminopyridine is administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose at selected intervals of time until a therapeutic dose is achieved. In one embodiment, the medicament is administered to a subject at a dose

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose of aminopyridine at selected intervals of time until a therapeutic dose is achieved. For example, at the commencement of treatment aminopyridine is preferably administered at a dose less than 15 mg/day until a tolerable state is reached. Suitably when said tolerable state is reached, the dose administered may be increased by amounts of at least 5-15 mg/day until said therapeutic dose is reached.

Preferably, aminopyridine is administered at a dose of about 10-15 mg twice daily (20-30 mg/day) depending upon the condition or symptoms being treated. The method can include scheduling administration of doses of the pharmaceutical so that the concentration of the aminopyridine in the patient is at about the minimum therapeutically effective level to ameliorate the neurological condition, yet relatively lower compared to the maximum concentration in order to enhance restful periods for the patient during the day or night, depending on desired results or dosage schedule. Preferably the method provides for the treatment of neurological diseases characterized by a degradation of nerve impulse transmission comprising the step of administering to a patient a composition of the present invention.

The formulations and compositions of the present invention exhibit a specific, desired release profile that maximizes the therapeutic effect while minimizing adverse side effects. The desired release profile may be described in terms of the maximum plasma concentration of the drug or active agent ($C_{max}$) and the plasma concentration of the drug or active agent at a specific dosing interval ($C_\tau$). A ratio of $C_{max}$ to $C_\tau$ ($C_{max}$:$C_\tau$) may be calculated from the observed $C_{max}$ and $C_\tau$. A dosing interval ($\tau$) is the time since the last administration of the drug or active agent. In the present application, the dosing interval ($\tau$) is twelve (12) hours, therefore $C_\tau$ the concentration of the drug or active agent at twelve (12) hours from the last administration.

Additionally, the formulations and compositions of the present invention exhibit a desired release profile that may be described in terms of the maximum plasma concentration of the drug or active agent at steady state ($C_{maxSS}$) and the minimum plasma concentration of the drug or active agent at steady state ($C_{minSS}$). Steady state is observed when the rate of administration (absorption) is equal to the rate of elimination of the drug or active agent. A ratio of $C_{maxSS}$ to $C_{minSS}$ ($C_{maxSS}$:$C_{minSS}$) may be calculated from the observed $C_{maxSS}$ and $C_{minSS}$. In addition, the formulations and compositions of the present invention exhibit a desired release profile that may be described in terms of the average maximum plasma concentration of the drug or active agent at steady state ($C_{avSS}$).

Another embodiment is a sustained release tablet of a sustained release matrix and an aminopyridine, said tablet exhibits a release profile to obtain a $C_{max}$:$C_\tau$ ratio in vivo of 1.0 to 3.5, and more preferably a $C_{max}$:$C_\tau$ ratio of about 1.5 to about 3.0. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio is about 2.0 to about 3.0. The aminopyridine may comprise 4-aminopyridine. The sustained release matrix may include for example, hydroxypropylmethylcellulose, or other rate controlling matrices that are suitable for controlling the release rate of an aminopyridine for use in the pharmaceutical compositions of the present invention.

Another embodiment is a sustained release tablet of a sustained release matrix and an aminopyridine, said tablet exhibits a release profile to obtain a $C_{max}$:$C_\tau$ ratio in vivo of 1.0 to 3.5 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml, and more preferably a $C_{max}$:$C_\tau$ ratio of about 1.5 to about 3.0. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio is about 2.0 to about 3.0.

A further aspect is a sustained release composition comprising a sustained release matrix and an aminopyridine, wherein said composition provides a $C_{avss}$ of about 15 ng/ml to about 35 ng/ml. In a further aspect, a sustained release tablet comprising a sustained release matrix and an aminopyridine, said tablet exhibiting a $C_{maxss}$ of about 20 ng/ml to about 35 ng/ml is provided. The pharmacokinetic characteristics of sustained release aminopyridine compositions and methods of treating various neurological disorders are described in co-pending PCT/US2004/008101 entitled "Stable Formulations of Aminopyrdines and Uses Thereof" filed Apr. 17, 2004 and U.S. application Ser. No. 11/010,828 entitled "Sustained Release Aminopyridine Composition" filed Dec. 13, 2004, the contents of which are incorporated herein by reference in their entireties.

The amount of a pharmaceutically acceptable quality aminopyridine, salt, solvated, or prodrug thereof included in the pharmaceutical composition of the present invention will vary, depending upon a variety of factors, including, for example, the specific potassium channel blocker used, the desired dosage level, the type and amount of rate-controlling polymer matrix used, and the presence, types and amounts of additional materials included in the composition. Preferably, the aminopyridine comprises from about 0.1 to about 13% w/w, more preferably from about 0.5 to about 6.25% w/w. In an even more preferable embodiment of the present invention the aminopyridine is present from about 0.5 to 4.75% w/w of the pharmaceutical composition. Accordingly, a weight percentage less than about 4.75% is desired. The amount of aminopyridine, or a derivative thereof, in the formulation varies depending on the desired dose for efficient drug delivery, the molecular weight, and the activity of the compound. The actual amount of the used drug can depend on the patient's age, weight, sex, medical condition, disease or any other medical criteria. The actual drug amount is determined according to intended medical use by techniques known in the art. The pharmaceutical dosage formulated according to the invention may be administered once or more times per day, preferably two or fewer times per day as determined by the attending physician.

Suitable formulations and methods of manufacture are further described in co-pending PCT/US2004/008101 entitled "Stable Formulations of Aminopyrdines and Uses Thereof" filed Apr. 17, 2004 and U.S. application Ser. No. 11/010,828 entitled "Sustained Release Aminopyridine Composition" filed Dec. 13, 2004, the contents of which are incorporated herein by reference in their entireties.

The release matrix aminopyridine formulation is preferably fabricated into tablets, capsules or granules for oral use. The rate of aminopyridine release from the tablets may be controlled by the erosion mechanism of the release matrix from which aminopyridine is released. In general, for producing a tablet on an industrial scale, the drug and polymer are granulated alone or in combination. Preferably the release of the aminopyridine from the matrix of the pharmaceutical composition is relatively linear over time. Preferably the matrix provides a release profile that gives a therapeutically effective concentration of the aminopyridine in the plasma of the patient permitting a once per day or twice per day dosing. Preferably the sustained release aminopyridine formulation for oral administration to patients includes from about 0.0001 mole to about 0.0013 mole aminopyridine that provides a mean maximum plasma concentration of aminopyridine from about 15 to about 180 ng/ml, a mean $T_{max}$ of about 2 to about 5 hours after administration, and a mean minimum plasma concentration of from about 10 to 60 ng/ml at about 8-24 hours after administration.

The formulations of the invention are prepared by procedures known in the art, such as, for example, by the dry or wet method. The method selected for manufacturing affects the release characteristics of the finished tablet. In one method, for example, the tablet is prepared by wet granulation in the presence of either water or an aqueous solution of the hydrophilic polymer or using other binder as a granulating fluid. In alternative, organic solvent, such as isopropyl alcohol, ethanol and the like, may be employed with or without water. The drug and polymer may be granulated alone or in combination.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Another method for preparation of the tablet which may be used requires using a drug-polymer dispersion in organic solvents in the presence or absence of water. Where the aminopyridine or its derivative has very low solubility in water it may be advantageous to reduce the particle size, for example, by milling it into fine powder and in this way to control the release kinetics of the drug and enhance its solubility.

The hardness of the tablets of the present invention may vary, depending on a variety of factors, including, for example, the relative amounts and specific types of ingredients used, the tableting equipment employed, and the selected processing parameters. The pressure used to prepare the tablets can influence the release profile of the aminopyridine into the patient. The pressure used to prepare the tablets of the present invention may vary depending upon their surface area and the amount and particle size of aminopyridine, additive, excipients, or binders included in the tablet. The degree of hydration and solvation of the components in the composition will also be important in determining the hard ness of the tablets. Preferably the formed tablets have a hardness in the range of from 80-400 N, and more preferably from 150 to 300 N.

The effects of various matrices, concentrations of aminopyridine, as well as various excipients and additives to the composition on the concentration of the channel blocker on the dissolution rate may be monitored for example using a type H dissolution apparatus according to U.S. Pharmacopoeia XXII, or USP Apparatus II (Paddle Method). Clinical evaluations may be used to study the effects on plasma levels of various release matrices, concentrations of aminopyridine, as well as various excipients and additives. Plasma aminopyridine concentrations may be used to calculate pharmacokinetic data (release profiles) including apparent absorption and elimination rates, area-under-the curve (AUC), maximum plasma concentration ($C_{max}$), time to maximum plasma concentration ($T_{max}$), absorption half-life ($T_{1/2}$(abs)), and elimination half-life ($T_{1/2}$(elim)). Pharmacodynamic effects may be assessed based upon response tests, such as muscle strength improvement or reduction in spasticity for patients with multiple sclerosis or spinal cord injury or other tests as would be known to those skilled in the art. Plasma aminopyridine concentration in blood plasma or cerebral spinal fluid may be monitored using liquid chromatography/MS/MS assay methods.

The drug delivery of the invention can utilize any suitable dosage unit form. Specific examples of the delivery system of the invention are tablets, tablets that disintegrate into granules, capsules, sustained release microcapsules, spheroids, or any other means that allow for oral administration. These forms may optionally be coated with pharmaceutically acceptable coating which allows the tablet or capsule to disintegrates in various portions of the digestive system. For example a tablet may have an enteric coating that prevents it from dissolving until it reaches the more basic environment of the small intestine.

The dispersion of the aminopyridine throughout the release matrix imparts enhanced stability characteristics in the dosage formulation. This enhanced stability is achieved without loss of the desired sustained-release profile. Preferably the release profile, which may be measured by dissolution rate is linear or approximately linear, preferably the release profile is measured by the concentration of the aminopyridine in the plasma in the patient and is such to permit twice daily (BID) dosing.

The pharmaceutical composition of the present invention can include also auxiliary agents or excipients, for example, glidants, dissolution agents, surfactants, diluents, binders including low temperature melting binders, disintegrants, solubilizing agents and/or lubricants as described in co-pending PCT/US2004/008101 entitled "Stable Formulations of Aminopyrdines and Uses Thereof" filed Apr. 17, 2004 and U.S. application Ser. No. 11/010,828 entitled "Sustained Release Aminopyridine Composition" filed Dec. 13, 2004, the contents of which are incorporated herein by reference in their entireties.

The active ingredient of the present invention may be mixed with excipients which are pharmaceutically acceptable and compatible with the active ingredient and in amounts suitable for use in the therapeutic methods described herein. Various excipients may be homogeneously mixed with the aminopyridines of the present invention as would be known to those skilled in the art. For example, aminopyridines may be mixed or combined with excipients such as but not limited to microcrystalline cellulose, colloidal silicon dioxide, lactose, starch, sorbitol, cyclodextrin and combinations of these.

To further improve the stability of the aminopyridine in the sustained release composition, an antioxidant compound can be included. Suitable antioxidants include, for example: sodium metabisulfite; tocopherols such as α, β, δ-tocopherol esters α.-tocopherol acetate; ascorbic acid or a pharmaceutically acceptable salt thereof; ascorbyl palmitate; alkyl gallates such as propyl gallate, Tenox PG, Tenox s-1; sulfites or a pharmaceutically acceptable salt thereof; BHA; BHT; and monothioglycerol.

In another embodiment, the pharmaceutical composition of the present invention comprises a rate-controlling polymeric matrix comprising of a hydrogel matrix. For instance, an aminopyridine may be compressed into a dosage formulation containing a rate-controlling polymer, such as HPMC, or mixture of polymers which, when wet, will swell to form a hydrogel. The rate of release of the aminopyridine from this dosage formulation is sustained both by diffusion from the swollen tablet mass and by erosion of the tablet surface over time. The rate of release of the aminopyridine may be sustained both by the amount of polymer per tablet and by the inherent viscosities of the polymers used.

According to another aspect of the invention, there is provided a stable, sustained-release oral dosage formulation which includes an effective amount a aminopyridine dispersed in a release matrix, and which, upon administration to a patient or as part of a therapy regiment, provides a release profile (of therapeutically effective blood plasma level of the aminopyridine) extending for a period of at least 6 hours, preferably at least 12 hours. In another embodiment, the stable, controlled-release oral dosage form provides, upon administration to a patient, a therapeutically effective blood plasma level of the aminopyridine for a period of at least 6 hours, preferably at least 12 hours, and more preferably at least 24 hours.

The dosage formulation may assume any form capable of delivering orally to a patient a therapeutically effective amount of an aminopyridine dispersed in a rate-controlling polymer. Preferably, the dosage formulation comprises a monolithic tablet.

Tablet weight will also vary in accordance with, among other things, the aminopyridine dosage, the type and amount of rate-controlling polymer used, and the presence, types and amounts of additional materials. Assuming 4-aminopyridine dosages of from about 2 mg to about 120 mg; tablet weights can range from about 50 mg to about 1200 mg per tablet, and preferably from 250 to 500 mg, and more preferably about 400 mg.

The dosage formulation of the present invention may comprise also one or more pharmaceutically acceptable excipients as mentioned above. In preferred embodiments, the dosage formulation will comprise diluents and a lubricant in addition to the aminopyridine unit dose and the rate-controlling polymer. Particularly preferred diluents is microcrystalline cellulose sold under the name Avicel PH101, and a particularly preferred lubricant is magnesium stearate. When these materials are used, the magnesium stearate component preferably comprises from about 0.2 to about 0.75% w/w of the dosage formulation, and the microcrystalline cellulose along with the rate controlling polymer and aminopyridine

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

comprises the balance of the formulation. For example, a tablet formulation including a aminopyridine x % w/w, a rate-controlling polymer y % w/w, and microcrystalline cellulose z %, the magnesium stearate amount would be (100−(x+y+z)) where 0.2%≦(100−(x+y+z))≦0.75% w/w. As would be known to those skilled in the art, the amount of an additives such as magnesium stearate may vary depending upon the shear rate used to perform the mixing and the amount of such an additive may be changed without limitation to obtain a satisfactory dissolution rate or plasma level of the aminopyridine.

As used herein, the term "sustained-release" as it relates to the aminopyridine compositions includes the release of a aminopyridine from the dosage formulation at a sustained rate such that a therapeutically beneficial blood level below toxic levels of the aminopyridine is maintained over a period of at least about 12 hours, preferably about 24 hours or more. Preferably, the amount of the aminopyridine in the oral dosage formulations according to embodiments of the present invention establish a therapeutically useful plasma concentration through BID administration of the pharmaceutical composition.

If desired, the dosage formulations of this invention may be coated with a sustained-release polymer layer so as to provide additional sustained-release properties. Suitable polymers that can be used to form this sustained release layer include, for example, the release matrices listed above. As desired, the dosage formulation of the invention can be provided also with a light-protective and/or cosmetic film coating, for example, film-formers, pigments, anti-adhesive agents and politicizes. Such a film-former may consist of fast-dissolving constituents, such as low-viscosity hydroxypropylmethylcelluose, for example, Methocel E5 or D14, or Pharmacoat 606 (Shin-Etsu). The film coating may also contain excipients or enteric coatings customary in film-coating procedures, such as, for example, light-protective pigments, for example, iron oxide, or titanium dioxide, anti-adhesive agents, for example, talc, and also suitable plasticizers such as, for example, PEG 400, PEG 6000, diethyl phthalate or triethyl citrate.

The compositions of the present invention may be used for the treatment of neurological diseases characterized by a degradation of nerve impulse transmission by administering to a patient the oral dosage formulation of the present invention. Preferably, the administration is twice daily dosage of a therapeutically effective amount of an aminopyridine, even more preferably, 4-AP dispersed in HPMC. The administration can also include scheduling administration of doses of the pharmaceutical so that the concentration of the aminopyridine in the patient is at about the minimum therapeutically effective level to ameliorate the neurological condition, yet relatively low compared to the maximum concentration in order to minimize side effects. The compositions may be administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose of said active agent in the tablets at selected intervals of time until a therapeutic dose is achieved in the subject. For example, at the commencement of treatment the active agent is preferably administered at a dose less than about 15 mg/day until a tolerable state is reached. The dose administered may then be increased by amounts of at least 5-10 mg/day until a therapeutic dose is reached, preferably less than about 30 mg/day. For other diseases the amount of the aminopyridine required to reach a therapeutically effective amount for treatment is described in U.S. Pat. No. 5, 952,357 the contents of which are incorporated herein by reference in their entirety.

Compositions of the present invention where the potassium channel blocker is a mono- or di-aminopyridine active agent are particularly suitable for use in the treatment of a neurological disease that is characterized by demyelination of the central nervous system, more especially multiple sclerosis.

In one embodiment of the present invention, a method of treating multiple sclerosis is provided. Compositions of the present invention containing a therapeutically effective amount of mono- or di-aminopyridine active agent may be administered to a patient in need thereof. In particular, sustained release compositions comprising at least about 5 milligrams of an aminopyridine, preferably 4-aminopyridine may be administered at least once daily. In a preferred embodiment, a sustained release composition containing from about 10 to about 15 milligrams of 4-aminopyridine is administered twice daily. Treatment of multiple sclerosis may include increased walking speed, improved lower extremity muscle strength or improved lower extremity muscle tone. The sustained release aminopyridine composition is preferably administered twice daily. In certain embodiments, the composition may be administered about every 12 hours.

A further embodiment is a method of increasing walking speed in patients with multiple sclerosis comprising administering to a patient at least about 5 milligrams of a sustained release aminopyridine composition, preferably at least about 10 to about 15 milligrams of a sustained release aminopyridine composition.

A further embodiment is a method of increasing muscle tone or muscle strength in patients with multiple sclerosis comprising administering to a patient at least about 5 milligrams of a sustained release aminopyridine composition, preferably at least about 10 to about 15 milligrams of a sustained release aminopyridine composition.

Fampridine is a potential therapy for MS with a unique mechanism of action. At concentrations of 1-2 μM or less, fampridine appears to be a specific blocker of voltage dependent, neuronal potassium channels that affect conduction in demyelinated axons. Fampridine has been shown to restore action potential conduction in damaged, poorly myelinated nerve fibers, and it may also directly enhance synaptic transmission. In previous clinical trials, treatment with fampridine has been associated with a variety of neurological benefits in people with MS including faster walking and increased strength, as measured by standard neurological assessments.

Another aspect of the present invention provides for a method of selecting individuals based on responsiveness to a treatment. In one embodiment, the method comprises identifying a plurality of individuals; administering a test to each individual prior to a treatment period; administering a treatment, including, but not limited to administering a therapeutic agent or drug, to one or more of the individuals during the treatment period; administering the test a plurality of times to each individual during the treatment period; and selecting one or more individuals, wherein the selected individuals exhibit an improved performance during a majority of the tests administered during the treatment period as compared to the test administered prior to the treatment period. In certain embodiments, the method may further comprise administering the test to each individual after the treatment period, wherein the selected individuals further exhibit an improved performance during a majority of the tests administered during the treatment period as compared to the test administered after the treatment period.

It is important to note that this embodiment selects subjects who show a pattern of change that is consistent with a treatment response, but does not define the full characteristics of that response. The criterion itself does not specify the amount of improvement nor does it specify that the improvement must be stable over time. For example, a progressive decline in effect during the course of the study period, even one resulting in speeds slower than the maximum non-treatment value, would not be excluded by the criterion; as a specific example, changes from the maximum non-treatment value of, respectively, +20%, +5%, +1% and −30% during the double blind treatment period would qualify as a response under the criterion, but would actually show a net negative average change for the entire period, poor stability and a negative

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

endpoint. Post-hoc analyses of studies discussed in greater detail below indicate that we may expect responders defined by consistency of effect also to demonstrate increased magnitude and stability of benefit.

We have found this embodiment particularly applicable in our analysis of fampridine in patients suffering from multiple sclerosis. Clinicians who regularly prescribe compounded fampridine for MS have reported that only a proportion of their patients appear to respond with clear clinical benefits, and that, in their judgment, this proportion may be around one third. This extent of responsiveness may be related to the proposed mechanism of action, which is the restoration of conduction in demyelinated axons via the blockade of voltage-dependent potassium channels. Only a proportion of MS patients would be expected to possess axons of appropriate functional relevance that are susceptible to these drug effects, given the highly variable pathology of the disease. Currently, there is insufficient understanding of the disease to allow for pre-trial selection of potentially responsive patients. However, the existence of a subset of patients who respond consistently to the drug can be supported by quantitative observations in our own clinical studies discussed below.

Before treatment, the subjects in these two trials exhibited average walking speeds on the TW25 measure of approximately 2 feet per second (ft/sec). This is a significant deficit, since the expected walking speed for an unaffected individual is 5-6 ft/sec. Subjects in MS-F202 were selected for TW-25 walking time at screening of 8-60, which is equivalent to a range in speed of 0.42-3.1 ft/sec. Variability of functional status is an inherent characteristic of MS, and this can be seen in repeated measurement of walking speed over the course of weeks or months. At any of the three visits during the stable treatment period, 15-20% of placebo-treated subjects showed >20% improvement from baseline walking speed, a threshold chosen as one that indicates a true change in walking speed over background fluctuations. A larger proportion of the Fampridine-SR treated subjects showed such improvements, but this difference was not statistically significant, given the sample size and placebo response rate.

Given the often large variations in function experienced by people with MS, it is difficult for the subject or a trained observer to separate a treatment-related improvement from a disease-related improvement without the element of consistency over time. Consistency of benefit might therefore be expected to be a more selective measure of true treatment effect than magnitude of change. Based on this rationale, the responses of the individual subjects in the MS-F202 trial were examined for the degree to which their walking speed showed improvement during the double-blind treatment period and returned towards pre-treatment values after they were taken off drug, at follow-up. This subject-by-subject examination yielded a subgroup of subjects whose pattern of walking speed over time appeared to be consistent with a drug response. This led to the analysis illustrated in FIG. 1. This compares the placebo and Fampridine-SR treated groups with respect to the number of visits during the double-blind treatment period in which walking speed on the TW25 was faster than the maximum speed out of all five of the non-treatment visits (four visits prior to randomization and one follow-up visit after the drug treatment period).

The placebo-treated group showed a clear pattern of exponential decline in numbers of subjects with higher numbers of "positive" visits. This is what would be expected from a random process of variability. In contrast, the pattern of response in the Fampridine-SR treated group strongly diverged from this distribution; much larger numbers of Fampridine-SR treated subjects showed three or four visits with higher walking speeds than the maximum speed of all five non-treatment visits and less than half of the expected proportion had no visits with higher speeds. These results indicate that there was a sub-population of subjects in the Fampridine-SR treated group that experienced a consistent increase in walking speed related to treatment.

This analysis suggests that a relatively highly selective criterion for a likely treatment responder would be: a subject with a faster walking speed for at least three (i.e., three or four) of the four visits during the double blind treatment period compared to the maximum value for all five of the non-treatment visits. The four visits before initiation of double-blind treatment provide an initial baseline against which to measure the consistency of response during the four treatment visits. The inclusion of the follow-up visit as an additional component of the comparison was found valuable primarily in excluding those subjects who did not show the expected loss of improvement after coming off the drug. These are likely to be subjects who happened by chance to have improved in their MS symptoms around the time of treatment initiation, but whose improvement did not reverse on drug discontinuation because it was actually unrelated to drug. Thus, incorporating the follow-up visit as part of the criterion may help to exclude false positives, if the TW25 speed remains high at follow-up.

As described in Example 5, below, this responder criterion was met by 8.5%, 35.3%, 36.0%, and 38.6% of the subjects in the placebo, 10 mg, 15 mg, and 20 mg b.i.d. treatment groups, respectively, showing a highly significant and consistent difference between placebo and drug treatment groups. Given that there was little difference in responsiveness between the three doses examined, more detailed analyses were performed comparing the pooled Fampridine-SR treated groups against the placebo-treated group. The full results of this analysis for study are described in the following sections. These show that the responder group so identified experienced a >25% average increase in walking speed over the treatment period and that this increase did not diminish across the treatment period. The responder group also showed an increase in Subject Global Impression score and an improvement in score on the MSWS-12.

Additional features and embodiments of the present invention are illustrated by the following non-limiting examples.

## EXAMPLE 1

This example illustrates preparation of compositions of the present invention and their release of an aminopyridine. Tablets in accordance with the present invention having dosages of 5 mg, 7.5 mg and 12.5 mg respectively were manufactured at 5 Kg scale. Materials were used in the amounts shown in Table 1.

TABLE 1

| | % w/w | % w/w | % w/w |
|---|---|---|---|
| Milled 4-AP (#50 mesh) | 1.25 | 1.875 | 3.125 |
| Methocel K100LV | 60 | 60 | 60 |
| Avicel PH101 | 38.15 | 37.525 | 36.275 |
| Magnesium stearate | 0.2 | 0.2 | 0.2 |
| Aerosil 200 | 0.4 | 0.4 | 0.4 |
| Equipment Tablet Press | Horn Noak equipped with 13 × 8 mm oval tooling press speed 42,000 tablets/hr | | |
| Tablet Weight Range (mg) | 386-404 (96.5-101.0%) | 388-410 (97.0-102.5%) | 388-406 (97.0-101.5%) |
| Tablet Hardness Range (N) | 200-262 | 179-292 | 150-268 |
| Tablet Potency - mg/tab. (% LC) | 97.1 | 99.1 | 100.2 |
| Mean CU (mg/tab.)/ % CV | 5.0 mg/1.0% | 7.4 mg/0.7% | 12.4 mg/1.1% |
| CU Discrete Samples (mg/tab.)/% CV | 5.0 mg/1.2% | 7.5 mg/1.8% | 12.3/1.1% |

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

TABLE 1-continued

| Dissolution (%/hr) | Mean | (SD) | Mean | (SD) | Mean | (SD) |
|---|---|---|---|---|---|---|
| 1 | 28.9 | 1.1 | 29.2 | 1.8 | 25.9 | 1.1 |
| 2 | 42.7 | 1.8 | 42.1 | 1.6 | 40.2 | 2.5 |
| 3 | 52.8 | 1.4 | 53.0 | 1.0 | 49.8 | 2.1 |
| 4 | 61.4 | 2.2 | 61.8 | 1.5 | 60.1 | 2.4 |
| 6 | 75.7 | 3.1 | 75.2 | 1.6 | 74.8 | 2.7 |
| 10 | 95.5 | 3.3 | 98.7 | 1.4 | 93.2 | 0.9 |

Prior to blending, 4-AP was milled through #50 mesh screen using a FitzMill® (comminutor). The materials were added into a Gral 25 bowl in the following order: half Methocel K100LV, Avicel PH101, Aerosil 200, milled 4-AP and the remaining Methocel K100LV. The mix was blended for 15 minutes at 175 rpm, then the magnesium stearate was added and was further blended for 5 minutes at 100 rpm. Samples were taken from top and bottom positions for blend potency analysis. Weight and hardness checks were performed every 15 minutes by the check-master E3049. Discrete tablet samples were taken during the compression process to evaluate intra batch content uniformity.

EXAMPLE 2

This example illustrates that the pharmacokinetic profile of fampridine in compositions of the present invention is altered by administration in a sustained release tablet matrix compared to immediate release and controlled release formulations.

There is a delay in absorption manifested by a lower peak concentration, without any effect on the extent of absorption. When given as a single 12.5 mg dose, the peak concentration is approximately two-thirds lower as compared to peak values following administration of the IR formulation; the time to reach peak plasma levels was delayed by about 2 hours. As with the IR formulation, food delayed the absorption of Fampridine-SR. The absorption of fampridine was approximately 50% slower following ingestion of a fatty meal, although due to the flatness of the absorption curve, this may be exaggerated value. Extent of absorption did not differ, as values for Cmax and AUC were comparable as summarized in Table 2.

TABLE 2

Pharmacokinetic Parameter Values (Mean ± SD) in Studies Using Fampridine SR, CR, and IR Formulations: Single Dose Studies in Healthy Adult Male Volunteers

| Study Number | Dose (mg) | Fed/ Fasted | $C_{MAX}$ (ng/mL) | $t_{MAX}$ (hours) | AUC (0-∞) (ng hr/mL) |
|---|---|---|---|---|---|
| 0494006 N = 12 | 12.5 SR (PD12265) | Fed | 28.7 ± 4.3 | 5.3 ± 0.8 | 257.0 ± 62.7 |
| | | Fasted | 25.6 ± 3.8 | 2.8 ± 1.3 | 269.9 ± 44.4 |
| | 12.5 IR (PD12266) | Fasted | 79.3 ± 16.3 | 0.9 ± 0.4 | 294.2 ± 55.6 |
| 1194002 N = 12 | 12.5 SR (PD12907) | Fasted | 28.5 ± 4.3 | 2.9 ± 2.4 | 285.9 ± 37.8 |
| | 12.5 CR (4n806) | Fasted | 37.7 ± 9.9 | 3.6 ± 0.9 | 300.0 ± 53.6 |
| | 12.5 IR (PS644) | Fasted | 83.5 ± 23.5 | 0.79 ± 0.3 | 274.0 ± 59.2 |

EXAMPLE 3

This example details the pharmacokinetic properties of Fampridine-SR in tablets of the present invention administered to patients with multiple sclerosis. Plasma samples were analyzed for fampridine using a validated LC/MS/MS assay with a sensitivity of 2 ng/mL. Noncompartmental pharmacokinetic parameter values were calculated using standard methodology.

This was an open-label, multi-center, dose proportionality study of orally administered fampridine in patients with multiple sclerosis. Single doses of fampridine were to be given in escalating doses (5 mg, 10 mg, 15 mg, and 20 mg) with at least a four-day interval between administration of each dose of drug. Safety evaluations were to be performed during the 24 hour period following administration of fampridine and blood samples were to be taken at the following times to determine pharmacokinetic parameters: hour 0 (pre-dose), hours 1-8, and hours 10, 12, 14, 18, and 24.

Twenty-three subjects received all 4 treatments, and one subject received only 3 treatments; data from all treatments were analyzed. Dose-dependent parameters (e.g., peak plasma concentration and areas-under-the curve) were normalized to a 10 mg dose for among-dose comparisons. Overall observed time of the peak plasma concentration (mean and its 95% confidence interval) was 3.75 (3.52, 3.98) h, observed peak plasma fampridine concentration (normalized to a 10 mg dose) was 24.12 (23.8, 26.6) ng/ml, area-under-the-concentration-time curve (normalized to a 10 mg dose) was estimated to be 254 (238, 270) ng·h/ml, extrapolated area-under-the-concentration-time curve (normalized to a 10 mg dose) was 284 (266, 302) ng·h/ml, terminal rate constant equaled 0.14 (0.13, 0.15) $h^{-1}$, terminal half-life was 5.47 (5.05, 5.89) h and clearance divided by bioavailability (CL/F) was equal to 637 (600, 674) ml/ min.

Dizziness was the most common treatment-related adverse event. Other treatment related adverse events included amblyopia, asthenia, headache, and ataxia. There were no clinically significant changes in clinical laboratory values, ECG parameters, vital signs, physical examination findings, or neurological examination findings noted over the course of this study.

When the plasma concentrations of fampridine were normalized to the 10.0 mg dose levels, there were no significant differences between any pharmacokinetic parameter (AUC, $C_{max}$, $t_{1/2}$) in the 5-20 mg dose range. Fampridine was well tolerated at the doses used in this study. Dose-normalized (to a 10 mg dose) pharmacokinetic parameter values are summarized in Table3.

TABLE 3

Dose-Normalized (at 10 mg) Pharmacokinetic Parameter Values (Mean ± SEM) Following Single Oral Administration of Fampridine-SR to Patients with MS.

| Dose (mg) | $C_{MAX}$ norm (ng/mL) | $t_{MAX}$ (hours) | AUC-norm (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
|---|---|---|---|---|---|
| 5 (n = 24) | 26.2 ± 0.6 | 3.9 ± 0.2 | 244.2 ± 9.4 | 5.8 ± 0.5 | 619.8 ± 36.2 |
| 10 (n = 24) | 25.2 ± 0.7 | 3.9 ± 0.3 | 252.2 ± 7.8 | 5.6 ± 0.4 | 641.4 ± 39.1 |
| 15 (n = 24) | 24.6 ± 0.7 | 3.6 ± 0.3 | 263.0 ± 7.4 | 5.5 ± 0.4 | 632.4 ± 39.0 |
| 20 (n = 23) | 24.6 ± 0.8 | 3.6 ± 0.3 | 255.6 ± 6.9 | 5.1 ± 0.3 | 653.9 ± 37.1 |

EXAMPLE 4

This example describes the results of an open-label study to assess the steady state pharmacokinetics of orally administered fampridine (4-aminopyridine) compositions of the present invention in subjects with Multiple Sclerosis. This study was an open-label multiple dose study of Fampridine-SR intended to assess steady state pharmacokinetics in 20 patients with MS who previously completed the study summarized in Table 4. Fampridine-SR (40 mg/day) was administered as two 20 mg doses, given as one morning and one evening dose for 13 consecutive days, with a single administration of 20 mg on Day 14. Blood samples for pharmacoki-

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

netic analysis were collected on Days 1, 7/8, and 14/15 at the following intervals: immediately prior to drug administration (baseline), hourly for the first 8 hours, and 10, 12, and 24 hours post-dose. Additional blood samples were collected 14, 18, and 20 hours post-dose on Day 14, and 30 and 36 hours post-dose on Day 15.

Pharmacokinetic parameter estimates following the first dose in these patients in this study on Day 1 were comparable to those determined when they participated in the study summarized in Table 4. No significant difference in $T_{max}$ was detected among the four means (Single dose=3.76 h; Day 1=3.78 h; Day 8=3.33 h; Day 15=3.25 h). $C_{max}$ and $C_{max}/C_{\tau}$ on Days 8 ($C_{max}$=66.7 ng/ml) and 15 ($C_{max}$=62.6 ng/ml) were significantly greater than those of the single dose treatment and of Day 1 ($C_{max}$=48.6 ng/ml), reflecting accumulation of the drug with multiple dosing.

There was no significant difference among the four occasions with regard to either T or C and no difference in $C_{max}$, $C_{max}/C_{\tau}$, CL/F or $AUC_{0-\tau}$ between Days 8 and 15. Further AUC on Days 8 and 15 did not differ significantly from total AUC with single dose treatment. Likewise, the estimates of CL/F on Days 8 and 15 and of λ and $T_{1/2}$ on Day 15 did not differ significantly from those with single dose.

Steady-state was attained by Day 7/8 as evidence by the lack of differences in $C_{max}$ or AUC between Days 7/8 and 14/15; there was no apparent unexpected accumulation. Likewise, the estimates of CL/F on Days 7/8 and 14/15 of and of $T_{1/2}$ on Day 14/15 did not differ significantly from those given a single dose. On the final day of dosing, mean $C_{max}$ was 62.6 ng/mL, occurring 3.3 hours post-dose. The $T_{1/2}$ was 5.8 hours. These values are similar to those observed in patients with chronic SCI receiving similar doses of this formulation. These results are summarized in Table 4.

TABLE 4

Pharmacokinetic Parameter Values (Mean and 95% CI) Following Multiple Oral Doses of Fampridine-SR (40 mg/day) to 20 Patients with MS.

| Day | Parameter $C_{MAX}$ (ng/mL) | $t_{MAX}$ (hours) | $AUC_{(0-12)}$ (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
|---|---|---|---|---|---|
| Day 1 | 48.6 (42.0, 55.3) | 3.8 (3.2, 4.3) | NE | NE | NE |
| Day 7/8 | 66.7 (57.5, 76.0) | 3.3 (2.8, 3.9) | 531 (452, 610) | NE | 700 (557, 884) |
| Day 14/15 | 62.6 (55.7, 69.4) | 3.3 (2.6, 3.9) | 499 (446, 552) | 5.8 (5.0, 6.6) | 703 (621, 786) |

Dizziness was the most common treatment-related adverse event. Other treatment-related adverse events that occurred included nausea, ataxia, insomnia, and tremor. There were no clinically significant changes in mean clinical laboratory values, vital signs, or physical examination findings from baseline to last visit. There were no apparent clinically significant changes in corrected QT intervals or QRS amplitudes after administration of fampridine.

Fampridine was well tolerated in subjects with multiple sclerosis who receive twice daily doses (20 mg/dose) of fampridine for two weeks. A significant increase was observed in $C_{max}$, and $C_{max}/C_{\tau}$ on Days 8 and 15 relative to those on Day 1 and with single dose treatment, reflecting accumulation of fampridine with multiple dosing. A lack of significant differences in $C_{max}$, $C_{max}/C_{\tau}$, CL/F or $AUC_{0-\tau}$ between Days 8 and 15 suggest that near steady-state is reached by Day 8. There was no evidence of significant changes in pharmacokinetics during a two-week period of multiple dosing with fampridine.

## EXAMPLE 5

This example provides an embodiment of a method of treating subjects with a sustained release fampridine formulation and a responder analysis of the present invention. This was a Phase 2, double-blind, placebo-controlled, parallel group, 20-week treatment study in 206 subjects diagnosed with Multiple Sclerosis. This study was designed to investigate the safety and efficacy of three dose levels of Fampridine-SR, 10 mg b.i.d., 15 mg b.i.d., and 20 mg b.i.d. in subjects with clinically definite MS. The primary efficacy endpoint was an increase, relative to baseline, in walking speed, on the Timed 25 Foot Walk. Secondary efficacy measurements included lower extremity manual muscle testing in four groups of lower extremity muscles (hip flexors, knee flexors, knee extensors, and ankle dorsiflexors); the 9-Hole Peg Test and Paced Auditory Serial Addition Test (PASAT 3"); the Ashworth score for spasticity; Spasm Frequency/Severity scores; as well as a Clinician's (CGI) and Subject's (SGI) Global Impressions, a Subject's Global Impression (SGI), the Multiple Sclerosis Quality of Life Inventory (MSQLI) and the 12-Item MS Walking Scale (MSWS-12).

At the first visit (Visit 0) subjects were to enter into a two-week single-blind placebo run-in period for the purpose of establishing baseline levels of function. At Visit 2 subjects were to be randomized to one of four treatment groups (Placebo or Fampridine-SR 10 mg, 15 mg, 20 mg) and begin two weeks of double-blind dose-escalation in the active drug treatment groups (B, C and D). Group A were to receive placebo throughout the study. Subjects in the 10 mg (Group B) arm of the study took a dose of 10 mg approximately every 12 hours during both weeks of the escalation phase. The 15 mg (Group C) and 20 mg (Group D) dose subjects took a dose of 10 mg approximately every 12 hours during the first week of the escalation phase and titrated up to 15 mg b.i.d. in the second week. Subjects were to be instructed to adhere to an "every 12 hour" dosing schedule. Each subject was advised to take the medication at approximately the same time each day throughout the study; however, different subjects were on differing medication schedules (e.g., 7 AM and 7 PM; or 9 AM and 9 PM). After two weeks, the subjects were to return to the clinic at Visit 3 for the start of the stable dose treatment period. The first dose of the double-blind treatment phase at the final target dose (placebo b.i.d. for the Group A, 10 mg b.i.d. for Group B, 15 mg b.i.d. for Group C, and 20 mg b.i.d. for Group D) was taken in the evening following Study Visit 4. Subjects were to be assessed five times during the 12-week treatment period. Following the 12-week treatment phase there was to be a one-week down titration starting at Visit 9. During this down-titration period, group B was to remain stable at 10 mg b.i.d. and Group C was to be titrated to 10 mg b.i.d., while group D was to have a change in the level of dose during the week (15 mg b.i.d. for the first three days and 10 mg b.i.d. for the last four days). At the end of the down titration period at Visit 10, subjects were to enter a two-week washout period where they did not receive any study medication. The last visit (Visit 11) was to be scheduled two weeks after the last dosing day (end of the downward titration). Plasma samples were collected at each study site visit other than Study Visit 0.

The primary measure of efficacy was improvement in average walking speed, relative to the baseline period (placebo run-in), using the Timed 25 Foot Walk from the Multiple Sclerosis Functional Composite Score (MSFC). This is a quantitative measure of lower extremity function. Subjects were instructed to use whatever ambulation aids they normally use and to walk as quickly as they could from one end to the other end of a clearly marked 25-foot course. Other efficacy measures included the LEMMT, to estimate muscle strength bilaterally in four groups of muscles: hip flexors, knee flexors, knee extensors, and ankle dorsiflexors. The test was performed at the Screening Visit and at Study Visits 1, 2, 4, 7, 8, 9 and 11. The strength of each muscle group was rated on the modified BMRC scale: 5=Normal muscle strength; 4.5=Voluntary movement against major resistance applied by the examiner, but not normal; 4=Voluntary movement against

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

moderate resistance applied by the examiner; 3.5=Voluntary movement against mild resistance applied by the examiner; 3=Voluntary movement against gravity but not resistance; 2=Voluntary movement present but not able to overcome gravity; 1=Visible or palpable contraction of muscle but without limb movement; and 0=Absence of any voluntary contraction. Spasticity in each subject was assessed using the Ashworth Spasticity Score. The Ashworth Spasticity Exam was performed and recorded at the Screening Visit and at Study Visits 1, 2, 4, 7, 8, 9 and 11.

Protocol Specified Responder Analysis. To supplement the primary analysis, a categorical "responder" analysis was also conducted. Successful response was defined for each subject as improvement in walking speed (percent change from baseline) of at least 20%. Subjects who dropped out prior to the stable dose period were considered non-responders. The proportions of protocol specified responders were compared among treatment groups using the Cochran-Mantel-Haenszel test, controlling for center.

Post hoc analysis of this study suggested that a relatively highly selective criterion for a likely treatment responder would be a subject with a faster walking speed for at least three visits during the double blind treatment period as compared to the maximum value among a set of five non-treatment visits (four before treatment and one after discontinuation of treatment). The four visits before initiation of double-blind treatment provided an initial baseline against which to measure the consistency of response during the four double-blind treatment visits. The inclusion of the follow-up visit as an additional component of the comparison was useful primarily in excluding those subjects who may be false positives, i.e., did not show the expected loss of improvement after coming off the drug. Treatment differences in the proportion of theses post hoc responders were analyzed using the Cochran-Mantel-Haenszel (CMH) test, controlling for center.

To validate the clinical meaningfulness of the post hoc responder variable, (post hoc) responders were compared against the (post hoc) non-responders, on the subjective variables: (i) Change from baseline in MSWS-12 over the double-blind; (ii) SGI over the double-blind; and (iii) Change from baseline in the CGI over the double-blind; to determine if subjects with consistently improved walking speeds during the double-blind could perceive improvement relative to those subjects who did not have consistently improved walking speeds. For the subjective variables, differences between responder status classification (responder or non-responder) were compared using an ANOVA model with effects for responder status and center.

Results. A total of 206 subjects were randomized into the study: 47 were assigned to placebo, 52 to 10 mg bid Fampridine-SR (10 mg bid), 50 to 15 mg bid Fampridine-SR (15 mg bid), and 57 to 20 mg bid Fampridine-SR (20 mg bid). The disposition of subjects is presented in Table 5 below.

TABLE 5

Summary of subject disposition (all randomized population)

| | Treatment Group: N (%) | | | | |
|---|---|---|---|---|---|
| | Placebo | 10 mg bid | 15 mg bid | 20 mg bid | Total |
| Subjects Randomized | 47 | 52 | 50 | 57 | 206 |
| Took at Least One Dose (Included in Safety Analysis) | 47 (100%) | 52 (100%) | 50 (100%) | 57 (100%) | 206 (100%) |
| ITT Population | 47 (100%) | 51 (98.1%) | 50 (100%) | 57 (100%) | 205 (99.5%) |
| Discontinued Subjects | 2 (4.3%) | 2 (3.8%) | 1 (2.0%) | 6 (10.5%) | 11 (5.3%) |

Note:
Percentages are based on the number of randomized subjects.

All 206 randomized subjects took at least one dose of study medication and were included in the safety population. One subject (subject# 010/07 10 mg bid group) was excluded from the ITT population (lost to follow-up after 8 days of placebo run-in). A total of 11 subjects discontinued from the study.

The population consisted of 63.6% females and 36.4% males. The majority of the subjects were Caucasian (92.2%), followed by Black (4.9%), Hispanic (1.5%), those classified as 'Other' (1.0%), and Asian/Pacific Islander (0.5%). The mean age, weight, and height of the subjects were 49.8 years (range: 28-69 years), 74.44 kilograms (range: 41.4-145.5 kilograms), and 168.84 centimeters (range: 137.2-200.7 centimeters), respectively. Most of the subjects (52.4%) had a diagnosis type of secondary progressive with about equal amounts of relapsing remitting (22.8%) and primary progressive (24.8%) subjects. The mean duration of disease was 12.00 years (range: 0.1-37.5 years) while the mean Expanded Disability Status Scale (EDSS) at screening was 5.77 units (range: 2.5-6.5 units). The treatment groups were comparable with respect to all baseline demographic and disease characteristic variables.

Results for the key efficacy variables at baseline for the ITT population are further summarized in Table 6 below.

TABLE 6

Summary of key efficacy variables at baseline (ITT population)

| | Treatment Group: Mean (SD) | | | | |
|---|---|---|---|---|---|
| Parameter | placebo N = 47 | 10 mg bid N = 51 | 15 mg bid N = 50 | 20 mg bid N = 57 | Treatment. p-value |
| Walking Speed (ft/sec) | 1.87 (0.902) | 1.94 (0.874) | 1.99 (0.877) | 2.04 (0.811) | 0.752 |
| LEMMT | 4.05 (0.690) | 3.98 (0.661) | 4.00 (0.737) | 3.98 (0.634) | 0.964 |
| SGI | 4.38 (0.795) | 4.32 (0.999)* | 4.56 (1.110) | 4.25 (0.969) | 0.413 |
| MSWS-12 | 75.71 (16.566) | 76.31 (16.186) | 74.60 (17.671) | 76.83 (18.124) | 0.923 |

*One subject did not have a baseline value.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

With respect to the 205 subjects in the ITT population, mean values for baseline walking speed, LEEMT, SGI, and MSWS-12 were approximately 2 feet per second, 4 units, 4.5 units, and 76 units, respectively. The treatment groups were comparable with respect to these variables as well as all the other efficacy variables at baseline.

Descriptive statistics for the average walking speed (ft/sec) by study day based on the Timed 25-Foot Walk are presented in Table 7 and FIG. 2. The timed 25 foot walk showed a trend toward increased speed during the stable dose period for all three dose groups, though the average improvement declined during the treatment period.

TABLE 7

Average walking speeds (ft/sec) by study day (observed cases, ITT population)
Summary Statistics Over Time

| Treatment | | Study day: base | titration | 1st stbl | 2nd stbl | 3rd stbl | follow-up |
|---|---|---|---|---|---|---|---|
| placebo | Mean | 1.87 | 1.89 | 1.90 | 1.89 | 1.89 | 1.86 |
| | (SD) | (0.902) | (0.876) | (0.908) | (0.891) | (0.914) | (0.933) |
| | N# | 47 | 47 | 46 | 46 | 45 | 45 |
| 10 mg bid | Mean | 1.94 | 2.20 | 2.09 | 2.12 | 2.00 | 1.88 |
| | (SD) | (0.874) | (0.979) | (0.955) | (1.043) | (1.016) | (0.970) |
| | N | 51 | 51 | 51 | 51 | 50 | 48 |
| 15 mg bid | Mean | 1.99 | 2.25 | 2.16 | 2.14 | 2.18 | 1.83 |
| | (SD) | (0.877) | (0.995) | (0.986) | (0.957) | (0.932) | (0.952) |
| | N | 50 | 49 | 49 | 48 | 48 | 47 |
| 20 mg bid | Mean | 2.04 | 2.26 | 2.22 | 2.19 | 2.04 | 1.83 |
| | (SD) | (0.811) | (0.936) | (0.893) | (0.936) | (0.996) | (0.822) |
| | N | 57 | 55 | 52 | 51 | 49 | 55 |

#The treatment sample sizes presented in the figure legend represent the number of ITT subjects. Sample sizes at individual time points may be smaller than those in the ITT population due to dropouts or missed assessments.

During double-blind treatment, all the Fampridine-SR groups exhibited mean walking speeds between 2.00 and 2.26 feet per second, while the mean value in the placebo group was consistently about 1.90 feet per second. It should be noted that, at the third stable-dose visit, both the 10 mg bid and 20 mg bid group means dropped-off from what would be expected under the assumption that treatment benefit is consistent over time. This may or may not have been due to chance; further studies should provide additional evidence for either case. After double-blind medication was discontinued, all the treatment groups converged to approximately the same mean value at follow-up.

Results for the primary efficacy variable (percent change in average walking speed during the 12-week stable dose period relative to baseline based on the 25-foot walk) are summarized in FIG. 3. The timed 25 foot walk showed a trend toward increased speed during the stable dose period for all three dose groups, though the average improvement declined during the treatment period, as shown in FIG. 3. The mean percent changes in average walking speed during the 12-week stable dose period (based on adjusted geometric mean change of the log-transformed walking speeds) were 2.5%, 5.5%, 8.4%, and 5.8% for the placebo, 10 mg bid, 15 mg bid, and 20 mg bid groups, respectively. There were no statistical differences between any Fampridine-SR groups and the placebo group.

Results for the protocol specified responder analysis (subjects with average changes in walking speed during the 12 weeks of stable double-blind treatment of at least 20%) are summarized in FIG. 4. The percentages of subjects with average changes in walking speed during the 12-week stable dose period of at least 20% (pre-defined responders) were 12.8%, 23.5%, 26.5%, and 16.1% for the placebo, 10 mg bid, 15 mg bid, and 20 mg bid groups, respectively. There were no statistically significant differences between any of the Fampridine-SR groups and the placebo group.

Descriptive statistics for the average overall Lower Extremity Manual Muscle Testing (LEMMT) by study day are presented in Table 8 and in FIG. 5.

TABLE 8

Average overall LEMMT by Study Day
Summary Statistics Over Time

| Treatment | | Study day: base | titration | 1st stbl | 2nd stbl | 3rd stbl | follow-up |
|---|---|---|---|---|---|---|---|
| placebo | Mean | 4.05 | 4.00 | 4.02 | 4.03 | 4.00 | 4.02 |
| | (SD) | (0.690) | (0.705) | (0.687) | (0.696) | (0.679) | (0.738) |
| | N# | 47 | 46 | 46 | 46 | 45 | 45 |
| 10 mg bid | Mean | 3.98 | 4.09 | 4.06 | 4.09 | 4.07 | 3.89 |
| | (SD) | (0.661) | (0.641) | (0.650) | (0.685) | (0.642) | (0.631) |
| | N | 51 | 50 | 51 | 51 | 50 | 49 |
| 15 mg bid | Mean | 4.00 | 4.16 | 4.11 | 4.09 | 4.17 | 4.08 |
| | (SD) | (0.737) | (0.653) | (0.645) | (0.659) | (0.618) | (0.674) |
| | N | 50 | 49 | 49 | 49 | 49 | 46 |
| 20 mg bid | Mean | 3.98 | 4.08 | 4.03 | 3.98 | 4.07 | 3.92 |
| | (SD) | (0.634) | (0.639) | (0.659) | (0.714) | (0.649) | (0.650) |
| | N | 57 | 54 | 52 | 52 | 48 | 55 |

#The treatment sample sizes presented at individual time points may be smaller than those in the ITT population due to dropouts or missed assessments.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

During double-blind treatment, all the Fampridine-SR groups exhibited a numerical pattern of larger mean LEMMT scores than placebo (except the 20 mg bid group at the 2nd stable dose visit). After double-blind medication was discontinued, with the exception of the 15 mg bid group, all the group means were lower than they were at baseline.

Results for the average change in LEMMT during the 12-week stable dose period relative to baseline are summarized in FIG. 6. The mean changes in overall LEMMT during the 12-week stable dose period were −0.05 units, 0.10 units, 0.13 units, and 0.05 units for the placebo, 10 mg bid, 15 mg bid, and 20 mg bid groups, respectively. Improvements in LEMMT were significantly greater in the 10 mg bid and 15 mg bid groups compared to the placebo group; there was no significant difference between the 20 mg bid group and the placebo group.

No statistically significant differences were detected among treatment group based on any of the other secondary efficacy variables, as shown in Table 9.

TABLE 9

Changes in secondary efficacy variables from baseline during the 12-week stable dose period

| Parameter | Treatment Group placebo N = 47 | 10 mg bid N = 51 | 15 mg bid N = 50 | 20 mg bid N = 57 |
|---|---|---|---|---|
| Ashworth Score | | | | |
| N | 46 | 51 | 49 | 53 |
| Mean (SD) | −0.11 (0.377) | −0.04 (0.449) | −0.06 (0.375) | 0.02 (0.466) |
| p-value (each dose vs. placebo) | | 0.802 | 0.826 | 0.275 |
| CGI | | | | |
| N | 45 | 50 | 49 | 52 |
| Mean (SD) | 0.0 (0.66) | −0.2 (0.72) | −0.1 (0.85) | 0.0 (0.78) |
| p-value (each dose vs. placebo) | | 0.772 | 0.997 | 0.996 |
| SGI | | | | |
| N | 46 | 50 | 49 | 53 |
| Mean (SD) | −0.2 (0.96) | 0.0 (1.27) | −0.1 (1.11) | −0.1 (0.86) |
| p-value (each dose vs. placebo) | | 0.704 | 0.953 | 0.968 |
| PASAT | | | | |
| N | 46 | 51 | 49 | 53 |
| Mean (SD) | 2.17 (4.016) | 2.13 (3.394) | 0.90 (3.274) | 0.65 (4.590) |
| p-value (each dose vs. placebo) | | >0.999 | 0.306 | 0.218 |
| MSFC | | | | |
| N | 46 | 51 | 49 | 52 |
| Mean (SD) | 0.08 (0.205) | 0.10 (0.310) | 0.90 (0.224) | 0.06 (0.194) |
| p-value (each dose vs. placebo) | | 0.977 | >0.999 | 0.968 |

TABLE 9-continued

Changes in secondary efficacy variables from baseline during the 12-week stable dose period

| Parameter | Treatment Group placebo N = 47 | 10 mg bid N = 51 | 15 mg bid N = 50 | 20 mg bid N = 57 |
|---|---|---|---|---|
| MSWS-12 | | | | |
| N | 46 | 51 | 49 | 52 |
| Mean (SD) | −3.56 (14.548) | −5.53 (16.154) | −7.32 (16.295) | −5.76 (15.296) |
| p-value (each dose vs. placebo) | | 0.718 | 0.445 | 0.617 |

Note:
The treatment sample sizes presented in the treatment heading represent the number of ITT subjects.
Sample sizes for individual variables may be smaller due to dropouts or missed assessments.
Note:
For each variable, the p-values (versus placebo) are Dunnett-adjusted.

While pre-planned analyses of the primary efficacy endpoint provided insufficient evidence of treatment benefits for any of the Fampridine-SR doses, subsequent analysis revealed the existence of a subset of subjects who responded to the drug with clinical meaningfulness. These subjects exhibited walking speeds while on drug that were consistently better than the fastest walking speeds measured when the subjects were not taking active drug.

The post hoc responder rates based on consistency of improved walking speeds were significantly higher in all three active dose groups (35, 36 and 39%) compared to placebo (9%; p<0.006 for each dose group, adjusting for multiple comparisons) as shown in FIG. 7.

Given that there was little difference in responsiveness between the three doses examined, more detailed analyses were performed comparing the pooled Fampridine-SR treated groups against the placebo-treated group. FIG. 8 summarizes, for the placebo and the pooled Fampridine-SR group, the percentage of post hoc responders. The number of subjects who met he post hoc responder criterion in the pooled Fampridine-SR treated group was 58 (36.7%) compared to 4 (8.5%) in the placebo-treated group, and this difference was statistically significant (p<0.001).

To validate the clinical meaningfulness of the post hoc responder variable, the 62 responders (58 fampridine and 4 placebo) were compared against the 143 non-responders (100 fampridine and 43 placebo) on the subjective variables to determine if subjects with consistently improved walking speeds during the double-blind could perceived benefit relative to those subjects who did not have consistently improved walking speeds. The results are summarized in FIG. 9 and indicate that consistency in walking speed had clinical meaningfulness for the subjects in this study since the responders had (over the double-blind period) significantly better changes from baseline in MSWS-12 and significantly better subjective global scores. In addition, the responders were rated marginally better than the non-responders by the clinicians during the double-blind. Thus, responders experienced clinically meaningful improvements in their MS symptoms, and treatment with fampridine significantly increased the chances of such a response.

To establish baseline comparability among the responder analysis groups, analyses were performed on the baseline demographic variables, key neurological characteristics and the relevant efficacy variables at baseline. In general, the responder analysis groups were comparable for all demographic and baseline characteristics variables.

Having demonstrated the clinical meaningfulness of consistently improved walking speeds during the double-blind as a criterion for responsiveness, the question of the magnitude

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

of benefit becomes of interest. The fampridine non-responders, although providing no relevant efficacy information, do provide safety information regarding those individuals who are treated with fampridine but show no apparent clinical benefit. As such, responder analyses of these groups were performed.

With respect to magnitude of benefit, FIG. **10** and Table 12 below summarizes the percent changes in walking speed at each double-blind visit by responder analysis grouping. The mean improvement for the fampridine responders during the double-blind across 14 weeks of treatment ranged from 24.6% to 29.0% compared to 1.7% to 3.7% for the placebo group; this was highly significant (p<0.001) at every visit. Although providing no relevant efficacy information, results for the fampridine non-responders are also illustrated and show that there was, and could be, some worsening in walking speeds after 12-weeks when a non-responder is treated with fampridine. The improvement was stable (±3%) across 14 weeks of treatment, and was associated with improvement in two global measures (Subject Global Impression and Multiple Sclerosis Walking Scale-12). The four placebo responders showed a 19% improvement in walking speed but there were too few subjects in this group for meaningful statistical comparison. Response status was not significantly related to baseline demographics, including type or severity of MS. Adverse events and safety measures were consistent with previous experience for this drug.

TABLE 12

Summary of percent change in Walking Speed at each double-blind visit by responder analysis grouping.
Summary Statistics Over Time

| Treatment | | Study day titration | 1st stbl | 2nd stbl | 3rd stbl |
|---|---|---|---|---|---|
| Placebo | Mean | 1.7 | 2.6 | 1.8 | 3.7 |
| | (SEM) | (2.21) | (3.23) | (3.11) | (3.38) |
| | N# | 47 | 46 | 46 | 45 |
| Fampridine | Mean | 8.3 | 3.5 | −0.2 | −6.5 |
| Non-responders | (SEM) | (2.05) | (1.90) | (1.76) | (2.49) |
| | N | 97 | 94 | 93 | 89 |
| Fampridine | Mean | 27.4 | 24.6 | 29.0 | 27.3 |
| Responders | (SEM) | (2.43) | (2.44) | (4.31) | (3.52) |
| | N | 58 | 58 | 57 | 58 |
| FR vs. Placebo | p-value^ | <0.001 | <0.001 | <0.001 | <0.001 |
| FR vs. FNR | p-value^ | <0.001 | <0.001 | <0.001 | <0.001 |
| FNR vs. PBO | p-value^ | 0.080 | 0.884 | 0.497 | 0.022 |

ABBREVIATIONS:
FR = Fampridine Responders;
FNR = Fampridine Non-responders.
#The treatment sample sizes presented at individual time points may be smaller than those in the ITT population due to dropouts or missed assessments.
#The treatment sample sizes presented in the figure legend represent the number of ITT subjects. Sample sizes at individual time points may be smaller due to dropouts or missed assessments.
^P-values from t-tests of the least-squares means using the mean square error via an ANOVA model with effects for responder analysis grouping and center.

FIG. **11** and Table 13 summarize the changes in LENMT at each double-blind visit by responder analysis grouping. The mean improvement for the fampridine responders during the double-blind ranged from 0.09 to 0.18 units compared to −0.04 units at each visit for the placebo group; this was significant at every visit except the second stable dose visit (p=0.106). Although providing no relevant efficacy information, results for the fampridine non-responders are also illustrated and show that there was, and could be, some significant improvement in leg strength when non-responder is treated with fampridine. This suggests that although a clinically meaningful response can be linked to about 37% of subjects treated with Fampridine-SR, additional subjects may have functional improvements on variables other than walking speed.

TABLE 13

Summary of percent change in LEMMT at each double-blind visit by responder analysis grouping.
Summary Statistics Over Time

| Treatment | | Study day titration | 1st stbl | 2nd stbl | 3rd stbl |
|---|---|---|---|---|---|
| Placebo | Mean | −0.04 | −0.04 | −0.04 | −0.04 |
| | (SEM) | (0.035) | (0.042) | (0.039) | (0.042) |
| | N# | 46 | 46 | 46 | 45 |
| Fampridine | Mean | 0.12 | 0.10 | 0.09 | 0.10 |
| Non-responders | (SEM) | (0.028) | (0.033) | (0.036) | (0.038) |
| | N | 95 | 94 | 94 | 89 |
| Fampridine | Mean | 0.18 | 0.09 | 0.09 | 0.17 |
| Responders | (SEM) | (0.029) | (0.032) | (0.043) | (0.045) |
| | N | 58 | 58 | 58 | 58 |
| FR vs. Placebo | p-value^ | <0.001 | 0.023 | 0.106 | 0.004 |
| FR vs. FNR | p-value^ | 0.178 | 0.627 | 0.739 | 0.311 |
| FNR vs. PBO | p-value^ | <0.001 | 0.003 | 0.038 | 0.032 |

ABBREVIATIONS:
FR = Fampridine Responders;
FNR = Fampridine Non-responders.
#The treatment sample sizes presented at individual time points may be smaller than those in the ITT population due to dropouts or missed assessments. Treatment sample sizes presented in the figure legend represent the number of ITT subjects. Sample sizes at individual time points may be smaller due to dropouts or missed assessments.
^P-values from t-tests of the least-squares means using the mean square error via an ANOVA model with effects for responder analysis grouping and center.

FIG. **12** and Table 14, below, summarize the changes in Overall Ashworth Score at each double-blind visit by responder analysis grouping. The mean reduction from baseline (indicative of improvement) for the fampridine responders during the double-blind ranged from −0.18 to −0.11 units compared to −0.11 to −0.06 for the placebo group. The fampridine responders were numerically superior to placebo but there was insufficient evidence to detect significant differences. Although appearing to provide little relevant efficacy information, results for the fampridine non-responders are also illustrated.

TABLE 14

Summary of change in overall Ashworth score at each double-blind visit by responder analysis grouping.
Summary Statistics Over Time

| Treatment | | Study day titration | 1st stbl | 2nd stbl | 3rd stbl |
|---|---|---|---|---|---|
| Placebo | Mean | −0.06 | −0.11 | −0.06 | −0.13 |
| | (SEM) | (0.069) | (0.073) | (0.070) | (0.073) |
| | N# | 46 | 46 | 46 | 45 |
| Fampridine | Mean | −0.16 | −0.08 | −0.07 | 0.00 |
| Non-responders | (SEM) | (0.044) | (0.053) | (0.054) | (0.056) |
| | N | 95 | 94 | 94 | 89 |
| Fampridine | Mean | −0.14 | −0.18 | −0.11 | −0.18 |
| Responders | (SEM) | (0.058) | (0.066) | (0.060) | (0.055) |
| | N | 58 | 58 | 58 | 58 |
| FR vs. Placebo | p-value^ | 0.343 | 0.374 | 0.717 | 0.680 |
| FR vs. FNR | p-value^ | 0.675 | 0.210 | 0.911 | 0.064 |
| FNR vs. PBO | p-value^ | 0.151 | 0.823 | 0.772 | 0.189 |

ABBREVIATIONS:
FR = Fampridine Responders;
FNR = Fampridine Non-responders.
#The treatment sample sizes presented at individual time points may be smaller than those in the ITT population due to dropouts or missed assessments.
^P-values from t-tests of the least-squares means using the mean square error via an ANOVA model with effects for responder analysis grouping and center.

Adverse events most commonly reported prior to treatment were accidental injury, reported by 12 (5.8%) subjects, nausea, reported by 9 (4.4%) subjects, and asthenia, diarrhea, and paresthesia, each reported by 8 (3.9%) subjects. Six (2.9%) subjects also reported headache, anxiety, dizziness, diarrhea, and peripheral edema. These adverse events are indicative of the medical conditions affecting people with MS.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Conclusions. The data does not appear to support either a number of anecdotal reports or expectations from preclinical pharmacology that doses higher than about 10 to 15 mg b.i.d., and even about 10 mg b.i.d., should be associated with greater efficacy. The data presented below in Table 15 support this, based on the new responder analysis methodology.

TABLE 15

Comparison of 10 mg vs. 15 mg among Responders

| | 10 mg (N = 51) | 15 mg (N = 50) |
|---|---|---|
| Responders N (%) | 18 (35.3) | 18 (36.0) |
| Average % CFB in Walk Speed: Mean (SD) | 27.6% (18.39) | 29.6% (22.43) |
| % Change in Walk Speed by Visit: minimum-maximum | 26%-32% | 27%-31% |
| Average SGI | 4.8 (1.09) | 4.7 (1.09) |
| Average Change in MSWS-12* | −11.1 (21.9) | −7.8 (19.6) |

*For the average change in the MSWS-12, a negative score is indicative of subjective improvement.

A responder analysis based on consistency of improvement provides a sensitive, meaningful approach to measuring effects on the timed 25 foot walk and may be used as a primary endpoint for future trials. This data suggest that for responsive subjects (approximately 37%), treatment with fampridine at doses of 10-20 mg bid produces substantial and persistent improvement in walking.

Efficacy. There are no notable differences between 10 mg bid and 15 mg bid among subjects who respond to drug. In fact, the largest difference, favors the 10 mg bid group (see MSWS-12 result).

Safety. With respect to safety, there are three considerations: There was an apparent decline below baseline walking speed at the last visit on drug in the fampridine non-responders in the 10 mg bid and 20 mg bid groups, but not the 15 mg bid group. This may or may not be significant, but is not clearly dose related. There was an apparent rebound effect, with walking speed dropping below baseline, among fampridine treated subjects at the two week follow-up visit; this occurred in the 15 and 20 mg but not the 10 mg bid group. Serious AE's were more frequent in the 15 mg and 20 mg bid groups 10% and 12% rates vs. 0% rate in 10 mg bid and 4% in placebo groups. This may or may not be significant, but the risk of potentially related SAEs, particularly seizures appears to be dose-related from all available data and based on mechanism of action. Based on this data, it would appear that a 10 mg bid dose is preferred because of its favorable risk to benefit ratio compared with the 15 and 20 mg doses.

Although the present invention has been described in considerable detail with reference to certain preferred embodiments thereof, other versions are possible. Therefore the spirit and scope of the appended claims should not be limited to the description and the preferred versions contain within this specification.

We claim:

1. A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

2. A method of improving walking in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

3. A method of improving lower extremity muscle tone in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

4. A method of improving lower extremity muscle strength in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

5. The method of claim 1 wherein said time period comprises twelve weeks.

6. The method of claim 2 wherein said time period comprises twelve weeks.

7. The method of claim 3 wherein said time period comprises twelve weeks.

8. The method of claim 4 wherein said time period comprises twelve weeks.

9. The method of claim 1 wherein said method comprises initiating treatment of said patient with 4-aminopyridine by orally administering said sustained release composition twice daily to said patient.

10. The method of claim 2 wherein said method comprises initiating treatment of said patient with 4-aminopyridine by orally administering said sustained release composition twice daily to said patient.

11. The method of claim 3 wherein said method comprises initiating treatment of said patient with 4-aminopyridine by orally administering said sustained release composition twice daily to said patient.

12. The method of claim 4 wherein said method comprises initiating treatment of said patient with 4-aminopyridine by orally administering said sustained release composition twice daily to said patient.

13. The method of claim 1 wherein twice daily is about every 12 hours.

14. The method of claim 2 wherein twice daily is about every 12 hours.

15. The method of claim 3 wherein twice daily is about every 12 hours.

16. The method of claim 4 wherein twice daily is about every 12 hours.

17. The method of claim 5 wherein twice daily is about every 12 hours.

18. The method of claim 1 wherein said sustained release composition is a tablet.

19. The method of claim 2 wherein said sustained release composition is a tablet.

20. The method of claim 3 wherein said sustained release composition is a tablet.

21. The method of claim 4 wherein said sustained release composition is a tablet.

22. The method of claim 18 wherein said tablet exhibits a release profile to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

23. The method of claim 19 wherein said tablet exhibits a release profile to obtain a $_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

24. The method of claim 20 wherein said tablet exhibits a release profile to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

25. The method of claim 21 wherein said tablet exhibits a release profile to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

26. The method of claim 1 further comprising a step of measuring walking speed of the patient.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

27. The method of claim 4 further comprising a step of measuring lower extremity muscle strength of the patient.

28. The method of claim 1 wherein said patient has relapsing remitting multiple sclerosis.

29. The method of claim 2 wherein said patient has relapsing remitting multiple sclerosis.

30. The method of claim 3 wherein said patient has relapsing remitting multiple sclerosis.

31. The method of claim 4 wherein said patient has relapsing remitting multiple sclerosis.

32. A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release tablet of 10 milligrams of 4-aminopyridine at about every 12 hours for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine at about every 12 hours are the only doses of 4-aminopyridine administered to said patient during said time period.

33. A method of improving walking in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release tablet of 10 milligrams of 4-aminopyridine at about every 12 hours for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine at about every 12 hours are the only doses of 4-aminopyridine administered to said patient during said time period.

34. A method of improving lower extremity muscle tone in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release tablet of 10 milligrams of 4-aminopyridine at about every 12 hours for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine at about every 12 hours are the only doses of 4-aminopyridine administered to said patient during said time period.



35. A method of improving lower extremity muscle strength in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release tablet of 10 milligrams of 4-aminopyridine at about every 12 hours for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine at about every 12 hours are the only doses of 4-aminopyridine administered to said patient during said time period.

36. The method of claim 32 wherein said time period comprises twelve weeks.

37. The method of claim 33 wherein said time period comprises twelve weeks.

38. A method of treating walking disability in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

39. The method of claim 38 wherein said method comprises orally administering to said patient a sustained release tablet of 10 milligrams of 4-aminopyridine at about every 12 hours for a time period of at least two weeks.

40. The method of claim 39 wherein said time period comprises 12 weeks.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 8,354,437 B2
APPLICATION NO. : 11/102559
DATED : January 15, 2013
INVENTOR(S) : Blight et al.



It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page
Item (57) in the abstract, replace "a aminopyridine" with --an aminopyridine--;

In the Drawings
In figure 8, replace "Cochran-Mantel Haenszel test" with --Cochran-Mantel-Haenszel test--;

In the Specification
In column 1, line 17, replace "relates a" with --relates to a--;
In column 2, line 10, replace "Hayes et al," with --Hayes et al.,--;
In column 2, line 13, replace "p. 345 1991)." with --p. 345 (1991)).--;
In column 4, line 51, replace "[(observed cases, ITT population])." with --(observed cases, ITT population).--;
In column 5, line 26, replace "spheroid" with --spheroids--;
In column 6, line 2, replace "naphthylate mesylate" with --naphthylate, mesylate--;
In column 6, line 7, replace "tetramethylammonium, tetramethylammonium" with --tetramethylammonium--;
In column 6, line 30, replace "afflicted refers, or amelioration" with --afflicted, or to ameliorate--;
In column 7, line 32, replace "therefore $C_\tau$ the" with --therefore $C_\tau$ is the--;
In column 7, line 65, replace "$C_{avss}$" with --$C_{avSS}$--;
In column 8, line 1, replace "$C_{maxss}$" with --$C_{maxSS}$--;
In column 8, line 12, replace "solvated" with --solvate--;
In column 8, line 36, replace "Aminopyrdines" with --Aminopyridines--;
In column 8, line 64, replace "other" with --another--;
In column 8, lines 64-65, replace "In alternative, organic solvent" with --In the alternative, an organic solvent--;
In column 9, line 18, replace "hard ness" with --hardness--;
In column 9, line 24, replace "blocker on" with --blocker or on--;
In column 9, line 47, replace "with pharmaceutically" with --with a pharmaceutically--;
In column 9, lines 48-49, replace "disintegrates" with --disintegrate--;

Signed and Sealed this
Fourth Day of November, 2014

Michelle K. Lee

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

**CERTIFICATE OF CORRECTION (continued)**
**U.S. Pat. No. 8,354,437 B2**



In column 9, line 56, replace "rate is" with --rate, is--;
In column 10, line 18, replace "esters α.-tocopherol" with --esters and α-tocopherol--;
In column 10, line 35, replace "amount a aminopyridine" with --amount of an aminopyridine--;
In column 10, line 37, replace "regiment" with --regimen--;
In column 10, line 61, replace "Particularly preferred diluents" with --A particularly preferred diluent--;
In column 11, line 2, replace "a aminopyridine" with --an aminopyridine--;
In column 11, line 4, replace "z %," with --z % w/w,--;
In column 11, line 7, replace "additive" with --additives--;
In column 11, lines 13-14, replace "a aminopyridine" with --an aminopyridine--;
In column 11, line 19, replace "establish" with --establishes--;
In column 11, line 29, replace "politicizes" with --plasticizers--;
In column 12, lines 7-8, replace "4-aminopyridine may" with --4-aminopyridine, may--;
In column 15, line 11, replace "(comminutor)" with --comminutor--;
In column 15, lines 37-38, replace "be exaggerated" with --be an exaggerated--;
In column 15, line 39, replace "Cmax" with --$C_{max}$--;
In column 15, Table 2, replace "$C_{MAX}$" with --$C_{max}$--;
In column 15, Table 2, replace "$t_{MAX}$" with --$T_{max}$--;
In column 16, line 23, replace "(CL/F)" with --(Cl/F)--;
In column 16, line 24, replace "ml/ min" with --ml/min--;
In column 16, line 34, replace "$t_{1/2}$" with --$T_{1/2}$--;
In column 16, Table 3, replace "$C_{MAX}$" with --$C_{max}$--;
In column 16, Table 3, replace "$t_{MAX}$" with --$T_{max}$--;
In column 16, Table 3, replace "$t_{1/2}$" with --$T_{1/2}$--;
In column 17, line 16, replace "CL/F" with --Cl/F--;
In column 17, line 19, replace "CL/F" with --Cl/F--;
In column 17, line 21, replace "evidence" with --evidenced--;
In column 17, line 24, replace "CL/F" with --Cl/F--;
In column 17, Table 4, replace "$C_{MAX}$" with --$C_{max}$--;
In column 17, Table 4, replace "$t_{MAX}$" with --$T_{max}$--;
In column 17, Table 4, replace "$t_{1/2}$" with --$T_{1/2}$--;
In column 17, line 60, replace "CL/F" with --Cl/F--;
In column 18, lines 15-16, replace "Subject's (SGI) Global Impressions, a Subject's Global Impression (SGI), the Multiple Sclerosis" with --Subject's (SGI) Global Impressions, the Multiple Sclerosis--;
In column 21, line 2, replace "LEEMT" with --LEMMT--;
In column 23, line 18, replace "treatment group" with --treatment groups--;
In column 24, line 39, replace "met he" with --met the--;
In column 24, line 48, replace "could perceived benefit" with --could have perceived benefits--;
In column 25, line 8, replace "summarizes" with --summarize--;
In column 25, line 54, replace "LENMT" with --LEMMT--;
In column 25, line 62, replace "when non-responder" with --when a non-responder--;
In column 27, lines 41-42, replace "10% and 12% rates vs. 0% rate in 10mg bid and 4% in placebo groups" with --(10% and 12% rates vs. 0% rate in 10mg bid and 4% in placebo groups)--;
In column 27, line 43, replace "seizures appears" with --seizures, appears--;

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

**CERTIFICATE OF CORRECTION (continued)**
**U.S. Pat. No. 8,354,437 B2**



In column 27, line 51, replace "contain" with --contained--;

In the Claims
In column 28, line 59, replace "$_{CavSS}$" with --$C_{avSS}$--.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

PTO-1683
(Rev. 7-96)

U 7504989

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

November 14, 2014

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,440,703*
ISSUE DATE: *May 14, 2013*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

T. WALLACE
Certifying Officer

CA No. 14-882-LPS
JTX-0004

AMPFH0017997

US008440703B2

(12) **United States Patent**
**Blight et al.**

(10) **Patent No.: US 8,440,703 B2**
(45) **Date of Patent: *May 14, 2013**

(54) **METHODS OF USING SUSTAINED RELEASE AMINOPYRIDINE COMPOSITIONS**

(75) Inventors: **Andrew R. Blight**, Mahopac, NY (US); **Ron Cohen**, Irvington, NY (US)

(73) Assignee: **Acorda Therapeutics, Inc.**, Ardsley, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/299,969**

(22) Filed: **Nov. 18, 2011**

(65) **Prior Publication Data**

US 2012/0064007 A1 Mar. 15, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 11/102,559, filed on Apr. 8, 2005, now Pat. No. 8,354,437.

(60) Provisional application No. 60/560,894, filed on Apr. 9, 2004.

(51) **Int. Cl.**
*A61K 31/44* (2006.01)
*A61K 9/22* (2006.01)

(52) **U.S. Cl.**
USPC ............ **514/352**; 514/903; 514/965; 424/468

(58) **Field of Classification Search** .................. 514/352, 514/903, 965; 424/468
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,386,095 | A | 5/1983 | Gibson et al. |
| 4,508,715 | A | 4/1985 | Booth et al. |
| 4,721,619 | A | 1/1988 | Panoz et al. |
| 4,851,230 | A | 7/1989 | Tencza et al. |
| 4,894,240 | A | 1/1990 | Geoghegan et al. |
| 4,946,853 | A | 8/1990 | Bannon et al. |
| 5,370,879 | A | 12/1994 | Masterson et al. |
| 5,540,938 | A | 7/1996 | Masterson et al. |
| 5,545,648 | A | 8/1996 | Hansebout et al. |
| 5,580,580 | A | 12/1996 | Masterson et al. |
| 5,597,827 | A | 1/1997 | Miller et al. |
| 5,597,828 | A | 1/1997 | Miller et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2085785 AA | 6/1994 |
| EP | 0 113 562 B1 | 7/1984 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 13/410,388, filed Mar. 2, 2012, Blight et al.

(Continued)

*Primary Examiner* — Savitha Rao
(74) *Attorney, Agent, or Firm* — Jones Day

(57) **ABSTRACT**

A pharmaceutical composition which comprises a therapeutically effective amount of a aminopyridine dispersed in a release matrix, including, for example, a composition that can be formulated into a stable, sustained-release oral dosage formulation, such as a tablet which provides, upon administration to a patient, a therapeutically effective plasma level of the aminopyridine for a period of at about 12 hours and the use of the composition to treat various neurological diseases, including multiple sclerosis. A method of selecting individuals based on responsiveness to a treatment, including, for example, identifying individuals who responded to treatment with a sustained release fampridine composition.

**52 Claims, 12 Drawing Sheets**




Copy provided by USPTO from the PIRS Image Database on 11/12/2014

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,869,480 | A | 2/1999 | Shutske et al. |
| 5,952,357 | A | 9/1999 | Blass et al. |
| 6,284,473 | B1 | 9/2001 | Whitaker |
| 6,288,026 | B1 | 9/2001 | Exner et al. |
| 8,007,826 | B2 | 8/2011 | Blight et al. |
| 2005/0025744 | A1 | 2/2005 | Lane |
| 2006/0276537 | A1 | 12/2006 | Goren et al. |
| 2007/0037848 | A1 | 2/2007 | Masters et al. |
| 2009/0150180 | A1 | 6/2009 | Cohen et al. |
| 2010/0272795 | A1 | 10/2010 | Cunningham |
| 2010/0272796 | A1 | 10/2010 | Cunningham |
| 2010/0272807 | A1 | 10/2010 | Cunningham |
| 2010/0324098 | A1 | 12/2010 | Blight et al. |
| 2010/0324099 | A1 | 12/2010 | Blight et al. |
| 2010/0324100 | A1 | 12/2010 | Blight et al. |
| 2011/0166187 | A1 | 7/2011 | Blight et al. |
| 2011/0166188 | A1 | 7/2011 | Blight et al. |
| 2011/0166189 | A1 | 7/2011 | Blight et al. |
| 2012/0029035 | A1 | 2/2012 | Blight et al. |
| 2012/0041034 | A1 | 2/2012 | Blight et al. |
| 2012/0164078 | A1 | 6/2012 | Blight et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 117 027 | A1 | 8/1984 |
| EP | 0 325 843 | A2 | 8/1989 |
| EP | 0 484 186 | A1 | 5/1992 |
| IE | 82916 | B1 | 6/2003 |
| WO | WO 2004/082684 | A1 | 9/2004 |
| WO | WO 2005/099701 | A2 | 10/2005 |
| WO | WO 2007/035958 | A2 | 3/2007 |
| WO | WO 2010/030755 | A1 | 3/2010 |
| WO | WO 2010/093838 | A1 | 8/2010 |
| WO | WO 2010/093839 | A1 | 8/2010 |
| WO | WO 2010/090730 | A1 | 9/2010 |
| WO | WO 2011/019845 | A1 | 3/2011 |
| WO | WO 2011/029082 | | 3/2011 |

OTHER PUBLICATIONS

Arhem et al., 1989, "A model for the fast 4-aminopyridine effects on amphibian myelinated nerve fibers. A study based on voltage-clamp experiments," Acta Physiol. Scan., vol. 137:53-61.

Beric et al., 1988, "Central dysesthesia syndrome in spinal cord injury patients," Pain, 34:109-116.

Beric, 1990, "Altered sensation and pain in spinal cord injury," Recent Achievements in Restorative Neurology, 3 Altered Sensation and Pain, Dimitrijevic et al., eds., Karger:Basel, pp. 27-36.

Barker et al., 1991, "Alzheimer's disease," Pharmaceutical Journal, Jan. 26, 1991, pp. 116-118.

Bever et al., 1990, "Preliminary trial of 3, 4-diaminopyridine in patients with multiple sclerosis," Annals of Neurology, 27(4):421-427.

Bever et al., 1994, "The effects of 4-aminopyridine in multiple sclerosis patients: Results of a randomized, placebo-controlled, double-blind, concentration-controlled, crossover trial," Neurol., vol. 44(6):1054-1059.

Bever, 1994, "The Current Status of Studies of Aminopyridines in Patients with Multiple Sclerosis," Ann Neurol, vol. 36:S118-S121.

Biessels et al., 1984, "Comparison of the pharmacological actions of some new 4-aminopyridine derivatives," European J. of Pharmacology, vol. 106:319-325.

Blight et al., 1987, "Augmentation by 4-aminopyridine of vestibulospinal free fall responses in chronic spinal-injured cats," J. of the Neurological Sciences, vol. 82(1-3):145-159.

Blight et al., 1991, "The effects of 4-aminopyridine on neurological deficits in chronic cases of traumatic spinal cord injury in dogs: a phase I clinical trial," J. Neurotrauma, vol. 8:103-119.

Blight, 1989, "Effect of 4-aminopyridine on axonal conduction-block in chronic spinal cord injury," Brain Res. Bull., vol. 22(1):47-52.

Blight et al., 1986, "Morphometric analysis of spinal cord injury in the cat: The relation of injury intensity of survival of myelinated axons," Neuroscience 19(1):321-341.

Blight, 1991, "Morphometric analysis of a model of spinal cord injury in guinea pigs, with behavioral evidence of delayed secondary pathology," J. Neurol. Sci., vol. 103(2):156-71.

Bostock et al., 1981, "The effects of 4-aminopyridine and tetraethylammonium ions on normal and demyelinated mammalian nerve fibres," J. Physiol., vol. 313:301-15.

Bowe et al., 1987, "Physiological effects of 4-aminopyridine on demyelinated mammalian motor and sensory fibers," Ann. Neurol., vol. 22(2):264-8.

Bresnahan et al., 1987, "A behavorial and anatomical analysis of spinal cord injury produced by a feedback-controlled impaction device," Exp. Neurol., 95:548-570.

Burchiel et al., 1985, "Effects of potassium channel-blocking agents on spontaneous discharges from neuromas in rats," J. of Neurosurgery. vol. 63:246-249.

Chandy et al., 1984, "Voltage-gated potassium channels are required for human T-lymphocyte activation," J. Exp. Med., 160:369-385.

Choquet et al ., 1988, "Modulation of voltage-dependent potassium channels in B-lymphocytes," Biochem. Pharmacol., 37(20):3797-3802.

Davidson et al., 1988, "4-Aminopyridine in the treatment of Alzheimer's Disease," Biol. Psychiatry, vol. 23:485-490.

Davis et al., 1990. "Orally Administered 4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis," Ann. Neurol., vol. 27:186-192.

Dimitrijevic et al., 1986, Spinal cord stimulation for the control of spasticity in patients with chronic spinal cord injury:II. Neurolophysiologic observations, Cent. Nerv. Syst. Trauma,: J. Am. Paralysis Assoc., 3(2): 145-152.

Dimitrijevic et al., 1986, Spinal cord stimulation for the control of spasticity in patients with chronic spinal cord injury:I. Clinical observations, Cent. Nerv. Syst. Trauma.: J. Am. Paralysis Assoc., 3(2):129-144.

Eidelberg et al., 1981, "Locomotor control in macaque monkeys," Brain, 104:647-663.

Eidelberg et al., 1981, "Anatomical correlates of return of locomotor function afer partial spinal cord lesions in cats," Exp. Brain Res., 42:81-88.

Eidelberg et al., 1977, "Relationship between residual hindlimb-assisted locomotion and surviving axons after incomplete spinal cord injuries," Exp. Neurol., 56:312-322.

Eliasson et al., 1991, "Effects of 4-aminopyridine on protein phosphorylation in heat-blocked peripheral nerve," J. Neutrol. Sci., 105:175-182.

Evenhuis et al., 1981, "Pharmacokinetics of 4-aminopyridine in human volunteers," Br. J. Anaesth., 53:567-570.

Fujihara et al., 1998, "The effects of 4-aminopyridine on motor evoked potentials in multiple sclerosis," J. Neurol. Sci., vol. 159(1):102-106.

Glover, 1982, "The aminopyridines," Gen. Pharmacol., vol. 13(4):259-285.

Gruner et al., 1987, "Recovery of Motor Function in Chronic Experimental Spinal Cord Injury Enhanced by 4-Aminopyridine," Society for Neuroscience Abstracts, vol. 13(1):62 (abstr. 21.16).

Hansebout et al., 1993, "K. 4-Aminopyridine in Chronic Spinal Cord Injury: A Controlled, Double-Blind, Crossover Study in Eight Patients," J. Neurotrauma, 10(1):1-18.

Hayes et al., 2003, "Pharmacokinetics Studies of Single and Multiple Oral Doses of Fampridine-SR (Sustained-Release 4-Aminopyridine) in Patients With Chronic Spinal Cord Injury," Clinical Neuropharmacology, 26(4):185-192.

Hayes et al., 2004, "Pharmacokinetics and Safety of Multiple Oral Doses of Sustained-Release 4-Aminopyridine (Fampridine-SR) in Subjects With Chronic, Incomplete Spinal Cord Injury," Arch. Phys. Med. Rehabil. 85:29-34.

Hayes et al., 2003, "Pharmacokinetics of an Immediate-Release Oral Formulation of Fampridine (4-Aminopyridine) in Normal Subjects and Patients with Spinal Cord Injury," J. Clin. Pharmacol., vol. 43:379-385.

Hayes, 2004, "The Use of 4-Aminopyridine (Fampridine) in Demyelinating Disorders," CNS Drug Reviews, vol. 10(4):295-316.

Hayes et al., 1991, "Effects of intravenous 4-aminopyridine on neurological function in chronic spinal cord injured patients: preliminary observations," Proc. IBRO World Conference Neurosci., p. 345.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Illis et al., 1983, "Spinal cord stimulation in the United Kingdom (Review)," J. Neurol. Neurosurg. Psychiat., 46:299-304.
Juarez et al., 2001, "Influence of admixed carboxymethylcellulose on release of 4-aminopyridine from hydroxypropyl methylcellulose matrix tablets," Intl. J. of Pharmaceutics, 216:115-125.
Martinez-Gonzalez et al., 2003, "Influence of enteric citric acid on the release profile of 4-aminopyridine from HPMC matrix tablets," Intl. J. of Pharmaceutics, vol. 251:183-193.
Martinez-Gonzalez et al., 2003, "Effect of varying the restriction degree of 4-aminopyridine release from HPMC matrices on the mechanism controlling the process," Int. J. Pharmaceutics, vol. 257:253-264.
Martinez-Gonzalez et al., 2004, "Influence of enteric-coated lactose on the release profile of 4-aminopyridine from HPMC matrix tablets," Pharmaceutical Development and Technology, vol. 9(2):145-153.
Meglio et al.,1981, "Spinal cord stimulation and peripheral blood flow: Part 1, in: indications for spinal cord stimulation," Y. Hosebuchi and T. Corbin (eds), Excerpta Medica: Amsterdam, pp. 60-66.
Potter et al., 1998, "Randomized double-blind crossover trial of Fampridine-SR (sustained release 4-aminopyridine) in patients with incomplete spinal cord injury," Neurotrauma, vol. 15(10):837-849.
Pratt et al.. 1995, "Plasma and cerebrospinal fluid concentrations of 4-aminopyridine following intravenous injection and metered intrathecal delivery in canines," J. Neurotrauma, vol. 12(1):23-39.
Schwid et al., 1997, "Quantitative assessment of sustained-release 4-aminopyridine for symptomatic treatment of multiple sclerosis," Neurology, vol. 48:817-821.
Segal et al., 2000, "Absorption characteristics of sustained-release 4-aminopyridine (Fampridine SR) in patients with chronic spinal cord injury," J. Clin. Pharmacol., vol. 40(4):402-409.
Stefoski et al 1987, "4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis," Ann. Neurol, vol. 21:71-77.
Stefoski et al., 1991, "4-Aminopyridine in multiple sclerosis: Prolonged administration," Neurology, vol. 41:1344-1348.
Targ et al., 1986, "Action potential characteristics of demyelinated rat sciatic nerve following application of 4-aminopyridine," Brain Res. 363:1-9.
Targ et al., 1985, "4-Aminopyridine leads to restoration of conduction in demyelinated rat sciatic nerve," Brain Res., vol. 328(2):358-361.
Tasker, 1990, "Pain resulting from central nervous system pathology (Central Pain)," The Management of Pain, vol. 1, Bonica ed., Lee and Febiger:Philadelphia, pp. 264-283.
Thesleff, 1980, "Aminopyridines and synaptic transmission," Neuroscience 5:1413-1419.
Uges et al., 1981, "4-aminopyridine; analysis of the substance and a method for the preparation of a solution for injection in man," Pharm Acta Helv. 56(6):158-162.
Uges et al., 1982, "4-Aminopyridine kinetics," Clin. Pharmacol. Ther., vol. 31(5):587-593.
Wagoner et al., 1990. "Aminopyridines block an inactivating potassium current having slow recovery kinetic." Biophys. J. 58:1481-1489.
Wesseling et al., 1984, "Effects of 4-Aminopyridine in Elderly Patients with Alzheimer's Disease. " New England J. of Medicine, vol. 310(15):988-989.
2nd Meeting of the Pharmacy Compounding Advisory Committee, May 6 1999, Transcript (http://www.fda.gov/ohrms/dockets/ac/99/transcript/3513tl.rtf(last accessed Nov. 18, 2010).
Agoston et al 1978, "Effects if 4-Aminopyridine in Eaton Lambert Syndrome," Br. J. Anesth., vol. 50:383-385.
Agoston et al.,1980, "Antagonism of Ketamine-Diazepam anaesthesia by 4-Aminopyridine in Human Volunteers," Br. J. Anaesth., vol. 52:367-369.
Aisen et al., 1995, "3,4-Diaminopyridine as a treatment for amyotrophic lateral sclerosis," J. of Neurological Sciences, vol. 129:21-24.
Aisen et al., 1996, "A double-blind placebo-controlled study of 3,4-diaminopyridine in amytrophic lateral sclerosis patients on a rehabilitation unit," J. of Neurological Sciences, vol. 138:93-96.
Albrecht et al., 2001, "Day-to-day variability of maximum walking distance in MS patients can mislead to relevant changes in the Expanded Disability Status Scale (EDSS): average walking speed is a more constant parameter," Multiple Sclerosis, vol. 7:105-109.
Ampyra® (dalfampridine), Acorda Therapeutics, Inc., Prescribing Information, Jan. 2010. http://ampyra.com/local/files/PI.pdf (last accessed Nov. 3, 2010).
Avonex® (interferon beta-la), Biogen Ideg Inc., Prescribing Information, Oct. 2008. http://www.avonex.com/pdfs/pi_luer_lock.pdf (last accessed Nov. 3, 2010).
Ball et al., 1979, "Human botulism caused by *Clostridium botulinum* Type E: the Birmingham Outbreak," Quarterly Journal of Med. New Series XLVIII, vol. 191:473-491.
Barge et al., 1977, "Pharmaceutical Salts," J. Pharm. Sci., vol. 66(1):1-19.
Bertelsmann et al., 1992, "Comparison between 4-aminopyridine and 3,4diaminopyridine in the treatment of multiple sclerosis," Annals of Neurology, vol. 32(2):256 (Abstract P100).
Betaseron® (Interferon Beta-1b) for SC injection, Bayer HealthCare Pharmaceuticals Inc., Prescribing Information, May 2010. http://berlex.bayerhealthcare.com/html/products/pi/Betaseron_PI.pdf (last accessed Nov. 3, 2010) (pp. 1-10).
Bever et al., 1995, "Experience with slow release 4-aminopyridine in multiple sclerosis patients: Long term tolerability and safety," Journal of Neuroimmunology, 1 Suppl. 58.
Bever et al., 1995, "The brief repeatable battery of neuropsychological tests for multiple sclerosis: a preliminary serial study," Multiple Sclerosis, vol. 1:165-169.
Bever et al., 1995, "The Pharmacokinetics and Tolerability of a Slow-Release Formulation of 4-Aminopyridine in Multiple Sclerosis Patients," Neurol. vol. 45(Suppl 4):A351 (Abst. 684P).
Bever et al., 1996, "Treatment with oral 3,4 diaminopyridine improves leg strength in multiple sclerosis patients: Results of a randomized, double-blind, placebo-controlled, crossover trial," Neurol., vol. 47:1457-1462.
Bever et al., 2009, "Sustained-release fampridine for multiple sclerosis," Expert Opin. Investig. Drugs, vol. 18(7):1013-1024.
Blight et al., 2001, "Acute spinal cord injury: Pharmacotherapy and drug development perspectives," Curr. Opin. Investig. Drugs, vol. 2(6):801-08.
Blight, 2002, "Miracles and molecules—progress in spinal cord repair," Nature Neuroscience, vol. 5:1051-1054.
Blight, 1987, "Effect of 4-aminopyridine on action potential conduction in myelinated axons of chronically injured spinal cord," Society of Neurosciences Abstracts, vol. 13(1):62 (Abstract 21.15).
Blight, 1998, "Containing plasticity: neurite inhibitory factors of myelin," Nat. Neurosci., vol. 1(2):87-88.
Blight, 2004,"Just one word: plasticity," Nat. Neurosci., vol. 7(3):206-08.
Blight et al., 1983, "Axonal physiology of chronic spinal cord injury in the cat: Intracellular recording in vitro," Neuroscience, vol. 10(4):1471-1486.
Blight, 1983, "Cellular morphology of chronic spinal cord injury in the cat: analysis of myelinated axons by line-sampling," Neuroscience, vol. 10(2):521-543.
Booij et al., 1978, "Neostigmine and 4-Aminopyridine Antagonism of Lincomycin-Pancuronium Neuromuscular Blockade in Man," Anesth. Analg., vol. 57:316-321.
Bowman et al., 1981, "Actions of 4-aminopyridine on the cardiovascular systems of anaesthetized cats and dogs," Br. J. Anaesth., vol. 53:555-565.
Bowman et al., 1981, "Pharmacological actions of aminopyridines and related compounds," Rev. Pure Appl. Phamacol. Sci., vol. 2(4):317-371.
Bronnum-Hansen et al., 2005, "Suicide among Danes with multiple sclerosis," J. of Neurol. Neurosurg. Psych., vol. 76:1457-1459.
Bruckner et al., 2000, "Effects of standard anticonvulsant drugs on different patterns of epileptiform discharges induced by 4-aminopyridine in combined entorhinal cortex-hippocampal slices," Brain Res., vol. 859(1):15-20.
Bugaresti et al., 2001, "Pharmacokinetics and safety of single oral doses of fampridine-SR (sustained-release 4-aminopyridine) tablets in patients with chronic spinal cord injury," Presented to the American Academy of Physical Medicine and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Calabresi et al., 1993, "Progressive spinal multiple sclerosis," Seminars in Neurology, vol. 13(4):322-332.
Capacio et al., 1997, "Pharmacokinetics and pharmacodynamics of 4-aminopyridine in awake guinea pigs," Drug Chem. Toxicol., vol. 20(3):151-172.
Cardenas E et al., 2007, "Phase 2 trial of sustained-release fampridine in chronic spinal cord injury," Spinal Cord, vol. 4592:158-168.
Carlsson et al., 1983, "Can 4-aminopyridine be used to reverse anaesthesia and muscle relaxation?" Acta Anaesth. Scand., vol. 27:87-90.
CD-ROM in duplicate containtl video-file "Today Show.mov," created Jul. 18, 2010, showing segment of the "Today Show" aired May 27, 2010 accompained by still image single frame photograph.
Chalk et al., 1990, "Response of the Lambert-Eaton myasthenic syndrome to treatment of associated small-cell lung carcinoma," Neurology, vol. 40(10):1552-1556.
Clinicaltrial.gov, Efficacy, safety, and tolerability of Nerispirdine in patients with multiple sclerosis, ClinicalTrials.gov. http://clinicaltrials.gov/show/NCT00811902 (last accessed Nov. 2, 2010).
Coetzee et al., 1999, "Molecular diversity of K+ channels," Ann. NY Acad. Sci., vol. 868:233-285.
Cohen et al., 1999, "Utilization of the multiple sclerosis functional composite as an outcome measure in the phase 3 trial of interferon beta-la (Avonex®) in secondary progressive multiple sclerosis (Impact)," Neurology, vol. 62 (6 Suppl. 2):A548-S549 (Abstract S74.002).
Cohen et al., 2000, "Intrarater and interrater reliability of the MS functional composite outcome measure," Neurology, vol. 54:802-806.
Cohen et al., 2000, "One-year change in the multiple sclerosis functional composite and expanded disability status scale in the phase 3 trial of interferon beta-1a in secondary progressive multiple sclerosis (Impact)," Neurology, vol. 54 (7 Supp. 3):A215 (Abstract 530.02).
Cohen et al., 2001, "Use of the multiple sclerosis functional composite as an outcome measure in a phase 3 clinical trial," Arch. Neurol. vol. 58:961-967.
Cohen et al., 2001, "Results of Impact, a phase 3 trial of interferon beta-la in secondary progressive multiple sclerosis," Neurology, vol. 56 (8 Supp. 3):A148-149 (Abstract S20.003).
Cohen et al., 2002, Benefit of interferon beta-la on MSFC progression in secondary progressing MS (Abstract), Neurology, vol. 59(5):679-687.
Cohen et al., 2005, "Responder analysis of walking speed applied to a trial of fampridine in subjects with MS," Neurology, 64(Suppl. 1):A388, P06.169.
Cohen et al., 2005, "Responder analysis of walking speed applied to a trial of fampridine in subjects with MS," 57th Annual Meeting of the American Academy of Neurology, Miami, FL, Apr. 9-16, 2005 (Poster).
Confavreux and Compston, 2005, "Disease-modifying treatments in multiple sclerosis," Chap. 18 in McAlpine's Multiple Sclerosis, 4th ed., Compston et al., (eds.), Churchill Livingstone Elsevier, pp. 765-770.
Confavreux and Compston, 2005, "The person with multiple sclerosis: a prospectus," Chap. 19, in McAlpine's Multiple Sclerosis 4th ed., Compston et al. (eds.), Churchill Livingstone Elsevier, pp. 805-810.
Confavreux and Compston, Dec. 2005, "The natural history of multiple sclerosis," Chap. 4 in McAlpine's Multiple Sclerosis, 4th Ed., Compston et al. (eds.) Churchill Livingstone Elsevier, pp. 193-196.
Consortium of Multiple Sclerosis Centers (CMSC), Annual Meeting, Jun. 7, 2002 (Poster).
Cooke et al., 1994, "Lambert-Eaton myasthenic syndrome: evaluation of movement performance following drug therapy," Electromyogr. Clin. Neurophysiol. vol. 34(2):87-93.
Copaxone® (glatiramer acetate), TEVA Neuroscience, Inc., Prescribing Information, Feb. 2009. http://www.copaxone.com/pdf/PrescribingInformation.pdf (last accessed Nov. 3, 2010).
Cowen and Company, "Acorda Therapeutics," Aug. 3, 2010 (pp. 1-5).
Crenshaw et al. 2006, "Gait variability in people with multiple sclerosis," Multiple Sclerosis, vol. 12:613-691.
Darlington, 2000, "Fampridine Acorda Therapeutics," Curr. Opin. Investig. Drugs, vol. 1(3):375-379.
Davis et al., 1995, "Mechanism of Action of 4-Aminopyridine in the Symptomatic Treatment of Multiple Sclerosis," Ann. Neurol., vol. 37(5):684.
de Waal et al., 1994, "The treatment of multiple sclerosis (MS): 4-aminopyridine (4-AP)," J. of Neurology, vol. 241:S102 (Abstract 11).
DeForge et al., 2004, "The effect of 4-aminopyridine on gait in ambulatory spinal cord injuries: a double-blind, placebo-controlled, crossover trial," Spinal Cord, vol. 42:674-685.
Department of Health & Human Services, Mar. 29, 2010, Warning Letter, http://www.fda.gov/dowloads/ICECI/EnforcementActions/WarningLetters/2001/UCM069491.pdf (last accessed Nov. 16, 2010).
Ditunno et al., 2002, "Double -blinded, placebo-controlled, dose-escalating study evaluating the safety and efficacy of oral doses of fampridine-SR (sustained-release-aminopyridine) in patients with chronic spinal cord injury," First Meeting of the American Spinal Injury and the Intl Medical Society of Paraplegia, Vancouver, Canada, May 3-6, 2002 (Poster).
Ditunno et al., 2002, "Double-blind, placebo-controlled, dose-escalating study evaluating the safety and efficacy of oral doses of fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic spinal cord injury," American Spinal Association Twenty-Eight Annual Meeting, p. S35 (Abstract # 78).
Donovan et al., 2000, "Intravenous infusion of 4-AP in chronic spinal cord injured subjects," Spinal Cord, vol. 38:7-15.
Dubuc et al., 1986, "The effects of 4-aminopyridine on the spinal cord: rhythmic discharges recorded from the peripheral nerves," Brain Res., vol. 369:243-259.
Edgley et al., 1991, "A survey of multiple sclerosis. Part 2: Determinants of employment status," Can. J. Rehab., vol. 4(3):127-132.
Eriksson et al., 2002, "Epileptic seizures, cranial neuralgias and paroxysmal symptoms in remitting and progressive multiple sclerosis," Mult. Scler. vol. 8(6):495-499.
Extavia® (interferon beta-1b), Novartis Pharmaceuticals Inc., Prescribing Information, Aug. 2009. http://www.pharma.us.novartis.com/product/pi/pdf/extavia.pdf (last accessed Nov. 3, 2010).
Faculty, Doctors, Staff, Department of Neurology, Columbia University, New York, http://web.neuro.columbia.edu/members/profiles.php?id=91 (last accessed Nov. 17, 2010).
FDA Approval Letter NDA 022250, Jan. 22, 2010.
FDA Guidance for Industry: Bioanalytical Method Validation (May 2001) (pp. 1-22).
FDA Guidance for Industry: Bioavailability and Bioequivalence Studies for Orally Administered Drug Products—General Considerations (Mar. 2003) (pp. 1-23).
FDA Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro / In Vivo Correlations (Sep. 1997) (pp. 1-24).
FDA Guidance for Industry: Food-Effect Bioavailability and Fed Bioequivalence Studies (Dec. 2002) (pp. 1-9).
Feinstein, 2004, "The neuropsychiatry of multiple sclerosis," Can. J. Psychiatry, vol. 49:157-163.
Fingerman, et al., 2000, "The overactive bladder in multiple sclerosis," J. Am. Osteopath. Assoc., vol. 100 (Suppl):S9-512.
Fischer et al., 1999, "The Multiple Sclerosis Functional Composite measure (MSFC): an integrated approach to MS clinical outcome assessment," Mult. Scler., vol. 5:244-250.
Fleming et al., 1994, "Patterns of comorbidity in elderly patients with multiple sclerosis," J. Clin. Epidemiol., vol. 47:1127-1132.
Folkert, 2005, " Neuropathologic Substrate of Cerebral Palsy," J. Child Neurol. vol. 20:940-949.
Friend et al., 1999, "Language Functions in Patients with Multiple Sclerosis," Clin Neuropsychologist, vol. 13(1):78-94.
Gean, 1990, "The epileptiform activity induced by 4-aminopyridine in rat amygdale slices: antagonism by non-N-methyl-D-aspartate receptor antagonists," Brain Res., vol. 530:251-256.
Gilenya® (fingolimod), Novartis Pharmaceuticals Corporation, Prescribing Information, Sep. 2010. http://www.pharma.us.novartis.com/product/pi/pdf/gilenya.pdf (last accessed Nov. 9, 2010).
Glasauer et al., 2005, "4-Aminopyridine restores visual ocular motor function in upbeat nystagmus," J. Neurol. Neurosurg. Psychiatry, vol. 76:451-453.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Glasauer et al., 2005, "Effect of 4-aminopyridine on upbeat and downbeat nystagmus elucidates the mechanism of downbeat nystagmus," Ann. NY Acad. Sci., vol. 1039:528-531.
Gold et al., 1996, "Characterization of six voltage-gated K+ currents in adult rat sensory neurons," J. Neurophysiol., vol. 75:2629-2646.
Goodman et al., 2002, "Placebo-controlled double-blinded dose ranging study of Fampridine-SR in multiple sclerosis," P308, ACTRIMS-ECTRIMS, Abstracts of the 7th Annual Meeting of the Americas Committee for Treatment and Research in Multiple Sclerosis and 18th Congress of the European Committee for Treatment and Research in Multiple Sclerosis, Sep. 18-21, 2002, Baltimore, Maryland, USA, Mult. Scler. vol. 8 Suppl Posters S116-S117, (Abstract P308).
Goodman et al., 2003, "Placebo-controlled double-blinded dose ranging study of fampridine-SR in multiple sclerosis," Neurology. vol. 60 (5 Suppl. 1), Abstract S21.001, p. A167.
Goodman et al., 2004, "Phase 2 trial of fampridine-SR (sustained-release 4-aminopyridine) in multiple sclerosis," 20th European Committee for Treatment and Research in Multiple Sclerosis, Vienna, Austria, Oct. 6-9, 2004 (Poster).
Goodman et al., 2005, "Clinical meaningfulness of consistent improvement on the timed 25 foot walk (TW25) during treatment with fampridine," 130th Annual Meeting of the American Neurological Association, San Diego, CA, Sep. 25-28, 2005 (Poster).
Goodman et al., 2005, "Stability and interrelatedness of the 12-item multiple sclerosis walking scale and the timed 25 foot walk during a 3 month clinical trial," Presented at the ECTRIMS/ACTRIMS Congress, Thessaloniki, Greece, Sep. 2005 (Poster).
Graziani et al., 2002, "Two multicenter trials demonstrate potential efficacy of fampridine-SR (sustained-release 4-aminopyridine) for spasticity management in subjects with chronic spinal cord injury," 63rd Annual Academy of Physical Medicine and Rehabilitation Assembly, Orlando, FL Nov. 21-23, 2002 (Poster).
Grijalva et al., 2003, "The efficacy and safety of 4-aminopyridine in patients with long-term spinal cord injury: a randomized, double-blind, placebo-controlled trial," Pharmacotherapy, vol. 23:823-834.
Gutman et al., 2005, "International Union of Pharmacology. LIII. Nomenclature and molecular relationships of voltage-gated potassium channels," Pharmacol. Rev., vol. 57(4):473-508.
Guy W. Ecdeu Assessment Manual for Psychopharmacology—Revised (DHEW Publ No. ADM 76-338). US Dept of Health Education & Welfare, Public Heath Service, Div of Exramural Research Programs, 1976: 218-222.
Haghighi et al., 1995, "Effect of 4-aminopyridine in acute spinal cord injury," Surg. Neurol., vol. 43(5):443-447.
Haghighi et al., 1998, "Effect of 4-aminopyridine and single-dose methylprednisolone on functional recovery after a chronic spinal cord injury," Spinal Cord, vol. 36:6-12.
Halter et al., 2000, "Intrathecal administration of 4-aminopyridine in chronic spinal injured patients," Spinal Cord, vol. 38(12):728-732.
Hapoalim Securities, "Acorda Therapeutics (ACOR)," Aug. 4, 2010 (pp. 1-7).
Hapoalim Securities, "Acorda Therapeutics (ACOR)," Nov. 1, 2010 (pp. 1-10).
Hassan et al.,1980, "Double-blind comparison of single doses of DS103-282, baclofen and placebo for suppression of spasticity," J. of Neurology Neurosurgery and Psychiatry, vol. 43:1132-1136.
Hauser et al., 1993, "Incidence of epilepsy and unprovoked seizures in Rochester, Minnesota: 1935-1984," Epilepsia, 34(3):453-468.
Hayes et al., 1993, "Preclinical Trial of 4-Aminopyridine in Patients with Chronic Spinal Cord Injury," Paraplegia, vol. 31:216-224.
Hayes et al., 1994, "4-Aminopyridine sensitive neurologic deficits in patients with spinal cord injury," J. Neurotrauma, 11(4):433-446.
Hayes et al., 2001, "Open-label, multiple-dose study to determine the pharmacokinetics and safety of fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic spinal cord injury," Presented to the American Neurological Association. Chicago, Il, Sep. 30-Oct. 3, 2001 (Poster).
Hayes et al., 2001, "Open-label, multiple-dose study to determine the pharmacokinetics and safety of fampridine-SR in patients with chronic spinal cord injury," Annals of Neurology, vol. 50(31):S62 (201).
Hayes et al., 2001, "Pharmacokinetics and safety of multiple oral doses of fampridine-SR (sustained-release 4-aminopyridine) tablets in patients with chronic spinal cord injury," Presented to the Academy of Physical Medicine and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Higuchi et al., 1975, "Pro-drugs as novel delivery systems," vol. 14 of the ACS Symposium Series (TOC).
Hobart et al., 2003, "Measuring the impact of MS on walking ability: the 12-Item MS Walking Scale (MSWS-12)," J. Neurology, vol. 60:31-36.
Hoogervorst et al., 2004, "The patient's perception of a (reliable) change in the Multiple Sclerosis Functional Composite," Multi. Scler., vol. 10:55-60.
International Preliminary Report on Patentability with Written Opinion from International Application No. PCT/US04/08101, issued Sep. 23, 2005.
International Preliminary Report on Patentability with Written Opinion from International Application No. PCT/US05/012427, issued Oct. 11, 2006.
International Search Report from International Application No. PCT/US04/08101, mailed Aug. 26, 2004.
International Search Report from International Application No. PCT/US05/12427, mailed Dec. 28, 2005.
International Search Report from International Application No. PCT/US09/56476, mailed Nov. 10, 2009.
International Search Report from International Application No. PCT/US10/23969, mailed Apr. 1, 2010.
International Search Report from International Application No. PCT/US10/23970, mailed Apr. 5, 2010.
Iriarte et al., 2000, "Modalities of fatigue in multiple sclerosis: correlation with clinical and biological factors," Mult. Scler., vol. 6:124-130.
Isoda et al., 2003, "The effects of 4-aminopyridine on cardiac repolarization, PR interval, and heart rate in patients with spinal cord injury," Pharmacotherapy, vol. 23:133-136.
J.P. Morgan, "Acorda Therapeutics," Aug. 3, 2010 (p. 1-7).
Jack et al., 1981, "Modifications to synaptic transmission at group la synapses on cat spinal motoneurones by 4-aminopyridine," J. Physiol., 321:111-126.
Jackson et al., 2002, "Twice-daily fampridine-SR (sustained-release 4-aminopyridine): safety and early efficacy experience in 151 patients with chronic motor-incomplete spinal cord injury," 127th Annual Meeting American Neurological Association, NY, NY Oct. 13-16, 2002 (Poster).
Jacobs et al., 1990, "Foot salvage and improvement of microsvascular blood flow as a result of epidural spinal cord electrical stimulation," J. Vasc. Surg., 12(3):354-360.
Jankowska et al., 1977, " Effects of 4-aminopyridine on transmission in excitatory and inhibitory synapses in the spinal cord," Brain Res., 136:387-392.
Jankowska et al., 1982, "Effects of 4-aminopyridine on synaptic transmission in the cat spinal cord," Brain Res., 240:117-129.
Jellinger, 1976, "Neuropathology of cord injuries," Handbook of Clinical Neurology, vol. 25, Part I, Injuries of the Spine and Spinal Cord. Vinken et al. eds., North-Holland: Amsterdan, 1976, pp. 43-121.
Jones et al., 1983, "Effects of 4-Aminopyridine in Patients with Multiple Sclerosis," J. Neurol Sci., vol. 60:353-362.
Josephson et al., 1984, "Early outward current in rat single ventricular cells," Circ. Res., 54:157-162.
Judge et al., 1999, "Inactivation gating and 4-AP sensitivity in human brain Kv1.4 potassium channel," Brain Research, vol. 831:43-54.
Judge et al., 2002, Determinants of 4-Aminopyridine Sensitivity in a Human Brain Kv1.4K+ Channel: Phenylalanine Substitutions in Leucine Heptad Repeat Region Stabilize Channel Closed State, Mol. Pharmacol., vol. 61:913-920.
Kachuck, 2009, "Sustained release oral fampridine in the treatment of multiple sclerosis," Expert Opinion, vol. 10(12):12:2025-2035.
Kakulas, 1984, "Pathology of spinal injuries," Cent. Nerv. Syst. Trauma, 192):117-129.
Kakulas et al., 1969, "A correlative clinico-pathologic study of spinal cord injury," Proc. Aust. Assoc. Neurologists, 6:123-132.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Kakulas et al., 1990, "The neuropathology of pain and abnormal sensations in human spinal cord injury derived from the clinicopathological data base at the Royal Perth Hospital," Recent Achievements in Restorative Neurology, 3: Altered Sensation and Pain, Dimitrijevic et al eds., Karger:Basel, pp. 37-41.
Kalla et al., 2004, "4-aminopyridine improves downbeat nystagmus, smooth pursuit, and VOR gain," Neurology, 62(7):1228-1229.
Katz et al., 2001, "Pharmacokinetics and safety of single oral doses of fampridine (immediate-release 4-aminopyridine) capsules in health volunteers," Presented to the American Academy of Physical and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Katz et al., 2002, "Pharmacokinetics and excretion of a single oral dose of 14c-labeled fampridine (4-aminopyridine) in healthy volunteers," 1st Joint Mtg of the American Spinal Injury Association and the Intl. Medical Society of Paraplegia, Vancouver, Canada, May 3-6, 2002 (Poster).
Kaufman et al., 2000, "The significant change for the timed 25-foot walk in the Multiple Sclerosis Functional Composite," Mult. Scler., 5:286-290.
Kirchhoff et al., 1992, "Excitation of cutaneous sensory nerve endings in the rat by 4-aminopyridine and tetraethylammonium," J. Neurophysiol., 67(1):125-131.
Kobelt et al. 2006, Costs and quality of life in multiple sclerosis: a cross-sectional study in the United States, Neurology, vol. 66:1696-1702.
Kocsis et al., 1983, "Effects of extracellular potassium concentration on the excitability of the parallel fibers of the rat cerebellum," J. Physiol. (Lond) 334:225-244.
Kocsis et al., 1986, "Different effects of 4-aminopyridine on sensory and motor fibers: pathogenesis of paresthesias," Neurology 36:117-120.
Kos et al., 2004 "Letter to the Editor," Multiple Sclerosis, Jun. 1 2004, 10/3 (337-338).
Kostka et al., 1992, "Column liquid chromatographic determination of 4-aminopyridine in plasma and urine after derivatization with benzoyl chloride," Clin. Biochem., 25:144.
Kovacs et al., 2003, "Seizure, neurotransmitter release, and gene expression are closely related in the striatum of 4-aminopyridine-treated rats," Epilepsy Res., vol. 55(1-2):117-129.
Kurtzke et al., 1983, "Rating neurologic impairment in multiple sclerosis: an expanded disability status scale (EDSS)," Neurology, 33:1444-1452.
Lammertse et al., 2002, "Clinical evaluation of oral fampridine-SR (sustained-release 4-aminopyridine) in subjects with chronic motor-incomplete spinal cord injury," 54th Annual Meeting of the American Academy of Neurology, Denver, CO, Apr. 13-20, 2002 (Poster).
Lammertse et al., 2002, "Evaluation fampridine-SR in patients with chronic spinal cord injury," 48th Conference of the Paraplegia Society, Las Vegas, NV, Sep. 3-5, 2002 (Poster).
Landete et al., 1998, "Low doses of 4-aminopyridine in the treatment of multiple sclerosis," Multiple Sclerosis, 4:386 (Abstract P3047).
Lazard Capital Markets, "Acorda Therapeutics (ACOR)," Aug. 24, 2010 (pp. 1-15).
Lazard Capital Markets, "Acorda Therapeutics," Aug. 3, 2010 (pp. 1-3).
Leary et al., 2003, "Interferon beta-la in primary progressing MS—An exploratory, randomized., controlled trial," Neurology, vol. 60:44-51.
Lemeignan, 1972, "Analysis of the action of 4-aminopyridine on the cat lumbar spinal cord. 1. Modification of the afferent volley, the monosynaptic discharge amplitude and the polysynaptic evoked responses," Neuropharm., 11:551-558.
Lemeignan et al., 1981, "The ability of 4-aminopyridine and 3,4-diaminopyridine to cross the blood-brain barrier can account for their difference in toxicity," Adv. Biosci., 35:222.
Liang et al., 2005, "Effects of pelvic nerve neurectomy and estrogen on the M2 muscarinic receptor of the urinary bladder," Chang Gung Med. J., vol. 28:786-793.
Linderoth et al., 1991, "Peripheral vasodilatation after spinal cord stimulation: Animal studies of putative effector mechanisms," Neurosurgery 28(2):187-195.
Llinas et al., 1982, 3- and 4-aminopyridine in synaptic transmission at the squid giant synapses, in: Aminopyridines and similarly acting Drugs: Effects on nerves, muscles and Synapses, Lechat et al. eds., Pergamon Press: Oxford, pp. 69-79.
Loss of mobility found to impact quality of life and emotional and financial health of most people living with multiple sclerosis, National Multiple Sclerosis Society, Mar. 2008, http://www.nationalmssociety.org/news/news-detail/index.aspx??nid=199 (last accessed Nov. 3, 2010).
Lublin et al., 1996, "Defining the clinical course of multiple sclerosis: Result of an international survey," Neurology, vol. 46:907-911.
Lundh et al., 1977, "4-Aminopyridine—A new drug tested in the treatment of Eaton-Lambert syndrome," J. Neuro. Neurosurg. Psych., vol. 40:1109-1112.
Lundh et al., 1979, "Effects of 4-Aminopyridine in Myasthenia Gravis," J. Neuro. Neurosurg. Psychiatry, 42:171-175.
Lundh et al., 1979, "Effects of 4-aminopyridine on statistical parameters of transmitter release at the neuromuscular junction," Acta Pharmacol. Toxicol., 44(5):343-346.
Lundh et al., 1982, "Lack of effect of 4-aminopyridine on choreic movements," J. Neurol. Neurosurg. Psychiatry, vol. 45(3):274-275.
Lundh et al., 1983, "Novel drug of choice in Eaton-Lambert syndrome," J. Neurol. Neurosurg. Psychiatry, vol. 46(7):684-685.
Lundh, 1978, "Effects of 4-aminopyridine on neuromuscular transmission," Brain Research, vol. 158(2):307-318.
Magdalan et al., 2003, "[Successful treatment by 4-aminopyridine of three cases of severe verapamil poisoning]," [Article in Polish] Przegl. Lek., vol. 60(4):271-273 (English translation attached).
Marchand et al., 1991, "The effects of dorsal column stimulation on measures of clinical and experimental pain in man," Pain, 45:249-257.
Martin et al., 2006, "Gait and balance impairment in early multiple sclerosis in the absence of clinical disability," Multiple Sclerosis vol. 12:620-628.
Martinez-Aguirre, 1982, "Antagonism of ketamine by 4-aminopyridine and physostigmine," Br. J. Anesth., 54(1):110.
Martinez-Aguirre et al., 1986, "Comparison of midazolam (RO 21-3981) and diazepam as complement of ketamine-air anesthesia in children," Acta Anesth. Belg., vol. 37(1):15-22.
Martinez-Aguirre, 1980, "Antagonism of 4-aminopyridine to ketamine-diazepam anesthesia in children," Acta Anaesthesiol. Belg., 31(4):289-291.
Matthews, 1998, "Symptoms and signs of multiple sclerosis," Chap. 5, in McAlpine's Multiple Sclerosis, 3d ed., Compston et al., (eds), Churchill Livingstone, at pp. 145-190; McDonald & Compston.
Matthews, B., 1998, "Differential diagnosis of multiple sclerosis and related disorders," Chap. 4 in McApline's Multiple Sclerosis, Compston et al. (eds.), Churchill Livingstone at pp. 228-243.
McDonald & Compston, 2005, "The symptoms and signs of multiple sclerosis," Chapter 6, in McAlpine's Multiple Sclerosis, 4th ed., Compston et al., (eds.), Churchill Livingstone Elsevier, at pp. 287-346.
McGuian et al., 2004, "Confirming the validity and responsiveness of the Multiple Sclerosis Walking Scale-12 (MSWS-12)," Neurology, 62:2103-2105.
Metz et al., 1998, "Urinary tract infections may trigger relapse in multiple sclerosis," Axone, vol. 19:67-70.
Mihai et al., 1997, "Selection criteria for interferon beta 1-b in multiple sclerosis patients," Neurology, vol. 48 (3 Suppl. 2):A348 (S48.005).
Miller et al., 1979, "4-Aminopyridine Potentiates Neostigmine and Pyridostigmine in Man," Anesthesiology, vol. 50:416-420.
Mitsov, 1988, "Analgesic activity of pimadine (4-aminopyridine)," Jul.-Aug. 1988, Russian J. of Pharmacology and Toxology, 51(4):122-125.
Molgo, 1982, Effects of aminopyridines on neuromuscular transmission, in: Aminopyridines and Similarly Acting Drugs: Effects on Nerves, Muscles and Synapses, Lechat et al. eds., Pergamon Press: Oxford, pp. 95-116.
Molgo et al., 1977, "Effects of 4-aminopyridine at the frog neuromuscular junction," J. Pharmacol Exp. Ther., vol. 203(3):653-663.
Molgo et al., 1980, "Potency of 3,4-diaminopyridine and 4-aminopyridine on mammalian neuromuscular transmission and the effect of pH changes," Eur. J. Pharmacol., 61(1):25-34.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

AMPFH0018003

Moritoki et al., 1978, "Actions of aminopyridines on guinea-pig ileum," Arch. Int. Pharmacodyn. Ther., vol. 232:28-41.

Morning Show Ratings—TvNewser, Ratings of Week of Nov. 1, 2010, http://www.mediabistro.com/tvnewser/category/morning-show-ratings (last accessed Nov. 17, 2010).

MS Hope for a Cure, http://www.mshopeforacure.org/board.php#elissa (last accessed Nov. 17, 2010).

Murray et al., 1981, "Treatment with Oral 4-Aminopyridine in Disorders of Neuromuscular Transmission," Neurology, 31:265-271.

Murray, 2000, "The History of Multiple Sclerosis," Multiple Sclerosis, Diagnosis, Medical Management, and Rehabilitation: Demos Medical Publishing, Inc., pp. 1-32.

Myers 1990, "Therapy of multiple sclerosis," Neurology and Neurosurgery, vol. 3:208-212.

National Multiple Sclerosis Society homepage on the Internet, http://www.nationalmssociety.org/index.aspx (last accessed Nov. 2, 2010).

National Multiple Sclerosis Society, "FSS and EDSS," http://www.nationalmssociety.org/for-professionals/reearchers/clinical-study-measures/fss-and-edss/index.aspx (last accessed Nov. 17, 2010).

Ng et al., 1987, "Studies on the calcium dependence of human NK cell killing," Biochem. Pharmacol., 36:3943-3949.

Nicoletti et al., 2003, "Epilepsy and multiple sclerosis in Sicily: a population-based study," Epilepsia, 44(1 1):1445-1448.

Noble et al., 1989, "Correlative analyses of lesion development and functional status after graded spinal cord contusive injuries in the rat," Exp. Neurol. 103:34-40.

Nockles et al., 1992, "Pharmacologic strategies in the treatment of experimental spinal cord injury," J. Neurotrauma. vol. 9, Supplement 1:S211-S217.

Noordenbos et al., 1976. "Diverse sensory functions with an almost totally divided spinal cord. A case of spinal cord transaction with preservation of part of one anterolateral quandrant," Pain 2:185-195.

Noseworthy, 2003, "Multiple Sclerosis and Related Conditions," Chap.97, in Neurological Therapeutics: Principle and Practices, vol. 1, Noseworthy, JH (ed.) pp. 1107-1131.

Novantrone® (interferon beta-1b), EMD Serono Inc., Prescribing Information, Sep. 2009. http://www.novantrone.com/assets/pdf/novantrone_prescribing_info.pdf (last accessed Nov. 3, 2010) (pp. 1-34).

Ochoa, 1982, "Pain in local nerve lesions," Abnormal Nerves and Muscles as Impulse Generators, Culp et al. eds., Oxford University Press: New York, pp. 568-587.

Office Action mailed Jun. 6, 2008 for U.S. Appl. No. 11/010,828, filed Dec. 13, 2004.

Office Action mailed Jun. 10, 2009 for U.S. Appl. No. 11/010,828, filed Dec. 13, 2004.

Office Action mailed May 25, 2010 for U.S. Appl. No. 11/010,828, filed Dec. 13, 2004.

Ogawa et al., 1986, "Combined mutagenicity of cobalt(II) salt and heteroaromatic compounds in *Salmonella typhimurium*," Mutation Research, 172:97-104.

Oh et al., 2003, "Inhibitory effects of potassium channel blockers on carbachol-induced contraction in rat detrusor muscle," J. Korean Med. Sci., 18:701-706.

Olaffson et al., 1999, "Risk of epilepsy in patients with multiple sclerosis: a population-based study in Iceland," Epilepsia, vol. 40(6):745-747.

Olafsson et al., 1996, "Incidence of epilepsy in rural Iceland: a population-based study," Epilepsia, 37(19):951-955.

Oosterhuis HJ. 1996, "Severe 4-aminopyridine intoxication in a body-builder. Letter to the Editor," Ned. Tijdschr. Geneeeskd., 140(8):452 [Translation provided].

Oremus et al., 2000, "Review of outcome measurement instruments in Alzheimer's Disease drug trials: psychometric properties of global scales," J. Geriatr. Psychiatry Neurol., vol. 13: 197-205.

Pant et al., 1982, "Calcium dependent 4 aminopyridine stimulation of protein phosphorylation in squid loligo-pealei optic lobe synaptosomes," Cellular and Molecular Neurobiology, vol. 3(3):223-238.

Paskov et al., 1973, "New Anti-Curare and Analeptic Drug, Pimadin, and its Use in Anesthesia," Eksp. Khir. Anestheziol., 18(4):48-52 (English translation provided).

Pearson, et al., 2004, "Quantification of walking mobility in neurological disorders," Q. J. Med. New Series, vol. 97:463-475.

Pena et al., 2000, "Seizures and neurodegeneration induced by 4-aminopyridine in rat hippocampus in vivo: role of glutamate- and GABA-mediated neurotransmission and of ion channels," Neuroscience, vol. 101(3):547-561.

Pickett et al., 1996, "Atypical presentation of 4-aminopyridine overdose," Ann. Emerg. Med., 27:382-385.

Pickett et al., 1996, "Fampridine Overdose," Reactions, vol. 30(594):8.

Piper Jaffray, "Acorda Therapeutics," Nov. 2. 2010 (pp. 1-8).

Pogue et al., 1998, "Overcoming the limitations of current meta-analysis of randomized controlled trials," Lancet, vol. 351 :47-52.

Polman et al., 1990, "4-Aminopyridine in Multiple Sclerosis," Ann. Neurol.. vol. 28(4):589.

Polman et al., 1994, "4-Aminopyridine is Superior to 3,4-Diaminopyridine in the Treatment of Patients With Multiple Sclerosis," Arch. Neurol., vol. 51:1136-1139.

Polman et al., 1994, "4-Aminopyridine in the Treatment of Patients With Multiple Sclerosis," Arch. Neurol., vol. 51:292-296.

Poser et al., 2003, "Epilepsy and multiple sclerosis," Epilepsy & Behavior, vol. 4:6-12.

Potter et al., 1993, "Effects of intravenous 4-aminopyridine on central conduction in persons with incomplete spinal cord injury," Clinical and Investigative Medicine, vol. 16(4Suppl.):B111 (Abstract 693).

Potter et al., 1998, "Sustained Improvements in Neurological Function in Spinal Cord Injured Patients Treated with Oral 4-Aminopyridine: Three Cases," Spinal Cord, 36:147-155.

Press Release, Sanofi-Aventis (Apr. 29, 2010), http://en.sanofi-aventis.com/press/press_releases/2010/ppc_28189.asp (last visited Nov. 2, 2010).

Prous et al., 1995, "Fampridine: agent for multiple sclerosis," Drugs of the Future, vol. 20:142-143.

Qiao et al., 1997, "Effects of 4-aminopyridine on motor-evoked potentials in patients with spinal cord injury," J. Neurotrauma, vol. 14(3):135-149.

REBIF® (interferon beta-la), EMD Serono Inc. and Pfizer Inc., Prescribing Information, Sep. 2009. http://www.emdserono.com/cmg.emdserono_us/en/images/rebif_tcm115_19765.pdf (last accessed Nov. 3, 2010).

Riggs JE, 1982, "Pharmacologic enhancement of neuromuscular transmission in myasthenia gravis," Clin. Neuropharmacol., vol. 5(3):277-292.

Roche, E.B. 1987, "Bioversible carriers in drug designs," American Pharmaceutical Association and Pergamon Press, New York (TOC).

Romani et al., 2004, "Fatigue in multiple sclerosis: multidimensional assessment and response to symptomatic treatment," Mult. Scler., 10:462-468.

Ropper and Brown (eds), 2005, "Epilepsy and Other Seizure Disorders," Adams and Victor's Principles of Neurology, Eighth Edition. Blacklick, OH: McGraw-Hill Professional, Chapter 16, pp. 271-301.

Rossini et al., 1996, 4-Aminopyridine treatment in chronic progressive multiple sclerosis: a 6 month double-blind placebo-controlled, crossover study by AMIT (American Italian Study). Europ. J. of Neurol., vol. 3 (Suppl 5):91, Abstract P208.

Rossini et al., 2001, "Fatigue in progressive multiple sclerosis: results of a randomized, double-blind. placebo-controlled, crossover trial of oral 4-aminopyridine," Multiple Sclerosis, vol. 7:354-358.

Ruddick et al., 1999, "Selecting relapsing remitting multiple sclerosis patients for treatment: The case of early treatment," J. of Neuroimmunology. vol. 98(1):22-28.

Rupp et al., 1983, "Pharmacokinetics and pharmacodynamics of 4-aminopyridine in anesthetized dogs," J. Pharmacol. Exp. Ther., vol. 225(2):351-354.

Rutecki et al., 1987, "4-Aminopyridine produces epileptiform activity in hippocampus and enhances synaptic excitation and inhibition," J. Neurophysiol., vol. 57(6):1911-1924.

Saade et al., 1985, "Effects of 4-aminopyridine, GABA and bicuculline on cutaneous receptive fields of cat dorsal horn neurons," Brain Res. 344:356-359.


Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Saade et al., 1982, "Cutaneous receptive field alterations induced by 4-aminopyridine," Brain Res. 232:177-180.
Sadovnick et al 1991, "Cause of death in patients attending multiple sclerosis clinics," Neurology, vol. 41:1193-1196.
Sander, 2003, "The epidemiology of epilepsy revisited," Curr. Opin. Neurol., vol. 16(2):165-170.
Sanders et al., 1980, "Eaton-Lambert syndrome: a clinical and electrophysiological study of a patient treated with 4-aminopyridine," J. Neurol. Neurosurg. Psychiatry, vol. 43(11):978-985.
Sandyk, 1996, "Weak electromagnetic fields potentiate the effects of 4-aminopyridine in multiple sclerosis," Intern. J. Neuroscience, vol. 85:125-129.
Scheinberg et al., 1980, "Multiple Sclerosis: Earning a living," NY State J. Med., 1395-1400.
Schneider et al., 1997, "Validity and reliability of the Alzheimer's Disease Cooperative Study—Clinical Global Impression of Change," Alzh. Disease Assoc. Dis., vol. 11(Suppl2):S22-S32.
Schwid et al., 1997, "Autoimmune hyperthyroidism in patients with multiple sclerosis treated with interferon beta 1-b," Archives of Neurology, vol. 57:1169-1170.
Schwid et al., 1998, "Quantitative measures of motor fatigue in multiple sclerosis: Features of motor dysfunction distinct from weakness," Neurology, vol. 50 (4 Suppl. 4):A210-A211 (P04.036).
Schwid et al., 2000, "Are quantitative functional measures more sensitive to worsening MS than traditional measures?" Neurology, vol. 55(12):1901-1903.
Schwid et al., 2000, "Subjective fatigue is associated with impaired central motor conduction in MS patients, but motor fatigue is not," Neurology, vol. 54 (7 Supp. 3):A56 (P01.085).
Schwid et al., 2001, "The cost of delaying treatment in multiple sclerosis, what is lost is not regained," Neurology, vol. 56(12):1620.
Schwid et al., 2002, "Quantitative functional measures in MS: What is a reliable change?" Neurology, vol. 58:1294-1296.
Schwid et al., 2004, "Cognitive status after 10 years of prospective evaluation in patients with relapsing multiple sclerosis," Multiple Sclerosis, vol. 10(2):S123 (P141).
Segal et al., 1991, "Decreased systemic clearance of lorzepam in humans with spinal cord injury," J. Clin. Pharmcol. 31:651-656.
Segal et al.. 1997, "4-Aminopyridine improves pulmonary function in quadriplegic humans with longstanding spinal cord injury," Pharmacotherapy, vol. 17(3):415-423.
Segal et al., 1998, "4-Aminopyridine alters gait characteristics and enhances locomotion in spinal cord injured humans." J. Spinal Cord Med., vol. 21(3):200-204.
Segal et al., 1999, "Safety and efficacy of 4-aminopyridine in humans with spinal cord injury: a long term, controlled trial," Phamacother., vol. 19(6):713-723.
Segal et al., 2002, "4-aminopyridine influences heart rate variability in long-standing spinal cord injury," Am. J. Ther., vol. 9(1):29-33.
Semba et al., 1985, "4-aminopyridine induces expansion of cutaneous receptive fields of dorsal horn cells," Brain Res. 343:398-402.
Sharrack et al., 1999, "The Guy's Neurological Disability Scale (GNDS): a new disability measure for multiple sclerosis," Mult. Scler., vol. 5:223-233.
Shealy et al., 1967, "Electrical inhibition of pain by stimulation of the dorsal columns: Preliminary clinical report," Anesth. Analg. 46(4):489-491.
Sherratt et al., 1980, "Effects of 4-aminopyridine on normal and demyelinated mammalian nerve fibres," Nature, vol. 283(5747):570-572.
Shi et al, 1996, "Compression injury of mammalian spinal-cord in-vitro and the dynamics of action-potential conduction failure," J. of Neurophysiology, vol. 76(3):1572-1580.
Shi et al., 1995, "4-Aminopyridine affects conduction in injured spinal cord axons in vitro at clinically relevant concentrations," Society of Neuroscience Abstracts, vol. 21(1-3):1003, (395.3).
Shi et al., 1997, "Conduction block in acute and chronic spinal cord injury: different dose-response characteristics for reversal by 4-aminopyridine," Exp. Neurol., vol. 148:495-501.
Shi et al., 1997, "Differential Effects of Low and High Concentrations of 4-Aminopyridine on Axonal Conduction in Normal and Injured Spinal Cord," Neuroscience, vol. 77(2):553-562.
Shinohara et al., 1982, "Ion-pair high performance liquid chromatographic assay of 4-aminopyridine in serum," J Chrom (Biomed Appl), vol. 230:363-372.
Sia et al., 1979, "Effects of the Analeptic Drug, 4-Aminopyridine, upon Post-operative Respiratory Depression in Patients," Acta Anesth. Belg., vol. 30(Suppl):195-199.
Sia et al., 1981, "4-Aminopyridine reversal of fentanyl-induced respiratory depression in normocapnic and hypercapnic patients," Br. J. Anaesth., vol. 53(4):373-379.
Sia et al., 1981, "Use of 4-aminopyridine to reverse morphine-induced respiratory depression in man," Br. J. Anaesth., vol. 53(8):865-868.
Sia et al., 1982, "An electroencephalographic study of 4-aminopyridine," Anest. Analg.. vol. 61(4):354-357.
Siegert et al., 2005, "Depression in multiple sclerosis: a review." J. Neurol. Neurosurg. Psychiatry, vol. 76:469-475.
Smeets et al., 1995, "Severe 4-aminopyridine intoxication in a bodybuilder," Ned. Tijdschr. Geneesdk., vol. 139(51):2667-2668.
Smith et al., 1982, "Spontaneous and evoked electrical discharges from a central demyelinating lesion," J. Neurol. Sci. 55:39-47.
Smith et al., 2000, "Effects of 4-aminopyridine on demyelinated axons, synapses and muscle tension," Brain, vol. 123:171-184.
Smits et al., 1994, "The effect of 4-aminopyridine on cognitive function in patients with multiple sclerosis: A pilot study," Neurology, vol. 44:1701-1705.
Smits et al., 1994, "The effects of 4-aminopyridine on cognitive function in patients with multiple sclerosis: A pilot study," J. of Neurology, vol. 241:S102 (Abstract. 10).
Snyderman N, MD, Nightly News—About Us—msnbc.com, http://www.msnbc.com/id/14894442 (last accessed Nov. 17, 2010).
Sohn et al., 1981, "Pharmacokinetics and side-effects of 4-aminopyridine. 1981," E. Rugheimer, M. Zindler (eds) Proceedings of the Seventh World Congress of Aneasthesiologists, Hamburg, Sep. 14-21, 1980. Amsterdam: Excerpta Medica, 1981; 224-228.
Solari et al., 2003, "Aminopyridines for symptomatic treatment in multiple sclerosis (Cochrane Review)", in: The Cochrane Library, Issue 2, 2003. Oxford: Update Software. (Date of most recent amendment: Jul. 15, 2002; Date of most recent substantive amendment: Jul. 15, 2002; copyright Update Software Ltd.).
Solari et al., 2004, "Aminopyridines for symptomatic treatment in multiple sclerosis." Cochrane Database of Systematic Reviews 2002, Issue 4. (Date edited: Oct. 11, 2004; Date of most recent substantive amendment: Jul. 15, 2002).
Spatt et al., 2001, "Epileptic and non-epileptic seizures in multiple sclerosis," J. Neurol., vol. 248:2-9.
Spyker et al., 1980, "Poisoning with 4-Aminopyridine: Report of Three Cases," Clinical Toxicology, vol. 16(4):487-497.
Stenager et al., 1992, "Suicide and multiple sclerosis: an epidemiological investigation," J. of Neurol. Neurosurg. Psychiatry, vol. 55:542-545.
Stork et al., 1994, "Characterization of 4-aminopyridine in overdose," Clin. Toxicol., vol. 32(5):583-587.
Stoyanov et al., 1976, "Clinical Electromyomechanographic and Electromyographic Studies in Decurarization with Pymadine," Anaesth. Resus Intern. Ther., vol. 4(2):139-142.
Striano et al., 2003, "Epileptic seizures in multiple sclerosis: clinical and EEG correlations," Neurol. Sci., vol. 24:322-328.
Strupp et al.. 2004, "Treatment of episodic ataxia type 2 with the potassium channel blocker 4-aminopyridine," Neurology, vol. 62(9):1623-1625.
Stuhmer et al.. 1989, "Molecular basis of functional diversity of voltage-gated potassium channels in mammalian brain," EMBO J., vol. 8(11):3235-3244.
Sugimura et al., 1982, "Metabolic aspects of the comutagenic action of norharman," Adv. Exper. Med. Biology, vol. 136:1011-1025.
Swingler et al., 1992, "The morbidity of multiple sclerosis," Q. J. Med., New Series, vol. 83(300):325-337.
Tapia et al., 1985, "Mechanism of the calcium-dependent stimulation of transmitter relealse by 4-aminopyridine in synaptosomes," Brain Res. 361:373-382.
Ter Wee et al., 1985, "4-Aminopyridine and haemodialysis in the treatment of verapamil intoxication," Human Toxicol., vol. 4(3):327-329.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Tim et al., 1998, "Lambert-Eaton myasthenic syndrome (LEMS): clinical and electrodiagnostic features and response to therapy in 59 patients," Ann. NY Acad. Sci., vol. 841:823-826.
Tim et al., 2000, "Lambert-Eaton myasthenic syndrome: electrodiagnostic findings and response to treatment," Neurology, vol. 54:2176-2178.
Truyen et al., 1996, "Magnetic resonance imaging of epilepsy in multiple sclerosis: a case control study, Implications for treatment trials with 4-aminopyridine," Mutt. Scler., vol. 1(4):213-217.
Tysabri® (natalizumab), Biogen Idec Inc. and Elan Pharmaceuticals Inc., Prescribing Information, Jul. 2010. http://www.tysabri.com/en_US/tysb/site/pdfs/TYSABRI-pi.pdf (last accessed Nov. 3, 2010) (pp. 1-25).
Uges et al., 1981, "Liquid-chromatographic determination of 4-aminopyridine in serum, saliva, and urine," Clinical Chemistry, vol. 27(3):437-440.
Uges et al., 1982, "4-aminopyridine Tablets; a Method for the Preparation in-vitro and in-vivo Studies," Pham. Acta. Helv. 57, Nr. 4, 122-128.
Uges et al., 1984, "Treatment of 4-aminopyridine-poisoning after oral overdoses; a proposal," Pharm. Acta Helv., vol. 59:172-176.
US Food and Drug Administration, For Consumers, Fast Track, Accelerated Approval and Priority Review, http://fda.gov/forconsumers/byaudience/forpatientadvocates/speedingaccesstoimportantnewtherapies/ucm128291.htm (last accessed Nov. 12, 2010).
van der Bruggen et al., 2001, "Randomized trial of 4-aminopyridine in patients with chronic incomplete spinal cord injury," J. Neurol., vol. 248(8):665-671.
van der Horst et al., 1992, "Determination of 4-aminopyridine in serum by solid-phase extraction and high-performance liquid chromatography," J. of Chromatography, vol. 574:166-169.
van Diemen et al., 1992, "Increased visual impairment after exercise (Uhthoff's phenomenon) in multiple sclerosis: therapeutic possibilities," Eur. Neurol., vol. 32(4):231-234.
van Diemen et al., 1992, "The Effect of 4-Aminopyridine on Clinical Signs in Multiple Sclerosis: A Randomized, Placebo-Controlled, Double-Blind, Cross-over Study," Ann. Neurol., vol. 32(2):123-130.
van Diemen et al., 1993, "4-Aminopyridine induces functional improvement in multiple sclerosis patients: a neurophysiological study," J. Of Neurological Sciences, vol. 116:220-226.
Van Heeringen, 2003, "Understanding the suicidal brain," Br. J. Psychiatry, vol. 184:282-284.
Velez et al., 2003, "Opisthotonic posturing with neuromuscular irritability attributable to 4-aminopyridine ingestion by a healthy pediatric patient," Pediatrics, vol. 111:e82-e84.
Voskuyl et al., 1985, "Spontaneous epileptiform discharges in hippocampal slices induced by 4-aminopyridine," Brain Research, vol. 342(1):54-66.
Wakabayashi et al., 1982, "Comutagneic effect of norharman with aminopyridine derivatives," Mutation Research, vol. 105:205-210.
Walker, 2002, "A. Common Statistical Methods for Clinical Research with SAS® Examples," Second Edition, 2002, Cary, NC: SAS Institute Inc., p. 32.
Waxman et al., 1984, "Impulse conduction in inhomogeneous axons: Effects of variation in voltage-sensitive Ionic conductances of invasion of demyelinated axon segments and preterminal fibers," Brain Res. 294:111-122.
Waxman et al., 1985, "Ligature-induced injury in peripheral nerve: Electrophysiological observations on changes in action potential characteristics following blockade of potassium conductance," Muscl. Nerve 8:85-92.
Waxman et al., 1993, "Molecular dissection of the myelinated axon," Ann. Neurol., vol. 33(2):121-136.
Wirtavuori et al., 1984, "Antagonism of d-tubocurarine-induced neuromuscular blockade with a mixture of 4-aminopyridine and neostigmine in man," Can. Anaesth. Soc. J., vol. 31(6):624-630.
Wolfe et al., 2001, "Effects of 4-aminopyridine on motor evoked potentials in patients with spinal cord injury: a double-blinded, placebo-controlled crossover trial," J. Neurotrauma., vol. 18(8):757-771.
Wolinsky et al., 2007, "Glatiramer acetate in primary progressive multiple sclerosis: results of a multinational, multicenter, double-blind, placebo-controlled trial," Ann Neurol., vol. 61:14-24.
Xu et al., 1992, "Chronic pain-related syndrome in rats after ischemic spinal cord lesion: a possible animal model for pain in patients with spinal cord injury," Pain 48:279-290.
Yeh et al., 1976, "Interactions of aminopyridines with potassium channels of squid axon membranes," Biophys. J. 16:77-81.
Yeh et al., 1976, "Dynamics of aminopyridine block of potassium channels in squid axon membrane," J. Gen. Physiol. 68:519-535.
Zorzon et al., 2001, "Depression and anxiety in multiple sclerosis. A clinical and MRI study in 95 subjects," J. Neurol., vol. 248:416-421.
Blight, 1991, "Morphometric analysis of blood-vessels in chronic experimental spinal-cord injury: hypervascularity and recovery of function," J of Neurol Sci., vol. 106(2):158-174.
Goodman et al., 2004, "Phase two trial of fampridine-SR in multiple sclerosis," Multiple Sclerosis, vol. 11(1):111.
Goodman et al., 2004, "Phase 2 trial of fampridine-SR in multiple Sclerosis," Multiple Sclerosis vol. 10(2):S273 (P694).
Goodman et al., 2005, "Clinical meaningfulness of consistent improvement on the timed 25-foot walk (TW25) during treatment with fampridine," Annals of Neurology, vol. 58(Suppl. 9):S26 (P96).
Goodman et al., 2005, "Stability and interrelatednes of the 12-item multiple sclerosis waking scale and the timed 25 foot walk during a 3 month clinical trial," Multiple Sclerosis, vol. 11:S102-S103 (P398).
Lammertse et al., 2002, "Clinical evaluation of oral fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic motor-incomplete spinal cord injury," Neurology, vol. 58 (7 Suppl. 3): A33 (P01.035).
Schwid et al., 1997, "The measurement of ambulatory impairment in multiple sclerosis," Neurology, vol. 49:1419-1424.
Ashworth et al., 1964, "Preliminary Trial of Carisoprodol in Multiple Sclerosis," Practitioner, vol. 192:540-542.
Goodman et al., 2009, "Sustained -Release Oral Fampridine in Multiple Sclerosis: a Randomized, Double-Blind, Controlled Trial," Lancet, vol. 373: 732-738.
Goodman et al., 2010, "A Phase 3 Trial of Extended Release Oral Dalfampridine in Multiple Sclerosis," Ann. Neurol., vol. 68(4):494-502.
Goodman et al., 2008, "Dose comparison trial of sustained-release fampridine in multiple sclerosis," Neurology 71:1134-1141.
Fischer et al., 2001, "Multiple Sclerosis Functional Compositie (MSFC), Administration and Scoring Manual," rev. Oct. 2001, National Multiple Sclerosis Society, New York, pp. 1-41.
Medical Research Council (MRC), 1976, "Memorandum No. 45—Aids to the examination of the peripheral nervous system, London: Her Majesty's Stationery Office," Printed in London for Her Majesty's Stationary Office, The White Rose Press, Mexborough and London, pp. 1-62.
Cowen and Company—Acorda Therapeutics, Nov. 19, 2010 (p. 1-18).
Wolinsky et al., 2004, "The PROMiSe trial: baseline data review and progress report," Multiple Sclerosis, vol. 10:S65-S72.
Van Diemen et al., 1993, "4-Aminopyridine in Patients with Multiple Sclerosis: Dosage and Serum Level Related to Efficacy and Safety," Clin. Neuropharm. vol. 16(3):195-204.
Opposition of EP1732548 by Synthon B.V., filed Mar. 7, 2012.
Opposition of EP 1732548 by neuraxpharm Arzneimittel GmbH, filed Mar. 8, 2012 (with English Translation).
Fampridine Monograph, 1998, "Fampridine Neurelan® Agent for Multiple Sclerosis," Drugs Fut. 23(2):218-219.
Office Action mailed Sep. 13, 2011 for U.S. Appl. No. 12/626,001, tiled Nov. 25, 2009.
Office Action mailed Sep. 16, 2011 for U.S. Appl. No. 12/626,036, filed Nov. 25, 2009.
Office Action mailed Sep. 16, 2011 for U.S. Appl. No. 12/626,085, filed Nov. 25, 2009.
Office Action mailed Apr. 25. 2012 for U.S. Appl. No. 12/626,085, filed Nov. 25, 2009.
Office Action mailed Sep. 8, 2011 for U.S. Appl. No. 12/824,137, filed Jun. 25, 2010.
Office Action mailed Aug. 12, 2011 for U.S. Appl. No. 12/824,140, filed Jun. 25, 2010.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Office Action mailed Aug. 16, 2011 for U.S. Appl. No. 12/824,141, filed Jun. 25, 2010.
Office Action mailed Aug. 30, 2011 for U.S. Appl. No. 12/824,133, filed Jun. 25, 2010.
Office Action mailed Aug. 16, 2011 for U.S. Appl. No. 12/824,135, filed Jun. 25, 2010.
Office Action mailed Aug. 22, 2011 for U.S. Appl. No. 12/824,136, filed Jun. 25, 2010.
Office Action mailed Sep. 17, 2010 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Apr. 14, 2010 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Jun. 23, 2009 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Oct. 29, 2008 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Jan. 23, 2008 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Aug. 20, 2007 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Notice of Allowance and Fees Due mailed Apr. 26, 2012 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Heng et al., 2001, "Investigation of the influence of mean HPMC particle size and number of polymer particles on the release of aspirin from swellable hydrophilic matrix tablets", Journal of Controlled Release; 76:39-49.
Advisory Action Before the Filing of an Appeal Brief mailed Mar. 13, 2009 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Cohen et al., 2004, "The two towers: Quest for drugs from discovery to approval," Top Spinal Cord Inj. Rehabil., 10(1):63-71.
Notice of Allowance mailed Aug. 13. 2012 from the United States Patent and Trademark Office for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Poster entitled "Placebo-controlled double-blinded dose ranging study of fampridine-SR in multiple sclerosis" presented at the 7th Annual Meeting of the Americas Committee for Treatment and Research in Multiple Sclerosis and 18th Congress of the European Committee for Treatment and Research in Multiple Sclerosis (ACTRIMS/ECTRIMS) by Goodman et al. on Sep. 18-21, 2002. Baltimore, Maryland, USA.
Press Release of Acorda Therapeutics. Inc. dated Aug. 13, 2012 entitled: "Acorda Therapeutics Announces Top Line Results of Post-Marketing Commitment Study Exploring 5 mg Dose of Dalampridine-ER" available at http://ir.acorda.com/phoenix.zhtml?c-194451&p=irol-newsArticle&ID=1724941&highlight= (last accessed Aug. 16, 2012).
Shaffer, "Ampyra Lower-Dose Post-Nlarket Study Misses Endpoint," Bioworld Today 23(157):1, 4 (Aug. 14. 2012).
Slide presentation entitled "Placebo-controlled double-blinded dose ranging study of fampridine-SR in multiple sclerosis" presented at the 7th Annual Meeting of the Americas Committee for Treatment and Research in Multiple Sclerosis and 18th Congress of the European Committee for Treatment and Research in Multiple Sclerosis (ACTRIMS/ECTRIMS) by Goodman et al. on Sep. 18-21, 2002, Baltimore, Maryland, USA.
Slide presentation entitled "Protocol No. DER-401 Top Line Results" presented at Webcast and Conference Call by Acorda Therapeutics, Inc. on Aug. 13. 2012.
U.S. Appl. No. 13/394,044, filed Mar. 2, 2012.
U.S. Appl. No. 13/585,277, filed Aug. 14, 2012.
Transcript of Webcast and Conference Call by Acorda Therapeutics, Inc. on Aug. 13, 2012.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 1

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 2

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Note: The treatment sample sizes are based on the number of ITT subjects with available data.

Note: The p-values (versus placebo) presented above the treatment mean bars are Dunnett-adjusted

Fig. 3

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Note: The treatment sample sizes are based on the number of ITT subjects with available data.

Fig. 4

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 5

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Note: The treatment sample sizes are based on the number of ITT subjects with available data.
Note: The p-values (versus placebo) presented above the treatment mean bars are Dunnett-adjusted

Fig. 6

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 7

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Note: Treatment p-value from the Cochran-Mantel Haenszel test controlling for center.

Fig. 8

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




•Double blind measurements at first and last stable dose visits only.
•Note: For the changes from baseline, a negative score is indicative of clinical benefit.
•Note: Some non-responders had no post-baseline data for a particular variable; so the sample sizes for the non-responders (with respect to that variable) may be less than the actual number of non-responders.
•Note: the p-values comparing responders to non-responders are from ANOVA models with effects for responder status and center.

Fig. 9

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




**: Significantly better than placebo and fampridine non-responders ($p < 0.001$ for each).

*: Significantly better than fampridine non-responders.

Fig. 10

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




@@: Significantly better than placebo ($p < 0.001$).
@: Significantly better than placebo ($p < 0.05$).

Fig. 11

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




Fig. 12

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

# METHODS OF USING SUSTAINED RELEASE AMINOPYRIDINE COMPOSITIONS

## CROSS REFERENCES

This application is a continuation of U.S. patent application Ser. No. 11/102,559, filed Apr. 8, 2005, which claims the benefit of U.S. Provisional Application No. 60/560,894, filed Apr. 9, 2004. U.S. patent application Ser. No. 11/102,559 is incorporated by reference herein in its entirety.

## BACKGROUND

This invention relates a sustained release oral dosage form of an aminopyridine pharmaceutical composition that can be used to treat individuals affected with neurological disorders wherein said pharmaceutical composition maximizes the therapeutic effect, while minimizing adverse side effects.

The sustained release oral dosage form of the present invention may be utilized to treat neurological disorders such as multiple sclerosis, spinal cord injuries, Alzheimer's disease and ALS.

Multiple sclerosis (MS) is a degenerative and inflammatory neurological disease that affects the central nervous system, more specifically the myelin sheath. The condition of MS involves demyelination of nerve fibers resulting in "short-circuiting" of nerve impulses and thus a slowing or blocking of transmission along the nerve fibers, with associated disabling symptoms. Treatment alternatives for promoting transmission along affected nerves have thus far been limited.

Potassium channel blockers are a class of compounds that has been found to improve the conduction of nerve impulses. As a result, they have become the focus of attention in the symptomatic treatment of spinal cord injury, MS and Alzheimer's disease. One sub-class of potassium channel blockers, aminopyridines have shown promise in the treatment of neurological diseases. 4-aminopyridine (4-AP), a mono-aminopyridine known as fampridine, has been found to reduce the potassium flow in nerve impulse transmission and, thereby, shows effectiveness in restoring conduction in blocked and demyelinated nerves.

Early studies of monoaminopyridines were conducted using an intravenous composition, comprising 4-AP. This was followed by the development of an immediate-release (IR) composition for oral administration of 4-AP, commonly known as fampridine. The IR composition consisted of 4-AP powder in a gelatin-based capsule and produced rapid peak plasma concentrations shortly after dosing with a time to maximum concentration of about 1 hour and a plasma half life of about 3.5 hours. The rapid release and short half life of fampridine makes it difficult to maintain effective plasma levels without producing high peaks following each dose that may cause undesirable side effects such as seizures and trembling.

Electrophysiological recordings from isolated spinal cord have shown chronic failure of action potential conduction in surviving myelinated axons, following a blunt contusion injury (Blight, A. R., "Axonal physiology of chronic spinal cord injury in the cat: intracellular recording in vitro", Neuroscience. 10:1471-1486 (1983b)). Some of this conduction block can be overcome, at the level of single nerve fibers, using the drug 4-aminopyridine (4-AP) (Blight, A. R., "Effect of 4-aminopyridine on axonal conduction-block in chronic spinal cord injury", Brain Res. Bull. 22:47-52 (1989)). Intravenous injection of this compound in animals with experimental or naturally occurring spinal cord injuries produces significant improvements in electrophysiological (Blight, A. R. and Gruner, J. A., "Augmentation by 4-aminopyridine of vestibulospinal free fall responses in chronic spinal-injured cats," J. Neurol. Sci. 82:145-159, (1987)) and behavior function (Blight, A. R., "The effects of 4-aminopyridine on neurological deficits in chronic cases of traumatic spinal cord injury in dogs: a phase I clinical trial," J. Neurotrauma, 8:103-119 (1991)).



An initial study in spinal cord injury patients was organized by Dr. Keith Hayes and indicated a potential for a therapeutic benefit, mostly at the electrophysiological level, combined with a lack of serious side effects (Hayes et al, "Effects of intravenous 4-aminopyridine on neurological function in chronic spinal cord injured patients: preliminary observations," Proc. IBRO World Conf. Neurosci., p. 345 1991).

A recent study of fampridine in patients with chronic incomplete SCI was reported in Clinical Neuropharmacology 2003: Keith C. Hayes; Patrick J. Potter; Robert R. Hansebout; Joanne M. Bugaresti; Jane T. C. Hsieh; Sera Nicosia; Mitchell A. Katz; Andrew R. Blight; Ron Cohen 26(4):185-192.

## SUMMARY OF THE INVENTION

One embodiment of the present invention relates to a pharmaceutical composition which contains one or more potassium channel blockers and which can be used in the effective treatment of various diseases, for example, spinal cord injury, multiple sclerosis, Alzheimer's disease, and ALS. Embodiments of the present invention are directed to compositions that include a matrix and a potassium channel blocker. The potassium channel blockers may include aminopyridines, for example, 4-aminopyridine, 3,4-diaminopyridine and the like, most preferably 4-aminopyridine. The composition provides for sustained-release of the aminopyridine from the matrix to maintain the efficacious and safe plasma level of an aminopyridine. The aminopyridine dispersed in the matrix is capable of providing, upon administration to a patient, a desired release profile. The composition may be used to establish in patients in need of such treatment, a therapeutically effective blood plasma level of the aminopyridine for a period of at least about 6 hours and preferably up to at least about 12 hours in the patient in a twice-daily administration while avoiding excessive peaks and troughs in the level of the aminopyridine. The composition may include a mono- or di-aminopyridine, preferably 4-AP or 3,4-DAP or a combination thereof, homogeneously dispersed in a rate-controlling polymer matrix, preferably including a hydrophilic polymer like hydroxypropylmethylcellulose (HPMC). The composition of the present invention may also include one or more additional active ingredients and/or one or more pharmaceutically acceptable excipients. These compositions can be used to treat various neurological diseases, for example, spinal cord injury, multiple sclerosis, Alzheimer's disease, and ALS.

Another embodiment of the present invention is a stable pharmaceutical composition that comprises a therapeutically effective amount of an aminopyridine dispersed in a matrix that provides a release profile of the aminopyridine to a patient that has a desired $C_{max}$ to $C_\tau$ ratio. The composition may be used to establish and/or maintain in a patient, a therapeutically effective level of the aminopyridine. Preferably the aminopyridine in the composition is released over time so that a therapeutically effective level of the aminopyridine in the patient can be achieved with twice daily dosing of the composition. In a more preferred embodiment, undesirable spikes or peaks in the release of the aminopyridine are avoided.

Another embodiment of the present invention is a stable, sustained-release oral dosage formulation of a composition which includes a therapeutically effective amount of a 4-ami-

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

nopyridine dispersed in a matrix that provides a release profile of 4-aminopyridine in the blood plasma of the patient extending over a period of at least 6 hours, preferably at least 8 hours, and more preferably, at least about 12 hours. In another embodiment, a stable, sustained-release oral dosage formulation of a composition includes a therapeutically effective amount of a 4-aminopyridine dispersed in a matrix that provides a therapeutically effective blood plasma level of 4-aminopyridine in the patient extending over about 24 hours.

Preferably, the oral dosage formulation of the composition is a monolithic tablet formed by compression of the pharmaceutical composition of the present invention. In preferred embodiments, the oral dosage formulation includes a compressed tablet of a therapeutically effective amount of 4-aminopyridine dispersed in matrix that includes a hydrophilic polymer such as HPMC. The oral dosage form of the present invention may also include one or more pharmaceutically acceptable excipients.

The dispersion of 4-aminopyridine throughout the matrix imparts chemical and physical stability to the composition while providing a sustained-release profile. This enhanced dosage stability is most notably observed in compositions and dosage forms of the present invention having low concentrations of 4-aminopyridine, and stability is achieved while maintaining the desired controlled-release profile. Specifically, the compressed tablet formulation of the present invention exhibits superior resistance to moisture absorption by ambient humidity and maintains a uniform distribution of the 4-aminopyridine throughout the tablet while providing a release profile of 4-aminopyridine that permits establishment of a therapeutically effective concentration of the potassium channel blocker with once daily or twice daily dosing of the formulation. Preferably the therapeutically effective concentration released by the formulation extends over at least about 6 hours, preferably at least about 8 hours, and more preferably at least about 12 hours. In addition, the homogeneity of the dosage form renders it amenable to formation by simple and inexpensive manufacturing processes as compared with the multi-layered structure of prior sustained-release dosage formulations.

The compositions of the present invention may be used in the treatment of a condition in a patient that includes establishing a therapeutically effective concentration of a potassium channel blocker in the patient in need thereof. The compositions may be used for building up a level and or maintaining a therapeutically effective concentration of an aminopyridine in the patient by twice daily dosing. The dosages of the present compositions can be made with a lower concentration of the aminopyridine to facilitate restful periods for the patient during the day or night, depending on desired results or dosage schedule. Where desirable, the compositions of the present invention may be formulated to avoid large peaks in initial release of the aminopyridine. The compositions of the present invention when administered to a patient in need thereof provide for the treatment of neurological diseases that are characterized by a degradation of nerve impulse transmission. Preferably, the compositions are a stable, sustained-release tablet of a therapeutically effective amount of a mono- or di-aminopyridine, dispersed in HPMC such that therapeutically effective blood plasma level of the mono- or di-aminopyridine is maintained in the patient for a period of at least 6 hours, preferably at least 8 hours, and more preferably at least about 10-12 hours in a once or twice daily administration.

One embodiment of the present invention relates to a method of increasing walking speed comprising administering to a patient with multiple sclerosis an effective amount of a sustained release aminopyridine composition twice daily, wherein said effective amount is less than about 15 milligrams of aminopyridine. In a preferred embodiment, the effective amount is about 10 to about 15 milligrams of aminopyridine.

In a further embodiment of the present invention a method of improving lower extremity muscle tone comprising administering to a patient with multiple sclerosis an effective amount of a sustained-release aminopyridine composition twice daily is provided. In a preferred embodiment, said effective amount is less than about 15 milligrams of aminopyridine.

Another embodiment of the present invention relates to a method of improving lower extremity muscle strength comprising administering to a patient with multiple sclerosis an effective amount of a sustained-release aminopyridine composition twice daily, wherein said effective amount is less than about 15 milligrams of aminopyridine.

One embodiment of the present invention relates to a method of selecting individuals based on responsiveness to a treatment. The method comprises identifying a plurality of individuals; administering a test to each individual prior to a treatment period; administering a treatment to one or more of the individuals during the treatment period; administering the test a plurality of times to each individual during the treatment period; and selecting one or more individuals, wherein the selected individuals exhibit an improved performance during a majority of the tests administered during the treatment period as compared to the test administered prior to the treatment period. In certain embodiments, the method may further comprise administering the test to each individual after the treatment period, wherein the selected individuals further exhibit an improved performance during a majority of the tests administered during the treatment period as compared to the test administered after the treatment period.

A further embodiment relates to a method of selecting individuals based on responsiveness to a treatment, the method comprising identifying a plurality of individuals; administering a test to each individual prior to a treatment period; administering a treatment to one or more of the individuals during the treatment period; administering the test a plurality of times to each individual during the treatment period; administering the test to each individual after the treatment period; and selecting one or more individuals, wherein the selected individuals exhibit an improved performance during a majority of the tests administered during the treatment period as compared to the better performance of the test administered prior to the treatment period and the test administered after the treatment period.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a histogram to show the number of treatment visits at which subjects showed faster walking speed on the timed 25 foot walk than at all of the five non-treatment visits.

FIG. 2 is a graph of the average walking speeds (ft/sec) by study day (observed cases, ITT population).

FIG. 3 is a histogram of the percent change in average walking speed during the 12-week stable dose period (observed cases, ITT population).

FIG. 4 is a histogram of the percentage of protocol specified responders (subjects with average changes in walking speed during the 12-week stable dose period of at least 20%) by treatment group [(observed cases, ITT population]).

FIG. 5 is a graph of LEMMT by study day (observed cases, ITT population).

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

FIG. 6 is a histogram of change in LEMMT during the 12-week stable dose period (observed cases, ITT population).

FIG. 7 is a histogram of the percentage of post hoc responders by treatment group (ITT population) according to a responder analysis of the present invention.

FIG. 8 is a histogram of the percentage of responders for placebo subjects vs. fampridine subjects pooled (ITT population) according to a responder analysis of the present invention.

FIG. 9 are histograms of the validation of the post hoc responder variable using subjective scales (observed cases, ITT population).

FIG. 10 is a graph of percent change in walking speed at each double-blind visit by responder analysis grouping (observed cases, ITT population).

FIG. 11 is a graph of the change in LEMMT at each double-blind visit by responder analysis grouping (observed cases, ITT population).

FIG. 12 is a graph of change in overall Ashworth Score at each double-blind visit by responder analysis grouping (observed cases, ITT population).

## DETAILED DESCRIPTION OF THE INVENTION

Before the present compositions and methods are described, it is to be understood that this invention is not limited to the particular molecules, compositions, methodologies or protocols described, as these may vary. It is also to be understood that the terminology used in the description is for the purpose of describing the particular versions or embodiments only, and is not intended to limit the scope of the present invention which will be limited only by the appended claims.

The terms used herein have meanings recognized and known to those of skill in the art, however, for convenience and completeness, particular terms and their meanings are set forth below.

It must also be noted that as used herein and in the appended claims, the singular forms "a", "an", and "the" include plural reference unless the context clearly dictates otherwise. Thus, for example, reference to a "spheroid" is a reference to one or more spheroid and equivalents thereof known to those skilled in the art, and so forth. Unless defined otherwise, all technical and scientific terms used herein have the same meanings as commonly understood by one of ordinary skill in the art. Although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of embodiments of the present invention, the preferred methods, devices, and materials are now described. All publications mentioned herein are incorporated by reference. Nothing herein is to be construed as an admission that the invention is not entitled to antedate such disclosure by virtue of prior invention.

"Local administration" means direct administration by a non-systemic route at or in the vicinity of the site of affliction, disorder, or perceived pain.

The terms "patient" and "subject" mean all animals including humans. Examples of patients or subjects include humans, cows, dogs, cats, goats, sheep, and pigs.

The term "pharmaceutically acceptable salts, esters, amides, and prodrugs" as used herein refers to those carboxylate salts, amino acid addition salts, esters, amides, and prodrugs of the compounds of the present invention which are, within the scope of sound medical judgment, suitable for use in contact with the tissues of patients without undue toxicity, irritation, allergic response, and the like, commensurate with a reasonable benefit/risk ratio, and effective for their intended use, as well as the zwitterionic forms, where possible, of the compounds of the invention.

The term "prodrug" refers to compounds that are rapidly transformed in vivo to yield the parent compounds of the above formula, for example, by hydrolysis in blood. A thorough discussion is provided in T. Higuchi and V. Stella, "Prodrugs as Novel Delivery Systems," Vol. 14 of the A.C.S. Symposium Series, and in Bioreversible Carriers in Drug Design, ed. Edward B. Roche, American Pharmaceutical Association and Pergamon Press, 1987, both of which are incorporated herein by reference.

The term "salts" refers to the relatively non-toxic, inorganic and organic acid addition salts of compounds of the present invention. These salts can be prepared in situ during the final isolation and purification of the compounds or by separately reacting the purified compound in its free base form with a suitable organic or inorganic acid and isolating the salt thus formed. Representative salts include the hydrobromide, hydrochloride, sulfate, bisulfate, nitrate, acetate, oxalate, valerate, oleate, palmitate, stearate, laurate, borate, benzoate, lactate, phosphate, tosylate, citrate, maleate, fumarate, succinate, tartrate, naphthylate mesylate, glucoheptonate, lactobionate and laurylsulphonate salts, and the like. These may include cations based on the alkali and alkaline earth metals, such as sodium, lithium, potassium, calcium, magnesium, and the like, as well as non-toxic ammonium, tetramethylammonium, tetramethylammonium, methlyamine, dimethlyamine, trimethlyamine, triethlyamine, ethylamine, and the like. (See, for example, S. M. Barge et al., "Pharmaceutical Salts," J. Pharm. Sci., 1977, 66:1-19 which is incorporated herein by reference).

A "therapeutically effective amount" is an amount sufficient to decrease or prevent the symptoms associated with a medical condition or infirmity, to normalize body functions in disease or disorders that result in impairment of specific bodily functions, or to provide improvement in one or more of the clinically measured parameters of the disease. Preferably, improvement in symptoms associated with the disease including walking speed, lower extremity muscle tone, lower extremity muscle strength, or spasticity. As related to the present application, a therapeutically effective amount is an amount sufficient to reduce the pain or spasticity associated with the neurological disorder being treated, or an amount sufficient to result in improvement of sexual, bladder or bowel function in subjects having a neurological disorder which impairs nerve conduction, which hinders normal sexual, bladder or bowel functions.

"Treatment" refers to the administration of medicine or the performance of medical procedures with respect to a patient, for either prophylaxis (prevention), to cure the infirmity or malady in the instance where the patient is afflicted refers, or amelioration the clinical condition of the patient, including a decreased duration of illness or severity of illness, or subjective improvement in the quality of life of the patient or a prolonged survival of the patient.

In addition, the compounds of the present invention can exist in unsolvated as well as solvated forms with pharmaceutically acceptable solvents such as water, ethanol, and the like. In general, the solvated forms are considered equivalent to the unsolvated forms for the purposes of the present invention.

One aspect of the invention is a sustained-release pharmaceutical composition comprising an aminopyridine dispersed in a sustained release matrix such as a rate-controlling polymer. The composition of the present invention is capable of providing, upon administration to a patient, a release profile

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

of the aminopyridine extending over at least 6 hours, preferably least about 12 hours, and more preferably at least 24 hours or more. Preferably the aminopyridine concentration in the composition is a therapeutically effective amount, and preferably the aminopyridine is dispersed uniformly throughout the release matrix. A therapeutically effective amount is an amount of a potassium channel blocker, preferably an aminopyridine compound, that when administered to a patient or subject, ameliorates a symptom of a neurological disease.

When the compositions of the present invention are administered to a patient, the concentration of the aminopyridine in the patient's plasma over time (release profile) may extend over a period of at least 6 hours, preferably over at least 8 hours, and more preferably over at about 12 hours. The compositions may provide in single dose a mean maximum plasma concentration of aminopyridine in the patient of from about 15 to about 180 ng/ml; a mean $T_{max}$ from about 1 to about 6 hours, more preferably about 2 to about 5.2 hours after administration of the composition to the patient.

In one embodiment, aminopyridine is administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose at selected intervals of time until a therapeutic dose is achieved. In one embodiment, the medicament is administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose of aminopyridine at selected intervals of time until a therapeutic dose is achieved. For example, at the commencement of treatment aminopyridine is preferably administered at a dose less than 15 mg/day until a tolerable state is reached. Suitably when said tolerable state is reached, the dose administered may be increased by amounts of at least 5-15 mg/day until said therapeutic dose is reached.

Preferably, aminopyridine is administered at a dose of about 10-15 mg twice daily (20-30 mg/day) depending upon the condition or symptoms being treated. The method can include scheduling administration of doses of the pharmaceutical so that the concentration of the aminopyridine in the patient is at about the minimum therapeutically effective level to ameliorate the neurological condition, yet relatively lower compared to the maximum concentration in order to enhance restful periods for the patient during the day or night, depending on desired results or dosage schedule. Preferably the method provides for the treatment of neurological diseases characterized by a degradation of nerve impulse transmission comprising the step of administering to a patient a composition of the present invention.

The formulations and compositions of the present invention exhibit a specific, desired release profile that maximizes the therapeutic effect while minimizing adverse side effects. The desired release profile may be described in terms of the maximum plasma concentration of the drug or active agent ($C_{max}$) and the plasma concentration of the drug or active agent at a specific dosing interval ($C\tau$). A ratio of $C_{max}$ to $C_\tau$ ($C_{max}$:$C_\tau$) may be calculated from the observed $C_{max}$ and $C_\tau$. A dosing interval ($\tau$) is the time since the last administration of the drug or active agent. In the present application, the dosing interval ($\tau$) is twelve (12) hours, therefore $C_\tau$ is the concentration of the drug or active agent at twelve (12) hours from the last administration.

Additionally, the formulations and compositions of the present invention exhibit a desired release profile that may be described in terms of the maximum plasma concentration of the drug or active agent at steady state ($C_{maxSS}$) and the minimum plasma concentration of the drug or active agent at steady state ($C_{minSS}$). Steady state is observed when the rate of administration (absorption) is equal to the rate of elimination of the drug or active agent. A ratio of $C_{maxSS}$ to $C_{minSS}$ ($C_{maxSS}$:$C_{minSS}$) may be calculated from the observed $C_{maxSS}$ and $C_{minSS}$. In addition, the formulations and compositions of the present invention exhibit a desired release profile that may be described in terms of the average maximum plasma concentration of the drug or active agent at steady state ($C_{avSS}$).

Another embodiment is a sustained release tablet of a sustained release matrix and an aminopyridine, said tablet exhibits a release profile to obtain a $C_{max}$:$C_\tau$ ratio in vivo of 1.0 to 3.5, and more preferably a $C_{max}$:$C_\tau$ ratio of about 1.5 to about 3.0. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio is about 2.0 to about 3.0. The aminopyridine may comprise 4-aminopyridine. The sustained release matrix may include for example, hydroxypropylmethylcellulose, or other rate controlling matrices that are suitable for controlling the release rate of an aminopyridine for use in the pharmaceutical compositions of the present invention.

Another embodiment is a sustained release tablet of a sustained release matrix and an aminopyridine, said tablet exhibits a release profile to obtain a $C_{max}$:$C_\tau$ ratio in vivo of 1.0 to 3.5 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml, and more preferably a $C_{max}$:$C_\tau$ ratio of about 1.5 to about 3.0. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio is about 2.0 to about 3.0.

A further aspect is a sustained release composition comprising a sustained release matrix and an aminopyridine, wherein said composition provides a $C_{avss}$ of about 15 ng/ml to about 35 ng/ml. In a further aspect, a sustained release tablet comprising a sustained release matrix and an aminopyridine, said tablet exhibiting a $C_{maxss}$ of about 20 ng/ml to about 35 ng/ml is provided. The pharmacokinetic characteristics of sustained release aminopyridine compositions and methods of treating various neurological disorders are described in co-pending PCT/US2004/008101 entitled "Stable Formulations of Aminopyrdines and Uses Thereof" filed Apr. 17, 2004 and U.S. application Ser. No. 11/010,828 entitled "Sustained Release Aminopyridine Composition" filed Dec. 13, 2004, the contents of which are incorporated herein by reference in their entireties.

The amount of a pharmaceutically acceptable quality aminopyridine, salt, solvated, or prodrug thereof included in the pharmaceutical composition of the present invention will vary, depending upon a variety of factors, including, for example, the specific potassium channel blocker used, the desired dosage level, the type and amount of rate-controlling polymer matrix used, and the presence, types and amounts of additional materials included in the composition. Preferably, the aminopyridine comprises from about 0.1 to about 13% w/w, more preferably from about 0.5 to about 6.25% w/w. In an even more preferable embodiment of the present invention the aminopyridine is present from about 0.5 to 4.75% w/w of the pharmaceutical composition. Accordingly, a weight percentage less than about 4.75% is desired. The amount of aminopyridine, or a derivative thereof, in the formulation varies depending on the desired dose for efficient drug delivery, the molecular weight, and the activity of the compound. The actual amount of the used drug can depend on the patient's age, weight, sex, medical condition, disease or any other medical criteria. The actual drug amount is determined according to intended medical use by techniques known in the art. The pharmaceutical dosage formulated according to the invention may be administered once or more times per day, preferably two or fewer times per day as determined by the attending physician.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Suitable formulations and methods of manufacture are further described in co-pending PCT/US2004/008101 entitled "Stable Formulations of Aminopyrdines and Uses Thereof" filed Apr. 17, 2004 and U.S. application Ser. No. 11/010,828 entitled "Sustained Release Aminopyridine Composition" filed Dec. 13, 2004, the contents of which are incorporated herein by reference in their entireties.

The release matrix aminopyridine formulation is preferably fabricated into tablets, capsules or granules for oral use. The rate of aminopyridine release from the tablets may be controlled by the erosion mechanism of the release matrix from which aminopyridine is released. In general, for producing a tablet on an industrial scale, the drug and polymer are granulated alone or in combination. Preferably the release of the aminopyridine from the matrix of the pharmaceutical composition is relatively linear over time. Preferably the matrix provides a release profile that gives a therapeutically effective concentration of the aminopyridine in the plasma of the patient permitting a once per day or twice per day dosing. Preferably the sustained release aminopyridine formulation for oral administration to patients includes from about 0.0001 mole to about 0.0013 mole aminopyridine that provides a mean maximum plasma concentration of aminopyridine from about 15 to about 180 ng/ml, a mean $T_{max}$ of about 2 to about 5 hours after administration, and a mean minimum plasma concentration of from about 10 to 60 ng/ml at about 8-24 hours after administration.

The formulations of the invention are prepared by procedures known in the art, such as, for example, by the dry or wet method. The method selected for manufacturing affects the release characteristics of the finished tablet. In one method, for example, the tablet is prepared by wet granulation in the presence of either water or an aqueous solution of the hydrophilic polymer or using other binder as a granulating fluid. In alternative, organic solvent, such as isopropyl alcohol, ethanol and the like, may be employed with or without water. The drug and polymer may be granulated alone or in combination. Another method for preparation of the tablet which may be used requires using a drug-polymer dispersion in organic solvents in the presence or absence of water. Where the aminopyridine or its derivative has very low solubility in water it may be advantageous to reduce the particle size, for example, by milling it into fine powder and in this way to control the release kinetics of the drug and enhance its solubility.

The hardness of the tablets of the present invention may vary, depending on a variety of factors, including, for example, the relative amounts and specific types of ingredients used, the tableting equipment employed, and the selected processing parameters. The pressure used to prepare the tablets can influence the release profile of the aminopyridine into the patient. The pressure used to prepare the tablets of the present invention may vary depending upon their surface area and the amount and particle size of aminopyridine, additive, excipients, or binders included in the tablet. The degree of hydration and solvation of the components in the composition will also be important in determining the hard ness of the tablets. Preferably the formed tablets have a hardness in the range of from 80-400 N, and more preferably from 150 to 300N.

The effects of various matrices, concentrations of aminopyridine, as well as various excipients and additives to the composition on the concentration of the channel blocker on the dissolution rate may be monitored for example using a type H dissolution apparatus according to U.S. Pharmacopoeia XXII, or USP Apparatus II (Paddle Method). Clinical evaluations may be used to study the effects on plasma levels of various release matrices, concentrations of aminopyridine, as well as various excipients and additives. Plasma aminopyridine concentrations may be used to calculate pharmacokinetic data (release profiles) including apparent absorption and elimination rates, area-under-the curve (AUC), maximum plasma concentration ($C_{max}$), time to maximum plasma concentration ($T_{max}$), absorption half-life ($T_{1/2}$(abs)), and elimination half-life ($T_{1/2}$(elim)). Pharmacodynamic effects may be assessed based upon response tests, such as muscle strength improvement or reduction in spasticity for patients with multiple sclerosis or spinal cord injury or other tests as would be known to those skilled in the art. Plasma aminopyridine concentration in blood plasma or cerebral spinal fluid may be monitored using liquid chromatography/MS/MS assay methods.

The drug delivery of the invention can utilize any suitable dosage unit form. Specific examples of the delivery system of the invention are tablets, tablets that disintegrate into granules, capsules, sustained release microcapsules, spheroids, or any other means that allow for oral administration. These forms may optionally be coated with pharmaceutically acceptable coating which allows the tablet or capsule to disintegrates in various portions of the digestive system. For example a tablet may have an enteric coating that prevents it from dissolving until it reaches the more basic environment of the small intestine.

The dispersion of the aminopyridine throughout the release matrix imparts enhanced stability characteristics in the dosage formulation. This enhanced stability is achieved without loss of the desired sustained-release profile. Preferably the release profile, which may be measured by dissolution rate is linear or approximately linear, preferably the release profile is measured by the concentration of the aminopyridine in the plasma in the patient and is such to permit twice daily (BID) dosing.

The pharmaceutical composition of the present invention can include also auxiliary agents or excipients, for example, glidants, dissolution agents, surfactants, diluents, binders including low temperature melting binders, disintegrants, solubilizing agents and/or lubricants as described in co-pending PCT/US2004/008101 entitled "Stable Formulations of Aminopyrdines and Uses Thereof" filed Apr. 17, 2004 and U.S. application Ser. No. 11/010,828 entitled "Sustained Release Aminopyridine Composition" filed Dec. 13, 2004, the contents of which are incorporated herein by reference in their entireties.

The active ingredient of the present invention may be mixed with excipients which are pharmaceutically acceptable and compatible with the active ingredient and in amounts suitable for use in the therapeutic methods described herein. Various excipients may be homogeneously mixed with the aminopyridines of the present invention as would be known to those skilled in the art. For example, aminopyridines may be mixed or combined with excipients such as but not limited to microcrystalline cellulose, colloidal silicon dioxide, lactose, starch, sorbitol, cyclodextrin and combinations of these.

To further improve the stability of the aminopyridine in the sustained release composition, an antioxidant compound can be included. Suitable antioxidants include, for example: sodium metabisulfite; tocopherols such as α,β,δ-tocopherol esters and α-tocopherol acetate; ascorbic acid or a pharmaceutically acceptable salt thereof; ascorbyl palmitate; alkyl gallates such as propyl gallate, Tenox PG, Tenox s-1; sulfites or a pharmaceutically acceptable salt thereof; BHA; BHT; and monothioglycerol.

In another embodiment, the pharmaceutical composition of the present invention comprises a rate-controlling polymeric matrix comprising of a hydrogel matrix. For instance,

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

an aminopyridine may be compressed into a dosage formulation containing a rate-controlling polymer, such as HPMC, or mixture of polymers which, when wet, will swell to form a hydrogel. The rate of release of the aminopyridine from this dosage formulation is sustained both by diffusion from the swollen tablet mass and by erosion of the tablet surface over time. The rate of release of the aminopyridine may be sustained both by the amount of polymer per tablet and by the inherent viscosities of the polymers used.

According to another aspect of the invention, there is provided a stable, sustained-release oral dosage formulation which includes an effective amount a aminopyridine dispersed in a release matrix, and which, upon administration to a patient or as part of a therapy regiment, provides a release profile (of therapeutically effective blood plasma level of the aminopyridine) extending for a period of at least 6 hours, preferably at least 12 hours. In another embodiment, the stable, controlled-release oral dosage form provides, upon administration to a patient, a therapeutically effective blood plasma level of the aminopyridine for a period of at least 6 hours, preferably at least 12 hours, and more preferably at least 24 hours.

The dosage formulation may assume any form capable of delivering orally to a patient a therapeutically effective amount of an aminopyridine dispersed in a rate-controlling polymer. Preferably, the dosage formulation comprises a monolithic tablet.

Tablet weight will also vary in accordance with, among other things, the aminopyridine dosage, the type and amount of rate-controlling polymer used, and the presence, types and amounts of additional materials. Assuming 4-aminopyridine dosages of from about 2 mg to about 120 mg; tablet weights can range from about 50 mg to about 1200 mg per tablet, and preferably from 250 to 500 mg, and more preferably about 400 mg.

The dosage formulation of the present invention may comprise also one or more pharmaceutically acceptable excipients as mentioned above. In preferred embodiments, the dosage formulation will comprise diluents and a lubricant in addition to the aminopyridine unit dose and the rate-controlling polymer. Particularly preferred diluents is microcrystalline cellulose sold under the name Avicel PH101, and a particularly preferred lubricant is magnesium stearate. When these materials are used, the magnesium stearate component preferably comprises from about 0.2 to about 0.75% w/w of the dosage formulation, and the microcrystalline cellulose along with the rate controlling polymer and aminopyridine comprises the balance of the formulation. For example, a tablet formulation including a aminopyridine x % w/w, a rate-controlling polymer y % w/w, and microcrystalline cellulose z %, the magnesium stearate amount would be (100−(x+y+z)) where $0.2\% \leqq (100-(x+y+z)) \leqq 0.75\%$ w/w. As would be known to those skilled in the art, the amount of an additives such as magnesium stearate may vary depending upon the shear rate used to perform the mixing and the amount of such an additive may be changed without limitation to obtain a satisfactory dissolution rate or plasma level of the aminopyridine.

As used herein, the term "sustained-release" as it relates to the aminopyridine compositions includes the release of a aminopyridine from the dosage formulation at a sustained rate such that a therapeutically beneficial blood level below toxic levels of the aminopyridine is maintained over a period of at least about 12 hours, preferably about 24 hours or more. Preferably, the amount of the aminopyridine in the oral dosage formulations according to embodiments of the present invention establish a therapeutically useful plasma concentration through BID administration of the pharmaceutical composition.

If desired, the dosage formulations of this invention may be coated with a sustained-release polymer layer so as to provide additional sustained-release properties. Suitable polymers that can be used to form this sustained release layer include, for example, the release matrices listed above. As desired, the dosage formulation of the invention can be provided also with a light-protective and/or cosmetic film coating, for example, film-formers, pigments, anti-adhesive agents and politicizes. Such a film-former may consist of fast-dissolving constituents, such as low-viscosity hydroxypropylmethylcelluose, for example, Methocel E5 or D14, or Pharmacoat 606 (Shin-Etsu). The film coating may also contain excipients or enteric coatings customary in film-coating procedures, such as, for example, light-protective pigments, for example, iron oxide, or titanium dioxide, anti-adhesive agents, for example, talc, and also suitable plasticizers such as, for example, PEG 400, PEG 6000, diethyl phthalate or triethyl citrate.

The compositions of the present invention may be used for the treatment of neurological diseases characterized by a degradation of nerve impulse transmission by administering to a patient the oral dosage formulation of the present invention. Preferably, the administration is twice daily dosage of a therapeutically effective amount of an aminopyridine, even more preferably, 4-AP dispersed in HPMC. The administration can also include scheduling administration of doses of the pharmaceutical so that the concentration of the aminopyridine in the patient is at about the minimum therapeutically effective level to ameliorate the neurological condition, yet relatively low compared to the maximum concentration in order to minimize side effects. The compositions may be administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose of said active agent in the tablets at selected intervals of time until a therapeutic dose is achieved in the subject. For example, at the commencement of treatment the active agent is preferably administered at a dose less than about 15 mg/day until a tolerable state is reached. The dose administered may then be increased by amounts of at least 5-10 mg/day until a therapeutic dose is reached, preferably less than about 30 mg/day. For other diseases the amount of the aminopyridine required to reach a therapeutically effective amount for treatment is described in U.S. Pat. No. 5,952,357 the contents of which are incorporated herein by reference in their entirety.

Compositions of the present invention where the potassium channel blocker is a mono- or di-aminopyridine active agent are particularly suitable for use in the treatment of a neurological disease that is characterized by demyelination of the central nervous system, more especially multiple sclerosis.

In one embodiment of the present invention, a method of treating multiple sclerosis is provided. Compositions of the present invention containing a therapeutically effective amount of mono- or di-aminopyridine active agent may be administered to a patient in need thereof. In particular, sustained release compositions comprising at least about 5 milligrams of an aminopyridine, preferably 4-aminopyridine may be administered at least once daily. In a preferred embodiment, a sustained release composition containing from about 10 to about 15 milligrams of 4-aminopyridine is administered twice daily. Treatment of multiple sclerosis may include increased walking speed, improved lower extremity muscle strength or improved lower extremity muscle tone. The sustained release aminopyridine composition is prefer-

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

ably administered twice daily. In certain embodiments, the composition may be administered about every 12 hours.

A further embodiment is a method of increasing walking speed in patients with multiple sclerosis comprising administering to a patient at least about 5 milligrams of a sustained release aminopyridine composition, preferably at least about 10 to about 15 milligrams of a sustained release aminopyridine composition.

A further embodiment is a method of increasing muscle tone or muscle strength in patients with multiple sclerosis comprising administering to a patient at least about 5 milligrams of a sustained release aminopyridine composition, preferably at least about 10 to about 15 milligrams of a sustained release aminopyridine composition.

Fampridine is a potential therapy for MS with a unique mechanism of action. At concentrations of 1-2 μM or less, fampridine appears to be a specific blocker of voltage dependent, neuronal potassium channels that affect conduction in demyelinated axons. Fampridine has been shown to restore action potential conduction in damaged, poorly myelinated nerve fibers, and it may also directly enhance synaptic transmission. In previous clinical trials, treatment with fampridine has been associated with a variety of neurological benefits in people with MS including faster walking and increased strength, as measured by standard neurological assessments.

Another aspect of the present invention provides for a method of selecting individuals based on responsiveness to a treatment. In one embodiment, the method comprises identifying a plurality of individuals; administering a test to each individual prior to a treatment period; administering a treatment, including, but not limited to administering a therapeutic agent or drug, to one or more of the individuals during the treatment period; administering the test a plurality of times to each individual during the treatment period; and selecting one or more individuals, wherein the selected individuals exhibit an improved performance during a majority of the tests administered during the treatment period as compared to the test administered prior to the treatment period. In certain embodiments, the method may further comprise administering the test to each individual after the treatment period, wherein the selected individuals further exhibit an improved performance during a majority of the tests administered during the treatment period as compared to the test administered after the treatment period.

It is important to note that this embodiment selects subjects who show a pattern of change that is consistent with a treatment response, but does not define the full characteristics of that response. The criterion itself does not specify the amount of improvement nor does it specify that the improvement must be stable over time. For example, a progressive decline in effect during the course of the study period, even one resulting in speeds slower than the maximum non-treatment value, would not be excluded by the criterion; as a specific example, changes from the maximum non-treatment value of, respectively, +20%, +5%, +1% and −30% during the double blind treatment period would qualify as a response under the criterion, but would actually show a net negative average change for the entire period, poor stability and a negative endpoint. Post-hoc analyses of studies discussed in greater detail below indicate that we may expect responders defined by consistency of effect also to demonstrate increased magnitude and stability of benefit.

We have found this embodiment particularly applicable in our analysis of fampridine in patients suffering from multiple sclerosis. Clinicians who regularly prescribe compounded fampridine for MS have reported that only a proportion of their patients appear to respond with clear clinical benefits, and that, in their judgment, this proportion may be around one



third. This extent of responsiveness may be related to the proposed mechanism of action, which is the restoration of conduction in demyelinated axons via the blockade of voltage-dependent potassium channels. Only a proportion of MS patients would be expected to possess axons of appropriate functional relevance that are susceptible to these drug effects, given the highly variable pathology of the disease. Currently, there is insufficient understanding of the disease to allow for pre-trial selection of potentially responsive patients. However, the existence of a subset of patients who respond consistently to the drug can be supported by quantitative observations in our own clinical studies discussed below.

Before treatment, the subjects in these two trials exhibited average walking speeds on the TW25 measure of approximately 2 feet per second (ft/sec). This is a significant deficit, since the expected walking speed for an unaffected individual is 5-6 ft/sec. Subjects in MS-F202 were selected for TW-25 walking time at screening of 8-60, which is equivalent to a range in speed of 0.42-3.1 ft/sec. Variability of functional status is an inherent characteristic of MS, and this can be seen in repeated measurement of walking speed over the course of weeks or months. At any of the three visits during the stable treatment period, 15-20% of placebo-treated subjects showed >20% improvement from baseline walking speed, a threshold chosen as one that indicates a true change in walking speed over background fluctuations. A larger proportion of the Fampridine-SR treated subjects showed such improvements, but this difference was not statistically significant, given the sample size and placebo response rate.

Given the often large variations in function experienced by people with MS, it is difficult for the subject or a trained observer to separate a treatment-related improvement from a disease-related improvement without the element of consistency over time. Consistency of benefit might therefore be expected to be a more selective measure of true treatment effect than magnitude of change. Based on this rationale, the responses of the individual subjects in the MS-F202 trial were examined for the degree to which their walking speed showed improvement during the double-blind treatment period and returned towards pre-treatment values after they were taken off drug, at follow-up. This subject-by-subject examination yielded a subgroup of subjects whose pattern of walking speed over time appeared to be consistent with a drug response. This led to the analysis illustrated in FIG. 1. This compares the placebo and Fampridine-SR treated groups with respect to the number of visits during the double-blind treatment period in which walking speed on the TW25 was faster than the maximum speed out of all five of the non-treatment visits (four visits prior to randomization and one follow-up visit after the drug treatment period).

The placebo-treated group showed a clear pattern of exponential decline in numbers of subjects with higher numbers of "positive" visits. This is what would be expected from a random process of variability. In contrast, the pattern of response in the Fampridine-SR treated group strongly diverged from this distribution; much larger numbers of Fampridine-SR treated subjects showed three or four visits with higher walking speeds than the maximum speed of all five non-treatment visits and less than half of the expected proportion had no visits with higher speeds. These results indicate that there was a sub-population of subjects in the Fampridine-SR treated group that experienced a consistent increase in walking speed related to treatment.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

This analysis suggests that a relatively highly selective criterion for a likely treatment responder would be: a subject with a faster walking speed for at least three (i.e., three or four) of the four visits during the double blind treatment period compared to the maximum value for all five of the non-treatment visits. The four visits before initiation of double-blind treatment provide an initial baseline against which to measure the consistency of response during the four treatment visits. The inclusion of the follow-up visit as an additional component of the comparison was found valuable primarily in excluding those subjects who did not show the expected loss of improvement after coming off the drug. These are likely to be subjects who happened by chance to have improved in their MS symptoms around the time of treatment initiation, but whose improvement did not reverse on drug discontinuation because it was actually unrelated to drug. Thus, incorporating the follow-up visit as part of the criterion may help to exclude false positives, if the TW25 speed remains high at follow-up.

As described in Example 5, below, this responder criterion was met by 8.5%, 35.3%, 36.0%, and 38.6% of the subjects in the placebo, 10 mg, 15 mg, and 20 mg b.i.d. treatment groups, respectively, showing a highly significant and consistent difference between placebo and drug treatment groups. Given that there was little difference in responsiveness between the three doses examined, more detailed analyses were performed comparing the pooled Fampridine-SR treated groups against the placebo-treated group. The full results of this analysis for study are described in the following sections. These show that the responder group so identified experienced a >25% average increase in walking speed over the treatment period and that this increase did not diminish across the treatment period. The responder group also showed an increase in Subject Global Impression score and an improvement in score on the MSWS-12.

Additional features and embodiments of the present invention are illustrated by the following non-limiting examples.

## Example 1

This example illustrates preparation of compositions of the present invention and their release of an aminopyridine. Tablets in accordance with the present invention having dosages of 5 mg, 7.5 mg and 12.5 mg respectively were manufactured at 5 Kg scale. Materials were used in the amounts shown in Table 1.

TABLE 1

| | % w/w | | % w/w | | % w/w | |
|---|---|---|---|---|---|---|
| Milled 4-AP (#50 mesh) | 1.25 | | 1.875 | | 3.125 | |
| Methocel K100LV | 60 | | 60 | | 60 | |
| Avicel PH101 | 38.15 | | 37.525 | | 36.275 | |
| Magnesium stearate | 0.2 | | 0.2 | | 0.2 | |
| Aerosil 200 | 0.4 | | 0.4 | | 0.4 | |
| Equipment | Horn Noak equipped with 13 × 8 mm oval | | | | | |
| Tablet Press | tooling press speed 42,000 tablets/hr | | | | | |
| Tablet Weight Range (mg) | 386-404 (96.5-101.0%) | | 388-410 (97.0-102.5%) | | 388-406 (97.0-101.5%) | |
| Tablet Hardness Range (N) | 200-262 | | 179-292 | | 150-268 | |
| Tablet Potency - mg/tab. (% LC) | 97.1 | | 99.1 | | 100.2 | |
| Mean CU (mg/tab.)/% CV | 5.0 mg/1.0% | | 7.4 mg/0.7% | | 12.4 mg/1.1% | |
| CU Discrete Samples (mg/tab.)/% CV | 5.0 mg/1.2% | | 7.5 mg/1.8% | | 12.3/1.1% | |
| Dissolution (%/hr) | Mean | (SD) | Mean | (SD) | Mean | (SD) |
| 1 | 28.9 | 1.1 | 29.2 | 1.8 | 25.9 | 1.1 |
| 2 | 42.7 | 1.8 | 42.1 | 1.6 | 40.2 | 2.5 |
| 3 | 52.8 | 1.4 | 53.0 | 1.0 | 49.8 | 2.1 |
| 4 | 61.4 | 2.2 | 61.8 | 1.5 | 60.1 | 2.4 |
| 6 | 75.7 | 3.1 | 75.2 | 1.6 | 74.8 | 2.7 |
| 10 | 95.5 | 3.3 | 98.7 | 1.4 | 93.2 | 0.9 |

Prior to blending, 4-AP was milled through #50 mesh screen using a Fitzmill® comminutor. The materials were added into a Gral 25 bowl in the following order: half Methocel K100LV, Avicel PH101, Aerosil 200, milled 4-AP and the remaining Methocel K100LV. The mix was blended for 15 minutes at 175 rpm, then the magnesium stearate was added and was further blended for 5 minutes at 100 rpm. Samples were taken from top and bottom positions for blend potency analysis. Weight and hardness checks were performed every 15 minutes by the check-master E3049. Discrete tablet samples were taken during the compression process to evaluate intra batch content uniformity.

## Example 2

This example illustrates that the pharmacokinetic profile of fampridine in compositions of the present invention is altered by administration in a sustained release tablet matrix compared to immediate release and controlled release formulations.

There is a delay in absorption manifested by a lower peak concentration, without any effect on the extent of absorption. When given as a single 12.5 mg dose, the peak concentration is approximately two-thirds lower as compared to peak values following administration of the IR formulation; the time to reach peak plasma levels was delayed by about 2 hours. As with the IR formulation, food delayed the absorption of Fampridine-SR. The absorption of fampridine was approximately 50% slower following ingestion of a fatty meal, although due to the flatness of the absorption curve, this may be exaggerated value. Extent of absorption did not differ, as values for Cmax and AUC were comparable as summarized in Table 2.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

TABLE 2

Pharmacokinetic Parameter Values (Mean ± SD) in Studies Using Fampridine SR, CR, and IR Formulations: Single Dose Studies in Healthy Adult Male Volunteers

| Study Number | Dose (mg) | Fed/Fasted | $C_{MAX}$ (ng/mL) | $t_{MAX}$ (hours) | AUC (0-∞) (ng hr/mL) |
|---|---|---|---|---|---|
| 0494006 N = 12 | 12.5 SR (PD12265) | Fed | 28.7 ± 4.3 | 5.3 ± 0.8 | 257.0 ± 62.7 |
| | | Fasted | 25.6 ± 3.8 | 2.8 ± 1.3 | 269.9 ± 44.4 |
| | 12.5 IR (PD12266) | Fasted | 79.3 ± 16.3 | 0.9 ± 0.4 | 294.2 ± 55.6 |
| 1194002 N = 12 | 12.5 SR (PD12907) | Fasted | 28.5 ± 4.3 | 2.9 ± 2.4 | 285.9 ± 37.8 |
| | 12.5 CR (4n806) | Fasted | 37.7 ± 9.9 | 3.6 ± 0.9 | 300.0 ± 53.6 |
| | 12.5 IR (PS644) | Fasted | 83.5 ± 23.5 | 0.79 ± 0.3 | 274.0 ± 59.2 |

Example 3

This example details the pharmacokinetic properties of Fampridine-SR in tablets of the present invention administered to patients with multiple sclerosis. Plasma samples were analyzed for fampridine using a validated LC/MS/MS assay with a sensitivity of 2 ng/mL. Noncompartmental pharmacokinetic parameter values were calculated using standard methodology.

This was an open-label, multi-center, dose proportionality study of orally administered fampridine in patients with multiple sclerosis. Single doses of fampridine were to be given in escalating doses (5 mg, 10 mg, 15 mg, and 20 mg) with at least a four-day interval between administration of each dose of drug. Safety evaluations were to be performed during the 24 hour period following administration of fampridine and blood samples were to be taken at the following times to determine pharmacokinetic parameters: hour 0 (pre-dose), hours 1-8, and hours 10, 12, 14, 18, and 24.

Twenty-three subjects received all 4 treatments, and one subject received only 3 treatments; data from all treatments were analyzed. Dose-dependent parameters (e.g., peak plasma concentration and areas-under-the curve) were normalized to a 10 mg dose for among-dose comparisons. Overall observed time of the peak plasma concentration (mean and its 95% confidence interval) was 3.75 (3.52, 3.98) h, observed peak plasma fampridine concentration (normalized to a 10 mg dose) was 24.12 (23.8, 26.6) ng/ml, area-under-the-concentration-time curve (normalized to a 10 mg dose) was estimated to be 254 (238, 270) ng·h/ml, extrapolated area-under-the-concentration-time curve (normalized to a 10 mg dose) was 284 (266, 302) ng·h/ml, terminal rate constant equaled 0.14 (0.13, 0.15) $h^{-1}$, terminal half-life was 5.47 (5.05, 5.89) h and clearance divided by bioavailability (CL/F) was equal to 637 (600, 674) ml/min.

Dizziness was the most common treatment-related adverse event. Other treatment related adverse events included amblyopia, asthenia, headache, and ataxia. There were no clinically significant changes in clinical laboratory values, ECG parameters, vital signs, physical examination findings, or neurological examination findings noted over the course of this study.

When the plasma concentrations of fampridine were normalized to the 10.0 mg dose levels, there were no significant differences between any pharmacokinetic parameter (AUC, $C_{max}$, $t_{1/2}$) in the 5-20 mg dose range. Fampridine was well tolerated at the doses used in this study. Dose-normalized (to a 10 mg dose) pharmacokinetic parameter values are summarized in Table 3.

TABLE 3

Dose-Normalized (at 10 mg) Pharmacokinetic Parameter Values (Mean ± SEM) Following Single Oral Administration of Fampridine-SR to Patients with MS.

| Dose (mg) | $C_{MAX}$ norm (ng/mL) | $t_{MAX}$ (hours) | AUC-norm (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
|---|---|---|---|---|---|
| 5 (n = 24) | 26.2 ± 0.6 | 3.9 ± 0.2 | 244.2 ± 9.4 | 5.8 ± 0.5 | 619.8 ± 36.2 |
| 10 (n = 24) | 25.2 ± 0.7 | 3.9 ± 0.3 | 252.2 ± 7.8 | 5.6 ± 0.4 | 641.4 ± 39.1 |
| 15 (n = 24) | 24.6 ± 0.7 | 3.6 ± 0.3 | 263.0 ± 7.4 | 5.5 ± 0.4 | 632.4 ± 39.0 |
| 20 (n = 23) | 24.6 ± 0.8 | 3.6 ± 0.3 | 255.6 ± 6.9 | 5.1 ± 0.3 | 653.9 ± 37.1 |

Example 4

This example describes the results of an open-label study to assess the steady state pharmacokinetics of orally administered fampridine (4-aminopyridine) compositions of the present invention in subjects with Multiple Sclerosis. This study was an open-label multiple dose study of Fampridine-SR intended to assess steady state pharmacokinetics in 20 patients with MS who previously completed the study summarized in Table 4. Fampridine-SR (40 mg/day) was administered as two 20 mg doses, given as one morning and one evening dose for 13 consecutive days, with a single administration of 20 mg on Day 14. Blood samples for pharmacokinetic analysis were collected on Days 1, 7/8, and 14/15 at the following intervals: immediately prior to drug administration (baseline), hourly for the first 8 hours, and 10, 12, and 24 hours post-dose. Additional blood samples were collected 14, 18, and 20 hours post-dose on Day 14, and 30 and 36 hours post-dose on Day 15.

Pharmacokinetic parameter estimates following the first dose in these patients in this study on Day 1 were comparable to those determined when they participated in the study summarized in Table 4. No significant difference in $T_{max}$ was detected among the four means (Single dose=3.76 h; Day 1=3.78 h; Day 8=3.33 h; Day 15=3.25 h). $C_{max}$ and $C_{max}/C_\tau$ on Days 8 ($C_{max}$=66.7 ng/ml) and 15 ($C_{max}$=62.6 ng/ml) were significantly greater than those of the single dose treatment and of Day 1 ($C_{max}$=48.6 ng/ml), reflecting accumulation of the drug with multiple dosing.

There was no significant difference among the four occasions with regard to either T or C and no difference in $C_{max}$, $C_{max}/C_\tau$, CL/F or $AUC_{0-\tau}$ between Days 8 and 15. Further AUC on Days 8 and 15 did not differ significantly from total

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

AUC with single dose treatment. Likewise, the estimates of CL/F on Days 8 and 15 and of λ and $T_{1/2}$ on Day 15 did not differ significantly from those with single dose.

Steady-state was attained by Day 7/8 as evidence by the lack of differences in $C_{max}$ or AUC between Days 7/8 and 14/15; there was no apparent unexpected accumulation. Likewise, the estimates of Cl/F on Days 7/8 and 14/15 of and of $T_{1/2}$ on Day 14/15 did not differ significantly from those given a single dose. On the final day of dosing, mean $C_{max}$ was 62.6 ng/mL, occurring 3.3 hours post-dose. The $T_{1/2}$ was 5.8 hours. These values are similar to those observed in patients with chronic SCI receiving similar doses of this formulation. These results are summarized in Table 4.

TABLE 4

Pharmacokinetic Parameter Values (Mean and 95% CI) Following Multiple Oral Doses of Fampridine-SR (40 mg/day) to 20 Patients with MS.

| | Parameter | | | | |
|---|---|---|---|---|---|
| Day | $C_{MAX}$ (ng/mL) | $t_{MAX}$ (hours) | $AUC_{(0-12)}$ (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
| Day 1 | 48.6 (42.0, 55.3) | 3.8 (3.2, 4.3) | NE | NE | NE |
| Day 7/8 | 66.7 (57.5, 76.0) | 3.3 (2.8, 3.9) | 531 (452, 610) | NE | 700 (557, 884) |
| Day 14/15 | 62.6 (55.7, 69.4) | 3.3 (2.6, 3.9) | 499 (446, 552) | 5.8 (5.0, 6.6) | 703 (621, 786) |

Dizziness was the most common treatment-related adverse event. Other treatment-related adverse events that occurred included nausea, ataxia, insomnia, and tremor. There were no clinically significant changes in mean clinical laboratory values, vital signs, or physical examination findings from baseline to last visit. There were no apparent clinically significant changes in corrected QT intervals or QRS amplitudes after administration of fampridine.

Fampridine was well tolerated in subjects with multiple sclerosis who receive twice daily doses (20 mg/dose) of fampridine for two weeks. A significant increase was observed in $C_{max}$, and $C_{max}/C_{\tau}$ on Days 8 and 15 relative to those on Day 1 and with single dose treatment, reflecting accumulation of fampridine with multiple dosing. A lack of significant differences in $C_{max}$, $C_{max}/C_{\tau}$, CL/F or $AUC_{0-\tau}$ between Days 8 and 15 suggest that near steady-state is reached by Day 8. There was no evidence of significant changes in pharmacokinetics during a two-week period of multiple dosing with fampridine.

## Example 5

This example provides an embodiment of a method of treating subjects with a sustained release fampridine formulation and a responder analysis of the present invention. This was a Phase 2, double-blind, placebo-controlled, parallel group, 20-week treatment study in 206 subjects diagnosed with Multiple Sclerosis. This study was designed to investigate the safety and efficacy of three dose levels of Fampridine-SR, 10 mg b.i.d., 15 mg b.i.d., and 20 mg b.i.d. in subjects with clinically definite MS. The primary efficacy endpoint was an increase, relative to baseline, in walking speed, on the Timed 25 Foot Walk. Secondary efficacy measurements included lower extremity manual muscle testing in four groups of lower extremity muscles (hip flexors, knee flexors, knee extensors, and ankle dorsiflexors); the 9-Hole Peg Test and Paced Auditory Serial Addition Test (PASAT 3"); the Ashworth score for spasticity; Spasm Frequency/Severity scores; as well as a Clinician's (CGI) and Subject's (SGI) Global Impressions, a Subject's Global Impression (SGI), the Multiple Sclerosis Quality of Life Inventory (MSQLI) and the 12-Item MS Walking Scale (MSWS-12).

At the first visit (Visit 0) subjects were to enter into a two-week single-blind placebo run-in period for the purpose of establishing baseline levels of function. At Visit 2 subjects were to be randomized to one of four treatment groups (Placebo or Fampridine-SR 10 mg, 15 mg, 20 mg) and begin two weeks of double-blind dose-escalation in the active drug treatment groups (B, C and D). Group A were to receive placebo throughout the study. Subjects in the 10 mg (Group B) arm of the study took a dose of 10 mg approximately every 12 hours during both weeks of the escalation phase. The 15 mg (Group C) and 20 mg (Group D) dose subjects took a dose of 10 mg approximately every 12 hours during the first week of the escalation phase and titrated up to 15 mg b.i.d. in the second week. Subjects were to be instructed to adhere to an "every 12 hour" dosing schedule. Each subject was advised to take the medication at approximately the same time each day throughout the study; however, different subjects were on differing medication schedules (e.g., 7 AM and 7 PM; or 9 AM and 9 PM). After two weeks, the subjects were to return to the clinic at Visit 3 for the start of the stable dose treatment period. The first dose of the double-blind treatment phase at the final target dose (placebo b.i.d. for the Group A, 10 mg b.i.d. for Group B, 15 mg b.i.d. for Group C, and 20 mg b.i.d. for Group D) was taken in the evening following Study Visit 4. Subjects were to be assessed five times during the 12-week treatment period. Following the 12-week treatment phase there was to be a one-week down titration starting at Visit 9. During this down-titration period, group B was to remain stable at 10 mg b.i.d. and Group C was to be titrated to 10 mg b.i.d., while group D was to have a change in the level of dose during the week (15 mg b.i.d. for the first three days and 10 mg b.i.d. for the last four days). At the end of the down titration period at Visit 10, subjects were to enter a two-week washout period where they did not receive any study medication. The last visit (Visit 11) was to be scheduled two weeks after the last dosing day (end of the downward titration). Plasma samples were collected at each study site visit other than Study Visit 0.

The primary measure of efficacy was improvement in average walking speed, relative to the baseline period (placebo run-in), using the Timed 25 Foot Walk from the Multiple Sclerosis Functional Composite Score (MSFC). This is a quantitative measure of lower extremity function. Subjects were instructed to use whatever ambulation aids they normally use and to walk as quickly as they could from one end to the other end of a clearly marked 25-foot course. Other efficacy measures included the LEMMT, to estimate muscle strength bilaterally in four groups of muscles: hip flexors, knee flexors, knee extensors, and ankle dorsiflexors. The test was performed at the Screening Visit and at Study Visits 1, 2, 4, 7, 8, 9 and 11. The strength of each muscle group was rated on the modified BMRC scale: 5=Normal muscle strength; 4.5=Voluntary movement against major resistance applied by the examiner, but not normal; 4=Voluntary movement against moderate resistance applied by the examiner; 3.5=Voluntary movement against mild resistance applied by the examiner; 3=Voluntary movement against gravity but not resistance; 2=Voluntary movement present but not able to overcome gravity; 1=Visible or palpable contraction of muscle but without limb movement; and 0=Absence of any voluntary contraction. Spasticity in each subject was assessed using the Ashworth Spasticity Score. The Ashworth Spasticity Exam was performed and recorded at the Screening Visit and at Study Visits 1, 2, 4, 7, 8, 9 and 11.

Protocol Specified Responder Analysis. To supplement the primary analysis, a categorical "responder" analysis was also conducted. Successful response was defined for each subject as improvement in walking speed (percent change from baseline) of at least 20%. Subjects who dropped out prior to the stable dose period were considered non-responders. The pro-

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

portions of protocol specified responders were compared among treatment groups using the Cochran-Mantel-Haenszel test, controlling for center.

Post hoc analysis of this study suggested that a relatively highly selective criterion for a likely treatment responder would be a subject with a faster walking speed for at least three visits during the double blind treatment period as compared to the maximum value among a set of five non-treatment visits (four before treatment and one after discontinuation of treatment). The four visits before initiation of double-blind treatment provided an initial baseline against which to measure the consistency of response during the four double-blind treatment visits. The inclusion of the follow-up visit as an additional component of the comparison was useful primarily in excluding those subjects who may be false positives, i.e., did not show the expected loss of improvement after coming off the drug. Treatment differences in the proportion of theses post hoc responders were analyzed using the Cochran-Mantel-Haenszel (CMH) test, controlling for center.

To validate the clinical meaningfulness of the post hoc responder variable, (post hoc) responders were compared against the (post hoc) non-responders, on the subjective variables: (i) Change from baseline in MSWS-12 over the double-blind; (ii) SGI over the double-blind; and (iii) Change from baseline in the CGI over the double-blind; to determine if subjects with consistently improved walking speeds during the double-blind could perceive improvement relative to those subjects who did not have consistently improved walking speeds. For the subjective variables, differences between responder status classification (responder or non-responder) were compared using an ANOVA model with effects for responder status and center.

Results. A total of 206 subjects were randomized into the study: 47 were assigned to placebo, 52 to 10 mg bid Fampridine-SR (10 mg bid), 50 to 15 mg bid Fampridine-SR (15 mg bid), and 57 to 20 mg bid Fampridine-SR (20 mg bid). The disposition of subjects is presented in Table 5 below.

TABLE 5

Summary of subject disposition (all randomized population)

| | Treatment Group: N (%) | | | | |
|---|---|---|---|---|---|
| | Placebo | 10 mg bid | 15 mg bid | 20 mg bid | Total |
| Subjects Randomized | 47 | 52 | 50 | 57 | 206 |
| Took at Least One Dose (Included in Safety Analysis) | 47 (100%) | 52 (100%) | 50 (100%) | 57 (100%) | 206 (100%) |
| ITT Population | 47 (100%) | 51 (98.1%) | 50 (100%) | 57 (100%) | 205 (99.5%) |
| Discontinued Subjects | 2 (4.3%) | 2 (3.8%) | 1 (2.0%) | 6 (10.5%) | 11 (5.3%) |

Note:
Percentages are based on the number of randomized subjects.

All 206 randomized subjects took at least one dose of study medication and were included in the safety population. One subject (subject#010/07 10 mg bid group) was excluded from the ITT population (lost to follow-up after 8 days of placebo run-in). A total of 11 subjects discontinued from the study.

The population consisted of 63.6% females and 36.4% males. The majority of the subjects were Caucasian (92.2%), followed by Black (4.9%), Hispanic (1.5%), those classified as 'Other' (1.0%), and Asian/Pacific Islander (0.5%). The mean age, weight, and height of the subjects were 49.8 years (range: 28-69 years), 74.44 kilograms (range: 41.4-145.5 kilograms), and 168.84 centimeters (range: 137.2-200.7 centimeters), respectively. Most of the subjects (52.4%) had a diagnosis type of secondary progressive with about equal amounts of relapsing remitting (22.8%) and primary progressive (24.8%) subjects. The mean duration of disease was 12.00 years (range: 0.1-37.5 years) while the mean Expanded Disability Status Scale (EDSS) at screening was 5.77 units (range: 2.5-6.5 units). The treatment groups were comparable with respect to all baseline demographic and disease characteristic variables.

Results for the key efficacy variables at baseline for the ITT population are further summarized in Table 6 below.

TABLE 6

Summary of key efficacy variables at baseline (ITT population)

| | Treatment Group: Mean (SD) | | | | |
|---|---|---|---|---|---|
| Parameter | placebo N = 47 | 10 mg bid N = 51 | 15 mg bid N = 50 | 20 mg bid N = 57 | Treatment, p-value |
| Walking Speed (ft/sec) | 1.87 (0.902) | 1.94 (0.874) | 1.99 (0.877) | 2.04 (0.811) | 0.752 |
| LEMMT | 4.05 (0.690) | 3.98 (0.661) | 4.00 (0.737) | 3.98 (0.634) | 0.964 |

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

TABLE 6-continued

Summary of key efficacy variables at baseline (ITT population)

| Parameter | Treatment Group: Mean (SD) placebo N = 47 | 10 mg bid N = 51 | 15 mg bid N = 50 | 20 mg bid N = 57 | Treatment, p-value |
|---|---|---|---|---|---|
| SGI | 4.38 (0.795) | 4.32 (0.999)* | 4.56 (1.110) | 4.25 (0.969) | 0.413 |
| MSWS-12 | 75.71 (16.566) | 76.31 (16.186) | 74.60 (17.671) | 76.83 (18.124) | 0.923 |

*One subject did not have a baseline value.

With respect to the 205 subjects in the ITT population, mean values for baseline walking speed, LEEMT, SGI, and MSWS-12 were approximately 2 feet per second, 4 units, 4.5 units, and 76 units, respectively. The treatment groups were comparable with respect to these variables as well as all the other efficacy variables at baseline.

Descriptive statistics for the average walking speed (ft/sec) by study day based on the Timed 25-Foot Walk are presented in Table 7 and FIG. 2. The timed 25 foot walk showed a trend toward increased speed during the stable dose period for all three dose groups, though the average improvement declined during the treatment period.

TABLE 7

Average walking speeds (ft/sec) by study day (observed cases, ITT population) Summary Statistics Over Time

| Treatment | | Study day base | titration | 1st stbl | 2nd stbl | 3rd stbl | follow-up |
|---|---|---|---|---|---|---|---|
| placebo | Mean | 1.87 | 1.89 | 1.90 | 1.89 | 1.89 | 1.86 |
| | (SD) | (0.902) | (0.876) | (0.908) | (0.891) | (0.914) | (0.933) |
| | N# | 47 | 47 | 46 | 46 | 45 | 45 |
| 10 mg bid | Mean | 1.94 | 2.20 | 2.09 | 2.12 | 2.00 | 1.88 |
| | (SD) | (0.874) | (0.979) | (0.955) | (1.043) | (1.016) | (0.970) |
| | N | 51 | 51 | 51 | 51 | 50 | 48 |
| 15 mg bid | Mean | 1.99 | 2.25 | 2.16 | 2.14 | 2.18 | 1.83 |
| | (SD) | (0.877) | (0.995) | (0.986) | (0.957) | (0.932) | (0.952) |
| | N | 50 | 49 | 49 | 48 | 48 | 47 |
| 20 mg bid | Mean | 2.04 | 2.26 | 2.22 | 2.19 | 2.04 | 1.83 |
| | (SD) | (0.811) | (0.936) | (0.893) | (0.936) | (0.996) | (0.822) |
| | N | 57 | 55 | 52 | 51 | 49 | 55 |

#The treatment sample sizes presented in the figure legend represent the number of ITT subjects. Sample sizes at individual time points may be smaller than those in the ITT population due to dropouts or missed assessments.

During double-blind treatment, all the Fampridine-SR groups exhibited mean walking speeds between 2.00 and 2.26 feet per second, while the mean value in the placebo group was consistently about 1.90 feet per second. It should be noted that, at the third stable-dose visit, both the 10 mg bid and 20 mg bid group means dropped-off from what would be expected under the assumption that treatment benefit is consistent over time. This may or may not have been due to chance; further studies should provide additional evidence for either case. After double-blind medication was discontinued, all the treatment groups converged to approximately the same mean value at follow-up.

Results for the primary efficacy variable (percent change in average walking speed during the 12-week stable dose period relative to baseline based on the 25-foot walk) are summarized in FIG. 3. The timed 25 foot walk showed a trend toward increased speed during the stable dose period for all three dose groups, though the average improvement declined during the treatment period, as shown in FIG. 3. The mean percent changes in average walking speed during the 12-week stable dose period (based on adjusted geometric mean change of the log-transformed walking speeds) were 2.5%, 5.5%, 8.4%, and 5.8% for the placebo, 10 mg bid, 15 mg bid, and 20 mg bid groups, respectively. There were no statistical differences between any Fampridine-SR groups and the placebo group.

Results for the protocol specified responder analysis (subjects with average changes in walking speed during the 12 weeks of stable double-blind treatment of at least 20%) are summarized in FIG. 4. The percentages of subjects with average changes in walking speed during the 12-week stable dose period of at least 20% (pre-defined responders) were 12.8%, 23.5%, 26.5%, and 16.1% for the placebo, 10 mg bid, 15 mg bid, and 20 mg bid groups, respectively. There were no statistically significant differences between any of the Fampridine-SR groups and the placebo group.

Descriptive statistics for the average overall Lower Extremity Manual Muscle Testing (LEMMT) by study day are presented in Table 8 and in FIG. 5.

TABLE 8

Average overall LEMMT by Study Day Summary Statistics Over Time

| Treatment | | Study day base | titration | 1st stbl | 2nd stbl | 3rd stbl | follow-up |
|---|---|---|---|---|---|---|---|
| placebo | Mean | 4.05 | 4.00 | 4.02 | 4.03 | 4.00 | 4.02 |
| | (SD) | (0.690) | (0.705) | (0.687) | (0.696) | (0.679) | (0.738) |
| | N# | 47 | 46 | 46 | 46 | 45 | 45 |
| 10 mg bid | Mean | 3.98 | 4.09 | 4.06 | 4.09 | 4.07 | 3.89 |
| | (SD) | (0.661) | (0.641) | (0.650) | (0.685) | (0.642) | (0.631) |
| | N | 51 | 50 | 51 | 51 | 50 | 49 |
| 15 mg bid | Mean | 4.00 | 4.16 | 4.11 | 4.09 | 4.17 | 4.08 |
| | (SD) | (0.737) | (0.653) | (0.645) | (0.659) | (0.618) | (0.674) |
| | N | 50 | 49 | 49 | 49 | 49 | 46 |
| 20 mg bid | Mean | 3.98 | 4.08 | 4.03 | 3.98 | 4.07 | 3.92 |
| | (SD) | (0.634) | (0.639) | (0.659) | (0.714) | (0.649) | (0.650) |
| | N | 57 | 54 | 52 | 52 | 48 | 55 |

#The treatment sample sizes presented at individual time points may be smaller than those in the ITT population due to dropouts or missed assessments.

During double-blind treatment, all the Fampridine-SR groups exhibited a numerical pattern of larger mean LEMMT scores than placebo (except the 20 mg bid group at the 2nd stable dose visit). After double-blind medication was discontinued, with the exception of the 15 mg bid group, all the group means were lower than they were at baseline.

Results for the average change in LEMMT during the 12-week stable dose period relative to baseline are summarized in FIG. 6. The mean changes in overall LEMMT during the 12-week stable dose period were −0.05 units, 0.10 units, 0.13 units, and 0.05 units for the placebo, 10 mg bid, 15 mg bid, and 20 mg bid groups, respectively. Improvements in LEMMT were significantly greater in the 10 mg bid and 15

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

mg bid groups compared to the placebo group; there was no significant difference between the 20 mg bid group and the placebo group.

No statistically significant differences were detected among treatment group based on any of the other secondary efficacy variables, as shown in Table 9.

TABLE 9

Changes in secondary efficacy variables from baseline during the 12-week stable dose period

| Parameter | Treatment Group placebo N = 47 | 10 mg bid N = 51 | 15 mg bid N = 50 | 20 mg bid N = 57 |
|---|---|---|---|---|
| Ashworth Score | | | | |
| N | 46 | 51 | 49 | 53 |
| Mean (SD) | −0.11 (0.377) | −0.04 (0.449) | −0.06 (0.375) | 0.02 (0.466) |
| p-value (each dose vs. placebo) | | 0.802 | 0.826 | 0.275 |
| CGI | | | | |
| N | 45 | 50 | 49 | 52 |
| Mean (SD) | 0.0 (0.66) | −0.2 (0.72) | −0.1 (0.85) | 0.0 (0.78) |
| p-value (each dose vs. placebo) | | 0.772 | 0.997 | 0.996 |
| SGI | | | | |
| N | 46 | 50 | 49 | 53 |
| Mean (SD) | −0.2 (0.96) | 0.0 (1.27) | −0.1 (1.11) | −0.1 (0.86) |
| p-value (each dose vs. placebo) | | 0.704 | 0.953 | 0.968 |
| PASAT | | | | |
| N | 46 | 51 | 49 | 53 |
| Mean (SD) | 2.17 (4.016) | 2.13 (3.394) | 0.90 (3.274) | 0.65 (4.590) |
| p-value (each dose vs. placebo) | | >0.999 | 0.306 | 0.218 |
| MSFC | | | | |
| N | 46 | 51 | 49 | 52 |
| Mean (SD) | 0.08 (0.205) | 0.10 (0.310) | 0.90 (0.224) | 0.06 (0.194) |
| p-value (each dose vs. placebo) | | 0.977 | >0.999 | 0.968 |
| MSWS-12 | | | | |
| N | 46 | 51 | 49 | 52 |
| Mean (SD) | −3.56 (14.548) | −5.53 (16.154) | −7.32 (16.295) | −5.76 (15.296) |
| p-value (each dose vs. placebo) | | 0.718 | 0.445 | 0.617 |

Note:
The treatment sample sizes presented in the treatment heading represent the number of ITT subjects. Sample sizes for individual variables may be smaller due to dropouts or missed assessments.
Note:
For each variable, the p-values (versus placebo) are Dunnett-adjusted.

While pre-planned analyses of the primary efficacy endpoint provided insufficient evidence of treatment benefits for any of the Fampridine-SR doses, subsequent analysis revealed the existence of a subset of subjects who responded to the drug with clinical meaningfulness. These subjects exhibited walking speeds while on drug that were consistently better than the fastest walking speeds measured when the subjects were not taking active drug.

The post hoc responder rates based on consistency of improved walking speeds were significantly higher in all three active dose groups (35, 36 and 39%) compared to placebo (9%; p<0.006 for each dose group, adjusting for multiple comparisons) as shown in FIG. 7.

Given that there was little difference in responsiveness between the three doses examined, more detailed analyses were performed comparing the pooled Fampridine-SR treated groups against the placebo-treated group. FIG. 8 summarizes, for the placebo and the pooled Fampridine-SR group, the percentage of post hoc responders. The number of subjects who met the post hoc responder criterion in the pooled Fampridine-SR treated group was 58 (36.7%) compared to 4 (8.5%) in the placebo-treated group, and this difference was statistically significant (p<0.001).

To validate the clinical meaningfulness of the post hoc responder variable, the 62 responders (58 fampridine and 4 placebo) were compared against the 143 non-responders (100 fampridine and 43 placebo) on the subjective variables to determine if subjects with consistently improved walking speeds during the double-blind could perceived benefit relative to those subjects who did not have consistently improved walking speeds. The results are summarized in FIG. 9 and indicate that consistency in walking speed had clinical meaningfulness for the subjects in this study since the responders had (over the double-blind period) significantly better changes from baseline in MSWS-12 and significantly better subjective global scores. In addition, the responders were rated marginally better than the non-responders by the clinicians during the double-blind. Thus, responders experienced clinically meaningful improvements in their MS symptoms, and treatment with fampridine significantly increased the chances of such a response.

To establish baseline comparability among the responder analysis groups, analyses were performed on the baseline demographic variables, key neurological characteristics and the relevant efficacy variables at baseline. In general, the responder analysis groups were comparable for all demographic and baseline characteristics variables.

Having demonstrated the clinical meaningfulness of consistently improved walking speeds during the double-blind as a criterion for responsiveness, the question of the magnitude of benefit becomes of interest. The fampridine non-responders, although providing no relevant efficacy information, do

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

provide safety information regarding those individuals who are treated with fampridine but show no apparent clinical benefit. As such, responder analyses of these groups were performed.

With respect to magnitude of benefit, FIG. 10 and Table 12 below summarizes the percent changes in walking speed at each double-blind visit by responder analysis grouping. The mean improvement for the fampridine responders during the double-blind across 14 weeks of treatment ranged from 24.6% to 29.0% compared to 1.7% to 3.7% for the placebo group; this was highly significant (p<0.001) at every visit. Although providing no relevant efficacy information, results for the fampridine non-responders are also illustrated and show that there was, and could be, some worsening in walking speeds after 12-weeks when a non-responder is treated with fampridine. The improvement was stable (±3%) across 14 weeks of treatment, and was associated with improvement in two global measures (Subject Global Impression and Multiple Sclerosis Walking Scale-12). The four placebo responders showed a 19% improvement in walking speed but there were too few subjects in this group for meaningful statistical comparison. Response status was not significantly related to baseline demographics, including type or severity of MS. Adverse events and safety measures were consistent with previous experience for this drug.

TABLE 12

Summary of percent change in Walking Speed at each double-blind visit by responder analysis grouping. Summary Statistics Over Time

| Treatment | | Study day: titration | 1st stbl | 2nd stbl | 3rd stbl |
|---|---|---|---|---|---|
| Placebo | Mean | 1.7 | 2.6 | 1.8 | 3.7 |
| | (SEM) | (2.21) | (3.23) | (3.11) | (3.38) |
| | N# | 47 | 46 | 46 | 45 |
| Fampridine Non-responders | Mean | 8.3 | 3.5 | −0.2 | −6.5 |
| | (SEM) | (2.05) | (1.90) | (1.76) | (2.49) |
| | N | 97 | 94 | 93 | 89 |
| Fampridine Responders | Mean | 27.4 | 24.6 | 29.0 | 27.3 |
| | (SEM) | (2.43) | (2.44) | (4.31) | (3.52) |
| | N | 58 | 58 | 57 | 58 |
| FR vs. Placebo | p-value^ | <0.001 | <0.001 | <0.001 | <0.001 |
| FR vs. FNR | p-value^ | <0.001 | <0.001 | <0.001 | <0.001 |
| FNR vs. PBO | p-value^ | 0.080 | 0.884 | 0.497 | 0.022 |

ABBREVIATIONS: FR = Fampridine Responders; FNR = Fampridine Non-responders.
#The treatment sample sizes presented at individual time points may be smaller than those in the ITT population due to dropouts or missed assessments.
#The treatment sample sizes presented in the figure legend represent the number of ITT subjects. Sample sizes at individual time points may be smaller due to dropouts or missed assessments.
^P-values from t-tests of the least-squares means using the mean square error via an ANOVA model with effects for responder analysis grouping and center.

FIG. 11 and Table 13 summarize the changes in LEMMT at each double-blind visit by responder analysis grouping. The mean improvement for the fampridine responders during the double-blind ranged from 0.09 to 0.18 units compared to −0.04 units at each visit for the placebo group; this was significant at every visit except the second stable dose visit (p=0.106). Although providing no relevant efficacy information, results for the fampridine non-responders are also illustrated and show that there was, and could be, some significant improvement in leg strength when non-responder is treated with fampridine. This suggests that although a clinically meaningful response can be linked to about 37% of subjects treated with Fampridine-SR, additional subjects may have functional improvements on variables other than walking speed.

TABLE 13

Summary of percent change in LEMMT at each double-blind visit by responder analysis grouping. Summary Statistics Over Time

| Treatment | | Study day: titration | 1st stbl | 2nd stbl | 3rd stbl |
|---|---|---|---|---|---|
| Placebo | Mean | −0.04 | −0.04 | −0.04 | −0.04 |
| | (SEM) | (0.035) | (0.042) | (0.039) | (0.042) |
| | N# | 46 | 46 | 46 | 45 |
| Fampridine Non-responders | Mean | 0.12 | 0.10 | 0.09 | 0.10 |
| | (SEM) | (0.028) | (0.033) | (0.036) | (0.038) |
| | N | 95 | 94 | 94 | 89 |
| Fampridine Responders | Mean | 0.18 | 0.09 | 0.09 | 0.17 |
| | (SEM) | (0.029) | (0.032) | (0.043) | (0.045) |
| | N | 58 | 58 | 58 | 58 |
| FR vs. Placebo | p-value^ | <0.001 | 0.023 | 0.106 | 0.004 |
| FR vs. FNR | p-value^ | 0.178 | 0.627 | 0.739 | 0.311 |
| FNR vs. PBO | p-value^ | <0.001 | 0.003 | 0.038 | 0.032 |

ABBREVIATIONS: FR = Fampridine Responders; FNR = Fampridine Non-responders.
#The treatment sample sizes presented at individual time points may be smaller than those in the ITT population due to dropouts or missed assessments. Treatment sample sizes presented in the figure legend represent the number of ITT subjects. Sample sizes at individual time points may be smaller due to dropouts or missed assessments.
^P-values from t-tests of the least-squares means using the mean square error via an ANOVA model with effects for responder analysis grouping and center.

FIG. 12 and Table 14, below, summarize the changes in Overall Ashworth Score at each double-blind visit by responder analysis grouping. The mean reduction from baseline (indicative of improvement) for the fampridine responders during the double-blind ranged from −0.18 to −0.11 units compared to −0.11 to −0.06 for the placebo group. The fampridine responders were numerically superior to placebo but there was insufficient evidence to detect significant differences. Although appearing to provide little relevant efficacy information, results for the fampridine non-responders are also illustrated.

TABLE 14

Summary of change in overall Ashworth score at each double-blind visit by responder analysis grouping. Summary Statistics Over Time

| Treatment | | Study day: titration | 1st stbl | 2nd stbl | 3rd stbl |
|---|---|---|---|---|---|
| Placebo | Mean | −0.06 | −0.11 | −0.06 | −0.13 |
| | (SEM) | (0.069) | (0.073) | (0.070) | (0.073) |
| | N# | 46 | 46 | 46 | 45 |
| Fampridine Non-responders | Mean | −0.16 | −0.08 | −0.07 | 0.00 |
| | (SEM) | (0.044) | (0.053) | (0.054) | (0.056) |
| | N | 95 | 94 | 94 | 89 |
| Fampridine Responders | Mean | −0.14 | −0.18 | −0.11 | −0.18 |
| | (SEM) | (0.058) | (0.066) | (0.060) | (0.055) |
| | N | 58 | 58 | 58 | 58 |
| FR vs. Placebo | p-value^ | 0.343 | 0.374 | 0.717 | 0.680 |
| FR vs. FNR | p-value^ | 0.675 | 0.210 | 0.911 | 0.064 |
| FNR vs. PBO | p-value^ | 0.151 | 0.823 | 0.772 | 0.189 |

ABBREVIATIONS: FR = Fampridine Responders; FNR = Fampridine Non-responders.
#The treatment sample sizes presented at individual time points may be smaller than those in the ITT population due to dropouts or missed assessments.
^P-values from t-tests of the least-squares means using the mean square error via an ANOVA model with effects for responder analysis grouping and center.

Adverse events most commonly reported prior to treatment were accidental injury, reported by 12 (5.8%) subjects, nausea, reported by 9 (4.4%) subjects, and asthenia, diarrhea, and paresthesia, each reported by 8 (3.9%) subjects. Six (2.9%) subjects also reported headache, anxiety, dizziness, diarrhea, and peripheral edema. These adverse events are indicative of the medical conditions affecting people with MS.

Conclusions. The data does not appear to support either a number of anecdotal reports or expectations from preclinical

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

pharmacology that doses higher than about 10 to 15 mg b.i.d., and even about 10 mg b.i.d., should be associated with greater efficacy. The data presented below in Table 15 support this, based on the new responder analysis methodology.

TABLE 15

Comparison of 10 mg vs. 15 mg among Responders

| | 10 mg (N = 51) | 15 mg (N = 50) |
|---|---|---|
| Responders N (%) | 18 (35.3) | 18 (36.0) |
| Average % CFB in Walk Speed: Mean (SD) | 27.6% (18.39) | 29.6% (22.43) |
| % Change in Walk Speed by Visit: minimum-maximum | 26%-32% | 27%-31% |
| Average SGI | 4.8 (1.09) | 4.7 (1.09) |
| Average Change in MSWS-12 * | −11.1 (21.9) | −7.8 (19.6) |

* For the average change in the MSWS-12, a negative score is indicative of subjective improvement.

A responder analysis based on consistency of improvement provides a sensitive, meaningful approach to measuring effects on the timed 25 foot walk and may be used as a primary endpoint for future trials. This data suggest that for responsive subjects (approximately 37%), treatment with fampridine at doses of 10-20 mg bid produces substantial and persistent improvement in walking.

Efficacy. There are no notable differences between 10 mg bid and 15 mg bid among subjects who respond to drug. In fact, the largest difference, favors the 10 mg bid group (see MSWS-12 result).

Safety. With respect to safety, there are three considerations: There was an apparent decline below baseline walking speed at the last visit on drug in the fampridine non-responders in the 10 mg bid and 20 mg bid groups, but not the 15 mg bid group. This may or may not be significant, but is not clearly dose related. There was an apparent rebound effect, with walking speed dropping below baseline, among fampridine treated subjects at the two week follow-up visit; this occurred in the 15 and 20 mg but not the 10 mg bid group. Serious AE's were more frequent in the 15 mg and 20 mg bid groups 10% and 12% rates vs. 0% rate in 10 mg bid and 4% in placebo groups. This may or may not be significant, but the risk of potentially related SAEs, particularly seizures appears to be dose-related from all available data and based on mechanism of action. Based on this data, it would appear that a 10 mg bid dose is preferred because of its favorable risk to benefit ratio compared with the 15 and 20 mg doses.

Although the present invention has been described in considerable detail with reference to certain preferred embodiments thereof, other versions are possible. Therefore the spirit and scope of the appended claims should not be limited to the description and the preferred versions contain within this specification.

We claim:

1. A method of improving lower extremity function in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of less than 15 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein the amount of said 4-aminopyridine administered to said patient in each said administering step is the same over said time period.

2. A method of improving lower extremity function in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks.

3. The method of claim 1, wherein the improving lower extremity function in the patient is increasing walking speed of the patient.

4. The method of claim 1, wherein the lower extremity function is lower extremity muscle strength.

5. The method of claim 1, wherein the lower extremity function is lower extremity muscle tone.

6. The method of claim 1, wherein said method comprises initiating treatment of said patient with 4-aminopyridine by orally administering said sustained release composition twice daily to said patient.

7. The method of claim 2, wherein said method comprises initiating treatment of said patient with 4-aminopyridine by orally administering said sustained release composition twice daily to said patient.

8. The method of claim 1, wherein twice daily is about every 12 hours.

9. The method of claim 2, wherein twice daily is about every 12 hours.

10. The method of claim 1, wherein said sustained release composition is a tablet.

11. The method of claim 2, wherein said sustained release composition is a tablet.

12. The method of claim 8, wherein said sustained release composition is a tablet.

13. The method of claim 9, wherein said sustained release composition is a tablet.

14. The method of claim 1, wherein said sustained release composition provides a release profile to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

15. The method of claim 2, wherein said sustained release composition provides a release profile to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

16. The method of claim 1, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 6 hours after administration of the sustained release composition to the patient.

17. The method of claim 2, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 6 hours after administration of the sustained release composition to the patient.

18. The method of claim 1, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 5.2 hours after administration of the sustained release composition to the patient.

19. The method of claim 2, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 5.2 hours after administration of the sustained release composition to the patient.

20. The method of claim 1, wherein said sustained release composition is capable of providing, upon administration to the patient, a release profile of the 4-aminopyridine extending over at least 6 hours.

21. The method of claim 2, wherein said sustained release composition is capable of providing, upon administration to the patient, a release profile of the 4-aminopyridine extending over at least 6 hours.

22. The method of claim 1, wherein said 4-aminopyridine is dispersed in a rate of release controlling polymer.

23. The method of claim 2, wherein said 4-aminopyridine is dispersed in a rate of release controlling polymer.

24. The method of claim 1, wherein said sustained release composition comprises a matrix, in which said 4-aminopyridine is uniformly dispersed, that is suitable for controlling the release rate of the 4-aminopyridine.

25. The method of claim 2, wherein said sustained release composition comprises a matrix, in which said 4-aminopyri-

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

dine is uniformly dispersed, that is suitable for controlling the release rate of the 4-aminopyridine.

**26**. The method of claim **1**, wherein said patient has relapsing remitting multiple sclerosis.

**27**. The method of claim **2**, wherein said patient has relapsing remitting multiple sclerosis.

**28**. The method of claim **1**, wherein said time period is more than two weeks.

**29**. The method of claim **2**, wherein said time period is more than two weeks.

**30**. The method of claim **1**, wherein said time period comprises twelve weeks.

**31**. The method of claim **2**, wherein said time period comprises twelve weeks.

**32**. The method of claim **1**, wherein the lower extremity function is walking.

**33**. The method of claim **32**, wherein said method comprises initiating treatment of said patient with 4-aminopyridine by orally administering said sustained release composition twice daily to said patient.

**34**. The method of claim **32**, wherein said sustained release composition is a tablet, and wherein twice daily is about every 12 hours.

**35**. The method of claim **32**, wherein said sustained release composition provides a release profile to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

**36**. The method of claim **2**, wherein the lower extremity function is walking, and wherein said sustained release composition provides a release profile to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

**37**. The method of claim **32**, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 6 hours after administration of the sustained release composition to the patient.

**38**. The method of claim **2**, wherein the lower extremity function is walking, and wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 6 hours after administration of the sustained release composition to the patient.

**39**. The method of claim **32**, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 5.2 hours after administration of the sustained release composition to the patient.

**40**. The method of claim **34**, wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 5.2 hours after administration of the sustained release composition to the patient.

**41**. The method of claim **2**, wherein the lower extremity function is walking, and wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 5.2 hours after administration of the sustained release composition to the patient.

**42**. The method of claim **32**, wherein said sustained release composition comprises a matrix, in which said 4-aminopyridine is uniformly dispersed, that is suitable for controlling the release rate of the 4-aminopyridine.

**43**. The method of claim **2**, wherein the lower extremity function is walking, and wherein said sustained release composition comprises a matrix, in which said 4-aminopyridine is uniformly dispersed, that is suitable for controlling the release rate of the 4-aminopyridine.

**44**. The method of claim **32**, wherein said time period is more than two weeks.

**45**. The method of claim **2**, wherein the lower extremity function is walking, and wherein said time period is more than two weeks.

**46**. The method of claim **32**, wherein said time period comprises twelve weeks.

**47**. The method of claim **40**, wherein the lower extremity function is walking, and wherein said time period comprises twelve weeks.

**48**. The method of claim **32**, wherein said sustained release composition is capable of providing, upon administration to the patient, a release profile of the 4-aminopyridine extending over at least 6 hours.

**49**. The method of claim **2**, wherein the lower extremity function is walking, and wherein said sustained release composition is capable of providing, upon administration to the patient, a release profile of the 4-aminopyridine extending over at least 6 hours.

**50**. The method of claim **32**, wherein said 4-aminopyridine is dispersed in a rate of release controlling polymer.

**51**. The method of claim **2**, wherein the lower extremity function is walking, and wherein said **4**-aminopyridine is dispersed in a rate of release controlling polymer.

**52**. The method of claim **32**, wherein said patient has relapsing remitting multiple sclerosis.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 8,440,703 B2
APPLICATION NO. : 13/299969
DATED : May 14, 2013
INVENTOR(S) : Blight et al.



It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title Page, Item (57), in the abstract, replace "a aminopyridine" with --an aminopyridine--;

In the Drawings
In figure 8, replace "Cochran-Mantel Haenszel test" with --Cochran-Mantel-Haenszel test--;

In the Specification
In column 1, line 14, replace "relates a" with --relates to a--;
In column 2, line 11, replace "Hayes et al," with --Hayes et al.,--;
In column 2, line 13, replace "p. 345 1991)." with --p. 345 (1991)).--;
In column 4, line 65, replace "[(observed cases, ITT population])." with --(observed cases, ITT population).--;
In column 5, line 43, replace "spheroid" with --spheroids--;
In column 6, line 23, replace "naphthylate mesylate" with --naphthylate, mesylate--;
In column 6, line 28, replace "tetramethylammonium, tetramethylammonium" with --tetramethylammonium--;
In column 6, lines 52-53, replace "afflicted refers, or amelioration" with --afflicted, or to ameliorate--;
In column 7, line 56, replace "interval ($C\tau$)" with --interval ($C_\tau$)--;
In column 8, line 30, replace "$C_{avss}$" with --$C_{avSS}$--;
In column 8, line 33, replace "$C_{maxss}$" with --$C_{maxSS}$--;
In column 8, line 44, replace "solvated" with --solvate--;
In column 9, line 3, replace "Aminopyrdines" with --Aminopyridines--;
In column 9, line 34, replace "other" with --another--;
In column 9, lines 34-35, replace "In alternative, organic solvent" with --In the alternative, an organic solvent--;
In column 9, line 56, replace "hard ness" with --hardness--;
In column 9, line 62, replace "blocker on" with --blocker or on--;
In column 10, line 20, replace "with pharmaceutically" with --with a pharmaceutically--;
In column 10, lines 21-22, replace "disintegrates" with --disintegrate--;
In column 10, line 30, replace "rate is" with --rate. is--;

Signed and Sealed this
Twenty-ninth Day of July, 2014

Michelle K. Lee

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

**CERTIFICATE OF CORRECTION (continued)**
**U.S. Pat. No. 8,440,703 B2**



In column 11, line 12, replace "amount a aminopyridine" with --amount of an aminopyridine--;
In column 11, line 14, replace "regiment" with --regimen--;
In column 11, line 42, replace "Particularly preferred diluents" with --A particularly preferred diluent--;
In column 11, line 50, replace "a aminopyridine" with --an aminopyridine--;
In column 11, line 52, replace "z %," with --z % w/w,--;
In column 11, line 55, replace "additives" with --additive--;
In column 11, line 61-62, replace "a aminopyridine" with --an aminopyridine--;
In column 12, line 1, replace "establish" with --establishes--;
In column 12, line 11, replace "politicizes" with --plasticizers--;
In column 12, lines 60-61, replace "4-aminopyridine may" with --4-aminopyridine, may--;
In column 16, line 65-66, replace "be exaggerated" with --be an exaggerated--;
In column 16, line 67, replace "Cmax" with --$C_{max}$--;
In column 17, Table 2, replace "$C_{MAX}$" with --$C_{max}$--;
In column 17, Table 2, replace "$t_{MAX}$" with --$T_{max}$--;
In column 17, line 52, replace "CL/F" with --Cl/F--;
In column 17, line 64, replace "$t_{1/2}$" with --$T_{1/2}$--;
In column 18, Table 3, replace "$C_{MAX}$" with --$C_{max}$--;
In column 18, Table 3, replace "$t_{MAX}$" with --$T_{max}$--;
In column 18, Table 3, replace "$t_{1/2}$" with --$T_{1/2}$--;
In column 18, line 66, replace "CL/F" with --Cl/F--;
In column 19, line 4, replace "evidence" with --evidenced--;
In column 19, line 7, replace "CL/F" with --Cl/F--;
In column 19, Table 4, replace "$C_{MAX}$" with --$C_{max}$--;
In column 19, Table 4, replace "$t_{MAX}$" with --$T_{max}$--;
In column 19, Table 4, replace "$t_{1/2}$" with --$T_{1/2}$--;
In column 19, line 43, replace "CL/F" with --Cl/F--;
In column 19, lines 64-66, replace "Subject's (SGI) Global Impressions, a Subject's Global Impressior (SGI), the Multiple Sclerosis" with --Subject's (SGI) Global Impressions, the Multiple Sclerosis--;
In column 23, line 14, replace "LEEMT" with --LEMMT--;
In column 25, line 5, replace "treatment group" with --treatment groups--;
In column 26, line 6, replace "could perceived benefit" with --could have perceived benefits--;
In column 27, line 6, replace "summarizes" with --summarize--;
In column 27, line 62, replace "when non-responder" with --when a non-responder--;
In column 29, lines 41-42, replace "10% and 12% rates vs. 0% rate in 10mg bid and 4% in placebo groups" with --(10% and 12% rates vs. 0% rate in 10mg bid and 4% in placebo groups)--;
In column 29, line 43, replace "seizures appears" with --seizures, appears--;
In column 29, line 52, replace "contain" with --contained--;

In the Claims
In column 31, Claim 37, line 33, replace "$_{Tmax}$" with --$T_{max}$--.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

PTO-1683
(Rev. 7-96)

U 7504989

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

November 14, 2014

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,663,685*
**ISSUE DATE:** *March 04, 2014*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

T. WALLACE
Certifying Officer

CA No. 14-882-LPS

**JTX-0005**

AMPFH0018115

US008663685B2

(12) **United States Patent**
**Blight et al.**

(10) **Patent No.: US 8,663,685 B2**
(45) **Date of Patent: *Mar. 4, 2014**

(54) **SUSTAINED RELEASE AMINOPYRIDINE COMPOSITION**

(75) Inventors: **Andrew R. Blight**, Mahopac, NY (US); **Ron Cohen**, Irvington, NY (US)

(73) Assignee: **Acorda Therapeutics, Inc.**, Ardsley, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 36 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/187,158**

(22) Filed: **Jul. 20, 2011**

(65) **Prior Publication Data**

US 2012/0041034 A1 Feb. 16, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 11/010,828, filed on Dec. 13, 2004, now Pat. No. 8,007,826.

(60) Provisional application No. 60/528,760, filed on Dec. 11, 2003, provisional application No. 60/560,894, filed on Apr. 9, 2004, provisional application No. 60/528,592, filed on Dec. 11, 2003, provisional application No. 60/528,593, filed on Dec. 11, 2003.

(51) **Int. Cl.**
*A61K 31/44* (2006.01)
*A61K 9/22* (2006.01)

(52) **U.S. Cl.**
USPC ............ **424/468**; 514/352; 514/903; 514/965

(58) **Field of Classification Search**
USPC ........................... 514/352, 903, 965; 424/468
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,386,095 A 5/1983 Gibson et al.
4,508,715 A 4/1985 Booth et al.
4,721,619 A 1/1988 Panoz et al.
4,851,230 A 7/1989 Tencza et al.
4,894,240 A 1/1990 Geoghegan et al.
4,946,853 A 8/1990 Bannon et al.
5,370,879 A 12/1994 Masterson et al.
5,540,938 A 7/1996 Masterson et al.
5,545,648 A 8/1996 Hansebout et al.
5,580,580 A 12/1996 Masterson et al.
5,597,827 A 1/1997 Miller et al.

(Continued)

FOREIGN PATENT DOCUMENTS

CA 2085785 AA 6/1994
EP 0 113 562 7/1984

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 13/148,231, filed Feb. 11, 2010 (unpublished).

(Continued)

*Primary Examiner* — Savitha Rao
(74) *Attorney, Agent, or Firm* — Jones Day

(57) **ABSTRACT**

A pharmaceutical composition which comprises a therapeutically effective amount of a aminopyridine dispersed in a release matrix, including, for example, a composition that can be formulated into a stable, sustained-release oral dosage formulation, such as a tablet which provides, upon administration to a patient, a therapeutically effective plasma level of the aminopyridine for a period of at least 12 hours, preferably 24 hours or more and the use of the composition to treat various neurological diseases.

**8 Claims, 5 Drawing Sheets**




Copy provided by USPTO from the PIRS Image Database on 11/12/2014

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,597,828 | A | 1/1997 | Miller et al. |
| 5,869,480 | A | 2/1999 | Shutske et al. |
| 5,952,357 | A | 9/1999 | Bliss et al. |
| 6,284,473 | B1 | 9/2001 | Whitaker |
| 6,288,026 | B1 | 9/2001 | Exner et al. |
| 8,007,826 | B2 | 8/2011 | Blight et al. |
| 8,354,437 | B2 | 1/2013 | Blight et al. |
| 8,440,703 | B2 | 5/2013 | Blight et al. |
| 2005/0025744 | A1 | 2/2005 | Lane |
| 2005/0276851 | A1 | 12/2005 | Cunningham et al. |
| 2006/0276537 | A1 | 12/2006 | Goren et al. |
| 2007/0037848 | A1 | 2/2007 | Masters et al. |
| 2009/0150180 | A1 | 6/2009 | Cohen et al. |
| 2010/0061935 | A1 | 3/2010 | Blight et al. |
| 2010/0272795 | A1 | 10/2010 | Cunningham |
| 2010/0272796 | A1 | 10/2010 | Cunningham |
| 2010/0272807 | A1 | 10/2010 | Cunningham |
| 2010/0324098 | A1 | 12/2010 | Blight et al. |
| 2010/0324099 | A1 | 12/2010 | Blight et al. |
| 2010/0324100 | A1 | 12/2010 | Blight et al. |
| 2011/0166187 | A1 | 7/2011 | Blight et al. |
| 2011/0166188 | A1 | 7/2011 | Blight et al. |
| 2011/0166189 | A1 | 7/2011 | Blight et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 117 027 | | 8/1984 |
| EP | 0 325 843 | | 8/1989 |
| EP | 0 484 186 | | 5/1992 |
| EP | 2377536 | A1 | 10/2011 |
| IE | 82916 | B1 | 6/2003 |
| WO | WO2004/082684 | | 9/2004 |
| WO | WO2005/099701 | | 10/2005 |
| WO | WO2007/035958 | | 3/2007 |
| WO | WO2010/030755 | | 3/2010 |
| WO | WO2010/093838 | | 8/2010 |
| WO | WO2010/093839 | | 8/2010 |
| WO | WO2010/090730 | | 9/2010 |
| WO | WO2011/029082 | | 3/2011 |
| WO | WO 2011/029082 | | 3/2011 |

OTHER PUBLICATIONS

2nd Meeting of the Pharmacy Compounding Advisory Committee, May 6 1999, Transcript (http://www.fda.gov/ohrms/dockets/ac/99/transcpt/3513t1.rtf (last accessed Nov. 18, 2010).
Advisory Action Before the Filing of an Appeal Brief mailed Mar. 13, 2009 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Agoston et al., 1978, "Effects if 4-Aminopyridine in Eaton Lambert Syndrome," Br. J. Anesth., vol. 50:383-385.
Agoston et al.,1980, "Antagonism of Ketamine-Diazepam anaesthesia by 4-Aminopyridine in Human Volunteers," Br. J. Anaesth., vol. 52:367-369.
Aisen et al., 1995, "3,4-Diaminopyridine as a treatment for amyotrophic lateral sclerosis," J. of Neurological Sciences, vol. 129:21-24.
Aisen et al., 1996, "A double-blind placebo-controlled study of 3,4-diaminopyridine in amytrophic lateral sclerosis patients on a rehabilitation unit," J. of Neurological Sciences, vol. 138:93-96.
Albrecht et al., 2001, "Day-to-day variability of maximum walking distance in MS patients can mislead to relevant changes in the Expanded Disability Status Scale (EDSS): average walking speed is a more constant parameter," Multiple Sclerosis, vol. 7:105-109.
Ampyra® (dalfampridine), Acorda Therapeutics, Inc., Prescribing Information, Jan. 2010. http://ampyra.com/local/files/PI.pdf (last accessed Nov. 3, 2010).
Arhem et al., 1989, "A model for the fast 4-aminopyridine effects on amphibian myelinated nerve fibers. A study based on voltage-clamp experiments," Acta Physiol. Scan., vol. 137:53-61.
Ashworth et al., 1964, "Preliminary Trial of Carisoprodol in Multiple Sclerosis," Practitioner, vol. 192:540-542.
Avonex® (interferon beta-la), Biogen Idec Inc., Prescribing Information, Oct. 2008. http://www.avonex.com/pdfs/pi_luer_lock.pdf (last accessed Nov. 3, 2010).
Ball et al., 1979, "Human botulism caused by *Clostridium botulinum* Type E: the Birmingham Outbreak," Quarterly Journal of Med. New Series XLVIII, vol. 191:473-491.
Barge et al., 1977, "Pharmaceutical Salts," J. Pharm. Sci., vol. 66(1):1-19.
Barker et al., 1991, "Alzheimer's disease," Pharmaceutical Journal, Jan. 26, 1991, pp. 116-118.
Beric et al., 1988, "Central dysesthesia syndrome in spinal cord injury patients," Pain, 34:109-116.
Beric, 1990, "Altered sensation and pain in spinal cord injury," Recent Achievements in Restorative Neurology, 3 Altered Sensation and Pain, Dimitrijevic et al., eds., Karger:Basel, pp. 27-36.
Bertelsmann et al., 1992, "Comparison between 4-aminopyridine and 3,4diaminopyridine in the treatment of multiple sclerosis," Annals of Neurology, vol. 32(2):256 (Abstract P100).
Betaseron® (Interferon Beta-1b) for SC injection, Bayer HealthCare Pharmaceuticals Inc., Prescribing Information, May 2010. http://berlex.bayerhealthcare.com/html/products/pi/Betaseron_PI.pdf (last accessed Nov. 3, 2010) (pp. 1-10).
Bever et al., 1990, "Preliminary trial of 3, 4-diaminopyridine in patients with multiple sclerosis," Annals of Neurology, 27(4):421-427.
Bever et al., 1994, "The effects of 4-aminopyridine in multiple sclerosis patients: Results of a randomized, placebo-controlled, double-blind, concentration-controlled, crossover trial," Neurol., vol. 44(6):1054-1059.
Bever et al., 1995, "Experience with slow release 4-aminopyridine in multiple sclerosis patients: Long term tolerability and safety," Journal of Neuroimmunology, 1 Suppl. 58.
Bever et al., 1995, "The brief repeatable battery of neuropsychological tests for multiple sclerosis: a preliminary serial study," Multiple Sclerosis, vol. 1:165-169.
Bever et al., 1995, "The Pharmacokinetics and Tolerability of a Slow-Release Formulation of 4-Aminopyridine in Multiple Sclerosis Patients," Neurol. vol. 45(Suppl 4):A351 (Abst. 684P).
Bever et al., 1996, "Treatment with oral 3,4 diaminopyridine improves leg strength in multiple sclerosis patients: Results of a randomized, double-blind, placebo-controlled, crossover trial," Neurol., vol. 47:1457-1462.
Bever et al., 2009, "Sustained-release fampridine for multiple sclerosis," Expert Opin. Investig. Drugs, vol. 18(7):1013-1024.
Bever, 1994, "The Current Status of Studies of Aminopyridines in Patients with Multiple Sclerosis," Ann Neurol, vol. 36:S118-S121.
Biessels et al., 1984, "Comparison of the pharmacological actions of some new 4-aminopyridine derivatives," European J. of Pharmacology, vol. 106:319-325.
Blight et al., 1983(b), "Axonal physiology of chronic spinal cord injury in the cat: Intracellular recording in vitro," Neuroscience, vol. 10(4):1471-1486.
Blight et al., 1986, "Morphometric analysis of spinal cord injury in the cat: The relation of injury intensity of survival of myelinated axons," Neuroscience 19(1):321-341.
Blight et al., 1987, "Augmentation by 4-aminopyridine of vestibulospinal free fall responses in chronic spinal-injured cats," J. of the Neurological Sciences, vol. 82(1-3):145-159.
Blight et al., 1991, "The effects of 4-aminopyridine on neurological deficits in chronic cases of traumatic spinal cord injury in dogs: a phase I clinical trial," J. Neurotrauma, vol. 8:103-119.
Blight et al., 2001, "Acute spinal cord injury: Pharmacotherapy and drug development perspectives," Curr. Opin. Investig. Drugs, vol. 2(6):801-08.
Blight, 1983, "Cellular morphology of chronic spinal cord injury in the cat: analysis of myelinated axons by line-sampling," Neuroscience, vol. 10(2):521-543.
Blight, 1987, "Effect of 4-aminopyridine on action potential conduction in myelinated axons of chronically injured spinal cord," Society of Neurosciences Abstracts, vol. 13(1):62 (Abstract 21.15).
Blight, 1989, "Effect of 4-aminopyridine on axonal conduction-block in chronic spinal cord injury," Brain Res. Bull., vol. 22(1):47-52.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

(56) **References Cited**

OTHER PUBLICATIONS

Blight, 1991, "Morphometric analysis of a model of spinal cord injury in guinea pigs, with behavioral evidence of delayed secondary pathology," J. Neurol. Sci., vol. 103(2):156-71.
Blight, 1991, "Morphometric analysis of blood-vessels in chronic experimental spinal-cord injury: hypervascularity and recovery of function," J of Neurol Sci., vol. 106(2):158-174.
Blight, 1998, "Containing plasticity: neurite inhibitory factors of myelin," Nat. Neurosci., vol. 1(2):87-88.
Blight, 2002, "Miracles and molecules—progress in spinal cord repair," Nature Neuroscience, vol. 5:1051-1054.
Blight, 2004,"Just one word: plasticity," Nat. Neurosci., vol. 7(3):206-08.
Booij et al., 1978, "Neostigmine and 4-Aminopyridine Antagonism of Lincomycin-Pancuronium Neuromuscular Blockade in Man," Anesth. Analg., vol. 57:316-321.
Bostock et al., 1981, "The effects of 4-aminopyridine and tetraethylammonium ions on normal and demyelinated mammalian nerve fibres," J. Physiol., vol. 313:301-15.
Bowe et al., 1987, "Physiological effects of 4-aminopyridine on demyelinated mammalian motor and sensory fibers," Ann. Neurol., vol. 22(2):264-8.
Bowman et al., 1981, "Actions of 4-aminopyridine on the cardiovascular systems of anaesthetized cats and dogs," Br. J. Anaesth., vol. 53:555-565.
Bowman et al., 1981, "Pharmacological actions of aminopyridines and related compounds," Rev. Pure Appl. Phamacol. Sci., vol. 2(4):317-371.
Bresnahan et al., 1987, "A behavorial and anatomical analysis of spinal cord injury produced by a feedback-controlled impaction device," Exp. Neurol., 95:548-570.
Bronnum-Hansen et al., 2005, "Suicide among Danes with multiple sclerosis," J. of Neurol. Neurosurg. Psych., vol. 76:1457-1459.
Bruckner et al., 2000, "Effects of standard anticonvulsant drugs on different patterns of epileptiform discharges induced by 4-aminopyridine in combined entorhinal cortex-hippocampal slices," Brain Res., vol. 859(1):15-20.
Bugaresti et al., 2001, "Pharmacokinetics and safety of single oral doses of fampridine-SR (sustained-release 4-aminopyridine) tablets in patients with chronic spinal cord injury," Presented to the American Academy of Physical Medicine and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Burchiel et al., 1985, "Effects of potassium channel-blocking agents on spontaneous discharges from neuromas in rats," J. of Neurosurgery, vol. 63:246-249.
Calabresi et al., 1993, "Progressive spinal multiple sclerosis," Seminars in Neurology, vol. 13(4):322-332.
Capacio et al., 1997, "Pharmacokinetics and pharmacodynamics of 4-aminopyridine in awake guinea pigs," Drug Chem. Toxicol., vol. 20(3):151-172.
Cardenas E et al., 2007, "Phase 2 trial of sustained-release fampridine in chronic spinal cord injury," Spinal Cord, vol. 4592:158-168.
Carlsson et al., 1983, "Can 4-aminopyridine be used to reverse anaesthesia and muscle relaxation?" Acta Anaesth. Scand., vol. 27:87-90.
CD-ROM in duplicate containg video-file "Today Show.mov," created Jul. 18, 2010, showing segment of the "Today Show" aired May 27, 2010 accompained by still image single frame photograph.
Chalk et al., 1990, "Response of the Lambert-Eaton myasthenic syndrome to treatment of associated small-cell lung carcinoma," Neurology, vol. 40(10):1552-1556.
Chandy et al., 1984, "Voltage-gated potassium channels are required for human T-lymphocyte activation," J. Exp. Med., 160:369-385.
Choquet et al ., 1988, "Modulation of voltage-dependent potassium channels in B-lymphocytes," Biochem. Pharmacol., 37(20):3797-3802.
Clinicaltrial.gov, Efficacy, safety, and tolerability of Nerispirdine in patients with multiple sclerosis, ClinicalTrials.gov. http://clinicaltrials.gov/show/NCT00811902 (last accessed Nov. 2, 2010).
Coetzee et al., 1999, "Molecular diversity of K+ channels," Ann. NY Acad. Sci., vol. 868:233-285.
Cohen et al., 1999, "Utilization of the multiple sclerosis functional composite as an outcome measure in the phase 3 trial of interferon beta-1a (Avonex®) in secondary progressive multiple sclerosis (IMPACT)," Neurology, vol. 62 (6 Suppl. 2):A548-5549 (Abstract S74.002).
Cohen et al., 2000, "Intrarater and interrater reliability of the MS functional composite outcome measure," Neurology, vol. 54:802-806.
Cohen et al., 2000, "One-year change in the multiple sclerosis functional composite and expanded disability status scale in the phase 3 trial of interferon beta-1a in secondary progressive multiple sclerosis (IMPACT)," Neurology, vol. 54 (7 Supp. 3):A215 (Abstract S30.02).
Cohen et al., 2001, "Use of the multiple sclerosis functional composite as an outcome measure in a phase 3 clinical trial," Arch. Neurol. vol. 58:961-967.
Cohen et al., 2001, "Results of IMPACT, a phase 3 trial of interferon beta-1a in secondary progressive multiple sclerosis," Neurology, vol. 56 (8 Supp. 3):A148-149 (Abstract S20.003).
Cohen et al., 2002, Benefit of interferon beta-1a on MSFC progression in secondary progressing Ms (Abstract), Neurology, vol. 59(5):679-687.
Cohen et al., 2005, "Responder analysis of walking speed applied to a trial of fampridine in subjects with MS," 57th Annual Meeting of the American Academy of Neurology, Miami, FL, Apr. 9-16, 2005 (Poster).
Cohen et al., 2005, "Responder analysis of walking speed applied to a trial of fampridine in subjects with MS," Neurology, 64(Suppl. 1):A388, P06.169.
Confavreux and Compston, 2005, "Disease-modifying treatments in multiple sclerosis," Chap. 18 in McAlpine's Multiple Sclerosis, 4th ed., Compston et al., (eds.), Churchill Livingstone Elsevier, pp. 765-770.
Confavreux and Compston, 2005, "The person with multiple sclerosis: a prospectus," Chap. 19, in McAlpine's Multiple Sclerosis 4th ed., Compston et al. (eds.), Churchill Livingstone Elsevier, pp. 805-810.
Confavreux and Compston, Dec. 2005, "The natural history of multiple sclerosis," Chap. 4 in McAlpine's Multiple Sclerosis, 4th Ed., Compston et al. (eds.) Churchill Livingstone Elsevier, pp. 193-196.
Consortium of Multiple Sclerosis Centers (CMSC), Annual Meeting, Jun. 7, 2002 (Poster).
Cooke et al., 1994, "Lambert-Eaton myasthenic syndrome: evaluation of movement performance following drug therapy," Electromyogr. Clin. Neurophysiol. vol. 34(2):87-93.
Copaxone® (glatiramer acetate), TEVA Neuroscience, Inc., Prescribing Information, Feb. 2009. http://www.copaxone.com/pdf/PrescribingInformation.pdf (last accessed Nov. 3, 2010).
Cowen and Company—Acorda Therapeutics, Nov. 19, 2010 (p. 1-18).
Cowen and Company, "Acorda Therapeutics," Aug. 3, 2010 (pp. 1-5).
Crenshaw et al. 2006, "Gait variability in people with multiple sclerosis," Multiple Sclerosis, vol. 12:613-691.
Darlington, 2000, "Fampridine Acorda Therapeutics," Curr. Opin. Investig. Drugs, vol. 1(3):375-379.
Davidson et al., 1988, "4-Aminopyridine in the treatment of Alzheimer's Disease " Biol. Psychiatry, vol. 23:485-490.
Davis et al., 1990, "Orally Administered 4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis," Ann. Neurol., vol. 27:186-192.
Davis et al., 1995, "Mechanism of Action of 4-Aminopyridine in the Symptomatic Treatment of Multiple Sclerosis," Ann. Neurol., vol. 37(5):684.
de Waal et al., 1994, "The treatment of multiple sclerosis (MS): 4-aminopyridine (4-AP)," J. of Neurology, vol. 241:S102 (Abstract 11).
DeForge et al., 2004, "The effect of 4-aminopyridine on gait in ambulatory spinal cord injuries: a double-blind, placebo-controlled, crossover trial," Spinal Cord, vol. 42:674-685.
Department of Health & Human Services, Mar. 29, 2010, Warning Letter, http://www.fda.gov/dowloads/ICECI/EnforcementActions/WarningLetters/2001/UCM069491.pdf (last accessed Nov. 16, 2010).

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

(56) **References Cited**

OTHER PUBLICATIONS

Dimitrijevic et al., 1986, Spinal cord stimulation for the control of spasticity in patients with chronic spinal cord injury:1. Clinical observations, Cent. Nerv. Syst. Trauma,: J. Am. Paralysis Assoc., 3(2):129-144.
Dimitrijevic et al., 1986, Spinal cord stimulation for the control of spasticity in patients with chronic spinal cord injury:II. Neurolophysiologic observations, Cent. Nerv. Syst. Trauma,: J. Am. Paralysis Assoc., 3(2):145-152.
Ditunno et al., 2002, "Double-blinded, placebo-controlled, dose-escalating study evaluating the safety and efficacy of oral doses of fampridine-SR (sustained-release-aminopyridine) in patients with chronic spinal cord injury," First Meeting of the American Spinal Injury and the Intl Medical Society of Paraplegia, Vancouver, Canada, May 3-6, 2002 (Poster).
Ditunno et al., 2002, "Double-blind, placebo-controlled, dose-escalating study evaluating the safety and efficacy of oral doses of fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic spinal cord injury," American Spinal Association Twenty-Eight Annual Meeting, p. S35 (Abstract # 78).
Donovan et al., 2000, "Intravenous infusion of 4-AP in chronic spinal cord injured subjects," Spinal Cord, vol. 38:7-15.
Dubuc et al., 1986, "The effects of 4-aminopyridine on the spinal cord: rhythmic discharges recorded from the peripheral nerves," Brain Res., vol. 369:243-259.
Edgley et al., 1991, "A survey of multiple sclerosis. Part 2: Determinants of employment status," Can. J. Rehab., vol. 4(3):127-132.
Eidelberg et al., 1977, "Relationship between residual hindlimb-assisted locomotion and surviving axons after incomplete spinal cord injuries," Exp. Neurol., 56:312-322.
Eidelberg et al., 1981, "Anatomical correlates of return of locomotor function afer partial spinal cord lesions in cats," Exp. Brain Res., 42:81-88.
Eidelberg et al., 1981, "Locomotor control in macaque monkeys," Brain, 104:647-663.
Eliasson et al., 1991, "Effects of 4-aminopyridine on protein phosphorylation in heat-blocked peripheral nerve," J. Neutrol. Sci., 105:175-182.
Eriksson et al., 2002, "Epileptic seizures, cranial neuralgias and paroxysmal symptoms in remitting and progressive multiple sclerosis," Mult. Scler. vol. 8(6):495-499.
Evenhius et al., 1981, "Pharmacokinetics of 4-aminopyridine in human volunteers. A preliminary study using a new GLC method for its estimation," Br. J. Anaesth., vol. 53:567-570.
Extavia® (interferon beta-1b), Novartis Pharmaceuticals Inc., Prescribing Information, Aug. 2009. http://www.pharma.us.novartis.com/product/pi/pdf/extavia.pdf (last accessed Nov. 3, 2010).
Faculty, Doctors, Staff, Department of Neurology, Columbia University, New York, http://web.neuro.columbia.edu/members/profiles.php?id=91 (last accessed Nov. 17, 2010).
FDA Approval Letter NDA 022250, Jan. 22, 2010.
FDA Guidance for Industry: Bioanalytical Method Validation (May 2001) (pp. 1-22).
FDA Guidance for Industry: Bioavailability and Bioequivalence Studies for Orally Administered Drug Products—General Considerations (Mar. 2003) (pp. 1-23).
FDA Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of in Vitro / in Vivo Correlations (Sep. 1997) (pp. 1-24).
FDA Guidance for Industry: Food-Effect Bioavailability and Fed Bioequivalence Studies (Dec. 2002) (pp. 1-9).
Feinstein, 2004, "The neuropsychiatry of multiple sclerosis," Can. J. Psychiatry, vol. 49:157-163.
Fingerman, et al., 2000, "The overactive bladder in multiple sclerosis," J. Am. Osteopath. Assoc., vol. 100 (Suppl):S9-512.
Fischer et al., 1999, "The Multiple Sclerosis Functional Composite measure (MSFC): an integrated approach to MS clinical outcome assessment," Mult. Scler., vol. 5:244-250.
Fischer et al., 2001, "Multiple Sclerosis Functional Compositie (MSFC), Administration and Scoring Manual," rev. Oct. 2001, National Multiple Sclerosis Society, New York, pp. 1-41.
Fleming et al., 1994, "Patterns of comorbidity in elderly patients with multiple sclerosis," J. Clin. Epidemiol., vol. 47:1127-1132.
Folkert, 2005, " Neuropathologic Substrate of Cerebral Palsy," J. Child Neurol. vol. 20:940-949.
Friend et al., 1999, "Language Functions in Patients with Multiple Sclerosis," Clin Neuropsychologist, vol. 13(1):78-94.
Fujihara et al., 1998, "The effects of 4-aminopyridine on motor evoked potentials in multiple sclerosis," J. Neurol. Sci., vol. 159(1):102-106.
Gean, 1990, "The epileptiform activity induced by 4-aminopyridine in rat amygdale slices: antagonism by non-N-methyl-D-aspartate receptor antagonists," Brain Res., vol. 530:251-256.
Gilenya® (fingolimod), Novartis Pharmaceuticals Corporation, Prescribing Information, Sep. 2010. http://www.pharma.us.novartis.com/product/pi/pdf/gilenya.pdf (last accessed Nov. 9, 2010).
Glasauer et al., 2005, "4-Aminopyridine restores visual ocular motor function in upbeat nystagmus," J. Neurol. Neurosurg. Psychiatry, vol. 76:451-453.
Glasauer et al., 2005, "Effect of 4-aminopyridine on upbeat and downbeat nystagmus elucidates the mechanism of downbeat nystagmus," Ann. NY Acad. Sci., vol. 1039:528-531.
Glover, 1982, "The aminopyridines," Gen. Pharmacol., vol. 13(4):259-285.
Gold et al., 1996, "Characterization of six voltage-gated K+ currents in adult rat sensory neurons," J. Neurophysiol., vol. 75:2629-2646.
Goodman et al., 2002, "Placebo-controlled double-blinded dose ranging study of Fampridine-SR in multiple sclerosis," P308, ACTRIMS-ECTRIMS, Abstracts of the 7th Annual Meeting of the Americas Committee for Treatment and Research in Multiple Sclerosis and 18th Congress of the European Committee for Treatment and Research in Multiple Sclerosis, Sep. 18-21, 2002, Baltimore, Maryland, USA, Mult. Scler. vol. 8 Suppl Posters S116-S117, (Abstract P308).
Goodman et al., 2003, "Placebo-controlled double-blinded dose ranging study of fampridine-SR in multiple sclerosis," Neurology, vol. 60 (5 Suppl. 1), Abstract S21.001, p. A167.
Goodman et al., 2004, "Phase 2 trial of fampridine-SR (sustained-release 4-aminopyridine) in multiple sclerosis," 20th European Committee for Treatment and Research in Multiple Sclerosis, Vienna, Austria, Oct. 6-9, 2004 (Poster).
Goodman et al., 2004, "Phase 2 trial of fampridine-SR in multiple Sclerosis," Multiple Sclerosis vol. 10(2):5273 (P694).
Goodman et al., 2004, "Phase two trial of fampridine-SR in multiple sclerosis," Multiple Sclerosis, vol. 11(1):111.
Goodman et al., 2005, "Clinical meaningfulness of consistent improvement on the timed 25 foot walk (TW25) during treatment with fampridine," 130th Annual Meeting of the American Neurological Association, San Diego, CA, Sep. 25-28, 2005 (Poster).
Goodman et al., 2005, "Stability and interrelatedness of the 12-item multiple sclerosis walking scale and the timed 25 foot walk during a 3 month clinical trial," Presented at the ECTRIMS/ACTRIMS Congress, Thessaloniki, Greece, Sep. 2005 (Poster).
Goodman et al., 2005, "Clinical meaningfulness of consistent improvement on the timed 25-foot walk (TW25) during treatment with fampridine," Annals of Neurology, vol. 58(Suppl. 9):S26 (P96).
Goodman et al., 2005, "Stability and interrelatednes of the 12-item multiple sclerosis waking scale and the timed 25 foot walk during a 3 month clinical trial," Multiple Sclerosis, vol. 11:S102-S103 (P398).
Goodman et al., 2008, "Dose comparison trial of sustained-release fampridine in multiple sclerosis," Neurology 71:1134-1141.
Goodman et al., 2009, "Sustained-Release Oral Fampridine in Multiple Sclerosis: a Randomized, Double-Blind, Controlled Trial," Lancet, vol. 373: 732-738.
Goodman et al., 2010, "A Phase 3 Trial of Extended Release Oral Dalfampridine in Multiple Sclerosis," Ann. Neurol., vol. 68(4):494-502.
Graziani et al., 2002, "Two multicenter trials demonstrate potential efficacy of fampridine-SR (sustained-release 4-aminopyridine) for spasticity management in subjects with chronic spinal cord injury,"

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

(56) **References Cited**

OTHER PUBLICATIONS

63rd Annual Academy of Physical Medicine and Rehabilitation Assembly, Orlando, FL Nov. 21-23, 2002 (Poster).
Grijalva et al., 2003, "The efficacy and safety of 4-aminopyridine in patients with long-term spinal cord injury: a randomized, double-blind, placebo-controlled trial," Pharmacotherapy, vol. 23:823-834.
Gruner et al., 1987, "Recovery of Motor Function in Chronic Experimental Spinal Cord Injury Enhanced by 4-Aminopyridine," Society for Neuroscience Abstracts, vol. 13(1):62 (abstr. 21.16).
Gutman et al., 2005, "International Union of Pharmacology. LIII. Nomenclature and molecular relationships of voltage-gated potassium channels," Pharmacol. Rev., vol. 57(4):473-508.
Guy W. ECDEU Assessment Manual for Psychopharmacology—Revised (DHEW Publ No. ADM 76-338). US Dept of Health Education & Welfare, Public Heath Service, Div of Exramural Research Programs, 1976: 218-222.
Haghighi et al., 1995, "Effect of 4-aminopyridine in acute spinal cord injury," Surg. Neurol., vol. 43(5):443-447.
Haghighi et al., 1998, "Effect of 4-aminopyridine and single-dose methylprednisolone on functional recovery after a chronic spinal cord injury," Spinal Cord, vol. 36:6-12.
Halter et al., 2000, "Intrathecal administration of 4-aminopyridine in chronic spinal injured patients," Spinal Cord, vol. 38(12):728-732.
Hansebout et al., 1993, "K. 4-Aminopyridine in Chronic Spinal Cord Injury: A Controlled, Double-Blind, Crossover Study in Eight Patients," J. Neurotrauma, 10(1):1-18.
Hapoalim Securities, "Acorda Therapeutics (ACOR )," Nov. 1, 2010 (pp. 1-10).
Hapoalim Securities, "Acorda Therapeutics, (ACOR," Aug. 4, 2010 (pp. 1-7).
Hassan et al.,1980, "Double-blind comparison of single doses of DS103-282, baclofen and placebo for suppression of spasticity," J. of Neurology Neurosurgery and Psychiatry, vol. 43:1132-1136.
Hauser et al., 1993, "Incidence of epilepsy and unprovoked seizures in Rochester, Minnesota: 1935-1984," Epilepsia, 34(3):453-468.
Hayes et al., 1991, "Effects of intravenous 4-aminopyridine on neurological function in chronic spinal cord injured patients: preliminary observations," Proc. IBRO World Conference Neurosci., p. 345.
Hayes et al., 1993, "Preclinical Trial of 4-Aminopyridine in Patients with Chronic Spinal Cord Injury," Paraplegia, vol. 31:216-224.
Hayes et al., 1994, "4-Aminopyridine sensitive neurologic deficits in patients with spinal cord injury," J. Neurotrauma, 11(4):433-446.
Hayes et al., 2001, "Open-label, multiple-dose study to determine the pharmacokinetics and safety of fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic spinal cord injury," Presented to the American Neurological Association, Chicago, IL, Sep. 30-Oct. 3, 2001 (Poster).
Hayes et al., 2001, "Open-label, multiple-dose study to determine the pharmacokinetics and safety of fampridine-SR in patients with chronic spinal cord injury," Annals of Neurology, vol. 50(31):S62 (201).
Hayes et al., 2001, "Pharmacokinetics and safety of multiple oral doses of fampridine-SR (sustained-release 4-aminopyridine) tablets in patients with chronic spinal cord injury," Presented to the Academy of Physical Medicine and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Hayes et al., 2003, "Pharmacokinetics of an Immediate-Release Oral Formulation of Fampridine (4-Aminopyridine) in Normal Subjects and Patients with Spinal Cord Injury," J. Clin. Pharmacol., vol. 43:379-385.
Hayes et al., 2003, "Pharmacokinetics studiesof single and multiple oral doses of fampridine-SR (sustained-release 4-Aminopyridine) in patients with chronic spinal cord injury," Clinical Neuropharmacology, 26(4):185-192.
Hayes et al., 2004, "Pharmacokinetic studies of single and multiple oral doses of fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic spinal cord injury," Arch. Phys. Med. Rehabil., vol. 85:29-34.
Hayes, 2004, "The Use of 4-Aminopyridine (Fampridine) in Demyelinating Disorders," CNS Drug Reviews, vol. 10(4):295-316.
Higuchi et al., 1975, "Pro-drugs as novel delivery systems," vol. 14 of the ACS Symposium Series (TOC).
Hobart et al., 2003, "Measuring the impact of MS on walking ability: the 12-Item MS Walking Scale (MSWS-12)," J. Neurology, vol. 60:31-36.
Hoogervorst et al., 2004, "The patient's perception of a (reliable) change in the Multiple Sclerosis Functional Composite," Multi. Scler., vol. 10:55-60.
Illis et al., 1983, "Spinal cord stimulation in the United Kingdom (Review)," J. Neurol. Neurosurg. Psychiat., 46:299-304.
International Preliminary Report on Patentability with Written Opinion from International Application No. PCT/US04/08101, issued Sep. 23, 2005.
International Preliminary Report on Patentability with Written Opinion from International Application No. PCT/US05/012427, issued Oct. 11, 2006.
International Search Report from International Application No. PCT/US04/08101, mailed Aug. 26, 2004.
International Search Report from International Application No. PCT/US05/12427, mailed Dec. 28, 2005.
International Search Report from International Application No. PCT/US09/56476, mailed Nov. 10, 2009.
International Search Report from International Application No. PCT/US10/23969, mailed Apr. 1, 2010.
International Search Report from International Application No. PCT/US10/23970, mailed Apr. 5, 2010.
Iriarte et al., 2000, "Modalities of fatigue in multiple sclerosis: correlation with clinical and biological factors," Mult. Scler., vol. 6:124-130.
Isoda et al., 2003, "The effects of 4-aminopyridine on cardiac repolarization, PR interval, and heart rate in patients with spinal cord injury," Pharmacotherapy, vol. 23:133-136.
J.P. Morgan, "Acorda Therapeutics," Aug. 3, 2010 (p. 1-7).
Jack et al., 1981, "Modifications to synaptic transmission at group 1a synapses on cat spinal motoneurones by 4-aminopyridine," J. Physiol., 321:111-126.
Jackson et al., 2002, "Twice-daily fampridine-SR (sustained-release 4-aminopyridine): safety and early efficacy experience in 151 patients with chronic motor-incomplete spinal cord injury," 127th Annual Meeting American Neurological Association, NY, NY Oct. 13-16, 2002 (Poster).
Jacobs et al., 1990, "Foot salvage and improvement of microsvascular blood flow as a result of epidural spinal cord electrical stimulation," J. Vasc. Surg., 12(3):354-360.
Jankowska et al., 1977, "Effects of 4-aminopyridine on transmission in excitatory and inhibitory synapses in the spinal cord," Brain Res., 136:387-392.
Jankowska et al., 1982, "Effects of 4-aminopyridine on synaptic transmission in the cat spinal cord," Brain Res., 240:117-129.
Jellinger, 1976, "Neuropathology of cord injuries," Handbook of Clinical Neurology, vol. 25, Part I, Injuries of the Spine and Spinal Cord. Vinken et al. eds., North-Holland: Amsterdan, 1976, pp. 43-121.
Jones et al., 1983, "Effects of 4-Aminopyridine in Patients with Multiple Sclerosis," J. Neurol Sci., vol. 60:353-362.
Josephson et al., 1984, "Early outward current in rat single ventricular cells," Circ. Res., 54:157-162.
Juarez et al., 2001, "Influence of admixed carboxymethylcellulose on release of 4-aminopyridine from hydroxypropyl methylcellulose matrix tablets," Intl. J. of Pharmaceutics, 216:115-125.
Judge et al., 1999, "Inactivation gating and 4-AP sensitivity in human brain Kv1.4 potassium channel," Brain Research, vol. 831:43-54.
Judge et al., 2002, Determinants of 4-Aminopyridine Sensitivity in a Human Brain Kv1.4K+ Channel: Phenylalanine Substitutions in Leucine Heptad Repeat Region Stabilize Channel Closed State, Mol. Pharmacol., vol. 61:913-920.
Kachuck, 2009, "Sustained release oral fampridine in the treatment of multiple sclerosis," Expert Opinion, vol. 10(12):12:2025-2035.
Kakulas et al., 1969, "A correlative clinico-pathologic study of spinal cord injury," Proc. Aust. Assoc. Neurologists, 6:123-132.
Kakulas et al., 1990, "The neuropathology of pain and abnormal sensations in human spinal cord injury derived from the clinicopathological data base at the Royal Perth Hospital," Recent

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

(56) **References Cited**

OTHER PUBLICATIONS

Achievements in Restorative Neurology, 3: Altered Sensation and Pain, Dimitrijevic et al eds., Karger:Basel, pp. 37-41.
Kakulas, 1984, "Pathology of spinal injuries," Cent. Nerv. Syst. Trauma, 192):117-129.
Kalla et al., 2004, "4-aminopyridine improves downbeat nystagmus, smooth pursuit, and VOR gain," Neurology, 62(7):1228-1229.
Katz et al., 2001, "Pharmacokinetics and safety of single oral doses of fampridine (immediate-release 4-aminopyridine) capsules in health volunteers," Presented to the American Academy of Physical and Rehabilitation, New Orleans, LA, Sep. 13-16, 2001 (Poster).
Katz et al., 2002, "Pharmacokinetics and excretion of a single oral dose of 14c-labeled fampridine (4-aminopyridine) in healthy volunteers," 1st Joint Mtg of the American Spinal Injury Association and the Intl. Medical Society of Paraplegia, Vancouver, Canada, May 3-6, 2002 (Poster).
Kaufman et al., 2000, "The significant change for the timed 25-foot walk in the Multiple Sclerosis Functional Composite," Mult. Scler., 5:286-290.
Kirchhoff et al., 1992, "Excitation of cutaneous sensory nerve endings in the rat by 4-aminopyridine and tetraethylammonium," J. Neurophysiol., 67(1):125-131.
Kobelt et al. 2006, Costs and quality of life in multiple sclerosis: a cross-sectional study in the United States, Neurology, vol. 66:1696-1702.
Kocsis et al., 1983, "Effects of extracellular potassium concentration on the excitability of the parallel fibers of the rat cerebellum," J. Physiol. (Lond) 334:225-244.
Kocsis et al., 1986, "Different effects of 4-aminopyridine on sensory and motor fibers: pathogenesis of paresthesias," Neurology 36:117-120.
Kos et al., 2004, "Letter to the Editor," Multiple Sclerosis, Jun. 1, 2004, 10/3 (337-338).
Kostka et al., 1992, "Column liquid chromatographic determination of 4-aminopyridine in plasma and urine after derivatization with benzoyl chloride," Clin. Biochem., 25:144.
Kovacs et al., 2003, "Seizure, neurotransmitter release, and gene expression are closely related in the striatum of 4-aminopyridine-treated rats," Epilepsy Res., vol. 55(1-2):117-129.
Kurtzke et al., 1983, "Rating neurologic impairment in multiple sclerosis: an expanded disability status scale (EDSS)," Neurology, 33:1444-1452.
Lammertse et al., 2002, "Clinical evaluation of oral fampridine-SR (sustained-release 4-aminopyridine) in subjects with chronic motor-incomplete spinal cord injury," 54th Annual Meeting of the American Academy of Neurology, Denver, CO, Apr. 13-20, 2002 (Poster).
Lammertse et al., 2002, "Evaluation fampridine-SR in patients with chronic spinal cord injury," 48th Conference of the Paraplegia Society, Las Vegas, NV, Sep. 3-5, 2002 (Poster).
Lammertse et al., 2002, "Clinical evaluation of oral fampridine-SR (sustained-release 4-aminopyridine) in patients with chronic motor-incomplete spinal cord injury," Neurology, vol. 58 (7 Suppl. 3): A33 (P01.035).
Landete et al., 1998, "Low doses of 4-aminopyridine in the treatment of multiple sclerosis," Multiple Sclerosis, 4:386 (Abstract P3047).
Lazard Capital Markets, "Acorda Therapeutics (ACOR)," Aug. 24, 2010 (pp. 1-15).
Lazard Capital Markets, "Acorda Therapeutics," Aug. 3, 2010 (pp. 1-3).
Leary et al., 2003, "Interferon beta-1a in primary progressing MS—An exploratory, randomized, controlled trial," Neurology, vol. 60:44-51.
Lemeignan et al., 1981, "The ability of 4-aminopyridine and 3,4-diaminopyridine to cross the blood-brain barrier can account for their difference in toxicity," Adv. Biosci., 35:222.
Lemeignan, 1972, "Analysis of the action of 4-aminopyridine on the cat lumbar spinal cord. 1. Modification of the afferent volley, the monosynaptic discharge amplitude and the polysynaptic evoked responses," Neuropharm., 11:551-558.
Liang et al., 2005, "Effects of pelvic nerve neurectomy and estrogen on the M2 muscarinic receptor of the urinary bladder," Chang Gung Med. J., vol. 28:786-793.
Linderoth et al., 1991, "Peripheral vasodilatation after spinal cord stimulation: Animal studies of putative effector mechanisms," Neurosurgery 28(2):187-195.
Llinas et al., 1982, 3- and 4-aminopyridine in synaptic transmission at the squid giant synapses, in: Aminopyridines and similarly acting Drugs: Effects on nerves, muscles and Synapses, Lechat et al. eds., Pergamon Press: Oxford, pp. 69-79.
Loss of mobility found to impact quality of life and emotional and financial health of most people living with multiple sclerosis, National Multiple Sclerosis Society, Mar. 2008, http://www.nationalmssociety.org/news/news-detail/index.aspx??nid=199 (last accessed Nov. 3, 2010).
Lublin et al., 1996, "Defining the clinical course of multiple sclerosis: Result of an international survey," Neurology, vol. 46:907-911.
Lundh et al., 1977, "4-Aminopyridine—A new drug tested in the treatment of Eaton-Lambert syndrome," J. Neuro. Neurosurg. Psych., vol. 40:1109-1112.
Lundh et al., 1979, "Effects of 4-Aminopyridine in Myasthenia Gravis," J. Neuro. Neurosurg. Psychiatry, 42:171-175.
Lundh et al., 1979, "Effects of 4-aminopyridine on statistical parameters of transmitter release at the neuromuscular junction," Acta Pharmacol. Toxicol., 44(5):343-346.
Lundh et al., 1982, "Lack of effect of 4-aminopyridine on choreic movements," J. Neurol. Neurosurg. Psychiatry, vol. 45(3):274-275.
Lundh et al., 1983, "Novel drug of choice in Eaton-Lambert syndrome," J. Neurol. Neurosurg. Psychiatry, vol. 46(7):684-685.
Lundh, 1978, "Effects of 4-aminopyridine on neuromuscular transmission," Brain Research, vol. 158(2):307-318.
Magdalan et al., 2003, "[Successful treatment by 4-aminopyridine of three cases of severe verapamil poisoning]," [Article in Polish] Przegl. Lek., vol. 60(4):271-273 (English translation attached).
Marchand et al., 1991, "The effects of dorsal column stimulation on measures of clinical and experimental pain in man," Pain, 45:249-257.
Martin et al., 2006, "Gait and balance impairment in early multiple sclerosis in the absence of clinical disability," Multiple Sclerosis vol. 12:620-628.
Martinez-Aguirre 1982, "Antagonism of ketamine by 4-aminopyridine and physostigmine," Br. J. Anesth., 54(1):110.
Martinez-Aguirre et al., 1986, "Comparison of midazolam (RO 21/3981) and diazepam as complement of ketamine-air anesthesia in children," Acta Anesth. Belg., vol. 37(1):15-22.
Martinez-Aguirre, 1980, "Antagonism of 4-aminopyridine to ketamine-diazepam anesthesia in children," Acta Anaesthesiol. Belg., 31(4):289-291.
Martinez-Gonzalez et al., 2003, "Effect of varying the restriction degree of 4-aminopyridine release from HPMC matrices on the mechanism controlling the process," Int. J. Pharmaceutics, vol. 257:253-264.
Martinez-Gonzalez et al., 2003, "Influence of enteric citric acid on the release profile of 4-aminopyridine from HPMC matrix tablets," Intl. J. of Pharmaceutics, vol. 251:183-193.
Martinez-Gonzalez et al., 2004, "Influence of enteric-coated lactose on the release profile of 4-aminopyridine from HPMC matrix tablets," Pharmaceutical Development and Technology, vol. 9(2):145-153.
Matthews, 1998, "Symptoms and signs of multiple sclerosis," Chap. 5, in McAlpine's Multiple Sclerosis, 3d ed., Compston et al., (eds), Churchill Livingstone, at pp. 145-190; McDonald & Compston.
Matthews, B., 1998, "Differential diagnosis of multiple sclerosis and related disorders," Chap. 4 in McApline's Multiple Sclerosis, Compston et al. (eds.), Churchill Livingstone at pp. 228-243.
McDonald & Compston, 2005, "The symptoms and signs of multiple sclerosis," Chapter 6, in McAlpine's Multiple Sclerosis, 4th ed., Compston et al., (eds.), Churchill Livingstone Elsevier, at pp. 287-346.
McGuigan et al., 2004, "Confirming the validity and responsiveness of the Multiple Sclerosis Walking Scale-12 (MSWS-12)," Neurology, 62:2103-2105.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

(56) **References Cited**

OTHER PUBLICATIONS

Medical Research Council (MRC), 1976, "Memorandum No. 45—Aids to the examination of the peripheral nervous system, London: Her Majesty's Stationery Office," Printed in London for Her Majesty's Stationary Office, The White Rose Press, Mexborough and London, pp. 1-62.
Meglio et al.,1981, "Spinal cord stimulation and peripheral blood flow: Part 1, in: indications for spinal cord stimulation," Y. Hosebuchi and T. Corbin (eds), Excerpta Medica: Amsterdam, pp. 60-66.
Metz et al., 1998, "Urinary tract infections may trigger relapse in multiple sclerosis," Axone, vol. 19:67-70.
Mihai et al., 1997, "Selection criteria for interferon beta 1-b in multiple sclerosis patients," Neurology, vol. 48 (3 Suppl. 2):A348 (S48. 005).
Miller et al., 1979, "4-Aminopyridine Potentiates Neostigmine and Pyridostigmine in Man," Anesthesiology, vol. 50:416-420.
Mitsov, 1988, "Analgesic activity of pimadine (4-aminopyridine)," Jul.-Aug. 1988, Russian J. of Pharmacology and Toxology, 51(4):122-125.
Molgo et al., 1977, "Effects of 4-aminopyridine at the frog neuromuscular junction," J. Pharmacol Exp. Ther., vol. 203(3):653-663.
Molgo et al., 1980, "Potency of 3,4-diaminopyridine and 4-aminopyridine on mammalian neuromuscular transmission and the effect of pH changes," Eur. J. Pharmacol., 61(1):25-34.
Molgo, 1982, Effects of aminopyridines on neuromuscular transmission, in Aminopyridines and Similarly Acting Drugs: Effects on Nerves, Muscles and Synapses, Lechat et al. eds., Pergamon Press: Oxford, pp. 95-116.
Moritoki et al., 1978, "Actions of aminopyridines on guinea-pig ileum," Arch. Int. Pharmacodyn. Ther., vol. 232:28-41.
Morning Show Ratings—TvNewser, Ratings of Week of Nov. 1, 2010, http://www.mediabistro.com/tvnewser/category/morning-show-ratings (last accessed Nov. 17, 2010).
MS Hope for a Cure, http://www.mshopeforacure.org/board.php#elissa (last accessed Nov. 17, 2010).
Murray et al., 1981, "Treatment with Oral 4-Aminopyridine in Disorders of Neuromuscular Transmission," Neurology, 31:265-271.
Murray, 2000, "The History of Multiple Sclerosis," Multiple Sclerosis, Diagnosis, Medical Management, and Rehabilitation: Demos Medical Publishing, Inc., pp. 1-32.
Myers, 1990, "Therapy of multiple sclerosis," Neurology and Neurosurgery, vol. 3:208-212.
National Multiple Sclerosis Society homepage on the Internet, http://www.nationalmssociety.org/index.aspx (last accessed Nov. 2, 2010).
National Multiple Sclerosis Society, "FSS and EDSS," http://www.nationalmssociety.org/for-professionals/reearchers/clinical-study-measures/fss-and-edss/index.aspx (last accessed Nov. 17, 2010).
Ng et al., 1987, "Studies on the calcium dependence of human NK cell killing," Biochem. Pharmacol., 36:3943-3949.
Nicoletti et al., 2003, "Epilepsy and multiple sclerosis in Sicily: a population-based study," Epilepsia, 44(11):1445-1448.
Noble et al., 1989, "Correlative analyses of lesion development and functional status after graded spinal cord contusive injuries in the rat," Exp. Neurol. 103:34-40.
Nockles et al., 1992, "Pharmacologic strategies in the treatment of experimental spinal cord injury," J. Neurotrauma, vol. 9, Supplement 1:S211-S217.
Noordenbos et al., 1976, "Diverse sensory functions with an almost totally divided spinal cord. A case of spinal cord transaction with preservation of part of one anterolateral quadrant," Pain 2:185-195.
Noseworthy, 2003, "Multiple Sclerosis and Related Conditions," Chap.97, in Neurological Therapeutics: Principle and Practices, vol. 1, Noseworthy, JH (ed.) pp. 1107-1131.
Notice of Allowance mailed Apr. 18, 2011 from the United States Patent and Trademark Office for U.S. Appl. No. 11/010,828, filed Dec. 13, 2004.
Notice of Allowance mailed Aug. Aug. 9, 2011 from the United States Patent and Trademark Office for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Novantrone® (interferon beta-1b), EMD Serono Inc., Prescribing Information, Sep. 2009. http://www.novantrone.com/assets/pdf/novantrone_prescribing_info.pdf (last accessed Nov. 3, 2010) (pp. 1-34).
Ochoa, 1982, "Pain in local nerve lesions," Abnormal Nerves and Muscles as Impulse Generators, Culp et al. eds., Oxford University Press: New York, pp. 568-587.
Office Action mailed Apr. 14, 2010 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Aug. 12, 2011 for U.S. Appl. No. 12/824,140, filed Jun. 25, 2010.
Office Action mailed Aug. 16, 2011 for U.S. Appl. No. 12/824,141, filed Jun. 25, 2010.
Office Action mailed Aug. 16, 2011 for U.S. Appl. No. 12/824,135, filed Jun. 25, 2010.
Office Action mailed Aug. 22, 2011 for U.S. Appl. No. 12/824,136, filed Jun. 25, 2010.
Office Action mailed Aug. 30, 2011 for U.S. Appl. No. 12/824,133, filed Jun. 25, 2010.
Office Action mailed Jan. 23, 2008 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Jun. 10, 2009 for U.S. Appl. No. 11/010,828, filed Dec. 13, 2004.
Office Action mailed Jun. 23, 2009 for U.S. Appl. No. 11/102/559, filed Apr. 8, 2005.
Office Action mailed Jun. 6, 2008 for U.S. Appl. No. 11/010,828, filed Dec. 13, 2004.
Office Action mailed May 25, 2010 for U.S. Appl. No. 11/010,828, filed Dec. 13, 2004.
Office Action mailed Oct. 29, 2008 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Sep. 13, 2011 for U.S. Appl. No. 12/626,001, filed Nov. 25, 2009.
Office Action mailed Sep. 16, 2011 for U.S. Appl. No. 12/626,036, filed Nov. 25, 2009.
Office Action mailed Sep. 16, 2011 for U.S. Appl. No. 12/626,085, filed Nov. 25, 2009.
Office Action mailed Sep. 17, 2010 for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Office Action mailed Sep. 8, 2011 for U.S. Appl. No. 12/824,137, filed Jun. 25, 2010.
Ogawa et al., 1986, "Combined mutagenicity of cobalt(II) salt and heteroaromatic compounds in *Salmonella typhimurium*," Mutation Research, 172:97-104.
Oh et al., 2003, "Inhibitory effects of potassium channel blockers on carbachol-induced contraction in rat detrusor muscle," J. Korean Med. Sci., 18:701-706.
Olaffson et al., 1999, "Risk of epilepsy in patients with multiple sclerosis: a population-based study in Iceland," Epilepsia, vol. 40(6):745-747.
Olafsson et al., 1996, "Incidence of epilepsy in rural Iceland: a population-based study," Epilepsia, 37(19):951-955.
Oosterhuis HJ. 1996, "Severe 4-aminopyridine intoxication in a body-builder. Letter to the Editor," Ned. Tijdschr. Geneeeskd., 140(8):452 [Translation provided].
Oremus et al., 2000, "Review of outcome measurement instruments in Alzheimer's Disease drug trials: psychometric properties of global scales," J. Geriatr. Psychiatry Neurol., vol. 13: 197-205.
Pant et al., 1982, "Calcium dependent 4 aminopyridine stimulation of protein phosphorylation in squid loligo-pealei optic lobe synaptosomes," Cellular and Molecular Neurobiology, vol. 3(3):223-238.
Paskov et al., 1973, "New Anti-Curare and Analeptic Drug, Pimadin, and its Use in Anesthesia," Eksp. Khir. Anestheziol., 18(4):48-52 (English translation provided).
Pearson, et al., 2004, "Quantification of walking mobility in neurological disorders," Q. J. Med. New Series, vol. 97:463-475.
Pena et al., 2000, "Seizures and neurodegeneration induced by 4-aminopyridine in rat hippocampus in vivo: role of glutamate- and GABA-mediated neurotransmission and of ion channels," Neuroscience, vol. 101(3):547-561.
Pickett et al., 1996, "Atypical presentation of 4-aminopyridine overdose," Ann. Emerg. Med., 27:382-385.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

(56) **References Cited**

OTHER PUBLICATIONS


Pickett et al., 1996, "Fampridine Overdose," Reactions, vol. 30(594):8.
Piper Jaffray, "Acorda Therapeutics," Nov. 2, 2010 (pp. 1-8).
Pogue et al., 1998, "Overcoming the limitations of current meta-analysis of randomized controlled trials," Lancet, vol. 351: 47-52.
Polman et al., 1990, "4-Aminopyridine in Multiple Sclerosis," Ann. Neurol., vol. 28(4):589.
Polman et al., 1994, "4-Aminopyridine Is Superior to 3,4-Diaminopyridine in the Treatment of Patients With Multiple Sclerosis, "Arch. Neurol., vol. 51:1136-1139.
Polman et al., 1994, "4-Aminopyridine in the Treatment of Patients With Multiple Sclerosis," Arch. Neurol., vol. 51:292-296.
Poser et al., 2003, "Epilepsy and multiple sclerosis," Epilepsy & Behavior, vol. 4:6-12.
Potter et al., 1993, "Effects of intravenous 4-aminopyridine on central conduction in persons with incomplete spinal cord injury," Clinical and Investigative Medicine, vol. 16(4Suppl.):B111 (Abstract 693).
Potter et al., 1998, "Randomized double-blind crossover trial of Fampridine-SR (sustained release 4-aminopyridine) in patients with incomplete spinal cord injury," Neurotrauma, vol. 15(10):837-849.
Potter et al., 1998, "Sustained Improvements in Neurological Function in Spinal Cord Injured Patients Treated with Oral 4-Aminopyridine: Three Cases," Spinal Cord, 36:147-155.
Pratt et al., 1995, "Plasma and cerebrospinal fluid concentrations of 4-aminopyridine following intravenous injection and metered intrathecal delivery in canines," J. Neurotrauma, vol. 12(1):23-39.
Press Release, Sanofi-Aventis (Apr. 29, 2010), http://en.sanofi-aventis.com/press/press_releases/2010/ppc_28189.asp (last visited Nov. 2, 2010).
Prous et al., 1995, "Fampridine: agent for multiple sclerosis," Drugs of the Future, vol. 20:142-143.
Qiao et al., 1997, "Effects of 4-aminopyridine on motor-evoked potentials in patients with spinal cord injury," J. Neurotrauma, vol. 14(3):135-149.
Rebif® (interferon beta-1a), EMD Serono Inc. and Pfizer Inc., Prescribing Information, Sep. 2009. http://www.emdserono.com/cmg.emdserono_us/en/images/rebif_tcm115_19765.pdf (last accessed Nov. 3, 2010).
Riggs JE, 1982, "Pharmacologic enhancement of neuromuscular transmission in myasthenia gravis," Clin. Neuropharmacol., vol. 5(3):277-292.
Roche, E.B. 1987, "Bioversible carriers in drug designs," American Pharmaceutical Association and Pergamon Press, New York (TOC).
Romani et al., 2004, "Fatigue in multiple sclerosis: multidimensional assessment and response to symptomatic treatment," Mult. Scler., 10:462-468.
Ropper and Brown (eds), 2005, "Epilepsy and Other Seizure Disorders," Adams and Victor's Principles of Neurology, Eighth Edition. Blacklick, OH: McGraw-Hill Professional, Chapter 16, pp. 271-301.
Rossini et al., 1996, 4-Aminopyridine treatment in chronic progressive multiple sclerosis: a 6 month double-blind placebo-controlled, crossover study by AMIT (American Italian Study). Europ. J. of Neurol., vol. 3 (Suppl 5):91, Abstract P208.
Rossini et al., 2001, "Fatigue in progressive multiple sclerosis: results of a randomized, double-blind, placebo-controlled, crossover trial of oral 4-aminopyridine," Multiple Sclerosis, vol. 7:354-358.
Ruddick et al., 1999, "Selecting relapsing remitting multiple sclerosis patients for treatment: The case of early treatment," J. of Neuroimmunology, vol. 98(1):22-28.
Rupp et al., 1983, "Pharmacokinetics and pharmacodynamics of 4-aminopyridine in anesthetized dogs," J. Pharmacol. Exp. Ther., vol. 225(2):351-354.
Rutecki et al., 1987, "4-Aminopyridine produces epileptiform activity in hippocampus and enhances synaptic excitation and inhibition," J. Neurophysiol., vol. 57(6):1911-1924.
Saade et al., 1982, "Cutaneous receptive field alterations induced by 4-aminopyridine," Brain Res. 232:177-180.
Saade et al., 1985, "Effects of 4-aminopyridine, GABA and bicuculline on cutaneous receptive fields of cat dorsal horn neurons," Brain Res. 344:356-359.
Sadovnick et al., 1991, "Cause of death in patients attending multiple sclerosis clinics," Neurology, vol. 41:1193-1196.
Sander, 2003, "The epidemiology of epilepsy revisited," Curr. Opin. Neurol., vol. 16(2):165-170.
Sanders et al., 1980, "Eaton-Lambert syndrome: a clinical and electrophysiological study of a patient treated with 4-aminopyridine," J. Neurol. Neurosurg. Psychiatry, vol. 43(11):978-985.
Sandyk, 1996, "Weak electromagnetic fields potentiate the effects of 4-aminopyridine in multiple sclerosis," Intern. J. Neuroscience, vol. 85:125-129.
Scheinberg et al., 1980, "Multiple Sclerosis: Earning a living," NY State J. Med., 1395-1400.
Schneider et al., 1997, "Validity and reliability of the Alzheimer's Disease Cooperative Study—Clinical Global Impression of Change," Alzh. Disease Assoc. Dis., vol. 11(Suppl2):522-532.
Schwid et al., 1997, "Quantitative assessment of sustained-release 4-aminopyridine for symptomatic treatment of multiple sclerosis," Neurology, vol. 48:817-821.
Schwid et al., 1997, "Autoimmune hyperthyroidism in patients with multiple sclerosis treated with interferon beta 1-b," Archives of Neurology, vol. 57:1169-1170.
Schwid et al., 1997, "The measurement of ambulatory impairment in multiple sclerosis," Neurology, vol. 49:1419-1424.
Schwid et al., 1998, "Quantitative measures of motor fatigue in multiple sclerosis: Features of motor dysfunction distinct from weakness," Neurology, vol. 50 (4 Suppl. 4):A210-A211 (PO4.036).
Schwid et al., 2000, "Are quantitative functional measures more sensitive to worsening MS than traditional measures?" Neurology, vol. 55(12):1901-1903.
Schwid et al., 2000, "Subjective fatigue is associated with impaired central motor conduction in MS patients, but motor fatigue is not," Neurology, vol. 54 (7 Supp. 3):A56 (P01.085).
Schwid et al., 2001, "The cost of delaying treatment in multiple sclerosis, what is lost is not regained," Neurology, vol. 56(12):1620.
Schwid et al., 2002, "Quantitative functional measures in MS: What is a reliable change?" Neurology, vol. 58:1294-1296.
Schwid et al., 2004, "Cognitive status after 10 years of prospective evaluation in patients with relapsing multiple sclerosis," Multiple Sclerosis, vol. 10(2):5123 (P141).
Segal et al., 1991, "Decreased systemic clearance of lorzepam in humans with spinal cord injury," J. Clin. Pharmcol. 31:651-656.
Segal et al., 1997, "4-Aminopyridine improves pulmonary function in quadriplegic humans with longstanding spinal cord injury," Pharmacotherapy, vol. 17(3):415-423.
Segal et al., 1998, "4-Aminopyridine alters gait characteristics and enhances locomotion in spinal cord injured humans," J. Spinal Cord Med., vol. 21(3):200-204.
Segal et al., 1999, "Safety and efficacy of 4-aminopyridine in humans with spinal cord injury: a long term, controlled trial," Phamacother., vol. 19(6):713-723.
Segal et al., 2000, "Absorption characteristics of sustained-release 4-aminopyridine (Fampridine SR) in patients with chronic spinal cord injury," J. Clin. Pharmacol., vol. 40(4):402-409.
Segal et al., 2002, "4-aminopyridine influences heart rate variability in long-standing spinal cord injury," Am. J. Ther., vol. 9(1):29-33.
Semba et al., 1985, "4-aminopyridine induces expansion of cutaneous receptive fields of dorsal horn cells," Brain Res. 343:398-402.
Sharrack et al., 1999, "The Guy's Neurological Disability Scale (GNDS): a new disability measure for multiple sclerosis," Mult. Scler., vol. 5:223-233.
Shealy et al., 1967, "Electrical inhibition of pain by stimulation of the dorsal columns: Preliminary clinical report," Anesth. Analg. 46(4):489-491.
Sherratt et al., 1980, "Effects of 4-aminopyridine on normal and demyelinated mammalian nerve fibres," Nature, vol. 283(5747):570-572.
Shi et al, 1996, "Compression injury of mammalian spinal-cord in-vitro and the dynamics of action-potential conduction failure," J. of Neurophysiology, vol. 76(3):1572-1580.


Copy provided by USPTO from the PIRS Image Database on 11/12/2014

(56) **References Cited**

OTHER PUBLICATIONS

Shi et al., 1995, "4-Aminopyridine affects conduction in injured spinal cord axons in vitro at clinically relevant concentrations," Society of Neuroscience Abstracts, vol. 21(1-3):1003, (395.3).
Shi et al., 1997, "Conduction block in acute and chronic spinal cord injury: different dose-response characteristics for reversal by 4-aminopyridine," Exp. Neurol., vol. 148:495-501.
Shi et al., 1997, "Differential Effects of Low and High Concentrations of 4-Aminopyridine on Axonal Conduction in Normal and Injured Spinal Cord," Neuroscience, vol. 77(2):553-562.
Shinohara et al., 1982, "Ion-pair high performance liquid chromatographic assay of 4-aminopyridine in serum," J Chrom (Biomed Appl), vol. 230:363-372.
Sia et al., 1979, "Effects of the Analeptic Drug, 4-Aminopyridine, upon Post-operative Respiratory Depression in Patients," Acta Anesth. Belg., vol. 30(Suppl):195-199.
Sia et al., 1981, "4-Aminopyridine reversal of fentanyl-induced respiratory depression in normocapnic and hypercapnic patients," Br. J. Anaesth., vol. 53(4):373-379.
Sia et al., 1981, "Use of 4-aminopyridine to reverse morphine-induced respiratory depression in man," Br. J. Anaesth., vol. 53(8):865-868.
Sia et al., 1982, "An electroencephalographic study of 4-aminopyridine," Anest. Analg., vol. 61(4):354-357.
Siegert et al., 2005, "Depression in multiple sclerosis: a review," J. Neurol. Neurosurg. Psychiatry, vol. 76:469-475.
Smeets et al., 1995, "Severe 4-aminopyridine intoxication in a bodybuilder," Ned. Tijdschr. Geneesdk., vol. 139(51):2667-2668.
Smith et al., 1982, "Spontaneous and evoked electrical discharges from a central demyelinating lesion," J. Neurol. Sci. 55:39-47.
Smith et al., 2000, "Effects of 4-aminopyridine on demyelinated axons, synapses and muscle tension," Brain, vol. 123:171-184.
Smits et al., 1994, "The effect of 4-aminopyridine on cognitive function in patients with multiple sclerosis: A pilot study," Neurology, vol. 44:1701-1705.
Smits et al., 1994, "The effects of 4-aminopyridine on cognitive function in patients with multiple sclerosis: A pilot study," J. of Neurology, vol. 241:S102 (Abstract. 10).
Snyderman N, MD, Nightly News—About Us—msnbc.com, http://www.msnbc.com/id/14894442 (last accessed Nov. 17, 2010).
Sohn et al., 1981, "Pharmacokinetics and side-effects of 4-aminopyridine. 1981," E. Rugheimer, M. Zindler (eds) Proceedings of the Seventh World Congress of Aneasthesiologists, Hamburg, Sep. 14-21, 1980. Amsterdam: Excerpta Medica, 1981; 224-228.
Solari et al., 2003, "Aminopyridines for symptomatic treatment in multiple sclerosis (Cochrane Review)", in: The Cochrane Library, Issue 2, 2003. Oxford: Update Software. (Date of most recent amendment: Jul. 15, 2002; Date of most recent substantive amendment: Jul. 15, 2002; copyright Update Software Ltd.).
Solari et al., 2004, "Aminopyridines for symptomatic treatment in multiple sclerosis." Cochrane Database of Systematic Reviews 2002, Issue 4. (Date edited: Oct. 11, 2004; Date of most recent substantive amendment: Jul. 15, 2002).
Spatt et al., 2001, "Epileptic and non-epileptic seizures in multiple sclerosis," J. Neurol., vol. 248:2-9.
Spyker et al., 1980, "Poisoning with 4-Aminopyridine: Report of Three Cases," Clinical Toxicology, vol. 16(4):487-497.
Stefoski et al., 1987, "4-Aminopyridine Improves Clinical Signs in Multiple Sclerosis," Ann. Neurol, vol. 21:71-77.
Stefoski et al., 1991, "4-Aminopyridine in multiple sclerosis: Prolonged administration," Neurology, vol. 41:1344-1348.
Stenager et al., 1992, "Suicide and multiple sclerosis: an epidemiological investigation," J. of Neurol. Neurosurg. Psychiatry, vol. 55:542-545.
Stork et al., 1994, "Characterization of 4-aminopyridine in overdose," Clin. Toxicol., vol. 32(5):583-587.
Stoyanov et al., 1976, "Clinical Electromyomechanographic and Electromyographic Studies in Decurarization with Pymadine," Anaesth. Resus Intern. Ther., vol. 4(2):139-142.
Striano et al., 2003, "Epileptic seizures in multiple sclerosis: clinical and EEG correlations," Neurol. Sci., vol. 24:322-328.
Strupp et al., 2004, "Treatment of episodic ataxia type 2 with the potassium channel blocker 4-aminopyridine," Neurology, vol. 62(9):1623-1625.
Stuhmer et al., 1989, "Molecular basis of functional diversity of voltage-gated potassium channels in mammalian brain," EMBO J., vol. 8(11):3235-3244.
Sugimura et al., 1982, "Metabolic aspects of the comutagenic action of norharman," Adv. Exper. Med. Biology, vol. 136:1011-1025.
Swingler et al., 1992, "The morbidity of multiple sclerosis," Q. J. Med., New Series, vol. 83(300):325-337.
Tapia et al., 1985, "Mechanism of the calcium-dependent stimulation of transmitter relealse by 4-aminopyridine in synaptosomes," Brain Res. 361:373-382.
Targ et al., 1985, "4-Aminopyridine leads to restoration of conduction in demyelinated rat sciatic nerve," Brain Res., vol. 328(2):358-361.
Targ et al., 1986, "Action potential characteristics of demyelinated rat sciatic nerve following application of 4-aminopyridine," Brain Res. 363:1-9.
Tasker, 1990, "Pain resulting from central nervous system pathology (Central Pain)," The Management of Pain, vol. 1, Bonica ed., Lee and Febiger:Philadelphia, pp. 264-283.
Ter Wee et al., 1985, "4-Aminopyridine and haemodialysis in the treatment of verapamil intoxication," Human Toxicol., vol. 4(3):327-329.
Thesleff, 1980, "Aminopyridines and synaptic transmission," Neuroscience 5:1413-1419.
Tim et al., 1998, "Lambert-Eaton myasthenic syndrome (LEMS): clinical and electrodiagnostic features and response to therapy in 59 patients," Ann. NY Acad. Sci., vol. 841:823-826.
Tim et al., 2000, "Lambert-Eaton myasthenic syndrome: electrodiagnostic fmdings and response to treatment," Neurology, vol. 54:2176-2178.
Truyen et al., 1996, "Magnetic resonance imaging of epilepsy in multiple sclerosis: a case control study. Implications for treatment trials with 4-aminopyridine," Mult. Scler., vol. 1(4):213-217.
Tysabri® (natalizumab), Biogen Idec Inc. And Elan Pharmaceuticals Inc., Prescribing Information, Jul. 2010. http://www.tysabri.com/en_US/tysb/site/pdfs/TYSABRI-pi.pdf (last accessed Nov. 3, 2010) (pp. 1-25).
Uges et al., 1981, "4-aminopyridine; analysis of the substance and a method for the preparation of a solution for injection in man," Pharm Acta Hely. 56(6):158-162.
Uges et al., 1981, "Liquid-chromatographic determination of 4-aminopyridine in serum, saliva, and urine," Clinical Chemistry, vol. 27(3):437-440.
Uges et al., 1982, "4-Aminopyridine kinetics," Clin. Pharmacol. Ther., vol. 31(5):587-593.
Uges et al., 1982, "4-aminopyridine Tablets; a Method for the Preparation in-vitro and in-vivo Studies," Pham. Acta. Helv. 57, Nr. 4, 122-128.
Uges et al., 1984, "Treatment of 4-aminopyridine-poisoning after oral overdoses; a proposal," Pharm. Acta Helv., vol. 59:172-176.
US Food and Drug Administration, for Consumers, Fast Track, Accelerated Approval and Priority Review, http://fda.gov/forconsumers/byaudience/forpatientadvocates/speedingaccesstoimportantnewtherapies/ucm128291.htm (last accessed Nov. 12, 2010).
van der Bruggen et al., 2001, "Randomized trial of 4-aminopyridine in patients with chronic incomplete spinal cord injury," J. Neurol., vol. 248(8):665-671.
van der Horst et al., 1992, "Determination of 4-aminopyridine in serum by solid-phase extraction and high-performance liquid chromatography," J. of Chromatography, vol. 574:166-169.
van Diemen et al., 1992, "Increased visual impairment after exercise (Uhthoff s phenomenon) in multiple sclerosis: therapeutic possibilities," Eur. Neurol., vol. 32(4):231-234.
van Diemen et al., 1992, "The Effect of 4-Aminopyridine on Clinical Signs in Multiple Sclerosis: A Randomized, Placebo-Controlled, Double-Blind, Cross-over Study," Ann. Neurol., vol. 32(2):123-130.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

(56) **References Cited**

OTHER PUBLICATIONS

van Diemen et al., 1993, "4-Aminopyridine in Patients with Multiple Sclerosis: Dosage and Serum Level Related to Efficacy and Safety," Clin. Neuropharmacol., vol. 16(3):195-204.
van Diemen et al., 1993, "4-Aminopyridine induces functional improvement in multiple sclerosis patients: a neurophysiological study," J. of Neurological Sciences, vol. 116:220-226.
Van Heeringen, 2003, "Understanding the suicidal brain," Br. J. Psychiatry, vol. 184:282-284.
Velez et al., 2003, "Opisthotonic posturing with neuromuscular irritability attributable to 4-aminopyridine ingestion by a healthy pediatric patient," Pediatrics, vol. 111:e82-e84.
Voskuyl et al., 1985, "Spontaneous epileptiform discharges in hippocampal slices induced by 4-aminopyridine," Brain Research, vol. 342(1):54-66.
Wagoner et al., 1990, "Aminopyridines block an inactivating potassium current having slow recovery kinetic," Biophys. J. 58:1481-1489.
Wakabayashi et al., 1982, "Comutagneic effect of norharman with aminopyridine derivatives," Mutation Research, vol. 105:205-210.
Walker, 2002, "A. Common Statistical Methods for Clinical Research with SAS® Examples," Second Edition, 2002, Cary, NC: SAS Institute Inc., p. 32.
Waxman et al., 1984, "Impulse conduction in inhomogeneous axons: Effects of variation in voltage-sensitive Ionic conductances of invasion of demyelinated axon segments and preterminal fibers," Brain Res. 294:111-122.
Waxman et al., 1985, "Ligature-induced injury in peripheral nerve: Electrophysiological observations on changes in action potential characteristics following blockade of potassium conductance," Muscl. Nerve 8:85-92.
Waxman et al., 1993, "Molecular dissection of the myelinated axon," Ann. Neurol., vol. 33(2):121-136.
Wesseling et al., 1984, "Effects of 4-Aminopyridine in Elderly Patients with Alzheimer's Disease." New England J. of Medicine, vol. 310(15):988-989.
Wirtavuori et al., 1984, "Antagonism of d-tubocurarine-induced neuromuscular blockade with a mixture of 4-aminopyridine and neostigmine in man," Can. Anaesth. Soc. J., vol. 31(6):624-630.
Wolfe et al., 2001, "Effects of 4-aminopyridine on motor evoked potentials in patients with spinal cord injury: a double-blinded, placebo-controlled crossover trial," J. Neurotrauma., vol. 18(8):757-771.
Wolinsky et al., 2004, "The PROMiSe trial: baseline data review and progress report," Multiple Sclerosis, vol. 10:S65-S72.
Wolinsky et al., 2007, "Glatiramer acetate in primary progressive multiple sclerosis: results of a multinational, multicenter, double-blind, placebo-controlled trial," Ann Neurol., vol. 61:14-24.
Xu et al., 1992, "Chronic pain-related syndrome in rats after ischemic spinal cord lesion: a possible animal model for pain in patients with spinal cord injury," Pain 48:279-290.
Yeh et al., 1976, "Dynamics of aminopyridine block of potassium channels in squid axon membrane," J. Gen. Physiol. 68:519-535.
Yeh et al., 1976, "Interactions of aminopyridines with potassium channels of squid axon membranes," Biophys. J. 16:77-81.
Zorzon et al., 2001, "Depression and anxiety in multiple sclerosis. A clinical and MRI study in 95 subjects," J. Neurol., vol. 248:416-421.
Fampridine Monograph, 1998, "Fampridine Neurelan(R) Agent for Multiple Sclerosis," *Drugs Fut.* 23(2):218-219.
Notice of Allowance mailed Apr. 26, 2012 from the United States Patent and Trademark Office for U.S. Appl. No. 11/102,559, filed Apr. 8, 2005.
Opposition to EP 1732548 B1 by neuraxpharm Arzneimittel GmbH, filed Mar. 8. 2012 (with English Translation).
Opposition to EP 1732548 B1 by Synthon B.V., filed Mar. 7, 2012.
U.S. Appl. No. 13/829,221, filed Mar. 14, 2013, Blight et al., With Preliminary Amendment Filed Mar. 14, 2013.
U.S. Appl. No. 13/949,889, filed Jul. 24, 2013, Blight et al., with Preliminary Amendment Filed Jul. 24, 2013.
U.S. Appl. No. 14/025,248, filed Sep. 12, 2013, Blight et al., with Preliminary Amendment Filed Sep. 20, 2013.
Form S-1 as filed by Acorda Therapeutics, Inc. with the Securities and Exchange Commission on Sep. 26, 2003.
Office Action mailed Sep. 4, 2013 for U.S. Appl. No. 13/949,889, filed Jul. 24, 2013.
Opposition of EP 1732548 B1, Communication from European Patent Office dated Jun. 14, 2013.
Opposition of EP 1732548 B1, Submission by Synthon B.V. dated Sep. 9, 2013.
Opposition of EP 1732548 B1, Submission by neuraxpharm Arzneimittel GmbH dated Sep. 11, 2013 with Expert Opinion of Dr. Loebbert (with English translation).
Request for an Administrative Declaration of Invalidation, *Nafar Laboratorios, S.A. de C.V.* vs *Acorda Therapeutics, Inc.*, filed May 22, 2013 at Mexican Institute of Industrial Property (with English translation).
Aulton (Ed.), 2002, "Pharmaceuticals—The Science of Dosage Form Design," Second Edition, Churchill Livingstone, New York, Chapter 19:275-288.
Declaration of Gerrit Voortman dated Dec. 6, 2013 (with Enclosures: Curriculum Vitae of Gerrit Voortman and Marinucci et al., 2007, "The Range Disparity Distribution and Its Application," Proceedings Am. Statistical Ass. Biopharmaceutical Section, Alexandria, VA, Am. Statistical Ass., 433-447).
European Medicines Agency, ICH Topic E4, Dose Response Information to Support Drug Registration, Reference No. CPMP/ICH/378/95, published May 1994.
Fampyra 10 mg prolonged-release tablets—(eMC) (http://www.medicines.org.uk/emc/printfriendlydocument.aspx?documentid=25003; last accessed May 12, 2013).
Form S-1, SEC Accession No. 0001047469-03-031904, filed Sep. 29, 2003.
Interlocutory Decision in Opposition Proceedings dated Dec. 19, 2013 regarding EP 1732548.
Memorandum on "NDA 22250 for Fampridine Sustained Release (Amaya)," Department of Health and Human Services, Public Health Service, Food and Drug Administration (Sep. 16, 2009).
Multiple Sclerosis—PubMed Health (http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001747/; last accessed May 12, 2013).
Opposition to EP 2377536 B1 filed by Actavis Group PTC ehf on Dec. 5, 2013.
Opposition to EP 2377536 B1 filed by neuraxpharm Arzneimittel GmbH on Dec. 6, 2013 (with English translation).
Opposition to EP 2377536 B1 filed by Synthon B.V. on Dec. 6, 2013.
SEC News Digest Archive: 2003 (http://www.see.gov/news/digest/digarchives/digarch2003.html; last accessed Nov. 27, 2013).
SEC News Digest, Issue 2003-186, Sep. 30, 2003 (http://www.sec.gov/news/digest/dig093003.txt; last accessed Nov. 27, 2013).

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




FIG. 1

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




FIG. 2

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




FIG. 3

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




FIG. 4

Copy provided by USPTO from the PIRS Image Database on 11/12/2014




FIG. 5

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

# SUSTAINED RELEASE AMINOPYRIDINE COMPOSITION

## CROSS REFERENCES

This application is a continuation of U.S. patent application Ser. No. 11/010,828, filed Dec. 13, 2004 now U.S. Pat. No. 8,007,826; which claims the benefit of U.S. Provisional Application No. 60/528,760 filed Dec. 11, 2003, U.S. Provisional Application No. 60/560,894 filed Apr. 9, 2004, U.S. Provisional Application No. 60/528,592 filed Dec. 11, 2003, and U.S. Provisional Application No. 60/528,593 filed Dec. 11, 2003, all of which are incorporated herein by reference in their entireties.

## BACKGROUND

This invention relates to a sustained release oral dosage form of an aminopyridine pharmaceutical composition that can be used to treat individuals affected with neurological disorders wherein said pharmaceutical composition maximizes the therapeutic effect, while minimizing adverse side effects.

The sustained release oral dosage form of the present invention may be utilized to treat neurological disorders such as spinal cord injuries, multiple sclerosis, Alzheimer's disease, and ALS. Spinal cord injuries are one of the leading causes of disability in young adults resulting in from partial to complete paralysis of the lower extremities to partial to complete paralysis from the level of spinal injury downward. In the most extreme cases, paralysis is complete from the C-1 cervical vertebra downward. Oftentimes, however, the injury to the spinal cord does not consist of an actual severing of the cord but rather consists of an injury that interferes with signal transmission. Treatment alternatives for promoting transmission along injured nerves of the spinal cord have thus far met with limited success.

Multiple sclerosis (MS) is a degenerative and inflammatory neurological disease which affects the central nervous system, more specifically the myelin sheath. The condition of MS involves demyelination of nerve fibers resulting in short-circuiting of nerve impulses and thus a slowing or blocking of transmission along the nerve fibers, with associated disabling symptoms. Treatment alternatives for promoting transmission along affected nerves have thus far been limited.

Alzheimer's disease is a major cause of dementia in the elderly. It may be described as a progressive pathological deterioration in personality, memory and intellect consistent with a generalized atrophy of corresponding brain centers. The emotional state, behavior, cognitive function and thought processes of sufferers are all adversely affected. A minor degrading in memory which gradually becomes more apparent is the first indication of the onset of the disease. Part of the disease process involves the transmission of nerve signals and, as with MS, treatment alternatives have thus far been limited.

Amyotrophic lateral sclerosis (ALS), commonly referred to as Lou Gehrig's Disease, is a fatal neuromuscular disease characterized by progressive muscle weakness resulting in paralysis. ALS patients often suffer from symptoms including tripping, stumbling, and falling, loss of muscle control and strength in hands and arms, difficulty speaking, swallowing and/or breathing, chronic fatigue, and muscle twitching and/or cramping. ALS is characterized by both upper and lower motor neuron damage. Symptoms of upper motor neuron damage include stiffness, spasticity, muscle twitching (fasciculations), and muscle shaking (clonus). Symptoms of lower motor neuron damage include muscle weakness and muscle atrophy.



Potassium channel blockers are a class of compounds that have been found to improve the conduction of nerve impulses. As a result, they have become the focus of attention in the symptomatic treatment of spinal cord injury, MS and Alzheimer's disease. One sub-class of potassium channel blockers, aminopyridines have shown promise in the treatment of neurological diseases. 4-aminopyridine (4-AP), a mono-aminopyridine known as fampridine, has been found to slow the potassium flow in nerve impulse transmission and, thereby, shows effectiveness in restoring conduction in blocked and demyelinated nerves.

Potassium channel blockers have also been found to improve mental function in patients with Alzheimer's disease. This effect is believed to be related to the potassium channel blocking action which in turn enhances calcium influx into the neuron thus prolonging nerve action potential and increasing transmitter release. Mono- and di-aminopyridines constitute a particular sub-class of potassium channel blockers that have showed promise in the treatment of Alzheimer's disease.

## SUMMARY OF THE INVENTION

The present invention relates to a pharmaceutical composition which contains one or more potassium channel blockers and which can be used in the effective treatment of various diseases, for example, spinal cord injury, multiple sclerosis, Alzheimer's disease, and ALS. Embodiments of the present invention are directed to compositions that include a matrix and a potassium channel blocker. The potassium channel blockers may include aminopyridines, for example, 4-aminopyridine, 3,4-diaminopyridine and the like. The composition provides for sustained-release of the aminopyridine from the matrix to maintain the efficacious and safe plasma level of an aminopyridine. The aminopyridine dispersed in the matrix is capable of providing, upon administration to a patient, a desired release profile. The composition may be used to establish in patients in need of such treatment, a therapeutically effective blood plasma level of the aminopyridine for a period of at least about 6 hours and preferably up to at least 24 hours in the patient in a twice-daily administration while avoiding peaks and troughs in the relapse of the aminopyridine. The composition may include a mono- or di-aminopyridine, preferably 4-AP or 3,4-DAP or a combination thereof, homogeneously dispersed in a rate-controlling polymer matrix, preferably including a hydrophilic polymer like hydroxypropylmethylcellulose (HPMC). The composition of the present invention may also include one or more additional active ingredients and/or one or more pharmaceutically acceptable excipients. These compositions can be used to treat various neurological diseases, for example, spinal cord injury, multiple sclerosis, Alzheimer's disease, and ALS.

Another embodiment of the present invention is a stable pharmaceutical composition which comprises a therapeutically effective amount of an aminopyridine dispersed in a matrix that provides a release profile of the aminopyridine to a patient that has a desired $C_{max}$ to $C_\tau$ ratio. The composition may be used to establish and/or maintain in a patient, a therapeutically effective level of the aminopyridine. Preferably the aminopyridine in the composition is released over time so that a therapeutically effective level of the aminopyridine in the patient can be achieved with twice daily dosing of the composition. In a more preferred embodiment, undesirable spikes or peaks in the release of the aminopyridine are avoided.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

Another embodiment of the present invention is a stable, sustained-release oral dosage formulation of a composition which includes an a therapeutically effective amount of a 4-aminopyridine dispersed in a matrix that provides a release profile of 4-aminopyridine in the blood plasma of the patient extending over a period of at least 6 hours, preferably at least 8 hours, and more preferably, at least about 12 hours. In another embodiment, a stable, sustained-release oral dosage formulation of a composition includes an a therapeutically effective amount of a 4-aminopyridine dispersed in a matrix that provides a therapeutically effective blood plasma level of 4-aminopyridine in the patient extending over about 24 hours.

Preferably, the oral dosage formulation of the composition is a monolithic tablet formed by compression of the pharmaceutical composition of the present invention. In preferred embodiments, the oral dosage formulation includes a compressed tablet of a therapeutically effective amount of 4-aminopyridine dispersed in matrix which includes a hydrophilic polymer such as HPMC. The oral dosage form of the present invention may also include one or more pharmaceutically acceptable excipients.

The dispersion of 4-aminopyridine throughout the matrix imparts chemical and physical stability to the composition while providing a sustained-release profile. This enhanced dosage stability is most notably observed in compositions and dosage forms of the present invention having low concentrations of 4-aminopyridine, and stability is achieved while maintaining the desired controlled-release profile. Specifically, the compressed tablet formulation of the present invention exhibits superior resistance to moisture absorption by ambient humidity and maintains a uniform distribution of the 4-aminopyridine throughout the tablet while providing a release profile of 4-aminopyridine that permits establishment of a therapeutically effective concentration of the potassium channel blocker with once daily or twice daily dosing of the formulation. Preferably the therapeutically effective concentration released by the formulation extends over at least 6 hours, preferably at least 8 hours, and more preferably to at least 12 hours. In addition, the homogeneity of the dosage form renders it amenable to formation by simple and inexpensive manufacturing processes as compared with the multilayered structure of prior sustained-release dosage formulations.

The compositions of the present invention may be used in the treatment of a condition in a patient which includes establishing a therapeutically effective concentration of a potassium channel blocker in the patient in need thereof. The compositions may be used for building up a level and or maintaining a therapeutically effective concentration of an aminopyridine in the patient by twice daily dosing. The dosages of the present compositions can made with a lower concentration of the aminopyridine to facilitate restful periods for the patient during the day. Where desirable, the compositions of the present invention may be formulated to avoid large peaks in initial release of the aminopyridine. The compositions of the present invention when administered to a patient in need thereof provide for the treatment of neurological diseases that are characterized by a degradation of nerve impulse transmission. Preferably, the compositions are a stable, sustained-release tablet of a therapeutically effective amount of a mono- or di-aminopyridine, dispersed in HPMC such that therapeutically effective blood plasma level of the mono- or di-aminopyridine is maintained in the patient for a period of at least 6 hours, preferably at least 8 hours, and more preferably at least about 10-12 hours in a once or twice daily administration.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graph of mean plasma profiles associated with the administration to a patient in both fasted and fed states of a tablet form of 4-AP (fampridine) in accordance with the present invention compared with the mean plasma profile associated with the administration of an immediate release formulation of 4-AP in a gelatin capsule.

FIG. 2 is a graph of mean plasma profiles associated with the administration (fasted state) of a homogeneous dispersion of 4-AP (fampridine) in a matrix in a tablet form of in accordance with the present invention compared with the mean plasma profile associated with the administration of a layered controlled-release capsule and an immediate release capsule formulations of 4-AP.

FIG. 3 is a graph of the mean change in walking sped observed with the administration of a sustained release 4-AP (fampridine) according to the present invention.

FIG. 4 is a graph of the mean change in LEMMT with the administration of a sustained release 4-AP (fampridine) according to the present invention.

FIG. 5 is a graph of the mean change in Ashworth score with the administration of a sustained release 4-AP (fampridine) according to the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

Before the present compositions and methods are described, it is to be understood that this invention is not limited to the particular molecules, compositions, methodologies or protocols described, as these may vary. It is also to be understood that the terminology used in the description is for the purpose of describing the particular versions or embodiments only, and is not intended to limit the scope of the present invention which will be limited only by the appended claims.

The terms used herein have meanings recognized and known to those of skill in the art, however, for convenience and completeness, particular terms and their meanings are set forth below.

It must also be noted that as used herein and in the appended claims, the singular forms "a", "an", and "the" include plural reference unless the context clearly dictates otherwise. Thus, for example, reference to a "spheroid" is a reference to one or more spheroid and equivalents thereof known to those skilled in the art, and so forth. Unless defined otherwise, all technical and scientific terms used herein have the same meanings as commonly understood by one of ordinary skill in the art. Although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of embodiments of the present invention, the preferred methods, devices, and materials are now described. All publications mentioned herein are incorporated by reference. Nothing herein is to be construed as an admission that the invention is not entitled to antedate such disclosure by virtue of prior invention.

"Buccal" refers to the check area in the mouth.

"Local administration" means direct administration by a non-systemic route at or in the vicinity of the site of affliction, disorder, or perceived pain.

The terms "patient" and "subject" mean all animals including humans. Examples of patients or subjects include humans, cows, dogs, cats, goats, sheep, and pigs.

The term "pharmaceutically acceptable salts, esters, amides, and prodrugs" as used herein refers to those carboxylate salts, amino acid addition salts, esters, amides, and prodrugs of the compounds of the present invention which are,

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

within the scope of sound medical judgment, suitable for use in contact with the tissues of patients without undue toxicity, irritation, allergic response, and the like, commensurate with a reasonable benefit/risk ratio, and effective for their intended use, as well as the zwitterionic forms, where possible, of the compounds of the invention.

The term "prodrug" refers to compounds that are rapidly transformed in vivo to yield the parent compounds of the above formula, for example, by hydrolysis in blood. A thorough discussion is provided in T. Higuchi and V. Stella, "Prodrugs as Novel Delivery Systems," Vol. 14 of the A.C.S. Symposium Series, and in Bioreversible Carriers in Drug Design, ed. Edward B. Roche, American Pharmaceutical Association and Pergamon Press, 1987, both of which are incorporated herein by reference.

The term "salts" refers to the relatively non-toxic, inorganic and organic acid addition salts of compounds of the present invention. These salts can be prepared in situ during the final isolation and purification of the compounds or by separately reacting the purified compound in its free base form with a suitable organic or inorganic acid and isolating the salt thus formed. Representative salts include the hydrobromide, hydrochloride, sulfate, bisulfate, nitrate, acetate, oxalate, valerate, oleate, palmitate, stearate, laurate, borate, benzoate, lactate, phosphate, tosylate, citrate, maleate, fumarate, succinate, tartrate, naphthylate mesylate, glucoheptonate, lactobionate and laurylsulphonate salts, and the like. These may include cations based on the alkali and alkaline earth metals, such as sodium, lithium, potassium, calcium, magnesium, and the like, as well as non-toxic ammonium, tetramethylammonium, tetramethylammonium, methylamine, dimethylamine, trimethylamine, triethylamine, ethylamine, and the like. (See, for example, S. M. Barge et al., "Pharmaceutical Salts," J. Pharm. Sci., 1977, 66:1-19 which is incorporated herein by reference.).

"Slow or sustained release formulation" refers to a formulation designed to release a therapeutically effective amount of drug or other active agent such as a polypeptide or a synthetic compound over an extended period of time, with the result being a reduction in the number of treatments necessary to achieve the desired therapeutic effect. In the matter of the present invention, a slow release formulation would decrease the number of treatments necessary to achieve the desired effect in terms of reduction in pain or spasticity, or an improvement in motor or sensory function in patients in need of such therapy, for example, in spinal cord injured patients or in patients suffering from multiple sclerosis, ALS or Alzheimer's disease. The slow or sustained release formulations of the present invention achieve a desired pharmacokinetic profile in a subject.

"Sublingual delivery" refers to the system delivery of drugs or other agents through the mucosal membranes lining the floor of the mouth.

A "therapeutically effective amount" is an amount sufficient to decrease or prevent the symptoms associated with a medical condition or infirmity or to normalize body functions in disease or disorders that result in impairment of specific bodily functions. As related to the present application, a therapeutically effective amount is an amount sufficient to reduce the pain or spasticity associated with the neurological disorder being treated, or an amount sufficient to result in improvement of sexual, bladder or bowel function in subjects having a neurological disorder which impairs nerve conduction, which hinders normal sexual, bladder or bowl functions.

"Treatment" refers to the administration of medicine or the performance of medical procedures with respect to a patient, for either prophylaxis (prevention) or to cure the infirmity or malady in the instance where the patient is afflicted.

In addition, the compounds of the present invention can exist in unsolvated as well as solvated forms with pharmaceutically acceptable solvents such as water, ethanol, and the like. In general, the solvated forms are considered equivalent to the unsolvated forms for the purposes of the present invention.

One aspect of the invention is a sustained-release pharmaceutical composition comprising an aminopyridine dispersed in a sustained release matrix such as a rate-controlling polymer. The composition of the present invention is capable of providing, upon administration to a patient, a release profile of the aminopyridine extending over at least 6 hours, preferably least about 12 hours, and more preferably at least 24 hours or more. Preferably the aminopyridine concentration in the composition is a therapeutically effective amount, and preferably the aminopyridine is dispersed uniformly throughout the release matrix. A therapeutically effective amount is an amount of a potassium channel blocker, preferably an aminopyridine compound, that when administered to a patient or subject, ameliorates a symptom of a neurological disease.

When the compositions of the present invention are administered to a patient, the concentration of the aminopyridine in the patient's plasma over time (release profile) may extend over a period of at least 6 hours, preferably over at least 8 hours, and more preferably over at about 12 hours. The compositions may provide in single dose a mean maximum plasma concentration of aminopyridine in the patient of from about 15 to about 180 ng/ml; a mean $T_{max}$ from about 1 to about 6 hours, more preferably about 2 to about 5.2 hours after administration of the composition to the patient.

In one embodiment, aminopyridine is administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose at selected intervals of time until a therapeutic dose is achieved. In one embodiment the medicament is administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose of aminopyridine at selected intervals of time until a therapeutic dose is achieved. For example, at the commencement of treatment aminopyridine is preferably administered at a dose less than 15 mg/day until a tolerable state is reached. Suitably when said tolerable state is reached, the dose administered may be increased by amounts of at least 5-15 mg/day until said therapeutic dose is reached. The method can include scheduling administration of doses of the pharmaceutical so that the concentration of the aminopyridine in the patient is at about the minimum therapeutically effective level to ameliorate the neurological condition, yet relatively lower compared to the maximum concentration in order to enhance restful periods for the patient during the day. Preferably the method provides for the treatment of neurological diseases characterized by a degradation of nerve impulse transmission comprising the step of administering to a patient a composition of the present invention.

The formulations and compositions of the present invention exhibit a specific, desired release profile which maximizes the therapeutic effect while minimizing adverse side effects. The desired release profile may be described in terms of the maximum plasma concentration of the drug or active agent ($C_{max}$) and the plasma concentration of the drug or active agent at a specific dosing interval ($C\tau$). A ratio of $C_{max}$ to $C_\tau$ ($C_{max}$:$C_\tau$) may be calculated from the observed $C_{max}$ and $C_\tau$. A dosing interval ($\tau$) is the time since the last admin-

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

istration of the drug or active agent. In the present application, the dosing interval (τ) is twelve (12) hours, therefore $C_\tau$ is the concentration of the drug or active agent at twelve (12) hours from the last administration.

Additionally, the formulations and compositions of the present invention exhibit a desired release profile that may be described in terms of the maximum plasma concentration of the drug or active agent at steady state ($C_{maxSS}$) and the minimum plasma concentration of the drug or active agent at steady state ($C_{minSS}$). Steady state is observed when the rate of administration (absorption) is equal to the rate of elimination of the drug or active agent. A ratio of $C_{maxSS}$ to $C_{minSS}$ ($C_{maxSS}$:$C_{minSS}$) may be calculated from the observed $C_{maxSS}$ and $C_{minSS}$. In addition, the formulations and compositions of the present invention exhibit a desired release profile that may be described in terms of the average maximum plasma concentration of the drug or active agent at steady state ($C_{avSS}$).

Another embodiment is a sustained release tablet of a sustained release matrix and an aminopyridine, said tablet exhibits a release profile to obtain a $C_{max}$:$C_\tau$ ratio in vivo of 1.0 to 3.5, and more preferably a $C_{max}$:$C_\tau$ ratio of about 1.5 to about 3.0. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio is about 2.0 to about 3.0. The aminopyridine may comprise 4-aminopyridine. The sustained release matrix may include for example, hydroxypropylmethylcellulose, or other rate controlling matrices that are suitable for controlling the release rate of an aminopyridine for use in the pharmaceutical compositions of the present invention.

In a further embodiment, a sustained release tablet of a sustained release matrix and an aminopyridine, wherein the tablet exhibits an in vivo $C_{max}$:$C_\tau$ ratio of about 2.0 to about 3.0.

A method of treating a disease associated with a neurological disorder is also provided. The method may include administering an 4-aminopyridine on a dosing regimen to obtain an in vivo $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5. In more preferred embodiments, the $C_{max}$:$C_\tau$ ratio is about 1.5 to 3.0, and about 2.0 to about 3.0. Such neurological disorders include a spinal cord injury, Alzheimer's disease, multiple sclerosis, ALS or the like. The dosing regimen of the method of treating a neurological disorder may comprise administering a tablet of said aminopyridine twice daily dosing. In a further embodiment, the twice-daily dosing regiment of the aminopyridine may comprise every twelve hours.

Another embodiment is a method of treating a neurological disorder comprising administering an aminopyridine to achieve an in vivo $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5, and more preferably the $C_{max}$:$C_\tau$ ratio is about 1.5 to about 3.25. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio of the method of treating a neurological disorder is about 2.0 to about 3.0.

Another aspect is a therapeutic composition of a release matrix and an active aminopyridine, wherein the aminopyridine is released from the release matrix at a rate to maintain a $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5, and more preferably about 1.5 to about 3.0. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio of the therapeutic composition is about 2.0 to about 3.0.

Another embodiment is a sustained release tablet of a sustained release matrix and an aminopyridine, said tablet exhibits a release profile to obtain a $C_{max}$:$C_\tau$ ratio in vivo of 1.0 to 3.5 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml, and more preferably a $C_{max}$:$C_\tau$ ratio of about 1.5 to about 3.0. In another preferred embodiment, the $C_{max}$:$C_\tau$ ratio is about 2.0 to about 3.0.

In another embodiment, a sustained release tablet comprising a sustained release matrix and an aminopyridine, said tablet exhibiting an in vivo $C_{max}$:$C_\tau$ ratio of about 2.0 to about 3.0 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml is provided.

A further embodiment is a method of treating a disease associated with a neurological disorder, said method comprising administering an aminopyridine on a dosing regimen to obtain an in vivo $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

A further aspect is a method of treating a disease associated with a neurological disorder comprising administering an aminopyridine to achieve an in vivo $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.

In a further aspect, a therapeutic composition comprised of a release matrix and an active aminopyridine, said aminopyridine being released from said release matrix at a rate to maintain an in vivo $C_{max}$:$C_\tau$ ratio of 1.0 to 3.5 and a $C_{avss}$ of about 15 ng/ml to about 35 ng/ml is provided.

In another embodiment, a method of treating a disease associated with a neurological disorder, said method comprising administering an aminopyridine on a dosing regimen to obtain an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 and a $C_{avss}$ of about 15 ng/ml to about 35 ng/ml is provided.

A further aspect is a sustained release composition comprising a sustained release matrix and an aminopyridine, wherein said composition provides a $C_{avss}$ of about 15 ng/ml to about 35 ng/ml. In a further aspect, a sustained release tablet comprising a sustained release matrix and an aminopyridine, said tablet exhibiting a $C_{maxss}$ of about 20 ng/ml to about 35 ng/ml is provided.

In another embodiment, a sustained release tablet comprising a sustained release matrix and an aminopyridine, said tablet exhibiting a $C_{maxss}$ of about 30 ng/ml to about 55 ng/ml. In a further embodiment, a sustained release tablet comprising a sustained release matrix and an aminopyridine, said tablet exhibiting a $C_{maxss}$ of about 24 ng/ml to about 40 ng/ml is provided. In a further embodiment, a sustained release tablet comprising sustained release matrix and an aminopyridine, said tablet exhibiting a $C_{maxss}$ of about 35 ng/ml to about 55 ng/ml is provided.

A further aspect is a method of treating a disease associated with a neurological disorder comprising administering an aminopyridine on a dosing regimen in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5, preferably an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of about 1.5 to about 3.0, and more preferably about 2.0 to about 3.0. The dosing regimen may consist of administering the aminopyridine twice daily, more preferably every twelve hours.

The amount of a pharmaceutically acceptable quality aminopyridine, salt, solvated, or prodrug thereof included in the pharmaceutical composition of the present invention will vary, depending upon a variety of factors, including, for example, the specific potassium channel blocker used, the desired dosage level, the type and amount of rate-controlling polymer matrix used, and the presence, types and amounts of additional materials included in the composition. Preferably, the aminopyridine comprises from about 0.1 to about 13% w/w, more preferably from about 0.5 to about 6.25% w/w. In an even more preferable embodiment of the present invention the aminopyridine is present from about 0.5 to 4.75% w/w of the pharmaceutical composition. It has been found that for many indications a weight (wt/wt %) above about 5% can result in undesirable side effects. Accordingly, a weight percentage less than about 4.75% is desired. The amount of aminopyridine, or a derivative thereof, in the formulation varies depending on the desired dose for efficient drug delivery, the molecular weight, and the activity of the compound. The actual amount of the used drug can depend on the

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

patient's age, weight, sex, medical condition, disease or any other medical criteria. The actual drug amount is determined according to intended medical use by techniques known in the art. The pharmaceutical dosage formulated according to the invention may be administered once or more times per day, preferably two or fewer times per day as determined by the attending physician.

Typically, the 4-aminopyridine is formulated in tablets or other pharmaceutical composition in amounts of about 0.5 mg to about 80 mg, preferably from about 5 to about 50 mg of 4-aminopyridine. Preferably, the amount of an aminopyridine in the composition is formulated to maintain therapeutic levels of the aminopyridine in patient's blood up to about 80 ng/ml.

The matrix in which the aminopyridine is homogeneously dispersed provides a sustained release of the aminopyridine into the plasma of the patient. Polymeric matrices suitable for controlling the release rate of aminopyridines for use in the pharmaceutical compositions of the present invention include hydrophilic polymers, hydrophobic polymers or mixtures of hydrophilic and/or hydrophobic polymers that are capable of forming sustained-release dosage formulation in combination with an aminopyridine. Such matrices are also capable of preventing degradation and loss of the aminopyridine from the composition. Examples of suitable matrices either alone or in combination include but are not limited to hydroxyalkylcelluloses, such as hydroxypropylcellulose and HPMC, hydroxyethyl cellulose, alkylcelluloses such as ethycellulose and methylcellulose, carboxymethylcellulose; sodium carboxymethylcellulose, hydrophilic cellulose derivatives, polyethylene oxide, polyethylene glycol, polyvinylpyrrolidone; cellulose acetate, cellulose acetate butyrate, cellulose acetate phthalate, cellulose acetate trimellitate, polyvinyl acetate phthalate, hydroxypropylmethyl-cellulose phthalate, hydroxypropylmethyl-cellulose acetate succinate; poly(alkyl methacrylate); and poly(vinyl acetate). Examples of other suitable polymers include, either alone or in combination, carboxyvinylpolymers, poly(vinyl alcohols), glucans, scleroglucans, mannans, xanthans, and, in general, cellulose, crosslinked polyvinylpyrrolidone, carboxymethyl starch, potassium methacrylate-divinylbenzene copolymer, hydroxypropylcyclodextrin, alpha, beta, gamma cyclodextrin or derivatives and other dextran derivatives, natural gums, seaweed extract, plant exudate, agar, agarose, algin, sodium alginate, potassium alginate, carrageenan, kappa-carrageenan, lambda-carrageenan, fucoidan, furcellaran, laminarin, hypnea, eucheuma, gum arabic, gum ghatti, gum karaya, gum tragacanth, guar gum, locust bean gum, okra gum, quince psyllium, flax seed, arabinogalactin, pectin, scleroglucan, dextran, amylose, amylopectin, dextrin, acacia, karaya, guar, a swellable mixture of agar and carboxymethyl cellulose, a swellable composition comprising methyl cellulose mixed with a sparingly cross-linked agar, a blend of sodium alginate and locust bean gumpolymers or copolymers derived from acrylic or methacrylic acid esters, copolymers of acrylic and methacrylic acid esters, zein, waxes, shellac and hydrogenated vegetable oils.

In certain embodiments, the matrix is a rate-controlling polymer such as but not limited to HPMC. HPMC is a hydroxyalkylcellulose characterized by a polymeric backbone of cellulose, a natural carbohydrate that contains a basic repeating structure of anhydroglucose units, and varying ratios of hydroxypropyl and methyl substitution at the three available substitution positions. The amount of substituent groups on the anhydroglucose units can be designated by weight percent or by the average number of substituent groups attached to the ring. For example, if all three available positions on each unit are substituted, the degree of substitution may be designated as 3 whereas if an average of two positions on each ring are reacted, the degree of substitution is correspondingly designated as 2.

According to one method of manufacture, cellulose fibers are heated with a caustic solution and then treated with methyl chloride and propylene oxide to produce HPMC. The fibrous reaction product is purified and ground to a fine, uniform powder. Especially suitable HPMCs manufactured according to this process are sold under the Methocel K designation, such as Methocel K100LV, Methocel K15M, Methocel K4M and Methocel K100M, all available from the Dow Chemical Co. Methocel K products are generally characterized by a methoxyl degree of substitution of about 1.4, a methoxyl percentage of about 22%, a hydroxypropyl molar substitution of about 0.2, a hydroxypropyl percentage of about 8%, and a particle size of 90%<100 mesh. In a preferred embodiment, the rate-controlling polymer is HPMC sold under the name Methocel K100LV.

Interaction between the matrix, excipients or other additives and the potassium channel blocker through van der Waal forces, hydrogen bonding, coordination, solvation, or complex formation may also be desirable to control the release of the potassium channel blocker from the composition and to prevent evaporation and or degradation of the potassium channel blocker within the composition.

In preferred embodiments, the rate-controlling polymer is HPMC. In such embodiments, the HPMC preferably has a viscosity (2 wt % solution at 20° C.) of about 100 to 100,000 cps, more preferably 100 to 30,000 cps. Especially suitable HPMCs are Methocel K types, such as Methocel K100LV, Methocel K15M, Methocel K4M and Methocel K100M, available from the Dow Chemical Co. The hydroxypropylmethylcelluloses used according to the invention preferably have a molecular weight of about 80,000 to about 1,150,000, more preferably about 80,000 to about 600,000. Especially suitable is a hydroxypropylmethylcellulose sold under the name Klucel LF available from Aqualon and Nippon Soda Co., which has a molecular weight of 100,000. The poly (ethylene oxide) used according to the invention preferably has a molecular weight of about 100,000 to about 7,000,000, more preferably about 900,000 to about 7,000,000. An especially suitable poly(ethylene oxide) is sold under the name Polyox WSR Coagulant available from the Dow Chemical Co., which has a molecular weight of 5,000,000. The ethylcelluloses used according to the invention preferably have a viscosity of about 3 to about 110 cps, more preferably about 7 to about 100 cps. In particularly preferred embodiments, the rate-controlling polymer is the HPMC sold under the name Methocel K100LV.

In another embodiment, the rate-controlling polymer is HPC. HPCs used according to the invention preferably have a viscosity (2 wt % solution at 20° C.) of about 10 to 100,000 cps, more preferably 100 to 30,000 cps, and a molecular weight of about 80,000 to about 1,150,000, more preferably about 80,000 to about 600,000. An especially suitable HPC is sold under the name Klucel LF available from Aqualon and Nippon Soda Co. which has a molecular weight of about 95,000.

In another embodiment, the rate-controlling polymer release matrix is poly(ethylene oxide) preferably having a molecular weight of about 100,000 to about 7,000,000, more preferably about 900,000 to about 7,000,000. An especially suitable poly(ethylene oxide) is sold under the name Polyox WSR Coagulant available from the Dow Chemical Co. which has a molecular weight of about 5,000,000. Suitable ethylcelluloses that may be used as the rate-controlling polymer in

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

accordance with the invention preferably have a viscosity of about 3 to about 110 cps, more preferably about 7 to about 100 cps.

The polymeric matrix of the drug delivery of the invention may additionally also contain a hydrophobic polymer. Suitable hydrophobic polymers are hydrophobic cellulose derivatives, such as ethyl cellulose, fats, such as glycerol palmitostearate, waxes, such as beeswax, glycowax, castrowax, carnaubawax, glycerol monostearate or stearylalcohol, hydrophobic polyacrylamide derivatives and hydrophobic methacrylic acid derivatives.

A hydrophobic polymer may be included as part of a release matrix, in order to modify the release kinetics. Preferably such a hydrophobic polymer is used only in a mixture of hydrophilic and hydrophobic polymers. In such a mixture, the hydrophobic polymer controls the water penetration rate into the delivery system. For example, incorporation of a hydrophobic polymer into the polymer matrix and the ratio of hydrophilic to hydrophobic polymer thus changes the erosion characteristics of the tablet. The hydrophobic polymer shows down the water penetration into the tablet and thus slows the tablet erosion.

The amount of the release matrix included in the pharmaceutical composition of the present invention will vary depending upon a variety of factors, including, for example, the specific matrix used, its molecular weight, is hydrophilicity, the type and amount of potassium channel blocker used, and the presence, types and amounts of additional materials included in the composition. Preferably, the rate-controlling polymer comprises from about 20 to about 96% w/w, more preferably from about 20 to about 70% w/w, of the pharmaceutical composition. It is desirable that the matrix permit release of the potassium channel blocker in the lower gastrointestinal tract.

In general, when the viscosity grade of the matrix polymer is higher, the release rate of the drug is slower. The size, shape and surface area of the tablet may also be modified to increase or decrease the release rate of the aminopyridine from the tablet.

In preferred embodiments, the aminopyridine is milled prior to dispersal in the rate-controlling polymer in order to ensure proper particle size distribution. Milling of the aminopyridine may be accomplished by any suitable means such as, for example, an air jet mill, a micronizer, a hammer mill, a ball mill, a cone mill, or other suitable type of mill. The milling is preferably accomplished so that the particle size distributions permit satisfactory dosage content uniformity and dissolution profiles. The particle size distribution may be ±25% of the mean particle size use in the formulation. In a preferred embodiment, the aminopyridine is milled so that 90% of the particles are smaller than about 1.5 mm, more preferably smaller than about 1 mm, and even more preferably smaller than about 300 μm; 50% of the particles are smaller than about 1 mm, more preferably smaller than about 600 μm, and even more preferably smaller than about 150 μm; and 10% of the particles are smaller than about 500 μm, more preferably smaller than about 400 μm, and even more preferably smaller than about 50 μm.

Suitable screen sizes are from about #10 to about #400 mesh, preferably #24 to #60 mesh. In certain embodiments, milling of the aminopyridine may involve multiple passes of the material through mesh screens at the same or different mill blade orientations. In one embodiment, the milling process involves two passes of 4-AP through a #24 mesh screen in a FitzMill® comminutor using two different mill blade orientations.



The aminopyridine, in either milled or un-milled form, is dispersed in the release matrix to form the pharmaceutical composition such that the aminopyridine is distributed substantially uniformly throughout the entirety of the matrix. The dispersal of aminopyridine throughout the matrix may be accomplished by any method capable of achieving substantial homogeneity. Preferred dispersal methods include the use of blenders, for example, planetary and cross-flow blenders. While blending time will vary depending on a variety of factors, including, for example, the specifics of the aminopyridine and rate-controlling polymer used, substantially uniform distribution is preferably realized within from about 10 to about 55 minutes of blending.

The release matrix aminopyridine formulation is preferably fabricated into tablets, capsules or granules for oral use. The rate of aminopyridine release from the tablets may be controlled by the erosion mechanism of the release matrix from which aminopyridine is released. In general, for producing a tablet on an industrial scale, the drug and polymer are granulated alone or in combination. Preferably the release of the aminopyridine from the matrix of the pharmaceutical composition is relatively linear over time. Preferably the matrix provides a release profile that gives a therapeutically effective concentration of the aminopyridine in the plasma of the patient permitting a once per day or twice per day dosing. Preferably the sustained release aminopyridine formulation for oral administration to patients includes from about 0.0001 mole to about 0.0013 mole aminopyridine that provides a mean maximum plasma concentration of aminopyridine from about 15 to about 180 ng/ml, a mean $T_{max}$ of about 2 to about 5 hours after administration, and a mean minimum plasma concentration of from about 10 to 60 ng/ml at about 8-24 hours after administration.

The formulations of the invention are prepared by procedures known in the art, such as, for example, by the dry or wet method. The method selected for manufacturing affects the release characteristics of the finished tablet. In one method, for example, the tablet is prepared by wet granulation in the presence of either water or an aqueous solution of the hydrophilic polymer or using other binder as a granulating fluid. In alternative, organic solvent, such as isopropyl alcohol, ethanol and the like, may be employed with or without water. The drug and polymer may be granulated alone or in combination. Another method for preparation of the tablet which may be used requires using a drug-polymer dispersion in organic solvents in the presence or absence of water. Where the aminopyridine or its derivative has very low solubility in water it may be advantageous to reduce the particle size, for example, by milling it into fine powder and in this way to control the release kinetics of the drug and enhance its solubility.

The hardness of the tablets of the present invention may vary, depending on a variety of factors, including, for example, the relative amounts and specific types of ingredients used, the tableting equipment employed, and the selected processing parameters. The pressure used to prepare the tablets can influence the release profile of the aminopyridine into the patient. The pressure used to prepare the tablets of the present invention may vary depending upon their surface area and the amount and particle size of aminopyridine, additive, excipients, or binders included in the tablet. The degree of hydration and solvation of the components in the composition will also be important in determining the hardness of the tablets. Preferably the formed tablets have a hardness in the range of from 80-400 N, and more preferably from 150 to 300 N.

Pellets or a combination of pellets in accordance with the invention may also be filled into hard or soft gelatin capsules.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

The pellets included in the capsule may have different amounts of aminopyridine in the pellets and or different matrices. Various amounts of the pellets may be used to tailor the total amount aminopyridine delivered as well as to alter the release and concentration profile of the aminopyridine in the patient.

The effects of various matrices, concentrations of aminopyridine, as well as various excipients and additives to the composition on the concentration of the channel blocker on the dissolution rate may be monitored for example using a type H dissolution apparatus according to U.S. Pharmacopoeia XXII, or USP Apparatus II (Paddle Method). Clinical evaluations may be used to study the effects on plasma levels of various release matrices, concentrations of aminopyridine, as well as various excipients and additives. Plasma aminopyridine concentrations may be used to calculate pharmacokinetic data (release profiles) including apparent absorption and elimination rates, area-under-the curve (AUC), maximum plasma concentration ($C_{max}$), time to maximum plasma concentration ($T_{max}$), absorption half-life ($T_{1/2}$(abs)), and elimination half-life ($T_{1/2}$(elim)). Pharmacodynamic effects may be assessed based upon response tests, such as muscle strength improvement or reduction in spascticity for patients with multiple sclerosis or spinal cord injury or other tests as would be known to those skilled in the art. Plasma aminopyridine concentration in blood plasma or cerebral spinal fluid may be monitored using liquid chromatography/MS/MS assay methods.

The drug delivery of the invention can utilize any suitable dosage unit form. Specific examples of the delivery system of the invention are tablets, tablets which disintegrate into granules, capsules, sustained release microcapsules, spheroids, or any other means which allow for oral administration. These forms may optionally be coated with pharmaceutically acceptable coating which allows the tablet or capsule to disintegrates in various portions of the digestive system. For example a tablet may have an enteric coating which prevents it from dissolving until it reaches the more basic environment of the small intestine.

The dispersion of the aminopyridine throughout the release matrix imparts enhanced stability characteristics in the dosage formulation. This enhanced stability is achieved without loss of the desired sustained-release profile. Preferably the release profile, which may be measured by dissolution rate is linear or approximately linear, preferably the release profile is measured by the concentration of the aminopyridine in the plasma in the patient and is such to permit twice daily (BID) dosing.

The pharmaceutical composition of the present invention can include also auxiliary agents or excipients, for example, glidants, dissolution agents, surfactants, diluents, binders including low temperature melting binders, disintegrants and/or lubricants. Dissolution agents increase the dissolution rate of the aminopyridine from the dosage formulation and can function by increasing the solubility of the aminopyridine. Suitable dissolution agents include, for example, organic acids such as citric acid, fumaric acid, tartaric acid, succinic acid, ascorbic acid, acetic acid, malic acid, glutaric acid and adipic acid, and may be used alone or in combination. These agents may also be combined with salts of the acids, e.g. sodium citrate with citric acid, in order to produce a buffer system.

Other agents that may alter the pH of the microenvironment on dissolution and establishment of a therapeutically effective plasma concentration profile of the aminopyridine include salts of inorganic acids and magnesium hydroxide. Other agents that may be used are surfactants and other solubilizing materials. Surfactants that are suitable for use in the pharmaceutical composition of the present invention include, for example, sodium lauryl sulphate, polyethylene separates, polyethylene sorbitan fatty acid esters, polyoxyethylene castor oil derivatives, polyoxyethylene alkyl ethers, benzyl benzoate, cetrimide, cetyl alcohol, docusate sodium, glyceryl monooleate, glyceryl monostearate, glyceryl palmitostearate, lecithin, medium chain triglycerides, monoethanolamine, oleic acid, poloxamers, polyvinyl alcohol and sorbitan fatty acid esters.

Diluents that are suitable for use in the pharmaceutical composition of the present invention include, for example, pharmaceutically acceptable inert fillers such as microcrystalline cellulose, lactose, sucrose, fructose, glucose dextrose, or other sugars, dibasic calcium phosphate, calcium sulfate, cellulose, ethylcellulose, cellulose derivatives, kaolin, mannitol, lactitol, maltitol, xylitol, sorbitol, or other sugar alcohols, dry starch, saccharides, dextrin, maltodextrin or other polysaccharides, inositol or mixtures thereof. The diluent is preferably a water-soluble diluent. Examples of preferred diluents include, for example: microcrystalline cellulose such as Avicel PH112, Avicel PH101 and Avicel PH102 available from FMC Corporation; lactose such as lactose monohydrate, lactose anhydrous, and Pharmatose DCL 21; dibasic calcium phosphate such as Emcompress available from Penwest Pharmaceuticals; mannitol; starch; sorbitol; sucrose; and glucose. Diluents are carefully selected to match the specific composition with attention paid to the compression properties. The diluent is preferably used in an amount of about 10 to about 80% by weight, preferably about 20 to about 50% by weight, of the sustained-release composition.

Glidants are used to improve the flow and compressibility of ingredients during processing. Suitable glidants include, for example, colloidal silicon dioxide, a sub-micron fumed silica that can be prepared by, for example, vapor-phase hydrolysis of a silicon compound such as silicon tetrachloride. Colloidal silicon dioxide is a sub-micron amorphous powder which is commercially available from a number of sources, including Cabot Corporation (under the tradename Cab-O-Sil); Degussa, Inc. (under the tradename Aerosil); and E.I. DuPont & Co. Colloidal silicon dioxide is also known as colloidal silica, fumed silica, light anhydrous silicic acid, silicic anhydride, and silicon dioxide fumed, among others. In one embodiment, the glidant comprises Aerosil 200.

Another agent that may be used is a surfactant, dissolution agent and other solubilizing material. Surfactants that are suitable for use in the pharmaceutical composition of the present invention include, for example, sodium lauryl sulphate, polyethylene stearates, polyethylene sorbitan fatty acid esters, polyoxyethylene castor oil derivatives, polyoxyethylene alkyl ethers, benzyl benzoate, cetrimide, cetyl alcohol, docusate sodium, glyceryl monooleate, glyceryl monostearate, glyceryl palmitostearate, lecithin, medium chain triglycerides, monoethanolamine, oleic acid, poloxamers, polyvinyl alcohol and sorbitan fatty acid esters. Dissolution agents increase the dissolution rate of the aminopyridine and function by increasing the solubility of the aminopyridine. Suitable dissolution agents include, for example, organic acids such as citric acid, fumaric acid, tartaric acid, succinic acid, ascorbic acid, acetic acid, malic acid, glutaric acid and adipic acid, which may be used alone or in combination. These agents may also be combined with salts of the acids, e.g. sodium citrate with citric acid, in order to produce a buffer system. Other agents that may be used to alter the pH of the microenvironment on dissolution include salts of inorganic acids and magnesium hydroxide.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

The pellets or granulates may be compressed into tablets using a binder and/or hardening agent commonly employed in tablets such as microcrystalline cellulose sold under the Trade Mark "AVICEL" or a co-crystallized powder of highly modified dextrins (3% by weight) and sucrose sold under the Trade Mark "DI-PAC" in such a way that the specific dissolution rate of the pellets is maintained. Binders that are suitable for use in the pharmaceutical composition of the present invention include, for example, starches, ethyl cellulose, polyvinylpyrrolidone, acacia, guar gum, hydroxyethylcellulose, agar, calcium carrageenan, sodium alginate, gelatin, saccharides (including glucose, sucrose, dextrose and lactose), molasses, extract of Irish moss, panwar gum, ghatti gum, mucilage of isapol husk, carboxymethylcellulose, methylcellulose, veegum, larch arbolactan, polyethylene glycols, waxes and mixtures thereof. Suitable low temperature melting binders include, for example, polyethylene glycols such as PEG 6000, cetostearyl alcohol, cetyl alcohol, polyoxyethylene alkyl ethers, polyoxyethylene castor oil derivatives, polyoxyethylene sorbitan fatty acid esters, polyoxyethylene stearates, poloxamers, and waxes.

Disintegrants that are suitable for use in the pharmaceutical composition of the present invention include, for example, starches, sodium starch glycollate, crospovidone, croscarmellose, microcrystalline cellulose, low substituted hydroxypropyl cellulose, pectins, potassium methacrylate-divinylbenzene copolymer, poly(vinyl alcohol), thylamide, sodium bicarbonate, sodium carbonate, starch derivatives, dextrin, beta cyclodextrin, dextrin derivatives, magnesium oxide, clays, bentonite and mixtures thereof.

The active ingredient of the present invention may be mixed with excipients which are pharmaceutically acceptable and compatible with the active ingredient and in amounts suitable for use in the therapeutic methods described herein. Various excipients may be homogeneously mixed with the aminopyridines of the present invention as would be known to those skilled in the art. For example, aminopyridines may be mixed or combined with excipients such as but not limited to microcrystalline cellulose, colloidal silicon dioxide, lactose, starch, sorbitol, cyclodextrin and combinations of these.

Lubricants that are suitable for use in the pharmaceutical composition of the present invention include agents that act on the flowability of the powder to be compressed include but are not limited to silicon dioxide such as Aerosil 200, talc; stearic acid, magnesium stearate, calcium stearate, hydrogenated vegetable oils, sodium benzoate, sodium chloride, leucine carbowax, magnesium lauryl sulfate, and glyceryl monostearate.

To further improve the stability of the aminopyridine in the sustained release composition, an antioxidant compound can be included. Suitable antioxidants include, for example: sodium metabisulfite; tocopherols such as α, β, δ-tocopherol esters and α-tocopherol acetate; ascorbic acid or a pharmaceutically acceptable salt thereof; ascorbyl palmitate; alkyl gallates such as propyl gallate, Tenox PG, Tenox s-1; sulfites or a pharmaceutically acceptable salt thereof; BHA; BHT; and monothioglycerol.

In another embodiment, the pharmaceutical composition of the present invention comprises a rate-controlling polymeric matrix comprising of a hydrogel matrix. For instance, an aminopyridine may be compressed into a dosage formulation containing a rate-controlling polymer, such as HPMC, or mixture of polymers which, when wet, will swell to form a hydrogel. The rate of release of the aminopyridine from this dosage formulation is sustained both by diffusion from the swollen tablet mass and by erosion of the tablet surface over time. The rate of release of the aminopyridine may be sustained both by the amount of polymer per tablet and by the inherent viscosities of the polymers used.

According to another aspect of the invention, there is provided a stable, sustained-release oral dosage formulation which includes an effective amount a aminopyridine dispersed in a release matrix, and which, upon administration to a patient or as part of a therapy regiment, provides a release profile (of therapeutically effective blood plasma level of the aminopyridine) extending for a period of at least 6 hours, preferably at least 12 hours, and more preferably at least 24 hours. In another embodiment, the stable, controlled-release oral dosage form provides, upon administration to a patient, a therapeutically effective blood plasma level of the aminopyridine for a period of at least 6 hours, preferably at least 12 hours, and more preferably at least 24 hours.

The dosage formulation may assume any form capable of delivering orally to a patient a therapeutically effective amount of a aminopyridine dispersed in a rate-controlling polymer. Preferably, the dosage formulation comprises a monolithic tablet.

Tablet weight will also vary in accordance with, among other things, the aminopyridine dosage, the type and amount of rate-controlling polymer used, and the presence, types and amounts of additional materials. Assuming 4-aminopyridine dosages of from about 2 mg to about 120 mg; tablet weights can range from about 50 mg to about 1200 mg per tablet, and preferably from 250 to 500 mg, and more preferably about 400 mg.

The dosage formulation of the present invention may comprise also one or more pharmaceutically acceptable excipients as mentioned above. In preferred embodiments, the dosage formulation will comprise diluents and a lubricant in addition to the aminopyridine unit dose and the rate-controlling polymer. A particularly preferred diluents is microcrystalline cellulose sold under the name Avicel PH101, and a particularly preferred lubricant is magnesium stearate. When these materials are used, the magnesium stearate component preferably comprises from about 0.2 to about 0.75% w/w of the dosage formulation, and the microcrystalline cellulose along with the rate controlling polymer and aminopyridine comprises the balance of the formulation. For example, a tablet formulation including a aminopyridine x % w/w, a rate-controlling polymer y % w/w, and microcrystalline cellulose z %, the magnesium stearate amount would be $(100-(x+y+z))$ where $0.2\% \leq (100-(x+y+z)) \leq 0.75\%$ w/w. As would be known to those skilled in the art, the amount of an additives such as magnesium stearate may vary depending upon the shear rate used to perform the mixing and the amount of such an additive may be changed without limitation to obtain a satisfactory dissolution rate or plasma level of the aminopyridine.

As used herein, the term "sustained-release" includes the release of a aminopyridine from the dosage formulation at a sustained rate such that a therapeutically beneficial blood level below toxic levels of the aminopyridine is maintained over a period of at least about 12 hours, preferably about 24 hours or more. Preferably, the amount of the aminopyridine in the oral dosage formulations according to embodiments of the present invention establish a therapeutically useful plasma concentration through BID administration of the pharmaceutical composition.

If desired, the dosage formulations of this invention may be coated with a sustained-release polymer layer so as to provide additional sustained-release properties. Suitable polymers that can be used to form this sustained release layer include, for example, the release matrices listed above. As desired, the dosage formulation of the invention can be provided also with

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

a light-protective and/or cosmetic film coating, for example, film-formers, pigments, anti-adhesive agents and politicizes. Such a film-former may consist of fast-dissolving constituents, such as low-viscosity hydroxypropylmethylcelluose, for example, Methocel E5 or D14, or Pharmacoat 606 (Shin-Etsu). The film coating may also contain excipients or enteric coatings customary in film-coating procedures, such as, for example, light-protective pigments, for example, iron oxide, or titanium dioxide, anti-adhesive agents, for example, talc, and also suitable plasticizers such as, for example, PEG 400, PEG 6000, diethyl phthalate or triethyl citrate.

The compositions of the present invention may be used for the treatment of neurological diseases characterized by a degradation of nerve impulse transmission by administering to a patient the oral dosage formulation of the present invention. Preferably, the administration is twice daily dosage of a therapeutically effective amount of an aminopyridine, even more preferably, 4-AP dispersed in HPMC. The administration can also include scheduling administration of doses of the pharmaceutical so that the concentration of the aminopyridine in the patient is at about the minimum therapeutically effective level to ameliorate the neurological condition, yet relatively lower compared to the maximum concentration in order to enhance restful periods for the patient during the day. The compositions may be administered to a subject at a dose and for a period sufficient to allow said subject to tolerate said dose without showing any adverse effects and thereafter increasing the dose of said active agent in the tablets at selected intervals of time until a therapeutic dose is achieved in the subject. For example, at the commencement of treatment the active agent is preferably administered at a dose less than 15 mg/day until a tolerable state is reached. The dose administered may then be increased by amounts of at least 5-15 mg/day until a therapeutic dose is reached. For other diseases the amount of the aminopyridine required to reach a therapeutically effective amount for treatment is described in U.S. Pat. No. 5,952,357 the contents of which are incorporated herein by reference in their entirety.

Compositions of the present invention where the potassium channel blocker is a mono- or di-aminopyridine active agent are particularly suitable for use in the treatment of a neurological disease which is characterized by demyelination of the central nervous system, more especially multiple sclerosis. The mono- or di-aminopyridine active agent in accordance with the invention is also suitable for the treatment of Alzheimer's disease. Additional features and embodiments of the present invention are illustrated by the following non-limiting examples.

## EXAMPLE 1

This example illustrates preparation of compositions of the present invention and their release of an aminopyridine. Tablets in accordance with the present invention having dosages of 5 mg, 7.5 mg and 12.5 mg respectively were manufactured at 5 Kg scale. Materials were used in the amounts shown in Table 1.

TABLE 1

| | % w/w | % w/w | % w/w |
|---|---|---|---|
| Milled 4-AP (#50 mesh) | 1.25 | 1.875 | 3.125 |
| Methocel K 100LV | 60 | 60 | 60 |
| Avicel PH101 | 38.15 | 37.525 | 36.275 |
| Magnesium stearate | 0.2 | 0.2 | 0.2 |

TABLE 1-continued

| | | | |
|---|---|---|---|
| Aerosil 200 | 0.4 | 0.4 | 0.4 |
| Equipment Tablet Press | Horn Noak equipped with 13 × 8 mm oval tooling press speed 42,000 tablets/hr | | |
| Tablet Weight Range (mg) | 386-404 (96.5-101.0%) | 388-410 (97.0-102.5%) | 388-406 (97.0-101.5%) |
| Tablet Hardness Range (N) | 200-262 | 179-292 | 150-268 |
| Tablet Potency - mg/tab. (% LC) | 97.1 | 99.1 | 100.2 |
| Mean CU (mg/tab.)/ % CV | 5.0 mg/1.0% | 7.4 mg/0.7% | 12.4 mg/1.1% |
| CU Discrete Samples (mg/tab.)/% CV | 5.0 mg/1.2% | 7.5 mg/1.8% | 12.3/1.1% |

| Dissolution (%/hr) | Mean | (SD) | Mean | (SD) | Mean | (SD) |
|---|---|---|---|---|---|---|
| 1 | 28.9 | 1.1 | 29.2 | 1.8 | 25.9 | 1.1 |
| 2 | 42.7 | 1.8 | 42.1 | 1.6 | 40.2 | 2.5 |
| 3 | 52.8 | 1.4 | 53.0 | 1.0 | 49.8 | 2.1 |
| 4 | 61.4 | 2.2 | 61.8 | 1.5 | 60.1 | 2.4 |
| 6 | 75.7 | 3.1 | 75.2 | 1.6 | 74.8 | 2.7 |
| 10 | 95.5 | 3.3 | 98.7 | 1.4 | 93.2 | 0.9 |

Prior to blending, 4-AP was milled through #50 mesh screen using a Fitzmill® comminutor. The materials were added into a Gral 25 bowl in the following order: half Methocel K100LV, Avicel PH101, Aerosil 200, milled 4-AP and the remaining Methocel K100LV. The mix was blended for 15 minutes at 175 rpm, then the magnesium stearate was added and was further blended for 5 minutes at 100 rpm. Samples were taken from top and bottom positions for blend potency analysis. Weight and hardness checks were performed every 15 minutes by the check-master E3049. Discrete tablet samples were taken during the compression process to evaluate intra batch content uniformity.

## EXAMPLE 2

This example illustrates that the pharmacokinetic profile of fampridine in compositions of the present invention is altered by administration in a sustained release tablet matrix compared to immediate release and controlled release formulations.

There is a delay in absorption manifested by a lower peak concentration, without any effect on the extent of absorption. When given as a single 12.5 mg dose, the peak concentration is approximately two-thirds lower as compared to peak values following administration of the IR formulation; the time to reach peak plasma levels was delayed by about 2 hours. FIG. 1 is a graph of mean plasma profiles associated with the administration to a patient in both fasted and fed states of a tablet form of 4-AP (fampridine) in accordance with the present invention compared with the mean plasma profile associated with the administration of an immediate release (IR) formulation. As with the IR formulation, food delayed the absorption of Fampridine-SR. The absorption of fampridine was approximately 50% slower following ingestion of a fatty meal, although due to the flatness of the absorption curve, this may be exaggerated value. Extent of absorption did not differ, as values for Cmax and AUC were comparable as summarized in Table 2.

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

TABLE 2

Pharmacokinetic Parameter Values (Mean ± SD) in Studies Using Fampridine SR, CR, and IR Formulations: Single Dose Studies in Healthy Adult Male Volunteers

| Study Number | Dose (mg) | Fed/Fasted | $C_{MAX}$ (ng/mL) | $t_{MAX}$ (hours) | AUC (0-∞) (ng hr/mL) |
|---|---|---|---|---|---|
| 0494006 N = 12 | 12.5 SR (PD12265) | Fed | 28.7 ± 4.3 | 5.3 ± 0.8 | 257.0 ± 62.7 |
| | | Fasted | 25.6 ± 3.8 | 2.8 ± 1.3 | 269.9 ± 44.4 |
| | 12.5 IR (PD12266) | Fasted | 79.3 ± 16.3 | 0.9 ± 0.4 | 294.2 ± 55.6 |
| 1194002 N = 12 | 12.5 SR (PD12907) | Fasted | 28.5 ± 4.3 | 2.9 ± 2.4 | 285.9 ± 37.8 |
| | 12.5 CR (4n806) | Fasted | 37.7 ± 9.9 | 3.6 ± 0.9 | 300.0 ± 53.6 |
| | 12.5 IR (PS644) | Fasted | 83.5 ± 23.5 | 0.79 ± 0.3 | 274.0 ± 59.2 |

FIG. 2 is a graph of mean plasma profiles associated with the administration of a tablet form of 4-AP (fampridine) in accordance with the present invention compared with the mean plasma profile associated with the administration of a sustained-release capsule of the present invention and an immediate release capsule.

EXAMPLE 3

This example details the plasma concentration of different dosage tablets of a aminopyridine in compositions of the present invention administered to patients with spinal cord injury. Pharmacokinetic results are presented for the subset of 11 patients who completed all dose levels. Maximal plasma concentrations and AUC values increased with increasing dose, with a mean $C_{max}$ of 152.0 ng/mL at the highest dose of 120 mg/day. The time of the peak and the plasma elimination half-lives were independent of dose. Mean $T_{max}$ ranged from 2.2 hours to 3.0 hours. The $T_{1/2}$ of fampridine ranged from 5.7 to 6.9 hours. There were no apparent differences between males and females. Data from this study are summarized in Table 3.

TABLE 3

Pharmacokinetic Parameter Values (Mean ± SD) Following Multiple Oral Doses of Fampridine-SR to 11 Patients with SCI.

| Fampridine-SR Dosage (mg b.i.d.) | $C_{MAX}$ (ng/mL) | $T_{MAX}$ (hours) | $AUC_{(0-12)}$ (ng hr/mL) | $T_{1/2}$ (hours) |
|---|---|---|---|---|
| 25 | 63.4 ± 11.9 | 2.2 ± 0.9 | 475.8 ± 65.5 | 6.4 ± 1.4 |
| 30 | 83.2 ± 20.5 | 2.4 ± 1.4 | 600.0 ± 128.0 | 6.7 ± 3.8 |
| 35 | 90.2 ± 14.4 | 2.4 ± 1.2 | 660.3 ± 137.7 | 6.9 ± 3.4 |
| 40 | 103.2 ± 19.4 | 2.6 ± 1.3 | 771.5 ± 135.3 | 6.6 ± 2.1 |
| 50 | 145.7 ± 27.9 | 3.0 ± 1.9 | 1047.6 ± 258.8 | 5.8 ± 1.9 |
| 60 | 152.0 ± 25.2 | 3.0 ± 2.0 | 1075.0 ± 163.0 | 5.7 ± 2.3 |

EXAMPLE 4

This example details the pharmacokinetic properties of Fampridine-SR in tablets of the present invention administered to patients with multiple sclerosis. Plasma samples were analyzed for fampridine using a validated LC/MS/MS assay with a sensitivity of 2 ng/mL. Noncompartmental pharmacokinetic parameter values were calculated using standard methodology.

This was an open-label, multi-center, dose proportionality study of orally administered fampridine in patients with multiple sclerosis. Single doses of fampridine were to be given in escalating doses (5 mg, 10 mg, 15 mg, and 20 mg) with at least a four-day interval between administration of each dose of drug. Safety evaluations were to be performed during the 24 hour period following administration of fampridine and blood samples were to be taken at the following times to determine pharmacokinetic parameters: hour 0 (pre-dose), hours 1-8, and hours 10, 12, 14, 18, and 24.

Twenty-three subjects received all 4 treatments, and one subject received only 3 treatments; data from all treatments were analyzed. Dose-dependent parameters (e.g., peak plasma concentration and areas-under-the curve) were normalized to a 10 mg dose for among-dose comparisons. Overall observed time of the peak plasma concentration (mean and its 95% confidence interval) was 3.75 (3.52, 3.98) h, observed peak plasma fampridine concentration (normalized to a 10 mg dose) was 24.12 (23.8, 26.6) ng/ml, area-under-the-concentration-time curve (normalized to a 10 mg dose) was estimated to be 254 (238, 270) ng·h/ml, extrapolated area-under-the-concentration-time curve (normalized to a 10 mg dose) was 284 (266, 302) ng·h/ml, terminal rate constant equaled 0.14 $(0.13, 0.15)^{-1}$, terminal half-life was 5.47 (5.05, 5.89) h and clearance divided by bioavailability (CL/F) was equal to 637 (600, 674) ml/min.

Dizziness was the most common treatment-related adverse event. Other treatment related adverse events included amblyopia, asthenia, headache, and ataxia. There were clinically significant changes in clinical laboratory values, ECG parameters, vital signs, physical examination findings, or neurological examination findings noted over the course of this study.

When the plasma concentrations of fampridine were normalized to the 10.0 mg dose levels, there were no significant differences between any pharmacokinetic parameter (AUC, $C_{max}$, $t_{1/2}$) in the 5-20 mg dose range. Fampridine was well tolerated at the doses used in this study. Dose-normalized (to a 10 mg dose) pharmacokinetic parameter values are summarized in Table 4.

TABLE 4

Dose-Normalized (at 10 mg) Pharmacokinetic Parameter Values (Mean ± SEM) Following Single Oral Administration of Fampridine-SR to Patients with MS.

| Dose (mg) | $C_{MAX}$-norm (ng/mL) | $t_{MAX}$ (hours) | AUC-norm (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
|---|---|---|---|---|---|
| 5 (n = 24) | 26.2 ± 0.6 | 3.9 ± 0.2 | 244.2 ± 9.4 | 5.8 ± 0.5 | 619.8 ± 36.2 |

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

TABLE 4-continued

Dose-Normalized (at 10 mg) Pharmacokinetic Parameter Values (Mean ± SEM) Following Single Oral Administration of Fampridine-SR to Patients with MS.

| Dose (mg) | $C_{MAX}$-norm (ng/mL) | $t_{MAX}$ (hours) | AUC-norm (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
|---|---|---|---|---|---|
| 10 (n = 24) | 25.2 ± 0.7 | 3.9 ± 0.3 | 252.2 ± 7.8 | 5.6 ± 0.4 | 641.4 ± 39.1 |
| 15 (n = 24) | 24.6 ± 0.7 | 3.6 ± 0.3 | 263.0 ± 7.4 | 5.5 ± 0.4 | 632.4 ± 39.0 |
| 20 (n = 23) | 24.6 ± 0.8 | 3.6 ± 0.3 | 255.6 ± 6.9 | 5.1 ± 0.3 | 653.9 ± 37.1 |

## EXAMPLE 5

This example describes the results of an open-label study to assess the steady state pharmacokinetics of orally administered fampridine (4-aminopyridine) compositions of the present invention in subjects with Multiple Sclerosis. This study was an open-label multiple dose study of Fampridine-SR intended to assess steady state pharmacokinetics in 20 patients with MS who previously completed the study summarized in Table 4. Fampridine-SR (40 mg/day) was administered as two 20 mg doses, given as one morning and one evening dose for 13 consecutive days, with a single administration of 20 mg on Day 14. Blood samples for pharmacokinetic analysis were collected on Days 1, 7/8, and 14/15 at the following intervals: immediately prior to drug administration (baseline), hourly for the first 8 hours, and 10, 12, and 24 hours post-dose. Additional blood samples were collected 14, 18, and 20 hours post-dose on Day 14, and 30 and 36 hours post-dose on Day 15.

Pharmacokinetic parameter estimates following the first dose in these patients in this study on Day 1 were comparable to those determined when they participated in the study summarized in Table 4. No significant difference in $T_{max}$ was detected among the four means (Single dose=3.76 h; Day 1=3.78 h; Day 8=3.33 h; Day 15=3.25 h). $C_{max}$ and $C_{max}/C_\tau$ on Days 8 ($C_{max}$=66.7 ng/ml) and 15 ($C_{max}$=62.6 ng/ml) were significantly greater than those of the single dose treatment and of Day 1 ($C_{max}$=48.6 ng/ml), reflecting accumulation of the drug with multiple dosing.

There was no significant difference among the four occasions with regard to either T or C and no difference in $C_{max}$, $C_{max}/C_\tau$, CL/F or $AUC_{0-\tau}$, between Days 8 and 15. Further AUC on Days 8 and 15 did not differ significantly from total AUC with single dose treatment. Likewise, the estimates of CL/F on Days 8 and 15 and of λ and $T_{1/2}$ on Day 15 did not differ significantly from those with single dose.

Steady-state was attained by Day 7/8 as evidence by the lack of differences in $C_{max}$ or AUC between Days 7/8 and 14/15; there was no apparent unexpected accumulation. Likewise, the estimates of Cl/F on Days 7/8 and 14/15 of and of $T_{1/2}$ on Day 14/15 did not differ significantly from those given a single dose. On the final day of dosing, mean $C_{max}$ was 62.6 ng/mL, occurring 3.3 hours post-dose. The $T_{1/2}$ was 5.8 hours. These values are similar to those observed in patients with chronic SCI receiving similar doses of this formulation. These results are summarized in Table 5.

TABLE 5

Pharmacokinetic Parameter Values (Mean and 95% CI) Following Multiple Oral Doses of Fampridine-SR (40 mg/day) to 20 Patients with MS.

| | Parameter | | | | |
|---|---|---|---|---|---|
| Day | $C_{MAX}$ (ng/mL) | $t_{MAX}$ (hours) | $AUC_{(0-12)}$ (ng hr/mL) | $t_{1/2}$ (hours) | Cl/F (mL/min) |
| Day 1 | 48.6 (42.0, 55.3) | 3.8 (3.2, 4.3) | NE | NE | NE |
| Day 7/8 | 66.7 (57.5, 76.0) | 3.3 (2.8, 3.9) | 531 (452, 610) | NE | 700 (557, 884) |
| Day 14/15 | 62.6 (55.7, 69.4) | 3.3 (2.6, 3.9) | 499 (446, 552) | 5.8 (5.0, 6.6) | 703 (621, 786) |

Dizziness was the most common treatment-related adverse event. Other treatment-related adverse events that occurred included nausea, ataxia, insomnia, and tremor. There were no clinically significant changes in mean clinical laboratory values, vital signs, or physical examination findings from baseline to last visit. There were no apparent clinically significant changes in corrected QT intervals or QRS amplitudes after administration of fampridine.

Fampridine was well tolerated in subjects with multiple sclerosis who receive twice daily doses (20 mg/dose) of fampridine for two weeks. A significant increase was observed in $C_{max}$, and $C_{max}/C_\tau$ on Days 8 and 15 relative to those on Day 1 and with single dose treatment, reflecting accumulation of fampridine with multiple dosing. A lack of significant differences in $C_{max}$, $C_{max}/C_\tau$, CL/F or $AUC_{0-\tau}$, between Days 8 and 15 suggest that near steady-state is reached by Day 8. There was no evidence of significant pharmacokinetics during a two-week period of multiple dosing with fampridine.

## EXAMPLE 6

This was an open-label, single dose, single-center study of the pharmacokinetics and tolerability of escalating doses of orally administered Fampridine-SR in fourteen (14) patients with chronic incomplete SCI.

After fasting overnight, a single oral dose of Fampridine-SR (10, 15, 20, or 25 mg) was to be administered. Each patient was to receive each dose in an ascending fashion. Each dose was to be followed by a 7-day washout period. A single dose of Fampridine-SR was to be administered orally on Day 1-10 mg, Day 8-15 mg, Day 15-20 mg and Day 22-25 mg with 240 mL of tepid water at approximately the same time on each treatment day. Patients were to continue their fast for 4 hours after dosing and then a standard meal was to be served. Blood samples for pharmacokinetic analysis were to be obtained at Hour 0 (immediately preceding study drug administration) and 1, 2, 3, 4, 5, 6, 8, 10, 12, 16, 20, and 24 hours after each dose. A baseline urine sample was to be collected prior to dosing and urine was to be collected for 24 hours after administration of the study drug at the following intervals: 0.1 to 4 hours; 4.1 to 8 hours; 8.1 to 12 hours; and 12.1 to 24 hours.

There was no detectable fampridine in any of the pre-dose plasma samples. By visual inspection of plasma concentration-time curves, concentrations were seen to rise for up to the first 4 hours post-dose and then to decline in a monophasic fashion. In some patients, there was evidence of a second peak. Peak concentrations increased proportionally with dose, with mean CMAX of 27.7 ng/mL following a single dose of 10 mg and mean CMAX of 67.4 ng/mL following a single dose of 25 mg. Peak concentrations occurred 3 to 4 hours post-dose, regardless of dose level. AUC also increased pro-

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

portionally with increasing dose. The length of sampling was adequate since $AUC_{0-24}$ is at least 92% of $AUC_{0-8}$. The mean $T_{1/2}$ was independent of dose, approximately 6 hours. Pharmacokinetic parameter values by dose are summarized in the Table 6 below.

TABLE 6

Mean (± SD) pharmacokinetic parameters of fampridine-SR following single dose administration

| Parameter | Fampridine-SR dose 10 mg n = 14 | 15 mg n = 14 | 20 mg n = 14 | 25 mg n = 13* |
|---|---|---|---|---|
| $C_{max}$ (ng/mL) | 27.7 ± 9.1 | 43.5 ± 11.2 | 54.9 ± 11.0 | 67.4 ± 13.3 |
| $t_{max}$ (h) | 3.2 ± 1.0 | 3.5 ± 1.2 | 3.5 ± 1.0 | 3.7 ± 1.2 |
| $AUC_{0-24\,h}$ (ng · h/mL) | 285.4 ± 96.8 | 423.0 ± 98.6 | 561.1 ± 117.6 | 715.6 ± 150.0 |
| $AUC_{0-\infty}$ (ng · h/mL) | 311.8 ± 93.2 | 460.2 ± 100.2 | 604.3 ± 124.6 | 769.2 ± 154.4 |
| $K_{el}$ ($h^{-1}$) | 0.13 ± 0.03 | 0.12 ± 0.03 | 0.12 ± 0.02 | 0.13 ± 0.03 |
| $t_{1/2}$ (h) | 5.9 ± 1.5 | 5.9 ± 1.5 | 5.9 ± 1.4 | 5.8 ± 1.6 |
| Cl/F (L/h) | 34.8 ± 10.2 | 34.3 ± 8.9 | 34.7 ± 8.5 | 34.0 ± 8.3 |
| $V_d$/F (L) | 299.8 ± 127.4 | 289.0 ± 93.7 | 289.9 ± 84.1 | 286.2 ± 123.2 |

*One patient was excluded from analysis, as not all blood samples were collected.
$C_{max}$, maximum observed plasma concentration;
$t_{max}$, time to reach $C_{max}$;
AUC, area under the plasma concentration-time curve;
$K_{el}$, elimination rate constant;
$t_{1/2}$, plasma half-life;
Cl/F, apparent total clearance;
$V_d$/F, apparent volume of distribution.

Fampridine pharmacokinetic parameters following the oral administration of single doses of fampridine-SR (10-25 mg) are summarized in Table 6. Fampridine-SR was slowly absorbed (mean $t_{max}$ occurring 3.2 to 3.7 hours postdose) and slowly eliminated in a monophasic manner (mean $t_{1/2}$~5.9 hours). Mean $t_{1/2}$, $K_{el}$, $V_d$/F, and Cl/F were independent of dose over the dose range (10-25 mg), while mean $C_{max}$, $AUC_{0-24h}$, and $AUC_{0-\infty}$ were linearly related to dose. $AUC_{0-24h}$ was at least 92% of $AUC_{0-\infty}$. Mean $C_{max}$ for the lowest fampridine-SR dose (10 mg) was 27.7 ng/mL, while mean $C_{max}$ for the highest dose (25 mg) was 67.4 ng/mL.

The plasma concentration profile following administration of Fampridine-SR was consistent with a sustained release of drug. Peak concentrations of fampridine occurred on average 3 to 4 hours post-dose, and concentrations declined with a plasma half-life of approximately 6 hours. The results of this study indicate that Fampridine-SR pharmacokinetics are linear over the single dose range studied, 10 to 25 mg. Area under the curve (AUC) and peak plasma concentration (CMAX) increased proportionally with dose.

Fampridine-SR was well-tolerated over the range of single oral doses administered in this study. Dizziness was the most frequently reported adverse event. The next most common events were hypotension, nausea, and paresthesia. There was no clear relationship between dose level and frequency of adverse events, except with the possibility of nausea, which only occurred at the 25 mg dose. There were no clinically significant changes in vital signs during treatment.

The pharmacokinetic analysis of Fampridine-SR administered once weekly showed dose proportionality across single oral doses of 10, 15, 20, and 25 mg. Mean peak fampridine concentration increased linearly with dose from 27.7 ng/mL following a dose of 10 mg to 69.9 ng/mL following a dose of 25 mg. Absorption was prolonged with peak concentrations occurring on average 3 to 4 hours postdose; this was independent of dose. The mean $T_{1/2}$ appeared independent of dose, approximately 6 hours. Single oral doses of 10, 15, 20, and 25 mg of Fampridine-SR were well-tolerated, as assessed by adverse event reporting, clinical laboratories, vital sign measurements, physical examinations, and ECG interpretation.

## EXAMPLE 7

This example describes the results of an open-label, multiple dose, single center study to assess the effects of escalating doses of orally administered sustained release fampridine (4-aminopyridine) in sixteen (16) patients with chronic incomplete spinal cord injury (SCI). Sustained release tablets of fampridine were administered 10 mg twice daily for 1 week, 15 mg twice daily for 1 week, 20 mg twice daily for 1 week and 25 mg twice daily for 1 week in sixteen patients with SCI.

Following administration of Fampridine-SR, fampridine was slowly adsorbed, with peak concentration observed approximately three hours post-dose, regardless of dose (p=0.227). Plasma levels declined gradually with a half life of 6 to 7 hours, independent of dose. Based on the mean trough concentrations, steady state was achieved by Day 5. Steady state maximal, minimal, and average plasma concentrations and AUC increased with increasing dose. Total clearance ranged between 9 and 10 mL/min/kg across dose groups. Volume of distribution at steady state ranged from 2.01 L/kg in the 15 mg BID dose group to 2.11 L/kg in the 20 mg BID dose group. A summary of the mean pharmacokinetic results is provided in Table 7.

Fampridine pharmacokinetic parameters following the oral administration of multiple doses of fampridine-SR (10-25 mg BID) are summarized in Table 7. Mean $t_{max}$ and $t_{1/2}$ were similar to values found in the single-dose study (compare to Table 6). Steady state was achieved by Day 5 (4 days of fampridine-SR dosing) following twice-daily administration of fampridine-SR. Mean $t_{max}$, $t_{1/2}$, $K_{el}$, $V_{ss}$/F, Cl/F, and mean residence time at steady state ($MRT_{ss}$) were independent of dosage following the administration of fampridine-SR (10-25 mg BID). Mean plasma concentrations ($C_{maxss}$, $C_{avss}$, and $C_{minss}$) and $AUC_{0-12h}$ at steady state were linearly related to dose over the dosage range (fampridine-SR 10-25 mg BID). Mean $C_{maxss}$ at steady state for the lowest fampri

dine-SR dosage (10 mg BID) was 32.2 ng/mL and was 87.2 ng/mL for the highest fampridine-SR dosage (25 mg BID). Corresponding $C_{minss}$ values for the lowest and highest dosages were 14.0 and 41.3 ng/mL.

TABLE 7

Mean (±SD) pharmacokinetic parameters of fampridine-SR following multiple dose administration

| Parameter | Fampridine-SR dose 10 mg BID n = 15 | 15 mg BID n = 15 | 20 mg BID n = 14 | 25 mg BID n = 14 |
|---|---|---|---|---|
| $C_{maxss}$ (ng/mL) | 32.2 ± 8.9 | 46.7 ± 10.5 | 60.1 ± 15.0 | 87.2 ± 29.0 |
| $C_{minss}$ (ng/mL) | 14.0 ± 4.4 | 23.5 ± 9.1 | 27.3 ± 10.0 | 41.3 ± 15.2 |
| $C_{avss}$ (ng/mL) | 20.8 ± 5.7 | 31.0 ± 7.2 | 39.4 ± 9.3 | 53.3 ± 14.5 |
| $t_{max}$ (h) | 2.7 ± 1.0 | 3.2 ± 0.9 | 3.1 ± 1.2 | 2.6 ± 0.9 |
| $AUC_{0-12\,h}$ (ng · h/mL) | 249.3 ± 68.3 | 371.8 ± 86.8 | 472.3 ± 111.8 | 639.4 ± 173.9 |
| $K_{el}$ ($h^{-1}$) | 0.14 ± 0.05 | 0.12 ± 0.03 | 0.13 ± 0.04 | 0.12 ± 0.05 |
| $t_{1/2}$ (h) | 5.6 ± 1.8 | 6.0 ± 1.5 | 5.8 ± 2.1 | 7.6 ± 5.5 |
| Cl/F (L/h/kg) | 9.52 ± 2.85 | 9.35 ± 2.44 | 9.79 ± 2.03 | 9.15 ± 2.35 |
| $V_{ss}$/F (L/kg) | 2.22 ± 0.79 | 2.01 ± 0.59 | 2.11 ± 0.51 | 2.09 ± 0.65 |
| $MRT_{ss}$ (h) | 5.18 ± 0.21 | 5.18 ± 0.30 | 5.15 ± 0.35 | 5.08 ± 0.31 |
| Accumulation factor | 1.30 ± 0.18 | 1.34 ± 0.16 | 1.32 ± 0.22 | 1.53 ± 0.62 |

$C_{maxss}$, maximum observed plasma concentration at steady state;
$C_{minss}$, minimum observed plasma concentration at steady state;
$C_{avss}$, average plasma concentration at steady state;
$t_{max}$, time to reach $C_{max}$;
AUC, area under the plasma concentration-time curve;
$K_{el}$, elimination rate constant;
$t_{1/2}$, plasma half-life;
Cl/F, apparent total clearance;
$V_{ss}$/F, apparent volume of distribution at steady state;
$MRT_{ss}$, mean residence time at steady state;
BID, twice daily.

Adverse events included pain, hypertonia, dizziness, accidental injury, dyspepsia, asthenia, urinary tract infection and euphoria. There was no clear relationship between frequency of adverse events and dose level, however euphoria and dizziness were observed more frequently in the 25 mg BID dose level.

Multiple oral doses of 10, 15, 20 and 25 mg BID of Fampridine-SR were generally well-tolerated, as assessed by adverse event reporting, clinical laboratories, vital signs, and physical examinations. The pharmacokinetic analysis of Fampridine-SR showed dose proportionality across multiple oral doses of 10, 15, 20, 25 mg BID each administered for 1 week. The results demonstrate that fampridine pharmacokinetics are linear over the dose range studied. Trough values indicated that steady state had been achieved by Day 5. Fampridine pharmacokinetics are dose-proportional: both AUC and $C_{max}$ at doses of 10, 15, 20, and 25 mg BID, each administered over the course of one week, were dose-proportional under both and ANOVA model and a regression power model. Neither rate of absorption (as reflected by the time of the peak concentration) nor the rate of elimination ($K_{el}$) were dependent on dose.

## EXAMPLE 8

This was a double-blind, placebo-controlled, 20 week, parallel-group study to evaluate safety, tolerability and activity of oral fampridine-SR in subjects with Multiple Sclerosis. The study was designed as follows: a two-week placebo run-in (single blind); a two-week upward titration (10 mg bid, 15 mg bid or placebo); a twelve-week stable treatment period (placebo, 10 mg bid, 15 mg bid or 20 mg bid); a one-week downward titration (10 mg bid, 15 mg bid or placebo) and a two-week post treatment follow-up. A total of 206 patients were enrolled in the study.

The mean change in walking speed, the walking speed measured per visit, the mean change in LEMMT, the LEMMT per visit, the adverse events and serious adverse events associated with the study were documented.

Results. The trial showed a strong positive trend across all three dose groups compared to placebo in its primary endpoint, improvement in walking speed, as measured by a timed 25-foot walk as shown in FIG. 3. The trial also showed a statistically significant improvement across dose groups in its secondary endpoint, the Lower Extremity Manual Muscle Test (LEMMT), as shown in FIG. 4. These results confirmed observations in earlier double-blind trials that involved fewer subjects and shorter treatment periods. Because most people with MS experience both impairment in walking ability and weakened muscles, the Timed 25 Foot Walk is widely-used to assess MS patients' functional status. The LEMMT is a standardized, 5-point manual assessment of strength, applied to leg muscle groups. The study showed a statistically significant difference across all doses at up-titration and follow-up for the 25 foot walk. The study also showed a statistically significant improvement in LEMMT across all doses during stable treatment. The study confirms the safety profile of 4-aminopyridine and preferable dosing of 10 to 15 milligrams twice daily.

Fampridine-SR showed a strong positive trend in the improvement of walking speed and significantly improved leg muscle strength in people with multiple sclerosis (MS). The drug also showed a reduction of muscle spasticity in people with chronic spinal cord injury (SCI).

## EXAMPLE 9

This was a group study to evaluate safety, tolerability and activity of oral fampridine-SR in subjects with spinal cord injury (SCI). The study was designed as follows: a two-week placebo run-in (single blind); a two-week upward titration (10 mg bid, 15 mg bid or placebo); a twelve-week stable treatment period (placebo, or 25 mg bid); a two-week down-

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

ward titration (10 mg bid, 15 mg bid) and a two-week post treatment follow-up. A total of 204 patients were enrolled in the study, of which 166 completed.

The mean change in Ashworth score, the Ashworth score measured per visit, the mean change in LEMMT, the LEMMT per visit, the adverse events and serious adverse events associated with each study were documented. The Ashworth is a validated, 5-point clinician assessment of an individual's spasticity (the involuntary tension, stiffness or contraction of muscles.)

Results. The study showed a statistically significant improvement of Ashworth score using FDA-preferred analysis, as shown in FIG. 5. The study also confirmed the safety profile of 4-aminopyridine.

Although the present invention has been described in considerable detail with reference to certain preferred embodiments thereof, other versions are possible. Therefore the spirit and scope of the appended claims should not be limited to the description and the preferred versions contain within this specification.

What is claimed is:

**1**. A method of improving walking in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein the sustained release composition further comprises one or more pharmaceutically acceptable excipients.

**2**. The method of claim **1** wherein said sustained release composition provides a mean $T_{max}$ in a range of about 2 to about 6 hours after administration of the sustained release composition to the patient.

**3**. The method of claim **2** wherein the sustained release composition is capable of providing, upon administration to the patient, a release profile of the 4-aminopyridine extending over at least 6 hours.

**4**. The method of claim **3** wherein the sustained release composition is capable of providing, upon administration to the patient, a release profile of the 4-aminopyridine extending over at least about 12 hours.

**5**. The method of claim **1** wherein the sustained release composition provides an average plasma concentration at steady state in humans in the range of about 15 ng/ml to about 35 ng/ml.

**6**. The method of claim **1** wherein the 4-aminopyridine is dispersed in a rate of release controlling polymer.

**7**. The method of claim **1** wherein the sustained release composition comprises a matrix in which the 4-aminopyridine is homogeneously dispersed that is suitable for controlling the release rate of the 4-aminopyridine.

**8**. The method of claim **1** wherein the step of administering comprises b.i.d. administering or administering at 12 hour intervals.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 11/12/2014

PTO-1683
(Rev. 7-96)

**CERTIFICATE OF SERVICE**

I, Bruce M. Wexler, hereby certify that on August 9, 2017, the foregoing Corrected Brief of Appellant Acorda Therapeutics, Inc. was filed using the Court's CM/ECF system and served on the parties' counsel of record via ECF.

/s/Bruce M. Wexler
Bruce M. Wexler
*Counsel for Appellant*
*Acorda Therapeutics, Inc.*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

The brief contains 13,991 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font.

Dated: August 7, 2017

/s/Bruce M. Wexler
Bruce M. Wexler
*Counsel for Appellant*
*Acorda Therapeutics, Inc.*