**2017-2078, -2134**

# United States Court of Appeals for the Federal Circuit

ACORDA THERAPEUTICS, INC.,

*Plaintiff-Appellant,*

ALKERMES PHARMA IRELAND LIMITED,

*Plaintiff-Appellee,*

v.

ROXANE LABORATORIES, INC., MYLAN PHARMACEUTICALS INC., TEVA PHARMACEUTICALS USA, INC.,

*Defendants-Cross-Appellants.*

Appeals from the United States District Court for the District of Delaware in Case Nos. 1:14-cv-00882-LPS, 1:14-cv-00922-LPS, 1:14-cv-00935-LPS, 1:14-cv-00941-LPS, Chief Judge Leonard P. Stark.

## BRIEF OF *AMICUS CURIAE* PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA IN SUPPORT OF ACORDA THERAPEUTICS, INC.

DAVID E. KORN
PHARMACEUTICAL RESEARCH
AND MANUFACTURERS OF AMERICA
950 F Street, NW, Suite 300
Washington, DC 20004
(202) 835-3400

SCOTT E. KAMHOLZ
BRIANNE BHARKHDA
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington DC 20001
(202) 662-6000

*Counsel for Amicus Curiae*
*Pharmaceutical Research and Manufacturers of America*

August 14, 2017

# CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae* Pharmaceutical Research and Manufacturers of America certifies the following:

1. The full name of every party or amicus represented by me is:

   Pharmaceutical Research and Manufacturers of America

2. The name of the real party in interest represented by me is:

   N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   PhRMA has no parent corporation and no publicly traded company owns 10% or more of its stock. However, its membership includes companies that have issued stock or debt securities to the public. A list of PhRMA's members is available at: www.phrma.org/about/members.

4. The names of all law firms and the partners or associates that appeared for Pharmaceutical Research and Manufacturers of America in proceedings before the district court or are expected to appear in this Court are:

   PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA: David E. Korn

   COVINGTON & BURLING LLP: Scott E. Kamholz, Brianne Bharkhda

Dated: August 14, 2017 By: /s/ Scott E. Kamholz

Scott E. Kamholz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington DC 20001
(202) 662-6000

# TABLE OF CONTENTS

**Page**


INTEREST OF *AMICUS CURIAE* .......... 1

ARGUMENT .......... 2

I. THE DETERRENCE ON WHICH *MERCK* IS PREMISED IS AIMED AT COPYCATS, NOT INVENTORS OF IMPROVEMENTS. .......... 3

II. *MERCK/GALDERMA* SHOULD NOT BE APPLIED AS A BRIGHT LINE RULE THAT DISTORTS THE BURDEN OF PROOF. .......... 11

III. ALLOWING THE TRIAL COURT'S RULING TO STAND COULD STIFLE INNOVATION AND INVESTMENT IN PHARMACEUTICAL RESEARCH AND DEVELOPMENT. .......... 15

CONCLUSION .......... 18

CERTIFICATE OF SERVICE .......... 20

CERTIFICATE OF COMPLIANCE .......... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acorda Therapeutics, Inc v. Roxane Labs., Inc.*,
No. 14–882–LPS, 2017 WL 1199767 (D. Del. Mar. 31, 2017) .................*passim*

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
725 F.2d 1350 (Fed. Cir. 1984) .......................................................................13

*Apple Inc. v. ITC*,
725 F.3d 1356 (Fed. Cir. 2013) .........................................................................6

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) .........................................................................5

*Aventis Pharma Deutschland GmbH v. Lupin Ltd.*,
No. 05CV421, 2006 WL 2008962 (E.D. Va. July 17, 2006) ...............................8

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008) .........................................................................10

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) .......................................................................11

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) .......................................................................12

*Galderma Labs., LP v. Tolmar, Inc.*,
737 F.3d 731 (Fed. Cir. 2013) ..................................................................*passim*

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)..............................................................................................11

*Hoffmann-La Roche v. Apotex, Inc.*,
No. 07-4417 (SRC)(MAS), 2012 WL 1637736 (D.N.J. May 7, 2012) ..............................................................................................................8

