**No. 2017-2078, -2134**

# In the United States Court of Appeals for the Federal Circuit

ACORDA THERAPEUTICS, INC.,
PLAINTIFF-APPELLANT

ALKERMES PHARMA IRELAND LIMITED,
PLAINTIFF-APPELLEE

*v.*

ROXANE LABORATORIES, INC., MYLAN PHARMACEUTICALS INC., TEVA PHARMACEUTICALS USA, INC.,
DEFENDANTS-CROSS-APPELLANTS

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, NOS. 14-cv-00882, 14-cv-00922, 14-cv-00935, 14-cv-00941, Chief Judge Leonard P. Stark, presiding*

**BRIEFS FOR DEFENDANTS-APPELLEES AND CROSS-APPELLANTS ROXANE LABORATORIES, INC., MYLAN PHARMACEUTICALS, INC., TEVA PHARMACEUTICALS USA, INC.**

CHARLES B. KLEIN
ANDREW C. NICHOLS
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 282-5000*

GEORGE C. LOMBARDI
SAMUEL S. PARK
BRYCE A. COOPER
REID F. SMITH
*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, IL 60601*
*(312) 558-5600*

*Counsel for Defendants-Appellees and Cross-Appellants Roxane Laboratories, Inc. and Teva Pharmaceuticals USA, Inc.*

CORRECTED – OCTOBER 6, 2017 [ADDITIONAL COUNSEL LISTED ON INSIDE COVER]

ROBERT L. FLORENCE
KAREN L. CARROLL
MICHEAL L. BINNS
*Parker Poe Adams & Bernstein*
*1180 Peachtree Street N.E.*
*Suite 1800*
*Atlanta, GA 30309*
*(678) 690-5750*

*Counsel for Defendant-Appellee and Cross-Appellant Mylan Pharmaceuticals, Inc.*

**FORM 9. Certificate of Interest** **Form 9 Rev. 10/17**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Acorda Therapeutics, Inc. **v.** Roxane Laboratories, Inc.

Case No. 2017-2078, -2134

**CERTIFICATE OF INTEREST**

Counsel for the:
☐ (petitioner) ☐ (appellant) ☐ (respondent) ▣ (appellee) ☐ (amicus) ☐ (name of party)

Roxane Laboratories, Inc.

certifies the following (use “None” if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Roxane Laboratories, Inc. | Roxane Laboratories, Inc. | Roxane Laboratories, Inc. is an |
| | | indirect wholly owned subsidiary of |
| | | West-Ward Pharmaceuticals Corp., |
| | | which is the only publicly traded |
| | | company that owns 10% or |
| | | more of the stock of |
| | | Roxane Laboratories, Inc. |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

John C. Phillips, Jr., Megan C. Haney, and David A. Bilson of Phillips, Goldman, McLaughlin & Hall

**FORM 9. Certificate of Interest** **Form 9**
**Rev. 10/17**

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

Acorda Therapeutics, Inc. v. Micro Labs. Ltd., No. 3:17-CV-03724-BRM-DEA (D.N.J.) (filed on May 24, 2017)

10/2/2017
Date

/s/ Charles B. Klein
Signature of counsel

Charles B. Klein
Printed name of counsel

Please Note: All questions must be answered

cc: ____________________

Reset Fields

**FORM 9. Certificate of Interest** **Form 9 Rev. 10/17**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Acorda Therapeutics, Inc. **v.** Roxane Laboratories, Inc.

Case No. 2017-2078, -2134

**CERTIFICATE OF INTEREST**

Counsel for the:
☐ (petitioner) ☐ (appellant) ☐ (respondent) ▣ (appellee) ☐ (amicus) ☐ (name of party)

Teva Pharmaceuticals USA, Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Teva Pharmaceuticals USA, Inc. | Teva Pharmaceuticals USA, Inc. | Teva Pharmaceuctical USA, Inc. is an |
| | | indirect wholly owned subsidiary of |
| | | Teva Pharmaceutical Industries, |
| | | Ltd., which is the only publicly |
| | | traded company that owns |
| | | 10% or more of the stock of |
| | | Teva Pharmaceuticals USA, Inc. |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

John C. Phillips, Jr., Megan C. Haney, and David A. Bilson of Phillips, Goldman, McLaughlin & Hall

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

Acorda Therapeutics, Inc. v. Micro Labs. Ltd., No. 3:17-CV-03724-BRM-DEA (D.N.J.) (filed on May 24, 2017)

10/2/2017
Date

/s/ Charles B. Klein
Signature of counsel

Please Note: All questions must be answered

Charles B. Klein
Printed name of counsel

cc: ______________________

Reset Fields

FORM 9. Certificate of Interest

Form 9
Rev. 10/17

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Acorda Therapeutics, Inc. v. Roxane Laboratories, Inc.

Case No. 17-2078, -2134

## CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☐ (appellant) ☐ (respondent) ■ (appellee) ☐ (amicus) ☐ (name of party)

Mylan Pharmaceuticals Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Mylan Pharmaceuticals Inc. | Mylan Pharmaceuticals Inc. | Mylan Pharmaceuticals Inc. is a wholly |
| | | owned subsidiary of Mylan Inc., which |
| | | is indirectly wholly owned by Mylan |
| | | N.V., a publicly held company. No |
| | | publicly-held company holds 10% or |
| | | more of Mylan N.V.'s stock. |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

Law firm of Morris James LLP: Mary B. Matterer, Richard K. Herrmann; Law firm of Parker Poe Adams & Bernstein LLP: Christopher M. Thomas, Melanie Black Dubis, Catherine R.L. Lawson; Law firm of McGuireWoods LLP: Timothy H. Kratz, Cedric C.Y. Tan, George J. Barry III, Brie L.B. Buchanan, Yun Wei

**FORM 9. Certificate of Interest** **Form 9**
**Rev. 10/17**

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

Acorda Therapeutics, Inc. v. Micro Labs Limited, No. 3:17-cv-03724-BRM-DEA (D.N.J.)

10/2/2017
Date

/s/ Robert L. Florence
Signature of counsel

Please Note: All questions must be answered

Robert L. Florence
Printed name of counsel

cc: Counsel of Record (by CM/ECF)

**Reset Fields**

# TABLE OF CONTENTS

**Page**


CERTIFICATES OF INTEREST ................................................................ iii, v, vii

TABLE OF AUTHORITIES ........................................................................ xii

STATEMENT OF RELATED CASES ....................................................... xv

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT.................................................................. 6

COUNTERSTATEMENT OF THE ISSUES ................................................ 6

COUNTERSTATEMENT OF THE CASE ................................................... 7

I. The Acorda Patents claim an optimized dose for a method of treatment taught by the prior art. ............................................................................ 7

A. The prior art taught that a sustained-release formulation of 4-AP could be used to treat MS patients and motivated a POSA to use such a formulation for that purpose. ................................................... 7

B. The Elan Patent claims methods of using a sustained-release formulation of 4-AP to treat MS, and Acorda licensed that patent. ...10

C. The prior art taught a preferred dose range (10-20 mg twice-daily) to treat impaired walking in MS patients. ............................................ 12

D. The prior art taught the pharmacokinetic results for dosing within the preferred range ................................................................................ 17

E. The Acorda Patents claim the lowest effective dose (10 mg twice-daily) from the preferred dose range disclosed in the prior art to treat impaired walking in MS patients. ................................................... 19

II. The District Court found the Elan Patent valid and non-obvious, but the Acorda Patents invalid as obvious. ........................................................ 21

SUMMARY OF ARGUMENT ....................................................................28

STANDARD OF REVIEW ....................................................................31

ARGUMENT ....................................................................32

**APPELLEES' RESPONSE BRIEF**

This Court should affirm the District Court's judgment holding the Acorda Patents invalid as obvious…………………………… ....................................32

A. The District Court recited and applied the correct standard for obviousness. ....................................................................32

B. Acorda simply rehashes its failed factual arguments, coming nowhere close to showing clear error. ....................................................................37

1. The record supports the District Court's reading of the prior art, which did not teach away from the claimed invention. ....................................................................38

2. The record supports the District Court's finding that the claimed invention as a whole was at least "obvious to try." ....................................................................41

3. The record supports the District Court's finding that it was obvious to optimize a stable dose. ....................................44

C. The District Court correctly found that the claimed pK parameters were inherent and otherwise obvious. ....................................................................47

1. Acorda has failed to show clear error with regard to the pK limitations. ....................................................................47

2. The record also supports an alternative basis to affirm the District Court's findings with regard to the pK limitations. ....................................................................52

D. Acorda ignores that its patents are presumed *prima facie* obvious as a matter of law. ....................................................................53

E. The District Court properly followed this Court's precedent in according little probative value to Acorda's purported evidence of secondary considerations due to the existence of a blocking patent. ............................56

**CROSS APPELLANTS' PRINCIPAL BRIEF**

This Court should declare the Elan Patent invalid under 35 U.S.C. § 112…………………………………………………………………………61

CONCLUSION ........................................................................................66

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcon Research Ltd. v. Barr Labs., Inc.*,
745 F.3d 1180 (Fed. Cir. 2014) ....................61

*Allergan, Inc. v. Sandoz Inc.*,
726 F.3d 1286 (Fed. Cir. 2013) ....................43

*Alza Corp. v. Mylan Labs., Inc.*,
464 F.3d 1286 (Fed. Cir. 2006) ....................37, 42

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ....................45

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ....................62, 65

*Bayer Schering Pharma AG v. Barr Labs., Inc.*,
575 F.3d 1341 (Fed. Cir. 2009) ....................46

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) ....................31

*Dome Patent L.P. v. Lee*,
799 F.3d 1372 (Fed. Cir. 2015) ....................32

*Galderma Labs., L.P. v. Tolmar, Inc.*,
737 F.3d 731 (Fed. Cir. 2013) ....................39, 54, 55

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
527 F.3d 1318 (Fed. Cir. 2008) ....................38, 39

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
748 F.3d 1326 (Fed. Cir. 2014) ....................43

*Kao Corp. v. Unilever U.S., Inc.*,
441 F.3d 963 (Fed. Cir. 2006) ....................*passim*

*KSR Int'l. Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................2, 3, 36, 37, 43

*Lampi Corp. v. Am. Power Prods., Inc.*,
228 F.3d 1365 (Fed. Cir. 2000) ....................................................................61

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
485 F.3d 1157 (Fed. Cir. 2007) ....................................................................38

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ................................................................*passim*

*Millennium Pharmaceuticals Inc. v. Sandoz, Inc.*
862 F.3d 1356 (Fed. Cir.2017) ......................................................................51

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012) ....................................................................31

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013) ..............................................................37, 38

*Par Pharm., Inc. v. TWI Pharm., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ....................................................................51

*Richardson-Vicks, Inc. v. Upjohn Co.*,
122 F.3d 1476 (Fed. Cir. 1997) ..........................................................5, 30, 56

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
719 F.3d 1305 (Fed. Cir. 2013) ....................................................................60

*Ruiz v. A.B. Chance Co.*,
357 F.3d 1270 (Fed. Cir. 2004) ................................................................*passim*

*Santarus, Inc. v. Par Pharm., Inc.*,
694 F.3d 1344 (Fed. Cir. 2012) ................................................................*passim*

*Senju Pharm. Co. v. Lupin Ltd.*,
780 F.3d 1337 (Fed. Cir. 2015) ....................................................................38

*SightSound Techs. v. Apple Inc.*,
809 F.3d 1307 (Fed. Cir. 2015) ....................................................................39

*Spectrum Pharm., Inc. v. Sandoz Inc.*,
802 F.3d 1326 (Fed. Cir. 2015) ................................................................4, 32

*Starr Int'l Co., Inc. v. United States*,
856 F.3d 953 (Fed. Cir. 2017) ....................................................................32, 44

*Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*,
482 F.3d 1330 (Fed. Cir. 2007) ..........................................................................60

*Transmatic, Inc. v. Gulton Indus., Inc.*,
53 F.3d 1270 (Fed. Cir. 1995) ............................................................................41

*Tyco Healthcare Group, LP v. Mutual Pharm. Co, Inc.*,
642 F.3d 1370 (Fed. Cir. 2011) ......................................................................3, 54

*UCB, Inc. v. Accord Healthcare, Inc.*,
201 F. Supp. 3d 491 (D. Del. 2016).....................................................................59

*Warner Chilcott Co, LLC v. Teva Pharm. USA, Inc.*,
37 F. Supp. 3d 731 (D. Del. 2014), *aff'd,* 594 F. App'x 630 (Fed. Cir. Nov. 18, 2014) ......................................................................................56

*In re Warsaw Orthopedic, Inc.*,
832 F.3d 1327 (Fed. Cir. 2016) ..........................................................................31

*Zoltek Corp. v. United States*,
815 F.3d 1302 (Fed. Cir. 2016) ..........................................................................64

**Statutes**

35 U.S.C. § 112..........................................................................5, 6, 31, 61, 65

**Other Authorities**

Fed. Circ. Rule 35(a)(1) .........................................................................................60

## STATEMENT OF RELATED CASES

A prior appeal in this case was before this Court under Docket Nos. 2015-1456 and 2015-1460. This Court decided the appeal on March 18, 2016. The opinion is available at *Acorda Therapeutics Inc. v. Mylan Pharmaceuticals Inc.*, 817 F.3d 755 (Fed. Cir. 2016). Judge Taranto authored the opinion, joined by Judge Newman. Judge O'Malley authored an opinion concurring in the judgment.

