**2017-2078, -2134**

# United States Court of Appeals for the Federal Circuit

ACORDA THERAPEUTICS, INC.,
*Plaintiff – Appellant,*
ALKERMES PHARMA IRELAND LIMITED,
*Plaintiff – Appellee,*

*v.*

ROXANE LABORATORIES, INC., MYLAN PHARMACEUTICALS INC., TEVA PHARMACEUTICALS USA, INC.,
*Defendants – Cross-Appellants.*

*Appeals from the United States District Court for the District of Delaware in Nos. 1:14-cv-00882-LPS, 1:14-cv-00922-LPS, 1:14-cv-00935-LPS, 1:14-cv-00941-LPS, Chief Judge Leonard P. Stark*

## REPLY BRIEF OF ACORDA THERAPEUTICS, INC. AND RESPONSE BRIEF OF ACORDA THERAPEUTICS, INC. AND ALKERMES PHARMA IRELAND LIMITED

Garrard R. Beeney
Stephen J. Elliott
Wen-Ying Angela Chang
Alexandra H. Moss
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
beeneyg@sullcrom.com
elliotts@sullcrom.com
changw@sullcrom.com
mossa@sullcrom.com

Jane G. Wasman
Anthony Michael
ACORDA THERAPEUTICS, INC.
420 Saw Mill River Road
Ardsley, NY 10502
(914) 347-4300
jwasman@acorda.com
amichael@acorda.com

Bruce M. Wexler
Gerald J. Flattmann, Jr.
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
brucewexler@paulhastings.com
geraldflattmann@paulhastings.com

Stephen B. Kinnaird
Igor V. Timofeyev
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C. 20005
(202) 551-1700
stephenkinnaird@paulhastings.com
igortimofeyev@paulhastings.com

*Counsel for Appellant Acorda Therapeutics, Inc.*

(ADDITIONAL COUNSEL LISTED INSIDE)

Corrected: November 15, 2017

COUNSEL CONTINUED:

Maryellen Noreika
Jeremy A. Tigan
MORRIS, NICHOLS,
ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mnoreika@mnat.com
jtigan@mnat.com

*Counsel for Appellee Alkermes Pharma Ireland Limited*

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Acorda Therapeutics, Inc. certifies the following:

| 1. Full name of party represented by me | 2. Name of real party in interest represented by me | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Acorda Therapeutics, Inc. | Acorda Therapeutics, Inc. | BlackRock, Inc. |

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

Arnold & Porter Kaye Scholer LLP:
Aaron Stiefel, Daniel DiNapoli, Jeffrey Martin, Soumitra Deka, and Sylvia Becker

Morris, Nichols, Arsht & Tunnell LLP:
Jack B. Blumenfeld, Maryellen Noreika, and Jeremy A. Tigan

5. A prior appeal in this case was before this Court under Docket Nos. 2015-1456 and 2015-1460. This Court's opinion resolving the appeal is available at *Acorda Therapeutics Inc. v. Mylan Pharmaceuticals Inc.*, 817 F.3d 755 (Fed. Cir. 2016). Judge Taranto authored the opinion, joined by Judge Newman. Judge O'Malley authored an opinion concurring in the judgment.

The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

*Acorda Therapeutics, Inc. v. Micro Labs. Ltd.*, No. 17-CIV-03724 (D.N.J., filed on May 24, 2017).

Dated: November 13, 2017

/s/Bruce M. Wexler
Bruce M. Wexler
*Counsel for Appellant*
*Acorda Therapeutics, Inc.*

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee Alkermes Pharma Ireland Limited certifies the following:

| 1. Full name of party represented by me | 2. Name of real party in interest represented by me | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Alkermes Pharma Ireland Limited | Alkermes plc | T. Rowe Price Associates, Inc. |

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

Jack B. Blumenfeld and Stephen J. Kraftschik of
Morris, Nichols, Arsht & Tunnell LLP

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

*Acorda Therapeutics, Inc. v. Micro Labs. Ltd.*, No. 17-CIV-03724 (D.N.J., filed on May 24, 2017).

A prior appeal in this case was before this Court under Docket Nos. 2015-1456 and 2015-1460. This Court's opinion resolving the appeal is available at *Acorda Therapeutics Inc. v. Mylan Pharmaceuticals Inc.*, 817 F.3d 755 (Fed. Cir. 2016). Judge Taranto authored the opinion, joined by Judge Newman. Judge O'Malley authored an opinion concurring in the judgment.

Dated: November 13, 2017

/s/Maryellen Noreika
Maryellen Noreika
*Counsel for Appellee*
*Alkermes Pharma Ireland Limited*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ ii

SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 6

I. The District Court's Methodological Errors Resulted in an Erroneous Obviousness Finding. ........ 6

A. The District Court's Reliance on Prior Art that Teaches Titration Does Not Support the Obviousness of an Invention Requiring Stable Dosing with No Titration. ........ 8

B. The District Court's Reliance on Schwid Was Clear Error Because Schwid Teaches Away from Acorda's Invention. ........ 16

C. The District Court's Determination that a Stable Low Dose of 10 mg Without Titration BID Was "Obvious to Try" Is Both Clearly Erroneous and Legally Flawed. ........ 19

1. The District Court Committed Clear Factual Error in Analyzing Goodman's Teachings. ........ 19

2. The District Court and Defendants Misapply the *KSR* Obvious-To-Try Standard. ........ 26

3. The Acorda Patents Are Not Presumed Obvious. ........ 32

II. The District Court Erred in Its Treatment of the Pharmacokinetic Limitation. ........ 34

III. The District Court Incorrectly Applied *Merck*'s Blocking-Patent Holding, and Improperly Extended It to Objective Indicia Not Subject to Being Blocked. ........ 38

IV. Defendants' Cross-Appeal Will Likely Become Moot and, in any Event, the Written-Description Argument Is Waived and Lacks Merit ........ 47

CONCLUSION ........ 50

# TABLE OF AUTHORITIES

## Cases

*Alexsam, Inc. v. IDT Corp.*,
715 F.3d 1336 (Fed. Cir. 2013) ....................23

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) ....................14

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ....................49

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
776 F.2d 281 (Fed. Cir. 1985) ....................16

*Bayer Schering Pharma AG v. Barr Labs., Inc.*,
575 F.3d 1341 (Fed. Cir. 2009) ....................11

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
246 F.3d 1368 (Fed. Cir. 2001) .................... 37, 38

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
868 F.2d 1251 (Fed. Cir. 1989) ....................13

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ....................41

*Eisai Co. v. Dr. Reddy's Labs., Ltd.*,
533 F.3d 1353 (Fed. Cir. 2008) ....................28

*Galderma Labs., L.P. v. Tolmar, Inc.*,
737 F.3d 731 (Fed. Cir. 2013) .................... 32, 33

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)....................4

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) .................... 36, 45

*In re Enhanced Sec. Research, LLC*,
739 F.3d 1347 (Fed. Cir. 2014) ....................8

*In re Gurley*,
27 F.3d 551 (Fed. Cir. 1994) ....................................................................18

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012) ....................................................................7

*Institut Pasteur v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) ....................................................................19

*K/S HIMPP v. Hear–Wear Techs., LLC*,
751 F.3d 1362 (Fed. Cir. 2014) ....................................................................14

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)........................................................................... *passim*

*Leo Pharm. Prods., Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013) ....................................................................46

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ............................................................ *passim*

*Merck Sharp & Dohme Corp. v. Hospira, Inc.*,
--- F.3d ----, 2017 WL 4819091 (Fed. Cir. Oct. 26, 2017)........................ *passim*

*Mintz* v. *Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012) ....................................................................31

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013) ....................................................................33

*Par Pharm., Inc. v. TWi Pharm., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ............................................................ 27, 36

*Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*,
411 F.3d 1332 (Fed. Cir. 2005) ....................................................................7

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009) ....................................................................30

*Ralston Purina Co. v. Far-Mar-Co, Inc.*,
772 F.2d 1570 (Fed. Cir. 1985) ....................................................................49

*Ruiz v. A.B. Chance Co.*,
357 F.3d 1270 (Fed. Cir. 2004) ....................................................................6, 7

*Sanofi v. Watson Labs. Inc.*,
--- F.3d ----, 2017 WL 5180716 (Fed. Cir. Nov. 9, 2017).................................30

*Santarus, Inc. v. Par Pharm., Inc.*,
694 F.3d 1344 (Fed. Cir. 2012) ......................................................................37

*UCB, Inc. v. Accord Healthcare, Inc.*,
201 F. Supp. 3d 491, 539 (D. Del. 2016) ..........................................................42

**Statutes**

35 U.S.C. § 112 ........................................................................... 47, 48, 49

35 U.S.C. § 271(e)(1)........................................................................................45

35 U.S.C. § 282 ................................................................................................33

**Other Authorities**

OECD Health Policy Studies, *Pharmaceutical Pricing Policies in a Global Market* (2008) ..........................................................................44

## SUMMARY OF ARGUMENT

In its principal brief, Appellant Acorda Therapeutics, Inc. ("Acorda") established that the district court improperly analyzed the alleged obviousness of the components of the Acorda invention in piecemeal fashion rather than analyzing the invention as a whole, as required. This error led the district court to rely selectively on the teachings of prior art references that it found to support a certain claim limitation, but to ignore the teachings of those same references that run contrary to other core limitations of the invention. The district court as a result improperly struck down Acorda's patents for an important innovation that allowed FDA approval of the first and still-only drug for improving walking in patients with multiple sclerosis ("MS"), using a compound that had long been subject to safety and efficacy concerns. The response by Defendants-Appellees-Cross-Appellants Roxane Laboratories, Inc., Mylan Pharmaceuticals Inc., and Teva Pharmaceuticals USA, Inc. ("Defendants") fails to overcome the serious challenges presented by this appeal.

