**Appeal No. 2017-2078, 2017-2134**

# United States Court of Appeals for the Federal Circuit

ACORDA THERAPEUTICS, INC.,

*Plaintiff-Appellant,*

ALKERMES PHARMA IRELAND LIMITED,

*Plaintiff-Appellee,*

v.

ROXANE LABORATORIES, INC., MYLAN PHARMACEUTICALS INC., TEVA PHARMACEUTICALS USA, INC.,

*Defendants-Cross-Appellants.*

*On Appeals from the United States District Court for the District of Delaware in Nos. 1:14-cv-00882-LPS, 1:14-cv-00922-LPS, 1:14-cv-00935-LPS, and 1:14-cv-00941-LPS, Judge Leonard P. Stark*

## BRIEF OF THE BIOTECHNOLOGY INNOVATION ORGANIZATION AS *AMICUS CURIAE* SUPPORTING REHEARING *EN BANC*

MELISSA BRAND
HANS SAUER
BIOTECHNOLOGY INNOVATION ORGANIZATION
1201 Maryland Ave., SW
Washington, DC 20024
(202) 962-6695
mbrand@bio.org
hsauer@bio.org

*Counsel for Amicus Curiae Biotechnology Innovation Organization*

*Of Counsel:*
BRIAN P. BARRETT
ELI LILLY & CO.
Indianapolis, IN 46285
BIO Amicus Committee, Chair

NOVEMBER 7, 2018

COUNSEL PRESS, LLC (888) 277-3259

# CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae* Biotechnology Innovation Organization certifies the following:

1. The full name of every party or *amicus curiae* represented is:

   Biotechnology Innovation Organization (“BIO”).

2. The name of the real parties in interest represented by us is:

   None.

3. All parent corporations and any publicly held companies that own 10 percent of the stock of the party or *amicus curiae* represented by us are:

   None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   None.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court’s decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b):

   None.

Dated: November 7, 2018

/s/ *Melissa A. Brand*
Melissa A. Brand

# TABLE OF CONTENTS

**Page**


CERTIFICATE OF INTEREST ..... i

TABLE OF AUTHORITIES ..... iii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ..... 1

INTRODUCTION ..... 3

ARGUMENT ..... 4

I. The Panel Opinion Exacerbates the Unsound Logic Underlying the Blocking Patent Doctrine ..... 4

II. The Panel Erred in Extending The Blocking Patent Doctrine to Long-Felt Need and Failure of Others ..... 7

III. The Panel Decision Presumes Facts in Favor of The Party Bearing The Burden of Persuasion and Sets up A Conflict with Fed. R. Evid. 702 ..... 9

CONCLUSION ..... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*,
No. 17-2078, slip op. at 52 (Fed. Cir. Sept. 10, 2018)................................... 6

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005), *rehearing en banc denied,*
405 F.3d 1338 (Fed. Cir. 2005)......................................................... 2, 3, 4, 7

*Merck KGaA v. Integra Lifesciences I, Ltd.*,
545 U.S. 193 (2005)........................................................................... 5, 6

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983) ..................................................................... 4

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)...................................................................... 11

**Statutes & Other Authorities:**

35 U.S.C. § 271(e)....................................................................................... 5, 8

35 U.S.C. § 287 ............................................................................................... 8

Fed. R. Evid. 702 ........................................................................................... 11

B.N. Roin, 61 UCLA L. Rev. 672 (2014) ....................................................... 1

E.R. Berndt, I.M. Cockburn, & K.A. Grépin, 2 Pharmacoeconomics Supp.
69, 71 (2006) ............................................................................................. 1

M. Lemley, *Ignoring Patents*, 2008 Mich. St. L. Rev. 19 ....................................... 5

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

The Biotechnology Innovation Organization (BIO) is the world's largest trade association representing biotechnology companies, academic institutions, biotechnology centers, and related organizations across the United States and in more than 30 countries. Many of BIO's members are small companies at the forefront of medical innovation.

BIO's members create products and services that have long lead times from invention to market. Among the longest are radiopharmaceutical diagnostics (7-9 years), agricultural chemicals (9 years), medical devices (first-in-class) (5-10 years), genetically modified crops (6-13 years), *in vitro* diagnostics (7-10 years), and pharmaceuticals (12-16 years).[1]

Patents on foundational innovations often issue before all possible uses or variations of a disclosed medical invention have been explored. Improvements often – and desirably – occur while products and services are being developed and regulated, and such improvements are critical for converting a molecule into an approvable drug and for developing additional therapeutic uses. Such innovations can generate substantial health benefits.[2]

---

[1] B.N. Roin, 61 UCLA L. Rev. 672 (2014).

[2] E.R. Berndt, I.M. Cockburn, & K.A. Grépin, 2 Pharmacoeconomics Supp. 69, 71 (2006).

