**2017-2078, -2134**

# United States Court of Appeals for the Federal Circuit

ACORDA THERAPEUTICS, INC.,

*Plaintiff-Appellant*,

ALKERMES PHARMA IRELAND LIMITED,

*Plaintiff-Appellee*,

v.

ROXANE LABORATORIES, INC., MYLAN PHARMACEUTICALS INC., TEVA PHARMACEUTICALS USA, INC.,

*Defendants-Cross-Appellants*.

Appeals from the United States District Court for the District of Delaware in Case Nos. 1:14-cv-00882-LPS, 1:14-cv-00922-LPS, 1:14-cv-00935-LPS, 1:14-cv-00941-LPS, Chief Judge Leonard P. Stark.

**BRIEF OF *AMICUS CURIAE* PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA IN SUPPORT OF PLAINTIFF-APPELLANT'S PETITION FOR REHEARING EN BANC**

DAVID E. KORN
PHARMACEUTICAL RESEARCH
AND MANUFACTURERS OF AMERICA
950 F Street, N.W., Suite 300
Washington, D.C. 20004
(202) 835-3400

SCOTT E. KAMHOLZ
BRIANNE BHARKHDA
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington DC 20001
(202) 662-6000

*Counsel for Amicus Curiae*
*Pharmaceutical Research and Manufacturers of America*

November 7, 2018

## CERTIFICATE OF INTEREST

Counsel for Amicus Curiae Pharmaceutical Research and Manufacturers of America certifies the following:

1. The full name of every party or amicus represented by me is:

Pharmaceutical Research and Manufacturers of America

2. The name of the real party in interest represented by me is:

N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

PhRMA has no parent corporation and no publicly traded company owns 10% of more of its stock. However, its membership includes companies that have issued stock or debt securities to the public. A list of PhRMA's members is available at: www.phrma.org/about/member-companies.

4. The names of all law firms and the partners or associates that appeared for Pharmaceutical Research and Manufacturers of America in proceedings before the district court or are expected to appear in this Court are:

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA: David E. Korn

COVINGTON & BURLING LLP: Scott E. Kamholz, Brianne Bharkhda

Dated: November 7, 2018

By: /s/ Scott E. Kamholz

Scott E. Kamholz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington DC 20001
(202) 662-6000

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ........ 1

ARGUMENT ........ 2

I. THE COURT'S CONSIDERATION OF OBJECTIVE INDICIA OF NONOBVIOUSNESS SHOULD BE *OBJECTIVE*. ........ 3

II. THE MAJORITY'S ARTICULATION OF THE "BLOCKING-PATENT" DOCTRINE COULD STIFLE PHARMACEUTICAL INNOVATION AND INVESTMENT ........ 6

III. THE MAJORITY'S ARTICULATION OF THE "BLOCKING-PATENT" DOCTRINE SHIFTS THE BURDEN AND CREATES A HEIGHTENED STANDARD OF PATENTABILITY FOR SPECIES PATENTS. ........ 9

CONCLUSION ........ 11

CERTIFICATE OF SERVICE ........ 13

CERTIFICATE OF COMPLIANCE ........ 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*,
764 F.3d 1366 (Fed. Cir. 2014) ....................................................................10

*Acorda Therapeutics, Inc v. Roxane Labs., Inc.*,
No. 14-882-LPS, 2017 WL 1199767 (D. Del. Mar. 31, 2017) ..................*passim*

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) ....................................................................11

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008) ........................................................................9

*Bilski v. Kappos*,
561 U.S. 593 (2010)..........................................................................................9

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ......................................................................5

*Galderma Labs., LP v. Tolmar, Inc.*,
737 F.3d 731 (Fed. Cir. 2013) ....................................................................4, 6

*Gen. Elec. Co. v. Int'l Trade Comm'n*,
685 F.3d 1034 (Fed. Cir. 2012) ....................................................................11

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)............................................................................................11

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ..................................................................4, 9

*Merck Sharp & Dohme Corp. v. Hospira, Inc.*,
874 F.3d 724 (Fed. Cir. 2017) ....................................................................5, 9

*Millennium Pharm., Inc. v. Sandoz Inc.*,
862 F.3d 1356 (Fed. Cir. 2017) ......................................................................8