*Janssen Pharm., Inc. v. Watson Labs., Inc.*,
No. 08-5103 (SRC), 2012 WL 3990221 (D.N.J. Sept. 11, 2012) .................9, 13

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................................................................................10, 11

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
405 F.3d 1338 (Fed. Cir. 2005) ..........................................................................6

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ...................................................................*passim*

*Millennium Pharm., Inc. v. Sandoz Inc.*,
862 F.3d 1356 (Fed. Cir. 2017) ........................................................................14

*Proct[e]r & Gamble Co. v. Teva Pharm. USA, Inc.*,
536 F. Supp. 2d 476 (D. Del. 2008).....................................................................8

*Safety Car Heating & Lighting Co. v. Gen. Elec., Co.*,
155 F.2d 937 (2d Cir. 1946) (L. Hand, J.) .........................................................10

*Sanofi-Synthelabo v. Apotex Inc.*,
492 F. Supp. 2d 353 (S.D.N.Y. 2007) ..................................................................8

*Senju Pharm. Co. Ltd. v. Apotex Inc.*,
717 F. Supp. 2d 404 (D. Del. 2010)................................................................5, 8

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983) ........................................................................11

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
407 F.3d 1371 (Fed. Cir. 2005) ........................................................................13

*Syntex (U.S.A.) LLC v. Apotex Inc.*,
No. 01-2214 (MJJ), 2006 WL 1530101 (N.D. Cal. June 2, 2006).....................13

*UCB, Inc. v. Accord Healthcare, Inc.*,
201 F. Supp. 3d 491, 539 (D. Del. 2016) ......................................................9, 13

*Utter v. Hiraga*,
845 F.2d 993 (Fed. Cir. 1988) ..........................................................................16

*ViiV Helathcare UK Ltd. v. Lupin Ltd.*,
6 F. Supp. 3d 461, 503 (D. Del. 2013)...........................................................9, 13

*Warner Chilcott Company, LLC v. Teva Pharm. USA, Inc.*,
37 F. Supp. 3d 731, 739 (D. Del. 2014)........8

**Statutes**

21 U.S.C. §§ 355(c)(3)(E)(ii) & (j)(5)(F)(ii) ........5

35 U.S.C. § 271(e)(1)........5

35 U.S.C. § 282........12

Cooperative Research and Technology Enhancement (CREATE) Act
of 2004, Pub. L. 108-453, 118 Stat. 3596 (2004)........17

**Other Authorities**

21 C.F.R. § 314.108(b)(2)........5

Congressional Budget Office, Pharmaceutical R&D and the Evolving
Market for Prescription Drugs, Economic and Budget Issue Brief,
at 6 (Oct. 26, 2009) ........16

E. Berndt, et al., *The Impact of Incremental Innovation in
Biopharmaceuticals: Drug Utilisation in Original and
Supplemental Indications*........15, 16

FDA, *Approved Drug Products with Therapeutic Equivalence
Evaluations ADA1* (21st ed. 2001) ........7

Federal Trade Commission, *To Promote Innovation: The Proper
Balance of Competition and Patent Law and Policy*, Ch. 2 at 1
(October 2003)........15

*To Promote Innovation: The Proper Balance of Competition and
Patent Law and Policy*, Ch. 2 at 1 (October 2003)
https://www.ftc.gov/sites/default/files/documents/reports/promote-
innovation-proper-balance-competition-and-patent-law-and-
policy/innovationrpt.pdf ........15

## INTEREST OF *AMICUS CURIAE*

The Pharmaceutical Research and Manufacturers of America ("PhRMA") represents leading biotechnology and pharmaceutical companies devoted to discovering and developing medicines.[1] Those efforts produce the cutting-edge treatments that save, prolong, and improve the quality of the lives of countless individuals around the world every day. Since 2000, the Food and Drug Administration ("FDA") has approved more than 600 new medicines. In view of the significant failure rate of biopharmaceutical research and development, and the substantial requirements of the FDA to demonstrate safety and efficacy of new products, those results are not obtained cheaply. In 2016 alone, PhRMA members invested an estimated $65.5 billion in researching and developing new medicines.