The following case involves the patents-in-suit here and may be directly affected by this Court's decision in this appeal: *Acorda Therapeutics, Inc. v. Micro Labs. Ltd.*, No. 17-CIV-03724 (D.N.J.) (filed on May 24, 2017).

Counsel is not aware of any other cases pending that will directly affect, or be directly affected by, this Court's decision in this appeal.

## INTRODUCTION

In this Hatch-Waxman case, Defendants seek approval to market affordable, generic versions of Acorda Therapeutics, Inc.'s branded drug product Ampyra® (dalfampridine), which is indicated to help multiple sclerosis ("MS") patients walk. Following a bench trial, in an 88-page opinion, Chief Judge Stark of the District of Delaware found invalid as obvious all asserted claims of Acorda's patents, U.S. Patent Nos. 8,007,826, 8,354,437, 8,440,703, and 8,663,685 (collectively, the "Acorda Patents"). This Court should affirm.

Nothing in the Acorda Patents is novel. Long before Acorda decided to pursue its clinical trials using dalfampridine (also known as "4-AP"), Elan Corporation, plc, developed and patented a method of using a sustained-release formulation of 4-AP to treat MS. Acorda obtained an exclusive license of this patent, U.S. Patent No. 5,540,938 (the "Elan Patent"), and used the very same sustained-release 4-AP formulation that Elan developed in its clinical trials in MS patients. The Acorda Patents merely narrow the Elan Patent to a specific dosing regimen (10 mg, taken orally twice-daily, for at least two weeks) that had already been determined to improve walking in MS patients, while achieving certain inherent pharmacokinetic ("pK") effects. Based on a careful analysis, the District Court held that its "assessment of the evidence as a whole is that Defendants have proven clearly and convincingly that the Acorda Patents are invalid due to obviousness." Appx89.

That holding was correct. The prior art of record (the "Goodman references") taught that orally administering 10-20 mg of dalfampridine twice-daily had a "[s]ignificant benefit on timed walking" in MS patients. Appx31, Appx65. The Acorda Patents merely claim the lowest effective dose in that narrow range. The District Court thus found that "the prior art as a whole … suggests a 'finite' set of plausible solutions" for optimizing the dosage of 4-AP (Appx71), and the "anticipated success" was "the product not of innovation but of ordinary skill and common sense." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

To challenge this finding, Acorda does nothing but rehash the very same factual arguments Chief Judge Stark rejected. But this Court "must uphold the trial court's determination" of the facts as long as it is at least "plausible in light of the entire record or where it chooses one of two permissible views of the evidence." *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 967 (Fed. Cir. 2006). Here, the District Court's factual findings are more than "plausible"; they are detailed, thoughtful, and well supported.

Far from making "a radical break" from what Acorda calls the "unpromising prior art" (Br. 2-3), the District Court held that the claimed invention routinely optimized the prior art—relying not only on the Goodman references, but also on concessions by Dr. Goodman himself, who was Acorda's expert at trial. As the District Court found, Dr. Goodman "conceded that a POSA [i.e., a person of ordinary skill

in the art] would have been motivated based on the results" disclosed in his prior-art, dose-ranging study to "explore[] sustained-release doses of 10 mg, 15 mg, and 20 mg/twice daily to treat walking in patients with MS." Appx73 n.35. Such a study would have tested stable dosing because, as Dr. Goodman further conceded, a stable dosing regimen "would be desirable" for patients. Appx76. "As such," the District Court found, "the prior art showed that the 'field of endeavor' was limited to a 'finite' number of solutions," Appx71 (quoting *KSR*, 550 U.S. at 420), and "stable dosing of a 10 mg sustained-release dose of 4-AP twice per day to treat walking in MS patients would have been obvious to a POSA." Appx76.

Having found the invention here obvious based on admissions by Acorda's own expert and the whole record, the District Court noted that it was unnecessary to rely on the principle that a legal "presumption of [*prima facie*] obviousness" exists "where there is a range disclosed in the prior art, and the claimed invention falls within that range." *Tyco Healthcare Group, LP v. Mut. Pharm. Co, Inc.*, 642 F.3d 1370, 1372-73 (Fed. Cir. 2011); Appx63 n.27. Acorda ignores this presumption, which only further underscores why this Court should affirm.

Acorda offers three challenges to the District Court's factual findings, none of which has merit. *First,* Acorda insists that the court "never analyzed th[e] claimed invention in light of the prior art to determine whether a POSA would be motivated to combine the claimed limitations with a reasonable expectation of achieving the

invention." Br. 33. But that is precisely what the District Court analyzed, holding: "Defendants have adduced clear and convincing evidence that a POSA at the priority date would have been motivated and would have had a reasonable expectation of success to practice *and* combine each of the limitations of the asserted claims of the Acorda Patents." Appx88 (emphasis added); *see also* Appx62; Appx67; Appx74-75. Lacking a credible answer, Acorda recycles factual arguments below, adding a meritless teaching-away argument that Acorda never asserted. None of this overcomes the "considerable deference on appeal" given to the court's "factual findings." *Spectrum Pharm., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1336 (Fed. Cir. 2015).

*Second*, Acorda fares no better in challenging the court's finding that "the [pK] responses that are incorporated as limitations into … the Acorda Patents are 'inherent in the claimed dosing and [are] taken directly from the prior art.'" Appx78. But at trial, Acorda's "counsel conceded that the claimed PK data were obvious." Appx78 n.39. Acorda's about-face on appeal ignores, among other things, that the claimed pK results were not only inherent in the claimed dose, but also fully reported in the prior art. Appx76-78. "[A]n obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting [effects in the blood]." *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012).

*Third*, Acorda fails to transform into legal error the District Court's findings concerning secondary considerations. Acorda says the court "expanded the holding

of *Merck* [*& Co. v. Teva Pharm. USA, Inc.*]" to find that the Elan "blocking" patent overcame multiple indicia of non-obviousness. Br. 55-63. Not so. *Merck* held "the inference of non-obviousness … from evidence of commercial success[]" in that case to be "weak" "[b]ecause market entry by others was precluded." 395 F.3d 1364, 1377 (Fed. Cir. 2005). The same was true here as to commercial success, long-felt but unmet need, and failure of others. And the District Court's analysis on this score was only part of its weighing of all these factors, which is entitled to great deference. Indeed, even if "substantial evidence" of secondary considerations existed (which is not the case), this still could not "overcome the clear and convincing evidence that the subject matter sought to be patented is obvious." *Richardson-Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484 (Fed. Cir. 1997).

Finally, we cross-appeal the District Court's ruling that the Elan Patent is valid—not because the District Court's factual findings were incorrect, but solely because they confirm that the patent is invalid for lack of written description. To be sure, that patent expires on July 31, 2018. Accordingly, this cross-appeal will become moot should this Court issue its decision after that date. If the cross-appeal is not mooted, however, the Court should find that the findings of the District Court render the Elan Patent invalid under 35 U.S.C. § 112.

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Delaware entered final judgment disposing of all parties' claims on April 24, 2017. The district court had jurisdiction under 28 U.S.C. § 1338(a). Acorda timely appealed on May 23, 2017, and Defendants-Appellees-Cross-Appellants Roxane Laboratories, Inc., Mylan Pharmaceuticals Inc., and Teva Pharmaceuticals USA, Inc. timely cross-appealed on June 5, 2017. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## COUNTERSTATEMENT OF THE ISSUES

1. Did the District Court clearly err in finding that "Defendants have adduced clear and convincing evidence that a POSA … would have been motivated and would have had a reasonable expectation of success to practice and combine each of the limitations of the asserted claims of the Acorda Patents"? Appx88.

2. Did the District Court's factual findings supporting non-obviousness for the Elan Patent render the asserted claims of that patent invalid under § 112 for lack of written description?

## COUNTERSTATEMENT OF THE CASE

### I. The Acorda Patents claim an optimized dose for a method of treatment taught by the prior art.

#### A. The prior art taught that a sustained-release formulation of 4-AP could be used to treat MS patients and motivated a POSA to use such a formulation for that purpose.

Acorda has never disputed that others invented 4-AP, a sustained-release formulation of 4-AP, as well as the use of a sustained-release formulation of 4-AP to treat MS. Appx617-618 (302:23-303:1). By the 1980s, 4-AP had been identified as a promising drug for MS patients, because its action as a potassium channel blocker improved human nerve conduction. Appx11-12; Appx388-390 (73:1-75:15). By 1990, researchers focusing on 4-AP directed their attention to the drug's kinetics, its effect on animal models for treating MS, and its efficacy in MS patients. Appx390-395 (75:15-80:10). Two pivotal human clinical studies—led by Drs. Davis and Stefoski—demonstrated that 4-AP in MS patients "improves clinical signs in multiple sclerosis" patients. Appx11-12; Appx390 (75:16-23); Appx758 (443:4-12); Appx6697.

The Stefoski I reference taught that 10 of the 12 MS patients studied showed mild-to-marked improvement with IV injection of 4-AP at doses as low as 2 mg. Appx11-12 (citing Appx6697, Appx6699); Appx391-392 (76:3-77:14). Stefoski I concluded that "4-AP lessens multiple neurological deficits in multiple sclerosis," and the study "suggests a clinical usefulness for this agent [4-AP]" in treating MS

patients. Appx46 (quoting Appx6697, Appx6701); Appx391-392 (76:3-77:14). The Davis reference further taught that "orally administered 4-AP produces clinically important improvements … in MS," including a significant improvement in "gait" (walking) for nine of 13 MS patients treated. Appx46-47 (quoting Appx6327); Appx394-395 (79:6-80:10). Davis found that "[i]mprovements developed gradually with doses as low as 10 mg 4-AP." Appx6329; *see also* Appx12-13.

When applying for the Elan Patent, Elan (Plaintiff Alkermes's predecessor) informed the U.S. Patent & Trademark Office ("PTO") that immediate-release "4-Aminopyridine (4-AP) has been found [by Drs. Davis and Stefoski] to improve the conduction of nerve impulses, thereby, alleviating symptoms in MS patients." Appx154 (col. 1:51-54.) This is the Elan Patent's sole written description and support for the claim limitation of treating MS with 4-AP and achieving therapeutically effective blood levels; the inventors reported no independent work with 4-AP in MS patients. *See* Appx154-164.

The prior art also taught that immediate-release 4-AP had limitations when used to treat MS, a chronic disease. According to Davis, 4-AP has "a safe and effective therapeutic window," but the authors noted from prior studies that high doses can cause "seizures" in "MS patients." Appx47 (quoting Appx6332); Appx521-522 (206:14-207:12). The prior art also taught that 4-AP has a short (approximately four-hour) half-life. Appx516 (201:4-23); Appx6711; *see also* Appx392-393 (77:20-

78:8). Thus, as explained by Dr. Peroutka (our expert in neurology, pharmacology, and drug development), a POSA in 1990 would have known that MS patients taking immediate-release 4-AP must take many pills a day, risking non-compliance; and dosing would have to be assessed carefully to avoid side effects. Appx392-393 (77:20-78:8).

The prior art further taught, however, that a sustained-release formulation of 4-AP would address the limitations of, and have advantages over, an immediate-release formulation. Appx503 (188:9-21); Appx640 (325:19-24); Appx6528-6531. One of the named inventors of the Elan Patent, Dr. Michael Myers, confirmed the general understanding in the prior art—i.e., an appreciation not limited to 4-AP—that "patient compliance" would be improved by "reducing the frequency of medications," and that sustained-release formulations "potentially reduce or eliminate" some of the side effects of 4-AP. Appx470-472 (155:20-156:2, 157:1-11).

Building on the known immediate-release 4-AP formulations and using known sustained-release platforms, Elan thus developed a sustained-release formulation of 4-AP to minimize side effects and improve patient compliance. Appx470-472 (155:20-156:2; 157:1-16); Appx476 (161:10-18).

### B. The Elan Patent claims methods of using a sustained-release formulation of 4-AP to treat MS, and Acorda licensed that patent.