The deficiencies in the district court's analysis are exemplified by its treatment of the critical low "stable dosing" and "no titration" claim limitations. A key aspect of the claimed invention is its long-term *stable* low-dosing regimen of 10 mg BID dose of 4-AP *without titration* (*i.e.*, without escalating the dosage of 4-AP to the patient). This was a radical break with the prior art use of 4-AP,

which—as the district court expressly found—consistently taught titration upward to high dosing. The district court purported to find support for "stable dosing" in two references (Van Diemen and Polman), but, as the district court also found, those references teach dosing only as part of, and after, an escalating dosing regimen that is flatly at odds with the claim requirement that *precludes* any titration (*i.e.*, escalating doses). Van Diemen also taught that 4-AP is efficacious in an escalating dosing regimen only at dosage and blood-serum levels that far exceed the low levels required for Acorda's patent. The court's assessment of Van Diemen and Polman was clear error.

Defendants do not even attempt to defend the district court's reliance on Van Diemen and Polman, which teach the opposite of Acorda's patent on this critical issue. The district court's failure to identify prior art rendering obvious Acorda's invention as claimed is legal error. And the district court committed clear factual error in finding that the prior art taught Acorda's claim limitations when considered in the context of the invention as a whole.

The district court's piecemeal analysis also led to clear error in its findings regarding the key Schwid reference. The district court relied upon Schwid in part to find that a person of ordinary skill in the art ("POSA") would be motivated to use 4-AP in some form to treat walking in MS patients. But the court ignored that Schwid (by teaching the need for 4-AP blood-serum levels above 60 ng/ml, and

thus high dosages of at least 25 mg BID) taught away from the invention as a whole, which requires a much lower dosage of only 10 mg BID. Defendants' primary response is that Acorda waived the argument, but the record shows the contrary.

Nor can Defendants salvage the district court's holding by asserting that Goodman makes obvious to a POSA that a stable low 10 mg BID dose can effectively improve walking speed in MS patients. Goodman teaches the use of a range *of escalating doses* (*i.e.*, upward titration) from 20-80 mg/day that as an aggregated whole showed some improvement in walking, but nothing about efficacy of *individual* doses. Defendants cannot convert that reference into support for the invention's stable 10 mg BID dosing regimen that expressly excludes dose escalation, breaking from the consistent use of titration in the 4-AP prior art including Goodman.

The piecemeal analysis also caused legal error in the district court's application of the obvious-to-try standard of *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). The district court applied that standard to a claim limitation (the 10 mg BID dose), and not to the entire invention, as *KSR* demands. And its finding that 10 mg BID was one of the *plausible* doses to explore after Goodman does not satisfy *KSR*'s requirement that the entire invention be an identified, *predictable* solution. Defendants have no response to this point.

Defendants fare no better in their attempt to defend the district court's analysis of the claimed pharmacokinetic ("PK") values. Their principal argument is that the PK values were disclosed in the prior-art Hayes reference. But Defendants, like the district court, ignore the invention as a whole, which requires the PK values from a sustained-release formulation to improve walking in MS patients. Hayes only reported a range including 15-35 ng/ml values for a particular 10 mg sustained-release formulation administered BID to spinal cord patients, and discloses neither the efficacy of those blood serum levels to improve walking in MS patients nor the formulation that was used. A POSA would not be motivated to combine Hayes with Schwid and Goodman's teachings on efficacy because (a) the prior art did not disclose whether the same formulation used in Hayes was also used in those studies and (b) Schwid teaches the need for much higher blood serum levels to significantly improve walking in MS patients than those disclosed in Hayes, which only involved spinal cord injury.

Defendants also fail to justify the district court's extension of *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005), to use a purported "blocking patent" to diminish the powerful objective indicia of nonobviousness that the district court itself found to exist in this case. Such indicia are intended to prevent a finding of obviousness based on hindsight, *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966), and their nullification allowed the

district court's flawed analysis to proceed unchecked. This Court recently admonished against negating evidence of commercial success by relying on putative blocking patents. *Merck Sharp & Dohme Corp. v. Hospira, Inc.*, --- F.3d ----, 2017 WL 4819091, at *4 (Fed. Cir. Oct. 26, 2017) ("*Merck II*"). And Defendants fail to show any evidence that U.S. Patent No. 5,540,938 (the "'938 patent" or the "Elan Patent") had any blocking effect in this case, or any warrant to apply *Merck* beyond the commercial-success factor.

Moreover, while considerations such as the cost or availability of a license might have some relevance to commercial success in some domestic circumstances not present here, blocking patents should not affect the analysis of the independent factors of long-felt need and failure of others. Those factors often turn upon the conduct of scientific research, which takes place around the world and in noncommercial contexts. *Merck* does not and should not diminish all objective indicia of nonobviousness, as *amici curiae* persuasively argue—arguments Defendants do not even attempt to counter. Here, the district court found strong indicia of non-obviousness, and these findings should not be negated by a categorical application and extension of *Merck*.

Finally, Defendants offer a half-hearted argument on their cross-appeal of the district court's rejection of their written-description challenge to the Elan Patent, admitting it will soon be moot. As the district court found, Defendants

waived the lack of written description defense they now raise because they presented no evidence at trial. On the merits, Defendants ignore the ample disclosures describing the invention as claimed, and do not address the district court's failure to make the factual findings on which their challenge rests.

## ARGUMENT

### I. The District Court's Methodological Errors Resulted in an Erroneous Obviousness Finding.

Defendants fail to counter with substance Acorda's demonstration in its opening brief that the district court improperly conducted a piecemeal mini-obviousness analysis of the claim limitations, without adequately analyzing the invention as a whole. Acorda Br. 31-34. Indeed, Defendants concede that the district court presented an "analysis setting forth where *each limitation was rendered obvious* by the prior art." Def. Br. 33 (emphasis added); *see also* Def. Br. 22-23.

Defendants nonetheless contend that the error is remedied by conclusory statements at the beginning and then at the end of the district court's opinion that "'Defendants have adduced clear and convincing evidence that a POSA at the priority date would have been motivated and would have had a reasonable expectation of success to practice and combine each of the limitations of the asserted claims of the Acorda Patents.'" Def. Br. 4, 32, 33, 35-36 (quoting Appx88); Def. Br. 34, 36 (quoting Appx63). But this Court in *Ruiz v. A.B. Chance*

*Co.*, 357 F.3d 1270, 1275 (Fed. Cir. 2004), explained that a district court cannot simply find limitations A, B, C, and D somewhere in the prior art and then on that basis declare the combination A+B+C+D obvious. Acorda Br. 32-33. "This form of hindsight reasoning, using the invention as a roadmap to find its prior art components, would discount the value of combining various existing features or principles in a new way to achieve a new result—often the very definition of invention." *Ruiz*, 357 F.3d at 1275;[1] *accord Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1337 (Fed. Cir. 2005).

It is thus legal error to hold that a POSA would find each limitation individually obvious or obvious to try (relying on a different set of references for each limitation) and then simply declare that Acorda's specific and narrowly claimed *combination* was obvious in light of all of those references together. *See In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012).

That methodological error was compounded with a second fundamental legal error: the district court picked certain teachings of particular references to support a finding that one limitation was obvious, while ignoring disclosures in the same and other references that contradicted other claim limitations. "[Section] 103

[1] It is irrelevant that (as Defendants observe, Def. Br. 34) *Ruiz* held the patent obvious by rejecting the appellant's claim there that "an express, written motivation to combine must appear in prior art references before a finding of obviousness," *Ruiz*, 357 F.3d at 1276, a principle that *KSR* later confirmed, 550 U.S. at 419-21. Acorda makes no such claim.

does not permit a court to stitch together an obviousness finding from discrete portions of prior art references without considering the references as a whole." *In re Enhanced Sec. Research, LLC*, 739 F.3d 1347, 1355 (Fed. Cir. 2014).

### A. The District Court's Reliance on Prior Art that Teaches Titration Does Not Support the Obviousness of an Invention Requiring Stable Dosing with No Titration.

The district court's clearest error was its reliance upon references that specifically teach upward titration—escalating from lower to higher doses during the course of treatment—to show the obviousness of Acorda's novel invention of a treatment regimen in which only a 10 mg BID dosage is administered, *and titration is expressly prohibited.* Defendants do not meaningfully address this key error.

The representative claims of the Acorda patents include the following two separate limitations in the required method of improving walking in an MS patient: (1) the same 10 mg BID dose must be stably administered for a term of at least two weeks, and (2) that dose must be the "only" dose administered to the patient, so neither prior or subsequent titration is permitted. Appx237 (Claim 22); Appx195 (Claim 7). For 4-AP, which had a mechanism of action related to its potential for toxicity, and which was believed to require high doses for potential efficacy, upward titration was consistently used in the prior art to enable the patient to "acclimate and get to an ultimate dose hopefully without adverse event." Appx600 (285:4-14); Appx75.