Patenting of improvements leads to a cascade of overlapping patent terms of increasingly narrow scope. Thus, a new patent covering an improved therapy or a new use of a drug may often implicate the practice of an earlier foundational patent. Evidence of secondary considerations is often used to demonstrate the non-obviousness of these important improvement inventions.

The dubious blocking patent doctrine first articulated in *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005), *rehearing en banc denied,* 405 F.3d 1338 (Fed. Cir. 2005), has now been expanded to discount to the point of irrelevance the probative value of objective evidence when a patentee also held purportedly blocking patent rights. BIO is concerned that the development and commercialization of important therapeutic improvements will be disincentivized if a party's foundational patent rights are permitted to presumptively eliminate the probative value of objective evidence of non-obviousness.

Acorda, Alkermes, Teva, and the Roxane/Hikma entities consented to the filing of this brief. Mylan may or may not oppose this brief. BIO has no direct stake in the result of this appeal, nor does BIO take a position on the validity or infringement of the claims at issue. No counsel for a party authored this brief in whole or in part, and no such counsel or party, nor any person other than the amicus curiae or its counsel, made a monetary contribution intended to fund the preparation or submission of this brief. This brief, submitted pursuant to Fed. R. App. P. 29(b),

is solely the work of BIO and its counsel and reflects BIO's consensus view, but not necessarily the view of any individual member.

## INTRODUCTION

The blocking patent doctrine is logically suspect and improperly disfavors patents that protect valuable pharmaceutical improvement innovations and certain aspects of multiple-component drug products. In this case, the patented invention solved a long-felt need for Multiple Sclerosis (MS) patients after others failed. Decades after the pharmaceutical compound was discovered, the Acorda inventors finally solved the puzzle of how to use that compound to improve certain symptoms for MS patients and the product saw great success. Yet, through an expansive application of the blocking patent doctrine – a doctrine never fully endorsed by this Court[3] – the panel affirmed the district court's holding that the patents covering this treatment were obvious.

The panel decision also took the unprecedented step of expanding this already suspect doctrine to long-felt need and failure of others without any support for doing so. The panel further erred by adopting a general rule purporting to set forth the presumed motivations of a medical or pharmaceutical researcher. This resulted in an impermissible burden shifting that cannot stand.

---

[3] Three judges dissented from the denial of rehearing in *Merck*. 405 F.3d 1338 at 1339.

# ARGUMENT

## I. The Panel Opinion Exacerbates the Unsound Logic Underlying the Blocking Patent Doctrine.

The blocking patent doctrine developed as a *post hoc* hypothetical analysis, effectively inviting the use of hindsight against the very evidence that was meant to counter hindsight – objective indicia of non-obviousness. As interpreted by the panel, the concept for the blocking patent doctrine formulated in *Merck* is that a later-in-time technological solution would not have been developed and commercialized where the practice of that solution requires the practice of an existing patent. Therefore, a court may discredit commercial success evidence in such cases. This is so despite the pronouncement that objective indicia, including commercial success evidence, are often the "most probative and cogent evidence in the record." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

The logic of *Merck* and the panel opinion rests on the unsupported assumption that the mere existence of a foundational patent would have prevented commercialization. In *Merck*, the would-be later-in-time inventor was presumed to be aware of, and deterred by, a foundational patent.[4] The panel has further deemed this hypothetical individual to be unaware of or uninfluenced by the safe harbor

---

[4] The *Merck* decision also relied on the fact that regulatory exclusivity may have prevented the sale of the later-in-time invention. *Merck*, 395 F.3d at 1377. There was no analogous regulatory exclusivity in this case.

exception in 35 U.S.C. § 271(e) and disproportionately fixated on the U.S. market. These assumptions are wrong and in conflict with readily observable facts concerning researcher and inventor behaviors.

Companies (in all industries) often launch potentially-infringing products.[5] Even in the pharmaceutical space, there are numerous at-risk launches. *See* Pharmaceuticals: Analyzing Litigation Success Rates, RBC Capital Markets, (Jan. 15, 2010), https://amlawdaily.typepad.com/pharmareport.pdf (noting 28 at-risk launches between 2002 and 2010). It is clear that the existence of an earlier patent often does not deter commercialization efforts. These instances are not limited to generic competition. An apt example is *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193 (2005) ("*Integra*"). The *Integra* respondents owned not one but five patents related to a tripeptide sequence called the "RGD peptide." *Id.* at 197. Merck nonetheless conducted years of experiments on RGD peptides and eventually sought FDA approval of one. *Id.* at 198-99. While much of the opinion discusses the § 271(e) safe harbor,[6] it is noteworthy that a panel of this Court unanimously

---

[5] *See, e.g.*, M. Lemley, Ignoring Patents, 2008 MICH. ST. L. REV. 19, 20-21 ("[C]ompanies do not seem much deterred from making products by threat of all this patent litigation. Intel continues to make microprocessors, Cisco routers, and Microsoft operating system software, even though they collectively face nearly 100 patent-infringement suits at a time and receive hundreds more threats of suit each year.").