*Prometheus Labs., Inc. v. Roxane Labs., Inc.*,
805 F.3d 1092 (Fed. Cir. 2015) ....................................................................10

*Utter v. Hiraga*,
845 F.2d 993 (Fed. Cir. 1988) ....................11

**Statutes**

35 U.S.C. § 271(e)(1)....................9

Cooperative Research and Technology Enhancement (CREATE) Act of 2004, Pub. L. 108-453, 118 Stat. 3596 (2004) ....................7

**Other Authorities**

E. Berndt et al., *The Impact of Incremental Innovation in Biopharmaceuticals: Drug Utilisation in Original and Supplemental Indications*, 24 Suppl. 2 Pharmacoeconomics 69-86 (2006) ....................6

Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy*, Ch. 2 (Oct. 2003)....................6

Robert Merges, *Intellectual Property Rights and Bargaining Breakdown: The Case of Blocking Patents*, 62 TENN. L. REV. 75 (1994) ....................7

## INTEREST OF *AMICUS CURIAE*

The Pharmaceutical Research and Manufacturers of America ("PhRMA") represents leading biopharmaceutical research companies devoted to discovering and developing medicines.[1] Those efforts produce the cutting-edge treatments that save, prolong, and improve the quality of the lives of countless individuals around the world every day. Over the past decade, hundreds of new medicines have been approved by the Food and Drug Administration ("FDA"). In view of the risky biopharmaceutical research and development process, which has a significant failure rate, and the substantial requirements of the FDA to demonstrate safety and efficacy of new products, those results are not obtained cheaply. Since 2000, PhRMA member companies have invested more than $600 billion in the search for new treatments and cures, including an estimated $71.4 billion in 2017 alone.

PhRMA members depend heavily on a robust system of patent rights and a fair system for adjudicating their validity. PhRMA seeks to advance public policies that foster innovation in pharmaceuticals, including by ensuring adequate patent protection to enable and incentivize its members' substantial investments in research and development. To those ends, PhRMA seeks to remove barriers that may arise in

[1] A complete list of PhRMA members is available at http://www.phrma.org/about/members (last visited Nov. 7, 2018). Members include Alkermes plc., a corporate affiliate of Plaintiff-Appellee, and Teva US Specialty Medicines, a corporate affiliate of Defendant-Cross-Appellant.

the nation's systems, including the patent laws, for protecting the intellectual property of its members—including as *amicus curiae* before this Court.[2]

## ARGUMENT

Ampyra®—the commercial embodiment of Acorda's patents—was a commercial success that satisfied a long-felt need for a treatment for one of the "most devastating symptoms" of multiple sclerosis where others failed to develop similar treatments. *See Acorda Therapeutics, Inc v. Roxane Labs., Inc.*, No. 14-882-LPS, 2017 WL 1199767, at *17, *36-41 (D. Del. Mar. 31, 2017). At trial, Acorda established the requisite nexus for the objective indicia of commercial success, long felt need, and failure of others. *Id.* at *36-41. Nonetheless, the panel majority held that these objective indicia of nonobviousness could be ignored because Ampyra® also practices the claims of an earlier-issuing, dominating patent—or so-called "blocking patent"—developed by Elan Corporation PLC ("Elan"), and licensed to Acorda. *See* Op. at 51; *Acorda*, 2017 WL 1199767, at *39.

[2] No party's counsel authored any portion of this brief. The above-listed attorneys from Covington & Burling LLP authored this brief, with input from PhRMA and its members. Covington attorneys have provided legal advice to Plaintiff-Appellant Acorda Therapeutics, Inc. ("Acorda") in other matters involving the patents-in-suit, but do not represent Acorda in this appeal and did not represent Acorda in the trial court. No party to this appeal or any person other than PhRMA, certain of its members not including Alkermes plc. or Teva US Specialty Medicines, or its counsel contributed any money that was intended to fund preparing or submitting the brief.

The majority's application and expansion of the "blocking-patent" doctrine is legally and logically unsound. It heightens the patentability standard for species patents by incorrectly assuming that a "blocking patent" will deter innovation. The Elan patent did not deter innovation or investment. The majority's decision may.