PhRMA members depend heavily on a robust system of patent rights and a fair system for adjudicating their validity. PhRMA seeks to advance public policies that foster innovation in pharmaceuticals, including by ensuring adequate patent protection to enable and incentivize its members' substantial investments in research and development. To those ends, PhRMA seeks to remove barriers that may arise in the nation's systems, including the patent laws, for protecting the intellectual

[1] A complete list of PhRMA members is available at http://www.phrma.org/about/members (last visited Aug. 14, 2017). Members include Alkermes plc., a corporate affiliate of Plaintiff-Appellee, and Teva US Specialty Medicines, a corporate affiliate of Defendant-Cross-Appellant.

property of its members—including as *amicus curiae* before this Court. All parties have consented to the filing of this brief.[2]

## ARGUMENT

Despite making factual findings that Ampyra®—the commercial embodiment of Acorda's patents (8,007,826, 8,354,437, 8,440,703, and 8,663,685)—was a commercial success, that it satisfied a long felt need for a treatment for one of the "most devastating symptoms" of multiple sclerosis, and that Acorda established the requisite nexus for both, the trial court concluded that these objective indicia did not support a finding of non-obviousness. *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, No. 14–882–LPS, 2017 WL 1199767, at *17, *36-41 (D. Del. Mar. 31, 2017). The court discounted these objective indicia of non-obviousness because Ampyra® also falls within the scope of the claims of an earlier-issuing patent—which the district court referred to as a "blocking patent"—developed by Elan Corporation PLC ("Elan"), and licensed to Acorda. *Id.* at *36-40. The "blocking" patent argument accepted by the trial court is legally and logically unsound. It

[2] No party's counsel authored any portion of this brief. The above-listed attorneys from Covington & Burling LLP authored this brief, with input from PhRMA and its members. Covington attorneys have provided legal advice to Plaintiff-Appellant Acorda Therapeutics, Inc. ("Acorda") in other matters involving the patents-in-suit, but do not represent Acorda in this appeal and did not represent Acorda in the trial court. No party to this appeal or any person other than PhRMA, certain of its members not including Alkermes plc. or Teva US Specialty Medicines, or its counsel contributed any money that was intended to fund preparing or submitting the brief.

misapprehends the incentives for innovation and the effect of "blocking" patents on innovation, and arbitrarily subjects later-in-time pharmaceutical patents to an unduly harsh obviousness analysis. Furthermore, it is inapplicable in cases, such as the instant one, where someone other than the original patentee developed the later patented technology. If left uncorrected, this ruling could stifle innovation in the pharmaceutical industry, particularly research and development that builds on previously patented discoveries.

This Court should reverse the trial court's flawed validity analysis, at least, because it disregarded key objective indicia of nonobviousness—including commercial success and long felt need—without a legitimate basis for doing so. Objective indicia should be part of the obviousness analysis for all patents, absent evidence breaking the connection between the objective indicia and the features of the patented invention.

## I. THE DETERRENCE ON WHICH *MERCK* IS PREMISED IS AIMED AT COPYCATS, NOT INVENTORS OF IMPROVEMENTS.

This Court's opinions in *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005) and *Galderma Labs., LP v. Tolmar, Inc.*, 737 F.3d 731 (Fed. Cir. 2013), are frequently cited as the justification for discounting objective indicia evidence due to the existence of a so-called "blocking" patent. However, neither *Merck* nor *Galderma* stands for such a sweeping proposition. Moreover, both are based on a flawed understanding of "blocking" patents, non-

patent-related regulatory exclusivity, and their effect on innovation and market entry. *Merck* and *Galderma* should not be extended to this case.