The PTO issued the Elan Patent, entitled "Formulations and Their Use in the Treatment of Neurological Diseases," on July 30, 1996. Appx9; Appx152. In this case, Acorda asserted claims 3 and 8 (Appx10), which depend upon claim 1:

> A method for the treatment of a neurological disease where the disease is characterised by a slowing of nerve impulse transmission, which comprises administering to a patient in need thereof a medicament containing a mono- or di-aminopyridine active agent, said medicament being effective to permit sustained release of said mono- or di-aminopyridine active agent at a rate allowing controlled absorption thereof which achieves therapeutically effective blood levels over a 12-24 hour period when administered on a once- or twice-daily basis.

Appx164 (col. 22:16-25). Claim 3 also depends upon claim 2, which recites: "[a] method according to claim 1, wherein the neurological disease is characterized by demyelination of the central nervous system." Appx164 (col. 22:26-28). Claim 3 recites: "[a] method according to claim 1 or 2, wherein the neurological disease is [MS]." Appx164 (col. 22:29-30). Claim 8 recites: "[a] method according to claim 1, wherein the active agent is 4-aminopyridine." Appx164 (col. 22:50-51).

The asserted claims of the Elan Patent are broad enough to cover both stable dosing as well as titrated dosing (unlike claims 5-7, which are limited to titrated dosing). Appx380 (65:18-19); Appx730 (415:16-416:10); *compare* Appx164 (col. 22:16-30, 50-51) *with* Appx164 (col. 22:33-49). According to the asserted claims,

however, the dose used must result in "therapeutically effective blood levels over a 12-24 hour period" when given once a day or twice-daily. Appx164 (col. 22:22-25).

In 1997, Acorda took an exclusive license to the Elan Patent, allowing Acorda to use the sustained-release 4-AP formulation Elan developed for clinical trials in spinal cord injury patients. Appx595 (280:16-281:3); Appx6094. In 1998, Elan expanded the exclusive license to Acorda, granting it exclusive rights over 4-AP, including for use in treatment of MS—another chronic condition for which a sustained-release formulation would be necessary. Appx596 (281:11-19); Appx618-619 (303:17-304:2); Appx380 (65:12-17); Appx392-393 (77:20-78:8); Appx6017.

According to Dr. Ron Cohen, CEO of Acorda and a named inventor of the Acorda Patents, "Elan invented the sustained release formulation that [Acorda] used and [is currently] using." Appx617-618 (302:23-303:4). Neither of the two named inventors for the Acorda Patents are formulation scientists. Appx480 (165:8-13). Before applying for the Acorda Patents, Acorda did not develop or formulate a sustained-release formulation and "never modified the … product that it got from Elan." Appx619 (304:6-21); Appx478 (163:14-20). Therefore, the same sustained-release formulation of 4-AP from Elan was used by Acorda in all of its spinal-cord injury and MS clinical trials. Appx402-403 (87:25-88:2).

### C. The prior art taught a preferred dose range (10-20 mg twice-daily) to treat impaired walking in MS patients.

According to Dr. Cohen, after Acorda licensed the Elan Patent, he and his co-inventor, Dr. Andrew Blight, "claimed to have found a preferred dose of the Elan product for treating MS patients"—i.e., "10 milligrams taken twice-daily" to improve walking. Appx620-621 (305:25-306:5). But this purported finding came after several prior-art clinical, dose-ranging studies for assessing the effect of 4-AP to improve walking in MS patients that pointed in the same direction.

For example, the prior art Schwid reference from 1997 (published seven years before the Acorda Patents' priority date in 2004, with Dr. Goodman as the senior author) taught that a stable dose of Elan's "4AP SR [sustained-release] 17.5 mg [twice-daily]" "improved motor function"—in particular, "[t]imed gait"—"in MS patients." Appx6681; Appx6684; Appx406-407 (91:17-92:15). The authors concluded that "[t]he quantitative outcomes used in [the] study permit more sensitive evaluation of the therapeutic effect and promise to be useful in future trials of symptomatic treatments for MS." Appx407 (92:5-19); Appx6681. Building on the Elan Patent, Schwid narrowed the therapeutic dosing range for 4-AP when used in MS patients to improve walking.[1]

[1] Acorda claims—as it did in the District Court—that Schwid also "reported on Elan's failed clinical trial." Br. 10. But this supposed "failed" study is unpublished and referenced only in the abstract and a single paragraph in the background section of the Schwid reference. Appx6681. That study did not prove efficacy under a

That a POSA would focus on the improvement in walking (as opposed to other MS symptoms) was confirmed by the later Solari literature review, which reported that Schwid showed statistically significant improved walking in MS patients with 17.5 mg sustained-release 4-AP twice-daily over a placebo with a p<0.0001, meaning that the "odds this is just a random finding as opposed to a real finding is one in 10,000." Appx1013 (698:20-21); Appx7208.

Dr. Goodman, Acorda's expert witness and long-time consultant for Elan and Acorda, helped Acorda run the "further studies" contemplated by the Schwid reference. For example, he ran a Phase II study[2] that further optimized the dose of sustained-release 4-AP to 10-20 mg 4-AP twice-daily to improve walking in MS patients by increasing walking speed. Dr. Goodman published in 2002 and 2003 the

---

particular test known as Expanded Disability Status Scale ("EDSS"), but Dr. Goodman himself reported that "EDSS … may have been an inadequate outcome variable" for this alleged failed trial. Appx6681. The District Court also found that these "failed efforts preceded the Scwhid and MS-F201 studies [discussed below] that demonstrated 4-AP's effects in walking," and thus "Elan's failure is not particularly probative of what would have been obvious to a POSA on the priority date of the Acorda Patents." Appx86.

[2] "Phase II" clinical studies, like the MS-F201 study discussed below, are routine in drug development, explore clinical outcomes, and can support FDA approval of new drugs. Appx8870 (555:14-21); Appx598 (283:1-7); Appx621 (306:6-16). Often Phase II studies are dose-ranging studies, whose purpose is to find a stable dose for a Phase III trial. Appx402-403 (87:1-88:3); Appx414 (99:5-11).

results of the Acorda Phase II clinical study known as MS-F201,[3] which again used Elan's sustained-release formulation. Appx29-32; Appx621 (306:6-8); Appx794-795 (479:16-480:2); Appx838-839 (523:23-524:14); Appx6370; Appx6371-6372; Appx6496-6504. These results appeared in publications referred to herein as "Goodman I" and the "Goodman Poster,"[4] and "Goodman II"—or, collectively, as the "Goodman references" and are all prior art to the Acorda Patents. Appx29-32. As presented in the Goodman Poster, the stated objectives of the MS-F201 study were twofold: (1) to "[d]etermine the safety of multiple doses of [sustained-release 4-AP] (one week each of 20 mg/day, 30 mg/day, 40 mg/day, 50 mg/day, 60 mg/day, 70 mg/day and 80 mg/day)"; and (2) to "[o]btain evidence of efficacy and dose-response using several outcome measures." Appx31 (quoting Appx6502).

The Goodman Poster concludes that there was "[e]vidence of a dose-response in [the] 20-40 mg/day range" (i.e., 10-20 mg, twice-daily) leading to a "[s]ignificant benefit on timed walking." Appx70, Appx31 (quoting Appx6502). Goodman I and

---

3 The MS-F201 study is also referred to in the record as the "F201 study" or the "201 study."

4 It is undisputed that the Goodman Poster was a public presentation available to a POSA as of the priority date. Appx31. Poster presentations are publicly presented at scientific conferences during which attendees can review the presented materials, take notes, and speak with the authors. Appx414-16 (99:18-101:5).

II similarly reported that the 201 study data "showed statistically significant improvement from baseline compared to placebo in functional measures of mobility (timed 25 walking speed; p=0.04)[.]" Appx30 (quoting Appx6370 and Appx6372).

Collectively, Schwid and Goodman disclosed only four doses—consisting of 10, 15, 17.5, and 20 mg sustained-release 4-AP twice-daily, which fall within a narrow range of 10-20 mg twice-daily—that showed safety and efficacy in improving walking in MS patients. Appx71. Dr. Goodman agreed that the clinical study results reported in the Goodman references would have motivated a POSA to conduct further testing within the 10-20 mg range. Dr. Cohen interpreted the study results as follows:

> Q: So the F201 study [reported in the Goodman References] supported looking to see if I think you said 10 or 20 milligrams [twice-daily] would work in a future study?
>
> A: I said it supported looking at a range between 10 and 20 milligrams BID to see if anything could work.
>
> Q: And when you say could work, you're referring to –
>
> A: The walking speed based on the timed 25[-]foot walk.

Appx627-628 (312:22-313:3). Dr. Goodman similarly testified that his prior-art reference taught that future studies should focus on this narrow dose range:

> Q: [I]f there were to be further studies [after the 201 study], what you are teaching in the two boxes on

DDX-5-5 is that the dose range for future studies would be 20 to 40 milligrams per day; right?

A: As a range, yes.

Appx845 (530:5-9).

Q: Well, just so I'm clear. 20 to 40 milligrams per day in the Goodman presentation refers to three doses, 10, 15, and 20 milligrams, of 4-AP sustained release taken twice-daily; right?

A: In the dosing scheme that we used in the escalating dosing scheme that we used in this study, yes.

Appx844 (529:4-9).

Dr. Goodman also conceded that "a person of ordinary skill in the art in December 2003 [would] be motivated based on the 201 study [reported in the Goodman References] to design a study along the lines of what became the 202 study"—Acorda's Phase III trial that supported FDA approval of Ampyra®. Appx874-875 (559:20-560:2); Appx871-872 (556:10-557:2). Dr. Goodman further conceded that such studies "needed to test 4-AP doses for longer than two weeks" in a stable dose. Appx867 (552:8-13). This is because, according to Dr. Goodman, a POSA would know that it would be desirable to have a stable, non-titrated dose of 4-AP:

Q. A person of ordinary skill in the art would know that eventually one has to test for stable dose format for 4-AP; right?

* * *

> A. So eventually it would be desirable that one would have some, some dose that one would take, the patient would be prescribed to take on a regular basis.

Appx868 (553:1-3, 553:7-9); Appx76. Indeed, several other prior-art references—van Diemen II, Polman I, and Murray—taught that stable doses of 4-AP could be administered safely and effectively for months. Appx74-75 (citing Appx7038 and Appx6656); Appx389 (74:7-13).

In short, taken as a whole, the Elan Patent, Schwid, and the Goodman references taught a POSA that 20-40 mg per day of sustained-release 4-AP is a safe and therapeutically effective dose range for improving walking speed in MS patients. Appx67-69.

### D. The prior art taught the pharmacokinetic results for dosing within the preferred range

The prior art also disclosed the pharmacokinetic results of administering Elan's licensed 4-AP sustained-release formulation. The Hayes III prior-art reference, sponsored by Acorda, used a stable dosing regimen of 10, 15, 20, or 25 mg of 4-AP given twice-daily for six days, and once on the seventh day. Appx33; Appx779 (464:1-5). These studies included: (1) a study to determine the pharmacokinetic and safety profile of an oral sustained-release formulation of 4-AP, administered as a single dose; and (2) a study to determine the pharmacokinetic and safety profile of an oral, sustained-release formulation of 4-AP taken twice-daily for one week in patients with chronic spinal cord injuries. Appx33; Appx410-411 (95:23-96:24).

The data reported in Hayes III are the pharmacokinetic profiles from the actual Ampyra® formulation used in clinical trials on spinal cord patients. Appx76; Appx402-403 (87:25-88:2); *compare* Appx6439 *with* Appx194 (col. 25:1-28).

Hayes III reported: (1) that the sustained-release 4-AP formulation was absorbed slowly; (2) the time of peak plasma concentration shortly after doses (2.6 to 3.7 hours); (3) the plasma half-life (5.6 to 6.7 hours); and (4) that it reached steady state after four days of twice-daily administration. Appx33; Appx410-411 (95:23-96:24). Hayes III specifically disclosed the pharmacokinetic ranges reached by the Ampyra® formulation (as reported in the Acorda Patents) when used in a 10 mg dose, taken twice-daily. Appx9540 (citing Appx6439 and Appx194 (col. 25:1-28)). And it was known that twice-daily (i.e., BID) dosing would be desirable because of 4-AP's half-life. App392-394 (77:20-79:2); Appx411 (96:1-19); Appx516 (201:4-21).

Although Hayes III reported on a study involving spinal-cord patients, there is no dispute that the pharmacokinetic data resulting from administration of 10 mg twice-daily in spinal-cord patients would be the same when administered to MS patients. Appx76-77; Appx539-540 (224:16-225:7); Appx1108 (793:9-14). In fact, Acorda conceded that "[i]t was known in the art that a sustained release formulation of 10 [milligrams] [twice-daily] could achieve [the claimed] PK." Appx1108-1109 (793:23-794:3); *see also* Appx825 (510:8-11).