The district court found that "stable dosing" of 10 mg BID 4-AP would have been obvious to a POSA, but failed to analyze or find that the prior art taught the separate "no-titration" limitation in combination with stable dosing. To the contrary, the district court acknowledged "the prior art's *consistent use of titration*." Appx75 (emphasis added). The court relied principally on two references (Van Diemen and Polman) in finding that a POSA would have a reasonable expectation of success in pursuing "stable dosing/no titration." Appx74-77.

Defendants do not even attempt to defend—because they cannot—the district court's reliance on Van Diemen and Polman to reach that finding. These references only teach constant dosing at the conclusion of an upward titration dosing regimen, as the district court had acknowledged.

In particular, as the district court found, in Van Diemen, "[f]or oral doses, the researchers used *an individualized titration scheme* based on tolerability up to a maximum amount calculated based on patient weight." Appx26-27 (emphasis added); *see also* Appx7038-7039, Appx7042 (orally administered doses started at 10-20 mg/day and were upwardly *titrated* by 5-15 mg "up to a maximum of 0.5 mg/kg of body weight each day," with a mean of 31.2 mg/day and a high of 50 mg/day). Similarly, the district court found that Polman "employed an *upward titration dosing scheme based on tolerability* up to a maximum (determined based

on weight) over the course of four to eight weeks." Appx27 (emphasis added); Appx6655-6656 (doses started at 10-15 mg/day, with upward titration to a mean of 28 mg/day, and as high as 40 mg/day).

In addition to disclosing titration, in contravention of Acorda's invention, Van Diemen also teaches away from the 10 mg BID dosage and PK limitations of Acorda's invention. Van Diemen concluded that "'higher dosages and serum levels are likely to produce greater improvement in those MS patients who are capable of favorably responding to 4-AP,'" Appx27 (quoting Appx7045), and that the majority of patients who showed improvement "had a 4-AP serum level above 60 ng/ml," Appx7042, a blood level that the district court found a POSA would have understood to be associated with a dosage of at least 25 mg BID, Appx70; Appx445-448 (130:21-133:9); Appx789 (474:1-7); Appx823 (508:10-16). Acorda's invention, in contrast, requires only a 10 mg BID dosage, and blood levels of only 15-35 ng/ml, important elements that minimize the risk to the patient of seizures and other adverse effects.

In sum, the district court erred in selectively relying on the disclosure of stable dosing in Van Diemen and Polman, but simultaneously disregarding the disclosures that are inconsistent with critical limitations of the Acorda invention as claimed (*i.e.*, the requirements of no prior or subsequent titration, of a 10 mg BID dosage, and the achievement of 15-35 ng/ml blood serum (PK) levels).

Defendants now argue that the district court's analysis of the "stable dosing/no titration" limitations can be sustained solely on the basis of a third reference that the court secondarily cited (Goodman), ignoring that the district court used Goodman as a supplement to its primary reliance on Van Diemen and Polman. Def. Br. 44. But there is a simple reason the district court did not rely on Goodman as an independent prior-art teaching of stable dosing with no titration: Goodman teaches neither stable dosing nor no titration. Instead, in the 8-week study reported in Goodman, as the district court found, "participants received *escalating rather than stable* doses." Appx74 (emphasis added). "The treatment group received placebo for the first week, 20 mg of 4-AP per day during the second week, and then an additional 10 mg per day *each subsequent week* to a maximum of 80 mg/day during the eighth week of the study." Appx30. The district court only relied on Goodman for the limited point that 4-AP could be used safely over the long term, not as direct support for the stable dosing/no titration limitations. Appx74.[2]

Defendants are wrong when they claim that Goodman alone suffices because it does not teach titration. Def. Br. 44. The district court specifically found that Goodman does teach "escalating doses," Appx74, and the MSF-201 study report

---

[2] Because Goodman teaches neither stable dosing nor no titration, this is hardly a case (as Defendants claim, Def. Br. 46) where the "[t]he prior art would have funneled the formulator toward these two options." *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1350 (Fed. Cir. 2009).

abstracted in Goodman expressly refers to this upward titration regimen. *See* Appx7238 (referring to patient's receipt of "dose titration" in the study); *see also* Appx7264; Acorda Br. 44-45. In any event, Defendants' argument is misdirection. The critical point is that Goodman does not teach the claim limitations of stable dosing with no titration, where the study lacked any stable dosing, and (as the district court found) escalated the dosage each week. Appx74.

Apparently recognizing that stable dosing without titration is not part of the Goodman study, Defendants assert that "consistent with typical drug-development efforts (and FDA requirements), the study pointed to stable doses to be tested in 'later trials.'" Def. Br. 44 (quoting Appx874 (559:19-25)). That statement is incorrect. The testimony cited by Defendants only discusses research motivation. Appx874 (559:19-25). Most importantly the Goodman references (which are all that was available to a POSA in 2004) say nothing about testing stable doses in later trials, and indeed titration was an essential component of the Goodman study. Appx6370-6372; Appx6501-6504. Defendants cannot convert the Goodman references that teach escalating (upwardly titrated) dosing into a disclosure of the stable dosing/no titration limitations of the invention.

Finally, the Defendants argue (Def. Br. 45) that the Elan Patent somehow discloses the stable-dosing/no titration limitations of Acorda's claimed invention. The district court did not rely upon the Elan Patent for this point, and its finding

thus cannot be sustained based upon this reference. But Defendants' argument also fails on the merits. Defendants argue (Def. Br. 45) that the Elan Patent teaches stable dosing without titration simply because claims 1 through 4 of that patent may broadly *cover* sustained-release 4-AP formulations with therapeutic effect, unrestricted to a specific dosing regimen. Appx164 (22:16-32). But a claim without a dosing regimen does not constitute a prior art teaching of a specific dosing regimen, and it is well settled that a broad genus patent does not implicitly render obvious every species invention. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1262 (Fed. Cir. 1989).

Indeed, consistent with other prior art that was acknowledged by the district court, the only dosing regimen for sustained-release 4-AP actually disclosed in the Elan Patent is upward titration. Appx160 (13:65-14:9) (the specification describes a regimen where doses begin at 15 mg/day until tolerability is established, and then "increased by amounts of at least 5-15 mg/day until said therapeutic dose is reached"); Appx724-725 (409:25-410:14).

In short, the district court, after it acknowledged that the prior art "consistently" teaches titration, failed to identify a single teaching in any prior art of the "stable dosing/no titration" limitations of the Acorda invention, much less stable dosing of 10 mg BID for at least two weeks. Nothing in the Defendants'

response negates that simple fact, which alone defeats the district court's obviousness finding.

Defendants next argue (based entirely on their own expert's testimony) that motivation to use stable dosing can be sustained as a matter of "common sense" because a stable dose can be more convenient for the patient. Def. Br. 46. The district court did not find that common sense established stable dosing of 4-AP without titration and the mantra of "common sense" cannot overcome a consistent teaching in the prior art of the use of escalating doses of 4-AP.

"[C]ommon sense is typically invoked to provide a known *motivation to combine*, not to supply a missing claim limitation." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016) (emphasis in original). This Court has recognized common sense as a source of a claim limitation when the "limitation in question was unusually simple and the technology particularly straightforward," *id.* at 1362, or was a peripheral limitation that the record establishes to be indisputably within a POSA's knowledge, *id.* at 1362-63. *See also K/S HIMPP v. Hear–Wear Techs., LLC*, 751 F.3d 1362, 1365 (Fed. Cir. 2014) (finding that the "the Board was correct to require record evidence to support an assertion that the structural features of . . . [the asserted claims] were known prior art elements"). Neither is the case here. To the contrary, the 4-AP prior art consistently taught titration, as the district court acknowledged. Appx75; Appx822 (507:17-20). Defendants'

invocation of "common sense" cannot bridge the gap between what the prior art taught in this case, and what the district court found.

The district court's limitation-by-limitation analysis obscured Acorda's radical break from the prior art. The prior art consistently taught titration to higher doses because of the belief that 4-AP had a narrow therapeutic window: namely, that 4-AP would only have efficacy at higher doses near toxic levels, since the same mechanism of action causes both benefit and toxicity. Appx773-774 (458:17-459:8) (discussing Bever); Appx789 (474:8-14) (discussing Schwid). Because the symptoms of MS (like walking impairment) exist on a continuum, the goal for treating MS was not to achieve just any effect but a significant effect that would improve the patient's function. Appx609-610 (294:19-295:6). The prior art consistently pursued titration to achieve the highest tolerable dose to maximize benefit without courting the risk of seizures to which MS patients are especially prone. Appx835-836 (520:5-521:3). Before Acorda's invention, no one understood that administering a very low 10 mg BID dose of sustained-release 4-AP without any prior or subsequent period of titration would be an efficacious treatment of walking impairment in MS patients that could be employed to achieve maximum benefit without undue patient risk. There was no motivation to combine the prior art into Acorda's invention as claimed with a reasonable expectation of

success. *See* Acorda Br. 38-47. The district court's declaration of obviousness is both legally flawed and clearly erroneous.