[6] The contours of § 271(e) were unclear at this time, yet the risk of infringement clearly did not deter Merck.

affirmed the finding that respondents' patents covered Merck's RGD peptides. *Id.* at 201-02.

The *Integra* case is just one of many examples that demonstrate the fault in the panel's logic. Further confirming these flaws is that this Court regularly affirms findings of infringement, which shows that products are often developed and introduced into the market without deterrence from ultimately-infringed patents. The entire doctrine of willful infringement has developed to address instances of knowing or reckless patent infringement.

The panel further erred by giving undue weight to U.S. patents, ignoring the fact that U.S. patents do not block commercialization in foreign markets. It faulted Acorda for not proving that the existence of unblocked foreign markets was "weighty" by "any concrete evidence." *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, No. 17-2078, at 52 (Fed. Cir. Sept. 10, 2018) ("Slip. op."). The panel cited no support for the assumption that, unless evidence to the contrary is produced, the domestic market is the only one relevant to this inquiry. Research and commercialization occurs outside the U.S. too. And in the pharmaceutical space where those likely to discover and patent "early-stage" innovations (like new compounds) often include small entities, it is unlikely that such small entities will file for patent protection globally because such a strategy is cost-prohibitive. Moreover, there are examples of products developed and launched in and

exclusively for ex-U.S. markets. Thus, it is incorrect to assume that a product that could not be commercialized in the U.S. would not be commercialized anywhere. *See, e.g.*, New Drug to Reduce Alcohol Consumption in Alcoholics Released in Europe, Healthline.com, https://www.healthline.com/health-news/mental-new-drug-to-reduce-alcohol-use-in-alcoholics-042413#1 (discussing drug launched in Europe with no plans to launch in the U.S.); Neglected Tropical Diseases Diagnosis Market Analysis Report By Disease (Dengue, Chikungunya), By Diagnostic Method (Conventional, Molecular/Modern), By Service Type, By End Use, and Segment Forecasts, 2018-2025, Grand View Research, (Feb. 2018), https://www.grandviewresearch.com/industry-analysis/neglected-tropical-diseases-diagnosis-market (reporting Neglected Tropical Disease burden as mostly concentrated in tropical and subtropical countries, and showing North America as a minor market).

## II. The Panel Erred in Extending The Blocking Patent Doctrine to Long-Felt Need and Failure of Others.

There is no sound justification for extending the *Merck* rationale to other objective indicia like long-felt need and failure of others. The rationale applied in assessing the skilled person's motivation to commercialize a purportedly obvious solution (*Merck*) should have no bearing on whether that person would have identified a long-felt but unmet need, or tried and failed to solve a given problem. There is no requirement to commercialize a solution to a given problem, nor is there

a reason one cannot experiment to solve a problem without introducing a product into the market. Solutions to problems can be described in written publications – a practice especially prevalent in medical research. Not only is medical research often shielded from infringement liability under § 271(e) and by similar exemptions for clinical research or basic experimentation in many countries, but one need not practice a solution in order to describe it. Such publications have long been used as invalidating references without ever asking whether their authors would have been blocked by a patent. Moreover, there are plenty of motivated researchers who are shielded from infringement liability due to government use licenses, sovereign immunity, or the medical practitioner exemption from infringement liability (35 U.S.C. § 287).

The fallacy of focusing solely on the U.S. market is even more clear when long-felt need and failure of others are considered. Accepting for argument's sake that the U.S. market is important for commercial motivations, that is simply not the case when considering whether someone abroad could identify a problem that needs to be solved, or attempt to supply a solution.

The "blocking patent" rationale as applied to these objective indicia is at odds with how obviousness is assessed from the perspective of the skilled artisan. To the best of counsel's knowledge, no court has employed the blocking patent doctrine to, e.g., negate the motivation to combine or the reasonable expectation of success of a

skilled person in the obviousness analysis. For those inquiries, the skilled person's potential infringement liability is immaterial. Yet, in a strange exercise of "heads – I win; tails – you lose," such earlier patent references can presumably provide the skilled person's motivation to combine and expectation of success, while at the same time "blocking" the skilled person from commercializing or working on these improvements. But how can it be that on the one hand, a skilled person would have identified a problem and combined prior art references to provide a claimed solution (for purposes of establishing obviousness), yet on the other hand we presume that no one in the world would have identified that problem, or posited a solution to it because of a U.S. patent?