The Federal Circuit should grant Acorda's petition for rehearing *en banc* to correct the majority's improper treatment of objective indicia of nonobviousness. This Court should make clear that the objective indicia analysis should be fact-specific and evidence-based. Objective indicia may only be discounted by a "blocking patent" when there is concrete evidence breaking the connection between the objective indicia and the features of the patented invention, not based on an unsupported belief in the "premise of diminished incentives" plus "weak or ambiguous" "evidence . . . about the significance of the deterrence" and "a background sense of the general realities in the area at issue." Op. at 50.

## I. THE COURT'S CONSIDERATION OF OBJECTIVE INDICIA OF NONOBVIOUSNESS SHOULD BE *OBJECTIVE*.

The foundation of the "blocking-patent" doctrine is the assumption that the threat of infringing a "blocking patent" deters investment activity in technology claimed by the "blocking patent"—the "blocked space"—by non-owners or non-licensees. Op. 49 ("[A] blocking patent diminishes possible rewards . . . therefore reducing incentives for innovations in the blocked space by non-owners and non-licensees of the blocking patent"). Based on this theory, commercial success has

been discounted in cases where "others were legally barred from commercially testing" the invention, even in the absence of supporting evidence that anyone was precluded or dissuaded from research investment. *See Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1377 (Fed. Cir. 2005) (*Merck I*); *Galderma Labs., LP v. Tolmar, Inc.*, 737 F.3d 731, 740-41 (Fed. Cir. 2013). The *Acorda* litigation demonstrates, however, that this underlying assumption is a fallacy.

The undisputed record evidence shows that Elan's "blocking patent" did not deter competitors from making commercial investments in the "blocked space." At least three different generic competitor companies, Roxane, Mylan, and Teva, invested their resources in products that infringed the Elan Patent. *See* Op. at 4. Even the possibility of an injunction, which was ultimately granted, did not deter these companies from pursuing the attractive commercial prospect of a 4-aminopyridine ("4-AP") product. *Id.* This alone is "evidence to make unreasonable the implicit finding that securing freedom from blocking patents in advance is likely important to pharmaceutical research investments." *Id*. at 53.

The Elan Patent also did not deter other innovators. Indeed, Acorda invested heavily in advancing a 4-AP product to improve walking in patients with multiple sclerosis despite Elan's failure to develop 4-AP as a commercial product and despite Elan's Patent—and developed the first FDA-approved commercial embodiment of any of the patents. The fact that Acorda recognized the promise of the 4-AP

technology developed by Elan and obtained a license to operate in the "blocked space" before doing so does not change the fact that Acorda was not deterred by the patent's existence. *See Merck Sharp & Dohme Corp. v. Hospira, Inc.*, 874 F.3d 724, 730 (Fed. Cir. 2017) (*Merck II*) ("Merck's evidence of commercial success should not have been discounted simply because of the existence of another patent of which Merck was the exclusive licensee.").

Rehearing *en banc* is necessary because the Court's consideration of objective indicia of nonobviousness should be *objective*. Evidence, not a court's assumptions or its "background sense of the general realities in the area at issue" (Op. 50), should guide the analysis. As this Court previously explained, "[i]t is . . . the task of the challenger to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention . . . . [C]onjecture [is] insufficient." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988). Courts should not disregard compelling objective indicia of nonobviousness based on the unproven, and in this case demonstrably incorrect, assumption that a "blocking patent" deters research investment in the "blocked space." Here, the evidence is that the Elan Patent did not deter investment.

## II. THE MAJORITY'S ARTICULATION OF THE "BLOCKING-PATENT" DOCTRINE COULD STIFLE PHARMACEUTICAL INNOVATION AND INVESTMENT.

In light of the majority's decision, a company faced with the choice of whether to invest its limited resources in further developing a patented therapeutic may be reluctant to do so. It may fear that patents claiming improvements resulting from such research will be judged by the majority's harsher validity standard: one in which objective indicia can be discounted or disregarded *per se* without supporting record evidence. Such a company may well eschew incremental research, however likely to generate useful improvements in a relatively short time, in favor of more speculative, but more patentable, work. The majority's decision thus aggravates the risk that promising lines of research may be abandoned before their full potential is realized. "In the field of medicaments, the denial of patentability for improvements is a disincentive to the development of such improvements. The losers are those afflicted with disease." *Galderma Labs.*, 737 F.3d at 742 (Newman, J. dissenting).