The *Merck* court reasoned that the evidence of commercial success in that case was "not significantly probative … because others were legally barred from commercially testing the [prior art reference's] ideas." *Merck*, 395 F.3d at 1377. Specifically, the court explained:

> Merck had a right to exclude others from practicing the weekly-dosing of alendronate specified in claims 23 and 37, given (1) another patent covering the administration of alendronate sodium to treat osteoporosis, U.S. Pat. No. 4,621,077 (issued Nov. 4, 1986); ***and*** (2) its exclusive statutory right, in conjunction with FDA marketing approvals, to offer Fosamax at any dosage for the next five years. 21 U.S.C. § 355(c)(3)(D)(ii) (2000). Because market entry by others was precluded ***on those bases***, the inference of non-obviousness of weekly dosing, from evidence of commercial success, is weak.

*Id.* (emphasis added). Thus, *Merck* relied on ***both*** a dominating prior patent and Merck's five year regulatory exclusivity for Fosamax, not simply on the existence of a prior patent—an important fact overlooked by subsequent cases.

The *Merck* court cited no record evidence showing that competition was precluded as a result of these two facts. It simply assumed that these two conditions, in combination, precluded others from practicing the invention. *Id.* This is not correct.

First, a prior patent would not have categorically precluded others from further developing the technology. For example, it would not have precluded others

from independently developing and patenting a related improvement, obtaining a license to the original patent and engaging in further development, developing or testing improvements under the safe harbor provision of 35 U.S.C. § 271(e)(1), or practicing the invention outside the United States. Far from hindering market entry, "blocking patents often serve the market well by pressuring both inventors to license their innovations to each other and beyond." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1365 (Fed. Cir. 2010) (Rader, J. dissenting-in-part and concurring-in-part).

Second, five-year exclusivity only precludes the FDA from accepting for review an abbreviated new drug application ("ANDA") or 505(b)(2) application—avenues for the regulatory approval of *non-innovative* generic and follow-on products that rely on the safety and efficacy data of the reference listed drug or published literature. *See* 21 U.S.C. §§ 355(c)(3)(E)(ii) & (j)(5)(F)(ii); 21 C.F.R. § 314.108(b)(2).[3] It does not preclude other companies from developing or testing new drugs or submitting full new drug applications ("NDAs") for new products. Thus, five year regulatory exclusivity does not function as a barrier to other potential innovators. Accordingly, the premise on which *Merck* is based is fundamentally

[3] *Senju Pharm. Co. Ltd. v. Apotex Inc.*, 717 F. Supp. 2d 404, 426 n.36 (D. Del. 2010) (describing *Merck* as "finding that where an earlier patent blocks entry of ***generic*** products into the market, a weak inference of commercial success may be attributed to a later patent on the product.") (emphasis added).

flawed. Moreover, *Merck* does not stand for the sweeping proposition that the existence of a prior patent alone categorically negates objective indicia linked to later patents.

Several members of this Court disagreed with the *Merck* ruling and its reasoning. Dissenting from denial of rehearing en banc, Judges Lourie, Michel, and Newman explained that commercial success "is not negatived by any inability of others to test various formulations because of the existence of another patent. Success is success. The panel's rule is especially unsound in the context of an improvement patent, as here, because it holds in effect that commercial success for an improvement is irrelevant when a prior patent dominates the basic invention." *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 405 F.3d 1338, 1339 (Fed. Cir. 2005) (dissenting from order denying rehearing en banc). Indeed, commercial success, when tied to the merits of the claimed invention, reflects an appreciation within the marketplace or relevant industry for the distinctive qualities of that invention. This, in itself, is an indicator of the non-obviousness of an invention and its benefits over the prior art. *See, e.g., Apple Inc. v. ITC*, 725 F.3d 1356, 1375 (Fed. Cir. 2013) (Reyna, J., concurring-in-part and dissenting-in-part) (Evidence "gleaned from the patented product's role in the marketplace[] is the indicia of the innovation principle upon which rests our system of patents."). The mere existence of a prior patent does

not diminish the significance of such evidence, where both commercial success and nexus have been established.

The *Galderma* case was likewise flawed. When the *Galderma* court cited *Merck* to justify discounting the commercial success of Differin 0.3%, it simply ignored the *Merck* court's focus on regulatory exclusivity, resting its reasoning entirely on a truncated quotation from *Merck*:

> Where "market entry by others was precluded ***[due to blocking patents]***, the inference of non-obviousness of [the asserted claims], from evidence of commercial success, is weak." *Galderma*, 737 F.3d at 740 (bracketing in original; emphasis added).