### E. The Acorda Patents claim the lowest effective dose (10 mg twice-daily) from the preferred dose range disclosed in the prior art to treat impaired walking in MS patients.

In April 2004, Acorda filed a provisional application, which provides priority for the four Acorda Patents. Appx20 n.8. Although Acorda asserted 16 claims from the Acorda Patents, the limitations of these claims fall into four "core" categories: a method of treatment where (1) a sustained-release formulation of 4-AP is administered to improve walking in MS patients; (2) the dose is 10 mg given twice-a-day; (3) where certain pharmacokinetic ranges result; and (4) the dose is administered for at least two weeks without titration. Appx62-63; Appx381-382 (66:21-67:12). Two claims are representative for purposes of this appeal.

Claim 7 of the '826 patent depends from claim 6. Claim 6 recites:

> A dosing regimen method for providing a 4-aminopyridine at a therapeutically effective concentration in order to improve walking in a human with multiple sclerosis in need thereof, said method comprising:
>
> initiating administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a day without a prior period of 4-aminopyridine titration, and then, maintaining administration of 4-aminopyridine by orally administering to said human a sustained release composition of 10 milligrams of 4-aminopyridine twice daily;
>
> without a subsequent period of 4-aminopyridine titration, whereby an in vivo $C_{maxSS}$:$C_{minSS}$ ratio of 1.0 to 3.5 and a $C_{avSS}$ of 15 ng/ml to 35 ng/ml are maintained in the human.

Appx195 (col. 27:41-57). Claim 7 recites: "[t]he method of claim 6, whereby an increase in walking speed is obtained in said human." Appx195 (col. 27:58-59).

Claim 22 of the ’437 patent depends upon claim 18, which depends upon claim 1. Claim 1 recites:

> A method of increasing walking speed in a human multiple sclerosis patient in need thereof comprising orally administering to said patient a sustained release composition of 10 milligrams of 4-aminopyridine twice daily for a time period of at least two weeks, wherein said 10 milligrams of 4-aminopyridine twice daily are the only doses of 4-aminopyridine administered to said patient during said time period.

Appx237 (col. 27:55-61). Claim 18 recites: “[t]he method of claim 1 wherein said sustained release composition is a tablet.” Appx237 (col. 28:48-49). Claim 22 recites: “[t]he method of claim 18 wherein said tablet exhibits a release profile to obtain a $C_{avSS}$ of about 15 ng/ml to about 35 ng/ml.” Appx237 (col. 28:55-57).

The key limitations of these claims narrow the scope of the prior art Elan Patent to treating a common, known symptom of MS (to improve walking) with a specific sustained-release 4-AP dose (10 mg twice-daily). The claims further specify that this treatment for an incurable, chronic disease lasts for at least two weeks;[5] and they require certain pharmacokinetic responses inherent in the claimed dosing of Elan’s sustained-release 4-AP formulation and taken directly from the prior art.

Acorda conceded that the Acorda Patents claim a subset of what Elan claimed in the Elan Patent. Appx1110 (795:1-10). That is, the Elan Patent and the Acorda

[5] The parties stipulated that if the two-week limitations (of, for example, claim 37 of the ’826 patent) is obvious, then the 12-week limitations (of, for example, claim 39 of the ’826 patent) are also obvious. Appx22.

Patents all cover the Ampyra® formulation and indication, and all are listed for this drug in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book"). Appx8; Appx366 (51:2-18); *see also* Appx9358; Appx404 (89:1-9); Appx1109-1110 (794:4-795:11).

## II. The District Court found the Elan Patent valid and non-obvious, but the Acorda Patents invalid as obvious.

As for the Elan Patent, the District Court found many of the claimed limitations obvious. For example, "[t]aken as a whole, the evidence would have strongly suggested to a POSA at the pertinent time that 4-AP could be used to improve symptoms of MS"; and "a POSA would have had a reasonable expectation that 4-AP would be 'therapeutically effective' in treating MS." Appx50. The prior art would have further "provided a clear motivation for a POSA to prepare a sustained-release formulation of 4-AP." Appx51. As the District Court also held, "Defendants have shown that the prior art included many sustained-release platforms, that many drugs had been formulated using these sustained release platforms, and that no affirmative evidence existed that would have dissuaded a POSA from pursuing a sustained-release dosage form of 4-AP." Appx58.

Despite this showing, the District Court found that "Defendants have not shown … that a POSA would have inferred from this evidence that success would reasonably be expected from an attempt to develop a therapeutically-effective, sustained-release formulation for *any* drug, and most particularly for 4-AP." Appx58.

Thus, the court found that "Defendants have not met their burden to establish, by clear and convincing evidence, that the Elan Patent is invalid as obvious." Appx59.

The District Court also declined to hold the Elan Patent invalid for lack of enablement or written description. Appx62. According to the court, those theories were "based on contingencies which, given the court's findings, have not been satisfied." Appx61. Specifically, the court pointed to our statement that "Plaintiffs have repeatedly made arguments or elicited testimony, that – *if accepted by the Court* – would render the Elan [P]atent invalid for lacking enablement or written description." Appx61 (emphasis in original). For example, "Defendants argue that 'either Davis and Stefoski teach using 4-AP to treat clinical symptoms of MS (including gait) or the Elan [P]atent is invalid for lacking enablement and written description.'" Appx61. But according to the District Court, "as best as the [c]ourt can tell[,] the [c]ourt has not 'accepted' these arguments or evidence relied on by Plaintiffs." Appx61. Rather, it "has found that Davis and Stefoski *do* teach using 4-AP to treat clinical symptoms of MS (including gait). Hence, on Defendants' own reasoning, it follows that the Elan Patent does not lack enablement or written description." Appx61-62 (emphasis in original).

As for the Acorda Patents, the District Court found that we "ha[d] shown the prior art taught the four disputed limitations: the use of 4-AP to improve walking; the use of a 10 mg/twice-daily dosage; the use of stable dosing; and the inherent

pharmacokinetic limitations." Appx63. Further, "a POSA would have been motivated to combine these limitations with a reasonable expectation of success." Appx63. The court's analysis of each Acorda Patent claim limitation builds on its discussion of the preceding claim, leading to its ultimate conclusion that the claimed invention, as a whole, was obvious.

First, the court found it obvious to use 4-AP to help MS patients walk:

> Goodman I explains that one of the goals of the MS-F201 study was to 'explore efficacy over a broad dose range using measures of fatigue and motor function,' and it concludes that the study data 'showed statistically significant improvement from baseline compared to placebo in functional measures of mobility (timed 25 walking speed; p=0.04) and lower extremity strength (manual muscle testing; p=0.01).' (JTX-0062 at S116-17) Likewise, the Goodman poster reports a '[s]ignificant benefit on timed walking' and a '[s]ignificant benefit on lower extremity strength." (JTX-0080A).

Appx64-65.

Second, the court—again citing the same prior-art, dose-ranging clinical study disclosed in the Goodman references—found it obvious to use (or at least to try) a dose of 10 mg twice-daily. It found:

> [T]he Goodman references are not silent as to the results of individual doses. Instead, Goodman states that the results showed 'evidence of a dose response in the 20 to 40 milligram per day range,' indicating that patients taking these dosages of 4-AP demonstrated a greater response to treatment than did patients receiving placebo…A POSA would have inferred from this finding that patients' walking responded to 4-AP dosed at a 10 mg level. Consequently, a POSA would consider 10 mg/twice daily to be among the finite group of doses of sustained-release 4-AP that could reasonably be expected to improve walking in MS patients. As the lowest of the range of encouraging doses,

> 10mg/twice daily would have been an attractive starting point for a POSA.

Appx72-73.

In particular, the District Court found it obvious, based in part on concessions from Dr. Goodman himself, to optimize a stable dose from the disclosed "20 to 40 milligram per day range." "Dr. Goodman conceded that, in at least some circumstances, 'it would be desirable that one would have some … dose that … the patient would be prescribed to take on a regular basis.' (Goodman Tr. at 553)." Appx75-76. Therefore, the District Court found no evidence of an expectation that a POSA would develop a sustained-release 4-AP product that would have to be titrated in patients. Appx75-76.

Third, "Plaintiffs offer[ed] no evidence indicating why stable, long-term dosing would change or magnify" any purported concerns about "adverse effects, including seizures." Appx74. Thus, the District Court was "not persuaded that safety concerns would have undermined a POSA's otherwise reasonable expectation of success in implementing stable dosing of 10 mg of sustained-release 4-AP twice daily." Appx74-75. Nor did Plaintiffs show that the prior art primarily used titration. The District Court found, "[e]ven crediting these arguments[,]" that "a POSA would have been motivated to seek a stable dose of 4-AP." Appx75. In so holding, the Court credited Dr. Peroutka's testimony that "stable dosing was particularly desirable for treating MS, a chronic disease requiring long-term treatment" and Dr.

Goodman's concession that "it would be desirable that one would have some … dose that … the patient would be prescribed to take on a regular basis." Appx75-76.

Fourth, citing Hayes, the District Court found the pK limitations were "inherent in the claimed dosing and [are] taken directly from the prior art":

> Hayes is a prior art study that disclosed the pharmacokinetics of a 10 mg sustained-release formulation when administered twice a day for six consecutive days, and once daily on the seventh day…It is undisputed that the Hayes researchers used the Ampyra formulation in their study. (*See* D.I. 272 at 71). There is also no disagreement that the pharmacokinetic parameters reported in Hayes are inherent properties of that formulation. (*See* D.I. 265 at 42-43).

Appx76-77.

Thus, the District Court agreed that we "ha[d] proven that … a POSA would have been aware that a sustained-release dosage form achieving the pharmacokinetic parameters disclosed in Hayes III would have been associated with improvement in walking in MS patients. (*See* D.I. 278 at 4) (citing evidence)." Appx77. That evidence is that the Goodman references disclose improvements in walking, and a "POSA would have associated this improvement … with the pK profiles reported in Hayes III." Appx4589.

Finding the Acorda Patents *prima facie* obvious, the District Court addressed Acorda's purported evidence of secondary considerations. Appx77.

***Commercial success.*** Acorda's commercial success expert did not compare: the sales, price, or market share of Ampyra® to any other drug; the commercial opportunity presented at the time of the invention; and, most importantly, the economic profitability of the product over its lifecycle. Appx916-917 (601:24-602:18); Appx921-922 (606:25-607:17); Appx926-927 (611:8-612:20). Nevertheless, the District Court found that Ampyra® had achieved commercial success "[g]iven the strength of [its] sales, and the absence of any evidence that its sales are disappointing." Appx82. And though Plaintiffs "did not attempt to apportion Ampyra®'s success among its various features," the court found its sales "sufficient for establishing a nexus between the Acorda Patents and Ampyra®'s success." Appx83.

The District Court found, however, that "this evidence is of little probative value to the obviousness inquiry with respect to the Acorda Patents because the earlier Elan Patent 'blocked' competitors from practicing the Acorda Patents." Appx84. Because "no one other than the Elan patentees and their licensees could have practiced the invention of the Acorda Patents without facing liability for patent infringements," the risk of such liability "would have provided an independent incentive for a patentee not to develop the invention of the Acorda Patents, even if those inventions were obvious." Appx84. As a result, the District Court found based on the trial evidence that any purported commercial success of Ampyra® did "not support a finding that the claims of the Acorda Patents are non-obvious." Appx84.

***Unexpected Results***. At trial, Acorda argued that it was surprising that using 10 mg of sustained-release 4-AP twice-daily improved walking. The District Court found otherwise because that is what Dr. Goodman reported in the prior art—namely, "[e]vidence of dose-response in 20-40 mg/day range [which includes 10 mg twice-daily]" shows "[s]ignificant benefit on timed walking." Appx70, Appx31 (quoting Appx6502). In fact, the results of Dr. Goodman's further testing that supported the approval of Ampyra® are virtually identical to those reported in the Goodman references. Appx9561 (citing Appx6448, Appx6504). Thus, the District Court found that Acorda did not "present[] evidence of unexpected results that militates in favor of finding that the claims of the Acorda Patents are non-obvious." Appx85. As the court found, the effectiveness of a 10 mg dose would not be "unexpected" even if the prior art did not "prove" such effectiveness. Appx85. Acorda has not challenged these findings.

***Failure of Others***. Although Acorda argued that others tried but failed to achieve the claimed invention, the District Court found that there was "minimal evidence" that anyone other than the Acorda Patentees attempted to develop a "safe and effective therapy to improve walking in MS patients." Appx86. And the purported failures identified by Acorda occurred before prior art demonstrating 4-AP's effects in walking, making them "not particularly probative." Appx86. Moreover,

the court found that other drug companies likely did not use 4-AP because they were "blocked from doing so by the Elan patent." Appx86.