### B. The District Court's Reliance on Schwid Was Clear Error Because Schwid Teaches Away from Acorda's Invention.

Acorda demonstrated in its opening brief that the district court improperly relied on the Schwid reference in finding obviousness because it teaches away from the invention as claimed. Acorda Br. 35-37.

Defendants' primary response is that Acorda waived the "opportunity" to argue teaching away because it "never offered any teaching away theory either at trial or in post-trial briefing, much less the specific theory that 'Schwid affirmatively teaches away.'" Def. Br. 38-39. That is wrong. For example, in its post-trial answering brief, Acorda expressly made this same point: "Defendants ignore Schwid's suggestion to pursue higher doses, although the Federal Circuit has admonished that a reference must be 'considered for all it taught,' including 'disclosures that diverged and taught away from the invention at hand.'" Appx4449-4450 (quoting *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 296 (Fed. Cir. 1985)). Acorda presented testimony to the district court by witnesses found to be credible regarding how Schwid teaches away from the claimed invention. Appx29; Appx38; Appx41; Appx70 (quoting Appx6684); Appx788-789 (473:15-474:7); Appx1093-1094 (778:18-779:3).

The district court used Schwid to find obvious the individual claim limitation of using 4-AP to improve walking, Appx69, but disregarded that Schwid's disclosures of blood-serum levels greater than 60 ng/ml and correspondingly high doses (greater than 25 mg BID) taught away from the Acorda invention as a whole, including the claimed low 10 mg BID dosage and 15-35 ng/ml blood levels (as did Schwid's report of the failed Elan study). Acorda Br. 36-37. In other words, the district court used Schwid to find obviousness of the claim *limitation* of simply using 4-AP, Appx69, but disregarded that Schwid's other disclosures taught away from *how* Acorda's inventive dosing regimen successfully treats MS for walking challenges.

The Schwid study involved a single dose (17.5 mg BID) that was 75% higher than the low 10 mg BID dose of Acorda's invention. Acorda Br. 36. It reported a statistically significant effect of that 17.5 mg BID dosage level upon timed gait. *Id.* at 11. But, as the district court found, Schwid also taught that 4-AP's "therapeutic window" was "relatively narrow" (*i.e.*, it would have efficacy only at higher dosages near the toxic range), and that "[n]one of the patients with a serum level less than 60ng/ml felt better . . . on 4AP SR than placebo." Appx29 (quoting Appx6683); *see also* Appx70 (quoting Appx6684). Schwid noted that its finding was consistent with the earlier Van Diemen study of immediate-release 4-AP. Appx6684.

The high target blood serum levels of 60 ng/ml that Schwid teaches far exceed the 15-35 ng/ml serum levels required by the claims. Appx237; Appx195; Appx788-789 (473:15-474:7). Moreover, the district court (relying on Defendants' expert Peroutka) found that the serum levels reported in Schwid would correspond to a required dosage of a high 25 mg/BID (more than twice the 10 mg BID dosage level of the invention). Appx70; Appx445-448 (130:21-133:9); Appx789 (474:1-7); Appx823 (508:10-16).

Defendants assert that Schwid cannot teach away from the invention because it does not expressly disparage the use of a stable 10 mg BID dose. Def. Br. 39. But "[a] reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). Schwid's disclosures that 4-AP had a narrow therapeutic window, and that significant effect would likely occur only at doses higher than a 25 mg BID dose associated with blood-serum levels of 60 ng/ml, clearly teach away from the critical insight of the Acorda invention of administering a stable low 10 mg BID dose without escalation to achieve blood serum levels of 15-35 ng/ml for treatment of walking in an MS patient. Appx789 (474:2-7). Especially in conjunction with Van Diemen's similar disclosures that "higher dosages and serum levels are likely to produce greater

improvement," Appx7045, and that the majority of patients who showed improvement had blood-serum levels above 60 ng/ml, Appx7042, Schwid's teachings "count[] significantly against finding a motivation to take the claimed steps with a reasonable expectation of success." *Institut Pasteur v. Focarino*, 738 F.3d 1337, 1345 (Fed. Cir. 2013).

Irrespective of Defendants' efforts to avoid Schwid as a "teaching away," the critical point is that Schwid, a central reference in the district court's analysis, teaches *the opposite* of Acorda's invention as a whole, and the district court was clearly wrong to place Schwid on the obviousness side of the scale based on an analysis of a limitation in isolation. Schwid cannot be cited to support the use of 4-AP to improve walking, Appx69, while disregarding how it did so and the inconsistency between Schwid's dose- and serum-level teachings and key innovative aspects of the Acorda invention.

### C. The District Court's Determination that a Stable Low Dose of 10 mg Without Titration BID Was "Obvious to Try" Is Both Clearly Erroneous and Legally Flawed.

#### 1. The District Court Committed Clear Factual Error in Analyzing Goodman's Teachings.

In its opening brief, Acorda demonstrated that the Goodman references did not teach the efficacy of a sole non-titrated stable 10 mg BID dose in improving walking in MS patients, much less render obvious the Acorda invention as a whole. Acorda Br. 38-44.

Defendants respond by repeatedly mischaracterizing Goodman. For example, they state that Goodman "taught that orally administering 10-20 mg of dalfampridine twice-daily had a '[s]ignificant benefit on timed walking' in MS patients," Def. Br. 2, 14 (same), and that Goodman "taught a preferred dose range (10-20 mg twice-daily) to treat impaired walking in MS patients," Def. Br. 12. To the contrary, the Goodman Poster has a single bullet point stating, "Evidence of dose-response in 20-40 mg/day range" (*i.e.*, that the treatment group, without a placebo comparison, showed a response in walking speed over that entire range when administered 10 mg twice daily, then 15 mg twice daily, and then 20mg twice daily in successive weeks). Appx6503.

None of the Goodman references, however, characterized that particular range as yielding significant walking benefits or taught that it was a preferred range. Rather, the only statistically significant finding of effect on walking speed was for the aggregated group following administration of the entire 20-80 mg escalating-dosage regimen. Appx30-31; Appx6372; Appx6501-6504; Appx792-793 (477:21-478:22); Appx797-798 (482:17-483:3). Contrary to Defendants' characterization, Goodman separately reported, consistent with its escalating dosing regimen, that "Dose-response curves showed increasing benefit" in walking speed "in the 20mg *to 50 mg* range" (10-25 mg BID). Appx6370, Appx6372

(emphasis added). All of this is consistent with Goodman's use of dose escalation as an essential element of the study regimen.

Defendants next repeat the district court's clearly erroneous finding that "'Goodman states that the results showed "evidence of a dose response in the 20 to 40 milligram per day range," indicating that patients taking these dosages of 4-AP demonstrated a greater response to treatment *than did patients receiving placebo*.'" Def. Br. 23 (quoting Appx72) (emphasis added). But there is nothing in the record to support this finding: Nothing in the Goodman Poster compares dosages of 4-AP to placebo, nor did any expert testify that a POSA would interpret the dose-response reported in Goodman in this way.

The district court erred because it tried to fill this gap in the evidence with speculation, asserting that "a POSA would have understood the Goodman authors to have considered the results of the placebo group before representing that there was 'evidence of a dose response' in the listed range." Appx73 n.34. The district court speculated that "a POSA would assume that" the Goodman Poster "did not omit context that a POSA would have found material to interpreting the study results." *Id.* It cited no evidence to support this assertion, but only argument of Defendants' attorney, Appx72 (citing Appx1116); Appx73 n.34 (citing Appx1048), and Dr. Goodman's general description of dose-response curves,

Appx72 (citing Appx792-793), none of which mentions comparison to a placebo control group.

The evidence was contrary to the district court's speculation. Dr. Goodman (the presenter of the Goodman Poster) whom the district court found to be credible, Appx41, explained that a POSA could not deduce any efficacy conclusions from the dose-response data precisely because there was no comparison to the placebo control group. Appx848-850 (533:17-535:2). As the district court found, placebo comparison was critical in the study of MS, given the disease's "great variability" in patient response and "high risk of placebo effect." Acorda Br. 5-6; Appx13; Appx42; Appx64 (citing Appx783); Appx66.

Defendants' expert Dr. Peroutka likewise did not treat the 20mg-40mg statement as an implied comparison to the placebo group of individual doses. He testified that Goodman's dose-response analysis "was based on my understanding on a composite of all the treated groups versus the baselines" (*i.e.*, a comparison of the *treated patients'* walking speed at each dose to *their* baseline speed on the first visit when they received a placebo, not to the *placebo group* that was tested in all eight weeks of the study). Appx453 (138:4-7); *see* Appx6504 ("Overview of Study Design"); Appx813-814 (498:21-499:3). The Goodman Poster bullet point stating "Evidence of a Dose Response in the 20-40 mg range" for the treatment group was a sentence fragment that says nothing about either the magnitude of the

dose response or statistical significance, and does not include any comparison to the placebo control group. It would not be used by a POSA in the way the district court did. Appx819 (504:6-14); Appx839 (524:18-21); Appx848-850 (533:17-535:2).