## III. The Panel Decision Presumes Facts in Favor of The Party Bearing The Burden of Persuasion and Sets up A Conflict with Fed. R. Evid. 702.

The panel promulgated a general rule of thumb that it contends should apply in these cases: "if all other variables are held constant, a blocking patent . . . reduc[es] incentives for innovations in the blocked space by non-owners and nonlicensees of the blocking patent." Slip. op. at 49. This is the "solid premise of diminished incentives" which the panel contends are the general realities in this area. *Id.* at 50. The panel invites patentees to try to rebut this new rule through the production of evidence, and repeatedly faults Acorda for not doing so.

Such a presumption is equivalent to introducing evidence in favor of the patent challenger who bears the burden of persuasion on obviousness. For example, under the panel's ruling, the patent challenger need not provide evidence that a blocking patent exists in every global market; instead, the patentee seemingly must introduce evidence of markets in which a "blocking" patent did not exist, that motivated researchers capable of solving the problem existed in those markets, and possibly more. This is made clear by the panel's reliance on only a U.S. patent as the "blocking patent" and faulting Acorda for not introducing "concrete evidence" to make the existence of unblocked foreign markets "weighty in this case." *Id*. at 52. Similarly, it seems under the panel's view that the challenger need not prove that a patent would have deterred a researcher from relevant research. Indeed, the panel did not credit the defendants for establishing this point,[7] rather it faulted Acorda for "not supply[ing] evidence to make unreasonable th[is] implicit finding." *Id.* at 53. This is especially perplexing given that artisans often engage in research and development without being deterred by patents due to the aforementioned exemptions from infringement liability. It is also at odds with the fact that the defendants in this case developed and sought FDA approval to launch their products

[7] The panel notes only that defendants' expert testified that the Elan patent would have blocked access in the U.S. to the claimed formulation. Slip. op. at 51. But that says nothing about whether an artisan would have been motivated to pursue a solution to the problem, acknowledge the problem, or describe a solution to it.

despite the existence of the Elan "blocking" patent. The defendants' activities are living proof that the commercialization efforts of at least some entities were not in fact deterred, and this should weigh against the panel's new assumptions.

This new general proposition (adopted without evidentiary support) favors patent challengers and does not require their expert witnesses to tie relevant evidence to the facts of the case. This is barely a step from the old 25% royalty rule of thumb that this Court finally rejected in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011). The 25% royalty rule assumed that a licensee would retain 75% of its profits, and permitted parties to present evidence to adjust from that baseline. *Id.* at 1313, 1317. That rule was abandoned because it was an arbitrary, theoretical construct that failed to require the party bearing the burden of persuasion to tie evidence to the particular circumstances of the case. *Id.* at 1315-17 (further explaining the rule's deficiencies under Fed. R. Evid. 702). Even using the 25% rule as a starting point was impermissible because "[b]eginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Id.* This is no different than what the panel has done in creating unsupported presumptions contrary to real world industry practice about how researchers would behave when a purportedly blocking patent exists.

## CONCLUSION

If left to stand, the panel's expansion of the blocking patent doctrine will open the floodgates to courts nullifying valuable evidence of non-obviousness on the flawed premise that foundational pharmaceutical patents have some talismanic blocking power. Innovation and ultimately patients may suffer the consequences. BIO respectfully submits that *en banc* reconsideration of this case is warranted.

Respectfully submitted,

November 7, 2018

Of Counsel:
Brian P. Barrett
Eli Lilly & Co.
Indianapolis, IN 46285
BIO Amicus Committee, Chair

/s/ *Melissa A. Brand*
Melissa Brand
Hans Sauer
Biotechnology Innovation Organization
1201 Maryland Avenue S.W.
Washington, DC 20024
mbrand@bio.org
hsauer@bio.org
*Counsel for Amicus Curiae Biotechnology Innovation Organization*

CERTIFICATE OF FILING AND SERVICE

I, Robyn Cocho, hereby certify pursuant to that, on November 7, 2018 the foregoing **Brief of the Biotechnology Innovation Organization As *Amicus Curiae* Supporting Rehearing *En Banc*** was filed through the NextGen system and served electronically on parties in the case.

Any counsel for Amicus Curiae who are registered users, at the time of filing, will also be served via e-mail notice from the Clerk of Court via the NextGen System.

/s/ Robyn Cocho
Robyn Cocho

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e)

__x__ The brief contains __2,596________________ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

____ The brief uses a monospaced typeface and contains ______ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

x____ The brief has been prepared in a proportionally spaced typeface using Microsoft word in a 14 point Times New Roman font or

____ The brief has been prepared in a monospaced typeface using ___ ____________in a ___ characters per inch_________ font.

11/7/2018 — /s/ Melissa A. Brand
Date — Melissa A. Brand