The pharmaceutical industry relies on patents to protect research and development investments. Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy*, Ch. 2 at 1 (Oct. 2003) ("Pharmaceutical companies . . . rely on patents to prevent free riding, recoup their R&D investments, and learn about new technological breakthroughs."). Pharmaceutical innovation is frequently cumulative and incremental. *See* E. Berndt

et al., *The Impact of Incremental Innovation in Biopharmaceuticals: Drug Utilisation in Original and Supplemental Indications*, 24 Suppl. 2 Pharmacoeconomics 69-86, 70-71 (2006). Patents in the pharmaceutical industry are often directed to such cumulative innovations, for example, novel delivery systems, new forms of an active compound, new methods of using or making existing compounds, and novel combinations of active ingredients.

The majority's "blocking-patent" analysis could stifle just this kind of innovation by disincentivizing pharmaceutical companies from building on their own previously patented work and the previously patented work of others. Companies will have less incentive to do so if later patents meant to protect them are subjected to a harsher obviousness analysis, in which objective indicia are disregarded. Moreover, companies often work together through licensing and collaboration agreements to work toward advances in the art, and the law has evolved to encourage such joint activity. *See, e.g.*, Cooperative Research and Technology Enhancement (CREATE) Act of 2004, Pub. L. 108-453, 118 Stat. 3596 (2004). *See* Robert Merges, *Intellectual Property Rights and Bargaining Breakdown: The Case of Blocking Patents*, 62 TENN. L. REV. 75, 81 (1994) (explaining that "blocking patents" "facilitate[] improver-pioneer bargaining" by "balanc[ing] incentives for pioneers with incentives for independent inventors to push pioneering technology forward"). As in this case, another innovator or a

development partner may find a way to make an existing compound into an effective pharmaceutical product where others have tried and failed. *See also Millennium Pharm., Inc. v. Sandoz Inc.*, 862 F.3d 1356 (Fed. Cir. 2017) (crediting commercial success, long felt need, and unexpected results, despite the existence of a prior dominating patent that covered the commercial embodiment (Velcade®) and explaining that "despite its known efficacy against various cancers, bortezomib never achieved FDA approval" prior to Velcade® because of instability, degradation, and solubility problems, which were overcome by the invention of the later patent).

The *Acorda* case illustrates how collaborative and incremental innovation in the pharmaceutical industry can, and should, work. Acorda licensed the Elan Patent in order to continue to work toward clinical implementation of a 4-AP formulation. *Acorda*, 2017 WL 1199767, at *37. Acorda "expend[ed] considerable time and money on licensing a formulation and conducting clinical trials" and developed its own inventions. *Id*. Rather than deterring Acorda, Acorda recognized the value of Elan's invention, licensed it, and built on it.

## III. THE MAJORITY'S ARTICULATION OF THE "BLOCKING-PATENT" DOCTRINE SHIFTS THE BURDEN AND CREATES A HEIGHTENED STANDARD OF PATENTABILITY FOR SPECIES PATENTS.

The majority's decision untethers the regulatory exclusivity component relied on in *Merck I* and *Merck II* from the "blocking-patent" doctrine,[3] pinning its reasoning instead to the mere existence of a "blocking patent." Op. 53. In the wake of the majority's decision, it is unclear whether the doctrine is limited to pharmaceutical patents that cover products subject to regulatory exclusivity or would apply to all genus-species patents. Either way, the flaws in the doctrine are laid bare.

If the majority's decision is limited to pharmaceutical patents,[4] it is improper because United States patent law provides a uniform set of rules that apply to all areas of technology. *In re Bilski*, 545 F.3d 943, 960 (Fed. Cir. 2008) *aff'd sub nom.*, *Bilski v. Kappos*, 561 U.S. 593 (2010). Assuming that the majority's decision is not

---

[3] As explained in *amicus curiae*'s merits brief (Doc. No. 72, Amicus Br. at 3-8), the reasoning of *Merck I* is flawed because the regulatory exclusivity on which the Court relied only precludes FDA from accepting for review an abbreviated new drug application ("ANDA") or 505(b)(2) application for a generic version of a reference listed drug—copycat products. It does not preclude others from independently developing and patenting a related improvement, licensing and further developing the original invention, developing or testing improvements under the safe harbor provision of 35 U.S.C. § 271(e)(1), or practicing the invention outside the United States. Moreover, the reasoning from *Merck I* does not apply to the facts of the *Acorda* litigation because there is no earlier 4-AP product with regulatory exclusivity.