In reality, both of the conditions identified in *Merck* (a prior dominating patent and regulatory exclusivity) were present in the *Galderma* case.[4] The prior art Differin 0.1% products (solution, gel, and cream) had five year regulatory exclusivity, and the cream version of the Differin 0.1% had three year exclusivity. FDA, *Approved Drug Products with Therapeutic Equivalence Evaluations ADA1* (21st ed. 2001). However, by truncating the reasoning of *Merck*, *Galderma* reinforced the misconception already taking hold in district courts that a prior dominating patent, alone, bars or diminishes the force of objective indicia—a rule never before existing in patent law.

---

[4] The *Galderma* court cited no record evidence that competition was in fact precluded.

Judge Newman's dissenting opinion in *Galderma* cautioned that the majority's approach would create a barrier to "improvement patents." *Galderma*, 737 F.3d at 742 (Newman, J. dissenting). She explained that "[i]n refusing to credit any of the demonstrated 'secondary considerations' my colleagues foreclose patentability to a vast body of improvement patents …. [t]he court places new obstacles in the path of improvement patents, a change of law that is particularly pernicious in the arts where small differences may have large consequences or benefits." *Id.* at 742, 749-750.

Indeed, many district courts have cited *Merck* and/or *Galderma* to discount commercial success, without requiring supporting evidence that others were actually precluded, or dissuaded, from practicing the invention. *See, e.g.*, *Warner Chilcott Company, LLC v. Teva Pharm. USA, Inc.,* 37 F. Supp. 3d 731, 739 (D. Del. 2014); *Hoffmann-La Roche v. Apotex, Inc.*, No. 07-4417 (SRC)(MAS), 2012 WL 1637736, at *18 (D.N.J. May 7, 2012); *Senju Pharm. Co. v. Apotex Inc.*, 717 F. Supp. 2d 404, 426 (D. Del. 2010); *Proct[e]r & Gamble Co. v. Teva Pharm. USA, Inc.*, 536 F. Supp. 2d 476, 496 (D. Del. 2008); *Sanofi-Synthelabo v. Apotex Inc.*, 492 F. Supp. 2d 353, 392 (S.D.N.Y. 2007); *Aventis Pharma Deutschland GmbH v. Lupin Ltd.*, No. 05CV421, 2006 WL 2008962, at *44 (E.D. Va. July 17, 2006).

But, other district courts have rejected so-called "blocking" patent arguments in the absence of evidence that market entry by others was precluded. *See, e.g.*,

*Janssen Pharm., Inc. v. Watson Labs., Inc.*, No. 08-5103 (SRC), 2012 WL 3990221, at *23 (D.N.J. Sept. 11, 2012) ("In the instant case, there has been no demonstration that market entry by others was precluded."); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 539 (D. Del. 2016) (rejecting "blocking" patent argument because "[r]ather than using the patents to block development efforts, [the patentee] offered licenses to them"); *ViiV Helathcare UK Ltd. v. Lupin Ltd.*, 6 F. Supp. 3d 461, 503 (D. Del. 2013) (Commercial success of the drugs could not completely be attributed to blocking patents because the patentee had only acquired rights to one of the three claimed compounds shortly before the operative priority date and there was evidence that researchers in the field of HIV drug therapy frequently share compounds.).

The obstacle created by the overbroad application of *Merck* and *Galderma* disproportionately affects pharmaceutical patents. Many other types of products are often covered by more than one patent, including earlier patents which would have given the patentee the right to exclude others from practicing the invention. Nonetheless, *amicus curiae* has found cases applying *Merck* and *Galderma* to foreclose or discount objective indicia only in the pharmaceutical arts, not in any other discipline. There appears to be no comparable "blocking" patent rule in any other technology.