***Long-felt need***. The District Court also found that any evidence of long-felt and unmet need "is of limited probative value with respect to the obviousness of the invention claimed by the Acorda Patents" because "a POSA would not have been able to practice the invention of the Acorda Patents without infringing the Elan Patent." Appx87.

In the end, having considered the record as a whole and offered detailed findings of fact, the District Court concluded that we "ha[d] proven clearly and convincingly that the Acorda Patents are invalid due to obviousness." Appx89.

## SUMMARY OF ARGUMENT

**Acorda Patents – Appellees' Response Brief.** As to the Acorda Patents, the District Court properly applied the legal standard for obviousness, and none of Acorda's arguments show that the court's factual findings were clearly erroneous.

*First*, Acorda is wrong that the "district court never analyzed th[e] entire claimed invention in light of the prior art to determine whether a POSA would be motivated to combine the claimed limitations with a reasonable expectation of achieving the invention." Br. 33. That is precisely what the District Court analyzed, holding: "Defendants have adduced clear and convincing evidence that a POSA … would have been motivated and would have had a reasonable expectation of success

to practice *and combine* each of the limitations of the asserted claims of the Acorda Patents." Appx87 (emphasis added); *see also* Appx62, Appx67; Appx74-75.

Moreover, all of the District Court's underlying factual findings were more than "plausible in light of the entire record[.]" *Kao Corp.*, 441 F.3d at 967. Acorda now says the Court erred in not finding that the Schwid prior-art reference teaches away. But Acorda never made this argument below (thus waiving it); and in any event, Acorda makes no effort to explain how it could have satisfied the strict "teaching away" standard. Nor has Acorda come close to showing clear error in how the District Court construed Schwid. Further, Acorda fails to show that the District Court clearly erred in finding that: (1) "a POSA would consider 10 mg/twice-daily [i.e., 20 mg per day] to be among the finite group of doses of sustained-release 4-AP that could reasonably be expected to improve walking in MS patients" (Appx69-73); and (2) "stable dosing of a 10 mg sustained-release dose of 4-AP twice per day to treat walking in MS patients would have been obvious to a POSA." Appx76.

*Second*, Acorda fails to show that the District Court clearly erred in finding that "the pharmacokinetic responses that are incorporated as limitations into certain asserted claims of the Acorda Patents are 'inherent in the claimed dosing and [are] taken directly from the prior art.'" Appx76-77. Nor could Acorda have done so: its own "counsel conceded that the claimed PK data were obvious." Appx78 & n.39.

Acorda has never asserted that the listed inventors discovered the claimed pK responses, nor has it disputed that those responses were reported in the prior art and would not change based on the disease state being treated. Thus, a POSA knew exactly what pK response to expect with the claimed 10 mg twice-per-day dose. Appx76-78. "[A]n obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting [effects in the blood]." *Santarus, Inc.*, 694 F.3d at 1354.

*Third*, the District Court did not commit legal error in its findings concerning secondary considerations. Of course, even "substantial evidence" of secondary considerations cannot "overcome the clear and convincing evidence that the subject matter sought to be patented is obvious." *Richardson-Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484 (Fed. Cir. 1997). That is all the more true here—where the District Court held that the Elan blocking patent eliminated any doubt created by secondary considerations. In so holding, the District Court did not "expand[] the holding of *Merck*." Br. 56-64. *Merck* held that "the inference of non-obviousness … from evidence of commercial success[] [wa]s weak" in that case "[b]ecause market entry by others was precluded." 395 F.3d at 1377. The same is true here as to commercial success, long-felt but unmet need, and failure of others. This was a straightforward application of *Merck*.

**<u>Elan Patent – Appellants' Principal Brief.</u>** As for our cross-appeal of the judgment upholding the validity of the Elan Patent, that cross-appeal will likely become moot—because the patent expires on July 31, 2018. If not, however, the Elan Patent should be held invalid. As the District Court found, "nothing in the record demonstrates that a POSA would have had a 'reasonable expectation' that at least one of [the prior art] approaches [to creating sustained-release formulations] would have resulted in a therapeutically effective sustained release formulation of 4-AP." Appx58. That is a critical problem for the Elan Patent under 35 U.S.C. § 112, as Acorda relies solely on the prior art to support this claimed, therapeutic effect.

## STANDARD OF REVIEW

"While the ultimate determination of obviousness is a legal conclusion reviewed by this Court without deference, that determination always entails various factual findings that this Court reviews for clear error following a bench trial." *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1275 (Fed. Cir. 2004). For instance, the scope and content of the prior art—including the issue of what a reference teaches—is a factual question. *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1329-30 (Fed. Cir. 2016). "Whether or not a reference teaches away from a claimed invention is a question of fact." *In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012). Furthermore, a "district court has wide discretion to weigh expert credibility." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 929 (Fed. Cir. 2012).

"The clear error standard permits reversal only when [this Court] is left with a 'definite and firm conviction' that the district court was in error." *Ruiz*, 357 F.3d at 1275. "We must uphold the trial court's determination if it is plausible in light of the entire record or where it chooses one of two permissible views of the evidence." *Kao Corp.*, 441 F.3d at 967. "Factfinding by the appellate court is simply not permitted." *Starr Int'l Co., Inc. v. United States*, 856 F.3d 953, 973 (Fed. Cir. 2017).

## ARGUMENT

## APPELLEES' RESPONSE BRIEF

### This Court should affirm the District Court's judgment holding the Acorda Patents invalid as obvious.

The District Court rightly found all asserted claims of the Acorda Patents obvious. Though sometimes framed in terms of legal error, Acorda's challenges ultimately focus on the District Court's factual findings. But Acorda never acknowledges that this Court "owe[s] the district court's factual findings considerable deference on appeal." *Spectrum Pharm., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1336 (Fed. Cir. 2015). Instead of attempting to carry this "heavy" burden, *Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1382 (Fed. Cir. 2015), Acorda rehashes the very same arguments the District Court rightly rejected. The Court should affirm.

#### A. The District Court recited and applied the correct standard for obviousness.

Acorda does not, and cannot, dispute that the District Court stated the correct legal standard for obviousness. *See* Appx43-44. Quoting 35 U.S.C. § 103, the Court

explained that Acorda is not entitled to its patents "if the differences between the claimed invention and the prior art are such that the claimed invention *as a whole* would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." Appx43 (quoting statute) (emphasis added).

According to Acorda, however, the District Court did not "correctly apply" this test (Br. 27): it "did not analyze the claimed invention as an integrated whole, nor whether there was a reasonable expectation in the art that the limitations of the Acorda invention as combined would have resulted in an efficacious treatment to improve walking in MS patients" (Br. 24). That is false. After dozens of pages of thoughtful, thorough factual and legal analysis setting forth where each limitation was rendered obvious by the prior art, the District Court expressly concluded that "Defendants have adduced clear and convincing evidence that a POSA at the priority date would have been motivated and would have had a reasonable expectation of success to practice *and combine each of the limitations of the asserted claims of the Acorda Patents*." Appx88 (emphasis added).

Thus, the District Court did not take a "piecemeal approach" that breaks the invention into its component parts and "ignor[e] whether a POSA would have a motivation to combine the art into the invention as a whole." Br. 33, 38. Rather, it

found that the prior art taught each limitation, and then it found that the prior art provided a "motivat[ion] to combine these limitations":

> [T]he Court concludes that Defendants have shown that the prior art taught the four disputed limitations: the use of 4-AP to improve walking; the use of a 10 mg/twice-daily dosage; the use of stable dosing; and the inherent pharmacokinetic limitations. The Court finds that a POSA would have been *motivated to combine these limitations with a reasonable expectation of success*.

Appx63 (emphasis added).

Breezing past all these findings, Acorda insists that the District Court committed the error warned against in *Ruiz*. There, this Court explained that without the statutory requirement that a claimed invention be considered "as a whole," a court "might break an invention into its component parts (A + B + C), then find a prior art reference containing A, another containing B, and another containing C, and on that basis alone declare the invention obvious." *Ruiz*, 357 F.3d at 1275. But "[w]hile this court indeed warns against employing hindsight, its counsel is just that—a warning. That warning does not provide a rule of law that an express, written motivation to combine must appear in prior art references before a finding of obviousness." *Id.* at 1276. To the contrary, "[t]his court has consistently stated that a court … may find a motivation to combine prior art references in the nature of the problem to be solved." *Id.* And on this basis, *Ruiz affirmed* the judgment of obviousness. *Id.*

As in *Ruiz*, the District Court here did not find obviousness based on a hind-sight-driven combination of prior-art references. It addressed each claim element in the context of prior art designed to solve the same problem—that is, to optimize dosing for the known, successful use of a sustained-release formulation of 4-AP to help MS patients walk.

As confirmation that this approach was sound, one need look no further than the Goodman references. As the District Court explained, the results reported in those references showed "'evidence of a dose response in the 20 to 40 milligram per day range,' indicating that patients taking these dosages of 4-AP demonstrated a greater response to treatment than did patients receiving placebo"; and "from this finding" a "POSA would have inferred … that patients' walking responded to 4-AP dosed at a 10 mg level." Appx72-73. "Consequently," the District Court found, "a POSA would consider 10 mg/twice-daily to be among the finite group of doses of sustained-release 4-AP that could reasonably be expected to improve walking in MS patients. As the lowest of the range of encouraging doses, 10 mg/twice-daily would have been an attractive starting point for a POSA." Appx73.

Given that the Goodman references reported on a dose-ranging Phase II study, "a POSA would have been motivated to pursue stable dosing" in follow-on studies. Appx76. Further, a POSA would have had a reasonable expectation of success"

when using "stable dosing of a 10 mg sustained-release dose of 4-AP twice per day to treat walking in MS patients[.]" Appx76.

As the court further held, in view of the successful study reported by Goodman, "stable dosing of a 10 mg sustained-release dose of 4-AP twice per day to treat walking in MS patients"—that is, the claimed invention as a whole—"would have been obvious to a POSA." Appx76. To be sure, the Goodman references did not expressly disclose the pK limitations. But as discussed below, the District Court found those limitations "inherent" in the claimed 10 mg dose of sustained-release 4-AP used in Dr. Goodman's study and otherwise obvious in view of the prior-art Hayes III reference. Appx78.

In short, the District Court here did not remotely commit the error warned of in *Ruiz*. To the contrary, the Goodman references alone confirm that "a POSA would have been motivated to combine [all of the claim] limitations with a reasonable expectation of success," as supported by "clear and convincing evidence." Appx63. There was no need for the court to recite the statutory phrase "as a whole" again here, as it had at the outset of its analysis. But it did: Several lines later, the Court reiterated that "the evidence *as a whole* establishes, clearly and convincingly, and objectively, that the asserted claims of the Acorda Patents would have been obvious to a person of ordinary skill in the art at the priority date." Appx87 (emphasis added). To ask more is to invite the error warned against in *KSR*, which cautioned

that "when a court transforms the general principle into a rigid rule that limits the obviousness inquiry, as the Court of Appeals did here, it errs." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007); *cf. Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1354 (Fed. Cir. 2013) ("[n]othing in the [district] court's opinion in this case indicates that it reached a premature conclusion on obviousness"). There was no error here, clear or otherwise. The Court should affirm.

### B. Acorda simply rehashes its failed factual arguments, coming nowhere close to showing clear error.

Backpedaling, Acorda admits that it must show that "the district court committed clear error," and says the court did so "in finding a motivation to combine references even though the references taught away from Acorda's invention as a whole." Br. 28. Further, Acorda says the court "clearly erred in holding that a 10 mg [twice-daily] dose identified in Goodman as a starting dose in an escalating, higher dose study was itself obvious to try[.]" *Id.* Finally, Acorda adds that the court committed "clear error when it found that a POSA would be motivated to combine and modify references so as to practice stable dosing, when that limitation is considered in the context required by the Acorda patents." *Id.* The District Court rightly found that all of these arguments lacked merit under the overwhelming record here. And as this Court instructs: "We must uphold the trial court's determination

if it is 'plausible in light of the entire record or where it chooses one of two permissible views of the evidence.'" *Kao Corp.*, 441 F.3d at 967 (citation omitted). Acorda fails to acknowledge, much less overcome, this burden.[6]

**1. The record supports the District Court's reading of the prior art, which did not teach away from the claimed invention.**

Acorda now argues that "Schwid affirmatively teaches away from Acorda's invention," and the District Court clearly erred when not so finding. Br. 36. This argument fails for several independent reasons.