It was clear error for the district court to rely on speculation about a POSA's understanding of the Goodman references without the support (and indeed in contradiction) of expert testimony. *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1348 (Fed. Cir. 2013). Indeed, Defendants do not contest Acorda's argument (Def. Br. 41) that the district court's theory of implied placebo comparison is unsupported.

The district court's finding regarding a 10 mg BID dose standing alone was also contrary to the stated purpose of the Goodman study. Goodman specifically declares that its "primary aim was to determine the safety and tolerability of *escalating doses*" and its "secondary aim was to explore efficacy over a broad *dose range*." Appx6502 (emphasis added). The study simply did not examine or report the efficacy of individual doses. And with only one observation at each dose for each patient, *see* Appx6504, there could not be any meaningful results for an individual dose for a disease where the patient's responses may vary within a single day, Acorda Br. 5.

Both experts agreed (and the district court acknowledged) that no statistical significance could be determined for an individual dose from the data presented. Appx793-794 (478:23-479:4); Appx1025 (710:3-24); Appx453 (138:4-7). The district court further recognized that, for individual dosages, Goodman did not disclose "information regarding the performance of 4-AP versus placebo," Appx71, and Dr. Goodman testified that no inference can be drawn about the efficacy of any individual dosage level without such information. *E.g.*, Appx819 (504:6-14); Appx848-850 (533:17-535:2). Goodman was just what the references said it was—an esclating (upward titrating) 4-AP dosing study. The district court erred by treating Goodman as a reference teaching the efficacy of the specific individual 10 mg twice daily dose to improve walking speed in MS patients so as to render obvious the invention of the Acorda claims excluding the use of an esclating dosing regimen.

Defendants also adopt the district court's statement that Acorda's argument that Goodman fails to show efficacy of 10 mg BID "'proves too much.'" Def. Br. 43 (quoting Appx72). The district court reasoned that Acorda's position means that "'a POSA could not have had a reasonable expectation of success in treating walking with *any* of the 4-AP doses disclosed in the Goodman references.'" Appx72. Again, this analysis does not consider the Acorda invention as a whole. Acorda does not contend that Goodman affirmatively teaches a lack of efficacy for

any use of 4-AP, but that Goodman does not teach efficacy of individual dosages. Goodman studies an escalating dosing regimen and made certain findings of efficacy with regard to the aggregated dosing range of that regimen, a pattern following the consistent use of titration in the earlier art. The MSF-201 study was not designed to measure the efficacy of individual doses, and the Goodman references did not supply the information that would enable a POSA to reasonably predict success with *a particular stable dose* within the escalating range—and especially not a stable low 10 mg BID dose administered over an extended period with no titration to improve walking in MS patients. Acorda Br. 38-42.

Furthermore, as Dr. Goodman testified, if one improperly sought "to eke out some efficacy inference," the Goodman Poster would at most suggest that the "higher end of the range" of doses that do not create undue safety risks (*e.g.*, 40-50 mg/day) "gets more efficacy than the lower end of the range." Appx848-849 (533:17-534:16). Indeed, the Goodman Poster states that "[d]ose response curves show *increasing* benefit in [walking] in the 20-50 mg range" (pointing toward higher levels). Appx6052 (emphasis added).

Finally, a POSA would not consider Goodman in isolation, but in light of the art as a whole. A POSA would take into account the Schwid and Van Diemen teachings (as found by the district court in analyzing other limitations) that a higher dose of at least 50 mg/day (25 mg BID) is necessary to achieve any significant

effect. A POSA would also be wary of making unsupported conclusions particularly in this art where because Schwid had reported the failure of the lone large-scale, rigorous trial of sustained-release 4-AP by Elan in 1997 to treat function (with a heavy emphasis on walking) in MS, Acorda Br. 9-11, and Solari in his rigorous Cochrane review of the published 4-AP art in 2003 declared that "no confident estimate of effectiveness of aminopyridines in the management of MS symptoms is possible," Appx7204; Acorda Br. 12. The prior art did not make Acorda's invention remotely obvious to a POSA.

#### 2. The District Court and Defendants Misapply the *KSR* Obvious-To-Try Standard.

In analyzing obviousness of individual limitations, the district court relied on Goodman to find that 10 mg BID was among "a 'finite' set of plausible solutions," Appx70, and "an attractive starting point for a POSA," Appx73. Defendants embrace these findings without much elaboration. Def. Br. 43. As Acorda demonstrated in its opening brief, these findings, in addition to being clearly erroneous for the reasons given above, do not satisfy the obvious-to-try standard of *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). Acorda Br. 42-44.

*KSR* involved a combination of two mechanical technologies with simple and well-understood functions: an adjustable gas pedal with a fixed pivot point, and an electronic sensor attached to a pivot point. 550 U.S. at 412. *KSR* defines the obviousness inquiry as whether the invention is merely "the *predictable* use of

prior art elements according to their *established functions*." *Id.* at 417 (emphasis added). Accordingly, even if there is no express teaching addressing the problem that a patent was attempting to solve, a combination constituting the invention may be obvious to try (as in *KSR*) if the combination is one of a "finite number of identified, *predictable* solutions." *Id.* at 421 (emphasis added); *see also* Acorda Br. 42-44.

The district court committed two significant legal errors with regard to the *KSR* standard. First, it substituted a "plausibility" of the *limitation* standard for *KSR*'s more demanding "predictability" of the *invention* standard. *Compare* Appx70 ("'finite' set of plausible solutions"), *with KSR*, 550 U.S. at 421 ("finite number of identified, predictable solutions"). A predictable solution is one a POSA would reasonably expect to work because it is combining prior art elements of established functions. *Id.* at 417. Here, however, nothing in the prior art rendered "predictable" the efficacy in improving walking in MS patients of a stable dose of 10 mg BID by itself, without higher doses, regardless of whether a 10mg BID dose was argued to be a plausible choice for further study. *See Par Pharm., Inc. v. TWi Pharm., Inc.*, 773 F.3d 1186, 1198 (Fed. Cir. 2014) (a reasonable expectation of success exists when the technology has "become fairly reliable and showed consistent results"). Second, the court disregarded *KSR*'s holding that the "combination" (*i.e.*, Acorda's entire invention) must be shown to be obvious to try

as a predictable solution, not just the dose amount limitation. *KSR*, 550 U.S. at 421.

Defendants do not address Acorda's showing that, under the proper *KSR* standard, the oral administration of a stable 10 mg BID dose for a minimum of two weeks, with no prior or subsequent titration, and achieving 15-35 ng/ml blood-serum concentrations would not have been an "identified, predictable solution" to the problem of walking in MS patients. Acorda Br. 47-51.

Predictability under *KSR* can be difficult to establish in the pharmaceutical arts. *Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008). And in the art at issue here, the district court expressly found special unpredictablity, including that "MS studies are particularly unpredictable in view of the great variability in MS patients' responses to treatment and the high risk of placebo effect." Appx42. A POSA would consider, among other things, the following teachings in the art:

- the inconclusiveness of the exploratory studies of 4-AP, a 102-year old drug, Acorda Br. 6-11;
- Elan's failure in the only large-scale and properly statistically powered trial of sustained-release 4-AP that deflated expectations for the drug, Acorda Br. 9-11;

- the rigorous 2003 Solari review of the field dispelling any confidence in using ampyridines to treat MS, Appx7204; Acorda Br. 12;
- the prior art's teaching that 4-AP had a narrow therapeutic window where high doses and high blood serum levels were necessary for any meaningful therapeutic effect, *supra* at 15, 17-19;
- the prior art's consistent use of titration to achieve a therapeutic dose because of seizure risk, Appx75;
- and the insufficiency of Goodman as a teaching of the efficacy of an individual dose (much less 10 mg BID), Acorda Br. 40-46.

Acorda's groundbreaking invention defied the prior art; the combination of its elements was not a predictable solution to the problem of walking in MS patients in 2004.

Defendants place great weight on Dr. Goodman's deposition testimony that a POSA "'in December 2003 [would] be motivated based on the 201 study [reported in the Goodman References] *to design a study* along the lines of what became the [non prior-art] 202 study.'" Def. Br. 16 (quoting Appx874-875 (559:20-560:2); Appx871-872 (556:10-557:2)) (emphasis added). Defendants ignore Dr. Goodman's clarification that his deposition testimony was unclear as to whether he was testifying as a fact witness versus an expert witness, and that he was not taking into account the limited information available to a POSA in 2004

from the Goodman references. Appx866 (551:1-12), Appx876 (561:7-23). Regardless, the testimony addresses motivation to conduct more research, not the reasonable expectation from the prior art alone that the Acorda invention would successfully treat walking impairment in MS patients, *i.e.*, predictability under *KSR*. The fact that a researcher says he might deem certain hypotheses worthy of future exploration is the essence of science, not an admission that the hypothesis will be predictably successful. "[P]atents are not barred just because it was obvious to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it." *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 997 (Fed. Cir. 2009) (internal quotation marks and citation omitted); *KSR*, 550 U.S. at 418-19; *see also Sanofi v. Watson Labs. Inc.*, --- F.3d ----, 2017 WL 5180716, at *10 (Fed. Cir. Nov. 9, 2017) (invention not obvious even if a POSA would be "cautiously optimistic" about success).