[4] *Amicus curiae* is not aware of any cases applying the "blocking patent" doctrine outside the pharmaceutical arts.

limited to pharmaceutical patents, it establishes a heightened standard of patentability that applies to species patents generally and shifts onto the owner of a species patent the burden of showing that a particular "blocking patent" did not deter research or investment in the species invention. *See* Op. at 3 ("The later Acorda patents claim species of the Elan patent's genus claims . . . ."); *id.* at 53 ("Acorda did not supply evidence to make unreasonable the implicit finding that securing freedom from blocking patents in advance is likely important to pharmaceutical research investments."). Thus, objective indicia of nonobviousness for all species patents, from electronics to mechanical patents to pharmaceuticals, can be discounted on the assumption that an earlier patent owned or licensed by the patentee deterred research investment by unknown competitors.

This result contrasts starkly with this Court's precedent, which has recognized the patentability and benefits of continued innovation even when there is an existing genus patent.[5] *See, e.g.*, *Prometheus Labs., Inc. v. Roxane Labs., Inc.*, 805 F.3d 1092, 1098 (Fed. Cir. 2015) ("To be sure, 'it is well-settled that a narrow species can be non-obvious and patent eligible despite a patent on its genus.'" (quoting *AbbVie Inc.*

---

[5] The disregard of objective indicia, such as long-felt need and the failure of others, based on the purported deterrence of a "blocking patent" is also paradoxical when the patent challenger asserts the "blocking patent" as invalidating prior art to the later invention. If a "blocking patent" deters research into the later invention, then it should also destroy the motivation to combine the "blocking patent" with other references in the obviousness analysis.

*v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1379 (Fed. Cir. 2014))); *Gen. Elec. Co. v. Int'l Trade Comm'n*, 685 F.3d 1034, 1046 (Fed. Cir. 2012) ("a separately patented invention may indeed be within the scope of the claims of a dominating patent"); *Utter v. Hiraga*, 845 F.2d 993, 998 (Fed. Cir. 1988) ("There is no inconsistency in awarding a generic count to one inventor, while awarding a patentably distinct species count to another"). More importantly, it is also in conflict with Supreme Court precedent as it undermines the objective-indicia prong of the *Graham* test for any species or "improvement" invention in any field. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

The patent laws do not single-out species or "improvement" patents for a heightened standard of obviousness, and it is improper for this Court to create such a standard. "In practice, all inventions are for improvements; all involve the use of earlier knowledge; all stand upon accumulated stores of the past." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015) (internal quotation marks and citation omitted). The nonobviousness of "improvement" inventions should be judged no more harshly than the nonobviousness of other patentable inventions.

## CONCLUSION

*Amicus curiae* urges this Court to grant Acorda's petition for rehearing *en banc*, and make clear that objective indicia of nonobviousness are available for all patents, including species patents, absent concrete evidence negating nexus.

Dated: November 7, 2018

Respectfully submitted,

/s/ Scott E. Kamholz
Scott E. Kamholz
Brianne Bharkhda
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington DC 20001
(202) 662-6000

David E. Korn
PHARMACEUTICAL RESEARCH
AND MANUFACTURERS OF AMERICA
950 F Street, N.W., Suite 300
Washington, D.C. 20004
(202) 835-3400

*Counsel for Amicus Curiae Pharmaceutical Research and Manufacturers of America*

## CERTIFICATE OF SERVICE

I, Brianne Bharkhda, hereby certify that, on November 7, 2018, the foregoing document was filed and served using the CM/ECF system.

/s/ Brianne Bharkhda

Brianne Bharkhda
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington DC 20001
(202) 662-6000

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29 and 32 and Federal Circuit Rule 35, I certify the following:

1. The brief complies with the type-volume limitations of Federal Circuit Rule 35(g). This brief contains 2586 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

2. The attached petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally space typeface using Microsoft Word 2016 in 14-point Times New Roman type style.

Dated: November 7, 2018

By: /s/ Scott E. Kamholz

Scott E. Kamholz
Brianne Bharkhda
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington DC 20001
(202) 662-6000