There is no basis for treating pharmaceutical patents differently from patents directed to other subject matter. U.S. patent law provides a uniform set of rules that apply to all areas of technology. *In re Bilski*, 545 F.3d 943, 960 (Fed. Cir. 2008) (reaffirming conclusion that "same legal requirements for patentability" apply regardless of technology). The obviousness standard, and specifically the legal availability of certain objective indicia, should not differ based on the subject matter of the patent. Nor is there a basis for treating so-called "improvement patents" differently. Essentially all inventions are improvements on prior inventions. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-419 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."). One of the questions the obviousness analysis, and specifically objective indicia, are supposed to answer is the "extent to which [an invention] superseded what had gone before." *Safety Car Heating & Lighting Co. v. Gen. Elec., Co.*, 155 F.2d 937, 939 (2d Cir. 1946) (L. Hand, J.). It makes little sense to foreclose a court from considering objective indicia to answer that question simply because the patent-at-issue came later in time than other patents that read on a particular commercial embodiment.

## II. *MERCK/GALDERMA* SHOULD NOT BE APPLIED AS A BRIGHT LINE RULE THAT DISTORTS THE BURDEN OF PROOF.

This Court and the Supreme Court have repeatedly stressed the importance of objective indicia, such as commercial success and long felt need, to the obviousness analysis. *See, e.g., Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1077 (Fed. Cir. 2012). Objective indicia function to guard against hindsight analysis and to provide a non-technical measure of nonobviousness that may be more easily accessible to lay judges and juries. *See In re Cyclobenzaprine*, 676 F.3d at 1079. Objective indicia "may often be the most probative and cogent evidence [of nonobviousness] in the record." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). Moreover, "[t]hroughout [the Supreme] Court's engagement with the question of obviousness, [its] cases have set forth an expansive and flexible approach …" *See, e.g., KSR v. Teleflex*, 550 U.S. at 415. The Court has emphasized that "[r]igid preventative rules that deny factfinders recourse to common sense … are neither necessary under our case law nor consistent with it." *Id.* at 421.

Yet, under the reasoning of the district court, evidence of certain objective indicia can be categorically rejected—or largely discounted—in instances in which the commercial embodiment of the patent is covered by an earlier patent. *See, e.g., Acorda*, 2017 WL 1199767, at *36-41. Such a bright line rule means that, for pharmaceuticals that are covered by multiple patents, the later patents, which are as

presumptively valid as the first patent covering the product (35 U.S.C. § 282), are judged more harshly, even when there is no actual evidence that potential competitors were blocked or the market distorted.

What is remarkable about this case, and other district court cases applying similar reasoning, is that—even after the patentee established commercial success and nexus—the court simply assumed that others were precluded from practicing the invention without requiring any proof. *See, e.g.*, *Acorda*, 2017 WL 1199767, at *38 (concluding without citing any record evidence that "[t]he risk of such liability would have provided an independent incentive for a patentee not to develop the invention of the Acorda Patents, even if those inventions were obvious."); *id.* at *40 (asserting without citing any record evidence that "it is possible that the need for a therapy to improve walking in MS patients remained unmet ***despite*** the ***obviousness*** of the solution claimed in the Acorda Patents") (emphasis in original).

Rather than having a bright line rule, the Court should require the accused infringer, consistent with the applicable burden of the obviousness analysis, at a minimum to refute nexus with evidence that the earlier patent blocked entry of potential competitors or distorted the market such that it deterred innovation. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988) ("It is the task of the challenger to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention

…. '[A]rgument' and 'conjecture' are insufficient."); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984) (explaining that the accused infringer at all times bears the burden of proving invalidity by clear and convincing evidence). Several district courts have shown that this type of case-specific, evidence-based analysis is feasible. *See, e.g.*, *Janssen*, 2012 WL 3990221, at *23; *UCB*, 201 F. Supp. 3d 491; *ViiV Healthcare*, 6 F. Supp. 3d 461. It is already part of the nexus analysis, which requires proof that objective indicia, such as commercial success, derive from the features of the claimed invention, rather than features that existed in the prior art. *See, e.g.*, *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1383 (Fed. Cir. 2005) ("Assuming that the active ingredient in the formulation was previously patented, the commercial success of ACULAR may heavily derive from subject matter that does not on the whole contribute to the patentable distinctiveness of these claims. In such a case, the trial court should carefully consider whether the nexus requirement of our law is satisfied."); *Syntex (U.S.A.) LLC v. Apotex Inc.*, No. 01-2214 (MJJ), 2006 WL 1530101, at *26 (N.D. Cal. June 2, 2006) ("Here, the record evidence shows that ACULAR®'s commercial success derives from its embodiment of the entire combination taught by the '493 patent, and not from the fact that its active ingredient, ketorolac tromethamine, was previously protected by another patent.").