As a threshold matter, it "is the general rule … that a federal appellate court does not consider an issue not passed upon below." *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322 (Fed. Cir. 2008). Here, Acorda never offered any teaching away theory either at trial or in post-trial briefing, much less the specific theory that "Schwid affirmatively teaches away." Br. 36. In fact, we emphasized in post-trial briefs that Acorda "offered no evidence at trial that the prior art taught away from the claimed invention." Appx4319; *see also* Appx4363 (arguing that Acorda "abandoned [a teaching away] theory at trial"); Appx4499. Acorda did not

---

[6] *Senju Pharm. Co. v. Lupin Ltd.*, 780 F.3d 1337 (Fed. Cir. 2015) (affirming the District Court's finding of obviousness following a bench trial upon finding no clear error); *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346 (Fed. Cir. 2013) (same); *Santarus*, 694 F.3d at 1358 (same); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007) (same); *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286 (Fed. Cir. 2006) (same) *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270 (Fed. Cir. 2004) (same).

dispute this. During closing argument, we stressed that "plaintiffs have not come forward with any evidence of a teaching away theory." Appx1050 (735:16-24). Once again, this assertion was not challenged.

Acorda missed its opportunity to argue that Schwid taught away from the claimed invention. *Golden Bridge Tech.*, 527 F.3d at 1322. The point is waived.

Even if Acorda did not waive this argument, "[a] reference does not teach away if it does not criticize, discredit, or otherwise discourage investigation into the invention claimed." *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013) (ellipses and quotation marks omitted). Nothing in the record shows that Schwid either criticizes, discredits, or otherwise discourages using 10 mg twice-daily to improve walking in MS patients. Instead, Schwid taught that "[t]imed gait" (i.e., walking ability) "was improved" by using "4AP SR [sustained-release] 17.5 mg [twice-daily]." Appx29-30 (quoting Appx6681). Further, Schwid—with Dr. Goodman as the senior author—encouraged "future studies of 4AP SR" to "further refine dosing regimens to optimize delivery despite a relatively narrow therapeutic window." Appx29 (citing Appx6684). Although Schwid discussed a 17.5 mg twice-daily dose (Appx28), "'mere disclosure of more than one alternative' does not amount to teaching away from one of the alternatives where the reference does not 'criticize, discredit, or otherwise discourage the solution claimed.'" *SightSound Techs. v. Apple Inc.*, 809 F.3d 1307, 1320 (Fed. Cir. 2015).

In fact, the later-published Goodman references reported on precisely the type of study proposed by Schwid and disclosed "evidence of a dose-response in the 20 to 40 milligram per day range," which includes the 10 mg twice-daily dose. Appx72. "Consequently," as the District Court found, "a POSA would consider 10 mg/twice daily to be among the finite group of doses of sustained-release 4-AP that could reasonably be expected to improve walking in MS patients." Appx72-73. Dr. Goodman himself "indicated at trial that this is the message that the Goodman Poster was intended to convey." Appx73 n.35. Further, Dr. Goodman conceded that follow-up studies "needed to test 4-AP doses for longer than two weeks" in a stable dose. Appx867 (552:8-13). And as the District Court found, "the prior art as a whole would not have tempered a POSA's expectations" of success. Appx67.

In short, the teaching of Schwid, particularly combined with the follow-up study reported in the Goodman references, did the opposite of teaching away—it taught *toward* the claimed invention.

If this were not enough (and it is), the District Court already rejected Acorda's assessment of Schwid: "Despite all of Plaintiffs' valid concerns, the Court finds that Defendants have proven, by clear and convincing evidence, that a POSA would have formed a reasonable expectation of success based on Schwid and Goodman, in light of the totality of the prior art." Appx67. It continued: "That neither Schwid nor the Goodman references report on the results of a randomized, placebo-controlled study

that was 'properly designed to assess efficacy' would be taken into account by a POSA, but would not have led a POSA to conclude that there was not a reasonable expectation of success in using 4-AP to improve walking speed." Appx67.

Yet Acorda makes no effort to show that this finding was clear error, which leaves no work for this Court to do. "[T]his court may not engage in fact-finding on its own" and "'oversteps the bounds of its duty … if it undertakes to duplicate the role of the lower court.'" *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1275–76 (Fed. Cir. 1995). The Court should dismiss Acorda's belated teaching-away argument and affirm.

**2. The record supports the District Court's finding that the claimed invention as a whole was at least "obvious to try."**

Acorda next argues that the District Court misapplied the "obvious to try standard," because the Goodman references "merely" disclosed the use of a "10 mg [twice-daily] dose of 4-AP" as "the starting point of an escalating dosing scheme." Br. 38. It thus follows, according to Acorda, that this prior art "did not teach the use of a single dose over the treatment period as a means to successfully improve MS symptoms." *Id.* at 39. Acorda is confusing obviousness with anticipation.

To be sure, the Goodman references do not fully disclose each and every limitation of, and thus anticipate, the claimed invention. But for obviousness, "the prior art need not contain '[c]onclusive proof of efficacy' in order to support a finding that a POSA would have been motivated to develop, and would have had a reasonable

expectation of success in developing, a medical treatment. Rather, a POSA need only have a 'reasonable expectation of success in developing [the claimed invention].'" Appx48 (citations omitted) (alterations in original). Indeed, a reference used solely for purposes of obviousness "is prior art for all that it discloses." *In re Kumar*, 418 F.3d 1361, 1368 (Fed. Cir. 2005). Further, there is no requirement that that a teaching in the prior art be scientifically tested, (*see PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1363–64 (Fed. Cir. 2007)), or even guarantee success, (*see Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1295 (Fed. Cir. 2006)), before providing a reason to combine. Rather, it is sufficient that one of ordinary skill in the art "would have perceived [from the prior art] a reasonable likelihood of success." *Alza Corp.*, 464 F.3d at 1295 (Fed. Cir. 2011).

Here, the District Court properly found a reasonable likelihood of success in practicing the claimed invention as a whole. After carefully considering the exact arguments Acorda makes on appeal, the Court found that "the Goodman references are not silent as to the results of individual doses. Instead, Goodman states that the results showed 'evidence of a dose response in the 20 to 40 milligram per day range.'" Appx72-73. Thus, "a POSA would consider 10 mg/twice daily [i.e., 20 mg per day] to be among the finite group of doses of sustained-release 4-AP that could reasonably be expected to improve walking in MS patients. As the lowest of the range of encouraging doses, 10 mg/twice daily would have been an attractive starting

point for a POSA." Appx69-73. And "[w]hile the prior art may have generally suggested that 4-AP would be more effective in higher doses, the art also reduced the set of plausible doses because it suggested that higher doses of 4-AP were more likely to cause adverse events." Appx71.

These factual findings fit neatly into the *KSR* framework. Given the "finite number of identified, predictable solutions" when assessing an optimized dose for the prior-art treatment of MS with sustained-release 4-AP, the "anticipated success" was "the product not of innovation but of ordinary skill and common sense." *KSR*, 550 U.S. at 421. And again, it is well established that "[c]onclusive proof of efficacy is not necessary to show obviousness." *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014). "There is no requirement that one of ordinary skill have a reasonable expectation of success in developing [the FDA-approved commercialized product]. Rather, the person of ordinary skill need only have a reasonable expectation of success of developing the claimed invention." *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013).

As the District Court rightly noted, Acorda's contrary position "proves too much." Appx72. "On [Acorda's] reasoning, a POSA could not have had a reasonable expectation of success in treating walking with ***any*** of the 4-AP doses disclosed in the Goodman references—despite the fact that the results of treatment with those dosages, taken as a whole, showed a statistically-significant effect on walking in MS

patients—simply because the significance of each individual result was unknown." Appx72 (emphasis in original). Acorda's "reasoning [w]as unpersuasive" to the District Court (*id.*), and today, in the strong light of clear-error review, it should remain even more so to this Court. None of Acorda's arguments comes close to creating "the definite and firm conviction that a mistake has been committed." *Starr Int'l Co., Inc. v. United States*, 856 F.3d 953, 973–74 (Fed. Cir. 2017).

#### 3. The record supports the District Court's finding that it was obvious to optimize a stable dose.

The District Court also rightly found that it was obvious to use a 10 mg twice-daily stable dose without titration. Remarkably, Acorda says "[t]he central teaching of Goodman is a titration scheme: of escalating the doses administered to individual patients and looking at the pooled, aggregated data set for some signal of effect." Br. 44. In reality, nothing in the Goodman references teaches titration. The claimed invention was obvious in view of what the Goodman references actually taught, and the District Court did not clearly err in so finding.

The Goodman references reported on the results of what is known as a Phase II, or "dose-ranging," study (Appx19), which is designed "to assess safety and to explore potential outcome measures for use in later trials." Appx6502. This study did not conclude that MS patients should be given titrated 4-AP doses. Instead, consistent with typical drug-development efforts (and FDA requirements), the study pointed to stable doses to be tested in "later trials." Appx874 (559:19-25). By the

time of the claimed invention, the use of sustained-release 4-AP to improve walking in MS patients had not yet advanced to Phase III studies, which explains why the prior-art studies often involved titrated dosing. So "while it may be true that the prior art's consistent use of titration did not specifically support stable dosing, it also did not undermine the other evidence in the prior art that supports a finding that a POSA would have had a reasonable expectation of success with stable dosing." Appx75; *see also* Appx74 ("References including Van Diemen and Polman included reports of safe and effective long-term use of stable dosing of immediate-release 4-AP"); Appx74 ("[T]he Court is not persuaded that safety concerns would have undermined a POSA's otherwise reasonable expectation of success in implementing stable dosing of 10 mg of sustained-release 4-AP twice daily.").

In fact, the Elan Patent itself claims stable dosing of sustained-release 4-AP to treat MS patients, and that patent is "presum[ed] … enabled" for the full scope of the claims. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354-55 (Fed. Cir. 2003). Moreover, Acorda itself is enforcing the Elan Patent—even obtaining an injunction for that purpose—because Acorda believes that patent discloses stable dosing of sustained-release 4-AP to treat MS. *See* Appx60-62. Under these circumstances, it was hardly clear error for the District Court to find a reasonable expectation of success with a 10 mg twice-daily stable dose.

The District Court also found "that a POSA would have been motivated to seek a stable dose of 4-AP." Appx75. Here the court cited Dr. Goodman himself, who "conceded that, in at least some circumstances, 'it would be desirable that one would have some ... dose that ... the patient would be prescribed to take on a regular basis.'" Appx75-76. This is common sense. In contrast to titrated dosing, which requires adjustment, "stable dosing was particularly desirable for treating MS, a chronic disease requiring long-term treatment." Appx75-76.

Nor did the Goodman references teach away from using a stable dose. "The goal of a stable dose (for at least some MS patients) and the goal of a dose that could be titrated upwards (perhaps for other patients) are not incompatible." Appx76 n.37. Thus, even if the Goodman references would have motivated a POSA to use titrated dosing for some patients, they would equally have motivated a POSA to use stable dosing for other patients. An invention is obvious that "funnel[s] the formulator toward … two options." *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1350 (Fed. Cir. 2009).

The court thus reached a logical, well-supported conclusion: "Because the evidence in the record reflects that a POSA would have been motivated to pursue stable dosing and would have had a reasonable expectation of success in doing so, the Court finds that stable dosing of a 10 mg sustained-release dose of 4-AP twice

per day to treat walking in MS patients would have been obvious to a POSA." Appx76. Acorda has not come close to showing that this finding was clear error.

### C. The District Court correctly found that the claimed pK parameters were inherent and otherwise obvious.

The District Court also properly found that the pK limitations are "inherent in the claimed dosing *and* [are] taken directly from the prior art." Appx78 (emphasis added) (alteration in original). As the court explained, and Acorda does not dispute, "[a]t trial, in response to the Court's questioning, Plaintiffs' counsel conceded that the claimed PK data were obvious." Appx78 n.39. Nevertheless, on appeal, Acorda ignores its admission, insisting that it is still entitled to patent protection based on this limitation. Acorda is mistaken. Not only has Acorda failed to show clear error, but there also exists an alternative basis for affirmance.

#### 1. Acorda has failed to show clear error with regard to the pK limitations.

The claimed pK results for the claimed—but obvious—10 mg (twice-daily) dose were fully reported in the prior art and thus would have been reasonably expected by a POSA. Moreover, those pK results were inherent in this claimed 10 mg (twice-daily) dose in MS patients. Acorda has failed to show otherwise, much less that the District Court's findings on these points were clearly erroneous.

Acorda has never argued that the listed inventors discovered the pK responses for the claimed dose (they did not), or that these pK responses are material to the

claimed invention as a whole (they are not). Acorda did no formulation work. Instead, after licensing the Elan Patent, it used Elan's sustained-release formulation. Appx478 (163:10-20); Appx619 (304:9-21); Appx965 (650:8-15); Appx618 (303:17-304:5); Appx6007; Appx6082. For example, Acorda used the Elan formulation (known as "fampridine-SR") in preliminary clinical studies designed to treat spinal cord patients. The Hayes III prior-art reference reported on two of these studies, which "were conducted to determine the pharmacokinetics and safety profile of an oral, sustained-release (SR) formulation of fampridine (fampridine-SR, 10-25 mg)[.]" Appx6433; Appx33.