Indeed, the original analysis of the 202 study results—investigating the average change in walking speed across the 12-week dose period versus baseline and then comparing them to placebo—failed to show statistical significance. Appx610-611 (295:21-296:3). Acorda's invention did not occur until after its innovative *post-hoc* responder analysis of the 202 study results (a study which

itself did not exist in the prior art) yielded the surprising inventive discovery that a stable low dose of 10 mg BID had the efficacy of higher doses without the safety risks, and enabled Acorda to break from the prior art's "consistent" understanding that titration to the highest tolerable dose was necessary for the treatment of MS patients with 4-AP. Acorda Br. 18-20. The district court itself found that Acorda took "harrowing financial risks" and overcame near "fatal blows" before making its invention. Appx88. There was nothing predictable about the unique combination that constitutes the Acorda invention.

* * *

The district court's analysis fell victim to hindsight—grounded in a piecemeal approach to the claim limitations, resulting in selective treatment of the prior art, and erroneous application of the *KSR* obvious-to-try standard to the claim limitations. In this way, Acorda's invention impermissibly became a roadmap to the prior art. *Mintz* v. *Dietz & Watson, Inc.*, 679 F.3d 1372, 1377-78 (Fed. Cir. 2012). Aware of the invention's teachings that a stable low 10 mg BID dosage without any upward titration was both safe and effective to improve walking in MS patients, the district court focused upon the stable-dosing disclosures of prior-art references in isolation (ignoring that they used upward titration to reach those significantly higher stable doses). This required dismissing the teachings of the

prior art (including those references) that titration was necessary to reach a therapeutic dose and avoid the seizures to which MS patients were prone. Appx75.

Similarly, the court looked for indications in Goodman to encourage use of a sole 10 mg BID dose. However, Goodman taught nothing about individual doses compared to placebo and addressed only escalating dose ranges that started at 10 mg BID and increased thereafter. Moreover, the prior art generally taught that larger dosages were required to provide a therapeutic effect. Finally, as discussed below, the court used Acorda's teaching of the PK values associated with its efficacious dosing regimen to search the prior art for a disclosure of those values. It found them in Hayes, Appx76, even though that study of PK values in spinal-cord injury patients did not disclose the administration of 4-AP to MS patients, and did not link 4-AP blood levels to any effectiveness in treating walking impairment in MS patients or anyone else. Acorda Br. 4; *infra* at 34-35.

### 3. The Acorda Patents Are Not Presumed Obvious.

Defendants venture a theory that the court did not reach (Appx63 n.27)—namely, that under *Galderma Laboratories, L.P. v. Tolmar, Inc.*, 737 F.3d 731 (Fed. Cir. 2013), Acorda's invention is "presumed *prima facie* obvious" because allegedly it merely "optimizes" a dose selected from a "range" disclosed in the prior art. Def. Br. 53-55. That theory is without merit.

*Galderma* says nothing about presumed obviousness. It simply applied the general burden-of-production rule of *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346 (Fed. Cir. 2013), to the dosing context. This Court in *Galderma* held that "where there is a range disclosed in the prior art, and the claimed invention falls within that range, *the burden of production* falls upon the patentee to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; *or* (3) there are other pertinent secondary considerations." 737 F.3d at 738 (emphasis added). Where *Galderma* applies, under its disjunctive test, the challenger may prevail only where the evidence is lacking in all three categories. *Id.* There is no allegation that Acorda failed to produce such evidence here. And both *Novo Nordisk* and *Galderma* are at pains to point out that the statutory presumption of validity remains intact, 35 U.S.C. § 282, and "the burden of persuasion . . . never shifts during the course of litigation." *Novo Nordisk*, 719 F.3d at 1352-53; *Galderma*, 737 F.3d at 736, 738.

In any event, the factual predicate for the *Galderma* burden-shifting rule is absent here. This is not a case where the patent at issue simply claimed a single concentration and the prior art disclosed a broad range of active-ingredient concentrations of an already-FDA approved drug that were all said to have therapeutic effect in the treatment. *See* 737 F.3d at 735. Here, the Elan Patent

does not disclose a dosage range for the treatment of MS without titration, much less any dosage for the improvement of walking in MS patients. The asserted "range" of doses in Goodman is an escalating dosing regimen, not a disclosure of doses that individually have therapeutic effect. Acorda's claimed invention expressly excludes the escalating dosing regimen, directly contrary to Goodman, the disclosure of the Elan Patent, and the "consistent" teaching of the other prior art. *Supra* at 8-16.

## II. The District Court Erred in Its Treatment of the Pharmacokinetic Limitation.

In its opening brief, Acorda demonstrated that a POSA would not be motivated to combine the teachings of PK values reported in Hayes for spinal cord injury patients with the (putative) teachings of Goodman and Schwid regarding the efficacy of sustained-release 4-AP to improve walking in MS patients, and that the PK values were not inherent in the dosing regimen of Acorda's claimed invention. Acorda Br. 51-55.

Defendants' principal argument in response is that obviousness can be predicated solely on the district court's finding that the Hayes prior-art reference disclosed the PK values appearing in the claims of the Acorda patents. Def. Br. 47-50. Focusing only on the pharmacokinetics limitation, Defendants (like the district court) ignore another limitation of the claims: namely, that dosing must occur "at a therapeutically effective concentration in order to improve walking in a

human with multiple sclerosis in need thereof." Appx195 (Claims 6 and 7). Hayes, as a study of PK values in spinal-cord patients, says nothing about the relationship between those reported values and the claimed therapeutic effect for improving walking in MS patients. Appx6433-6440.

Defendants argue that a POSA would be motivated to combine these references because Acorda used the same Elan formulation in both the MSF-201 study of MS patients reported in Goodman and in the Hayes study of spinal-cord patients, and both sets of patients would be expected to have similar serum levels if administered the same formulation. Def. Br. 47-49. But Defendants provide no evidence that a POSA would know that the studies used the same formulation or that the use of the same formulation was disclosed anywhere in the prior art. The Goodman references do not identify the formulation or the source of the tablet used, and the Hayes reference uses a different dose of tablets than Goodman (5 mg tablets). Appx6435; Appx6501-6504; Appx6370; Appx6371-6372.

More importantly, even if a POSA made the assumption (without evidence) that the same Elan formulation was used in all of the prior art studies of sustained-release 4-AP, she would be aware of Schwid's teaching that serum levels above 60 ng/ml were necessary to efficacious treatment of walking in MS patients. *Supra* at 17-19. A POSA would not be motivated to combine the MS dose-response teachings of Goodman with the MS pharmacokinetic teachings of Schwid and the

spinal cord injury teachings of Hayes and, if even if she did, the PK teachings of Schwid in the treatment of MS, as found by the district court, would lead away from Acorda's claimed invention. Acorda Br. 55; Appx1093-1094 (778:18-779:8); Appx788-789 (473:15-474:7); Appx445 (130:21-24).

In *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation*, 676 F.3d 1063 (Fed. Cir. 2012), this Court found clear error when the district court held the PK limitations obvious despite the lack of a disclosure of the relationship between efficacy and PK in the prior art. Here, as in *Cyclobenzaprine*, "[t]he district court's failure to appreciate the lack of a known . . . relationship [between the PK parameters and therapeutic effect] for *any* formulation of [the claimed compound] rendered deficient its analysis of . . . the implications of that evidence on its legal conclusion of obviousness." 676 F.3d at 1071. Defendants cannot distinguish *Cyclobenzaprine* and therefore entirely ignore it.

Acorda also established that the district court clearly erred in holding that the claimed pharmacokinetic limitations are inherent in an obvious dosage regimen. Acorda Br. 51-55. As this Court has held, "the concept of inherency must be limited when applied to obviousness, and is present only when the limitation at issue is the 'natural result' of the combination of prior art elements." *Par Pharm.*, 773 F.3d at 1195 (citation omitted). It is undisputed that PK parameters vary depending upon the formulation; and there was no finding that the

prior art taught a specific formulation across the various references. Acorda Br. 52-54.

Acorda's counsel did not concede inherency, as Defendants insist. Def. Br. 4 (quoting Appx78 n.39). Rather, Acorda's counsel merely agreed at trial that "[i]t was known in the art that *a sustained release formulation* of 10 megs [*sic*] BID *could achieve*" the claimed pharmacokinetic values. Appx1108-1109 (emphasis added). Acorda's counsel did not concede that *every* formulation of a 10 mg sustained-release 4-AP administered twice-daily *would* necessarily achieve those PK values, which inherency requires. And, most importantly, Acorda's counsel made clear that nothing in the art taught this PK parameter could achieve a therapeutic effect *in walking*, *i.e.*, as in the combination of the asserted claims. Appx4576; Appx4458-4459.

Defendants' reliance (Def. Br. 50-52) on *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344 (Fed. Cir. 2012), is unpersuasive. In *Santarus*, the claims were directed to a *particular* formulation taught by the prior art that necessarily produced the claimed PK values. *See* 694 F.3d at 1353-54. Here, by contrast, the claims are directed to a method of treatment and not to a formulation with PK characteristics existing in the prior art.