The instant case illustrates that the one-size-fits-all approach that has arisen pursuant to *Merck* is not appropriate. In the *Merck* and *Galderma* cases, there was a prior version of the commercial product (in *Merck* daily Fosamax, in *Galderma* Differin 0.1%) marketed by the patentee and covered by one of the patentee's patents, which also covered the product-at-issue in the suit. The *Merck* court found it relevant that the existence of the prior product, its regulatory exclusivity, and its prior patent may have precluded "market entry by others." *Merck*, 395 F.3d at 1377. This reasoning, which was flawed to begin with, has now been applied in situations (as in the instant case) in which ***someone other than the original patentee developed the later technology***. This kind of expansion shows that a blanket application of *Merck/Galderma* is incorrect. *Cf. Millennium Pharm., Inc. v. Sandoz Inc.*, 862 F.3d 1356 (Fed. Cir. 2017) (crediting commercial success, long felt need, and unexpected results, despite the existence of a prior dominating patent that covered the commercial embodiment (Velcade®), where there was no earlier viable commercial product and there was evidence tying the objective indicia to the features of the later invention).

Even if the regulatory exclusivity of a prior FDA-approved product is relevant to the question of whether nexus has been established for objective indicia, this piece of the *Merck* equation is missing in this case. Ampyra®, the commercial embodiment of the Acorda patents, is the first and only FDA-approved 4–Aminopyridine ("4-

AP") product. *Acorda*, 2017 WL 1199767, at, *3. Moreover, Ampyra® was not approved until 2010—six years after the priority date of the Acorda patents. *Id.* at, *3, *9 n.8. Accordingly, this is not a situation in which regulatory exclusivity precluded others from developing the claimed inventions at an earlier date.

## III. ALLOWING THE TRIAL COURT'S RULING TO STAND COULD STIFLE INNOVATION AND INVESTMENT IN PHARMACEUTICAL RESEARCH AND DEVELOPMENT.

The pharmaceutical industry relies on patents to protect investments in drug research and development and the generation of safety and efficacy data. Federal Trade Commission, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy*, Ch. 2 at 1 (October 2003)[5] ("Pharmaceutical companies … rely on patents to prevent free riding, recoup their R&D investments, and learn about new technological breakthroughs."). Pharmaceutical innovation is frequently cumulative and incremental. *See* E. Berndt, et al., *The Impact of Incremental Innovation in Biopharmaceuticals: Drug Utilisation in Original and Supplemental Indications*, 24 Suppl. 2 Pharmacoeconomics 69-86, 70-71 (2006). Patents in the pharmaceutical industry are often directed to novel delivery systems, new forms of the active compound, novel controlled release formulations, and novel combinations of active ingredients. Yet even changes over the prior art that are considered

---

[5] https://www.ftc.gov/sites/default/files/documents/reports/promote-innovation-proper-balance-competition-and-patent-law-and-policy/innovationrpt.pdf.

incremental advances often can result in inventions that provide substantial improvements for patients. Objective indicia provide evidence of this. Patients benefit from drug development that leads to more therapeutic choices and drugs with fewer side effects and better efficacy. *See id.* at 71. In the past, this Court's case law sought to encourage continued innovation even when there is a dominating patent held by another. *See, e.g., Utter v. Hiraga*, 845 F.2d 993, 998 (Fed. Cir. 1988) (holding in an interference proceeding that "[t]here is no inconsistency in awarding a generic count to one inventor, while awarding a patentably distinct species count to another.").