To support the pK limitations in its patents, Acorda relied entirely on the pK data disclosed in Hayes III—not on the inventors' own work. *See* Appx33, Appx76-77. Here are snapshots of trial exhibits that compare the Hayes III prior-art disclosure to the pK data disclosure in the '826 patent. Note that the data are identical:

**Hayes III (2003)**

TABLE 3. *Mean (±standard deviation) pharmacokinetic parameters of fampridine-SR after multiple-dose administration (study 2)*

| Parameter | Fampridine-SR dose: 10 mg BID, n = 15 | 15 mg BID, n = 15 | 20 mg BID, n = 14 | 25 mg BID, n = 14 |
|---|---|---|---|---|
| $C_{max,ss}$, ng/mL | 32.2 ± 8.9 | 46.7 ± 10.5 | 60.1 ± 15.0 | 87.2 ± 29.0 |
| $C_{min,ss}$, ng/mL | 14.0 ± 4.4 | 23.5 ± 9.1 | 27.3 ± 10.0 | 41.3 ± 15.2 |
| $C_{av,ss}$, ng/mL | 20.8 ± 5.7 | 31.0 ± 7.2 | 39.4 ± 9.3 | 53.3 ± 14.5 |
| $t_{max}$, h | 2.7 ± 1.0 | 3.2 ± 0.9 | 3.1 ± 1.2 | 2.6 ± 0.9 |

**'826 Patent**

TABLE 7

Mean (±SD) pharmacokinetic parameters of fampridine-SR following multiple dose administration

| Parameter | Fampridine-SR dose: 10 mg BID n = 15 | 15 mg BID n = 15 | 20 mg BID n = 14 | 25 mg BID n = 14 |
|---|---|---|---|---|
| $C_{maxss}$ (ng/mL) | 32.2 ± 8.9 | 46.7 ± 10.5 | 60.1 ± 15.0 | 87.2 ± 29.0 |
| $C_{minss}$ (ng/mL) | 14.0 ± 4.4 | 23.5 ± 9.1 | 27.3 ± 10.0 | 41.3 ± 15.2 |
| $C_{avss}$ (ng/mL) | 20.8 ± 5.7 | 31.0 ± 7.2 | 39.4 ± 9.3 | 53.3 ± 14.5 |
| $t_{max}$ (h) | 2.7 ± 1.0 | 3.2 ± 0.9 | 3.1 ± 1.2 | 2.6 ± 0.9 |

*Compare* Appx9192-9207 *and* Appx6433, *with* Appx167. As the District Court found: "The $T_{max}$, $C_{avg}$ at steady state, and ratio of $C_{max}$ to $C_{min}$ at steady state" reported in Hayes III in connection with the 10 mg twice-daily dose "are all within the claimed pharmacokinetic ranges of the Acorda Patents." Appx33 n.12.

To be sure, the Hayes III data comes from administering sustained-release 4-AP to spinal cord patients, but there was no dispute at trial that (as the Acorda Patents represent) such pK data applies equally to MS patients. As the District Court found: "It is undisputed that the Hayes researchers used the Ampyra® formulation in their study," and "[t]here is also no disagreement that the [pK] parameters reported in Hayes are inherent properties of that formulation." Appx76-77 (citations omitted).

Acorda cannot credibly challenge these findings. As Acorda's expert, Dr. Goodman, admitted, the pK profiles reported in Hayes III "may certainly show the pharmacokinetic profile that's analogous to what would be found in MS patients. I don't have any dispute with that." Appx825 (510:8-11). Acorda's own counsel agreed, stating at closing: "It was known in the art that a sustained release formulation of 10 [milligrams] twice-daily could achieve [the claimed] PK." Appx1108-1109 (793:23-794:3); *see also* Appx78 ("a POSA would have been aware that a sustained-release dosage form achieving the pharmacokinetic parameters disclosed in Hayes III would have been associated with an improvement in walking in MS patients"). In post-trial briefing, Acorda confirmed yet again that it does "not dispute

that the Hayes references disclose that the Elan sustained release formulation … when dosed at 10 mg twice-daily yielded [pK] values that fall within the scope of the Acorda Patent claims (*or that Ampyra would do so*)[.]" Appx4458 (emphasis added).

Not surprisingly—given all these concessions—Acorda has not challenged the District Court's finding that the pK limitations come "directly from the prior art." Appx78. That is dispositive. Acorda cannot patent something it never invented and that was disclosed in the prior art. *See Santarus*, 694 F.3d at 1354 (affirming obviousness finding because there was "no dispute that the blood serum concentrations claimed in the [patent at issue] are expected in light of the dosages").

But Acorda has another insurmountable problem: the claimed pK results are inherent in the claimed, but obvious, 10 mg twice-daily sustained-release 4-AP formulation. "[A]n obvious formulation cannot become nonobvious simply by administering it to a patient and claiming the resulting [inherent property]." Appx78 (quoting *Santarus*, 694 F.3d at 1354). In *Santarus*, for example, this Court held that claims reciting blood serum concentration resulting from administering a dosage form are not patentable when the dosage form was known in the prior art. In that case, "[the prior art's] express teachings render the claimed … formulation obvious, and the claimed [serum concentration] adds nothing of patentable consequence."

694 F.3d at 1354 (quoting *In re Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011) (alteration in original)). "To hold otherwise would allow any formulation—no matter how obvious—to become patentable merely by testing and claiming an inherent property." *Santarus*, 694 F.3d at 1354.

As in *Santarus*, each of "the claimed [pk limitations here] adds nothing of patentable consequence." *Id.* To sustain Acorda's patents under these circumstances would turn patent law on its head. After all, when a "claimed limitation [is] an 'inherent property' of a formulation that 'adds nothing of patentable consequence,'" it is "inherently disclosed by the prior art formulation." *Par Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014). That is the case here.

Pointing to *Millennium Pharmaceuticals Inc. v. Sandoz, Inc.*, which declined to hold that a result was "'inevitable' and thus 'inherent,'" cannot save Acorda. 862 F.3d 1356, 1367 (Fed. Cir. 2017). In that case, "[n]o expert testified that they foresaw, or expected, or would have intended," the claimed unexpected result, "or that the resulting [formulation] would have the long-sought properties and advantages." *Id.* Here, the pK results were *both* inherent *and* expected.

The District Court specifically found all of the pK limitations here "inherent in the claimed dosing." Appx78. That was correct. As Acorda concedes, "inherency … is present … when the limitation at issue is the 'natural result' of the combination of prior art elements." Br. 52 (quoting *Par Pharm.*, 773 F.3d at 1195). And our

formulation expert, Dr. Kibbe, testified that the "claimed PK parameters resulting from the administration of 10 milligrams twice-daily of 4-AP … were a natural result of the administration of the 10 milligrams sustained release product." Appx541 (226:10-13); Appx539-540 (224:16-225:7); *see also* Appx461-462 (146:9-147:3). As noted, this Court "must uphold the trial court's determination if it is 'plausible in light of the entire record or where it chooses one of two permissible views of the evidence.'" *Kao Corp.*, 441 F.3d at 967. Here, the trial court's determination is far more than plausible.

Ultimately, Acorda cannot avoid *Santarus*—protesting only in a footnote that "Acorda did not claim a formulation, but rather a specific dosing regimen for treating a particular MS symptom." Br. 53 n.3. That misses the point. Under the principles enunciated in *Santarus*, Acorda may not patent an obvious formulation *or* method of using an obvious formulation by claiming pK results that were inherent—much less, as here, disclosed in the prior art.

#### 2. The record also supports an alternative basis to affirm the District Court's findings with regard to the pK limitations.

If all of this were not enough (it is), an independent basis also exists for affirmance here. *See Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347, 1356 (Fed. Cir. 2013) ("On judicial review, the correctness of the decision appealed from can be defended by the appellee on any ground that is supported by the record"); *El-Sheikh v. United States*, 177 F.3d 1321, 1326 (Fed. Cir. 1999) ("Of course, we may affirm

a judgment of the trial court on any ground supported by the record, whether or not that basis was given by the court or urged by a party").

The recited pK results merely state the intended result of using the invention and thus do not limit it. As this Court held under similar circumstances: "The express dosage amounts are material claim limitations; the statement of the intended result of administering those amounts does not change those amounts or otherwise limit the claim." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001). There, the Court found that the claim term "an antineoplastically effective amount" merely expressed the "intended result" that "essentially duplicates the dosage amounts recited in the claims that are also described in the specification as 'antineoplastically effective.'" *Id.* So too here. The recited pK results merely reflect the pharmacological effect of the sustained-release 4-AP dose in the patient when administered, thus essentially duplicating the claimed 10 mg twice-daily dose, which the specification explains achieves those results. Appx9540 (citing Appx6439 and Appx194 (col. 25:1-28)).

### D. Acorda ignores that its patents are presumed *prima facie* obvious as a matter of law.

Acorda understates its challenge by failing to mention that the law presumes the Acorda Patents are *prima facie* obvious. The District Court did not need this presumption to invalidate the Acorda Patents, but it underscores why this Court should affirm.

As the District Court noted, throughout trial and in post-trial briefing "Defendants contend[ed] that the Acorda Patents 'are presumed [*prima facie*] obvious as a matter of law, because they simply claim an optimized dose selected from a discrete, narrow range of doses disclosed in the prior art,' including the Elan Patent." Appx63 n.27 (citing *Tyco Healthcare Grp., LP v. Mut. Pharm. Co.*, 642 F.3d 1370, 1372-73 (Fed. Cir. 2011); *Galderma Labs., L.P. v. Tolmar*, 737 F.3d 731, 738 (Fed. Cir. 2013) (record citation omitted)). Specifically, the Elan Patent claims the use of sustained-release 4-AP to treat MS—including via stable doses. Appx9-11. After the Elan Patent issued, additional prior art narrowed the method claimed by that patent by narrowing the dose and the symptoms of MS patients that are being treated.

For example, the Goodman references encouraged future studies testing 10-20 mg twice-daily sustained-release 4-AP to improve walking in MS patients, and Hayes III disclosed the pK results for such doses, including the claimed 10 mg twice-daily dose. Appx29-33 (citing Appx6370; Appx6371-6372; Appx6501-6504; Appx6433-6440); Appx69-73 (citing Appx6501-6504); Appx76-78 (citing Appx6433-6440). The asserted claims of the Acorda Patents thus merely claim an optimized dose that "falls within" "a [dose] range disclosed in the prior art." *Galderma*, 737 F.3d at 738.

In these circumstances, "the burden of production falls upon the patentee to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations." *Galderma*, 737 F.3d at 738. The District Court found it unnecessary to reach these questions: "Given the Court's conclusion that Defendants have proven, by clear and convincing evidence, that the asserted claims of the Acorda Patents are obvious, it is unnecessary for the Court to also determine whether these claims should be presumed [*prima facie*] obvious." Appx63 n.27.

But to obtain a reversal, Acorda must show why the presumption does not apply here—or that it has been overcome. Acorda has done neither. It does not mention the presumption, much less explain why it does not apply or how it is overcome. Nor could Acorda possibly do so. As discussed, it has no viable teaching away argument; raises no argument on appeal for unexpected results; and as shown below, has no other "pertinent secondary considerations" sufficient to rebut a presumption of *prima facie* obviousness. *Galderma*, 737 F.3d at 738.

For this reason, too, the Court should affirm.

### E. The District Court properly followed this Court's precedent in according little probative value to Acorda's purported evidence of secondary considerations due to the existence of a blocking patent.

In an effort to avoid affirmance, Acorda stresses the District Court's "own findings of 'significant' and 'convincing' evidence of multiple indicia of non-obviousness." Br. 56. Of course, even "substantial evidence" of secondary considerations cannot "overcome the clear and convincing evidence that the subject matter sought to be patented is obvious." *Richardson-Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484 (Fed. Cir. 1997). To circumvent this hurdle, Acorda says the District Court "expanded the holding of *Merck*" to find that the Elan "blocking" patent overcame the court's findings. Br. 55-63. But as *Merck* held, "the inference of non-obviousness … from evidence of commercial success[] [wa]s weak" "[b]ecause market entry by others was precluded." 395 F.3d at 1377; *see also Warner Chilcott Co, LLC v. Teva Pharm. USA, Inc.*, 37 F. Supp. 3d 731, 739 (D. Del. 2014), *aff'd*, 594 F. App'x 630 (Fed. Cir. Nov. 18, 2014) (same; quoting *Merck*). As the District Court found, the same was true here as to commercial success, long-felt need, and failure of others. As to all these considerations, the court's blocking-patent analysis was only part of its weighing of the overall evidence. There was no legal error here.