Finally, *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc.,* 246 F.3d 1368 (Fed. Cir. 2001), is inapposite. This Court there held that the claim term "an

antineoplastically effective amount" simply expressed the "intended result" of the dosage and thus "essentially duplicates the dosage amounts recited in the claims." *Id.* at 1375. Here, in contrast, the pharmacokinetic parameters are an express functional limitation that restricts the covered dosage regimen—*i.e.*, the claims require a 10 mg dosage that achieves the claimed pharmacokinetic values when administered BID. This is not the reflection of an inherent property, but instead – given 4AP's narrow therapeutic index—an important part of the claimed invention.

In sum, the district court committed clear factual and legal error in its analysis of the pharmacokinetic claim limitations, and its obviousness ruling must be reversed on this ground as well.

## III. The District Court Incorrectly Applied *Merck*'s Blocking-Patent Holding, and Improperly Extended It to Objective Indicia Not Subject to Being Blocked.

The district court erroneously expanded *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005), using that decision to support its reliance on a purported "blocking patent" as the reason to nullify multiple indicia of non-obviousness. *See* Acorda Br. 56-62. *Merck* does not stand for the sweeping proposition that the mere existence of a prior patent—particularly one that is not a composition of matter patent and is held by a different entity than the patentee, who abandons research and willingly licenses the patent—categorically negates all objective indicia of non-obviousness that are clearly

present. As this Court instructed recently, "evidence of commercial success should not [be] discounted simply because of the existence of another patent of which [the inventor] was the exclusive licensee." *Merck II*, 2017 WL 4819091, at *4.

Defendants argue the district court did not view *Merck* as a "categorical bar." Def. Br. 58. That is refuted by the court's own opinion. The district court invoked the Elan Patent to negate its own findings that Acorda's invention was commercially successful, satisfied a long-felt but unmet need, and that others tried but failed to create the invention, without *any* evidentiary showing that the patent in fact blocked Acorda's competitors from developing the claimed invention. Acorda Br. 55-63.

***Commercial Success.*** The district court found both that Ampyra® "is a commercial success and . . . a nexus between that success and the features claimed in the Acorda Patents." Appx79; *see also* Acorda Br. 57. Relying on *Merck*, however, the court then asserted—citing no evidence—that the Elan Patent "'blocked' competitors from practicing the Acorda Patents." Appx84 (quoting 395 F.3d at 1377). This conclusion cannot be reconciled with *Merck*.

In *Merck*, the patent owner itself "had a right to exclude others from practicing" the claimed invention. 395 F.3d at 1377. As this Court explained, that was because the patentee both (1) owned "another patent" covering the administration of the claimed drug for the claimed treatment (albeit in a different

dosage) *and* (2) had the "exclusive statutory right, in conjunction with FDA marketing approvals, to offer [the drug] *at any dosage* for the next five years." *Id.* (citation omitted) (emphasis added). Accordingly, "market entry by others was precluded on those bases." *Merck*, 395 F.3d at 1377; *see also* Acorda Br. 58; PhRMA Br. 4.

Neither factor is present here, and Defendants do not contend otherwise. The Elan Patent did not claim 4-AP itself or a treatment for improving walking speed in MS patients, and it did not disclose Acorda's claimed method. Acorda Br. 58; *supra* at 12-13. Elan did not enjoy regulatory exclusivity—a factor *Merck* deemed essential; prior to Acorda' invention, the FDA did not approve 4-AP for any purpose. Acorda Br. 58; *see also* PhRMA Br. 14-15.[3]

The Elan Patent also did not block all research into use of 4-AP—a fact Defendants do not dispute and one the district court failed to consider. Indeed, research was conducted (albeit unsuccessfully) in Europe, and the district court itself cited prior art using 4-AP that was not Elan's work. *See* Appx26-27; Appx7037; Appx6654; Acorda Br. 7-8, 58-59.

---

[3] Defendants incorrectly claim that the district court "agreed" with their expert that the Elan Patent "heavily dampened" (not even blocked) others' incentives to develop a drug using sustained-release 4-AP. Def. Br. 58 (citing Appx963 (648:1-13)). The district court did not rely on the testimony of Defendants' expert, which, in any event, only discussed the general concept of a "blocking patent." *See* Appx84.

The inventor in *Merck* itself held the prior patent—and "had a right to exclude others" from practicing the invention. 395 F.3d at 1377. Here, by contrast, the purported "blocking" patent belonged to Elan—not Acorda. And Elan did not succeed in bringing a product to market, nor did it satisfy the need for a treatment for walking impairment in MS patients. Only Acorda did. Moreover, Defendants do not dispute that others could have sought a license from Elan, or, later, a sub-license from Acorda, and there was no evidence that others sought and were unable to do so. *See* Acorda Br. 58; *see also* PhRMA Br. 5. Instead, Defendants contend Acorda presented no evidence of willingness to grant a license (or a sublicense). Def. Br. 57. That is incorrect. Elan licensed its patent to Acorda because (as Dr. Cohen testified) Elan was "no longer interested in pursuing" a possible MS treatment once its own research effort failed. Appx596 (281:11-19); *see also* Acorda Br. 13.

Moreover, it was not Acorda's duty to present evidence that others could not develop Acorda's invention, or were not motivated to develop that invention, in the face of the Elan Patent. Once the district court found both commercial success and nexus in fact, *Defendants* had to refute those findings with evidence—not mere conjecture—that the Elan Patent blocked entry of potential competitors and that is why Acorda's invention achieved success. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988) (the patent

challenger must "adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention"); *see also* PhRMA Br. 12-13. There is no evidence that anyone other than Acorda sought a license to the Elan Patent—a fact consistent with Acorda's invention not being obvious and others not seeing promise in the field. *See* Acorda Br. 6-17.[4]

On November 13, 2017, the day this brief was due, Defendants filed a citation of supplemental authority (D.I. 89) discussing *Merck II*, which this Court had issued over two weeks earlier, on October 26. In their letter, Defendants make concessions that further support Acorda's appeal, and misstatements about *Merck II* in an unsuccessful effort to avoid that precedent.

First, Defendants concede that *Merck II* is "significant authority pertinent" to this appeal. D.I. 89 at 1. They also concede that the blocking patent rule in *Merck*, 395 F.3d at 1377, was premised in part on "exclusive statutory rights stemming from FDA marketing approvals," D.I. 89 at 1, which are not present here because Elan failed in its clinical effort to develop a 4-AP treatment. *See supra* at 17; Acorda Br. 11-12.

---

[4] Defendants assert that the correctness of the district court's decision in a *different case* (with different facts and a different opinion) suggests that the district court correctly applied *Merck* here. *See* Def. Br. 59 (referring to *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 539 (D. Del. 2016)). The court's evidentiary findings in that case, based on a different record, have no relevance here.

Then, while ignoring the relevance of FDA exclusivity to the blocking patent rule, Defendants suggest that *Merck II* held that the rule applies unless there is a "package of patents" resulting from the prosecution process. D.I. 89 at 1. But that was just an example in *Merck II* of why having more than one patent is not a *per se* negation of commercial success, which remains an objective indicium of nonobviousness even where there are multiple patents. 2017 WL 4819091, at *4. And Defendants ignore *Merck II*'s further explanation that inventions may properly reside in "continuing improvements in a product or process" after an initial patented discovery. *Id.* In the present case, Acorda's invention and commercial success after Elan's earlier undisputed failure is precisely the sort of innovation recognized as important in *Merck II*. *See supra* at 39-41.

Defendants also admit that the Elan patent was "not a compound patent" (as was the case in *Merck*) and was "not . . . related in any other way" to the Acorda Patents, as Acorda has argued in this appeal. D.I. 89 at 1; *see supra* at 12-13. And although Defendants note that commercial success is a "fact-specific inquiry," D.I. 89 at 1, they do not and cannot dispute that the district court found as a factual matter that Acorda's invention was a significant commercial success with a nexus to the Acorda Patents. *See supra* at 39.[5]

---

[5] Defendants also do not, because they cannot, assert that the facts of *Merck II* are anything like those here: there, unlike here, the district court found that the claimed solution to formulation stability, as a whole, was taught in the prior art and that

***Long-Felt but Unmet Need and Failure of Others.*** Defendants scarcely try to defend the district court's extension of *Merck*'s blocking-patent rule beyond the commercial success prong, to negate other objective indicia of non-obviousness. *See* Def. Br. 58. The court found that "Ampyra® satisfied a long-felt, unmet need for a method of treating walking in MS patients," but then adjudged that evidence "of limited probative value" because of the Elan Patent. Appx87; *see also* Acorda Br. 59. The blocking-patent rule—developed in the context of evaluating the invention's commercial success, *see Merck*, 395 F.3d at 1376-77—should not be extended to the very different inquiry of whether the invention satisfied a long-felt need, which can include research that occurs around the world and in noncommercial contexts.