Allowing the trial court's ruling to stand could stifle just this kind of innovation. It disincentivizes pharmaceutical companies from building on their own previously patented work and the previously patented work of others. *See* Congressional Budget Office, Pharmaceutical R&D and the Evolving Market for Prescription Drugs, Economic and Budget Issue Brief, at 6 (Oct. 26, 2009) ("[P]olicies that would lower expectations about revenues would discourage R&D investment."). Indeed, companies will have less incentive to develop their own such improvements if later patents meant to protect them are subjected to a harsher obviousness analysis, in which objective indicia like commercial success are disregarded. Moreover, companies often work together through licensing and collaboration agreements to work toward advances in the art, and the law has

evolved to encourage such joint activity. *See, e.g.*, Cooperative Research and Technology Enhancement (CREATE) Act of 2004, Pub. L. 108-453, 118 Stat. 3596 (2004). The trial court's ruling has the opposite effect, disincentivizing the licensing of existing pharmaceutical patents in order to advance the technology.

This case illustrates how collaborative and incremental innovation in the pharmaceutical industry can work. Acorda licensed the U.S. Patent No. 5,540,938 ("the Elan Patent") from Elan[6] in order to continue to work toward clinical implementation of a 4–Aminopyridine ("4-AP") treatment regimen. *Acorda*, 2017 WL 1199767, at *37. Acorda "expend[ed] considerable time and money on licensing a formulation and conducting clinical trials" and developed its own inventions. *Id.* Ampyra®—the commercial clinical product that resulted from this effort—is the first and only FDA-approved drug indicated for improving walking in patients with MS; it was granted priority review by the FDA because of its clinical usefulness. *Id.* at *40. The Elan patent did not actually prevent others from innovating in the 4-AP space or from developing the inventions claimed in the Acorda patent. On the contrary, Acorda recognized the value of Elan's invention, licensed it, and built on it. Acorda, and companies like it, should not be punished by having the later patents they obtain judged more harshly.

---

[6] Plaintiff-Appellee Alkermes Pharma Ireland Ltd. acquired Elan and became successor-in-interest to the Elan Patent. *Acorda*, 2017 WL 1199767, at *5.

* * *

If the reasoning of the trial court in this matter is allowed to stand, pharmaceutical innovation will likely suffer. "In the field of medicaments, the denial of patentability for improvements is a disincentive to the development of such improvements. The losers are those afflicted with disease." *Galderma*, 737 F.3d at 742 (Newman, J. dissenting). *Amicus curiae* urges this Court to reverse the ruling below, and make clear that objective indicia are available for pharmaceutical "improvement" patents, absent evidence breaking the connection between the objective indicia and the features of the patented invention.

## CONCLUSION

For the foregoing reasons, *amicus curiae* urges the Court to reverse the district court's judgment of invalidity as to the Acorda Patents.

Dated: August 14, 2017

Respectfully submitted,

/s/ Scott E. Kamholz
Scott E. Kamholz
Brianne Bharkhda
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington DC 20001
(202) 662-6000

David E. Korn
PHARMACEUTICAL RESEARCH
AND MANUFACTURERS OF AMERICA
950 F Street, N.W., Suite 300
Washington, D.C. 20004
(202) 835-3400

*Counsel for Amicus Curiae Pharmaceutical Research and Manufacturers of America*

## CERTIFICATE OF SERVICE

I, Scott E. Kamholz, hereby certify that, on August 14, 2017, the foregoing document was filed and served using the CM/ECF system.

/s/ Scott E. Kamholz

Scott E. Kamholz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington DC 20001
(202) 662-5339

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29 and 32 and Federal Circuit Rule 32, I certify the following:

1. The brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(A) and Federal Circuit Rule 28.1. This brief contains 4,100 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

2. The attached petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally space typeface using Microsoft Word 2016 in 14-point Times New Roman type style.

Dated: August 14, 2017 By: /s/ Scott E. Kamholz

Scott E. Kamholz
Brianne Bharkhda
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington DC 20001
(202) 662-6000