***Commercial success.*** As a threshold matter, that "there was already a medication on the market" practicing the blocking patent in *Merck* is irrelevant. (Br.

58.) *Merck* held that "[f]inancial success is not significantly probative" where "others were legally barred from commercially testing" the claimed inventions. 395 F.3d at 1377. It did not limit its reasoning to cases where the patented invention was embodied in a marketed product. Nor would such a distinction make sense. According to the unrefuted testimony of our commercial-success expert, "[b]locking patents are relevant because even if there is a commercial opportunity, that blocking patent disincentivizes or blocks other entities from bringing a product to market sooner, so there is no inference for obviousness in that case." Appx963 (648:9-13).

To avoid this conclusion, Acorda speculates that "[o]thers could have sought a license from Elan as Acorda did, yet none did." Br. 58. A license also would have impeded development, however, because it would require payment of a royalty. And in any event, Acorda ignores that its license from Elan was "exclusive," meaning that only Acorda could access the Elan Patent. Appx965-966 (650:16-651:1); Appx6094; Appx6017. Moreover, Acorda offered no evidence at trial that Elan was willing to license its patent to anyone except Acorda (Appx966 (651:10-17)), or that Elan ever attempted to license the Elan Patent to anyone else. Appx966 (651:18-21). Nor did Acorda offer any evidence about the terms of any proposed license between Elan and anyone except Acorda. Appx966 (651:22-25). Likewise, no evidence was presented at trial that Acorda was willing to sublicense the Elan Patent. Indeed, sublicensing the Elan Patent would make no sense where Acorda took an

exclusive license to prevent competition from developing the same drug and method it was then attempting.

In sum, the record lacks any evidence that anyone had an incentive to develop the claimed inventions of the Acorda Patents. As our commercial success expert testified, "Acorda [was] the only entity that [could] get access or can get a license to the [Elan] patent. In effect, other entities that might want to pursue commercial opportunity like Ampyra … would not have access to it because Acorda has that exclusive license." Appx965-966 (650:21-651:1). Accordingly, the District Court correctly held the Elan Patent blocked development of "the invention of the Acorda Patents, even if those inventions were obvious." Appx84.

Nor did the District Court convert *Merck* into a "categorical bar" to "negate per se" any consideration of commercial success. Br. 57, 59. In its post-trial decision, the court agreed with our expert that the Elan Patent heavily dampened incentives for other companies to develop a sustained-release 4-AP product because the patent broadly claims any sustained-release form. Appx963 (648:1-13). Thus, it made sense to find that, in this case, evidence of commercial success "is of little probative value to the obviousness inquiry with respect to the Acorda Patents because the earlier Elan Patent 'blocked' competitors from practicing the Acorda Patents." Appx84.

By contrast, Chief Judge Stark found differently in a different case involving blocking patents—confirming that he applies no *per se* rule for such patents. *UCB, Inc. v. Accord Healthcare, Inc*., 201 F. Supp. 3d 491 (D. Del. 2016). As he put it in *UCB*, "the record as a whole supports a finding of commercial success" despite "dis-incentives that other potential developers would have encountered" in the form of "blocking patents." *Id*. at 539. His contrary finding here is consistent with *Merck* and easily satisfies the deferential, clear-error standard.

***Failure of others; long-felt but unmet need.*** Turning to Acorda's purported evidence of "failure of others," the District Court found that "[t]he record includes only minimal evidence that anyone other than the Acorda patentees attempted to develop a 'safe and effective therapy to improve walking in MS patients.'" Appx86. Here, too, "this failed effort is not particularly probative of a 'gap' in the prior art that would render non-obvious the invention of the Acorda Patents"; Acorda's competitor "likely did not use 4-AP because it was blocked from doing so by the Elan Patent[.]" Appx86. That was exactly right, and certainly not clearly erroneous.

Likewise, long-felt but unmet need "is of limited probative" value where a POSA would not have been able to practice the invention without infringing a patent. Appx87. In that situation, "the need for a therapy to improve walking in MS patients remained unmet *despite* the obviousness of the solution claimed in the Acorda Patents." Appx87 (emphasis in original; other emphasis omitted). And, of course, the

District Court found that Acorda had not presented evidence of unexpected results, which Acorda does not challenge on appeal. There was no clear error here.

Ultimately, what Acorda and its *amici* seek is for this panel to overrule *Merck*, which would require an en banc decision. Fed. Cir. R. 35(a)(1). Acorda itself, however, never asks the Court to consider recommending that the en banc court overrule *Merck*. Nor should the panel do so. "This court respects the principle of stare decisis and follows its own precedential decisions unless the decisions are 'overruled by the court en banc, or by other controlling authority such as an intervening ... Supreme Court decision.'" *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1338 (Fed. Cir. 2007) (citing *Tex. Am. Oil Co. v. U.S. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995) (en banc)). "Indeed, panel opinions, like en banc opinions, invoke the principle of stare decisis. Panel opinions are, of course, opinions of the court and may only be changed by the court sitting en banc." *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1316 (Fed. Cir. 2013). The court should affirm.

## CROSS-APPELLANTS' PRINCIPAL BRIEF

**This Court should declare the Elan Patent invalid under 35 U.S.C. § 112.**

Turning to the Elan Patent, we do not challenge the District Court's factual findings. Rather, in light of those findings, the patent is invalid for lack of written description under 35 U.S.C. § 112. The Elan Patent expires on July 31, 2018. Based on the current briefing schedule and the typical argument and decision timeline, we acknowledge that this cross-appeal will likely become moot. Consequently, the Court need not reach the cross-appeal unless the Court intends to issue a decision before August 2018 (and we are not requesting expedited consideration).[7]

As with obviousness, compliance with the written-description requirement is reviewed for clear error. *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000). That assessment, however, "requires an objective inquiry into the four corners of the specification." *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1190-91 (Fed. Cir. 2014) (citation omitted). The party alleging invalidity due to a lack of written description has the burden of establishing by clear and convincing evidence that a patent disclosure does not "reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter

[7] The District Court's injunction terminates on July 31, 2018, when the Elan Patent expires. To the extent Acorda intends to seek relief from this Court to extend that injunction pending a decision in this appeal, we will confer with Acorda to try to avoid or moot emergency motions practice.

as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). That is the case here.

In its obviousness analysis, the District Court found "a reasonable expectation of success in using 4-AP to treat MS" and that "the prior art would have provided a clear motivation for a POSA to prepare a sustained-release formulation of 4-AP." Appx50-51. The court found the Elan Patent nonobvious, however, because the prior art provided no reasonable expectation of success in developing a therapeutically effective, sustained-release formulation. As the court held:

> [W]hile the record indicates that it may have been obvious to experiment with certain approaches to developing a sustained-release formulation, *nothing in the record demonstrates that a POSA would have had a "reasonable expectation" that at least one of those approaches would have resulted in a therapeutically effective sustained release formulation of 4-AP*.

Appx58 (emphasis added).

In support, the District Court found that "[t]he record does not support a finding that Uges, combined with other prior-art references, would have allowed a POSA to infer the relationship between the pharmacokinetics and therapeutic effects." Appx57 (citing Appx6711-6717). That is, "a POSA would not have known what *in vitro* dissolution profile a sustained-release formulation would have needed to achieve in order to maintain safe and effective therapeutic blood levels of 4-AP over time." Appx57. "Thus," the court concluded, a "POSA would not have had the

information necessary to assess whether a sustained-release formulation could be developed to achieve those blood levels." *Id.*

The court went on to hold that "Defendants have shown that the prior art included many sustained-release platforms, that many drugs had been formulated using these sustained release platforms, and that no affirmative evidence existed that would have dissuaded a POSA from pursuing a sustained-release dosage form of 4-AP." Appx58. Nonetheless, "Defendants have ***not*** shown … that a POSA would have inferred from this evidence that success would reasonably be expected from an attempt to develop a therapeutically-effective, sustained-release formulation for *any* drug, and most particularly for 4-AP." *Id* (emphasis in original).

These findings render the Elan Patent invalid for lack of written description. The patent contains no disclosure supporting a claim that sustained-release 4-AP formulations overall, or that each claimed formulation, "achieves therapeutically effective blood levels over a 12-24 hour period when administered on a once- or twice-daily basis." Appx164. The sole disclosure for achieving such "therapeutically effective blood levels" comes from the section "BACKGROUND AND PRIOR ART." But that section—and, indeed, the specification as a whole—discloses less information than the trial record, which the District Court found failed to support a reasonable expectation of "a therapeutically effective sustained release formulation of 4-AP." Appx58. For example, the patent specification does not even mention the

Uges references discussed above. Appx154. Further, the disclosure simply states that the composition should release over an extended period of time, not that it achieves "therapeutically effective blood levels." Appx154 (col. 2:8-16).

In fact, the entire disclosure in the Elan Patent for the "therapeutically effective blood levels" limitation merely recites the desires of, and problem faced by, the inventors—not any solutions:

> In the use of a drag [sic] for long-term therapy it is desirable that the drug be formulated so that it is suitable for once- or twice-daily administration to aid patient compliance. Further, in view of the nature of neurological diseases, it can be appreciated that there is a need for an improved dosage form. However, *such a formulation must result in a controlled release of drug to the systemic circulation and therapeutically effective blood levels throughout a given treatment period.*
>
> *Another problem with long-term therapy is the requirement of determining an optimum dose which can be tolerated by the patient.* If such a dose is not determined this can lead to a diminution in the effectiveness of the drag [sic] being administered.

Appx154 at 2:8-22 (emphasis added).

"The written description is the *quid pro quo* of the patent system; the public must receive meaningful disclosure in exchange for being excluded from practicing the invention for a limited period of time." *Zoltek Corp. v. United States*, 815 F.3d 1302, 1308 (Fed. Cir. 2016). Accepting that "a POSA would not have had the in-

formation necessary to assess whether a sustained-release formulation could be developed to achieve [therapeutically effective] blood levels" (Appx57), it follows that the disclosure here does not "reasonably convey[] to" this same POSA "that the inventor had possession of" a sustained-release formulation that would, in fact, achieve such blood levels. *Ariad Pharm., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). Thus, the disclosure is inadequate under § 112.

Finally, although the decision states that our "Section 112 defenses could likely be found to have been waived"—but never actually finds waiver—we fully preserved the argument. The "general rule" is "that a party may raise on appeal any issue that was raised or actually cited below." *Lifestyle Enter., Inc. v. United States*, 751 F.3d 1371, 1377 (Fed. Cir. 2014). We raised our § 112 defense multiple times—first in our pretrial brief. Appx4013-4015. Then, during opening statements, we informed the court that we "have a 112 defense that is pleaded in the alternative that is directed solely to the Elan patent and depending on the position that Plaintiffs take, if appropriate, we'll address those in closing argument and post-trial briefing." Appx323 (8:8-13). We reiterated that position during closing argument. Appx1115 (800:10-21). And we devoted entire sections of our post-trial briefs to this defense. Appx4376-4377; Appx4513-4516. As to the Elan Patent, the Court should reverse.

## CONCLUSION

For all these reasons, the judgment as to the Acorda Patents should be affirmed. Assuming the Court resolves our cross-appeal before July 31, 2018, the judgment as to the Elan Patent should be reversed; otherwise, as of that date the cross-appeal will become moot.

Respectfully submitted,

/s/ Charles B. Klein
CHARLES B. KLEIN
*Counsel for Defendants-Appellees and Cross-Appellants Roxane Laboratories, Inc. and Teva Pharmaceuticals USA, Inc.*

/s/ Robert Florence
ROBERT FLORENCE
*Counsel for Defendant-Appellees and Cross-Appellants Mylan Pharmaceuticals, Inc.*

**CERTIFICATE OF SERVICE**

I certify that, on October 6, 2017, I caused the foregoing Corrected Briefs for Defendants-Appellees and Cross-Appellants to be electronically filed with the Clerk of Court using the CM/ECF system, and thereby served via CM/ECF on counsel for Plaintiff-Appellant and Plaintiff-Cross-Appellee.

Date: October 6, 2017

/s/ Charles B. Klein
CHARLES B. KLEIN
*Counsel for Defendants-Appellees and Cross-Appellants Roxane Laboratories, Inc. and Teva Pharmaceuticals USA, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b)(2)(A) because it contains 15,436 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in 14-point Times New Roman, a proportionally spaced typeface, using Microsoft Word 2010.

Dated: October 6, 2017

*/s/* Charles B. Klein

CHARLES B. KLEIN
*Counsel for Defendants-Appellees and Cross-Appellants Roxane Laboratories, Inc. and Teva Pharmaceuticals USA, Inc.*