There is no rationale for such extension, especially here. Defendants do not contest that the Elan Patent (even if it created any exclusivity in the United States) did not block research in Europe—a market that accounts for a large amount of global pharmaceutical sales. *See* OECD Health Policy Studies, *Pharmaceutical Pricing Policies in a Global Market* 58 & tbl.2.2 (2008). Scientists in those

---

certain individual limitations, even if not expressly disclosed, were known in the art of record to be routine experimental implementations for the claimed stability solution. *Merck II*, 2017 WL 4819091, at *2-3. The only objective indicia at issue, unlike the present case, were commercial success and copying by the one defendant, and this Court did indeed consider the impact of those indicia on the legal question of obviousness *vel non*.

countries could have undertaken research into sustained-release 4-AP without risking liability under the Elan Patent. Even in the United States, research and development could have been carried out under the "safe harbor" provision of 35 U.S.C. § 271(e)(1). *See* BIO Br. 12; PhRMA Br. 4-5. There is also no requirement that the inventor *practice* a solution to the problem (thereby risking infringement); the inventor can simply describe the solution in a written publication, which can then be used as an invalidating reference. *See* BIO Br. 16. As scientific literature shows, preexisting patent rights are not a barrier to attempts to solve long-felt but unmet needs. BIO Br. 17 & n.13.

Defendants also offer no response to Acorda's arguments that the district court erred in discounting its finding that other have tried—but failed—to develop an effective treatment to improve walking in MS patients. *See* Acorda Br. 60-62. The district court committed legal error when it brushed aside Sanofi's failure because it employed a different active ingredient than Acorda. *See* Acorda Br. 61-62. As *amici* observe, one need not show that others tried and failed to arrive at *the particular solution* claimed by the patentee. BIO Br. 14. The fact that Sanofi was "going in [a] different way[] is strong evidence that [Acorda's] way would not have been obvious." *Cyclobenzaprine*, 676 F.3d at 1082 (internal quotation marks and citation omitted).

Defendants restate the district court's speculation that Sanofi "likely did not use 4-AP because it was blocked from doing so by the Elan Patent." Appx86, *quoted in* Def. Br. 59. But the only "evidence" the court cited in support of its conjecture was *Acorda*'s post-trial brief, *see* Appx86 (citing Appx4479), which did not say that, and instead noted that Sanofi used an alternative active ingredient than Acorda. The record demonstrates that Sanofi tried an alternative to 4-AP because of safety concerns with that compound, not because of the Elan Patent. Appx727 (412:8-16); *see also* Acorda Br. 61. Indeed, as the district court found, because of safety concerns with 4-AP there was "consistent use of titration" in the prior art. Appx75. Acorda's success with 4-AP in the face of Sanofi's aversion to using that compound is precisely the sort of compelling objective indicia of nonobviousness that serves as a critical check against unwitting hindsight bias. *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013).

Nor do Defendants defend the district court's dismissal of the failed effort by Elan itself—the holder of the purported "blocking" patent. The record demonstrates that Elan abandoned further research into 4-AP because it did not expect such efforts to succeed. *See* Appx596 (281:13-19); Acorda Br. 12, 62. To apply *Merck* where the holder of the "blocking" patent itself chooses not to pursue further research after failure is to distort that precedent beyond recognition.

As *amici* persuasively demonstrate, the district court's erroneous interpretation of *Merck* risks stifling innovation and investment in the field of pharmaceutical arts. *See* PhRMA Br. 15-17; BIO Br. 20-21. In pharmaceutical industry, changes over the prior art that may appear incremental in reality can be significant advances that provide substantial benefits for patients (in this case the first approved treatment to enable MS patients to improve walking), and objective indicia of non-obviousness are an important objective indicator of the invention's nonobviousness. "[M]ultiple patents do not necessarily detract from evidence of commercial success of a product or process, which speaks to the *merits of the invention*." *Merck II*, 2017 WL 4819091, at *4 (emphasis in original). The district court's approach, by contrast, would discourage pharmaceutical companies from building on their own (and others') previously patented work. The district court's negation of its own findings that significant objective indicia non-obviousness existed is a reversible legal error.

## IV. Defendants' Cross-Appeal Will Likely Become Moot and, in any Event, the Written-Description Argument Is Waived and Lacks Merit.

Expending virtually no effort on their cross-appeal, Defendants assert that the Elan Patent "is invalid for lack of written description under 35 U.S.C. § 112." Def. Br. 61. Defendants begin their cross-appeal with the assertion that the issue "will likely become moot" because the Elan Patent expires on July 31, 2018. *Id.*

Despite that time-frame, Defendants did not seek expedited consideration of their cross-appeal. *Id.*[6]

Mootness is not the only procedural reason why the cross-appeal should be rejected. Defendants waived their written-description challenge. *See* Appx60 ("Defendants' Section 112 defenses could likely be found to have been waived, given the lack of evidence presented at trial."). Defendants protest that they "raised . . . § 112 defense multiple times," and "devoted entire sections of . . . post-trial briefs to this defense." Def. Br. 65. As the district court noted, however, "these defenses barely even got mention at trial." Appx60 & n.24. Having adduced no expert testimony on that defense, Defendants devoted "less than two pages (out of 66)" of their post-trial opening brief to those arguments. Appx60-61.

In any event, as the district court found, Appx61-62, Defendants have failed to establish lack of written description for the Elan Patent, which is a question of fact subject to the requisite showing of clear and convincing evidence of patent

---

[6] Because their cross-appeal itself extended the schedule for Acorda's appeal, Defendants represent that they will cooperate "to avoid or moot emergency motions practice" in the event the appeal is not decided by July 31, 2018 and Acorda is faced with the need to seek injunctive relief pending a decision in this appeal (given that the district court's injunction based on the Elan Patent expires on July 31, 2018). Def. Br. 61 n.7. Acorda thus understands that Defendants will not take advantage of the appeal's lengthened briefing schedule (caused by their own cross-appeal) to threaten or attempt an "at-risk" launch of their generic versions of Ampyra® while this appeal is *sub judice* and thus burden this Court with emergency motion practice over an injunction pending issuance of the Court's decision.

invalidity. *Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1574-75 (Fed. Cir. 1985). Defendants claim (Def. Br. 63) that the Elan Patent "contains no disclosure" supporting the claimed methods of using sustained-release 4-AP formulations to achieve therapeutically effective blood levels. That is incorrect. *See, e.g.*, Appx154-159 (2:51-12:2); Appx160 (13:39-14:11); Appx160-164 (14:24-22:15). Defendants presented no evidence that these portions of the Elan Patent do not reasonably "describe an invention understandable to [a] skilled artisan." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

As the district court observed, "[N]one of the experts testified at trial about the Section 112 defenses and, accordingly, none opined that the Elan Patent is invalid due to lack of enablement or written description." Appx60 (citing Appx587). Defendants' written-description "defense" at trial consisted entirely of cursory attorney argument at closing. *See* Appx1115 (800:10-21). Moreover, as the district court noted, Defendants' section 112 invalidity theory was "contingen[t]" on factual findings the court declined to make. Appx61-62. As Defendants disclaim any challenge to the court's factual findings, Def. Br. 60, their written-description argument cannot survive.

Defendants also ignore that the claimed invention of the Elan Patent is the use of sustained-release formulations of 4-AP to treat a broad genus of

neurological diseases, and not a specific method of treatment of one particular symptom of a single, specific disease. Appx164 (22:16-25); Appx10. There was a substantial question of obviousness raised with respect to those broad claims and the district court found them to be nonobvious. Appx59-60. Defendants expressly represent that they are not appealing from that ruling. Def. Br. 60.

Defendants' cross-appeal, to the extent it is not moot and not waived, utterly lacks merit.

## CONCLUSION

This Court should reverse the district court judgment invalidating the Acorda Patents, and should affirm the district court's judgment holding the Elan Patent not invalid.

November 13, 2017

Respectfully submitted,

/s/Bruce M. Wexler

Bruce M. Wexler
*Attorney of Record*
Gerald J. Flattmann, Jr.
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000
brucewexler@paulhastings.com
geraldflattmann@paulhastings.com

Garrard R. Beeney
Stephen J. Elliott
Wen-Ying Angela Chang
Alexandra H. Moss
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
beeneyg@sullcrom.com
elliotts@sullcrom.com
changw@sullcrom.com
mossa@sullcrom.com

Jane G. Wasman
Anthony Michael
ACORDA THERAPEUTICS, INC.
420 Saw Mill River Road
Ardsley, NY 10502
(914) 347-4300
jwasman@acorda.com
amichael@acorda.com

Stephen B. Kinnaird
Igor V. Timofeyev
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C. 20005
(202) 551-1700
stephenkinnaird@paulhastings.com
igortimofeyev@paulhastings.com

*Counsel for Appellant Acorda Therapeutics, Inc.*

/s/Maryellen Noreika

Maryellen Noreika
*Attorney of Record*
Jeremy A. Tigan
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
mnoreika@mnat.com
jtigan@mnat.com

*Counsel for Appellee Alkermes Pharma Ireland Limited*

## CERTIFICATE OF SERVICE

I, Bruce M. Wexler, hereby certify that on November 15, 2017, the foregoing Reply Brief of Acorda Therapeutics, Inc. and Response Brief of Acorda Therapeutics, Inc. and Alkermes Pharma Ireland Limited was filed using the Court's CM/ECF system and served on the parties' counsel of record via ECF.

/s/Bruce M. Wexler
Bruce M. Wexler
*Counsel for Appellant*
*Acorda Therapeutics, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b)(1)(A).

The brief contains 11,703 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font.

Dated: November 13, 2017

/s/Bruce M. Wexler
Bruce M. Wexler
*Counsel for Appellant*
*Acorda Therapeutics, Inc.*